UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  1:18-MJ-01581-SCY |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| DOUGLAS D. SMITH, | ) | Wednesday, May 9, 2018 |
| | ) | ( 9:35 a.m. to  9:51 a.m.) |
| Defendant. | ) | (10:57 a.m. to 11:02 a.m.) |


PRELIMINARY / DETENTION HEARING

BEFORE THE HONORABLE STEVEN C. YARBROUGH,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:                JAMES BRAUN, ESQ.
                             U.S. Attorney's Office
                             District of New Mexico
                             P.O. Box 607
                             Albuquerque, NM 87103


For Defendant:               THOMAS B. JAMESON, ESQ.
                             Office of the Federal Public Defender
                             First State Bank Building
                             111 Lomas Boulevard NW, Suite 501
                             Albuquerque, NM 87102


U.S. Probation/Pretrial: S. Day / A. Galaz

Court Reporter:              Recorded; Liberty - Rio Grande

Clerk:                       K. Dapson

Transcribed by:              Exceptional Reporting Services, Inc.
                             P.O. Box 18668
                             Corpus Christi, TX 78480-8668
                             361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| TRAVIS TAYLOR | 4 | 9 | | |

1    **Albuquerque, New Mexico; Wednesday, May 9, 2018; 9:35 a.m.**

2                          **(Call to Order)**

3              **THE CLERK:**  *United States of America versus Douglas*

4    *Smith*.

5              **MR. BRAUN:**  Good morning, Your Honor.  James Braun on

6    behalf of the United States.

7              **THE COURT:**  Good morning.

8              **MR. JAMESON:**  Good morning, Your Honor.  Tom Jameson.

9    I'm here on behalf of Mr. Smith, who is making his way over.

10             **THE COURT:**  Good morning.

11             **MR. JAMESON:**  Your Honor, I think we're going to be

12   proceeding to a preliminary hearing.

13             **THE COURT:**  That's fine.  You can just have a seat

14   right there, Mr. Smith.  All right, we were scheduled -- are

15   scheduled today for a preliminary hearing and a detention

16   hearing.  Is the Government ready to proceed?

17             **MR. BRAUN:**  Yes, Your Honor.

18             **THE COURT:**  All right.  You can go ahead and call

19   your first Witness.

20             **MR. BRAUN:**  United States would call FBI Special

21   Agent Travis Taylor.

22             **TRAVIS TAYLOR, GOVERNMENT'S WITNESS, SWORN**

23   //

24   //

25   //

**DIRECT EXAMINATION**

1

**BY MR. BRAUN:**

2

3    Q    Please state your name.

4    A    My name is Travis Taylor.

5    Q    How are you employed?

6    A    By the FBI as a Special Agent.

7    Q    How long have you been a Special Agent with FBI?

8    A    Eight months.

9    Q    What is your prior Law Enforcement experience?

10   A    I was an FBI analyst for three-and-a-half years before

11   that.

12   Q    Okay.  And where are you stationed?

13   A    Santa Fe, Resident Agency (phonetic).

14   Q    What is your role in this case of _United States versus_

15   _Douglas Smith_?

16   A    I am the Case Agent.

17   Q    And how are you aware of the facts that are recited in the

18   affidavit you prepared in this case?

19   A    On Sunday, the FBI duty agent was notified of the events

20   that occurred on May 5th.  There was a complaint.

21   Q    Actually, before you go into the facts, if you could just

22   tell the Court how you're aware of all the facts that are in

23   your affidavit.

24   A    Through an interview of Douglas Smith that occurred on

25   Monday, as well as an interview that occurred with the

1  Detective of the Espanola Police Department.  And that was

2  passed to us.

3  Q    And so what is your understanding, based on your

4  investigation and your personal involvement in this case, of

5  what happened with regard to the Defendant on May 5th, 2018?

