IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    vs.                                Case No. CR 18-03495-001 JCH

DOUGLAS SMITH,

    Defendant.

**Defendant's motion to dismiss under Rule 12(b) for insufficient evidence**

    Mr. Douglas Smith, by and through undersigned counsel, Assistant Federal Public Defender Aric G. Elsenheimer, moves pursuant to Rule 12 of the Federal Rrules of Criminal Procedure to dismiss the indictment in this case for insufficient evidence.

**I    Factual background**

    In the early morning hours of May 5, 2018, Douglas Smith was at his home in Espanola, New Mexico. Since November of 2017 Mr. Smith had experienced several break-ins at his property. Between November and

December of that year he and his brothers, who also live on his property, experienced four break-ins. In response, they put up motion sensors. One of these motion sensors was affixed to a trailer behind his house. This sensor made a doorbell-like sound when someone walked through his back gate.

On the night of May 4, or the early morning hours of May 5, Mr. Smith heard his sensor sound. He thought it was just raccoons. Because he had once had an encounter with someone in the past who was trespassing on his property, Mr. Smith grabbed his gun, as a matter of safety. He opened his back door and stepped out onto a small step behind his house.

Mr. Smith looked out and heard someone at the trailer and saw a shadow of a person looking in his direction. Mr. Smith was scared, and fired his pistol off to the left of the person to scare them away. He then saw the person take off running to his left, around the property. Mr. Smith believed they had run from his property and, scared because someone had been trespassing on his property, fired three more times. He wanted to scare the person because, as he said in his interview, "scaring them is better

than shooting them." *See Appendix Exhibit E – May 5, 2018, Page 10, lines 18-20* (hereinafter **[Exh. E 5-5-18 Tr. 10:18-20]**).[1] Mr. Smith was not shooting at anyone, and as he said, was just shooting to scare the person.

Mr. Smith then walked over to his truck and tried to put more bullets in his gun, but he was shaking too much and stopped trying to re-load. He then went around the trailer and walked to the driveway. There, he saw somebody laying on the ground. He turned the person over and saw it was a woman. He told his neighbor that he had shot someone and his neighbor said to call 911. He immediately called 911.

On the 911 call, Mr. Smith said "there was someone breaking in into the building back here, and I shot somebody." *See Appendix Exhibit G – 911 Call Transcript – Page 2, Lines 6-7* (hereinafter **[Exh. G 5-4-18 Tr. 2:6-7]**). The 911 operator told Mr. Smith to put his gun down on the ground and he did exactly that. *Id. at* **[ Exh. G 5-4-18 Tr. 3:20-22]**.

---

[1] Exhibits referred to in this motion are in reference to exhibits contained in an appendix the defense will file following the filing of the instant motion. Because these exhibits are also referred to in other motions, in the interest of conserving resources, the defense is filing all of those exhibits under an appendix.

Law enforcement arrived at Mr. Smith's property minutes later. Immediately, Mr. Smith was placed in handcuffs and placed in the back of the police car. While handcuffed, and before being read his *Miranda* warnings, Mr. Smith said "The shadow started running after the first shot because I knew I wasn't pointing it at the shadow. Started running and I just shot several times." The officer then asked, "do they start running before or after you shot" and Mr. Smith replied "After I shot the first one cause I know I shot to miss on the first one." Mr. Smith continued, "I didn't point at the shadow, I pointed to the side to scare and then whoever it was started running and then uhh, and I didn't think I was hitting anyone, I didn't think I could hit anyone actually. Cause I wasn't aiming, I was just shooting."  *See Appendix Exhibit F – Page 3, Lines 4-10* (hereinafter **[Exh. F 5-5-18 Tr. 3:4-10]**).

The police conducted a protective sweep of the property, located the body of M.G. and Mr. Smith's gun, just as he said. They also located four shell casings, also confirming Mr. Smith's statement.

Later, Mr. Smith was taken to the police station and there he was interviewed by Detective Abeyta. Mr. Smith told Detective Abeyta that he began having problems with his property in about November, referring to November of 2017. He related that his property had been broken into four times starting in November or December of 2017. In response, he and his brother put up motion lights.

