IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

    vs.                                    Case No. CR 18-03495-001 JCH

DOUGLAS SMITH,

    Defendant.

### Mr. Smith's motion for production of grand jury transcripts

Douglas Smith, by and through undersigned counsel Aric G. Elsenheimer and Amanda R. Lavin, Assistant Federal Public Defenders, and hereby moves this honorable Court for an order directing the United States to produce a recording or transcripts of the grand jury proceedings and the jury instructions provided to the grand jury, pursuant to Federal Rule of Criminal Procedure 6(e) and the procedural guarantees of the U.S. Constitution. In support, Mr. Smith states:

## I. Background

On June 13, 2018, a Grand Jury returned an Indictment (Doc. 2) against Mr. Smith, charging him with one count of second degree murder, contrary to 18 U.S.C. § 1112.

The government has provided discovery to Mr. Smith and his counsel. Part of this discovery included the transcript of Ercilia Trujillo's grand jury testimony. Based on the fact that Ms. Trujillo did not, and could not have, testified to the material facts relevant to the charges brought by the grand jury, undersigned counsel has a good faith belief that other witnesses testified before the grand jury. Mr. Smith seeks the disclosure of the transcripts of the testimony of each witness who testified before the grand jury. In the alternative, Mr. Smith seeks an *in camera* review of these transcripts.

Mr. Smith requests a hearing on this matter to clarify issues raised in this motion and to develop any evidence that may be disputed.

## II. Argument

"In our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact. Exceptions to this are justifiable only by the clearest and most compelling considerations." *Dennis v. United States*, 384 U.S. 855, 873, 86 S.Ct. 1840, 1851 (1966).

### A. Mr. Smith has a particularized need for and a constitutional right to access the transcript of the grand jury proceedings because grounds may exist to dismiss the indictment.

Federal Rules of Criminal Procedure 6(e)(3)(E)(i) and (ii) permit the court to order the disclosure of grand jury proceedings "preliminary to or in connection with a judicial proceeding" or "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Disclosure of grand jury transcripts is appropriate where the defendant shows a "particularized need" for the materials that outweigh the policy underlying grand jury secrecy. *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 223-24 (1979).

Mr. Smith is charged by indictment with second degree murder. To convict someone of second degree murder, the government must show that the defendant acted "with malice aforethought." 18 U.S.C. § 1111. The Eighth Circuit has stated that "malice may be established by evidence of conduct which is 'reckless and wonton, and a gross deviation from a reasonable standard of care, of such nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" *United States v. Black Elk*, 579 F.2d 49, 51 (8th Cir. 1978) (citing *United States v. Cox*, 509 F.2d 390, 392 (D.C. Cir. 1974)).  The Ninth Circuit has defined "malice aforethought" as "the state of mind with which one intentionally commits a wrongful act without legal justification or excuse." *United States v. Celestine*, 510 F.2d 456, 459 (9th Cir. 1975).

The government's case rests on no evidence of malice aforethought. Mr. Smith heard a noise outside of his house, stepped out the back door, and saw an intruder who he believed was attempting to burglarize a trailer on his property. Mr. Smith fired a warning shot to the left (Mr. Smith's left) of where the intruder was standing. The intruder then ran. Mr. Smith

thought the intruder had left the property and fired three warning shots to scare that person away. This evidence is virtually undisputed.

The government has made several statements in this case that suggest that the grand jury may have been misled in their understanding of the evidence.

The government first mischaracterized the evidence at the preliminary hearing. At that hearing, on direct examination, FBI Special Agent (SA) Taylor described the evidence, in relevant part, as follows:

> So May 5th, approximately 1 a.m. Douglas Smith walked out to his porch to a noise that he heard. Uhm, at that time he saw a shadow by his camper trailer, fired a warn, a shot to the left of the camper trailer and the shadow moved to, began to move and run to the left in that direction and more shots were fired in that direction.

*See Appendix Exhibit B – Preliminary Hearing Transcript Dated May 9, 2018 –*

*Page 3, Line 18-21* (hereinafter **[Exh. B 5-9-18 Tr. 3:18-20]**.[1]

---

[1] Exhibits referred to in this motion are in reference to exhibits contained in an appendix the defense will file following the filing of the instant motion. Because these exhibits are also referred to in other motions, in the interest of conserving resources, the defense is filing all of those exhibits under an appendix.

