IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 1:18-03495-001 JCH |
| | ) | |
| vs. | ) | |
| | ) | |
| DOUGLAS D. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**Mr. Smith's reply to the government's
response to motion to dismiss for lack of federal jurisdiction**

Mr. Douglas Smith, by and through undersigned counsel, Assistant Federal Public Defender Aric G. Elsenheimer, submits this reply to the government's response to his motion to dismiss for lack of federal jurisdiction. Nothing in the government's reply establishes that Congress had the authority to re-assert federal jurisdiction over land to which congress had previously extinguished that jurisdiction. Mr. Smith requests a hearing on his motion to dismiss to clarify and develop issues raised in the parties' briefing.

**I.      The 1924 Pueblo Lands Act extinguished federal jurisdiction.**

The government begins its argument by contending that the 1924 Pueblo Lands Act (hereinafter PLA) did not extinguish federal jurisdiction. This argument is belied by the language of the PLA and the legal effect of Congress' use of the language of the PLA.

As directed by Congress, the Pueblo Lands Board issued patents to non-Indians whose adverse claims were found valid; "[t]he Pueblos' rights to such land were extinguished." *Arrieta*, 436 F.3d at 1249-50 (citing PLA, § 4; 43 Stat. at 637, *Mountain States Tel. & Tel.*, 472 U.S. at 244)(explaining that § 4 of the PLA set forth the conditions that "sufficed to extinguish a Pueblo's title."). The United States relinquished its claims to those lands. § 13, 43 Stat. at 640.

Moreover, at the time Congress enacted the PLA, it was clear that the legal effect of the extinguishment of Pueblo title and relinquishment of all federal interest would terminate federal criminal jurisdiction. As the Supreme Court recognized in *Solem v. Bartlett*, 465 U.S. 463 (1984), there was no question that, prior to 1948, the extinguishment of Indian title terminated Indian country status.

> The notion that reservation status of Indian lands might not be coextensive with tribal ownership was unfamiliar at the turn of

>the century. Indian lands were judicially defined to include only those lands in which the Indians held some form of property interest . . . See *Bates v. Clark*, 95 U.S. 204, 24 L.Ed. 471 (1877); *Ash Sheep Co. v. United States*, 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920). Only in 1948 did Congress uncouple reservation status from Indian ownership, and statutorily define Indian country to include lands held in fee by non-Indians within reservation boundaries.

*Id.* at 468 (citing 18 U.S.C. § 1151).

In *Bates*, the Court explained that Indian country status turns solely on Indian title to the land. "The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer." *Bates*, 95 U.S. at 208. In *Ash Sheep Co.*, the Court upheld a judgment against the Sheep Company, which had pastured 5,000 sheep on Montana lands that the Court determined retained "Indian land" status in light of the trusteeship that the government maintained of the lands for the benefit of the Crow Tribe. *Id.* at 166.

Cases decided around the time the PLA was enacted consistently held that Indian country status turned on whether Indian title to the land in question had been extinguished. In *United States v. Soldana*, 246 U.S. 530

(1918), for example, defendants were charged with introducing liquor within the exterior boundaries of the Crow Reservation upon the station platform of the Chicago, Burlington & Quincy Railway Company. The decision turned on whether the act of Congress granting the right of way for the station platform extinguished Indian title. "If the Indian title to the soil on which the platform stands was extinguished by that grant, the platform was not within Indian country." *Id.* at 531. Because the Court determined that "it was not the purpose of Congress to extinguish the title of the Indians in the land comprised within the right of way," defendants were held to have been properly indicted for introducing intoxicating liquors into Indian country. *Id.* at 532-33.

Employing the same rationale, the Court reached the opposite result in *Clairmont v. United States*, 225 U.S. 551 (1912), which also involved charges against a train passenger for introducing liquor into the Indian Territory. The Court found that the grant of the railway company's right of way extinguished Indian title to that strip of land.

