IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. CR 1:18-03495-001 JCH |
| | ) | |
| vs. | ) | |
| | ) | |
| DOUGLAS D. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**Mr. Smith's response to the government's motion in limine
to exclude Mr. Smith's statements to law enforcement (Doc. 66)**

Mr. Douglas Smith, by and through undersigned counsel, Assistant Federal Public Defenders Aric G. Elsenheimer and Amanda R. Lavin, submits this response to the government's motion in limine to exclude Mr. Smith's statements to law enforcement.

The government seeks to exclude Mr. Smith's statements made to law enforcement immediately and very shortly after the incident on the ground that those statements are hearsay and not subject to any hearsay exception. The government seeks to exclude these statements because they are

remarkably consistent, were made almost immediately after the incident, and, as even law enforcement has admitted, line up perfectly with evidence in this case. These statements, in short, demonstrate that Mr. Smith was honest and candid when he met with law enforcement on three separate occasions and that his statements demonstrate overwhelmingly that he did not act with malice and was not reckless when he fired his gun to scare the intruder on his property.

Notwithstanding the government's efforts to keep from the jury the direct evidence of Mr. Smith's state of mind at the time of the incident in this case, these statements are admissible as evidence in this case. First, his statements made to law enforcement immediately after the incident are admissible under the "excited utterance" exception to the hearsay rule. Second, those statements are admissible because they fall within the residual exception under Fed. R. Evid. 807.

**I    Background**

Mr. Smith made four separate statements to law enforcement. First, at 1:17 a.m. he called 911 to report the attempted burglary and the shooting

incident. On the 911 call, Mr. Smith said "there was someone breaking in into the building back here, and I shot somebody." *See Doc. 52 Exhibit G – Page 2, Lines 6-7* (hereinafter **[Exh. G 5-4-18 Tr. 2:6-7]**). The 911 operator told Mr. Smith to put his gun down on the ground and he did exactly that. *Id. at **[ Exh. G 5-4-18 Tr. 3:20-22]**.*

Law enforcement arrived at Mr. Smith's property minutes later. Immediately, Mr. Smith was placed in handcuffs and placed in the back of the police car. While handcuffed, and before being read his *Miranda* warnings, Mr. Smith said "The shadow started running after the first shot because I knew I wasn't pointing it at the shadow. Started running and I just shot several times." The officer then asked, "do they start running before or after you shot" and Mr. Smith replied "After I shot the first one cause I know I shot to miss on the first one." Mr. Smith continued, "I didn't point at the shadow, I pointed to the side to scare and then whoever it was started running and then uhh, and I didn't think I was hitting anyone, I didn't think I could hit anyone actually. Cause I wasn't aiming, I was just

3

shooting." *See Doc. 52 Exhibit F – Page 3, Lines 4-10* (hereinafter **[Exh. F 5-5-18 Tr. 3:4-10]**).

The police conducted a protective sweep of the property, located the body of M.G. and Mr. Smith's gun, just as he said. They also located four shell casings, also confirming Mr. Smith's statement.

Later, Mr. Smith was taken to the police station and there he was interviewed by Detective Abeyta. Mr. Smith's interview with Detective Abeyta started at approximately 5:24 that morning. Mr. Smith told Detective Abeyta that he began having problems with his property in about November, referring to November of 2017. He related that his property had been broken into four times starting in November or December of 2017. In response, he and his brother put up motion lights.

Mr. Smith said that on the night of the incident, the motion lights turned on and he went outside to check, thinking it was just raccoons. After returning inside and laying down, Mr. Smith heard the alarm again, put on shoes, and went outside with his pistol. He stood on his back porch and waited to see if he could hear anything. Mr. Smith said

4

> I heard somebody at my mom's trailer and then I saw somebody and then somebody --- there was a shadow, like, looking down, trying to eyeball in my direction. And I got scared witless, and I just went –and there were there, and I went, pow, off to this side and then it took off, the shadow took off and then went behind the bushes, and I couldn't see. And I thought they had run all over – kept going, and I just went bam, bam, bam, bam three or four times. I couldn't – I didn't see anybody. I was just panicky shooting to scare them off because scaring them is better than shooting them. That's why I wouldn't have to go through this if I had managed to scare this person off and not hit them. But I was not trying to hit anybody. I didn't see behind the –there's, like, a – some – there's one tree there that's about, uh, yay big around then some bushes and stuff on that – on that side. So I couldn't see anybody. I wasn't really shooting at anybody at that point, just shooting to make noise to get them to run off.

*See Doc. 52 Exhibit E – page 10-11* **[Exh. E 5-5-18 Tr. 10-11:9-4]**.

On May 7, 2018, Mr. Smith was interviewed by the FBI and recounted for the FBI what happened on his property. Mr. Smith's interview with the FBI was consistent, in virtually every way, as his statement to Detective Abeyta and his initial and very short statement to Officer Rael.

**II     Discussion**

Mr. Smith's statements to law enforcement are admissible on two independent grounds. First, Mr. Smith's statements to Officer Rael and

5

Detective Abeyta are admissible as an "excited utterance." Second, Mr. Smith's three statements, to Officer Rael, Detective Abeyta, and the FBI are admissible under the Fed. R. Evid. 807 residual exception.

