**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                No. 18-cr-3495 JCH

DOUGLAS D. SMITH

    Defendant.

### MEMORANDUM OPINION AND ORDER

On April 3, 2020, Defendant Douglas Smith filed a Motion to Dismiss for Lack of Federal Jurisdiction (ECF No. 47). The Court held a hearing on the motion on August 25, 2020. The Court, having considered the motion, briefs, evidence, relevant law, and otherwise being fully advised, concludes that Defendant's motion should be denied.

**I.     BACKGROUND**

A federal grand jury charged Defendant Smith, a non-Indian, with unlawfully killing Jane Doe, an Indian, with malice aforethought on or about May 5, 2018, in Indian Country, in violation of 18 U.S.C. §§ 1152 and 1111. *See* Indictment, ECF No. 24. The parties agree that the alleged crime occurred on Defendant's property at 826 N. Riverside Drive in Española, Rio Arriba County, New Mexico, mainly in Section 2, Township 20N, Range 8E, NMPM (hereinafter "the Property"). *Compare* Gov.'s Resp. 1, ECF No. 53, *with* Def.'s Mot. 2-4, 6, ECF No. 47. The parties also agree that the land was transferred to non-Indians Alfred Lucero, Antonia F. de Lucero, and Pleasant Henry Hill, Jr., under the provisions of the Pueblo Lands Act, 43 Stat. 636, via a patent issued on March 29, 1937. *Compare* Def.'s Mot. 6, ECF No. 47; Def.'s Ex. A, ECF No. 47-1 at 3, *with* Gov.'s Resp. 1, ECF No. 53. The Property is located within the exterior boundaries of the Pueblo of Santa Clara. *See* Def.'s Ex. A, ECF No. 47-1 at 3; Def.'s Ex. A, ECF No. 47-2.

Defendant filed a motion to dismiss, arguing that the Court lacks federal jurisdiction because the 1924 Pueblo Lands Act (the "PLA") extinguished federal jurisdiction over the land in question and the Indian Pueblo Land Act Amendments of 2005, Pub. L. No. 109-133, 119 Stat. 2573, (the "2005 Amendment") was an unconstitutional exercise of congressional authority. Def.'s Mot. 1, ECF No. 47. The Government in response contends that the PLA did not extinguish federal jurisdiction because extinguishment must be plain and unambiguous from Congress, and the Executive, not Congress, issued the specific land patent quieting title to the Property. *See* Gov.'s Resp. 2-4, ECF No. 53. The United States further asserts that the 2005 Amendment was a constitutionally proper exercise of congressional plenary authority over Indian tribes and pueblos, so the 2005 Amendment ensures federal criminal jurisdiction over crimes that occur within the exterior boundaries of the pueblos, regardless of who holds title to the land parcel. *Id.* at 2.

**II.    STANDARD**

"The party seeking to invoke the jurisdiction of a federal court must demonstrate that the case is within the court's jurisdiction." *United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994). "The facts supporting jurisdiction must be affirmatively alleged, and if challenged, the burden is on the party claiming that the court has subject matter jurisdiction." *Id.* Accordingly, in a criminal prosecution under 18 U.S.C. §§ 1152 or 1153, the United States has the burden to prove by a preponderance of the evidence that the land on which the crime is alleged to have occurred is Indian country under 18 U.S.C. § 1151. *See Bustillos*, 31 F.3d at 933. Once the district court has made the jurisdictional determination that "a particular tract of land or geographic area is Indian Country," *Roberts*, 185 F.3d at 1139, the United States then has the burden to prove beyond a reasonable doubt that the alleged crime occurred on that particular tract of land or geographic area, *see United States v. Frank*, 901 F.2d 846, 849 (10th Cir. 1990). While determining congressional

2

intent is a matter of statutory construction, when statutory construction turns on an historical record, it involves a mixed question of law and fact. *Osage Nation v. Irby*, 597 F.3d 1117, 1122 (10th Cir. 2010).

