## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                              No. 18-cr-3495 JCH

DOUGLAS D. SMITH

      Defendant.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Douglas Smith's *Motion to Dismiss under Rule 12(b) for Insufficient Evidence* (ECF No. 50) and *Motion for Production of Grand Jury Transcripts* (ECF No. 51). Defendant requests a hearing on the motion for production of grand jury transcripts, but the Court finds that a hearing is not necessary to resolve the legal issues. The Court, having considered the motions, briefs, evidence, applicable law, and otherwise being fully advised, concludes that the motions should be denied.

### I.      FACTUAL BACKGROUND

A federal grand jury charged Defendant Smith, a non-Indian, with unlawfully killing Jane Doe, an Indian, with malice aforethought on or about May 5, 2018, in Indian Country, in violation of 18 U.S.C. §§ 1152 and 1111. *See* Indictment, ECF No. 24. The parties agree that the alleged crime occurred on Defendant's property at 826 N. Riverside Drive in Española. *Compare* Gov.'s Resp. 1, ECF No. 53, *with* Def.'s Mot. 2-4, 6, ECF No. 47. Defendant called 911 to report that "there was someone breaking in into the building back here, and I shot somebody." Dispatch Call Tr. 2:6-7, ECF No. 52-7.

On May 5, 2018, Defendant spoke to Officer Rael of the Española Police Department ("EPD") in which he described what occurred as follows:

Smith: The shadow started running after the first shot cause I knew I wasn't pointing it at the shadow and uh started running and I just shot several times after that first one.

Police: Okay, so do they start running before or after you shot?

Smith: After I shot the first one cause I know I shot to miss on the first one.

Police: Okay, what do you mean by you shot to miss?

Smith: I didn't point at the shadow. I pointed to the side to scare and then uh whoever it was started running and uh and I, didn't think I was hitting it. I didn't think I could hit anybody actually. Cause I wasn't aiming I was just shooting.

Body Cam Tr. 1, 3:4-11, ECF No. 52-6.

Later that same day, EPD Detective Byron Abeyta interviewed Defendant, after reading him his *Miranda* rights. *See* May 5, 2018 Tr. 3:11-5:11, ECF No. 52-5. Defendant said his property had been broken into four times since November, so they put in motion sensors. *See id.* at 8:16-9:6. He admitted to using his gun in some of the prior incidents: "just to scare them away because I've shot at – shot to scare people away before." *Id.* at 12:6-7. For one guy on his property that left a guitar behind, Defendant said he "shot to miss him again, too" and when he took off running, Defendant "went pow, pow, pow again, just like I did with this girl." *Id.* at 13:6-12.

He described the incident for which he has been charged in this case as follows:

And I heard somebody at my mom's trailer and then I saw somebody and then somebody – there was a shadow, like, looking down, trying to eyeball in my direction. And I got scared witless, and I just went – and they were there, and I went, pow, off to this side and then it took off, the shadow took off and then went behind the bushes, and I couldn't see.

And I thought they had run off all over – kept going, and I just went bam, bam, bam, bam three or four times. I couldn't – I didn't see anybody. I was just panicky shooting to scare them off because scaring them is better than shooting them. That's why I wouldn't have to go through this if I had managed to scare this person off and not hit them.

But I was not trying to hit anybody. I didn't see behind the – there's, like, a – some – there's one tree there that's about, uh, yay big around then some bushes

and stuff on that – on that side. So I couldn't see anybody. I wasn't really shooting at anybody at that point, just shooting to make noise to get them to run off.

*Id.* at 10:9-11:4. When repeating his story, Defendant stated:

So I shot to miss, missed the trailer and missed the – I think I shot to miss the trailer, sure hope so. But at that point, I was scared shitless because that person was eyeballing me, and I thought, oh, shit. They're going to start blasting away at me, so I thought I better scare them off….

I shot to miss the trailer so it was behind – it was over to the side of her….

She started running and ran behind the bushes, and then I couldn't see. I thought she was already gone, but I was still scared witless and just – I don't know how many rounds I shot, four or five all together….

If I had seen, I would have definitely shot to miss. But I thought whoever it was had already taken off running so I was just making noise -- … with no intentions of hitting anybody.

*Id.* at 14:24-16:8.

