1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA      )
                                   )
5    vs.                           )    No. 1:CR-18-3495-JCH
                                   )
6    DOUGLAS SMITH                 )

7

8

9

10

11

12                   TRANSCRIPT OF PROCEEDINGS

13                     ZOOM MOTION HEARING

14                       August 25, 2020

15

16   BEFORE:  HONORABLE JUDGE JUDITH HERRERA
             UNITED STATES DISTRICT JUDGE
17

18

19

20        Proceedings reported by stenotype.

21        Transcript produced by computer-aided

22   transcription.

23

24

25

1    A P P E A R A N C E S:

2    FOR THE GOVERNMENT:    NOVALINE WILSON
                            novaline.wilson@usdoj.gov
3                          KYLE NAYBACK
                            Office of the U.S. Attorney
4                          201 Third Street, Northwest #900
                            Albuquerque, New Mexico 87103
5                          505-346-7274

6    FOR DEFENDANT:         ARIC ELSENHEIMER
                            aric_elsenheimer@fd.org
7                          Office of the Federal Public
                            Defender
8                          111 Lomas Boulevard, Northwest,
                            #501
9                          Albuquerque, New Mexico 87102
                            505-346-2489

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

  1          THE COURT:  If everyone's ready, then we'll

  2  go on the record.

  3          We are on the record in USA versus Smith.

  4  The case number is CR-18-3495.

  5          And can I have counsels' appearances,

  6  please?

  7          MS. WILSON:  Good morning, Your Honor.

  8  Novaline Wilson and Kyle Nayback on behalf of the

  9  United States.

 10          THE COURT:  Good morning.

 11          MR. ELSENHEIMER:  Good morning, Your Honor.

 12  Aric Elsenheimer on behalf of Mr. Doug Smith.

 13  Mr. Smith is at his residence in Espanola.  My

 14  colleague, Dan Berg is there with him so that

 15  Mr. Smith can appear by Zoom.

 16          Mr. Smith has no problem appearing by Zoom,

 17  but I will get a signed waiver of personal presence

 18  as soon as I can, but I have to get a copy of that.

 19          THE COURT:  All right.  Well, I'll go ahead

 20  and do as I do in all of these Zoom hearings, and

 21  just verify with the defendant that he agrees to

 22  participate in this hearing today by way of Zoom

 23  video conference.

 24          So if Mr. Berg could unmute the microphone

 25  for just a moment.

```
 1              So I'm -- this -- by my estimation, this is
 2    essentially a legal argument today.  Nevertheless,
 3    let me ask Mr. Smith -- well, we -- I just want to
 4    put on the record that all of us are participating
 5    today by way of video conference, and most of us are
 6    not in the same place.  You're at your home in
 7    Espanola, I'm at the courthouse in Santa Fe, and
 8    counsel are in different places, I assume in
 9    Albuquerque.
10              So I just want to make sure that,
11    Mr. Smith, you understand that we're all
12    participating by way of video conference.  And I want
13    to know whether or not you are in agreement with
14    proceeding today by way of video conference.
15              THE DEFENDANT:  I am in agreement.
16              THE COURT:  All right.
17              THE DEFENDANT:  I understand.
18              THE COURT:  All right.  Thank you,
19    Mr. Smith.
20              And your attorney indicated that he would
21    be getting a waiver of your personal appearance for
22    the record after this hearing.  But I just wanted to
23    make sure that you -- you were okay with it.
24              So all right.
25              Well, we're here today to take up
```

1   defendant's motion to dismiss for lack of federal

2   jurisdiction.

3           Everybody ready to proceed?

4           MR. ELSENHEIMER:  Yes, Your Honor.

5           MS. WILSON:  Yes, Your Honor.

6           THE COURT:  All right.  I don't know -- let

7   me ask:  Does anybody intend to put on any evidence

8   today, any witnesses?

9           MS. WILSON:  The United States does,

10  Your Honor.  We did file a motion in limine for

11  pretrial determination of Indian Country.  And these

12  would be the same witnesses from the Santa Clara

13  realty office who would testify.

14          We have a GIS technician Ivan Shije, and

15  also the realty director, Jesse Gutierrez.  So those

16  are the two witnesses we are prepared to put on.

17          THE COURT:  All right.  Let me ask

18  Mr. Elsenheimer.

19          Do you intend to put on any testimony

20  today?

21          MR. ELSENHEIMER:  No, I don't, Your Honor.

22          THE COURT:  Okay.  I have reviewed the

23  pleadings that you all filed, so I don't require any

24  oral argument.