6  A    Would you like me to talk about what -- the events that

7  occurred on May 5th and how --

8  Q    Yes.

9  A    Okay.  So on May 5th, approximately 1:00 a.m., Douglas

10  Smith walked out to his porch to a noise that he heard.  At

11  that time, he saw a shadow by his camper trailer, fired a shot

12  to the left of the camper trailer.  And the shadow moved to --

13  began to move and run to the left in that direction.  And more

14  shots were fired in that direction.  Afterward, Douglas Smith

15  walked off his porch, went counterclockwise on the property, so

16  to the left, and identified that there was a human being laying

17  there on the ground; continued to walk to the front of the

18  property.  On the way back, a tenant of his identified that

19  there was a -- that he had shot somebody, that he should call

20  911.  Douglas Smith called 911.  And that is when Espanola

21  Police Officer showed up on scene, detained him, did an

22  investigative sweep, and then was transported to Espanola

23  Station.  And that's when the Detective showed up on the scene

24  to collect evidence, which he collected a pistol, a 22

25  Revolver.  After evidence collection was conducted, Espanola

Taylor - Direct / By Mr. Braun                6

1   Detective went back to the station and interviewed --

2   mirandized and interviewed Douglas Smith, in which he gave

3   statements to the events that occurred that night.

4   Q    And in that statement, did it recite that facts that you

5   just testified to, as far as shooting towards the figure that

6   night --

7   A    Yes, sir.

8   Q    -- or that morning?

9   A    And then on Monday morning, two agents from the FBI went

10  to Tierra Amarilla Prison to pick up Douglas Smith and bring

11  him to the Santa Fe office to be interviewed by myself and

12  another agent.  Approximately 12:30, we re-interviewed Douglas

13  Smith, gave him his advice of rights.  He acknowledged he

14  understood his advice of rights and waived them.  We continued

15  to interview.  He reiterated me the same facts that he had

16  talked to the Espanola Detective about.  And in addition, he

17  talked about several incidents like this where he had fired

18  shots at people in his backyard.  And then -- and so he also

19  spoke about those incidents and some of the -- two of those

20  incidents being reported to Police, stated there was five

21  incidents total that he could remember at the time, where

22  someone was in his backyard.

23  Q    Okay.  Based on your investigation, what was the cause of

24  death for the victim?

25  A    Per -- I had a conversation with the Detective at

1    Espanola.  And he stated that OMI (phonetic) found one gunshot

2    wound to the upper left temple of the victim, a 22-caliber

3    round that was still lodged within -- there was no exit would,

4    still lodged within the body.

5    Q    Okay.  And what is your understanding of the Indian status

6    of the victim?

7    A    Talked to Santa Clara Governor.  Governor verbally

8    confirmed that she is an enrolled member, and that -- confirmed

9    that the land was Santa Clara Pueblo.  But I have an

10   outstanding certificate of Indian blood and land status to

11   verify those verbal confirmations by the Governor.

12   Q    So that would be part of your ongoing investigation?

13   A    Yes, sir.

14   Q    Okay.  But based on your investigation to date, the victim

15   is an enrolled member of Santa Clara Pueblo?

16   A    Yes, sir.

17   Q    Is the Defendant an Indian under Federal Law?

18   A    I have only seen messages that he was a non-Indian.  But

19   in the NCIC reports the -- there was nothing stating race.

20   Q    Okay.  And do you recognize the Defendant, Douglas Smith,

21   here in the courtroom this morning?

22   A    Yes, sir.

23   Q    Would you please identify him?

24   A    Right there, sir (indicating).

25   Q    Okay.  In the red jumpsuit --

Taylor - Direct / By Mr. Braun                    8

1   A    Red jumpsuit.

2   Q    White hair?

3   A    Yep.

4   Q    Okay.  And if you could just describe in a little more

5   detail for the Court, how the Defendant explained firing these

6   shots at the victim?

7   A    So the Defendant made statements to the Detective and I on

8   Monday, that he came out to his porch the third time after

9   hearing noise that night.  There was two other times; didn't

10  see anything.  The third time he came out, he saw a shadowy

11  figure by his camper-trailer -- or by his deceased mother's

12  camper-trailer that is adjacent to the garden and the porch.