Mr. Smith said that on the night of the incident, the motion lights turned on and he went outside to check, thinking it was just raccoons. After returning inside and laying down, Mr. Smith heard the alarm again, put on shoes, and went outside with his pistol. He stood on his back porch and waited to see if he could hear anything. Mr. Smith said

> I heard somebody at my mom's trailer and then I saw somebody and then somebody --- there was a shadow, like, looking down, trying to eyeball in my direction. And I got scared witless, and I just went –and there were there, and I went, pow, off to this side and then it took off, the shadow took off and then went behind the bushes, and I couldn't see. And I thought they had run all over – kept going, and I just went bam, bam, bam, bam three or four times. I couldn't – I didn't see anybody. I was just panicky shooting to scare them off because scaring them is better than shooting them. That's why I wouldn't have to go through this if I had managed to scare this person off and not hit them. But I was not trying to hit

> anybody. I didn't see behind the –there's, like, a – some – there's one tree there that's about, uh, yay big around then some bushes and stuff on that – on that side. So I couldn't see anybody. I wasn't really shooting at anybody at that point, just shooting to make noise to get them to run off.

See Appendix Exhibit E – Detective Abeyta Interview **[Exh. E 5-5-18 Tr. 10-11:9-4]**.

Detective Abeyta followed up with several questions, and asked "So when you exit – or when you saw – saw the shadow, you began – you started shooting where?" Mr. Smith responded:

> They were – I – so I could miss the trailer and miss the hole – everybody just because she was there. So I shot to miss, missed the trailer and missed the – I think I shot to miss the trailer, sure hope so. But at that point, I was scared shitless because that person was eyeballing me, and I thought, oh, shit. They're going to start blasting away at me, so I thought I better scare them off.

Id. at **[Exh. E 5-5-18 Tr. 14-15:19-4]**..

Detective Abeyta then asked

Detective Abeyta: 'So – so after you shot – so say the door's here is about where she's at?'

Mr. Smith: 'Yeah. I shot to miss the trailer so it was behind – it was way over to the side of her.'

6

Detective Abeyta: 'So towards, like, the woods and stuff?'

Mr. Smith: 'Yeah.'

Detective Abeyta: 'Okay. And then what happened after the –'

Mr. Smith: 'She started running and ran behind the bushes, and then I couldn't see. I thought she was already gone, but I was still scared witless and just – I don't know how many rounds I shot, four or five altogether. I don't know.'

Detective Abeyta: 'Uh-huh'

Mr. Smith: 'Because there was still a couple of rounds left in there so it had to be at least five. If I had seen, I would have definitely shot to miss. But I thought whoever it was had already taken off running so I was just making noise –'

Detective Abeyta: 'Uh-huh. What – '

Mr. Smith: 'With no intentions of hitting anybody.'

*Id.* at *[Exh. E 5-5-18 Tr. 15-16:10-9]*.

Mr. Smith also spoke at length with the FBI. His statements to the FBI mirrored his statements to Detective Abeyta. Mr. Smith recounted how he had several prior incidents with people breaking into and trespassing on his property. Mr. Smith explained that one of the instances with a

7

trespasser, he "saw a shadow at the back end of the trailer, bent down doing something, and I cocked the pistol and went pow, definitely missing both him and the trailer, just to scare him off. And he got up and took off running, then I just went pow, pow, pow a couple of more times." *See Appendix Exhibit C – FBI Interview of Smith Dated May 7, 2018 – Page 33, Lines 15-20* (hereinafter **[Exh. C 5-7-18 Tr. 33:15-20]**).

> Mr. Smith explained that on May 5,
>
> So I just went out again and stood on the back porch, and then I saw the shadow over by the trailer again, somebody trying to break in, and I just panicked, panicked. I lost any – fear took over, cocked the gun right away, and I shot behind the trailer like I did with the other guy. And then she – I didn't know it was a she – the shadow, took off, and I was just scared, just shooting. And then, uh – to scare them off, just to scare them off. And I went out the back gate, and I thought, oh, what if there's – what if they come back so – because I didn't know I had hit anybody.

*Id. at* **[Exh. C 5-7-18 Tr. 37:7-18]**.

Later, SA Taylor asked Mr. Smith, "And once you started shooting, can you tell me what happened again, the first shot?" Mr. Smith explained "After the first shot, which is behind the – I just went total fear." SA Taylor asked "What was the the person doing?" Mr. Smith replied "Running. I

8

thought they –I thought whoever it was had already run off so I was just shooting to make sure that they were scared." *Id. at* *[Exh. C 5-7-18 Tr. 40:4-13]*.

Critically, in explaining his fear of intruders on his property, Mr. Smith said that he thought people had been breaking into his property since November of 2017. Mr. Smith said, in response to SA Taylor's question about why November,

> because the first ones who've went through found that it was so easy to spread the word, and that's why I thought shooting, you know, maybe that'll spread the word that don't go over there; you'll probably get shot. So that's – shooting just to warn them away, to scare them away.

*Id. at* *[Exh. C 5-7-18 Tr. 44-45:20-1]*.