5

This is an inaccurate characterization of Mr. Smith's statement to law enforcement. The phrase, "more shots were fired in that direction" implies that Mr. Smith aimed in the direction of the intruder. This clumsy construction, at testimony for a preliminary hearing, might be forgivable, except that it begins a pattern of inaccuracy that has recurred several times. Indeed, erasing any ambiguity about this clumsy construction, the examining AUSA shortly after this asks "And that statement [referring to Mr. Smith's statement to Detective Abeyta] did it recite the facts that you just testified to *as far as shooting towards the figure that night.*" The FBI agent answered "yes" despite the fact that Mr. Smith never said that he shot "towards the figure." *Id. – Page 4, Lines 10-12* **[Exh. B 5-9-18 Tr. 4:10-12]**.

Instead, Mr. Smith said the exact opposite. In his statement to the FBI, Mr. Smith said:

> I saw the shadow over by the trailer again, somebody trying to break in, and I just panicked, panicked. I lost any – fear took over, cocked the gun right away, and I shot behind the trailer like I did with the other guy. And then she – I didn't know it was a she – the shadow, took off, and I was just scared, just shooting. And then, uh – to scare them off, just to scare them off.

6

*See Appendix Exhibit C – FBI Interview of Smith Dated May 7, 2018 – Page 37, Line 7-16* (hereinafter **[Exh. C 5-7-18 Tr. 37:7-16]**).  Later, in response to SA Taylor's question "And once you started shooting, can you tell me what happened again, the first shot?" Mr. Smith replied: "After the first shot, which is behind the – I just went into total fear." SA Taylor asked "What was the –the person doing?" And Mr. Smith replied "Running. I thought they – I thought whoever it was had already run off so I was just shooting to make sure that they were scared." *Id. at* **[Exh. C 5-7-18 Tr. 40:4-13]**.

Not once did Mr. Smith say he was "shooting towards the figure that night."

In his testimony at the preliminary hearing, SA Taylor also stated that Mr. Smith "reiterated to me the same facts that he talked to the Espanola detective about and in addition, talked about several incidents like this where he had *fired shots at people in his backyard* . . . ." **[Exh. B 5-9-18 Tr. 4:18-21]**.

Mr. Smith never said he fired shots "*at people.*" Rather, Mr. Smith said that when he found another intruder in his backyard, Mr. Smith fired a

7

shot to scare that person off. Mr. Smith's exact words were, in referring to the past incident "I saw a shadow at the back end of the trailer, bent down doing something, and I cocked the pistol and went pow, definitely missing both him and the trailer, just to scare him off." **[Exh. C 5-7-18 Tr. 33:15-18]**. In reference to another past incident with an intruder, Mr. Smith said someone was trying to break into the front door and he "opened the front door" and the intruder was "right there." Mr. Smith said he "cocked the gun and fired through the door up into the roof, pow. And he [the intruder] took off running." Mr. Smith did not say he "shot at" the intruder.  **[Exh. C 5-7-18 Tr. 56:10-15]**.

The government repeated this inaccurate statement at the second detention hearing held on July 5, 2018. At that hearing the government said that Mr. Smith "admitting to prior conduct of shooting at people" on his property in the past. Again, this mischaracterizes the evidence. Mr. Smith never "admitted to" "shooting at" other people. *See Appendex Exhibit D – Bail/Bond Review Hearing Dated July 5, 2018 Page 6, Line 1 and Page 11, Line 1* (hereinafter ." **[Exh. D 7-5-18 Tr. 6:1 and 11:1]**).  In fact, from Mr. Smith's

8

description of each event, it is clear that he never intentionally "shot at" anyone, but that he always shot to miss in an effort to scare the intruder away.

This trend did not stop with the hearings. The government's submission of an affidavit along with its August 2019 search warrant also mischaracterizes the evidence. In that warrant, the government asserts:

> SMITH began shooting toward the left of the camper from the porch. SMITH stated that the shadow began running to the left after the first shot, and SMITH continued to shoot in the same general direction of the person, as he has done on a prior occasion with another person on his property.