> Our conclusion must be that the right of way had been completely withdrawn from the reservation by the surrender of

4

> the Indian title, and that in accordance with the repeated rulings of this court, it was not Indian country. The District Court, therefore, had no jurisdiction of the offense charged, and the judgment must be reversed.

*Id.* at 560.

The Tenth Circuit has determined in recent years that federal criminal jurisdiction turns on whether Congress has extinguished Indian rights to land where an offense was committed. In *Hackford v. Utah*, 845 F.3d 1325 (10th Cir.), *cert. denied*, 138 S.Ct. 206 (2017), the Court decided that traffic offenses allegedly committed by an Indian driver did not take place on tribal land. In 1910, Congress had expressly provided for extinguishment of Indian interest in the land where the offenses occurred and had set it aside for use as a reservoir. *Id.* at 1329. The land was thereby removed from the reservation and no longer had Indian Country status. *Id.* The Court pointed to the Court's explanation in *Nebraska v. Parker*, – U.S. –, 136 S.Ct. 1072, 1079 (2016), that Congress' passage of a statute that provides for surrender of tribal land claims, along with compensation, "creates 'an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished.'" *Hackford*, 845 F.3d at 1329 (internal

5

quotations omitted).  Because the traffic offenses in *Hackford* did not occur on tribal land, the State of Utah properly had criminal jurisdiction.  *Id.* at 1330.

In *Magnan v. Trammell*, 719 F.3d 1159 (10th Cir. 2013), the Court reached the opposite conclusion, *i.e.*, the land where the crimes in question occurred was "Indian country" because one step required to extinguish Indian title had not been completed.  In a 1945 law, Congress had set forth provisions for extinguishment of federal restrictions on what had been Indian land.  *Id.* at 1172.  Congress had required approval of the Secretary of the Interior in order to effectuate a conveyance to the Housing Authority that would have removed its Indian status.  *Id.*  That requirement was not satisfied with respect to the tract of land where Magnan's crimes occurred.  For that reason, it was not conveyed to the Housing Authority and remained "Indian country" at the time of the crimes.  *Id.* at 1176 & n.8.  Consequently, the United States had exclusive criminal jurisdiction.  *Id.*

The PLA and the issuance of a patent under the PLA plainly extinguished pueblo title to the land at issue in this case.  By extinguishing

6

pueblo title, Congress exempted the land from federal criminal jurisdiction. This Court can only conclude that Congress thus "otherwise provided" with respect to criminal jurisdiction within the meaning of 25 U.S.C.A. § 331 Note, subsection (a).  This Court must enforce the plain statutory language and conclude that it lacks jurisdiction in this case.

Where statutory language is clear, it is controlling. "In determining the meaning of a statutory provision, 'we look first to its language, giving the words used their ordinary meaning.'" *Moskal v. United States*, 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990) (citation and internal quotation marks omitted). Arguments about policy, statutory purposes, and legislative history cannot overcome clear statutory language. *Trump v. Hawaii*, 138 S.Ct. 2392, 2408 (2018); *Sandoz Inc. v. Amgen Inc.*, 137 S.Ct. 1664 (2017) (citing *McFarland v. Scott*, 512 U.S. 849, 865 (1994)).

The government argues that Congress' extinguishment of tribal and federal jurisdiction was not clear because it was "the executive" not Congress that issued patents quieting title to the land. This argument is meritless and fails to understand the legal procedure contemplated by the

PLA. The PLA established a legislative tribunal, fixed that tribunal with a set of rules, and permitted that tribunal, upon a unanimous vote, to quiet title to land and permit the executive to issue patents based on that decision. Such a step, in our constitutional system, constitutes an act of Congress. The government's argument that this is somehow not an act of Congress is constitutionally nonsensical.