### A *Mr. Smith's statements to Officer Rael and Detective Abeyta are admissible as excited utterances.*

Federal Rule of Evidence 803(2) excludes from hearsay "a statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." This rule applies regardless of the declarant's availability. The rationale for this rule, "is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self-interest and therefore rendered unreliable.'" *United States v. Alexander*, 331 F.3d 116, 122 (D.C. Cir. 2003) (quoting *United States v. Brown*, 454, 458 (3rd Cir. 2001). To "qualify as an excited utterance, the declarant's state of mind at the time that the statement was made must preclude conscious reflection on the subject of the statement." *Alexander*, 331 F.3d at 122. The Tenth Circuit employs the following analysis to determine admissibility under the excited utterance exception: "The so

called excited-utterance exception has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and 3) a nexus between the content of the statement and the event." *United States v. Smith*, 606 F.3d 1270 (10th Cir. 2010). According to the Tenth Circuit, "there is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance." *Id.* Rather, admissibility as an excited utterance "hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself." *Id.* at 1279. The Tenth Circuit has instructed courts to consider a range of factors, among them "the amount of time between the event and the statement; the nature of the event; the subject matter of the statement; the age and condition of the declarant; the presence or absence of self-interest; and whether the statement was volunteered or in response to questioning." *Id.* (quoting *United States v. Pursley*, 577 F.3d 1204, 1220 (10th Cir. 2009)).

    Mr. Smith, at approximately 1:30 in the morning, was the victim of an intruder on his property. This intruder tried to break into a trailer on his

land and when Mr. Smith stepped onto his back porch, the intruder stepped toward him. He then fired four warning shots to scare the intruder away. When he saw that he had accidentally hit the intruder, he immediately called 911. He spoke with Officer Rael less than ten minutes after this. When he spoke with Officer Rael, he was in handcuffs and in the back of the police vehicle. He was then taken to the police station, kept in a holding cell, and interviewed with Detective Abeyta less than four hours later. He was still dressed in a blue jacket and had not slept that night.

    Mr. Smith's statements to Officer Rael and Detective Abeyta were all made under the stress of the incident. Mr. Smith's statements were not manufactured or contrived. He candidly describes what happened, how it happened, and his feelings about it. In listening to Mr. Smith's statements, there is a sense that he is himself only, as he explains it, understanding what he had just experienced. This is the very heart of the "excited utterance" exception. That exception is designed to catch those statements that are uninhibited by the cognitive filters that shape our understanding of events.  Mr. Smith's statements are the raw data of a mind still

processing the traumatic event that had just happened to him in the middle of the night. Such statements are precisely those contemplated by the "excited utterance" exception of Fed. R. Evid. 802(2).

### B     *Mr. Smith's statements to law enforcement fall within Fed. R. Evid. 807's residual exception*

Under the residual exception in Fed. R. Evid. 807, "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception" if

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Mr. Smith's statements fall within the residual exception. Mr. Smith's three statements to law enforcement are supported by sufficient guarantees of trustworthiness. Each of Mr. Smith's statements have been consistent and have laid out, in detail, exactly what happened in the early morning hours of May 5, 2018. There is remarkable consistency across each of these statements. Moreover, evidence, in the form of Ercilia Trujillo's statements

9

to law enforcement and the grand jury corroborate Mr. Smith's statements. First, they establish that there was at least one intruder on Mr. Smith's property. Second, they establish that this intruder sought to break into Ms. Trujillo's car and then said "come on, let's get it on" shortly before an intruder tried to break into Mr. Smith's trailer. Third, the physical evidence in this case corroborates Mr. Smith's statements. Mr. Smith said he fired four or five times and four shell casings were discovered.

    Mr. Smith's statements are also the most probative evidence of Mr. Smith's mental state at the time of the incident. There is no video of the incident, there is no audio recording of the incident, and there was little investigation done by either the police or the FBI to corroborate Mr. Smith's statement. Moreover, this case hinges fundamentally on Mr. Smith's mental state. The most probative evidence—indeed, the only evidence—of Mr. Smith's mental state is his own statements made in the minutes, hours, and days after the incident. The government's effort to use Mr. Smith's own diagram as evidence of Mr. Smith's intent demonstrates the pivotal role of Mr. Smith's own words as critical evidence in this case. It is also

worth pointing out that the government's effort to use Mr. Smith's statements as proof of his intent, particularly in regards to the fact that he did not see a gun and the diagram, demonstrate the importance of admitting into evidence all of Mr. Smith's statements to law enforcement. The government should not have the ability to selectively pick isolated parts of Mr. Smith's statements without giving the jury access to all of his statements. Such selective use of Mr. Smith's statements is particularly prejudicial given the government's effort to mischaracterize these statements. The government is seeking to use Mr. Smith's own diagram as "evidence" that he "aimed at" M.G. as she ran from his trailer to the street. Mr. Smith never said this. He never implied this. He never used the words shot at and very clearly said that the shots he fired (and drew in the diagram) were fired after M.G. had run away and when he thought she was off his property and on the street.

    The government's effort to use a diagram drawn by Mr. Smith as evidence against Mr. Smith, and then deny Mr. Smith the use of the very same evidence the government is using would deprive Mr. Smith of his

right to due process under the Fifth Amendment and his right to a jury trial under the Sixth Amendment. It is for this very reason---to vindicate constitutional rights---particularly the right to due process and the right to a jury trial, for which exceptions such as the residual exception are intended.

        **FEDERAL PUBLIC DEFENDER**
        111 Lomas NW, Suite 501
        Albuquerque, NM 87102
        (505) 346-2489
        (505) 346-2494 Fax
        aric_elsenheimer@fd.org
        amanda_lavin@fd.org

        *Electronically filed July 29, 2020*
        /s/ Amanda R. Lavin
        /s/ Aric G. Elsenheimer
        Assistant Federal Public Defenders
        Counsel for Defendant Douglas