### III.   ANALYSIS

#### A.  Brief History of Title to Pueblo Lands

The King of Spain granted title to the Pueblo Indians in 1689 to the lands on which they resided, and the United States agreed in the Treaty of Guadalupe Hidalgo to protect the rights of Indians recognized by prior sovereigns. *United States v. Arrieta*, 436 F.3d 1246, 1249 (10th Cir. 2006). In 1877, the Supreme Court held that Pueblo Indians were not "Indian tribes" within the meaning of the Indian Nonintercourse Act, 25 U.S.C. § 177, which prohibited any loss or transfer of title to Indian lands except by treaty or convention. *Arrieta*, 436 F.3d at 1249. Consequently, Pueblo Indians could transfer land without congressional approval. *Id.* Approximately 3,000 transfers of Pueblo land subsequently occurred to non-Indians, because it was thought that Pueblo Indians could convey good title to their lands. *See id.*; *Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 241-42 (1985).

The validity of these title transfers subsequently came into question, however. *Arrieta*, 436 F.3d at 1249. After a ruling by the Territorial Supreme Court in 1907 that the Pueblos were not "Indians" within the meaning of a criminal statute prohibiting the sale of liquor to any "Indian," Congress passed the New Mexico Enabling Act of 1910 that "expressly required that the new State's Constitution prohibit 'the introduction of liquors into Indian country, which term shall also include all lands now owned or occupied by the Pueblo Indians of New Mexico.'" *Mountain States*, 472 U.S. at 242. Section 2 of the 1910 Enabling Act additionally provided:

> That the people inhabiting said proposed State do agree and declare that they forever disclaim all right and title to the unappropriated and ungranted public lands

> lying within the boundaries thereof and to all lands lying within said boundaries owned or held by any Indian or Indian tribes the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that **until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States**; …

36 Stat. 558-59 (bold emphasis added).

The Supreme Court later determined, in ruling that Congress could expressly prohibit the introduction of intoxicating liquors into Pueblo lands under its power to regulate commerce with the Indian tribes, that Pueblos are dependent Indian communities entitled to aid and protection by the federal government and subject to congressional control. *See United States v. Sandoval*, 231 U.S. 28, 45-49 (1913). *See also Mountain States*, 472 U.S. at 242-43 (discussing *Sandoval*). This ruling left open the issue of the validity of prior title transfers of Pueblo lands. *See Mountain States*, 472 U.S. at 243.

"To settle the status of Pueblo lands, Congress enacted the Pueblo Lands Act of 1924 ('PLA')," which "established the Pueblo Lands Board ('Board') to resolve conflicting claims to Pueblo lands." *Arrieta*, 436 F.3d at 1249 (citing Pueblo Lands Act of June 7, 1924, ch. 331, 43 Stat. 636). The Board was composed of the Secretary of the Interior, the Attorney General, and a third person appointed by the President. *Mountain States*, 472 U.S. at 244. After investigation, the Board was to file a report, setting forth metes and bounds, as to each pueblo and the Attorney General was to file a suit to quiet title to the lands described in the report "as Indian lands the Indian title to which is determined by said report not to have been extinguished." PLA, §§ 2 & 3, 43 Stat. at 636-37. Unanimity was required by the Board as to all decisions in which it determined "Indian title has been extinguished." § 2, 43 Stat. at 636. "The Act also directed the Board to award the Pueblos compensation for the value of any rights that were extinguished if they 'could have

been at any time recovered for said Indians by the United States by seasonable prosecution.'"

*Mountain States*, 472 U.S. at 245 (quoting 43 Stat. 636, § 6).

The Tenth Circuit explained what occurred next:

> The Board issued patents to quiet title to land in favor of non-Indians who adversely possessed land and paid taxes on the land from 1889 to 1924 or who had color of title to the land from 1902 to 1924. *Id.* § 4, 43 Stat. at 637; *Mountain States Tel. & Tel.*, 472 U.S. at 244-45, 105 S.Ct. 2587. **The Pueblos' rights to such land were extinguished.** PLA § 4, 43 Stat. at 637; *Mountain States Tel. & Tel.*, 472 U.S. at 244, 105 S.Ct. 2587. The Pueblo retained title to all lands not patented to non-Indians. Consequently, pockets of privately owned, non-Indian land lie amidst Pueblo lands.

*Arrieta*, 436 F.3d at 1249-50 (bold emphasis added).