On May 7, 2018, FBI Special Agents Travis Taylor and Michelle Cobb interviewed Defendant after reading him his *Miranda* rights. *See* May 7, 2018 Interview Tr. 2:21-7:21, ECF No. 52-3. Defendant told agents he set up motion sensors on his property following multiple break-ins at his property. *See id.* at 25:1-29:24. After putting in the motion sensors, he had another trespasser on his property the day after Christmas. *See id.* at 30:1-33:2. Approximately two weeks later, Defendant said he heard the motion sensor go off, and because he was scared, he took his pistol. *See id.* at 33:5-14. He then explained again the incident with the guy with the guitar: "I saw a shadow at the back end of the trailer, bent down doing something, and I cocked the pistol and went pow, definitely missing both him and the trailer, just to scare him off. And he got up and took off running, and then I just went pow, pow, pow a couple of more times." *Id.* at 33:15-20. When asked about the incident on May 4th-5th, Defendant stated he heard motion sensors go off twice

before, but he found nothing. *See id.* at 36:23-37:3. But, when the motion sensor went off again,

Defendant said he

> went out again and stood on the back porch, and then I saw the shadow over by the trailer again, somebody trying to break in, and I just panicked, panicked. I lost any – fear took over, cocked the gun right away, and I shot behind the trailer like I did with the other guy.
>
> And then she – I didn't know it was a she – the shadow, took off, and I was just scared, just shooting. And then, uh – to scare them off, just to scare them off. And I went out the back gate, and I thought, oh, what if there's – what if they come back so – because I didn't know I had hit anybody.

*Id.* at 37:7-18. When asked to repeat what happened, the following exchange occurred:

Mr. Smith:  After the first shot, which is behind the – I just went total fear.

FBI SA Taylor:  What was the – the person doing?

Mr. Smith: Running. I thought they – I thought whoever it was had already run off so I was just shooting to make sure that they were scared.

*Id.* at 40:7-13.

He later said, when he shot behind the trailer, it was "[b]ehind the trailer to miss." *Id.* at 47:12. He said the shadow ran away going out toward the street, fleeing, but that at the time he couldn't see where the person was so he figured the person was already out of the area and he was shooting to make sure they were as afraid as he was. *See id.* at 47:18-48:7. Agents then asked Defendant to draw a picture of what happened. *See id.* at 48:8-54:15. Defendant drew a diagram of where he was, where Jane Doe was initially, where he shot initially, which direction she started running, and the direction of his shots. *Compare* May, 7, 2018 Diagram, ECF No. 61-1, *with* May 7, 2018 Tr. 48:8-54:15, ECF No. 52-3.

When asked why more trespassing incidents started occurring in November, Defendant responded that he thought it was "because the first ones who've went through found that it was so easy that they spread the word, and that's why I thought shooting, you know, maybe that'll spread

the word that don't go over there; you'll probably get shot. So that's – shooting just to warn them away, to scare them away." May 7, 2018 Tr. 44:20-45:1, ECF No. 52-3. When asked about the prior incident in which he fired warning shots, Defendant said that about two years ago, somebody tried to break in the front door, and when Defendant opened the door, the person was right here, so Defendant cocked his gun and fired through the door up into the roof. *Id.* at 56:2-15. Regarding the incident with the guy with the guitar case, Defendant stated "it was a frightening release to shoot in his general direction but miss." *Id.* at 57:12-16.

During the preliminary/detention hearing held on May 9, 2018, Special Agent Taylor testified that his knowledge of the case was based on Defendant's interviews with the EPD and the FBI. *See* Tr. 3:8-12, ECF No. 52-2. Special Agent Taylor stated that Defendant "saw a shadow by his camper trailer, fired a warn, a shot to the left of the camper trailer and the shadow moved to, began to move and run to the left in that direction and more shots were fired in that direction." *Id.* at 3:18-21. Special Agent Taylor confirmed that Defendant's statement recited the facts to which he testified as to the shooting towards the figure that night. *See id.* at 4:10-12. He explained that Defendant in his FBI interview "reiterated to me the same facts that he had talked to the Española detective about and in addition, talked about several incidents like this where he had fired shots at people in his backyard…." *Id.* at 4:18-21. When asked to give more detail about how the defendant explained firing shots at the victim, Special Agent Taylor explained:

> Third time he came out, he saw a shadowy figure by his camper trailer, or by his uh deceased mother's camper trailer that is adjacent to the garden and the porch. The shadowy figure crouched down. At that point, he stated he feared that uh he was in danger. When asked if that shadow figure made any movements toward him or had anything in their hand, he stated that he did not see anything nor did they move towards him so he fired a shot to the left of the camper trailer. After the first shot, the shadow figure moved in that direction and he fired, continued to fire shots in that same general direction.