25          If you all would -- if you have some brief

```
1    opening comments that you feel you need to make I'll

2    accommodate you.  But otherwise, I'm ready to hear

3    the testimony.

4              Ms. Wilson, anything?

5              MS. WILSON:  No, Your Honor.  The

6    United States is prepared to call our first witness.

7              THE COURT:  All right.

8              Mr. Elsenheimer, any preliminary comments?

9              MR. ELSENHEIMER:  No, Your Honor.  If I

10   could just have an opportunity at the end to make a

11   brief statement.

12             THE COURT:  Yes.  If -- if anybody has

13   anything they want to say, I will certainly

14   accommodate you.  I'm just -- I just wanted you to be

15   assured that I've read your briefs and I'm ready to

16   hear some testimony.

17             With that, then, Ms. Wilson, you may call

18   your first witness.

19             MS. WILSON:  The United States calls Ivan

20   Shije.

21             THE COURT:  All right.

22             So, Mr. Shije, can you hear everything all

23   right?

24             THE WITNESS:  Yes, I do, Your Honor.

25             THE COURT:  Okay.  Good.
```

```
 1              Since we're not in the same room, I'm going
 2    to have my law clerk administer the oath to you by
 3    way of this video conference.
 4              So, Virginia, can you administer the oath,
 5    please?
 6              (Whereupon the witness was sworn.)
 7              THE COURT:  So, Mr. Shije, what I'm going
 8    to do is, I'm going to ask you to spell your first
 9    and last names for the record, please.
10              THE WITNESS:  Okay.  My first name is Ivan,
11    I-V-A-N.  My last name is Shije.  It's spelled
12    S-H-I-J-E.
13              THE COURT:  Okay.  Thank you, Mr. Shije.
14              Ms. Wilson, you may proceed.
15              MS. WILSON:  Thank you.
16          IVAN SHIJE, GOVERNMENT'S WITNESS, SWORN
17                    DIRECT EXAMINATION
18    BY MS. WILSON:
19    Q.    Mr. Shije, what is your occupation, sir?
20    A.    I am a GIS technician for the Santa Clara
21    Pueblo realty department.
22    Q.    Okay.  And could you tell the Court what GIS
23    stands for?
24    A.    Geographical information system.
25    Q.    And in order to be a GIS technician, did you
```

1    have any specialized education or training?

2    A.    Yes.

3    Q.    And where did that take place?

4    A.    At SIPI, which is the Southwestern Indian

5    Polytechnic Institute.

6    Q.    Are you certified?

7    A.    Yes.

8    Q.    And is that certification specific to your

9    current position as a GIS technician?

10   A.    Yes.

11   Q.    And who is your employer?

12   A.    Santa Clara Pueblo.

13   Q.    And is the Pueblo of Santa Clara a

14   federally-recognized Indian tribe?

15   A.    Yes, ma'am.

16           MS. WILSON:  Your Honor, we would ask the

17   Court to take judicial notice that Santa Clara Pueblo

18   is a federally-recognized Indian tribe.

19           THE COURT:  Is there objection,

20   Mr. Elsenheimer?

21           MR. ELSENHEIMER:  No, Your Honor.

22           THE COURT:  All right.  The Court will take

23   judicial notice.

24   BY MS. WILSON:

25   Q.    And, Mr. Shije, could you tell the Court:  What

```
1    are your responsibilities in your job position?
2    A.    I create maps.  We do a lot of the land
3    transfer inter boundary issues, coordinates,
4    et cetera, et cetera.
5    Q.    And as part of the duties, you make maps to
6    help determine the boundaries of the Pueblo of
7    Santa Clara?
8    A.    Yes, ma'am.
9    Q.    And in some cases is that used to determine
10   jurisdiction?
11   A.    Yes, ma'am.
12   Q.    And what type of technology do you use?
13   A.    We use the GIS software.  It is called Art Map.
14   Q.    And could you explain to us a little bit what
15   that is, what that involves, what data it draws from?
16   A.    Yeah.  It's just -- basically we have about six
17   different kinds of imageries.  We mostly use a lot of
18   the satellite imagery.
19         We create shape files which are shared.  We
20   share shape files with Rio Arriba, Santa Fe County,
21   and also with the BIA.
22         And what those shape files are, are
23   basically polygons which you can add on to -- to
24   create a map onto the imagery.
25   Q.    Okay.  As part of your duties, were you asked
```

```
 1   to determine whether a location, specifically
 2   826 North Riverside Drive, was within the boundaries
 3   of the Santa Clara Pueblo?
 4   A.    Yes.
 5   Q.    And could you describe for us how you did that?
 6   A.    We went out onto the field with my GPS, which
 7   is a global positioning system.  It's a device, and
 8   you go on -- you go to the location.  You take about
 9   30 -- I'd say 30 points -- and that shows you where
10   your coordinate is.
11         And you go ahead and you bring that data
12   back to the office and you create a map with it.  And
13   it shows you where that location is that you took.
14   Q.    And approximately how many maps did you create
15   for this case?
16   A.    I believe two maps.
17   Q.    Okay.  If I could show you what has been marked
18   for identification purposes as Government's
19   Exhibits 2 and 3.
20         I will start with 2 first.
21   A.    Okay.
22   Q.    Do you see that, Mr. Shije?
23   A.    Yes, I do.
24   Q.    Okay.  This has been marked.  Let me start with
25   the first one, as Government's Exhibit 2.
```