13  The shadowy figure crouched down.  At that point, he stated he

14  feared that he was in danger.  When asked if that shadowy

15  figure made any movements toward him or had anything in their

16  hand, stated that he did not see anything, nor did they move

17  towards him.  So he fired a shot to the left of the camper-

18  trailer.  After the first shot, the shadowy figure moved in

19  that direction and he fired -- continued to fire shots in that

20  same general direction.

21  Q    So the subsequent shots that were fired were in the

22  direction in which the figure was moving?

23  A    Correct.

24          **MR. BRAUN:**  No further questions.

25          **THE COURT:**  All right.  Cross exam?

**CROSS EXAMINATION**

1

**BY MR. JAMESON:**

2

3    Q    After talking to the -- what was the name of the Detective

4    from Espanola Police Department?

5    A    Byron Abata (phonetic).

6    Q    Abata, okay.  You obviously talked to Mr. Abata, right?

7    A    Over the phone briefly on Monday.

8    Q    So Mr. Abata told you shortly after the event that

9    Mr. Smith called 911 to report that somebody had been shot on

10   his property?

11   A    A tenant of his suggested he called 911.  He said he was

12   going to.  And that's when he called 911 and talked to Dispatch

13   at that point.

14   Q    So Mr. Smith called 911 to report that someone was shot?

15   A    As far as I know.

16   Q    Okay.  And that was soon after, as far as we know, the

17   incident where somebody was shot?

18   A    I believe so, based on the time of events.

19   Q    And Mr. Abata told you that when he arrived that Mr. Smith

20   left the firearm on the ground and was away from the firearm,

21   and the firearm was not present on his body or in his vicinity

22   when the Police Officer arrived?

23   A    Correct.

24   Q    And Detective Abata told you that after properly being

25   Mirandized that Mr. Smith agreed to speak with them?

Taylor - Cross / By Mr. Jameson                    10

1   A     Correct.

2   Q     And he told you essentially the things that you just

3   testified to; essentially?  I mean I'm not --

4   A     Yes, sir.

5   Q     -- picking over.

6   A     We didn't discuss it.  I read his report.

7   Q     Did Detective Abata tell you that Mr. Smith was

8   cooperative?

9   A     We didn't discuss that.

10  Q     Did you have any information that Mr. Smith attempted to

11  flee?

12  A     Per the report, I did not see any of that information.

13  Q     Do you have any knowledge from any source that Mr. Smith

14  attempted to flee the scene after the incident?

15  A     Per the report, I have no knowledge to suggest that.

16  Q     Okay.  Have you been to the -- physically the scene of

17  whatever happened last Saturday?

18  A     I have not yet.

19  Q     Okay.  Is it your -- it's your understanding, isn't it,

20  that this is what used to be a working motel, that's now semi-

21  working?

22  A     From what Mr. Smith told me, it's still an operational

23  motel; that's all I know.

24  Q     And it's located in along the main business district in

25  Espanola, New Mexico?

1   A    That I am not aware of.

2   Q    Okay.  Do you have any reason to believe it's not?

3   A    I do not.

4   Q    The reason I ask you this is, oftentimes, when we deal

5   with Indian country, we're dealing with places geographically

6   that aren't cities or communities that we could drive through

7   on our way, correct?

8   A    Correct.

9   Q    Okay.  So it's a little bit different slant on Indian

10  country than oftentimes we deal with.  So you interviewed

11  Mr. Smith, I believe it was this past Monday, correct?

12  A    Correct.

13  Q    And after properly Mirandizing him, he waived his rights?

14  A    Yes.

15  Q    And he spoke with you?

16  A    Yes.

17  Q    Was he cooperative?

18  A    Yes.

19  Q    Did he -- did you encounter any problems in your interview

20  with him?

21  A    No.

22  Q    Did he appear to be deceptive, just in your impression,

23  when you were speaking with him?

24  A    No.

25  Q    Did you do any background investigation into who he is or

1   what he might have been involved in in his life?