The decedent, M.G., who Mr. Smith said he believed was trying to break into his trailer before running off, was under the influence of alcohol and morphine, and, in confirmation of Mr. Smith's suspicions, had a record of an arrest for burglary.

9

**II       Legal analysis**

Under Rule 12(b) of the Federal Rules of Criminal Procedure, "An indictment is sufficient if it (1) contains the essential elements of the offense intended to be charged, (2) sufficiently apprises the accused of what he must be prepared to defend against, and (3) enables the accused to plead a judgment under the indictment as a bar to any subsequent prosecution for the same offense." *United States v. Kilpatrick*, 821 F.2d 1456 (10th Cir. 1987).

Where the facts are not subject to dispute, a motion to dismiss may be brought to establish a violation of Rule 12. "[I]t is permissible and may be desirable where the facts are essentially undisputed, for the district court to examine the factual predicate for an indictment to determine whether the elements of the criminal charge can be shown sufficiently for a submissible case." *United States v. Brown*, 925 F.2d 1301 (10th Cir. 1991).

The indictment in this case, while facially sufficient, rests on little evidentiary support. Mr. Smith is charged with second-degree murder. That charge requires the government to prove that he acted with malice

aforethought. 18 U.S.C. § 1112. Not a shred of evidence supports the government's contention that Mr. Smith acted with malice.

The Tenth Circuit Pattern Jury Instructions defines malice aforethought as follows: "To kill 'with malice aforethought' means either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life . . . ." Tenth Circuit Pattern Jury Instruction No. 2.53.

There is no evidence that Mr. Smith killed M.G. deliberately or intentionally or that he acted with callous or wanton disregard of human life. Mr. Smith was on the back porch of his house in the early morning hours. It was dark and there was no light. He saw a shadow and fired to his left of the shadow. He then saw the shadow run away and thought the person left his property. He then fired three more shots at a cluster of trees, past which was a shed and a woodpile, something he had done in the past to scare away an intruder. Between Mr. Smith and the shed and woodpile was a thick cluster of trees. It was dark, and the area was unlit. He then walked out to his car to inspect the property and reload his pistol. It was

then that he saw a body lying in his driveway. Mr. Smith went over to the body, told his neighbor he had shot someone, and immediately called 911.

Mr. Smith's statements to law enforcement have consistently recited precisely what happened. There is no evidence to contradict Mr. Smith's statements and nothing that would suggest any other version of events. In short, Mr. Smith confronted an intruder on his property. He took steps to defend his property from the commission of a felony by firing warning shots. New Mexico law permits an action to reasonably defend one's property.[2] Mr. Smith said he fired to the side of the intruder and when he believed the intruder had run and left the property he fired three more shots. He did so to scare the intruder into leaving and once gone, deter the intruder from returning. There is simply no evidence of willful or callous disregard of human life needed for a charge of second-degree murder. Mr.

---

[2] The New Mexico Supreme Court has held that the defense of habitation "gives the householder the right to meet force with force, and an attack upon a dwelling, ... especially in the night, the law regards as equivalent to an assault on a man's person, for a man's house is his castle." *State v. Couch*, 1946–NMSC–047, ¶ 29. "The... rule limiting the amount of force which may be lawfully used in defense of other property does not apply in defense of habitation." Id. ¶ 30. See also, UJI 14-5170 NMRA. Justifiable Homicide; Defense of Habitation.

Smith's statements to law enforcement illustrates the complete lack of reckless conduct in this case.

This lack of evidentiary support is paralleled by the government's several mischaracterizations of Mr. Smith's statements to law enforcement. This pattern of mischaracterization has sought to twist Mr. Smith's words and force the accidental shooting of M.G. into the confines of second degree murder. If the evidence actually supported the charge of second degree murder, the government would not have left such a conspicuous trail mischaracterizing Mr. Smith's statements.

This trail of mischaracterization began with the preliminary hearing. At that hearing, on direct examination, FBI Special Agent (SA) Taylor described the evidence, in relevant part, as follows:

> So May 5th, approximately 1 a.m. Douglas Smith walked out to his porch to a noise that he heard. Uhm, at that time he saw a shadow by his camper trailer, fired a warn, a shot to the left of the camper trailer and the shadow moved to, began to move and run to the left in that direction and more shots were fired in that direction.

*See Appendix Exhibit B – Preliminary Hearing Transcript Dated May 9, 2018 – Page 3, Lines 18-20* (**[Exh. B 5-9-18 Tr. 3:18-20]**).