*Appendix Exhibit A – Search Warrant Dated August 15, 2019 ¶ 9*. This statement mischaracterizes what Mr. Smith told Detective Abeyta. *See Appendix Exhibit A at ¶ 9*.

What Mr. Smith actually said is as follows:

> And I heard somebody at my mom's trailer and then I saw somebody and then somebody – there was a shadow, like, looking down, trying to eyeball in my direction. And I got scared witless, and I just went – and they were there, and I went, pow, off to this side and then it took off, the shadow took off and then went behind the bushes, and I couldn't see. And I thought they had run off all over – kept going, and I just went bam, bam, bam three or four times. I couldn't – I didn't see

9

anybody. I was just panicky shooting to scare them off because scaring them is better than shooting them. That's why I wouldn't have to go through this if I had managed to scare this person and not hit them. But I was not trying to hit anybody. I didn't see behind the – there's, like, a – some – there's one tree that's there that's about, uh, yay big around then some bushes and stuff on that – on that side. So I couldn't see anybody. I wasn't really shooting at anybody at that point, just shooting to make noise to get them to run off."[2]

*See Appendix Exhibit E – Espanola Police Interview – Pages 10-11, Lines 9-4*

(hereinafter **[Exh. E 5-5-18 Tr. 10-11:9-4]**). .

The statement in the search warrant is an inaccurate summary of Mr. Smith's statement. That the government would repeat this characterization on several occasions gives rise to the probability that this mischaracterization of the evidence was presented to the grand jury. Not once in his statement to Officer Abeyta does Mr. Smith say that he

---

[2] Mr. Smith's initial statement to law enforcement, made minutes after their arrival at his property, before any *Miranda* warnings, are similarly consistent with his later statement to Detective Abeyta and then to the FBI. At that first statement, in response to inartful questioning by the on duty officer, Mr. Smith said "The shadow started running after the first shot because I knew I wasn't pointing it at the shadow. Started running and I just shot several times." The officer then asked, "do they start running before or after you shot" and Mr. Smith replied "After I shot the first one cause I know I shot to miss on the first one." Mr. Smith continued: "I didn't point at the shadow, I pointed to the side to scare and then whoever it was started running and then ahh, and I didn't think I was hitting anyone, I didn't think I could hit anyone actually. Cause I wasn't aiming, I was just shooting."

10

"continued to shoot in the same general direction of the person."[3] Nothing that he says could support this summary of his statement. This statement was made almost a year after the government's presentation to the Grand Jury. It shows that the government's misstatements were not limited to the preliminary hearing and detention hearing. Rather, it reflects that those early mistakes, far from being the result of inadvertence or insufficient knowledge of the facts, were in fact the result of an effort to manipulate Mr. Smith's statements into an admission that he never actually made. If this inaccurate "admission" was presented to the Grand Jury then Mr. Smith was deprived of his Fifth Amendment right to a Grand Jury and he would be entitled to the dismissal of the indictment.

The government's mischaracterization of the evidence were an attempt to make Mr. Smith's actions appear reckless and wanton when in fact they were neither. Mr. Smith never admitted to "shooting at" other

---

[3] The only instance that Mr. Smith used the phrase "general direction" was in reference to a past incident involving an intruder who was also next to the trailer. Mr. Smith made clear that in that instance he was firing a warning shot and intending to miss. Mr. Smith then described this as firing in the intruder's "general direction." This was in reference to the warning shot Mr. Smith said he fired.

11

people. Rather, he made clear, repeatedly, that he was trying to miss, or aiming to miss. One who is trying to miss is not "shooting at" another. The government's misuse of the term "shot at" and mischaracterization of the evidence in two prior judidical hearings raises the significant possibility that the government used this same mischaracterization of evidence before the grand jury.

    Such a mischaracterization to the grand jury of Mr. Smith's actual statement would be grounds to dismiss the indictment. There is a fundamental difference between the government's mischaracterization of Mr. Smith's statement---saying that Mr. Smith admitted to "shooting towards" or admitted to shooting "in the general direction of" the intruder----and Mr. Smith's actual statement. Mr. Smith made clear repeatedly that he never shot at or aimed at the intruder. What he made clear was that he fired shots to scare the person in the hope they would not return. He never intended to hit the intruder and believed that he couldn't hit the intruder because he believed that intruder had already left his property.