## II. Congress lacked constitutional authority to pass the 2005 amendment to the Pueblo Lands Act.

The government argues that Congress had authority to pass the 2005 Pueblo Lands Act because 1) there were inconsistent rulings between federal and state courts regarding jurisdiction over certain areas in New Mexico; 2) the Indian Commerce Clause gives the federal government authority over the tribes; and 3) federal law is built on the concept that Congress has plenary authority over the tribes and Pueblos.

First, as an initial matter, the fact that a state court reached a conclusion that the state court does not have jurisdiction does not mean that the federal government suddenly has jurisdiction. The flawed jurisdictional analysis of a state court is legally irrelevant to whether a

8

federal court has jurisdiction over an alleged crime committed in the State of New Mexico.

Second, the Indian Commerce Clause does not provide a constitutional source for Congress to act to re-establish jurisdiction over an area over which Congress had extinguished Indian title and ceded jurisdiction to the state. With the 1924 PLA, congress relinquished jurisdiction over the tract of land at issue here. That tract of land is now within the city of Espanola. It is not subject to any other tribal law or regulation, nor is it subject to any federal law or regulation that is not otherwise applicable in New Mexico generally. In short, nothing distinguishes Mr. Smith's property from a piece of property in Albuquerque.

An act of Congress to extend criminal jurisdiction over tracts of land such as Mr. Smith's has absolutely nothing to do with commerce. There were no findings of Congress that established a "commercial" component to this legislation, and even if there were, those findings would have been woefully insufficient to establish a constitutional basis for commerce clause

jurisdiction. *See United States v. Morrison*, 120 S.Ct. 1740, 1754 (2000) ("We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between that what is truly national and what is truly local."). Any exercise of Congressional authority under the Indian Commerce Clause in the 2005 Amendment to the PLA lacks any connection to commerce with the Indian tribes and is unconstitutional.

Third, and last, the government intimates that the 2005 amendment to the PLA was a valid exercise of Congress' plenary authority to regulate the Indian tribes. Despite the dubious, extra-Constitutional basis of this "plenary" authority, even if Congress has such authority, it does not provide a basis for the 2005 amendment to the PLA. The 2005 Amendment did nothing to regulate tribal or Pueblo communities. It merely asserted jurisdiction, in a broad sweep, over land for which it had previously extinguished federal jurisdiction. The city of Espanola is an incorporated municipality in the State of New Mexico. Individuals, like Mr. Smith, who

reside there pay county land taxes, they are subject to state regulations and county regulations. They are not subject, in any way, to tribal authority. Nothing in the 2005 amendment changed this.

In fact, the 2005 amendment to the PLA has absolutely nothing to do with the Pueblos. The Act's only accomplishment is to reassert federal criminal jurisdiction over land for which the federal government had previously extinguished jurisdiction. The discussion of Congress' plenary authority to regulate the tribes lends nothing to the analysis. The 2005 Amendment to the PLA has absolutely nothing to do with Pueblos. It does not affect them in any way. The Pueblo status quo before the 2005 amendment is identical to the status quo after the 2005 amendment. There is simply no connection to the sovereignty of the Pueblos, the authority of the Pueblos, or anything else having to do with the Pueblos contained in the 2005 Amendment.

To justify this action under Congress' "plenary" power stretches that legal theory to its breaking point, and would give Congress a blank check to extend federal criminal jurisdiction wherever and whenever it chooses.

Given the absence of any connection between the 2005 amendment and tribal sovereignty, there is no Constitutional limit to prevent Congress from enacting legislation that asserts federal criminal jurisdiction whenever and wherever an "Indian" (in the language of federal law) is the victim or defendant in a criminal case. Such an Act of Congress is far beyond the metes and bounds, both literally and figuratively, of the Constitutional limits the Framers intended.

Respectfully Submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
(505) 346-2494 Fax
aric_elsenheimer@fd.org

*Electronically filed April 30, 2020*
/s/ Aric G. Elsenheimer
Assistant Federal Public Defender