### B. Criminal Jurisdiction in Indian Country

In 1948, Congress enacted Section 1152 of Title 18 of the United States Code, which provided that "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States … extend to the Indian Country," subject to certain exceptions not applicable here. *See* 18 U.S.C. § 1152. Congress defined "Indian Country" to include "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation," 18 U.S.C. § 1151(a), "all dependent Indian communities" within the United States' borders, *id.* § 1151(b), and "all Indian allotments, the Indian titles to which have not been extinguished," *id.* § 1151(c).[1]

---

[1] Reservations were created by Congress for Native American tribes, but the federal policy shifted toward the end of the nineteenth century from creating reservations to breaking them into individual allotments. *Hackford v. Utah*, 845 F.3d 1325, 1327-28 (10th Cir. 2017). With respect to section 1151(c), the Supreme Court determined that land allotted in trust to a tribal member at the time a reservation was restored to the public domain maintained its character as Indian country because the lands remained Indian lands during the trust period. Conference of Western Attorneys General, *American Indian Law Deskbook* § 2:11 (2019 ed.) (quoting *United States v. Pelican*, 232 U.S. 442, 449 (1914)). The Supreme Court has never required specific language to establish a reservation, but it generally requires that the federal government reserves the land from sale, often when it promises to hold aside federally owned land in trust for the benefit of the Tribe or when the government cannot give the tribal lands to others or to appropriate them to its own purposes without engaging in a confiscatory act. *See McGirt v. Oklahoma*, __ U.S. __, 140 S.Ct. 2452, 2475 (2020).

Congress's purpose in enacting § 1151 was to avoid the practical problems of checkerboard jurisdiction. *See Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 357-58 (1962) (explaining problem of law enforcement officers needing to search tract books to determine whether jurisdiction over each criminal offense is within the state or federal jurisdiction). In passing § 1151, Congress uncoupled reservation status from Indian ownership, and statutorily defined Indian country to include lands held in fee by non-Indians within the reservation boundaries. *Solem v. Bartlett*, 465 U.S. 463, 468 (1984). In *Seymour*, the petitioner argued that, when Congress enacted a law that permitted non-Indians to own in fee land previously part of the reservation, the reservation would be diminished by the purchase of land, and thus, the land could not be reserved for Indians. 368 U.S. at 357. Although the Supreme Court noted that this contention was not facially implausible, it determined that the enactment of § 1151 put to rest the issue of whether reservation land was diminished by permitting the purchase of land within it by non-Indians. *See id.*

Pre-enactment of § 1151, the Supreme Court had determined that Pueblo lands were dependent Indian communities. *See Sandoval*, 231 U.S. at 47. Accordingly, "Pueblo lands were within Indian Country and subject to federal jurisdiction even though the lands were not formally designated as a reservation." *United States v. Antonio*, 936 F.3d 1117, 1121 (10th Cir. 2019). Unlike § 1151(a) which provided for criminal jurisdiction over all lands within the exterior reservation boundaries, notwithstanding the issuance of any patent, *see* 18 U.S.C. § 1151(a), § 1151(b) did not contain the clarifying language regarding private lands within the boundaries of dependent Indian communities, *see id.* § 1151(b). *See also Antonio*, 936 F.3d at 1121 ("Although the Pueblo lands fell within Indian Country because the Pueblos were a dependent Indian community, 18 U.S.C. § 1151 did not account for tracts of land within the dependent Indian

6

communities that were owned by non-Indians. Under § 1151, these private holdings would not necessarily be subject to federal jurisdiction.").

To resolve the question of criminal jurisdiction over Indian Pueblo lands and avoid checkerboard jurisdiction, Congress passed an amendment to the PLA in 2005 that states:

> (a) IN GENERAL.—Except as otherwise provided by Congress, **jurisdiction over offenses committed anywhere within the exterior boundaries of any grant from a prior sovereign**, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico, shall be as provided in this section.
>
> (b) JURISDICTION OF THE PUEBLO.—The Pueblo has jurisdiction, as an act of the Pueblos' inherent power as an Indian tribe, over any offense committed by a member of the Pueblo or an Indian as defined in title 25, sections 1301(2) and 1301(4), or by any other Indian-owned entity.
>
> (c) JURISDICTION OF THE UNITED STATES.—The United States has jurisdiction over any offense described in chapter 53 of title 18, United States Code, committed by or against an Indian as defined in title 25, sections 1301(2) and 1301(4) or any Indian-owned entity, or that involves any Indian property or interest.
>
> (d) JURISDICTION OF THE STATE OF NEW MEXICO.—The State of New Mexico shall have jurisdiction over any offense committed by a person who is not a member of a Pueblo or an Indian as defined in title 25, sections 1301(2) and 1301(4), which offense is not subject to the jurisdiction of the United States.