*Id.* at 6:7-14.

During the follow-up bail/bond review hearing held on July 5, 2018, Assistant United States Attorney ("AUSA") Novaline Wilson, described Defendant as having "admitted to prior conduct of shooting at people." July 5, 2018 Hr'g Tr. 10:23-11:1, ECF No. 52-4. In the affidavit supporting a search warrant in August 2019, Special Agent Taylor averred that Defendant had told Detective Abeyta in the interview that he "continued to shoot in the same general direction of the person, as he has done on a prior occasion with another person on his property." Aff. 3, ECF No. 52-1 at 8 of 15.

## II.    Elements of Second-Degree Murder

Defendant is charged with second-degree murder under 18 U.S.C. § 1111, which is "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). To convict the defendant of second-degree murder, the Government must prove the defendant caused the death of the victim named in the indictment with malice aforethought and the killing took place within the territorial jurisdiction of the United States. *See* Tenth Circuit Pattern Instructions No. 2.53. *See also United States v. Visinaiz*, 428 F.3d 1300, 1306 (10th Cir. 2005) (describing second-degree murder elements as (1) defendant killed a person, (2) defendant acted unlawfully, (3) defendant acted with malice, (4) defendant is an Indian, and (5) he committed the crime within Indian Country). The act is unlawful if the killing was without excuse or justification. *Visinaiz*, 428 F.3d at 1307. "Malice, as defined for purposes of second degree murder, requires either: (1) general intent to kill, or (2) intent to do serious bodily injury; (3) depraved heart recklessness, or (4) a killing in the commission of a felony that is not among those specifically listed in the first degree murder statute." *Id. See also United States v. Pearson*, 203 F.3d 1243, 1271 (10th Cir. 2000) (describing second-degree murder's malice aforethought element as "satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent to do serious bodily

injury; (3) a depraved-heart; or (4) commission of a felony when the crime does not fall under the first-degree murder paragraph of § 1111(a).”). In determining whether the requisite malice element is met, a jury may consider the use of a weapon and the manner in which the defendant used the weapon to cause death. *See* Tenth Circuit Pattern Instructions No. 2.53.

The mens rea element distinguishes second-degree murder from involuntary manslaughter. *United States v. Brown*, 287 F.3d 965, 974 (10th Cir. 2002). The former is a general intent crime that requires malice aforethought, which may be proven “by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.” *Id.* The terms “depraved heart,” “reckless and wanton,” and “gross deviation from a reasonable standard of care” are functionally equivalent for this crime. *Id.* In contrast, involuntary manslaughter is “the unlawful killing of a human being without malice ... in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.” *Id.* at 974-75 (quoting 18 U.S.C. § 1112(a)). For involuntary manslaughter, the defendant’s acts must be grossly negligent, or have shown a “wanton or reckless disregard for human life.” *Id.* at 975 (quoting *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000)).  “The substantive distinction is the severity of the reckless and wanton behavior: Second-degree murder involves reckless and wanton disregard for human life that is extreme in nature, while involuntary manslaughter involves reckless and wanton disregard that is not extreme in nature.” *Id.* (quoting *Wood*, 207 F.3d at 1229).

### III.    Standard

“The grand jury proceeding is accorded a presumption of regularity, which generally may be dispelled only upon particularized proof of irregularities in the grand jury process.” *United*

*States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (quoting *United States v. Mechanik*, 475 U.S. 66, 75 (O'Connor, J., concurring in judgment)). An indictment that is valid on its face may not be challenged on the basis that the evidence upon which it relied is unreliable. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 260-61 (1988). Indeed, the Supreme Court has declined to require a prosecutor to present exculpatory information to the grand jury because of the grand jury's historical role as an accusatory body, not an adjudicatory one. *United States v. Williams*, 504 U.S. 36, 51 (1992). The Supreme Court reiterated that neither the history of the grand jury institution, justice, nor the concept of a fair trial, requires a review of facially valid indictments on grounds that the prosecutor's presentation was "incomplete" or "misleading." *Id.* at 54-55.