1          Do you recognize this?

2  A.    Yes, I do.

3  Q.    And how so?

4  A.    I created the map.

5  Q.    And let me show you what's been marked as

6  Government's Exhibit 3.

7          So there's two maps here.

8          Government's Exhibit 3.

9          Do you recognize this also?

10  A.    Yes, ma'am.

11  Q.    How so?

12  A.    I created that one also.

13          MS. WILSON:  At this time, Your Honor, the

14  United States would move for admission of Exhibits 2

15  and 3 and permission to publish.

16          THE COURT:  Is there objection for the

17  admission of Exhibits 2 and 3 or 3, Mr. Elsenheimer?

18          MR. ELSENHEIMER:  No, Your Honor.

19          THE COURT:  All right.  Exhibits 2 and 3

20  are admitted.

21  BY MS. WILSON:

22  Q.    Okay.  Let's go ahead, Mr. Shije, and talk

23  about Government's Exhibit 2, the first map that you

24  created.

25          Could you describe this for the Court?

1    A.    Yes.   The -- the polygons, which are in red,

2    that's a close-up image of the Western Winds Motel.

3               And as you can see, there are all the

4    various businesses around that location and the main

5    street that runs on the side of the Western Winds

6    Motel.

7    Q.    And if you could, describe for the Court what

8    the map you created in the bottom of Government's

9    Exhibit 2 depicts.

10   A.    Okay.  So what that is there is the boundary of

11   Santa Clara Pueblo, which is in lime green.  And that

12   little red dot there is explaining where the Western

13   Winds Motel is located within the exterior boundaries

14   of Santa Clara Pueblo.

15   Q.    And were you able to determine how far that

16   Western Winds Motel, located at 826 North Riverside

17   Road, was from the boundary?

18   A.    Yes.  It is a quarter mile south of the

19   northern boundary of the Santa Clara Pueblo land

20   grant.

21   Q.    Let me show you, Mr. Shije.  If you could,

22   describe for the Court what you did in the top part

23   of Government's Exhibit 3.

24   A.    Okay.  So what I did here is, we have a -- we

25   have a drawer full of plats, of private claims, that

```
 1   all are within the exterior boundary of the
 2   Santa Clara Pueblo land grant.
 3              And as you can see here, I -- I scanned the
 4   plat and I overlaid it onto some satellite imagery.
 5              And I don't know if you can see.  If you
 6   zoom up a little bit closer, you can see where it
 7   says the north boundary of the Santa Clara Pueblo
 8   land grant.
 9              So what I did there is I kind of positioned
10   it to where -- you know, where it fits where all the
11   parcels are.
12              And then the star there is the location of
13   the western boundary -- I mean the Western Winds
14   Motel, excuse me -- with the streets.
15              And also the red line there kind of
16   explains where the northern boundary of Santa Clara
17   Pueblo is located.
18   Q.    Okay.  And just for the record, did I -- did I
19   highlight that properly, that northern boundary?  Is
20   that properly designated, just for the record?
21   A.    Yes, ma'am.
22   Q.    Okay.  And finally, sir, if you could explain
23   to the Court what you did in the bottom half of
24   Government's Exhibit 3.
25   A.    Okay.  For the bottom half, that's just like a
```

medium zoom image of the Santa Clara Pueblo land

grant boundary.

The star there shows where the Western

Winds Motel is also located within the exterior

boundaries of Santa Clara Pueblo.

The little grids on the map are the

section, township, and range, which I believe is 35,

21 north, 8 east.

And if you -- if you scroll up to the big

map there with the plat, it -- it shows that section,

township, and range also.

Q.     And that would be right here (indicating)?

A.     Yes, ma'am.

Q.     Okay.  Thank you.

And, Mr. Shije, in this case were you

responsible for making the certified determination

that that is Indian Country?

A.     No.

Q.     Who did that?

A.     Well, my supervisor.

Q.     And what is his name?

A.     Jesse Gutierrez.

MS. WILSON:  I pass the witness,

Your Honor.