2   A    We ran and NCIC check; and didn't identify -- the only

3   criminal history we identified was an intoxicating driving

4   record several decades ago.

5   Q    That was in 1975?

6   A    Yes.

7   Q    Are you aware that there are other people who live on the

8   property where the incident took place?

9   A    I believe Mr. Smith told me there was three tenants of his

10  at the time.

11  Q    And did he tell you his brother also lives in a residence

12  that's on the same property?

13  A    Yes.

14  Q    And Mr. Smith told you he's lived there since he was 15

15  years old?

16  A    He said he's moved around a bit out of New Mexico, so I'm

17  not sure if he's been there.  From my understanding, he was not

18  there the entirety of the time, but he has been there recently.

19  Q    And it's to your best knowledge that Mr. Smith's

20  approximately 68 years old?

21  A    Correct.

22  Q    During the course of your interview, Mr. Smith told you

23  that starting last November that his -- the property had been

24  the scene of a number of break-ins or attempted break-ins;

25  didn't he?

Taylor - Cross / By Mr. Jameson                          13

1   A    Yes, sir.

2   Q    And he told you at least one of those incidents within the

3   last six months that he was involved with a physical

4   altercation with one of the people who was attempting to break

5   in on his property?

6   A    Yes, sir

7   Q    He told you that on Friday night or Saturday morning when

8   this incident happened that he was scared?

9   A    Yes, sir.

10          **MR. JAMESON:**  Nothing further.

11          **THE COURT:**  Redirect?

12          **MR. BRAUN:**  No, thank you, Your Honor.

13          **THE COURT:**  Okay.  Would Government like to make any

14  argument, or you would just rest on the testimony?

15          **MR. BRAUN:**  We would rest on the testimony.

16          **THE COURT:**  Mr. Jameson?

17          **MR. JAMESON:**  We have no argument at this time.

18          **THE COURT:**  (Indisc.) Witness be excused?

19          **MR. BRAUN:**  Yes, Your Honor.

20          **THE COURT:**  All right, you can go ahead and step

21  down, sir.  Do you have other witnesses?

22          **MR. BRAUN:**  No, Your Honor.

23          **THE COURT:**   All right.  Any witnesses, Mr. Jameson?

24          **MR. JAMESON:**  No, sir.

25          **THE COURT:**  Okay.  With respect to the probable cause

1   determination, I am finding that there's probable cause to

2   support the criminal complaint.  There is sufficient evidence

3   that this did occur in Indian country.

4        I know it's a difficult area in that part of the

5   state.  But the Agent did testify that he had checked, he

6   talked to the Governor, that this is -- part of that area is

7   Indian country, or that part of the Espanola region is Indian

8   country, that the victim in this case is also Indian; and the

9   evidence that we have thus far is that Mr. Smith isn't.

10        And so the jurisdictional elements, at least there's

11   probable cause to support the jurisdictional elements at USC

12   1152.  With regard to the charge in this case, based on the

13   alleged statements that Mr. Smith made, there is probable cause

14   to believe that he is the person that shot the victim in this

15   case.

16        I understand what the defenses may be going forward;

17   but at least at this point, there's probable cause to support

18   each of the elements related to 18 United States Code; Section

19   1111.  So I will find probable cause based on the Agent's

20   testimony here today.

21        I know we have an issue with detention.  And my

22   understanding is that Mr. Smith hasn't been interviewed.  Let

23   me ask if this would work.

24        I've got a proposal; it would be, we've got some

25   change of pleas.  Whether -- I was going to see if it works for

1   everybody, including Pretrial Services, if Mr. Smith could do

2   an interview while we're doing the change of pleas; and then we

3   could see what information we have after that.

4           And then if we have enough -- if Pretrial Services

5   feels comfortable making an oral report, we can go forward; if

6   they don't, then we can cross that bridge when we get there and

7   see what the next steps should be.

8           **MR. JAMESON:**  From our point of view, that would be

9   completely acceptable.