13

This is an inaccurate assessment of Mr. Smith's statement to law enforcement. The phrase, "more shots were fired in that direction" implies that Mr. Smith aimed in the direction of the intruder. Shortly after, the examining AUSA asks "And that statement [referring to Mr. Smith's statement to the FBI] did it recite the facts that you just testified to *as far as shooting towards the figure that night.*"  *Id. at* **[Exh. B 5-9-18 Tr. 4:10-12]**. The FBI agent answered "yes" despite the fact that Mr. Smith never said that he shot "towards the figure." Instead, Mr. Smith said the exact opposite. He said that he "thought whoever it was had already run off so I was just shooting to make sure that they were scared." *See* ***[Exh. C 5-7-18 Tr. 40:11-13]***.

Later, SA Taylor states that Mr. Smith "reiterated to me the same facts that he talked to the Espanola detective about and in addition, talked about several incidents like this where he had *fired shots at people in his backyard . . . .*" *See* ***[Exh. B 5-9-18 Tr. 4:18-20]***. Mr. Smith never said he fired shots "*at people.*" Rather, Mr. Smith said he had fired shots when an intruder had been in his backyard and had fire the shots to scare the

14

intruder. That is all Mr. Smith said. The FBI agent's testimony at the preliminary hearing misrepresented the facts of this case and Mr. Smith's statement to the FBI.

At the second detention hearing held on July 5, 2018, the government reiterated this mischaracterization. At that hearing, the government said that Mr. Smith had "shot at" other people on his property in the past and "admitted to prior conduct of shooting at people." *See Appendix Exhibit D – Bail/Bond Review Hearing Dated July 5, 2018 – Page 6, Line 1 and Page 11, Line 1* (hereinafter **[Exh. D 7-5-18 Tr. 6:1 and 11:1]**). Again, this misrepresents the evidence. Mr. Smith never "shot at" other people and never admitted to "shooting at" people.

This pattern again repeated itself in the application for a search warrant submitted to the court in August of 2019. In that warrant, the government asserts:

> SMITH began shooting toward the left of the camper from the porch. SMITH stated that the shadow began running to the left after the first shot, and SMITH continued to shoot in the same general direction of the person, as he has done on a prior occasion with another person on his property.

*See Appendix Exhibit A – Search Warrant*, ¶ 9. This statement mischaracterizes what Mr. Smith told Detective Abeyta.

What Mr. Smith actually said is as follows:

> And I heard somebody at my mom's trailer and then I saw somebody and then somebody – there was a shadow, like, looking down, trying to eyeball in my direction. And I got scared witless, and I just went – and they were there, and I went, pow, off to this side and then it took off, the shadow took off and then went behind the bushes, and I couldn't see. And I thought they had run off all over – kept going, and I just went bam, bam, bam three or four times. I couldn't – I didn't see anybody. I was just panicky shooting to scare them off because scaring them is better than shooting them. That's why I wouldn't have to go through this if I had managed to scare this person and not hit them. But I was not trying to hit anybody. I didn't see behind the – there's, like, a – some – there's one tree that's there that's about, uh, yay big around then some bushes and stuff on that – on that side. So I couldn't see anybody. I wasn't really shooting at anybody at that point, just shooting to make noise to get them to run off.[3]

---

[3] Mr. Smith's initial statement to law enforcement, made minutes after their arrival at his property, before any *Miranda* warnings, are similarly consistent with his later statement to Detective Abeyta and then to the FBI. At that first statement, in response to inartful questioning by the on duty officer, Mr. Smith said "The shadow started running after the first shot because I knew I wasn't pointing it at the shadow. Started running and I just shot several times." The officer then asked, "do they start running before or after you shot" and Mr. Smith replied "After I shot the first one cause I know I shot to miss on the first one." Mr. Smith continued: "I didn't point at the shadow, I pointed to the side to scare and then whoever it was started running and then ahh, and I didn't think I was hitting anyone, I didn't think I could hit anyone actually. Cause I wasn't aiming, I was just shooting."

*See Exhibit E – **[Exh. E 5-5-18 Tr. 10-11:9-4]**.*

That the government must misconstrue, misstate, and mischaracterize Mr. Smith's statements to law enforcement, and that they rely on these mischaracterizations as the "proof" that Mr. Smith committed the crime of second degree murder, demonstrates that there is no evidence to support the charge in the indictment.

WHEREFORE, Mr. Smith, by and through undersigned counsel, respectfully requests that this Court dismiss the indictment in this case.

    Respectfully Submitted

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
(505) 346-2494 Fax
aric_elsenheimer@fd.org
amanda_lavin@fd.org

*Electronically filed April 16, 2020*
/s/ *Aric G. Elsenheimer*
/s/ *Amanda R. Lavin*
Assistant Federal Public Defenders