"When a defendant asserts error in the grand jury proceeding, the Tenth Circuit considers whether the asserted error falls into one of two categories. The first category is technical (or procedural) error, which affects 'only the grand jury's finding of probable cause.'" *United States v. Cooper*, 396 F.Supp.3d 992, 994 (D. Kan. 2019) (quoting *United States v. Moya-Breton*, 329 F.App'x 839, 844 (10th Cir. 2009)). "The second category is an error that 'threaten[s] the defendant's right to fundamental fairness in the criminal process.'" *Id.* (quoting *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1244 (10th Cir. 1996)). To establish an error in the "fundamental fairness" of the grand jury process, a defendant must "show the alleged error 'substantially influenced the grand jury's decision to indict, or . . . there is a grave doubt that the decision to indict was free from the substantial influence of such violations.'" *Id.* (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)).

If the government informed the grand jury that Mr. Smith admitted to "shooting in the same general direction of" or "shooting towards" the intruder, this would be a severe mischaracterization of the evidence.

Moreover, if the grand jury had been informed that Mr. Smith had admitted to "shooting at" or that he "shot at" other intruders in the past, this too would mischaracterize the evidence. Such a mischaracterization would prejudicialy infringe on the grand jury's ability to exercise independent judgment and would deprive Mr. Smith of his Fifth Amendment right to a grand jury. *See Cooper*, 396 F.Supp.3d at 996 (ordering the dismissal of an indictment without prejudice where the government agent made a false statement to the grand jury and the government did not correct this misstatement, even though it had access to the medical records showing the statement to be false). That right ensures, at a minimum, a grand jury that exercises independent judgment. The mischaracterization of a defendant's statements in a way that fundamentally changes the defendant's intent at the time of the charged conduct, and without showing the grand jury the defendant's actual statements, would usurp the grand jury's independent judgment.

## B. In order to adequately prepare a defense, Mr. Smith needs access to grand jury proceedings in advance of trial.

The Tenth Circuit employs a liberal standard requiring disclosure of grand jury materials where the defense requests the grand jury transcripts for the purpose of impeaching a witness, testing his credibility, or refreshing his memory. *Cargill v. United States*, 381 F.2d 849 (10th Cir. 1967). When one of these three needs is expressed, the "particularized need" requirement is satisfied and no additional facts need be demonstrated. *Id*. at 852-53.

Although *Cargill* did not expressly invoke the constitution to ground its holding, both the Fifth Amendment right to due process and the Sixth Amendment right to effective cross-examination lend considerable support to liberal disclosure of grand jury testimony. The Fifth Amendment protections are highlighted by *Brady v. Maryland,* 373 U.S. 83 (1963). Grand jury testimony is evidence held solely by the prosecution. Failure to satisfy a request for material evidence favorable to a defendant is inconsistent with the requirements of due process since its effect leads to an unfair trial. Suppression of grand jury evidence in this case handicaps Mr. Smith's

ability to defend himself and inhibits the ultimate ascertainment of the truth.

The Sixth Amendment, in turn, affords the right to an opportunity for effective cross-examination, including the opportunity to impeach the testimony given. A grand jury transcript may often include testimony of unquestioned impeachment value to the defense without which confrontation would be ineffective. Thus, to ensure Mr. Smith the full potential of his opportunity for cross-examination, the Sixth Amendment compels disclosure of relevant portions of the grand jury transcript. *See Pointer v. Texas*, 380 U.S. 400 (1965) (noting that the right to confrontation and due process may not be satisfied unless the accused has an opportunity for effective cross-examination).

*Wherefore*, Mr. Smith respectfully requests that this Court grant the instant motion so that he vindicate his Fifth Amendment right to grand jury presentment and his Fifth and Sixth Amendment rights to due process and effective confrontation.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas Blvd., NW Ste. 501
Albuquerque, NM 87102
(505) 346-2489
(505) 346-2494 Fax
aric_elsenheimer@fd.org
amanda_lavin@fd.org

*Electronically filed April 16, 2020*
*/s/ Aric G. Elsenheimer*
*/s/ Amanda R. Lavin*
Assistant Federal Public Defender
Counsel for Defendant Douglas Smith

17