PL 109-133, 119 Stat. 2573 (bold emphasis added).

### C. Application to The Property

Federal jurisdiction exists in this case if the Property where the alleged crime occurred was Indian Country at the time of the offense. Defendant argues that the PLA unambiguously removed the land at issue here from federal control and Congress clearly extinguished all rights of the Pueblo to the Property. Defendant finds additional support in the 1910 Enabling Act, which said that Congress retained control over lands lying within boundaries of Indian tribes until title of Indians or Indian tribes has been "extinguished." Defendant argues that when the PLA extinguished the title to the Property, the Property under the Enabling Act became subject to the

jurisdiction of the State, and thus, Congress had no constitutional basis upon which to pass the 2005 Amendment to the PLA, rendering it unconstitutional.

The United States responds that the Santa Clara Pueblo land, a dependent Indian community, and the Property within its external boundaries, is Indian Country, regardless of whether title is now held by a non-Indian. The Government argues that only Congress can diminish reservation land through plain language and that the PLA did not remove patented Pueblo lands from federal control, relying on *United States v. Antonio*, 936 F.3d 1117 (10th Cir. 2019), *cert. denied*, 140 S.Ct. 818 (2020). The United States further contends that the Executive branch, not Congress, quieted title to the specific Property, and thus, the quiet title action was not an act of Congress and cannot constitute diminishment of Pueblo lands. *See* Gov.'s Resp. 3-4 (relying on *United States v. Vigil*, Cr. No. 18-739-MV (D.N.M. Aug. 16, 2019) (concluding court had federal criminal jurisdiction over offense committed on privately owned land within exterior boundaries of Ohkay Owingeh Pueblo because "the 1935 patent was not effectuated by Congress as would be necessary to except the land's status as 'Indian country'")).

### 1. Whether Congress diminished Santa Clara Pueblo land under the Enabling Act and PLA

"[O]nly Congress can divest a reservation of its land and diminish its boundaries." *Solem*, 465 U.S. at 470. Diminishment "will not be lightly inferred," *id.*, and there is a presumption in favor of the continued existence of the reservation, *see id.* at 472. Congress must clearly show an intent to change boundaries before a court may find diminishment:

> The most probative evidence of congressional intent is the statutory language used to open the Indian lands. Explicit reference to cession or other language evidencing the present and total surrender of all tribal interests strongly suggests that Congress meant to divest from the reservation all unalloted opened lands. When such language of cession is buttressed by an unconditional commitment from Congress to compensate the Indian tribe for its opened land, there is an almost

8

>insurmountable presumption that Congress meant for the tribe's reservation to be diminished.

*Id.* at 470-71 (internal citations omitted). Nevertheless, the Supreme Court has inferred Congress's intent to diminish Indian reservation land in the absence of clear language when the events surrounding passage of the law, the manner in which the transaction was negotiated with the tribes, and the legislative reports presented to Congress reveal the widely-held contemporaneous understanding that the reservation would shrink under the legislation. *See id.* at 471. Finally, courts may look to post-legislative events to determine congressional intent, particularly in the years immediately following the legislation, including the way the Bureau of Indian Affairs and local judicial authorities dealt with unallotted open lands and who moved onto opened reservation lands. *See id.* at 471-72.

These latter two extratextual factors have "limited interpretive value." *McGirt v. Oklahoma*, __ U.S. __, 140 S.Ct. 2452, 2469 (quoting *Nebraska v. Parker*, 577 U.S. 481, __, 136 S.Ct. 1072, 1082 (2016)). The value of such evidence "can only be *interpretative*—evidence that, at best, might be used to the extent it sheds light on what the terms found in a statute meant at the time of the law's adoption, not as an alternative means of proving disestablishment or diminishment." *Id.* In other words, the "only role such materials can properly play is to help 'clear up … not create' ambiguity about a statute's original meaning." *Id.* When both the act and its legislative history "fail to provide substantial and compelling evidence of a congressional intention to diminish Indian lands," courts "are bound by our traditional solicitude for the Indian tribes to rule that diminishment did not take place and that the old reservation boundaries survived the opening." *Solem*, 465 U.S. at 472.