Unless errors in grand jury proceedings prejudiced the defendant, a district court may not dismiss the indictment. *Bank of Nova Scotia*, 487 U.S. at 254. Dismissal of the indictment "is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Id.* at 256 (internal quotations omitted). An indictment may be dismissed for prosecutorial misconduct before a grand jury if "technical" or "procedural" errors affected the grand jury's finding of probable cause or if the errors threatened the defendant's "right to fundamental fairness in the criminal process." *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1244 (10th Cir. 1996) (quoting *United States v. Kilpatrick*, 821 F.2d 1456, 1466 (10th Cir. 1987)). The former errors must have been raised before a petit jury renders a guilty verdict for a defendant to succeed. *See id.* For the latter type of errors, a court considers "whether the prosecutor engaged in 'flagrant or egregious misconduct which significantly infringed on the grand jury's ability to exercise independent judgment.'" *Id.* at 1245 (quoting *Kilpatrick*, 821 F.2d at 1466). Attempting

to unfairly sway the grand jury or a pervasive attempt to charge without cause or undermine the defense might be characterized as affecting a defendant's right to fundamental fairness. *See id.*

Grand jury proceedings are subject to strict secrecy rules. *See* Fed. R. Crim. P. 6(e)(2); *R. Enterprises, Inc.*, 498 U.S. at 299. An exception exists, however, for courts to authorize disclosure in connection with a judicial proceeding or at the request of a defendant "who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(i)-(ii). Nevertheless, a defendant must make a "strong showing of particularized need before grand jury materials are disclosed." *United States v. Warren*, 747 F.2d 1339, 1347 (10th Cir. 1984). "Specifically, a party seeking grand jury materials must show (1) the materials are needed to avoid a possible injustice in another judicial proceeding, (2) the need for disclosure is greater than the need for continued secrecy, and (3) the request is structured to cover only material so needed." *In re Grand Jury 95-1*, 118 F.3d 1433, 1437 (10th Cir. 1997). The request must be more than a fishing expedition. *Id.* A defendant must point to something in the record that suggests "the prosecution engaged in improper conduct before the grand jury." *United States v. Edelson*, 581 F.2d 1290, 1291 (7th Cir. 1978). Once the defendant makes the particularized need showing, the court must weigh the importance of secrecy and the need for the grand jury transcripts by examining the transcripts *in camera* and structuring an appropriate order limited to the claimed need. *See United States ex rel. Stone v. Rockwell Intern. Corp.*, 173 F.3d 757, 759 (10th Cir. 1999).

## IV.   Motion for Production of Grand Jury Transcripts

### A.  Cross-examination and use of grand jury transcripts

Defendant contends that Ercilia Trujillo, Defendant's neighbor, testified before the grand jury, despite not being able to testify to the material facts of the charge, and thus, defense counsel

has a good faith belief that other witnesses testified before the grand jury. Defendant seeks disclosure of the transcripts of those who testified, or alternatively, an *in camera* review of the transcripts. Defendant contends that his right to cross-examine witnesses under the Sixth Amendment and his right to due process under the Fifth Amendment may be violated if the Government does not disclose the transcripts well enough in advance of trial to effectively use them to impeach witnesses, test their credibility, and/or refresh memories.

The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is "in the possession of the United States" once that witness has testified. 18 U.S.C. § 3500(a) & (b). The Act "manifests the general statutory aim to restrict the use of such statements to impeachment." *Palermo v. United States*, 360 U.S. 343, 349 (1959). The purpose of the Act is to protect the government's files from unwarranted disclosure and to give defendants access to materials usable for impeachment. *See United States v. Smaldone*, 544 F.2d 456, 460 (10th Cir. 1976).

The Jencks Act defines a witness "statement" as (1) a written statement made by the witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording or transcription thereof, that is a substantially verbatim recital of an oral statement made by the witness and recorded contemporaneously with the making of such oral statement; or (3) a statement or transcription thereof made by the witness to a grand jury. 18 U.S.C. § 3500(e). The defendant has the burden to show that particular materials qualify as "statements" and that the purported statements relate to the subject matter of the witness's testimony. *Smaldone*, 544 F.2d at 460.