MR. ELSENHEIMER:  Your Honor, would it be

```
1    possible to ask to have the exhibits left on the
2    screen?  I have a couple of questions about them.
3              THE COURT:  Can you leave them on,
4    Ms. Wilson?
5              MS. WILSON:  Yes.
6              MR. ELSENHEIMER:  If it's possible, just
7    because I don't have control over that, if it's
8    possible to go to Exhibit 1.  I have a question about
9    Exhibit 1.
10             MS. WILSON:  Exhibit 2?
11             MR. ELSENHEIMER:  I'm sorry.  Yeah.
12   Exhibit 2.  I'm sorry, Ms. Wilson.
13                     CROSS-EXAMINATION
14   BY MR. ELSENHEIMER:
15   Q.    Good morning, Mr. Shije.
16   A.    Good morning.
17   Q.    Am I pronouncing your name correctly?
18   A.    That's correct.
19   Q.    Great.
20             I have a few brief questions for you.
21             First of all, if you're looking at
22   Government's Exhibit 2, there is a neon green line.
23             Can you tell me what that line represents?
24   A.    Yes.  That's the Santa Clara Pueblo land grant
25   boundary.
```

1  Q.    Is that the original historical land grant
2  boundary?
3  A.    It has expanded over the years, but that is the
4  original.
5  Q.    And how -- where did this line come from?  In a
6  sense, you created this particular image, correct?
7  A.    No.  This was created before I arrived at my
8  job.
9  Q.    And so you didn't put the neon green line on
10 this particular map?
11 A.    Oh, I -- I put the green -- the neon green
12 boundary onto this imagery.  It's just that the
13 street file was created before I got here, and it was
14 passed on to me.
15 Q.    I see.  But you did put the green boundary on
16 this?
17 A.    Yes, I did.
18 Q.    Okay.  And where do you get the data to put
19 this -- to ascertain exactly where that green line
20 should go?
21 A.    This data was created before I got here, so
22 it's been passed down.  We have them -- I have them
23 in my external hard drive.  And you go ahead and you
24 transfer it onto an imagery.
25         And I believe that BIA also uses this

1    imagery as well.

2    Q.    Is it GPS data?

3    A.    It's GIS data.

4    Q.    GIS data.  Okay.

5    A.    Yes, sir.

6    Q.    There's a white dotted line to the right of the

7    image.

8    A.    Uh-huh.

9    Q.    And the red dot is on that white dotted line.

10         What does that white dotted line signify?

11   A.    It explains where -- the split between Santa Fe

12   and Rio Arriba County.

13   Q.    So it's a county line?

14   A.    Yes, sir.

15   Q.    Okay.

16         MR. ELSENHEIMER:  Can we -- Ms. Wilson,

17   could we scroll to the next image?  I believe it's

18   Exhibit 3.

19         Precisely.  Right there is fine.  Thank

20   you.

21   BY MR. ELSENHEIMER:

22   Q.    Mr. Shije, let me ask you about this image.

23         My understanding is that you took -- there

24   was an overlay there.  There is a plat or a map

25   describing private holdings?

1    A.    Yes, sir.

2    Q.    And you placed another map over that?

3    A.    Yes.  I -- I placed the overlay of the plat

4    over the imagery that is provided through Art Map,

5    which is the software I use.

6    Q.    Okay.  So let me make sure that I understand

7    this.

8              So originally, this had kind of an imagery

9    where you see some buildings and trees and -- and

10   roads.

11             Is that correct?

12   A.    Yes, sir.

13   Q.    And then you took a plat map which has, let's

14   say for example, right in the center it says Alfred

15   Lucero and his wife, and P.H. Hill.

16             You took that, which is the plats, and you

17   overlaid it on top of the imagery that contains kind

18   of photographs of trees and buildings.

19             Is that right?

20   A.    Yes, sir.

21   Q.    Okay.  You said this describes certain private

22   claims.

23             Is that correct?

24   A.    Yes, sir.

25   Q.    So all of these -- is it true that all of these

1    particular holdings that are described by the plat

2    map are private claims?

3            Is that right?

4    A.    Yes, sir.

5    Q.    So let's say, for example, that we look at

6    where the star is on this particular image, and it

7    overlays the property that you were asked to look

8    into.

9            That's a private claim, correct?

10   A.    Yes.  A private claim within the stated

11   boundary of Santa Clara Pueblo.

12   Q.    And the claims that are north of that, so going

13   toward the boundary, are those all private claims?

14   A.    Yes, they are.

15   Q.    Is everything on here a private claim?

16   A.    Yes.

17   Q.    So this is all private claims.  And like you

18   say, within the exterior boundaries, but they're all

19   private claims, correct?

20   A.    Yes, sir.

21   Q.    And they have been since -- well, do you know

22   how long they've been private claims?

23   A.    Well, this -- this plat was filed with the

24   public survey office in Santa Fe in 1936.