10          **THE COURT:**  All right.  Any objection in doing that,

11  Mr. Braun?

12          **MR. BRAUN:**  No, Your Honor.

13          **THE COURT:**  All right.  Would Pretrial Services be

14  able to do that while we're doing these change of pleas?

15          **PRETRIAL SERVICES:**  Yes, Your Honor.  If we can ask

16  some Marshals to bring him down --

17          **THE COURT:**  Okay.

18          **PRETRIAL SERVICES:**  -- we can interview him right

19  away.

20          **THE COURT:**  Okay.  Will the Marshals be able to do

21  that?  And if you need a recess, we can take a recess while you

22  move --

23          **MARSHAL:**  No, that's --

24          **THE COURT:**  -- him down and come back in.

25          **MARSHAL:**  -- it'll be find, Judge.

1          **THE COURT:**  Okay.

2          **MARSHAL:**  (Indisc.) [9:50:44].

3          **THE COURT:**  All right.  Thank you.  Let's go ahead

4    and try to do that.

5          **MR. JAMESON:**  Just for (indisc.) purposes, would you

6    guess this at least an hour from now?

7          **THE COURT:**  Yeah.  I think that it could be before.

8    It could be sooner than an hour.  But if you have somewhere to

9    be or things to do, we can just plan on it being at least an

10   hour.  And if we finish earlier, I can could come down.  I

11   don't think it would be --

12         **MR. JAMESON:**  I'm available.  What I meant is I

13   haven't really been to my office this morning in any

14   significance.  If I could go back to my office, I'll head back

15   here in about 45 minutes, and we'll see how we're doing, if

16   that's acceptable with you.

17         **THE COURT:**  Okay.  That's fine.  Does that work for

18   you, Mr. Braun?

19         **MR. BRAUN:**  Yes, Your Honor.

20         **THE COURT:**  Okay.  That -- I think that makes more

21   sense than trying to come back again later this afternoon or

22   doing something.  We have the Agents here.  And I'm sure

23   Mr. Braun can find a way to do some work if he's waiting around

24   while we're in a recess.

25         **MR. BRAUN:**  I'll keep myself busy.

1          **THE COURT:**  All right.  Sounds great.

2          **MR. JAMESON:**  Thank you, Judge.

3          **THE COURT:**  I know we've got his change of plea set.

4    The Attorneys need to talk to the Client.  Let me ask, how much

5    time do you think you need, Counsel?

6          **MR. JAMESON:**  No more than five minutes, Your Honor.

7          **THE COURT:**  Okay.  Let's go ahead and take a five-

8    minute recess.  That'll give Counsel a chance to talk to his

9    Clients.  Then we'll come back and handle these.  All right?

10         **MR. JAMESON:**  Thank you, Judge.

11         **THE COURT:**  Thank you.

12      **(Recess taken from 9:51 a.m. to 10:57 a.m.)**

13         **THE COURT:**  All right.  You can go ahead and step up

14   next to your Attorney there, Mr. Smith.  All right.  And

15   Counsel, go ahead and enter their appearances.

16         **MR. BRAUN:**  James Braun on behalf of the United

17   States.

18         **MR. JAMESON:**  Tom Jameson on behalf of Mr. Smith.

19         **THE COURT:**  All right.  So has Mr. Smith had a chance

20   to be interviewed by Pretrial Services now?

21         **MR. JAMESON:**  He has, Your Honor.  I've spoken with

22   Mr. Galaz.  And I booked -- well, Mr. Galaz can speak for

23   himself.

24         **THE COURT:**  Okay.  Yes, Anthony Galaz with Pretrial

25   Services.  Yes, what's your recommendation?

1        **MR. GALAZ:**  Your Honor, I did talk with Mr. Smith.  I

2   also collaborated some personal with his brother.  At this

3   point, I do think there are conditions that can be fashioned to

4   mitigate a risk of non-appearance and danger to the community.

5           And at this point, our recommendation would be to

6   release him to (indisc.) La Posada halfway house with Pretrial

7   supervision.  I do think I'm not comfortable at this point

8   recommending he go back home.  He is -- he does own several

9   firearms.