The Tenth Circuit examined the PLA in the *Antonio* case in determining whether there was federal jurisdiction over a crime occurring on privately owned land within the Sandia Pueblo

9

boundaries. *See Antonio*, 936 F.3d at 1119, 1121. The defendant argued that the western boundary of the Pueblo had not been confirmed by Congress in an 1858 Act. *See id.* at 1122-23. After concluding that the language in the 1858 Act confirmed the exterior boundary of the Pueblo, the Tenth Circuit examined the PLA, noting that its purpose was to resolve conflicting claims to Pueblo lands and award compensation for the extinguishment of Pueblo land rights. *See id.* at 1123. It explained that Congress established the PLA Board to determine the exterior boundaries of the Pueblo lands and the status of lands within the boundaries. *Id.* The Tenth Circuit stated that the PLA "only addressed how land disputes were to be resolved—it did not affect the 1858 confirmation nor did it exempt any specific properties *or terminate federal jurisdiction*." *Id.* at 1123 (italics added). According to the Tenth Circuit, the PLA did not provide a clear directive to exempt the private tract from confirmation because "it does not even mention jurisdiction but rather quieted title to tracts of disputed land." *Id.* at 1124. The Tenth Circuit then discussed the impact of the 2005 Amendment:

> the 2005 Amendments were enacted to prevent this very type of confusion over jurisdiction. Rather than have checkerboard jurisdiction over certain tracts of land but not others, courts conduct a simple, two-part analysis. To establish jurisdiction under the 2005 Amendments, parties must show that the land was part of a grant from a prior sovereign and Congress confirmed the boundaries. Even if Garcia or the Middle Rio Grande Conservancy District owned the land, the parcel as a whole would still fall within the boundaries of a grant from a prior sovereign that were confirmed by Congress. In this case, both parties agree the land where the offense occurred was part of a grant from a prior sovereign. And the 1858 Act confirmed the Rio Grande as the western boundary of this land, placing the site of the offense squarely within federal jurisdiction.

*Id.*

Although the Tenth Circuit did not examine the *Solem* factors or consider the constitutionality of the 2005 Amendment, it nonetheless is instructive on the issue of congressional intent in passing the PLA – resolving Pueblo land disputes, not terminating federal jurisdiction.

10

*Antonio*, 936 F.3d at 1123. This result follows from the statutory language of the PLA, which is explicitly "An Act To quiet the title to lands within Pueblo Indian land grants." PLA, 43 Stat. at 636.

In *Osage*, the Tenth Circuit gave examples of express language for divestment or termination of reservation lands:

> 'the Smith River reservation is hereby discontinued,' " *Mattz v. Arnett*, 412 U.S. 481, 505 n. 22, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (discussing 15 Stat. 221 (1868)); " 'the same being a portion of the Colville Indian Reservation ... be, and is hereby, vacated and restored to the public domain,' " *id.* (discussing 27 Stat. 63 (1892)); " 'the reservation lines of the said Ponca and Otoe and Missouria Indian reservations ... are hereby, abolished,' " *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 618, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977) (discussing 33 Stat. 218 (1904)); " 'the ... Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest,' " *DeCoteau v. District County Court*, 420 U.S. 425, 455–56, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (discussing Agreement of 1889, ratified by 26 Stat. 1035 (1891)).

*Osage Nation*, 597 F.3d at 1123. Disestablishment, however, does not require any particular form of words; rather, it requires clear expression of congressional intent to diminish, usually with an explicit "reference to cession or other language evidencing the present and total surrender of all tribal interests." *McGirt*, 140 S.Ct. at 2463 (quoting *Parker*, 136 S.Ct. at 1079). The PLA does not mention jurisdiction or contain language abolishing the land's Indian Country status.