Under the Jencks Act, the Court cannot compel the early production of the statements. Nor did Defendant make the particularized showing that there is a need for early disclosure of any

specific witness statements. The Court, nevertheless, strongly encourages the Government to disclose Jencks Act material well before trial to avoid trial continuances and delays.

### B.    Characterization of evidence before the grand jury

Defendant argues that grounds may exist to dismiss the indictment because there is no evidence of malice aforethought to sustain the charge of second-degree murder under 18 U.S.C. § 1111. Defendant asserts that the Government has a pattern of mischaracterizing the evidence at previous hearings and that it may have similarly misled the grand jury in its understanding of the evidence. Defendant contends that it was misleading for Special Agent Taylor to indicate that Defendant confessed to firing shots in the direction of the shadow, implying that he aimed in the direction of the intruder. *Compare* May 9, 2018 Tr. 3:20-21, ECF No. 52-2 ("the shadow moved to, began to move and run to the left in that direction and more shots were fired in that direction"), *id.* 4:10-12 (responding "Yes" to AUSA's question of "And that statement did it recite the facts that you just testified to as far as shooting towards the figure that night?"), *with* May 7, 2018 Tr. 37:14-16, ECF No. 52-3 ("the shadow, took off, and I was just scared, just shooting. And then, uh – to scare them off, just to scare them off"); *id.* at 40:8-13 ("I just went total fear... I thought whoever it was had already run off so I was just shooting to make sure that they were scared.").

According to Defendant, Special Agent Taylor and AUSA Wilson also misleadingly said that Defendant had fired shots at people on prior occasions. *Compare* May 9, 2018 Tr. 4:20-21, ECF No. 52-2 ("talked about several incidents like this where he had fired shots at people in his backyard…."); Aff. 3, ECF No. 52-1 at 8 of 15 (stating defendant said he "continued to shoot in the same general direction of the person, as he has done on a prior occasion with another person on his property"), July 5, 2018 Hr'g Tr. 11:1, ECF No. 52-4 ("he admitted to prior conduct of shooting at people"), *with* May 7, 2018 Tr. 33:16-18, ECF No. 52-3 ("I cocked the pistol and went

pow, definitely missing both him and the trailer, just to scare him off."); *id.* at 56:14-15 ("I just cocked the gun and fired through the door up into the roof, pow."); May 5, 2018 Tr. 10:16-20, ECF No. 52-5 ("And I thought they had run off all over – kept going, and I just went bam, bam, bam, bam three or four times. I couldn't – I didn't see anybody. I was just panicky shooting to scare them off because scaring them is better than shooting them."). Defendant asserts that if the inaccurate statements of what Defendant admitted to saying were presented to the grand jury, then he was deprived of his right to a grand jury and is entitled to dismissal.

The Court is not convinced that Defendant has made the particularized showing necessary to compel disclosure of the grand jury transcripts. Defendant must show that the prosecutor engaged in misconduct before a grand jury that affected the grand jury's finding of probable cause or that the errors threatened the defendant's "right to fundamental fairness in the criminal process." The purported potential misrepresentations about which Defendant complains do not amount to flagrant or egregious misconduct that would have significantly infringed on the grand jury's ability to exercise independent judgment. Even assuming that Special Agent Taylor testified before the grand jury as he did on May 9, 2018 at the preliminary hearing, he would have said that Defendant admitted that "the shadow moved to, began to move and run to the left in that direction and more shots were fired in that direction." *See* May 9, 2018 Tr. 3:20-21, ECF No. 52-2. While some of Defendant's statements may be construed as saying that he did not intend to fire in the direction of the shadow, other statements made by Defendant and his own diagram lend support to what Special Agent Taylor testified. Reasonable inferences could be made from Defendant's diagrams and statements explaining them that he admitted to knowing the direction the shadow moved and to knowingly firing shots in that direction. Although Defendant may also have made other statements that are more exculpatory in nature, as the Supreme Court in *Williams* instructs, the

Court may not review the grand jury proceedings to ensure that the prosecutor presented complete information to the grand jury. *See Williams*, 504 U.S. at 51-55.