25   Q.    Okay.  So these would have at least been

```
 1    private claims since 1936.
 2            Is that right?
 3    A.    Yes.
 4    Q.    Okay.  And the property -- again, just to make
 5    sure that we -- the property that you were asked to
 6    look into, the property that is at issue in this
 7    case, is -- is depicted with the star, the gold star
 8    over it, right?
 9    A.    Yes, sir.
10    Q.    And that's a private claim?
11    A.    Yes.
12    Q.    Since 1936?
13    A.    Yes.
14    Q.    Thank you, sir.
15    A.    Uh-huh.
16            MR. ELSENHEIMER:  I have no further
17    questions, Your Honor.
18            THE COURT:  All right.  Thank you.
19            Ms. Wilson, anything further?
20            MS. WILSON:  No, Your Honor.  We pass the
21    witness.
22            THE COURT:  May this witness be excused?
23            MS. WILSON:  Yes, Your Honor.  Thank you.
24            MR. ELSENHEIMER:  Yes, Your Honor.
25            THE COURT:  All right.  Thank you for your
```

```
 1   testimony today, Mr Shije.

 2            Ms. Wilson, you may call your next witness.

 3            MR. NAYBACK:  Good morning, Your Honor.

 4            Kyle Nayback, and I'll call Jesse Gutierrez

 5   to the stand.

 6            (Discussion off the record.)

 7            THE COURT:  Good morning, Mr. Gutierrez.

 8            THE WITNESS:  Good morning.

 9            THE COURT:  So I take it you can hear me

10   all right?

11            THE WITNESS:  Yes.

12            THE COURT:  Okay.  Good.

13            So before we begin, I am going to ask my

14   clerk to swear you in.

15            All right, Virginia?

16            (Whereupon the witness was sworn.)

17            THE COURT:  All right.  Mr. Gutierrez, what

18   I'm going to ask you to do before we begin is simple.

19   If you would, please, for the record, could you

20   please spell your first and last names?

21            THE WITNESS:  Sure.  My name is Jesse

22   Gutierrez.  J-E-S-S-E.  G-U-T-I-E-R-R-E-Z.

23            THE COURT:  All right.  Thank you.

24            So with that, then, Mr. Nayback, you may

25   proceed.
```

```
1              MR. NAYBACK:  Thank you, Your Honor.
2         JESSE GUTIERREZ, GOVERNMENT'S WITNESS, SWORN
3                      DIRECT EXAMINATION
4    BY MR. NAYBACK:
5    Q.    Mr. Gutierrez, would you tell us where you are
6    employed?
7    A.    Santa Clara Pueblo.
8    Q.    What is your title?
9    A.    A realty director.
10   Q.    Do you know an Ivan Shije?
11   A.    Yes.
12   Q.    Do you supervise him?
13   A.    Yes.
14   Q.    Can you describe the training that you received
15   to perform your job, as you just described your
16   title?
17   A.    Yes.  I received some GIS, GPS training.
18   Q.    Where was that at?
19   A.    At SIPI, Southwestern Indian Polytechnic
20   Institute, and also from BIA logs, which is a --
21   Q.    And you had --
22   A.    -- geographic support.
23   Q.    And, Mr. Gutierrez, do you try to keep -- well,
24   let me ask you this.
25              Are you certified in GIS?
```

1    A.    Yes.

2    Q.    And do you try to keep up to date on the latest

3    technology?

4    A.    Yes, I do.

5    Q.    Okay.  Can you please describe for the Court

6    what you do in your position?

7    A.    I oversee the lands at Santa Clara Pueblo, and

8    also deal with trespass issues, internal land

9    transfers, leases, and right of ways.

10   Q.    Are you familiar with a case called

11   United States versus Douglas Smith?

12   A.    Now I am.  At this time I am.

13   Q.    How did you get involved in the case?

14   A.    I was asked by Mr. Travis Taylor, from the FBI,

15   to provide a land status.

16   Q.    Okay.  As part of his request, were you asked

17   to determine whether the scene of an alleged crime is

18   within the exterior boundaries of the Santa Clara

19   Pueblo?

20   A.    Yes.

21   Q.    Can you describe for the Court the process that

22   you use to determine whether a certain site is within

23   the exterior boundaries of the Santa Clara Pueblo?

24   A.    Once I got the request I went ahead and gave it

25   to our GIS technician, Ivan Shije.

1    Q.    And can you describe what he produced?

2    A.    Yes.  He produced two maps.  The first one was

3    produced, and then the second one was an overlay of a

4    plat of the -- over -- over our boundary and our

5    imagery that we have, our shape file.

6    Q.    After you reviewed those maps, did you have any

7    conversations with Ivan Shije about his work?

8    A.    Yes, just to make sure that it's within our

9    exterior boundaries, and make sure we've got the

10   township -- section, township, and range correct.

11   Q.    And were you confident that Ivan Shije did his

12   work accurately and correctly?

13   A.    Yes.

14   Q.    I am going to show you an exhibit,

15   Mr. Gutierrez, if you could be patient.

16   A.    Yes.

17   Q.    Mr. Shije [sic], do you recognize this letter

18   dated July 27 of 2020?