10          Just at this point, (indisc.) comfortable (indisc.)

11   but I do think he could be released to La Posada and we could

12   supervise him, and then sort of get him stabilized, and then

13   maybe have him go through an assessment, make sure there's no

14   certified mental health or substance issues.

15          **THE COURT:**  All right, thank you.  Mr. Braun?

16          **MR. BRAUN:**  We have no objection to that, Your Honor.

17          **THE COURT:**  Okay.  So my inclination, Mr. Jameson --

18   and of course I'll let you address anything; but just so you'll

19   know what my inclination is, is to go ahead and release him to

20   third-party custody at a halfway house for now.

21          I know we're doing this on a short timeline.  So it

22   sounds like Pretrial Services might need to get us some more

23   information.  If Pretrial Services gathers that additional

24   information and the recommendation changes, so that Mr. Smith

25   could be released to something other than the halfway house, I

1     would go ahead and consider that as well at that time.

2            But my inclination today would be to release him to

3     the halfway house, based on the recommendation of Pretrial

4     Services.

5            **MR. JAMESON:**  Your Honor, we don't object to that.

6     Sure as you might guess, it's Mr. Smith's hope that he can go

7     back home.  (glitch in audio) to do this today, but I have done

8     this too long.

9            I understand that no one in this system has actually

10    seen the residence; nobody's walked through it.  There are some

11    firearms there.  I think it's reasonable under the

12    circumstances for Pretrial to work with him a little bit for us

13    to have the firearms removed from the home by his brothers and

14    give Pretrial an opportunity to look at the residence before

15    they can weigh in on whether they think it's an appropriate

16    residence or not.

17           We're intending to come back and see once Pretrial

18    has had an appropriate amount of time to think about this and

19    investigate it.  But at this point, we'd be happy to be -- for

20    your recommendation or your release to the halfway house until

21    something else can be fashioned.

22           **THE COURT:**  Okay.  That's what I'll do.  And just for

23    the record, I will note that the factors I have to consider,

24    the nature of the offense, it's clearly a serious offense.  But

25    also, hearing the testimony this morning and looking at the

1    complaint, it's a second -- it's a different second-degree type

2    of murder charge in the sense that the circumstances are much

3    different than what I normally see with this type of charge.

4            So I'm considering that as well.  Obviously, it's a

5    violent crime that's being charged.  With regards to the weight

6    of the evidence, there certainly was enough for probably cause.

7    I understand that Mr. Smith may have some defenses as well

8    going forward.

9            But looking at the Defendant's personal history,

10   there was just one misdemeanor conviction back in 1975.  There

11   wasn't anything about his personal history that created

12   concerns for me.  He seems to have strong ties to the

13   community.  Looking through all the factors that I look at,

14   that notates in his favor.

15           And so I do think that it's appropriate in the least

16   restrictive conditions at this point to assure his appearance

17   and to mitigate risk of danger of the community, he's released

18   to the halfway house.  And so I'll do that.

19           And if there are different circumstances, or once

20   Pretrial Services is able to do some more investigation, if

21   you'd like to file another motion, or if you work something out

22   with the Government, then we can look at that at that point.

23   All right?

24           **MR. JAMESON:**  Thank you, Judge.

25           **THE COURT:**  All right.  I don't have anything else.

21

1   Anything else from you, Mr. Jameson?  Okay.

2          **MR. JAMESON:**  I have nothing.

3          **THE COURT:**  From the United States?

4          **MR. BRAUN:**  No.

5          **THE COURT:**  Okay.  That's all we have then. I don't

6   think we have any other cases right now, do we Kim?  I think

7   that's it.  So we'll be in recess.  Thank you very much.

8          **MR. JAMESON:**  Thank you.

9          **THE COURT:**  Thank you.

10       **(Proceeding adjourned at 11:02 a.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                    May 18, 2018_


TONI HUDSON, TRANSCRIBER