The Court recognizes that the use of the terms "extinguish" and "relinquish" in the PLA lends support to Defendant's argument. *See* PLA, 43 Stat. at 640, § 13 ("copies of said plat and field notes … shall be accepted in any court as competent and conclusive evidence of the *extinguishment of all the right, title, and interest of the Indians in and to the lands* so described in said plat and field notes and of any claim of the United States in and or to the same") (italics added); *id.* ("Any patent or certificate of title issued under the provisions of this Act shall have the effect only of *a relinquishment by the United States of America and the said Indians*.") (italics

11

added). The Tenth Circuit recently said that "Congress's use of the words 'cede, grant, and relinquish' can only indicate one thing—a diminished reservation." *Wyoming v. United States Environmental Protection Agency*, 875 F.3d 505, 515-16 (10th Cir. 2017), *petition for cert. docketed*. When Congress enacted the PLA, Indian lands were "only those lands in which the Indians held some form of property interest," and only in 1948 did Congress uncouple reservation status from Indian ownership. *Solem*, 465 U.S. at 468. *See also United States v. Soldana*, 246 U.S. 530, 531 (1918) ("If the Indian title to the soil on which the platform stands was extinguished by that grant, the platform was not within Indian country."); *Bates v. Clark*, 95 U.S. 204, 208 (1877) ("The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer.").

Although "extinguish" is used in the PLA, it is not clear that Congress meant the present and total surrender of all tribal interests to that land, rather than merely a change of title thereto. *See Solem*, 465 U.S. at 470 ("Once a block of land is set aside for an Indian Reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise."). In *Solem*, the Supreme Court examined a surplus lands act that authorized the Secretary of the Interior to sell and dispose of a portion of the Cheyenne River and Standing Rock Indian reservations lying within certain boundaries and to deposit the proceeds in the United States Treasury for the tribe. *Id.* at 472-73. The *Solem* Court found that this language indicated Congress simply authorized the sale of certain lands with the Secretary of the Interior acting as the Tribe's sales agent. *Id.* at 473. Although the Supreme Court found problematic references in the surplus lands act to opened areas being in "the public domain" and to unopened areas comprising "the reservation thus diminished," it nonetheless

determined that these isolated phrases were not dispositive because, "when balanced against the Cheyenne River Act's stated and limited goal of opening up reservation lands for sale to non-Indian settlers, these two phrases cannot carry the burden of establishing an express congressional purpose to diminish." *Id.* at 475.

As in *Solem*, the use of the terms "extinguish" and "relinquish" is not enough when balanced against the PLA's stated and limited goal of quieting title to lands. *See Antonio*, 936 F.3d at 1123. *See also State v. Romero*, 2006-NMSC-039, ¶ 25, 140 N.M. 299 ("Due to the lack of substantial and compelling evidence of congressional intent to change Indian country status, we must reject the State's overly-broad interpretation that the Pueblo Lands Act extinguishes Indian country status merely by allowing non-Indians to have fee title to certain parcels.").

While not necessarily conclusive, another textual factor indicating congressional intent is whether payment is by sum certain. *See Wyoming*, 875 F.3d at 517. The PLA provides that the United States

> shall be liable, and the board shall award compensation, to the pueblo within the exterior boundaries of whose lands such tract or tracts of land shall be situated or to which such water rights shall have been appurtenant to the extent of any loss suffered by said Indians through failure of the United States seasonably to prosecute any right of the United States or of said Indians…. Such report and award shall have the force and effect of a judicial finding and final judgment upon the question and amount of compensation due to the Pueblo Indians from the United States for such losses.

PLA, 43 Stat. at 638, § 6(c). Payment "contingent on future sales usually indicates an intent not to terminate" whereas sum-certain payments "indicate an intent to terminate the reservation." *Osage Nation*, 597 F.3d at 1123. Here, the fact that the PLA does not provide for a sum certain payment suggests Congress did not intend to diminish the reservation. *Compare Murphy v. Royal*, 875 F.3d 896, 951 (10th Cir. 2017), *affirmed by Sharp v. Murphy*, 140 S.Ct. 2412 (2020) (concluding Congress showed no intent to diminish reservation in part because agreement provided tribe would

receive uncertain amount of revenue based on future sales to non-Indian settlers of lots, not sum-certain payments to Creek Nation), *with Hackford*, 845 F.3d at 1329 ("[W]hen Congress passed the 1910 statute providing that the Ute Indians would be paid a fixed sum of $1.25 per acre and that '[a]ll right, title, and interest of the Indians in the said lands are hereby extinguished,' it 'clearly evince[d] an intent" to diminish the Uintah and Ouray Indian Reservation.'"). Unlike *Hackford*, upon which Defendant relies, here Congress did not direct the Executive Branch, through the Board, to purchase the Property specifically for a set sum. It is therefore not clear that Congress intended to change the Pueblo's boundaries.