As for the prior incidents, there is evidence in the record that supports a reasonable inference that Defendant admitted to having fired shots at a person on a prior occasion. *Compare* May 9, 2018 Tr. 4:20-21, ECF No. 52-2 ("talked about several incidents like this where he had fired shots at people in his backyard…."); *with* May 7, 2018 Tr. 57:12-16, ECF No. 52-3 (regarding incident with guy with guitar case, Defendant said that "it was a frightening release to shoot in his general direction but miss"). However, regarding the second prior occasion, Defendant said he shot into the roof, so Special Agent Taylor's statement that Defendant admitted to firing shots *at* people in "several" prior incidents, rather than one, was misleading.

Even assuming Special Agent Taylor may have made the same misleading statement about prior incidents before the grand jury, the Court is not convinced the Government or its witnesses likely made misstatements that substantially influenced the grand jury's decision to indict or engaged in flagrant misconduct before the grand jury to warrant impinging on the secrecy of the grand jury proceedings. The potential misleading statement did not pertain to the charged crime or undermine the probable cause regarding the incident in question. Moreover, any prejudice from the statement that Defendant previously shot in the general direction of several persons trespassing on his property, rather than one, is minimal. Again, based on Supreme Court precedent, the prosecutor had no duty to present to the grand jury other evidence in Defendant's favor that he was not shooting at the person in the prior incident, but rather panicky shooting and/or shooting into the roof. Therefore, even if the prosecutor or a witness made similar statements during the grand jury proceedings as they did in other hearings, Defendant could not establish that the prosecutor engaged in misconduct that undermined the grand jury's finding of probable cause or substantially

13

influenced the grand jury's decision to indict or that there is grave doubt that the decision to indict was free from the substantial influence of such violations.

Consequently, Defendant has not shown that a ground exists to dismiss the indictment to warrant disclosure of the grand jury transcripts. Because Defendant has not made the requisite showing, the Court will deny Defendant's motion to compel disclosure of the grand jury transcripts.

## V.      Motion to Dismiss under Rule 12(b) for Insufficient Evidence

An indictment is required to be "plain, concise, and a definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). "An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006) (quoting *United States v. Dashney*, 117 F.3d 1197, 1205 (10th Cir. 1997)).

"Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion." *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994). When examining the sufficiency of an indictment, the court should look solely to the basis of the allegations made on the face of the indictment, and such allegations are to be taken as true. *Id.* "Courts should refrain from considering evidence outside the indictment when testing its legal sufficiency." *Id.* The Tenth Circuit, nonetheless, has permitted pretrial dismissal of an indictment based on insufficiency of the evidence where the underlying facts were essentially undisputed, and the government did not object to the district court's examination of evidence outside the four corners of the indictment. *Id.* The Tenth Circuit noted, however, that a pretrial determination that, as a matter of law, the

government is incapable of proving its case beyond a reasonable doubt is "the rare exception." *Id.* at 1088.

This case is not "the rare exception." The Government objects to this Court's consideration of evidence at this stage in the proceedings and the operative facts are disputed. There are thus not undisputed facts before the Court showing, as a matter of law, that Defendant could not have committed the offense for which he was indicted. The Court will therefore limit its consideration of the sufficiency of the indictment to the allegations contained therein. *Cf. Todd*, 446 F.3d at 1068 (concluding that dismissals under *Hall* exception are not made on account of lack of evidence to support government's case, but because undisputed evidence shows that, as matter of law, defendant could not have committed offense). Because the indictment contains the elements of second-degree murder, the date, and the place, it sufficiently puts the defendant on fair notice of the charge against which he must defend and enables him to assert a double jeopardy defense. The Court will therefore deny Defendant's motion to dismiss the indictment. The factual issues Defendant raises will be issues for the jury to resolve at trial. *See United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) ("If contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial.").

**IT IS THEREFORE ORDERED** that Defendant's *Motion to Dismiss under Rule 12(b) for Insufficient Evidence* (**ECF No. 50**) and *Defendant's Motion for Production of Grand Jury Transcripts* (**ECF No. 51**) are **DENIED**.

**SENIOR UNITED STATES DISTRICT JUDGE**
**JUDITH C. HERRERA**