19   A.    Yes.

20   Q.    Who drafted it?

21   A.    I drafted the letter for our governor's

22   signature.

23   Q.    Is this -- Government's Exhibit 4, this letter

24   that's in front of you, is it a fair and accurate

25   depiction of the original letter that you drafted for

1   Governor Chavarria's signature?

2   A.    Yes.

3           MR. NAYBACK:  Your Honor, I move

4   Government's Exhibit 4 and request to publish.

5           THE COURT:  Any objection to Exhibit 4,

6   Mr. Elsenheimer?

7           MR. ELSENHEIMER:  No objection.

8           THE COURT:  All right.  Exhibit 4 is

9   admitted.

10  BY MR. NAYBACK:

11  Q.    Mr. Gutierrez, is this the letter that you

12  produced to Travis Taylor of the FBI, in response to

13  his inquiry to the realty office?

14  A.    Yes.

15  Q.    And can you describe the meaning of the letter?

16  A.    Yes.  It's just to provide a land status report

17  on the area in which the incident occurred at

18  826 North Riverside Drive, and just to show that it

19  is within the exterior boundary of Santa Clara.

20  Q.    What business is located at 826 North Riverside

21  Drive, if you know?

22  A.    The Western Winds Motel.

23  Q.    Mr. Gutierrez, where is the nearest boundary of

24  the Santa Clara Pueblo reservation to the Western

25  Winds Motel?

1    A.     That would be the northern boundary.  It is

2    about a quarter of a mile away.

3    Q.     And did you see any errors or disputes of

4    inquiry in Mr. Shije's work when you reviewed it?

5    A.     No.

6    Q.     What would you do if you saw any discrepancies?

7    A.     I would make sure he corrected them.

8    Q.     Mr. Gutierrez, is there any question in your

9    mind that the Western Winds Motel, located at

10   826 North Riverside Drive, is within the exterior

11   boundaries of the Santa Clara Pueblo?

12   A.     No, there's no question.

13   Q.     Thank you.

14          MR. NAYBACK:  I pass the witness,

15   Your Honor.

16          THE COURT:  Okay.  Mr. Elsenheimer, you may

17   cross-examine the witness.

18          MR. ELSENHEIMER:  I have no questions,

19   Your Honor.

20          THE COURT:  All right.

21          May this witness be excused?

22          MR. NAYBACK:  He may, Your Honor.

23          Thank you for your time.

24          THE WITNESS:  Yes, sir.

25          MR. ELSENHEIMER:  Yes, Your Honor.

```
 1              THE COURT:  All right.  Thank you for your
 2   testimony today, Mr. Gutierrez.
 3              THE WITNESS:  Thank you.
 4              Your Honor, a question?
 5              THE COURT:  Yes, sir.
 6              THE WITNESS:  Do I go ahead and log off, or
 7   do I stay on, or do we need anything else or...
 8              THE COURT:  Ms. Wilson, do you need
 9   anything further from the witnesses?
10              MS. WILSON:  No, Your Honor.  He can be
11   excused.
12              THE COURT:  All right.
13              Mr. Elsenheimer, you don't need anything
14   from either of them.
15              Is that right?
16              MR. ELSENHEIMER:  I do not.
17              THE COURT:  Okay.  Then yes, sir, you may
18   log off.
19              THE WITNESS:  Okay.  Thank you.
20              You have a good day and be safe.
21              THE COURT:  The same to you.  Thank you.
22              THE WITNESS:  Thank you.
23              THE COURT:  Ms. Wilson, any other
24   witnesses?
25              MS. WILSON:  No, Your Honor.
```

```
 1                THE COURT:  And, Mr. Elsenheimer?
 2                MR. ELSENHEIMER:  We have no witnesses.
 3                THE COURT:  Okay.  So with that, then, I
 4     will turn to counsel for any comment or argument
 5     you'd like to make.
 6                MR. ELSENHEIMER:  Who would you like to
 7     hear from first, Your Honor?
 8                THE COURT:  Honestly, it doesn't -- it
 9     doesn't matter to me.
10                If you all have a preference, go ahead.
11                MS. WILSON:  I can start, Your Honor.
12                As -- as Your Honor heard from testimony
13     today, the location is within the boundaries of the
14     Santa Clara Pueblo.  These boundaries have not been
15     extinguished.  Any such extinguishment has to be
16     plain and unambiguous.
17                And from our perspective, the defendant
18     misreads the 1924 PLA and the 2005 amendments.
19                The Tenth Circuit did hold, in Antonio,
20     that the PLA did not terminate federal jurisdiction.
21     And the Section 20A of the 2005 amendment includes
22     language that specifically says within the exterior
23     boundaries.
24                And that's consistent with the modern
25     approach of how Indian Country is determined.  And
```

1    that's consistent with the reading of the statute,

2    Section 151, that Indian Country includes all the

3    lands within the reservation.