As for the second *Solem* factor, events surrounding passage of the law, the history of the PLA shows it was enacted to finally adjudicate a series of conflicting titles affecting lands claimed by the Pueblo Indians. *See Mountain States*, 472 U.S. at 240. Indeed, the stated purpose of the PLA was to "settle the complicated questions of title and to secure for the Indians all of the lands to which they are equitably entitled." *Id.* at 244 (quoting S.Rep. No. 492, 68th Cong., 1st Sess., 5 (1924)). The events surrounding the passage of the PLA give some, albeit not definitive, support that the PLA was merely to quiet title and did not have a purpose of diminishing tribal and federal authority and jurisdiction over the privately owned lands within the Pueblo.

Finally, post-legislative events indicate that congressional intent was not to diminish the lands. "From 1913 to 2001, the United States Government prosecuted crimes committed by or against the New Mexico Pueblo Indians within the exterior boundaries of their reservation lands in the State of New Mexico." 151 Cong. Rec. H11046-01 (daily ed. Dec. 6, 2005). After a federal judge ruled in *United States v. Gutierrez*[2] that it had no criminal jurisdiction over crimes occurring on private lands within the boundaries of the New Mexico Pueblos, and a New Mexico state court

---

[2] *See* Def.'s Ex. B, Order of Dismissal, *United States v. Gutierrez*, No. CR 00-M-375 LH (D.N.M. Dec. 1, 2000), ECF No. 47-3.

ruled that the State of New Mexico lacked jurisdiction over these same lands, Congress sought to clarify the uncertainty and correct the void of jurisdiction by enacting the 2005 Amendment. *See* 151 Cong. Rec. H11046-01. The history of the federal government asserting jurisdiction over the private non-Indian lands within the Pueblo boundaries suggests that the understanding of the PLA was that it did not divest federal authority over the private lands therein.[3]

Defendant relies on other post-legislative events to support his position: the county assesses taxes on the land, *see* Def.'s Ex. E, ECF No. 47-6; residents on such properties are subject to state and county regulations; and the Property is within the municipal boundary of the Town of Española. As for this latter point, that the Property is within the county or city does not affect the question of express congressional diminishment. *Cf. Seymour*, 368 U.S. at 358-59 (rejecting Washington State's argument that land was subject to state jurisdiction because a town had been established on the site, because § 1151 set forth congressional intent to include under its jurisdiction all lands within the limits of the reservation boundary, whether owned by Indians or non-Indians). Although the assessment and payment of county taxes and the imposition of local and state regulations suggest that certain state and local authorities considered the land no longer under federal and tribal jurisdiction, the evidence is not enough to overcome the presumption against diminishment, especially given the textual and legislative history evidence discussed *supra*. *See McGirt*, 140 S.Ct. at 2471 (casting doubt on reliability of using historical practices of State entities to determine congressional intent given numerous States that have overstepped their authority in Indian country, perhaps in good faith, perhaps sometimes not).

"Whether a reservation has been disestablished or diminished depends on whether its boundaries were erased or constricted, not on who owns title to land inside the lines." *Murphy*,

---

[3] Moreover, although the 2005 Amendment was passed long after the 1924 Act, the fact that Congress acted shortly after the jurisdictional controversy arose is some, albeit limited, additional evidence of the intent of Congress.

875 F.3d at 952. Adjudicating title is distinct from adjudicating reservation or pueblo status. *See id.* Based on the *Solem* factors, the Tenth Circuit's decision in *Antonio*, and that the Executive, not Congress, quieted title to the Property at issue, Defendant has not overcome the presumption against diminishment.

### 2. Whether there was Constitutional authority to enact the 2005 Amendment

The United States contends that, even if the PLA diminished the boundaries of the Santa Clara Pueblo, Congress was well within its authority to amend and clarify the statute to ensure federal jurisdiction over the totality of lands within the exterior boundaries of the Pueblo. The Government notes that Congress amended the PLA, rather than enacting a separate law, indicating its intention to make clear the original intent of the PLA. Moreover, the United States contends that Congress had authority to pass the 2005 Amendment under its plenary powers to regulate Indian tribes and Article I, Section 8 of the Constitution.