4         Jurisdiction does not depend on Indian

5    title.  So the -- the fact that somebody -- private

6    ownership within the boundaries does not affect

7    Indian Country jurisdiction.

8         And recently, the Supreme Court held in

9    McGirt v. Oklahoma -- and the United States did

10   include this analysis in its Document 104 -- that

11   once land is set aside, the boundaries are

12   established for the use by the tribe.  No matter what

13   happens to the title of the parcels within the

14   boundaries, that entire block remains Indian Country

15   until Congress explicitly states otherwise, and that

16   has not happened in this case.

17        Again, Congress has the power under the

18   Indian commerce clause to regulate with regards to

19   the tribe, and this is a basic tenet of federal

20   Indian law.

21        And the United States submits that the

22   property is clearly within the boundaries, a quarter

23   mile from the northern boundary, and that his

24   property is in Indian Country, and that this Court

25   has jurisdiction over this case.

1    We would ask that defendant's motion to

2  dismiss be denied and the Court grant the

3  United States' motion for pretrial determination of

4  Indian Country.

5    THE COURT:  All right.  Thank you,

6  Ms. Wilson.

7    Mr. Elsenheimer?

8    MR. ELSENHEIMER:  Your Honor, I think the

9  fundamental disagreement in this cases is the effect

10  of the Pueblo Lands Act, and then we get to the

11  question of what happens in 2005.

12    But first, to address the consequences of

13  the Pueblo Lands Act in 1924.

14    I want to refer the Court to the Supreme

15  Court's recent decision in McGirt v. Oklahoma.  This

16  is a decision that came down, I believe, in June of

17  this year.  McGirt addressed the status of certain

18  reservation land in eastern Oklahoma.

19    But there's an important facet of that

20  decision that I think has bearing here.

21    In McGirt, the Supreme Court says once a

22  reservation is established it cannot -- it retains

23  that status unless Congress explicitly provides

24  otherwise.

25    In this case, with the Pueblo Lands Act,

1    Congress explicitly provided otherwise.

2              With the Pueblo Lands Act, Congress said

3    that the consequence of that is the relinquishment by

4    the United States and the said Indians.  So whatever

5    pueblo was involved or had previously -- of -- of the

6    land in question, it was a relinquishment by the

7    United States and the said Indians, or the pueblo.

8              That is the type of language that McGirt

9    would -- I believe under the language of McGirt --

10   have to find as a diminishment or disestablishment of

11   a particular tribe.

12             In this case we're talking about a

13   diminishment.  The pueblo was not disestablished, but

14   it was diminished.

15             It was diminished because certain claims on

16   that -- of that pueblo were -- became private

17   property; and, therefore, became part of the state of

18   New Mexico and no longer -- no longer had federal --

19   had characteristics of the federal government or the

20   pueblos.

21             That pueblo was diminished, and that is the

22   consequence of the Pueblo Lands Act.

23             And I think --

24             THE COURT:  Point me to where there was

25   explicit relinquishment that -- as it applies in this

1  case versus quiet title.

2          MR. ELSENHEIMER:  Well, the word

3  relinquishment is used in the Pueblo Lands Act.  So

4  in the Pueblo Lands Act itself it says:

5          "This Act shall have the effect only of a

6  relinquishment by the United States and the said

7  Indians."

8          And then in the title, it describes a

9  relinquishment of that land to the United States and

10 the tribes.

11         Or it said -- the language they used is

12 "said Indians."  We are talking about the pueblo.

13         So the word relinquishment is in the Pueblo

14 Lands Act.

15         McGirt, the recent Supreme Court case, said

16 there's no magic language that Congress has to use to

17 extinguish federal jurisdiction.  They have to use

18 some language that -- if this is an intent to

19 diminish the tribe.

20         The word relinquish -- I'm sure there are

21 other synonyms that could have been used.  But it's

22 quite clear that relinquishing something is

23 disestablishing it.  It is diminishing it.

24         So it's relinquishing vis-a-vis the federal

25 government of the United States and the pueblos, that

1    can only mean one thing.  That can only mean the

2    disestablishment or the diminishment of that

3    particular pueblo, and that is what happened here.

4         That leads us to the 2005 -- I think a

5    clear indication that that's what happened in 1924,

6    is the fact that Congress tried to do something in

7    2005.

8         The problem with Congress' attempt to do

9    something in 2005 is that it doesn't have

10   constitutional authority to do that.  Congress

11   cannot, after it has ceded certain land, or

12   relinquished federal jurisdiction over certain land,

13   cannot go back and just, as if on a blank slate,

14   reassert federal jurisdiction over that land.  It has

15   to have some type of constitutional hub.