Defendant asserts that there is no basis in Article I to enact the 2005 Amendment because it lacks any connection to commerce with the Indian tribes. As for Congress' plenary authority to regulate the Indian tribes, Defendant contends that the 2005 Amendment is not an act taken to regulate a tribal community, as it merely asserted jurisdiction over land for which federal jurisdiction had been previously extinguished. Defendant therefore argues that Congress cannot re-assert jurisdiction out of whole cloth over land for which federal and Indian title had been extinguished and is no different than other land in the state.

Congress's powers are defined and limited, so it may only enact laws based on one or more powers enumerated in the Constitution. *United States v. Morrison*, 529 U.S. 598, 607 (2000) (quoting *Marbury v. Madison*, 1 Cranch 137, 176, 2 L.Ed. 60 (1803)). Article I, Section 8, of the Constitution gives Congress power to "regulate Commerce … with the Indian Tribes." U.S. Const.

Art. I, Sec. 8. Additionally, the "Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'" *United States v. Lara*, 541 U.S. 193, 200 (2004). The Supreme Court has identified the Indian Commerce Clause, U.S. Const., Art. I, § 8, cl. 3, and the Treaty Clause, Art. II, § 2, cl. 2, as sources of Congress' plenary power to legislate in the field of Indian affairs. *Lara*, 541 U.S. at 200. There is a presumption of constitutionality, and courts only invalidate a law "upon a plain showing that Congress has exceeded its constitutional bounds." *Id.*

In light of this Court's decision that the PLA did not diminish Pueblo lands, Congress retained authority under its plenary powers and the Indian Commerce Clause to enact the 2005 Amendment. Congress has authority to enact legislation dealing with Indians and Indian affairs within the exterior boundaries of reservation lands:

> 18 U.S.C. § 1151 defines Indian country as 'all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent * * *.' It is urged that Congress does not have the constitutional power to define privately owned lands as Indian country. However, it has always been recognized that Congress has the exclusive power to deal with Indians and Indian affairs on reservations set apart for them. The purpose of section 1151 is to remove the uncertainty of federal jurisdiction over crimes committed by or against Indians within the exterior boundaries of an Indian reservation.

*Hilderbrand v. Taylor*, 327 F.2d 205, 206 (10th Cir. 1964) (internal citation omitted). In *Hilderbrand*, the defendant challenged federal jurisdiction over a crime within reservation boundaries that had been conveyed to a church. *Id.* Relying on *Seymour*, the Tenth Circuit recognized "the power of Congress to fix the jurisdiction of federal courts over crimes by or against Indians even though committed on patented land within an Indian reservation." *Id.* at 207. Consequently, the Tenth Circuit had "no doubt as to the constitutionality of the statute." *Id.*

The 2005 Amendment likewise fixes the jurisdiction of federal courts over crimes "committed by or against an Indian…." 2005 Amendment, PL 109-133, 119 Stat. 2573, subsec.

17

(c). The Court finds that Congress had authority to define privately held lands within the boundaries of an Indian Pueblo as Indian Country based on its plenary authority to deal with Indians and Indian affairs within reservations and Pueblo lands. Defendant contends that such a ruling would result in "no Constitutional limit to prevent Congress from enacting legislation that asserts federal criminal jurisdiction whenever and wherever an 'Indian' … is the victim or defendant in a criminal case." Def.'s Reply 12, ECF No. 60. The Supreme Court and Tenth Circuit, however, have provided a territorial limitation to this plenary authority to assert jurisdiction when an Indian is a victim or perpetrator of a crime – when it occurs on lands within the boundaries of an Indian Pueblo or reservation.

Because the Indictment charges Defendant with unlawfully killing an Indian in Indian Country, and it is undisputed that the crime occurred on private land within the boundaries of the Santa Clara Pueblo, the Court finds and concludes that it has federal jurisdiction over the charged crime.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss for Lack of Federal Jurisdiction (**ECF No. 47**) is **DENIED**.

_____
**SENIOR UNITED STATES DISTRICT JUDGE
JUDITH C. HERRERA**