16        And in this case we don't have a

17   constitutional hub.  It's not constitutional under

18   the Indian commerce clause, because it doesn't

19   pertain at all to commerce with the tribes or the

20   reservations.

21        It is -- there's no other constitutional

22   hook on which Congress, in 2005, can go back and

23   reassert jurisdiction over something that it has

24   relinquished jurisdiction.

25             In the same way that Congress could not

1   come into Albuquerque and assert jurisdiction over --
2   over Nob Hill or the -- the Northeast Heights.  They
3   just can't come back and say, We're just going to, on
4   a clean slate, reassert jurisdiction.  There has to
5   be a constitutional hook for that reassertion of
6   jurisdiction.
7           If they sold off a piece of land -- if
8   Congress sold off the federal courthouse, for
9   example, and it became a -- I don't know, whatever --
10  it became state land, without some -- without some
11  type of constitutional hook, Congress could just not
12  come in and draft a law saying we now have
13  jurisdiction over that land that we had relinquished
14  jurisdiction over.
15          THE COURT:  So your -- your argument on the
16  2005 amendment really hinges on your reading of the
17  PLA and the use of the word "relinquishment."
18          MR. ELSENHEIMER:  Yes, precisely.  Congress
19  relinquished jurisdiction, relinquished title of
20  jurisdiction over that particular piece of land.  And
21  it can't -- and it could not come back later without
22  a constitutional justification and reassert
23  jurisdiction over that, in the same way they can't --
24  Congress is constrained to do that anywhere else.
25  They could not do that in Espanola.

1           And that's the situation we have here.

2    That is why the federal government doesn't have

3    jurisdiction.

4           THE COURT:  All right.  Thank you,

5    Mr. Elsenheimer.

6           MR. ELSENHEIMER:  Sure.

7           THE COURT:  Anything further, Ms. Wilson?

8           MS. WILSON:  No, Your Honor.

9           Well, briefly, just to address the plenary

10   power of Con- -- Congress has plenary power over

11   Indian tribes, which is clear under the Indian

12   commerce clause, which is broadly construed.  The

13   United States has briefed -- outlined some of that.

14   And that only needs to require rational basis,

15   Your Honor.

16          So it's a fundamental tenet of federal

17   Indian law.  Congress can legislate with regard to

18   Indian tribes and pueblos, so just with regard to

19   that issue.

20          And the fact that relinquishment in the

21   2000 -- in the 1924 -- if defendant's argument relies

22   totally on that, he is ignoring the Tenth Circuit

23   case in Antonio, where the Court there determined

24   that the PLA was a means -- a mechanism to deal with

25   land disputes.  And that specifically, the PLA did

1    not terminate federal jurisdiction.  So that's --

2    that's ignoring that Tenth Circuit precedent.

3           And even if there were issues with the 1924

4    PLA, in 2005 Congress amended that, which they can do

5    with their powers, and they have done that.  They

6    have made those clarifications of jurisdiction in

7    Indian Country, pueblo country specifically.

8           So that's it.  Thank you, Your Honor.

9           THE COURT:  All right.  Thank you,

10   Ms. Wilson.

11          Anything else, Mr. Elsenheimer?

12          MR. ELSENHEIMER:  No, Your Honor.

13          THE COURT:  Okay.  Well, thank you all for

14   your presentations today.  I will take the matter

15   under advisement, and I hope to get a decision out

16   fairly promptly.

17          So anything else that we need to take up?

18          MR. ELSENHEIMER:  I don't believe so,

19   Your Honor.

20          MS. WILSON:  No.  Not from the government,

21   Your Honor.

22          THE COURT:  All right.  Well, thank you

23   all.  And have a good day, and stay safe, everybody.

24          MR. ELSENHEIMER:  You as well.

25          THE COURT:  Thank you.

1          (Proceedings concluded at 10:42 a.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                          CERTIFICATION

2

3    I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.  I further certify that the transcript fees

6    and format comply with those prescribed by the Court

7    and the Judicial Conference of the United States.

8

9    Date:  September 1, 2020

10

11                    _____
                      PAUL BACA, RPR, CCR
12                    Certified Court Reporter #112
                      License Expires:  12-31-20
13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2              GOVERNMENT'S EVIDENCE

3  WITNESSES:

4  IVAN SHIJE:

5    Direct Examination by Ms. Wilson  ................7
     Cross-Examination by Mr. Elsenheimer ...........15
6

7  JESSE GUTIERREZ:

8    Direct Examination by Mr. Nayback  ..............22

9  Certificate of Court Reporter .....................38

10

11

12              GOVERNMENT'S EXHIBITS

13 NO.   DESCRIPTION                      ADMITTED

14 2     Map                                  11

15 3     Map                                  11

16 4     Letter                               25

17

18

19

20

21

22

23

24

25