```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF NEW MEXICO

 3

 4    UNITED STATES OF AMERICA      )
                                    )
 5    vs.                           )   No. 1:CR-18-3495 JCH
                                    )
 6    DOUGLAS SMITH                 )

 7

 8

 9

10

11

12               TRANSCRIPT OF PROCEEDINGS

13              MOTIONS HEARING (via Zoom)

14                  November 5, 2020

15

16    BEFORE:  HONORABLE JUDGE JUDITH HERRERA
               UNITED STATES DISTRICT JUDGE
17

18

19

20       Proceedings reported by stenotype.

21       Transcript produced by computer-aided

22    transcription.

23

24

25
```

1    A P P E A R A N C E S:

2    FOR THE GOVERNMENT:    KYLE NAYBACK
                            NOVALINE WILSON
3                          novaline.wilson@usdoj.gov
                            Office of the U.S. Attorney
4                          201 Third Street, Northwest #900
                            Albuquerque, New Mexico 87103
5                          505-224-1419

6    FOR DEFENDANT:         ARIC ELSENHEIMER
                            aric_elsenheimer@fd.org
7                          AMANDA LAVIN
                            amanda_lavin@fd.org
8                          Office of the Federal Public
                            Defender
9                          111 Lomas Boulevard, Northwest,
                            #501
10                         Albuquerque, New Mexico 87102
                            505-346-2489
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  All right.  We're on the record
 2   in USA versus Douglas Smith.  The case number is
 3   CR-18-3495.
 4              And can I have appearances, please, before
 5   we get into who all is participating today?
 6              MR. NAYBACK:  Good morning, Your Honor.
 7              Kyle Nayback on behalf of the
 8   United States.  I'm with my colleague Novaline
 9   Wilson.  And we'll be sharing motions and witnesses
10   on and off, if that's okay.
11              THE COURT:  Thank you.
12              MR. ELSENHEIMER:  Good morning, Your Honor.
13              Aric Elsenheimer on behalf of Mr. Douglas
14   Smith.
15              We are in the Mimbres courtroom.  I'm
16   joined by my colleague, Amanda Lavin and a paralegal
17   with the federal public defender's office.
18              And Mr. Smith is with us here in the
19   courtroom.
20              Your Honor, before we go -- because we're
21   in the courthouse, as I understand there is a court
22   order that requires that we wear masks.  If we're
23   sitting at counsel table, we will be wearing masks.
24   But can I have the Court's permission to not wear a
25   mask while I'm speaking, or whomever is speaking?
```

1    Would that be all right?
2            THE COURT:  That's fine.  Can you just let
3    me know if you're properly distanced from other
4    people at that point or...
5            MR. ELSENHEIMER:  We are from Doug Smith.
6    But we -- we're doing our best to stay as far away as
7    we can.  Probably not six feet from my colleague.
8    But...
9            THE COURT:  Well, if those who are not
10   speaking wear masks, maybe we can try to...
11           MR. ELSENHEIMER:  They do have masks on.
12           THE COURT:  All right.  Okay.  Thank you.
13           Now, I don't see the defendant.  But you
14   said he's in the courtroom with you.
15           Is that correct?
16           MR. ELSENHEIMER:  He is.  Yes, Your Honor.
17   Let me have him come up to the -- he is here.
18           THE COURT:  As long as you put on the
19   record that he's there, that's fine.
20           So, Mr. Nayback, tell me who else is
21   observing or participating in this hearing.
22           MR. NAYBACK:  Thank you, Your Honor.
23           The first witness we intend to call is
24   Saige Libertore, who you see on your screen, I
25   believe.

1          The second witness is Theodore Chavez, who

2   you see on your screen.  He's presenting from our US

3   Attorney's office in Tulsa, Oklahoma, Conference Room

4   561.

5          And then I believe we have -- I don't see

6   their names, but a couple of FBI supervisors

7   observing.  Eric Smith and Jim Adar.  Those are the

8   four witnesses and/or participants that should be

9   allowed on behalf of the United States.

10         Thank you.

11         THE COURT:  All right.  Mr. Elsenheimer, do

12  you have any witnesses or observers?

13         MR. ELSENHEIMER:  We have three observers,

14  Your Honor.

15         The first observer is Ms. Shaley Klein.

16  I'm sorry.  It shows up on the screen as S. Klein.

17  Shaley Klein is a paralegal intern with our office.

18         Also joining us is Corina Titus.  She's an

19  investigator with our office.

20         And lastly, I believe it's Verenees -- I

21  think it's Pernia.  I can't see the full name.  But

22  that's somebody who our colleague, Kari Converse --

23  someone who asked our colleague Kari Converse if --

24  if that person can observe a hearing.  And this was a

25  hearing that was on the calendar.  So...

```
 1              THE COURT:  All right.  Very good.

 2              Well, we're here today to take up several

 3    motions.  Let me tell you that you have my undivided

 4    attention all morning, but I need to try to get this

 5    wrapped up before we break for lunch.  Hopefully we

 6    break for lunch at noon.  But if it's a little -- if

 7    it goes a little bit longer I can accommodate that,

 8    but we need to -- we need to be -- I don't have the

 9    afternoon available.  So hopefully that works with

10    your -- with your plans.

11              So I think we should begin with the motions

12    that require testimony.

13              So let me ask:  Are you ready to proceed,

14    Mr. Nayback?

15              MR. NAYBACK:  I am, Your Honor.  And we

16    would -- I'm glad you suggested that.  We were hoping

17    to call Saige Libertore first.  I don't think she's a

18    lengthy witness, at least from our perspective.

19              And then Theodore Chavez second.  And he is

20    the trajectory expert.

21              Ms. Libertore put the model together, and

22    so those are the respective motions that we were

23    having them testify about.

24              So we would be happy to start with

25    Ms. Libertore whenever the Court is ready.
```

1          THE COURT:  All right.  Is that all right

2  with you, Mr. Elsenheimer?  My suggestion that we

3  begin with testimony, to the extent we can get that

4  done.  I'd like to be sure that we get that done this

5  morning.  If what is left after that is oral

6  argument, I feel like I can accommodate that more

7  easily.

8          So, okay with you?

9          MR. ELSENHEIMER:  That's certainly fine

10  with me.

11          THE COURT:  All right.

12          MR. ELSENHEIMER:  Your Honor?

13          THE COURT:  Yes.

14          MR. ELSENHEIMER:  We would invoke the rule

15  for purposes of this hearing.

16          THE COURT:  So are there any witnesses that

17  are observing that are not expert witnesses or case

18  agents?

19          MR. NAYBACK:  Not on behalf of the

20  United States, Your Honor.

21          THE COURT:  All right.  So this being a

22  video conference hearing it's, I guess, easier for us

23  to keep track of who is observing.

24          But to the extent there is a witness that

25  I'm not aware of, I will require that that witness

1    remain outside of the hearing process.  So -- because
2    the rule has been invoked.
3            So all right.  Well, then, I assume,
4    Mr. Nayback, you're putting on the first witness, not
5    Ms. Wilson?
6            MR. NAYBACK:  You are correct, Your Honor.
7    Thank you.
8            THE COURT:  All right.  You may proceed.
9            MR. NAYBACK:  Thank you.
10           The United States calls Saige Libertore to
11   the virtual witness stand.
12           THE COURT:  Let me just state also, for the
13   record, that we are doing all of this by Zoom video
14   conference.  The defendant is participating.  I -- to
15   the extent the defendant has a right to an in-person
16   hearing on a motion to suppress or these various
17   motions, I am operating under the assumption that the
18   defendant has waived personal appearance.
19           Is that right, Mr. Elsenheimer?
20           MR. ELSENHEIMER:  He is willing to waive
21   the personal appearance.  We haven't had him fill out
22   a form yet, but we will give that to the Court.
23           THE COURT:  All right.  Thank you.
24           So we are ready for the witness to take the
25   virtual witness stand.

1          Thank you.  And my clerk will administer
2    the oath.
3        SAIGE LIBERTORE, GOVERNMENT'S WITNESS, SWORN
4                    DIRECT EXAMINATION
5    BY MR. NAYBACK:
6    Q.    Miss, will you state and spell your full name
7    for the record?
8    A.    Saige Libertore, S-A-I-G-E, L-I-B-E-R-T-O-R-E.
9    Q.    Where do you work?
10   A.    I work for the FBI laboratory in Quantico,
11   Virginia.
12   Q.    What is your title?
13   A.    I's am a visual information specialist.
14   Q.    Can you tell the Court a little bit about your
15   job description?
16   A.    Yeah.  So I go out and I document crime scenes
17   with total station, scanning, photography, enhanced
18   sketching, and I bring that data back to the
19   laboratory, and I use it to reconstruct said crime
20   scenes.
21          Sometimes I'll reconstruct evidence as
22   well.  And that is peer reviewed, supervisor
23   reviewed, and then we give it to the case agent or
24   whoever requested it.
25   Q.    Can you describe your educational background?

1   A.    Yes.  I graduated with a bachelor's degree from

2   Ringling College of Art and Design in Sarasota,

3   Florida, in 2017.

4   Q.    Can you talk a little bit about your training

5   on the job at the FBI?

6         How do you learn how to put these crime

7   scene models together?

8   A.    So the bureau -- the FBI, they provide training

9   through classrooms.  And then once you have the basic

10  understanding of the programs that we use and the

11  techniques, we then go on to shadow senior visual

12  information specialists, both in the laboratory and

13  on scene.

14        And after a little while, once it's

15  determined that you understand our process, then

16  we're able to go out on our own with the rest of our

17  team and collect that data on our own.

18  Q.    You touched on this briefly.  But can you

19  explain, when you do work on a model, how is it

20  reviewed by supervisors and other peers?

21        I mean, are they just looking at it or are

22  they cross-checking measurements?  Are they

23  interviewing you?

24  A.    All of the above.  So as the model is

25  progressing, they come through at various milestones

```
1    and they will take measurements.  They will look at
2    the data that I'm taking my measurements from, and
3    they will just double and triple check that I'm doing
4    everything correctly, that the scale conversions are
5    accurate.
6                And once everything is complete, we'll have
7    another peer review it.  And then a supervisor comes
8    in, and he does his own review before it's shipped
9    off.
10   Q.    Okay.  Ms. Libertore, I'm going to show you
11   some exhibits.  Would you please let me know verbally
12   whether you can see those when they come up on your
13   screen?
14   A.    Of course.
15                There we go.
16   Q.    Ms. Libertore, I'm showing you what I believe
17   is Government's Exhibit 1 on your screen.
18                Do you see that?
19   A.    I do.
20   Q.    Okay.  Do you recognize what's in that
21   photograph?
22   A.    Yes.  That is the model that I constructed.
23   Q.    Is it a fair and accurate depiction of the
24   model, as it left the FBI, before you sent it to
25   New Mexico?
```

A.     Yes.

          MR. NAYBACK:  Your Honor, I move for
admission of Government's Exhibit 1, just for
purposes of this hearing.

          THE COURT:  All right.  Let me just -- I
have received a binder of exhibits from -- that's
labeled "United States Superseding Exhibits for
Motions Hearing on November 5."

          And I -- I see a Government Exhibit 1 that
I -- I just want to be clear for the record.  There
is a Government's Exhibit 1 that is attached to
Theodore J. Chavez's -- well, it is Theodore Chavez's
CV or resume.

          And so I just want to make sure that the
book that I have, that has two different exhibits
marked Government's Exhibit 1.  I just want to make
the record clear, because I also have Government's
Exhibit 1 as this photograph.

          So I've got two Government Exhibit 1s in
this notebook.

          MR. NAYBACK:  I apologize, Your Honor.
That -- that's on me.

          There are three exhibits attached to
Document 73, and they are listed as Government's
Exhibits 1, 2, and 3.

1          So you wouldn't find them necessarily in

2     the binder; but they're, rather, attachments to

3     Doc 73.  And it's actually -- the title of Doc 129 is

4     "Notice of Filing of Superseding Exhibits in Support

5     of Motion in Limine to use Demonstrative Exhibits at

6     Trial."

7          So I apologize for the confusion.  If

8     you'll let me know when I may proceed, or when the

9     Court has located it.

10         THE COURT:  All right.  I just want to make

11    sure that the record is clear.

12         So I'm with you.  You may proceed.

13         Let me ask Mr. Elsenheimer, is there any

14    objection to Government's Exhibit 1 for purposes of

15    this hearing?

16         MR. ELSENHEIMER:  Not for purposes of this

17    hearing, Your Honor.

18         THE COURT:  All right.  So for purposes of

19    the hearing, Government's Exhibit 1 is admitted.

20         MR. NAYBACK:  Thank you.

21    BY MR. NAYBACK:

22    Q.    And, Ms. Libertore, can you see the next

23    exhibit, Government's Exhibit 2?

24         Does that show on your screen?

25    A.    I think this is 3.

```
 1   Q.      Okay.  Is that 2?

 2   A.      That's 2, yes.

 3   Q.      Okay.  And is this also a photograph of the

 4   model that you created?

 5   A.      It is.

 6   Q.      A fair and accurate depiction?

 7   A.      It is.

 8              MR. NAYBACK:  I move Government's 2,

 9   Your Honor.

10              THE COURT:  Mr. Elsenheimer, any objection

11   for the purposes of the hearing today?

12              MR. ELSENHEIMER:  No, Your Honor.

13              THE COURT:  All right.  Government's

14   Exhibit 2 is admitted.

15              MR. NAYBACK:  Thank you, Your Honor.

16   BY MR. NAYBACK:

17   Q.      And Government's Exhibit 3, Ms. Libertore, do

18   you recognize it?

19   A.      I do.

20   Q.      Does it appear to be a close-up shot of the

21   model that you created?

22   A.      It is.

23   Q.      A fair and accurate depiction of the actual

24   model?

25   A.      Yes.
```

```
 1              MR. NAYBACK:  I move 3, Your Honor.
 2              THE COURT:  Mr. Elsenheimer, any objection?
 3              MR. ELSENHEIMER:  No, not for purposes of
 4  this hearing.
 5              THE COURT:  All right.  Government's
 6  Exhibit 3 will also be admitted for today's hearing.
 7  BY MR. NAYBACK:
 8  Q.    So, Ms. Libertore, I'm going to leave these up
 9  just for a minute and ask you a little bit about
10  them.
11              But can you talk about -- when you get an
12  assignment from a case agent or from a US Attorney's
13  office, can you explain to the Court how you go about
14  creating a smaller version of an actual -- of an
15  alleged crime scene?
16  A.    Yes.  So I will typically receive an assignment
17  from a case agent, and they will discuss that they
18  want a representation of a crime scene.
19              So either I will receive data that has
20  already been collected, or I will go out with a team
21  and collect it myself.  And once that data comes back
22  to the lab, I will use it to create a scaled down
23  version.
24              So with this one in particular, the data
25  had already been collected.  So I used the total
```

1    station measurements and the scan data, as well as

2    some photography and aerial imagery, scaled it down

3    to 5/16 scale, and then built it from there.

4    Q.    How do you decide what scale to use?

5    A.    This one, it had been decided by another visual

6    information specialist, so I stuck with that scale.

7              But typically, we will just decide -- it

8    has to fit through doors, so usually we keep it under

9    35 inches wide.  That's important to keep in mind.

10             And with this one, it worked out in the

11   5/16 scale simply because of the scope of the model

12   and the structures that needed to be included.

13   Q.    Okay.  So can you describe what is in the

14   bottom left?  It looks like a little placard.  On

15   this photograph, it looks like it's on the model as

16   well.

17             Can you describe, if you can read it,

18   basically what that says so the Court knows?

19   A.    Yes.  So that is an end plate, and it just has

20   the address of where the scene is located.  And it

21   has the scale itself, so it will have the name of it.

22   So 5/16 scale.  And then it also has a ruler, so it

23   can be checked by someone, and a north arrow

24   indicator so people can orient themselves.

25   Q.    And can you explain how this scale worked?

5/16 of what is equal to a foot of what?

A.    So 5/16 of an inch is 1 foot.  And the scale
conversion factor for that is .026.  So when you're
taking the measurements from a one-to-one scale, you
would just multiply the inches by 0.026, and you will
arrive at the 5/16 measurement.

Q.    A few minutes ago you explained that you were
using data taken by a total station and photography.

      Can you go a little bit more into depth as
to your experience reading total station data and
kind of what total station data is?

A.    Of course.  So we collect total station data at
almost every scene that we deploy to.  And it's a
very popular survey data collecting method, where two
operators will choose certain points, whether those
are evidence, buildings, cars, bullet holes.  And
it's all shot into something that can be
geo referenced and placed back into a measurement.

      And we use that to build the bones of the
crime scene and also place evidence, place vehicles,
place structures, and you can take measurements from
that.

Q.    Okay.  And then I see here in the model you
also have a number of trees and bushes which may or
may not be important in this case.

```
 1              Can you explain to the Court whether those
 2    are to scale as well?
 3    A.    They are.  So they -- vertically, you know,
 4    they -- I can't measure exactly how tall they are.
 5    But I know that they are placed exactly where they
 6    need to be, simply because the FARO scanner collected
 7    everything in place.  And that is very similar to a
 8    total station, except instead of choosing a few dozen
 9    points, you're choosing millions.
10              So each of those is measured, and I used
11    that data to place the foliage.
12    Q.    Why is the FBI asked to make models of crime
13    scenes?  Is that helpful in some way?
14    A.    It's very helpful to juries and witnesses, to
15    place themselves back in the scene.  You know, a
16    picture is worth a thousand words, but a model is
17    worth a million, simply because it puts things into
18    three-dimensional reality.  And you know we may get
19    there eventually, but 3D digital is a little bit
20    disarming for some people.  So -- especially for
21    witnesses who have a difficult time understanding
22    exactly where they were when the situation took
23    place.
24              It's just very helpful for people to place
25    themselves back into the scene.
```

```
 1   Q.    Final question, Ms. Libertore.

 2          Are you confident that this model fairly

 3   and accurately represents the alleged crime scene in

 4   this case?

 5   A.    I am.

 6          MR. NAYBACK:  I'll pass the witness,

 7   Your Honor.

 8          THE COURT:  All right.  Thank you.

 9          Mr. Elsenheimer, you may cross-examine the

10   witness.

11          MR. ELSENHEIMER:  Thank you, Your Honor.

12          Can I ask the government to unshare their

13   screen?  Maybe they already did.

14          THE COURT:  They did.

15          MR. ELSENHEIMER:  Thank you.

16                   CROSS-EXAMINATION

17   BY MR. ELSENHEIMER:

18   Q.    Good morning, Ms. Libertore.

19   A.    Good morning.

20   Q.    So did you ever visit the address at

21   825 Riverside Drive in Espanola?

22   A.    No.

23   Q.    You never personally visited that location?

24   A.    No, I've never been there.

25   Q.    Who was -- who was it that went there to
```

```
 1   collect the data?
 2   A.    It was the Albuquerque evidence response team
 3   from the FBI.
 4   Q.    And do you know who that consisted of in this
 5   case?
 6   A.    I would have to look up the names.
 7   Q.    Do you know when they visited the property at
 8   825 Riverside Drive in Espanola to collect the data?
 9   A.    I don't have the date of that, but I could get
10   it for you.
11   Q.    Do you have it available, readily available?
12   A.    Not readily.  I'd have to go to the office.
13   Q.    You're not in the office right now?
14   A.    No, sir.
15   Q.    Okay.  So how long -- well, do you know the
16   date of incident of the alleged -- of the allegations
17   in this case?
18   A.    I only know the [audio cutting out] date.  But
19   I --
20   Q.    What do you know that to be?
21   A.    It was just a time stamp.  But I would much
22   rather get the actual date for you.
23   Q.    And do you have that information readily
24   available?
25   A.    Again, that's in the office.
```

1   Q.     Okay.  Let me ask you this.

2          You said "time stamp."  Are you referring

3   to a time stamp on the photographs that you looked

4   at?

5   A.     Yes, sir.

6   Q.     Okay.  So that goes to my next question.

7          What -- let me ask you.  Let's set aside

8   the data for a moment.

9          What other information did you look at to

10  familiarize yourself with this case?

11  A.     I only looked at the scan data that was

12  collected, the total station data that was shot on

13  scene, and the photographs that were taken.

14  Q.     And let me just -- the photographs that were

15  taken, are you referring to the photographs that were

16  obtained by the data collection team or photographs

17  obtained by other law enforcement officers at the

18  time of the incident?

19  A.     The data collection team.

20  Q.     Okay.  So you haven't looked at anything from

21  any other law enforcement about photographs or -- or

22  documents relat- -- taken at or shortly after the

23  alleged incident in this case?

24  A.     I also referenced an aerial imagery piece that

25  was pulled by the data collection team.  So that

```
 1    isn't specifically from the FBI.  That would be
 2    provided by Google Earth.
 3    Q.    Did you look at aerial data?
 4    A.    That would be the aerial data.
 5    Q.    Was there a drone or air- -- some type of
 6    aircraft?
 7    A.    Not that I'm aware of.
 8    Q.    And you didn't look at anything that was
 9    collected by a drone?
10    A.    No, sir.
11    Q.    So you don't know when the data was collected?
12    A.    I can get it to you.
13    Q.    Do you -- and you don't know, off the top of
14    your head, the date of the incident in this case?
15    A.    No, sir.  Not off the top of my head.
16    Q.    Okay.  So off the top of your head, you don't
17    know how long it was between the date of the incident
18    and the date that the data was collected.
19          Is that right?
20    A.    That's correct.
21    Q.    Okay.  Let me show you a few photographs, and
22    perhaps that will -- if there is a time stamp or a
23    date stamp, that will refresh your recollection.
24          Now, let me show you a photograph -- well,
25    let me first go back and -- and show you what I've
```

1    labeled as Defendant's Exhibit A.

2            And I think we've already discussed this,

3    but I have a couple of questions for you about it.

4            Are you able to see that, Ms. Libertore?

5    A.    I am.

6    Q.    Okay.  And can you just tell me what that is?

7    A.    That is the nameplate that we discussed that

8    has the address of the incident, as well as the scale

9    and the north indicator.

10   Q.    And so you said that 5/16 equals -- of an

11   inch -- equals 1 foot.

12           You gave a decimal point.  What was the

13   decimal number you gave?

14   A.    That is 0.026.

15   Q.    And that's the conversion of 5/16 of an inch?

16   A.    That is the scale conversion for model makers.

17   Q.    Okay.  So if one were to try to ascertain what

18   the scale is, we would take the -- let's say we were

19   looking at Point A to Point B, and there is 20 feet

20   between Point A to Point B.

21           To get the scale conversion we would take

22   20 feet -- 20, and we would multiply that by 0.026.

23           Is that right?

24   A.    You would have to convert the feet to inches

25   first, and then multiply the inches by .026.

1 Q.    I see.  So it would be 20 times 12 times .026?

2 A.    Yes.

3 Q.    Okay.  Thank you.

4       MR. ELSENHEIMER:  Your Honor, I move

5 Defendant's Exhibit A.

6       THE COURT:  Is there objection?

7       MR. NAYBACK:  No objection.

8       MR. ELSENHEIMER:  For purposes of this

9 hearing.

10       THE COURT:  Exhibit A is admitted.

11       MR. ELSENHEIMER:  Thank you.

12 BY MR. ELSENHEIMER:

13 Q.    Ms. Libertore, let me show you

14 Defendant's Exhibit B.

15       And this -- can you tell us what this is?

16 A.    Yes, sir.  That is the model that I

17 constructed.

18 Q.    What is the directional -- so what is -- what's

19 the north, south, east, west, as it relates to this

20 model?

21 A.    North would be to the right.  So if we're

22 looking at the corner that's closest to us, on the

23 right side, that is the north side of the model.

24 Q.    So the corner that it is closest to the bottom

25 of the screen --

1    A.    Uh-huh.

2    Q.    -- would be the north side of the model?

3    A.    Yes, sir.  The side to the right of that

4    corner.

5    Q.    Okay.  Okay.

6          And now this particular model, there is --

7    just in from that north corner, there's a building or

8    the model of the building with a metal -- what

9    appears to be kind of a silver roof.

10   A.    Uh-huh.

11   Q.    What was -- what's your understanding of what

12   that building is?

13   A.    That is, from my understanding, the residence

14   of the defendant.

15   Q.    And that particular image right there, though,

16   is missing a separate building.

17          Is that right?

18   A.    Yes, sir.

19   Q.    And what building is it missing?

20   A.    I'm not sure.  It wasn't in my data.

21   Q.    Well, let me show you Defendant's Exhibit B,

22   and then I'll come back to -- actually, I'm sorry, D.

23          I'm sorry.  Let me show you Defendant's

24   Exhibit E.

25          So do you recognize this image here?

```
1    A.    I've never seen this image before, but I do
2    recognize that that is the crime scene.
3    Q.    Okay.  And if we are looking at this particular
4    image, this would be -- the north would be to the
5    right of the image?
6    A.    Yes, sir.
7    Q.    And -- and is it right -- I just want to make
8    sure we're oriented.
9          Is it correct to say that the driveway and
10   the road are to the bottom of the image?
11         Is that correct?
12   A.    Correct.
13   Q.    And I'm going to put this image next to a prior
14   image.
15         MR. ELSENHEIMER:  If we can have a moment,
16   Your Honor.  We need to put the images together and
17   then share.
18         While I'm waiting for that, I had
19   referenced Exhibit B.  That was the model that you
20   put together.
21         I would move the admission of Exhibit B as
22   well.
23         THE COURT:  Any objection, Mr. Nayback?
24         MR. NAYBACK:  No objection, Your Honor.
25         THE COURT:  Exhibit B is admitted.
```

```
 1   BY MR. ELSENHEIMER:

 2   Q.    So -- we're going to have to do these

 3   separately, Ms. Libertore.

 4            So the image I was just showing you, the

 5   aerial view, there was another building there that is

 6   not in the model.

 7            Is that correct?

 8   A.    Correct.

 9   Q.    And then there is a large section of the

10   driveway that is also not in the model.

11            Is that correct?

12   A.    Correct.

13   Q.    And how much -- did you do any measurements of

14   that particular driveway to ascertain how much of

15   that driveway -- or how far it is between the

16   building and the road that is not in the model?

17   A.    So the data that I received only extended to

18   the area that you're seeing.  So I couldn't create

19   anything beyond that, simply because it was outside

20   the scope of our collection.

21   Q.    I see.  So the team that went here to collect

22   data never collected data from the front of the

23   building.

24            Is that correct?

25   A.    As far as I'm aware.
```

1  Q.    Okay.  And by "the front of the building," I

2  mean the driveway and the view of the building from

3  the road.

4         That data was never collected?

5  A.    As far as I'm aware.

6  Q.    And let me -- so this is, I believe, Exhibit B.

7         Let me move to Exhibit C.

8         So, Ms. Libertore, this is another image of

9  the model.  It's -- let me just -- tell me if I'm

10 wrong.

11        This is a view of the model from what would

12 be the driveway in real life, correct?

13 A.    Correct.

14 Q.    And on the -- on the left of the screen is

15 another building.

16        Can you describe that building for us, or

17 what is your understanding of what that building is?

18 A.    I believe it to be some sort of an apartment

19 complex.

20 Q.    I'm sorry.  What was that?

21 A.    Is it part of an apartment complex, I believe?

22 Q.    Is this the entire -- a representation of the

23 entire building?

24 A.    No.

25 Q.    So it's -- it's only a section of that

1    building?

2    A.    Correct.

3    Q.    How much of the building is not included in the

4    model?

5    A.    I don't have those measurements.

6    Q.    Were you ever given those measurements?

7    A.    No, sir.

8              MR. ELSENHEIMER:  I would move the

9    admission, for purposes of this hearing, of

10   Exhibit C.

11             THE COURT:  Any objection, Mr. Nayback?

12             MR. NAYBACK:  No objection, Your Honor.

13   Thank you.

14             THE COURT:  All right.  Exhibit C is

15   admitted.

16             MR. ELSENHEIMER:  Let me move -- move back

17   to Exhibit E.

18   BY MR. ELSENHEIMER:

19   Q.    So here is Exhibit E.  Again, I just want to

20   ask you:  The entire front portion of the building,

21   which is basically in the middle of the screen, that

22   is not included in your model, correct?

23   A.    Correct.  It is not included.

24   Q.    And the entire -- the entire driveway section

25   of this building is not included in your model,

1  correct?

2  A.    Correct.  That would have made the scale too

3  small.

4  Q.    And a portion of the apartment complex that is

5  on the left of the image on the screen, a portion of

6  that -- and you don't know what portion -- is also

7  not included in your model, correct?

8  A.    Correct.

9            MR. ELSENHEIMER:  I would move the

10  admission of Defendant's Exhibit E.

11            MR. NAYBACK:  No objection.

12            THE COURT:  All right.  Exhibit E is

13  admitted.

14  BY MR. ELSENHEIMER:

15  Q.    Just to ask you about your model.

16            There's no real way to tell how far -- in

17  the model, there's no way to tell how far the house

18  is to the street.

19            So the house that's included in your model,

20  there is no way to determine, from the model, how far

21  that house is from where the street would be.

22            Is that correct?

23  A.    Correct.

24  Q.    And there is no way to determine how much

25  farther the apartment building on the left extends,

1  based on your model, correct?

2  A.    Correct.

3  Q.    Did you -- you said that this model was an

4  accurate reflection of the crime scene.  I think that

5  is what you said during your direct examination.

6        Is that right?

7  A.    Yes.

8  Q.    But you never looked at any images or pictures

9  taken at or around the time of the alleged incident.

10       Is that correct?

11  A.    I did receive some images that were taken.  And

12  I believe it was around the time of the crime scene.

13  But again, I would have to go into the office and get

14  the time stamp for you.

15  Q.    Okay.  So there are -- there were photographs

16  that you looked at that were around the time of the

17  alleged incident?

18  A.    I would have to look at those time stamps.

19  Q.    Okay.  So let me ask you about the -- the --

20  some more details of the model.

21       I'm going to bring up Defendant's

22  Exhibit G.

23       Are you able to see Defendant's Exhibit G

24  here?

25  A.    Yes, sir.

1   Q.    And can you just orient us to where this is as

2   it pertains to your model?

3   A.    Yes.  So we're standing right in front of the

4   small carport with the tin roof shed.  And you are

5   looking towards the front door of the defendant's

6   house.

7   Q.    And this particular image is missing several

8   items from what one would see if one were to look at

9   a picture, an actual picture of this scene, correct?

10  A.    Correct.

11  Q.    Let me pull up Defendant's Exhibit H.

12          So -- so let me ask you first, before I ask

13  you about the image.  Let me ask you:  This does have

14  a time stamp of 5-5-2018.

15          Have you viewed this image before?

16  A.    No, sir.

17  Q.    So this is not one of the images that you

18  viewed, that were given to you by the -- by the FBI

19  or anybody else?

20  A.    No, sir.

21  Q.    Were you given any images with a time stamp of

22  5-5-2018?

23  A.    I'd have to look.

24  Q.    Well, can you -- can you tell us what this

25  image is?

```
 1   A.    Yes.  It is from a fairly similar perspective
 2   to the exhibit we just had pulled up.  And we are
 3   looking towards the defendant's front door again.
 4   Q.    Okay.  And this is what your model was trying
 5   to reflect.
 6              Is that right?
 7   A.    Correct.
 8   Q.    And not included in your model, though, are a
 9   number of objects that we see in this image.
10              Is that right?
11   A.    Right.
12   Q.    So for example, there are marble kind of stone
13   blocks to the right of this picture on the screen.
14   They're white in color.
15              Do you see those?
16   A.    Yes.
17   Q.    They are not included in your model, right?
18   A.    Right.
19   Q.    And there are -- there are other trees that are
20   in this image, on the picture, that are not included
21   in your model, correct?
22   A.    There are some smaller trees, correct.
23   Q.    And those trees are not in the model?
24   A.    Correct.
25   Q.    And if we look -- looking toward the house.  If
```

1    we're looking toward the house, there are a number of

2    objects that are in that inside courtyard that are

3    not included in your model, right?

4    A.    Correct.

5    Q.    Okay.

6              MR. ELSENHEIMER:  I would move

7    Defendant's Exhibit H for purposes of this hearing?

8              MR. NAYBACK:  No objection.

9              THE COURT:  Exhibit H is admitted.

10   BY MR. ELSENHEIMER:

11   Q.    Let me move on to -- let me move on to

12   Defendant's Exhibit I.

13             Actually, I'm sorry.  Let me go back to

14   Exhibit G -- I'm sorry.  Defendant's Exhibit H.

15             So, Ms. Libertore, I'm not sure you can see

16   this.  But toward the center of this picture, of this

17   photograph, there are -- there's a -- there's kind of

18   a big dolly that is -- do you see that?  It's just

19   past the --

20   A.    Uh-huh.

21   Q.    -- the fence, on the inside of the courtyard?

22   A.    Yes.

23   Q.    That's not included in your model either, is

24   it?

25   A.    No, it is not.

1   Q.    Okay.  So -- and let me go to Defendant's

2   Exhibit I.

3              Do you recognize this?

4   A.    Yes.

5   Q.    And what is it?

6   A.    It is the front door of the defendant's house.

7   Q.    And -- okay.  And there's a step down from the

8   front door.

9              Is that right?

10  A.    Right.

11  Q.    There are a number of objects in this

12  particular image that are not included in your model,

13  right?

14  A.    Correct.

15  Q.    I don't want to go through an exhaustive list

16  of those exhibits.  But I think, by process of

17  elimination, what is actually -- the only thing

18  included in your model is just the step, correct?

19  It's the first step, and then a small second step,

20  and then a third step.

21             Is that right?

22  A.    Three steps, and the structures themselves.

23  Q.    Okay.  And that's the step that's coming out of

24  that front door, correct?

25  A.    Correct.

```
 1   Q.    Okay.  So let me just go back very quickly to
 2   Exhibit G, and see if we have a -- if there is a good
 3   image.
 4              I want to ask you about the step that comes
 5   out of the door.
 6              Personally, I think it would be easier, but
 7   I'm going to ask, to see if you -- if you have a good
 8   enough view of this picture from the model.
 9              But do you see where the top of that blue
10   step is?
11   A.    Uh-huh.
12   Q.    And then where the bottom of the door is, do
13   you see that?
14   A.    Yes.
15   Q.    And there's a space between there, correct?
16   A.    Correct.
17   Q.    How did you ascertain how far that space is
18   from the bottom of the door to the top of the step?
19   A.    The steps were created using total station
20   data, which can meet the elevation.
21   Q.    So it looks like there's -- there's -- I don't
22   know how many, what the scale would be.  But it looks
23   like there's some, relatively speaking, sizable space
24   between the bottom of the door and the top of the
25   step, right?
```

```
1    A.    It's difficult to ascertain, simply because I
2    can't see where the seam of the door is from this
3    particular photograph.
4    Q.    Well, you can see the bottom of the dark
5    portion, correct --
6    A.    The window.
7    Q.    -- on the door?
8    A.    Yes, sir.
9    Q.    And that's the bottom of the door?
10   A.    I believe there's a little space between that
11   and the actual bottom of the door.
12   Q.    Well, I'm not seeing it on this particular
13   picture.
14         But let me go -- let me move to the next
15   exhibit, and actually one beyond that, Exhibit I.
16         So you see there is the bottom of the door,
17   correct?
18   A.    Right.
19   Q.    And then that screen section, that's a smaller
20   space than what's reflected in the model, isn't it?
21   A.    It's difficult to tell from the picture.
22   Q.    The other thing that's not included in the
23   model.
24         Do you see where the step is?  On both the
25   right side of the step is an extension of that little
```

1   porch, and on the left side of the step is an

2   extension of the porch that goes toward the left of

3   the screen, as we're looking at it, into the house.

4          Do you see that?

5   A.   I see a shelf of some sort.

6   Q.   Correct.  And then on the other side of the

7   step, going toward the right side of the screen, is

8   another extension of the porch.

9          Do you see that?

10  A.   I see a blanket draped over something.

11  Q.   Okay.  And neither of those extensions, whether

12  it's a shelf or an extension of the porch, neither of

13  those are included in the model, correct?

14  A.   The total station data didn't collect that, no.

15  Q.   So this total station data doesn't take

16  pictures of everything?

17  A.   No.  The total station data, it is survey type

18  data, so it only chooses specific points and you go

19  from there.

20  Q.   So it never took pictures of this section of

21  the house?

22  A.   No.  It took measurements of the front steps.

23  Q.   And that's it?

24  A.   And the house -- I'll have to look at the data,

25  if you'd like a better understanding of exactly what

```
 1   the total station data collected.
 2           But in terms of the front porch, it only
 3   collected the steps.
 4   Q.    And you don't have that data with you right
 5   now?
 6   A.    No.
 7   Q.    Let me ask you this.  Is this the first -- the
 8   model we looked at, that the government showed you, I
 9   think it's Government's Exhibit 1, is that the first
10   version of the model?
11   A.    No, sir.
12   Q.    There was a model -- there was a version before
13   that, correct?
14   A.    Correct.
15   Q.    In that version of the model this particular
16   step was different, wasn't it?
17   A.    No, I believe it was the same.
18   Q.    I'm sorry.  Let me reask the question.
19           The step in Version 1 of the model was in a
20   different place as it relates to the house?
21   A.    I'm not sure.
22   Q.    Did you look -- Okay.  Let me ask you this.
23           From Version 1 to Version 2, what changes
24   were made?
25   A.    I would say I built up about 90 percent of
```

1  this, and only 10 percent of the original model

2  remained.

3  Q.    What do you mean?  I don't quite understand.

4  What do you mean by that?

5  A.    So I had to create my own model, because I

6  would be testifying to it, and I needed to testify to

7  my own work.

8         So I took the original model, and I made

9  whatever changes needed to be made, so that I could

10  fairly say that was an accurate representation of the

11  scene.

12  Q.    Who designed the first model?

13  A.    Another individual information specialist who

14  has since retired.

15  Q.    So you did not design the first model?

16  A.    No, sir.

17  Q.    Let me -- let me show you exhibit --

18  Defendant's Exhibit J.

19         So again, this is a better image with

20  the -- the dolly that I was speaking about earlier,

21  the dolly with a trash can.  It's toward -- just to

22  the right of center in the image.

23         Do you see that?

24  A.    I do.

25  Q.    And that -- that's not included in the model,

1  correct?

2  A.    Correct.

3  Q.    And again, just for purposes of the hearing

4  today, can you just tell us what we're looking at

5  with this picture?

6  A.    Yes.  We're still looking at the front door of

7  the defendant's house.

8  Q.    Okay.  And moving toward the bottom right of

9  the image, there is a fence.  And against that fence

10 there are a number of objects that are leaning.

11         Do you see those?  There's a red broom

12 handle and some sticks?

13 A.    Yes, I see those.

14 Q.    Those are not included in your model, correct?

15 A.    Correct.

16 Q.    Let me ask you about the fencing that you used

17 in your model.

18         How did you ascertain the dimension and the

19 size of the fence for the model?

20 A.    I took measurements from the scan data and

21 scaled those down.  And I structured a fence that was

22 to 5/16 scale.

23 Q.    And that -- you mean in terms of the height of

24 that fence?

25 A.    The height of the fence, the space between the

```
 1   wires and the gate, and the diameter of the posts.
 2   Q.    You mean the wires on the fence in the model?
 3   A.    Yes, sir.
 4   Q.    Okay.  This wire here is a -- do you know what
 5   kind of wire -- what kind of fencing it's called?  Do
 6   you know what that fencing is, how it's described?
 7   A.    I'm not sure.
 8   Q.    Just to -- I want to make sure I -- I think I
 9   asked you this.
10         But those -- like the red broom handle and
11   the sticks, all of those objects are not included in
12   the model, right?
13   A.    Those are not included.
14   Q.    And do you see towards -- against the wall of
15   the house and to the right of the front door, there
16   is a -- some shrubbery.
17         Do you see that green shrubbery?
18   A.    I do.
19   Q.    That's not included in the model either,
20   correct?
21   A.    Correct.
22   Q.    Let me ask you this.
23         The FARO -- the scanner.  Is it called a
24   FARO scan?
25   A.    Yes, FARO scanner.
```

Q.      What does FARO stand for?

A.      FARO is the name of the company that creates the scanner.

Q.      I see.  And that gives -- it gives you measurements between two points.  So if I wanted to find a distance between Point A and B, I could look at the FARO scanner, and that would give me an accurate distance between the two, correct?

A.      Correct.

Q.      Does the FARO scan also give you elevation or differences?

A.      I'm sorry.  Could you repeat the question?

Q.      Does it give you elevation or altitude differences between two points?

A.      Yes.

Q.      Okay.  So for example, if you were taking a FARO scan of something that's on a piece of land and there's a light grade or a slope between Point A and Point B, the FARO scan would reflect that, correct?

A.      Correct.

Q.      Was -- does your model reflect any difference in grade or slope between any different points on this particular -- at 825 Riverside?

A.      It doesn't have topographical data, but it does reflect the difference in elevation of structures,

1    outhouses, and things like that.

2    Q.    But the topographical data, it's all on the

3    same level, correct?

4    A.    Correct.

5    Q.    So if there was a topographical difference

6    between the porch and, let's say the other side of

7    the model where the metal shed is, if there was a

8    topographical difference, the model would not reflect

9    that topographical difference?

10   A.    It should reflect it simply because it's all

11   built off of the same data.

12         So you start at a central location and you

13   build your model out from that.  So if you have a

14   shed that's, you know, 6 feet higher than something

15   in real life, it's going to be reflected in the

16   model.

17   Q.    But if the model is flat, how is that -- how is

18   that the case?

19   A.    So we are just taking the data from the scanner

20   and the total station and using that to recreate an

21   accurate representation of how the scene appeared.

22         And the -- from that measurement, I was

23   able to ascertain the -- according to the data, when

24   I compared the elevation of, say, the steps to the

25   shed, it should be accurate.

1    Q.    But if there's a grade between the steps and

2    the shed and the model itself, the bottom of the

3    model is flat, it wouldn't reflect the grade, would

4    it?

5    A.    If it had been more extreme it would.  But this

6    was all fairly flat.

7    Q.    You say "fairly flat."  But it's not flat.

8    There is a little bit of a difference in grade

9    between the --

10   A.    Yeah.

11   Q.    And your model doesn't reflect that.  That's my

12   question.

13   A.    Correct.

14   Q.    Thank you.  Let me move on --

15         Oh, let me move for introduction of

16   Defendant's Exhibit J.

17         THE COURT:  Any objection to J?

18         MR. NAYBACK:  No, Your Honor.

19         THE COURT:  All right.  Exhibit J is

20   admitted.

21   BY MR. ELSENHEIMER:

22   Q.    Let me move to Exhibit K.

23         I don't have too many questions about this.

24   But this is -- why don't you just describe what the

25   particular perspective this image gives you of your

1    model.

2    A.    Okay.  So this is us looking over the fence in

3    the courtyard of the defendant's property.  We're

4    looking towards the shed and the apartment building

5    across the driveway.

6    Q.    Do you recall, from your view of the FARO scan,

7    to the data you received from the data team, the

8    scans, this is not an area that is clear of debris

9    and objects, is it?

10   A.    It is not.

11   Q.    There are a lot -- there are a number of

12   objects that, on the FARO scan, are not included in

13   this particular scene?

14   A.    There were a number of objects and debris that

15   were not depicted here.

16   Q.    Okay.  It's safe to say that one, in real life,

17   wouldn't be able to look through this particular

18   fence here, as -- as we are right now.

19          It's kind of covered with things, isn't it?

20   A.    It had some debris stacked up against it.

21   Q.    Okay.  Thank you.

22          Let me move on to -- oh, I'll move

23   Defendant's Exhibit K.

24          THE COURT:  Mr. Nayback, any objection?

25          MR. NAYBACK:  No objection, Your Honor.

1    Thank you.

2             THE COURT:  K is admitted.

3    BY MR. ELSENHEIMER:

4    Q.    Let me move to -- I want to ask you about this

5    particular perspective.  This is Defendant's

6    Exhibit L.

7             Tell me about -- if I am right, in terms of

8    perspective.  This is a view of the inner courtyard

9    from the -- from the driveway.

10            Is that correct, the driveway?

11   A.    Correct.

12   Q.    Okay.  And there's a -- a tree to the right,

13   next to the house.

14            Is that right?

15   A.    Right.

16   Q.    And you said these trees are to scale.

17   A.    They are placed in the model to scale.

18   Q.    Okay.  They are placed to scale, which is to

19   say that where they are kind of glued to the -- to

20   the model, or to the board of the model, that's to

21   scale, right?

22   A.    Correct.

23   Q.    Okay.  But the size of the trees, the width or

24   the narrowness of the trees, that's not necessarily

25   to model -- or to scale?

A.    It's difficult to quantify trees, simply

because foliage changes.  So they are there as

placeholders.

Q.    Now this particular area here, this is -- and

by "this," the inner courtyard -- is surrounded by a

fence, correct?

A.    Correct.

Q.    And we can see the fence.  It's the metal fence

here?

A.    Yes.

Q.    Let me show you Defendant's Exhibit M.

       Do you see this image?  Can you -- can you

describe what this image is?

A.    Yes.  This is us looking towards the courtyard

from the driveway.

Q.    Okay.  And the tree that's kind of just right

of center, that would be the tree that your model has

right next to the house, right?

A.    Correct.

Q.    But it's a much larger tree that we see here,

correct, than -- than what seems to be a scale tree

in your model?

A.    Oh.  But it's --

Q.    It's a bigger tree vertically.

       Is that right?

```
 1    A.     Correct.
 2    Q.     And it's a slightly larger tree, or a larger
 3    tree horizontally.  Like the canopy of the tree is
 4    larger than what it is in your model?
 5    A.     That's difficult data to capture.  So yes.
 6    Q.     And to the -- just to the left of that tree on
 7    our screen, there is a taller tree and then what
 8    appears to be a shorter tree?
 9    A.     Correct.
10    Q.     And again, is that shorter tree in your
11    model -- and I can go back to the prior image, if you
12    would like me to.
13    A.     If you could, that would be great.
14    Q.     This?
15    A.     Yes, it is.
16    Q.     The shorter tree, where is it in your model?
17    A.     It's, I believe, part of the shrubbery just to
18    the left of that shed area, where everything is
19    condensed.
20    Q.     So -- so by the "shed area," you're talking
21    about the white shed with the black roof that's
22    inside the courtyard?
23    A.     Yes, sir.
24    Q.     Okay.  So you're saying it's to the left of
25    that?
```

A.     The taller tree is the one directly to the left
of that.

Q.     Okay.  Is that the tree you're saying is the --
that green shrub?

A.     The taller one.

Q.     Okay.  So let me go back.  Let's -- I want to
ask you about that taller tree.

       Let's go back and see Defendant's
Exhibit M.

       We can see the taller tree, correct?

A.     Uh-huh.

Q.     It's -- and then right next to that taller
tree, kind of toward the -- the -- toward the front
of the image, is a -- is a shorter tree that has a
wider canopy.

       That tree is not in your model, is it?

A.     There are three trees in a line in that
specific area that have fairly sizable trunks.  And I
measured and placed those according to the scale of
the model.

       It's difficult, from this picture, to tell
exactly which tree belongs to which trunk, simply
because of the foliage.  So I don't want to say
something that is in the model or isn't, and
vice versa.

Q.    Okay.  So that tree -- the canopy of that green
tree, maybe the trunk is to scale in the model, but
that canopy is not reflected in the model, is it?  We
can go back to the model if you want.

A.    Okay.

Q.    I want to ask you about that canopy.

          That canopy is not in that model?

A.    In the data that I received, there was another
tree, which is the tree that you see to the left,
between the fence and the camper.

          If we're talking about the same tree, then
yes, it is in the model.

Q.    But the canopy isn't -- doesn't reflect the
size of that canopy.

A.    The canopy -- we could say that it's not
perfectly reflective.

Q.    Okay.  Thank you.

          Let me move to Exhibit N.

          Before I do so, I would move
Defendant's Exhibit L, if I haven't done so, and
Exhibit M, if I have not done so.

          THE COURT:  Any objection to L and M,
Mr. Nayback?

          MR. NAYBACK:  None, Your Honor.  No
objection.

```
 1              THE COURT:  All right.  L and M are
 2     admitted.
 3              MR. ELSENHEIMER:  Your Honor, I believe I
 4     may have failed to also move Exhibit K.  If I've
 5     failed to do so, I do so now.  It was the image of
 6     the fence that we were looking at three images ago.
 7              THE COURT:  I think K was admitted.
 8              MR. ELSENHEIMER:  Okay.  Thank you.
 9     BY MR. ELSENHEIMER:
10     Q.    So let me move to N.
11              So, Ms. Libertore, can you just describe
12     what we are looking at here?
13     A.    That is a similar view looking into the
14     courtyard from the driveway.
15     Q.    And this image -- let me just ask you about it.
16              There are a number of trees and shrubs and
17     bushes.  There's a lot of foliage that blocks one's
18     view of both the fence and the inner courtyard, and
19     to some extent, that shed with the white side and the
20     grayish roof, correct?
21     A.    Correct.
22     Q.    And it makes it difficult, if not impossible,
23     to see inside the courtyard?
24     A.    There's a lot of foliage.
25     Q.    And that amount of foliage that we see in this
```

1    particular image is not reflected in your model as it

2    is in this image, is it?

3    A.    It -- it is reflected, for the most part.

4    Q.    So let me go to Exhibit L again.

5          You're saying that where we can see the

6    fence on the right side -- so if we go to the side of

7    the house where the fence connects to the house, do

8    you see where I am talking about, to the -- just

9    right of center of the picture?

10   A.    Yes.

11   Q.    And there's -- I don't know what the distance

12   would be, but several feet, that we can see of that

13   fence that's unobstructed by any type of foliage.

14         Do you see that?

15   A.    It -- it is less than several feet.  But yes, I

16   can see it.

17   Q.    Okay.  It's a couple feet?

18         So that -- let's go back to Exhibit N.

19         And where, in exhibit -- well, this is

20   Exhibit N.  Let's go to Exhibit N.

21         Where -- and there's no -- all of that side

22   of the house, where the fence connects to the house,

23   that's covered with foliage in this image, isn't it?

24   A.    It is in this image.  But in the data that I

25   was given, it wasn't.

1   Q.    But in this image, it is?

2   A.    Correct.

3   Q.    Okay.  Let me go back to Exhibit L.

4         Let me ask you about -- so just to orient

5   us, let's use, as a point of reference, the shed

6   that's in the -- in that little courtyard.

7         Just to the left and down from that is the

8   top of the fence, right?  And the top of the fence,

9   and then a little bit of the fence under there, maybe

10  a foot, half a foot.  I'm not sure how much it is to

11  scale.

12        But there is a section of the fence that we

13  can see, correct?

14  A.    Correct.

15  Q.    And then moving above the fence, there is a

16  section of that tree that we can see.  The trunk,

17  where we can see the trunk.  Not necessarily the

18  foliage or the canopy, but we can see that trunk,

19  correct?

20  A.    Correct.

21  Q.    And how many -- I mean, I'm guessing it is

22  probably 3 feet.  If we were to take a scale image of

23  that, it's about 3 feet of that tree that's not

24  covered by foliage going up from the fence, right?

25  A.    I would have to measure it.

Q.    Roughly 2, 3 feet?

A.    I would have to measure it.

Q.    Okay.  But a good -- a good part of that tree, from the bottom of it, is not covered by foliage in this model?

A.    Correct.

Q.    Okay.  Let's go back to Exhibit N.

       And so looking at this picture, where, in this picture, is the top of that fence, and where is anything that shows just the trunk of that tree?

A.    The lighting in this image makes it difficult to see.

Q.    But you can see that there's a lot of foliage in and around the fence, above the fence, and going up that tree, correct?

A.    Correct.

Q.    And let me go back to Exhibit M, because I think maybe you can see it in there as well.

       You can see from here there's a lot of that foliage of that tree that the canopy of which comes out.  So just -- I'm sorry.  I know this is tough when we're not in person.

       But just to orient you to that, I'm talking about the tree that its canopy kind of stretches to the left of the tree and gets -- do you see that?

A.    Yes.

Q.    And again, that's not in the model.

And this particular image is covered with foliage and greenery -- green, kind of leaves and shrubs.

And that's not reflected in your model, is it?

A.    Correct.

Q.    Okay.

MR. ELSENHEIMER:  May I have just a moment, Your Honor?

THE COURT:  Yes.

MR. ELSENHEIMER:  Before I forget, Your Honor, I would like to move Defendant's Exhibit N.  I don't think I have done so yet.

THE COURT:  Is there objection to N, Mr. Nayback?

MR. NAYBACK:  No objection, Your Honor.

THE COURT:  N is admitted.

BY MR. ELSENHEIMER:

Q.    Let me move on to -- I want to ask you about the view of the back portion of the model, Ms. Libertore, and I will move to Defendant's Exhibit P.

MR. ELSENHEIMER:  I'm sorry, Your Honor.

1  If I could have just a moment to bring up Exhibit P.

2  BY MR. ELSENHEIMER:

3  Q.    Are you able to see that, Ms. Libertore?

4  A.    Yes, I am.

5  Q.    Okay.  So what -- just directionally speaking,

6  if the kind of top right of the screen is the north

7  end, this here is the south end, or south?

8  A.    We are looking directly to the north from the

9  south.

10  Q.    Okay.  This is directly south to north.

11         Let me ask you about -- that is -- well,

12  let's orient ourselves.

13         There's a pole in the middle.

14         Do you see that?

15  A.    Yes.

16  Q.    That's a telephone pole, correct?

17  A.    Correct.

18  Q.    Okay.  Just to the -- like left and look down

19  from that moving south, there's a fence.  It's kind

20  of like a wooden fence.

21         Do you see that?

22  A.    Yes.

23  Q.    Okay.  There's a woodpile in front of that

24  fence, kind of to the north of that fence right

25  directly next to it.

1   A.    Right.

2   Q.    Do you remember looking at that in your -- from

3   the data you collected, or that they collected for

4   you?

5   A.    Yes.  Uh-huh.

6   Q.    And that woodpile is not included in the model,

7   is it?

8   A.    It is not.

9             MR. ELSENHEIMER:  I will move

10  Defendant's Exhibit P.

11            MR. NAYBACK:  No objection.

12            THE COURT:  Any objection?

13            MR. NAYBACK:  No objection, Your Honor.

14            THE COURT:  Exhibit P is admitted.

15            MR. ELSENHEIMER:  Thank you.

16  BY MR. ELSENHEIMER:

17  Q.    Let me bring up Exhibit Q.

18            So what -- can you just describe this,

19  Ms. Libertore?  Where is this from?

20  A.    We are looking from the driveway to the shed

21  and the fence, which is in the western direction.

22  Q.    Now, let me move on to Exhibit R.

23            Do you recognize this image?

24  A.    Yes.

25  Q.    And what is it a view of?

```
 1   A.    We are looking from the driveway, in a slightly
 2   Northwestern direction, towards the house.
 3         And you can see the telephone pole as well.
 4   Q.    Okay.  So there's the telephone pole.  And that
 5   is the telephone pole that's in your model.
 6         Is that right?
 7   A.    Correct.
 8   Q.    And there are kind of a number of things.  I'm
 9   not sure that you can see them.  Let me know if you
10   can't see them.
11         But there is a small kind of break, almost,
12   just left of center of the picture.  There's a wooden
13   kind of like a bucket or a planter of sorts.
14         Do you see that?
15   A.    I do.
16   Q.    And there are a couple of logs that are laying
17   on the ground next to that.
18   A.    Yes.
19   Q.    Do you see those?
20   A.    Yes.
21   Q.    And those are not in your model, are they?
22   A.    They are not.
23   Q.    Let me ask you this.
24         There's a -- to the right of this
25   particular image there is a large shrub.
```

```
 1              Do you see that large shrub?
 2   A.    Yes.
 3   Q.    And that's not in your model, is it?
 4   A.    That is outside the scope of the model.
 5   Q.    So no.
 6              Ms. Libertore, we are going to try to zoom
 7   in on that a little bit.  I want to ask you about
 8   another tree towards the back of the property.
 9              So just behind, or kind of on the western
10   side of that telephone pole, there's another tree,
11   right?
12   A.    Yes.
13   Q.    And that's a tree with a wide canopy?
14   A.    Correct.
15   Q.    Let me go back to Exhibit Q.
16              That tree, with the very wide canopy that
17   we just looked at, is the tree that is just behind,
18   to the west, of the pole that is in your model,
19   correct?
20   A.    It is.
21   Q.    And I think it's safe to say that that canopy
22   is not close to what it is in real life in your model
23   is it?
24   A.    Correct.  It's just a representation.
25   Q.    It's just a representation.  But that is a much
```

1  wider canopy in real life?

2  A.    Correct.

3       MR. ELSENHEIMER:  I move in Defendant's

4  Exhibits P, Q and R.

5       THE COURT:  P is already in.

6       Q and R, any objection?

7       MR. NAYBACK:  No, Your Honor.  Thank you.

8       THE COURT:  All right.  Q and R are

9  admitted.

10 BY MR. ELSENHEIMER:

11 Q.    When you receive -- so we talked about the

12 first version of the model and the second version of

13 the model.

14       When you received the second version -- I'm

15 sorry.  When you received the first version of the

16 model you said you made changes to it, right?

17 A.    Yes.

18 Q.    And did you consult with anybody about what

19 changes should be made to that model?

20 A.    I did.

21 Q.    Did anybody tell you particular changes that

22 should be made to the model?

23 A.    No.  I made those decisions, but I ran it by my

24 supervisor, who agreed.

25 Q.    What were the changes?  Would you be able to

describe them for us?

A.    So it's difficult to quantify exactly what those changes were, simply because this is mostly a model built from the ground up by myself.  So it was a model that was built pretty much originally from square one, from the data that I received.

Q.    So what happened to Version 1?  Is that --

A.    It's no longer a model.

Q.    Okay.

        MR. ELSENHEIMER:  May I have just a moment, Your Honor?

        THE COURT:  Yes.

BY MR. ELSENHEIMER:

Q.    So in terms of -- you were asked to construct a model of a particular alleged crime scene.

        Is that right?

A.    Correct.

Q.    Did you take into account the difference in seasons between when the data was collected and when the alleged incident took place?

A.    I did.

Q.    When and how did you take that into account?

A.    I knew that a considerable amount of time had passed between when the incident took place and when the data that I received had been collected, which is

1    why you only see a small amount of foliage, and the

2    big trees placed where they should be, simply because

3    I had no way of knowing exactly what leaves were

4    placed where and what debris was placed where, or how

5    much wood was in that fire pit.

6                So I just took everything that I knew was

7    in the structure and large landscaping, and placed it

8    according to the data.

9    Q.    How did you ascertain the type of foliage from

10   the time of the alleged incident?

11   A.    So where I had pictures from the time of the

12   incident, I placed those trees.

13               And of course if you have a tree that's

14   30 years old or something like that, with the trunk

15   that's a sizable diameter, that has been there for a

16   few years, so I placed that.

17   Q.    So just to go to exhibit -- Defendant's

18   Exhibit N.

19               So this is an image taken on -- you see the

20   time stamp -- or the date stamp at the bottom of the

21   image, correct?  It was taken on 5-5-2018.

22   A.    Yes, sir.

23   Q.    The day of -- I mean, short- -- shortly after,

24   almost within hours after the alleged incident.  Did

25   you review this particular image in constructing your

```
1    model?
2    A.    I did not.
3    Q.    And as we have discussed, there's -- there are
4    leaves and foliage in this image that is not
5    reflected in your model, correct?
6    A.    Correct.
7    Q.    And so the model isn't based on images drawn
8    from the scene of the alleged crime?
9    A.    They are drawn from the scene of this incident.
10   Q.    Taken a year later, right?
11   A.    The measurements were.
12   Q.    The measurements were taken a year later.  And
13   the FARO scans were taken, actually, over a year
14   later, correct?
15   A.    I don't know the exact date, but I know some
16   time had elapsed.
17   Q.    It was a considerable amount of time that had
18   elapsed?
19   A.    Correct.
20   Q.    You just said that.
21          And all of the pictures that I've shown you
22   of the -- of the scene, except for the aerial photos,
23   but these photos that have 5-5-2018, let me ask you.
24          You never looked at or consulted any of
25   those particular images?
```

```
1    A.    None of the ones that you've shown me.

2              MR. NAYBACK:  Objection --

3              THE COURT:  I'm sorry.  I couldn't hear

4    you, Mr. Nayback.

5              MR. NAYBACK:  I'm sorry.  I was talking

6    over the witness.

7              But the objection was that it has been

8    asked and answered.

9              MR. ELSENHEIMER:  I'll move on.

10             THE COURT:  Thank you.

11   BY MR. ELSENHEIMER:

12   Q.    Does your model take into account the time of

13   day that the alleged incident took place?  So that it

14   took place in the middle of the night under darkness.

15             Did your model take that into account?

16   A.    Measurements don't change from time of day to

17   time of day.

18   Q.    Do you know when the first model was peer

19   reviewed, that first model that you were talking

20   about?

21   A.    No.  I --

22             MR. NAYBACK:  Objection; relevance,

23   Your Honor.

24             THE COURT:  You'll have to tell me why this

25   is relevant, Mr. Elsenheimer.
```

1        MR. ELSENHEIMER:  I'm just -- I'm wondering

2   about the differences between Version 1 of the model

3   and Version 2 of the model, and why there was

4   significant changes made to Version 2.

5        THE COURT:  Well, I think she's already

6   talked to some of that, but I don't see that it's

7   particularly useful for today's hearing.  So...

8        MR. ELSENHEIMER:  I'll move on.

9        THE COURT:  Thank you.

10  BY MR. ELSENHEIMER:

11  Q.    You discussed the training that you've had.

12        How long have you worked for the FBI?

13  A.    Two years and a month.

14  Q.    And how many crime scenes have you done,

15  collected data on, and reproduced a model for?

16  A.    Close to 20 scenes for data collection.

17        And product design, I've done eight

18  physical models and nine digital 3D models.

19  Q.    You said you've been with the FBI for over

20  two years.

21  A.    Yes, sir.

22  Q.    Have you always been a visual information

23  specialist?

24  A.    I have.

25  Q.    We've discussed a lot of particular features of

```
 1   the property -- objects, shrubs, trees -- that are
 2   not included in the model.
 3          My question is:  How did you determine what
 4   to include in the model and what to leave out of the
 5   model?
 6   A.   Everything that is a removable structure or a
 7   vehicle, I included.  And if there were large trees,
 8   I included those as well.
 9          If I had pictures from the time of the
10   incident, I included the main foliage that I was able
11   to see.  But anything that was small and removable, I
12   can't testify to the fact that that was there at the
13   time of the incident, so I didn't include it.
14   Q.   It is safe to say that the quality of a
15   particular model is dependent on the quality of the
16   scan data.
17          Is that correct?
18   A.   The accuracy of it.
19   Q.   It's dependent on the quality or the accuracy
20   of the scan data.
21          Is that right?
22   A.   All types of data collection.  So whether it's
23   the scan data, the total station data, the
24   photography, it's accurate to say.
25   Q.   Do you have any certifications or licenses?
```

```
1    A.    I do in FARO scanning.
2    Q.    You have a license or a certification in FARO
3    scanning?
4    A.    I do.  And I have a certification in AutoCAD,
5    which is the program we use for measuring total
6    station data.  And we can use it for scan data as
7    well.
8              MR. ELSENHEIMER:  Nothing further,
9    Your Honor.
10             I'll pass the witness.
11             THE COURT:  Do you have anything further,
12   Mr. Nayback?
13             MR. NAYBACK:  I do not, Your Honor.  Thank
14   you.
15             THE COURT:  May this witness be excused
16   from this hearing?
17             MR. NAYBACK:  She may.
18             MR. ELSENHEIMER:  Yes, Your Honor.
19             THE COURT:  All right.
20             Thank you for your testimony today,
21   Ms. Libertore.
22             THE WITNESS:  Thank you, Your Honor.
23             THE COURT:  Mr. Nayback, you may call your
24   next witness.
25             MR. NAYBACK:  Your Honor, we would be
```

```
 1  moving for this model.
 2          The witness testimony is complete.  We'd be
 3  happy to offer brief argument, but if the Court
 4  doesn't need any, we would be going on to the next
 5  witness, which is Theodore Chavez, who did our --
 6  which is more of a Daubert hearing, I understand.
 7  Ms. Libertore was just a foundational witness.
 8          So however the Court wants to proceed.  I'm
 9  happy to make brief argument or to move on to the
10  next witness.
11          THE COURT:  Move on, please.
12          MR. NAYBACK:  Thank you, Your Honor.
13          Ms. Wilson will be handling that witness.
14          THE COURT:  All right.
15          MS. WILSON:  The United States calls
16  Theodore Chavez.
17          (Witness duly sworn.)
18          THE COURT:  So, Mr. Chavez, before we
19  begin, let me just ask you to spell your first and
20  last name for the record, please.
21          THE WITNESS:  The first name is spelled
22  T-H-E-O-D-O-R-E.  The last name, Chavez, C-H-A-V-E-Z.
23          THE COURT:  Thank you.
24          You may proceed, Ms. Wilson.
25          (Discussion off the record.)
```

```
 1              (A recess was taken from 10:22 a.m. to
 2     10:27 a.m.)
 3          THEODORE CHAVEZ, GOVERNMENT'S WITNESS, SWORN
 4                     DIRECT EXAMINATION
 5     BY MS. WILSON:
 6     Q.    Okay.  Are you ready, Mr. Chavez?
 7     A.    I am, yes.
 8     Q.    What do you do for a living, sir?
 9     A.    I'm employed by the Federal Bureau of
10     Investigation, located in Quantico, Virginia.
11     Q.    And what is your formal title?
12     A.    I'm a forensic examiner, who is qualified in
13     the discipline of firearms and tool mark discipline.
14     Q.    What are your responsibilities in that
15     position?
16     A.    My primary responsibilities as an examiner are
17     to receive evidence relating to firearms and tool
18     marks, to include shooting incident reconstruction
19     requests, conducting examination on such items or
20     requests, generating a lab report, and being able to
21     testify to those results in a court of law.
22     Q.    And how long have you been employed with the
23     FBI?
24     A.    Approximately ten years, since 2009.
25     Q.    And, sir, are you familiar with the methods and
```

1  procedures employed by the FBI relating to firearm

2  trajectory analysis?

3  A.    Yes, I am.  Those are currently referred to as

4  our laboratory operation manual, our standard

5  operating procedures.

6          I am also a quality assurance manager for

7  those documents.

8  Q.    And in addition to the firearm trajectory

9  analysis, what other areas do you work in as a

10  scientist for the FBI?

11  A.    I'm qualified in the disciplines of firearms

12  evidence, so that being any type of firearm that is

13  submitted -- bullets, cartridge cases, tool marks --

14  if they are suspect of a burglary or some cut item.

15          Also gunshot residue, distance

16  determination.  A victim is shot and there's a

17  question of how close or what was the approximate

18  distance.

19          And then also shooting incident

20  reconstruction, trying to generate information about

21  that shooting based on objects or areas.

22  Q.    Thank you.  If I may show you what has been

23  marked for identification purposes, for the purposes

24  of this hearing, as Government's Exhibit 1.

25          Let me know if you see that on your screen.

```
 1                    Do you see that, sir?
 2   A.    Yes, I see it.
 3   Q.    Do you recognize it?
 4   A.    I do recognize it by my name up on the top and
 5   the revision date at the bottom of November 15, 2019.
 6   Q.    Is it a fair and accurate depiction of your --
 7   can you explain what it is for the Court?
 8   A.    Sure.  It's broken up into three parts:
 9   professional experience, outlining training, as well
10   as current responsibilities and prior experience with
11   the FBI.  Education, as well as testimony experience
12   within the discipline.
13   Q.    So that is your CV, sir?
14   A.    That is correct.
15   Q.    And is this a fair and accurate depiction of
16   your CV?
17   A.    That is correct.
18            MS. WILSON:  I move Government's Exhibit
19   Number 1.
20            THE COURT:  Is there objection,
21   Mr. Elsenheimer?
22            MR. ELSENHEIMER:  No objection, Your Honor.
23            THE COURT:  All right.  Thank you.
24            Exhibit 1 is admitted.
25
```

BY MS. WILSON:

Q.    You alluded to this section earlier.

         Could you describe for the Court your educational background?

A.    Sure.  I received a bachelor's of science in physics from St. Vincent College, which is located in Latrobe, Pennsylvania.

Q.    And how does your physics degree relate to the area of trajectory analysis?

A.    First, the examiner position for the FBI lab requires a science background.  And so my degree in physics allowed me to have the foundational experience that was critical to being, then, able to enter into their examiner training program.

Q.    And generally, could you describe the specialized training you've received since becoming employed at the FBI that qualifies you for your analysis, your special analysis?

A.    My training program was approximately three years.  So any new examiner will enter into a training program that is basically a training manual outlining various elements.  And this can be classroom based, instruction based, as well as on-the-job training.

         Those elements will cover various aspects

1   of different items that are routinely submitted, to

2   include a lot of the administrative, such as travel,

3   discovery, and also understanding of the operating

4   procedures of the lab.

5              The way that an examiner will be able to

6   pass the program is through a series of competency

7   tests, as well as three moot courts and three oral

8   boards.

9              Upon completion of those tests, as well as

10  all signatures of the training manual, the examiner

11  is then qualified within that discipline.

12  Q.   Thank you.  And of that -- and this includes

13  your expertise in trajectory analysis, specific just

14  to trajectory analysis?

15  A.   I'm sorry.  My CV or the training program?

16  Q.   The training program.

17  A.   Yes.  The training program will highlight

18  elements relating to trajectory analysis.

19  Q.   How many cases, approximately, have you

20  performed trajectory analysis in?

21  A.   I've conducted examinations in approximately

22  30 cases.  But I've also technically reviewed a

23  number of cases for other examiners.

24  Q.   And have you testified in court as an expert in

25  trajectory analysis?

1   A.     I have, yes, one time.

2   Q.     And you've also testified as an expert

3   regarding other issues as well.

4          Is that correct?

5   A.     That is also correct.

6   Q.     Could you describe briefly for the Court what

7   types of courts you were considered to be an expert

8   in?

9   A.     Sure.  Displayed up on the screen there at the

10  bottom is testimony experience.  So approximately 11

11  times, or 11 times I've testified.  Seven of those

12  times in federal court and four in state court.

13         MS. WILSON:  Your Honor, at this time the

14  United States would offer Mr. Chavez as an expert in

15  the field of firearm trajectory analysis with the

16  ability to testify to opinions and analysis therein.

17         THE COURT:  Any objection, Mr. Elsenheimer?

18         MR. ELSENHEIMER:  Yes.  We object to his

19  testifying as an expert.  So that's the purpose of

20  this hearing, as I understand it.

21         THE COURT:  Right.  That is the purpose of

22  the hearing.

23         So having tendered, then, the expert,

24  Mr. Elsenheimer, would you like to conduct any

25  examination at this time?

```
 1              MR. ELSENHEIMER:  I could voir dire him now
 2   as an expert.  But I could also do so at the end, as
 3   part of cross-examination.  It's whatever you would
 4   like.
 5              THE COURT:  Well, why don't you voir dire
 6   the witness now, please.
 7              MR. ELSENHEIMER:  Thank you, Your Honor.
 8                    VOIR DIRE EXAMINATION
 9   BY MR. ELSENHEIMER:
10   Q.    Good morning, Mr. Chavez.
11   A.    Good morning.
12   Q.    Did you -- let me just -- I want to be sure I
13   understand what you just testified to.
14              You said you testified as an expert, did
15   you say, 11 times?
16   A.    That is correct.
17   Q.    And those are the cases listed at the bottom of
18   your resume.
19              Is that right?
20   A.    That's right.
21   Q.    How many times have you testified as an expert
22   for trajectory analysis?
23   A.    One time in federal court.
24   Q.    And where was that?
25   A.    That was located in Jacksonville, Florida.
```

1   Q.    And so the other times testifying, was that as

2   a fact witness or an expert witness in something

3   other than -- I'm sorry.  That was a bad question.

4          Was that as a fact witness?

5   A.    No.

6   Q.    The other times that you listed, those are as

7   an expert witness, but in something other than

8   trajectory analysis?

9   A.    Every time that I've testified has been to an

10  expert witness within the discipline of firearms and

11  tool marks.

12  Q.    I see.  Thank you.

13         And what was your undergraduate degree in?

14  A.    It was in physics, with a major in physics and

15  a minor in mathematics.

16  Q.    Do you have any advanced degrees in physics?

17  A.    I do not.

18  Q.    How long have you worked for the FBI?

19  A.    Approximately ten years, since 2009.

20  Q.    And have you taken any advanced courses in

21  trajectory analysis?

22  A.    I did complete the training program and also

23  served as an instructor for the shooting incident

24  reconstruction course that is -- that is commonly

25  afforded to evidence response team personnel

1  throughout all of our field offices.

2  Q.    Did you take any undergraduate courses in

3  trajectory analysis?

4  A.    No undergraduate studies, no.

5  Q.    Were you ever excluded as a witness in -- as an

6  expert in trajectory analysis?

7  A.    No, I have not.

8  Q.    Have you ever been involved in peer review of

9  other individuals' work on the topic of trajectory

10 analysis?

11 A.    Yes.  Within the capacity of a technical, as

12 well as an administrative reviewer.

13 Q.    What is a technical reviewer?

14 A.    Our quality system, in order for a product to

15 be released, has to first go through a technical

16 review.  The technical review is conducted by another

17 qualified examiner within that discipline, so looking

18 at all of the records that are supporting the results

19 that is ultimately issued within the laboratory

20 report.

21        MR. ELSENHEIMER:  May I have a moment,

22 Your Honor?

23        THE COURT:  Yes.

24        MR. ELSENHEIMER:  Your Honor, I have no

25 other questions.  We don't object to Mr. Chavez as an

1  expert.  Our objection still stands as it pertains to

2  the Daubert factors with regard to the evidence he's

3  testifying about for this case.

4           THE COURT:  All right.  So, Ms. Wilson, you

5  may proceed.

6           And the Court will recognize Mr. Chavez as

7  an expert in the area of trajectory analysis.

8           MS. WILSON:  Thank you, Your Honor.

9           DIRECT EXAMINATION (Continued)

10  BY MS. WILSON:

11  Q.    Mr. Chavez, did you prepare, in preparation for

12  today's hearing, a slide presenta- -- a slide to

13  assist with your testimony today?

14  A.    Yes, I did.

15  Q.    Let me show you what has been marked for

16  identification purposes as Government's Exhibit 2.

17           Sir, do you recognize these?  And I'm going

18  to go through, actually, Exhibits 2, 3, and 4.  So if

19  you'll let me know when you're done looking at each

20  page.

21  A.    Yes.

22  Q.    That was Government's Exhibit 2.

23           Do you recognize that, sir?

24  A.    Yes, I recognize it.

25  Q.    And Government's Exhibit 3 and Government's

Examination (Cont'd) by
Ms. Wilson

1    Exhibit 4.

2            Do you recognize those as well?

3    A.    I do recognize all three exhibits.

4    Q.    And could you explain to us how so?

5    A.    The first 13 pages there at the bottom with

6    pagination, and at the very front first slide,

7    represents the case, as well as my name there and my

8    title and place of employment.

9    Q.    And these are fair and accurate depictions of

10   the slide material that you prepared for today's

11   testimony?

12   A.    They are.

13   Q.    And Exhibits 3 and 4 are merely larger images

14   of the content of Slide 3, providing references?

15   A.    For clarity, yes.

16           MS. WILSON:  I move Government's

17   Exhibits 2, 3, and 4, Your Honor, with permission to

18   publish freely as the witness requires.

19           THE COURT:  Mr. Elsenheimer, is there any

20   objection to 2, 3, and 4, for purposes of the hearing

21   today?

22           MR. ELSENHEIMER:  I have no objection.

23           THE COURT:  All right.  Exhibits --

24   Government's Exhibits 2, 3, and 4 are admitted.

25

Chavez - Examination (Continued) by
Ms. Wilson

BY MS. WILSON:

Q.    Mr. Chavez, could you explain to us, what is
firearm trajectory?

A.    Trajectory analysis, for this slide here, is
broken up into five different elements.

It's critical to know that when a bullet,
or when a projectile takes flight, there will either
be several elements that are considered as a result
of establishing, first, where it originated, what
items may it have hit or encountered.  Potentially,
if it just took a path to a proximate directionality.
And that fifth element there, sometimes the general
shape or characteristic of a hole or an impact can be
of value, just depending on the characteristics that
are surrounding that area.

Q.    And you --

A.    And simply put -- I'm sorry.

Simply put, in order to create a -- or
approximate a path of a projectile, there needs to be
two points.  Those two points then create a line
indicating the path of that bullet.

Q.    And can you explain what happens when the FBI
is asked to perform trajectory analysis?

A.    Sure.  So on this slide, we have a general work
flow of the process that takes place.  So there on

1   the left-hand side is a process map showing a large

2   picture of when an incident occurs and all of the

3   resources, to include certain elements of the

4   laboratory that will respond to assist that incident.

5           On the right-hand side is a detailed

6   synopsis of all of the elements that can be provided

7   on scene as a result of a shooting investigation.

8   Q.    And can you explain how this works, when you --

9   once you get a call, what happens?

10  A.    So from the process map we're pulling certain

11  elements that are critical to my unit, which is the

12  firearms and tool marks unit, as well as the

13  operational projects unit.

14          Those two units are two of the four units

15  that serve on the laboratory shooting reconstruction

16  team.  So when a shooting occurs there will be a team

17  deployed out.  And it generally begins with a

18  conference call of, Okay.  What's the area,

19  approximate number of shooters?

20          We start developing a plan, or an op- -- a

21  plan as a mission, or an operational meeting.  What

22  type of assets need to be sent out?  Should several

23  teams be sent out or just a five-person team?

24          When we talk about scene deployment,

25  that's, Okay.  What type of location are we going to?

 1  Are we -- what type of weather elements may we

 2  encounter?

 3          And finally that last bullet, depending on

 4  the type of the scene, what type of equipment are we

 5  sending out in anticipation of the laboratory

 6  products?

 7  Q.    And you alluded to this a little bit.

 8          Can you explain to the Court a little bit

 9  about the laboratory team method at the FBI?

10  A.    Sure.  So in the table, I broke it down by

11  observation, imaging, and measurement.  So this is

12  kind of a detailed understanding of those.

13          Here we've highlighted -- or I've

14  highlighted three of the four teams.  So the firearms

15  and tool marks unit, which I'm a member of; the

16  operational projects unit; and the evidence response

17  team.

18          The evidence response team -- we have our

19  teams that are spread out throughout the

20  United States.

21          So the second column there, when we deal

22  with imaging, it refers to the responsibilities, in

23  my case as an examiner, to analyze the defects and to

24  begin identifying entrance or exit holes.

25          You see there the other responsibilities

Chavez - Direct Examination (Continued) by
Ms. Wilson

1  for the units, to include photography, imaging,

2  videography.

3          And then finally the last column, in

4  certain situations hand measurements, scan data, and

5  survey data can be collected by those two units there

6  at the bottom.

7          Reinforcing, again, what trajectory

8  analysis is, trying to gather as much information or

9  data that can be used to help articulate what took

10 place.

11          And this can be further enhanced by any

12 type of imaging, which can include photography or

13 videography.

14 Q.    And, Mr. Chavez, when your unit is confronted

15 with a Daubert issue, what is your analysis?

16 A.    So we're first -- in order to ensure the

17 validity of trajectory analysis, we're challenged by

18 these five different factors, or prongs.

19          And what I can do is walk the Court through

20 those five elements.

21 Q.    Okay.

22 A.    So the first question is:  Is trajectory

23 analysis and the theory of trajectory analysis, can

24 that be tested, or has it been tested?

25          There are different elements that I'm

 1  highlighting here: competency testing, proficiency

 2  testing, validation, and empirical studies.

 3        When I talked about the training program

 4  earlier, I dealt -- it dealt with a competency test.

 5        Most recently, we all were competency

 6  tested on a vehicle, meaning each examiner was

 7  assigned to reconstruct this vehicle and take

 8  measurements.  And from that, develop any type of

 9  uncertainty as a result of measurements taken by

10  individual examiners.

11        When I mention proficiency testing, there

12  are accredited forensic test providers that are

13  developing tests to then issue out to forensic

14  laboratories, to include -- the scope of forensic

15  accreditation is something that is being offered by

16  an accrediting body, such as one that the FBI lab is

17  accredited by ANAB, which stands for ANSI National

18  Accreditation Board.

19        And within that acronym is also -- ANSI

20  stands for the American National Standards Institute.

21  And so they also have a scope for trajectory analysis

22  that forensic laboratories can show that they are

23  competent in conducting casework.

24        Validation and empirical studies are often

25  done by examiners, to include researchers or

1    universities, again, further challenging trajectory

2    analysis and those elements.

3              The second factor is, trajectory analysis,

4    can it be -- is it subjected to peer review and

5    publication?

6              The three listed there at the bottom are

7    all common for professional organizations within

8    forensic science.  So the AFTE Journal, as well as

9    the American Academy of Forensic Sciences, all have

10   articles relating to trajectory analysis and are

11   constantly challenging specific areas, such as a

12   bullet traveling through different types of material,

13   deflection of a bullet, if a bullet were to fall

14   apart and it creates two separate paths.

15             So there at the top, highlighting,

16   basically, overall in textbooks, reinforce this --

17   these common foundational scientific principles that

18   relate back to physics and math.  I need to gather

19   this point X, Y, and Z.

20             Military training guidance, there is some

21   information of a projectile taking flight and how it

22   may impact an end object.

23             And then I highlight the journals there at

24   the bottom.

25             The third element is, what is -- you know,

Thelonius Wilson - Examination (Continued) by
Ms. Wilson

1    the question is:  What is the known and potential

2    error rate for projectile analysis?

3              I mentioned this earlier, about a vehicle

4    being processed by 11 different examiners.

5              So during that process there may be an

6    uncertainty that is developed as a result of the

7    bullet passing through different types of material.

8              In the case of a vehicle, it will first

9    pass through -- say, for instance, the shot was from

10   the driver's side.  It will first pass through metal,

11   likely some type of polymer material or liner.  It

12   may then pass into a softer object, such as the seat

13   cushion.

14             And so those are different elements where

15   there could be some uncertainty developed as a result

16   of trying to establish a trajectory.

17             The second point there, directionality.  In

18   some cases there may be an erroneous determination of

19   a trajectory based on directionality.  And so ways

20   for us to mitigate that are highlighted by our

21   quality assurance review process.  So ensuring that

22   if there are field notes taken and it is put into a

23   report, that ultimately -- that report will then get

24   a technical or an administrative review prior to

25   issuance.

1              The fourth factor, which questions the
2    existence and maintenance of standards and controls
3    for trajectory analysis, is highlighted by the
4    comprehensive training program.
5              So I mentioned that there are elements that
6    an examiner in training may conduct independently.
7    There are also situations where the examiner will go
8    out with a qualified examiner to better understand
9    different elements that may be encountered on scene,
10   as well as their ultimate qualifications, being able
11   to provide any testimony within the trajectory
12   analysis.
13             The second there, quality system,
14   explaining this a little bit more, is that our
15   laboratory operations manual, our standard operating
16   procedures, all provide sort of that robust insurance
17   that any time we are to go out on scene, it is being
18   handled in a manner that is unbiased to any type of
19   other information, and further supported by the
20   technical, as well as administrative reviews.
21             Lastly, accreditation programs.  I
22   mentioned ANAB.  There are other accrediting bodies
23   that also look at forensic laboratories to ensure
24   they are meeting their standard operating procedures
25   accordingly.

    1          The final factor is questioning whether

    2   trajectory analysis is really generally accepted

    3   within the relevant scientific community.

    4          I reiterate AFTE as being an international

    5   professional organization that is comprised of

    6   different examiners spread throughout forensic

    7   testing laboratories, as well as researchers who are

    8   looking at this same concept of this bullet travels

    9   through this item, what is occurring, to include

   10   academic programs.

   11          There are a lot of undergraduate

   12   universities, to include graduate universities, that

   13   are offering classes or certain elements within their

   14   programs.

   15          Lastly, in order to have additional

   16   validation or empirical studies, grant programs, such

   17   as the National Institute of Justice and NIST, offer

   18   that element financially to support that.

   19          The last bullet point there is that we may

   20   see these same types of equipment being used,

   21   surveying equipment, when conducting land surveying

   22   sites or other tools that are being used along the

   23   side of the roads.

   24   Q.    And how are these results typically reported?

   25   A.    I broke this up into two different columns.

 1              So the responsibility that I have is to
 2   ensure that the laboratory report summarizes the
 3   team, the location, as well as the time that the
 4   examination took place, to include now the results of
 5   the examinations, methods and limitations.
 6              And it can be further supplemented by
 7   graphics.  So if you think of that -- of those first
 8   three bullet points as the narrative, and the last
 9   point is a visual representation.
10              So who was responsible for assisting me in
11   generating that supplemental graphic, that would be
12   the operational projects unit.  And so they will
13   generally create graphics or exhibits.
14              And for the graphics, they will have a
15   two-dimensional graphic, just for ease of
16   understanding -- the quick understanding of what took
17   place, so it can be an overhead perspective or a side
18   elevation view.
19   Q.    And speaking of the graphic, can you briefly
20   explain how the graphic image is labeled?
21              And you provided us with an example?
22   A.    I did, yes.  So this example here, I redacted
23   some of the administrative information to include the
24   case number, laboratory number, since it was a part
25   of another investigation.

1          But what is critical to note here is a

2    scale, the regimen, or key, there at the bottom

3    right, that for green, blue, and that orange bullet,

4    impact and trajectories.

5          And for the purpose of the narrative, when

6    I talk about these trajectories in the report, I

7    broke it up by vehicle quadrant.  So you can see in

8    each corner, front driver, rear driver, and passenger

9    side.  It's further kind of broken up by that

10   crosshair, so you have that designated quadrant.

11         In the case of Hole 6, 5, and 4, you can

12   see that those three holes are connected, meaning

13   that they create a line that is then labeled by our

14   Trajectory 1.

15         Where it's labeled also indicates

16   directionality, which is then further supported by

17   the report.  Meaning in the report, it will likely

18   read that a trajectory was established and originated

19   from the front driver's side, connecting Hole 6, 5,

20   and 4.

21   Q.    Thank you.

22         You were asked to conduct a firearm

23   trajectory analysis in the case of United States

24   versus Douglas Smith.

25         Is that correct?

A.     That's correct.

Q.     And as part of this request, you were deployed to Espanola, New Mexico, on August 22, 2019?

A.     That is also correct.

Q.     And could you explain what you did, when you arrived on scene in Espanola?

A.     So the laboratory decided to send out just myself as an examiner, serving as the lead for this project.  And so upon arriving to the Santa Fe resident agency, I met up with the team that was comprised of the agents there in Santa Fe, as well as the evidence response team that was pulled from the Albuquerque field office.

Q.     And as part of your deployment, what type of information were you interested in at the scene, and what did you observe when you got there?

A.     So for any shooting incident, we are capturing field notes that indicate holes or impacts that we are interested in, as part of this investigation, to include photographs and any type of data, whether that be hand measurement, survey, or scan data.

Q.     And at the scene in Espanola, did you find evidence of bullets or impacts?

A.     Yes, we did.  So arriving on scene, the team basically did a line search.  And so what that

1   entailed is, based on limited information that we

2   knew about the incident, we did sort of a sweep of

3   the property.

4          And as we located areas that were suspect

5   of being bullet holes or impact points, we labeled

6   them.

7          I labeled them by designator of Hole 1 or

8   Hole 2, depending on the surface being examined.

9          And it was at that point, upon labeling,

10  that I directed the photographer to begin collecting

11  information about those areas of interest.

12         Once the photographs were taken, then I

13  directed the evidence response team members to begin

14  collecting survey or scan data of that area of

15  interest.

16  Q.    You may describe this in more detail later.

17  But generally, can you describe how many holes you

18  found and where they were located?

19  A.    Again, looking at the entire property and doing

20  a line search of the property, there were two areas

21  that we would designate as areas of interest.  That

22  being a metal shed adjacent to the main property, as

23  well as a trailer that was just located outside of

24  the fenced area.

25  Q.    And once you collected all of this information

1    on scene, what did you do with that?

2    A.    Generally, the information for the

3    photographer, as well as the scan and survey data, is

4    handled according to their procedures.  It's my

5    responsibility to take my field notes back with me to

6    the lab and then request information from the

7    photographer, mainly, of a copy of their photos.

8              And so the scan data and survey data,

9    getting back to the operational projects unit, they

10   will get that data upon return back to the -- to

11   their office and be handled that way.

12   Q.    And as part of your analysis, did you examine

13   any additional evidence in this case, besides what

14   you've described?

15   A.    No additional evidence, no.

16   Q.    And why is that?

17   A.    In typical cases that involve shooting

18   incidents, we try to prevent any information that

19   relates to the physical evidence from the examiner

20   going out on scene.  So an unbiased approach, if you

21   can say that, where the examiner who is going on

22   scene knows little information about the physical

23   evidence.

24              Or if I am working the evidence itself, I'm

25   not relaying information back to the examiner on

1   site.

2   Q.    And did you generate a report and a graphic

3   image associated with that report in this case?

4   A.    Yes, I did.

5   Q.    If I can show you what's been marked for

6   identification as Government's Exhibits 5 and 6.

7         Would you please take a look at that and

8   let me know if you recognize it?

9         Do you recognize that, sir?

10  A.    Yes, I do.  That is the -- I recognize it first

11  by the Laboratory Number 2019-2375.  And that should

12  be a footer for each of those pages.

13  Q.    And approximately how many pages is your

14  report?

15  A.    Three pages.  And if you go back to the first

16  one, it also indicates there was a supplemental

17  graphic of one page.

18  Q.    And that's marked as Government's Exhibit 6?

19  A.    Yes.  And the lab number located there at the

20  bottom right is how I recognize it.

21  Q.    Thank you.  And are these fair and accurate

22  depictions of your report and the associated

23  graphics?

24  A.    They are.

25        MS. WILSON:  I move Government's Exhibits 5

1    and 6, Your Honor.

2              And I would also ask the Court to allow

3    Mr. Chavez to annotate both exhibits during his

4    testimony during this hearing.

5              THE COURT:  Is there objection to

6    Exhibits 5 and/or 6, Mr. Elsenheimer?

7              MR. ELSENHEIMER:  Not for purposes of this

8    hearing, Your Honor.

9              And I don't have any objection to

10   Mr. Chavez annotating that for purposes of this

11   hearing.

12             THE COURT:  All right.  So 5 and 6 are

13   admitted for today's hearing.

14             And then yes, the witness can annotate.

15   BY MS. WILSON:

16   Q.   Mr. Chavez, do you have that there?  And if you

17   could, walk us through your report -- the findings,

18   the methodology, and the limitations.

19   A.    First, just note the administrative section

20   here in green.  First, by who requested us to go out,

21   the approximate date of that request, when we were on

22   site.  I mention the lab number.  And also an

23   understanding of what H, what I, and what T mean.

24             And in this case, highlighted here is we're

25   using a compass direction to allow for information of

1    where the trajectory originated from.

2              I'm going to clear this section and move on

3    to page 2.

4    Q.    Okay.

5    A.    So on the top section are the results of the

6    examination.  So in this case you see here now T1,

7    which is comprised of Hole 2 and Impact 1.  And then

8    Hole 1, that was located on the corner of the

9    trailer.

10             It's also a requirement, for us to have the

11   methodology and limitations as part of the report,

12   indicating how we collected the information or how

13   the data was collected.

14             And then also in the limitation section,

15   what certain limits may be impacted by the X, Y, and

16   Z.  So certain coordinates that are critical to put

17   in a point in space, further supporting connecting

18   those two points to create a line.

19             The final page -- and I'll clear the

20   drawings here.

21             The final page, we'll just highlight the

22   remarks section.  So again, the person who was

23   responsible for generating the graphic, and then

24   myself as the author of this report, to include the

25   opinion there.

 1              And the supplemental graphic that

 2    accompanies this report.  So again, viewing the

 3    results as the narrative, this is more of the visual

 4    component of the report.  The lab number there at the

 5    bottom.  The lab number at the bottom, and the report

 6    date of February 3, the case ID.

 7              And in this case we have Hole 1, Hole 2,

 8    and Impact 1.

 9              I mentioned earlier the areas of interest.

10    And those areas I'm going to highlight in red.  That

11    would be this trailer and this metal shed.

12              Lastly, at the top left is a snapshot of

13    the area that would be viewed within this diagram.

14    Q.    And in your opinion, based on your observation,

15    the data that was collected, your report, and the

16    associated graphic, were multiple bullets fired by a

17    gun that you were to determine?

18    A.    Yeah.  So a part of the methodology for

19    trajectory analysis allows us to look at each area

20    independently.

21              And so for Hole 1, there was significant

22    damage at the corner of that, that would indicate the

23    bullet likely impacted that and deflected or was

24    unstable versus Hole 2, connecting to Impact 1, was a

25    separate shot based on the damage to the television

1    screen, as well as the entry of that bullet into the

2    corrugated metal.

3    Q.    And were you able to determine directionality

4    associated with those impact points?

5    A.    Yes.  So each location or hole or impact is

6    also -- we observe the characteristics.  So there are

7    certain elements, such as the metal being pulled

8    back, that will indicate directionality.

9             As well as in the case of the Hole 2 to

10   Impact 1, we observed -- or I observed the

11   continuation of that damage to a second item, further

12   supporting the connection between those two areas.

13   Q.    And based on your review of the data and

14   analysis in this matter, is it your opinion that all

15   standard FBI procedures were followed?

16   A.    Yes, they were.

17   Q.    And the results were peer reviewed?

18   A.    By "peer reviewed," do you mean a

19   technical/administrative review?

20   Q.    Yes.

21   A.    Yes, they were.

22             MS. WILSON:  Your Honor, I pass the

23   witness.

24             THE COURT:  All right.  Thank you.

25             Mr. Elsenheimer, you may cross-examine the

1    witness.

2                        CROSS-EXAMINATION

3    BY MR. ELSENHEIMER:

4    Q.    Good morning again, Mr. Chavez.

5    A.    Good morning.

6    Q.    I want to ask you about your report a little

7    bit.  So it's a three-page report that is followed by

8    46 pages of documentation.

9              Is that right?

10   A.    So -- I'm sorry.  The report itself is three

11   pages, with one supplemental graphic.

12   Q.    The supplemental graphic is the -- is the

13   trajectory image that we just looked at.

14             Is that right?

15   A.    That is correct.

16   Q.    There are also written notes that -- at least

17   that I have of yours.

18             Is that part of your report in this case?

19   A.    We commonly refer to the report as being the

20   three-page document, then supported by a supplemental

21   graphic.

22   Q.    Okay.  Well, I have one -- pages 1 through 46,

23   and they consist of two written pages, and then a

24   number of photographs.

25             They -- the written pages, are those

1   your -- is that your handwriting?

2            Let me show you the page that I'm referring

3   to.

4   A.     Sure.

5   Q.     Can you see that?

6   A.     Yes.  Will you scroll to the bottom, so I can

7   see the footer?

8   Q.     Certainly.

9   A.     I do recognize that by the laboratory number,

10  as well as the pagination, the date, and my initials

11  at the bottom.

12  Q.     So this is a document that you wrote?

13  A.     This is commonly referred to as our supporting

14  documentation.  So when a report is generated, these

15  would be the field notes put in as part of a

16  discovery packet.

17  Q.     I see.  Are these your field notes?  Like did

18  you write this?

19  A.     Yes, I did.

20  Q.     Okay.  Following that -- those pages, I

21  received a number of pictures.  They seem to have FBI

22  Lab Number 2019-2375-2.

23            Let me show you the first of those.

24            Do you see that image?  And I'll try to get

25  it rotated correctly.

```
 1              Is this an image that you reviewed for
 2   purposes of your report, or is it an image that you
 3   had taken?
 4   A.    It is an image that I reviewed, but an image
 5   that I directed someone to take.
 6   Q.    I see.  So it was taken on August 22 of 2019?
 7   A.    That would have been the time, yes.  The
 8   photographer was on site with me.
 9   Q.    Let me go back to that handwritten page.
10              Are you able to see this clear enough to
11   read the writing?
12   A.    I am.  And I also have a laptop here.  If you
13   may -- if you could zoom in just a little bit?
14   Q.    Sure.
15   A.    Okay.
16   Q.    Is that better?
17   A.    That does help, yes.  Thank you.
18   Q.    Can you tell me if -- there are three
19   hashmarks.  The second hashmark starts with H1.
20              Can you tell me -- I'm having a difficult
21   time reading the third line down from that.
22              It's -- the first part of it says 2, and
23   then I think it is additional.  And then I can't read
24   beyond that.
25              Can you tell me what that says?
```

1   A.     Yeah.  So it starts with an arrow.  That is two

2   additional areas were tested.  In parentheses is the

3   acronym BTK, which stands for bullet testing kit,

4   below H1.  And the lead, which is referred to as Pb,

5   and copper, Cu, were negative.

6   Q.     Okay.  So I'm going to ask you about that.

7              So we're refer- -- this is referring to the

8   hole that is identified as H1.

9              Is that right?

10  A.     What I read is referring to two additional

11  areas that were tested below H1.

12  Q.     Oh, I see.  And where were those areas?

13  A.     When conducting a bullet testing kit of a

14  suspected area, what we will -- what I will do is

15  take a negative to ensure that they -- there isn't

16  anything on that material that would produce an

17  erroneous positive test for bullet or lead.

18             So in this case, I chose two areas a

19  distance away from Hole 1 and tested them both for

20  copper and lead, and they were negative.

21  Q.     Let me ask you about the -- the third hash that

22  says H2.

23             Could you read that for me, just so that I

24  make sure I know exactly what it says?

25  A.     Sure.  So it starts with H2, located on

1    corrugated metal shed that is adjacent to property.

2    In parentheses, main house.  Exterior of east facing

3    rear door, consistent with entry -- entry -- I'm

4    sorry.

5              May you zoom in just a little bit?

6    Q.    Certainly.  Is that better?

7    A.    I'll continue.  Entry hole and material inward.

8    Upon opening of shed, visible damage was noted on

9    some items within the property.  And in parentheses,

10   shed.

11   Q.    Thank you.  Let me ask you about that.

12             Upon -- so my understanding from this, and

13   you tell me if I'm wrong.  But if I'm opening the

14   shed, you noticed visible damage.

15             What damage did you notice?  Like what is

16   that in reference to?

17   A.    That's referring to the direction.  So first,

18   looking at Hole 2, indicating that metal or material

19   is inward, which to me indicates that the bullet was

20   traveling from outside in.

21             So following the path of that bullet, or

22   projectile, and then looking at any material within

23   the shed.

24             So first, just taking a clockwise approach

25   and basically, again, doing sort of a line search, or

1   in this case a wall search, of any items that may

2   have been damaged.

3           So there was visible damage no- -- noted on

4   a television screen that resulted in, also, some

5   glass falling.  So those were indicators that damage

6   was visible.

7   Q.    Were any other items damaged in this shed,

8   aside from the television screen?

9   A.    No other items, but focused only on the

10  television screen.

11  Q.    Let me ask you about the next hash.  It has

12  I -- it has I2 struck out, and then it has I1.

13          Would you mind reading that for me, please?

14  A.    Sure.  So it is a -- I1.  A common quality

15  measure in our lab is to just single strike out,

16  initial, and date.  So that I am actually just

17  crossing that out and rewriting Impact 1, located on

18  television screen that is on the southwest corner of

19  the interior that contains damage and other breaks in

20  the glass.  This damage displays a radial pattern.

21  Bullet testing kit, or testing of lead positive,

22  copper negative.

23  Q.    And then what does the next hash say?  What

24  does the writing after the next hash say?

25  A.    That begins with, Upon review of damage there

1    may be fragments that continue through the interior

2    of the television.

3    Q.    Thank you.  And then how about that last --

4    those last two lines?  Would you mind reading those,

5    because I can't quite tell what they say.

6    A.    Sure.  Review television and surrounding area

7    that may contain some additional evidence.

8    Q.    What does that mean?  Did it say review

9    television, surrounding area?

10         Did you take any tests or was it just a

11   visual review?

12   A.    The last two statements that I just read were

13   reminders for me to relay that information to our

14   evidence response team, who are responsible for

15   collecting any additional evidence.  So they were

16   just a reminder for me to have that conversation with

17   the team leader.

18   Q.    Is it Officer Chavez or how do you -- is it

19   Agent Chavez?  What's your appropriate designation?

20   I don't want to get it incorrect.

21   A.    I'm a qualified examiner, so Theo Chavez is

22   fine.

23   Q.    You -- was the first time you visited

24   825 Riverside Drive on August 22, 2019?

25   A.    That is correct.

1    Q.    Did you -- are you familiar with the date of

2    the incident giving rise to the allegations in this

3    case?

4    A.    I -- no, I had no indication of the date of

5    incident.

6    Q.    You don't know how long it was before you

7    visited there in August of 2019?

8    A.    The only information -- I think that it was

9    several months, but no details.

10   Q.    When were you first contacted about this case?

11   A.    Around the time frame of August 19, which would

12   reflect the date on my laboratory report.

13   Q.    So it was shortly before you visited

14   825 Riverside on August 22?

15   A.    Using that date to, yes, form and develop a

16   team which, again, would just be myself, from --

17   Q.    And just to make sure -- okay.  Thank you.

18         Just to make sure I am clear on this, you

19   didn't review any other documentation about this

20   case, any witness statements, photographs, anything

21   like that?

22   A.    No.  And that goes to the unbiased approach for

23   this examination, specifically.  Just reviewing the

24   data on site.

25   Q.    In addition to what is in your report, is there

1    anything else -- are there any other conclusions that

2    you drew about this case, or findings that you made,

3    that are not included in this report?

4    A.    No.  The 46 pages, or records, would be any

5    physical records that are contained.  The only other

6    information that was also, I believe, part of the

7    discovery packet, would be the chain of custody or

8    any technical or administrative reviews that were

9    conducted as a result of this report being issued.

10    Q.    Did you personally take any of the measurements

11    that are used in your report?

12    A.    No, I did not.  And the reason being is, there

13    are individuals who are trained to run the equipment,

14    such as the scanner, or are also trained to

15    photograph areas within the FBI's procedures.

16    Q.    And by the scanner, you are referring to the

17    FARO scanner.

18          Is that right?

19    A.    I don't know if it was a FARO scanner.  I just

20    commonly refer to it as a scanner.

21    Q.    Okay.  Let me ask you about the tests that you

22    personally conducted.

23          You've mentioned a bullet testing kit.

24          Can you describe that bullet testing kit

25    for us?  What does that test consist of?

A.    So it is a presumptive color chromophoric test,
meaning that I am using positive controls to test a
site.

        Given the fact that I knew it was several
months prior to the shooting, I will test the
location to ensure and further support that it was a
hole, or an impact, and that I also wasn't getting
any false positives from the surface just because it
may have been in contact or been comprised of any
type of lead or copper material.

Q.    How did you ident- -- you've mentioned there's
H1 and there's H2.  And those both describe bullet
holes, or holes that you found that you believe are
associated with a bullet.

        Is that right?

A.    Those are two labels that I would have placed
on two different areas, correct.

Q.    How did you find H1 and H2?

A.    Upon arriving to the scene, we did a line
search to locate any areas that were suspect of
having damage as a result of a bullet.

        Upon review of the property, we then
identified two areas of interest, that being the
trailer and adjacent metal shed.

        Further detail and observations of that

```
1    resulted in labeling, physically labeling, those

2    holes and impacts that I wanted further information,

3    or being gathered from, specifically, photos, as well

4    as scan data.

5    Q.    You were with agents from the FBI field office

6    in Santa Fe when you visited 825 Riverside Drive,

7    correct?

8    A.    That's correct.

9    Q.    Did they point those holes out to you?

10   A.    No.  The agents from Santa Fe were primarily

11   responsible for ensuring that the scene was secure,

12   given that we were in close proximity to a major

13   driveway -- or highway.

14            So they were providing scene protection for

15   us, and allowing us to conduct the examination.

16   Q.    Did you do any other tests, aside from the

17   bullet testing kit?

18            Did you do any laser tests, anything like

19   that?

20   A.    No, just the bullet testing kit.

21   Q.    Did you -- so you found -- let me just clarify

22   this.

23            You found the holes by just looking for

24   them?  I'm still not entirely clear on how you found

25   these two particular holes.
```

A.    That is correct.  So the procedure for us is
to -- any type of shooting incident, and in this
case -- arrive on site, begin just doing a general
observation.  And these are individuals who are
trained to respond to shooting scenes or other
scenes, and locate items of evidence.

          In this case, we're looking for areas that
were of interest.  So did it display any features
that were consistent with a bullet either having
passed, grazed, or impacted?

          And so in this case we started in a
clockwise manner going through the property and
locating those areas and then labeling after that.

          So yes, it was a matter of a line search
for a review of the entire property.

Q.    Now you mentioned in your report using your
survey equipment or laser scanner devices.  So you're
saying that no laser scanning device was used in your
trajectory analysis in this case?

A.    No.  I believe the question was if I used
lasers.

Q.    Right.  Did you use lasers?

A.    No.  Lasers were not used in this case.

Q.    Can you use lasers as part of ascertaining what
a particular bullet's trajectory is?

1    A.    If you are referring to lasers in a photograph,

2    those are common practices for generating an

3    investigative photograph, but it is not a requirement

4    to use lasers.  The only time that is being used is

5    when a photograph needs to be released for

6    investigative reasons.

7              But in this case a supplemental graphic

8    using the data collected was generated.

9    Q.    Let me ask you this.

10             Your report says that suspected bullet hole

11   impacts were examined to determine whether they have

12   physical defects consistent with having been caused

13   by a bullet or debris.

14             In this case, what was done to determine

15   whether they were consistent with a bullet or debris?

16   A.    So based on my training and experience, and

17   having looked at different types of materials being

18   encountered by bullets, these displayed

19   characteristics such as the peeling of the material,

20   further supported by the color chromophoric test of

21   lead and copper that further supported it being a

22   result of a bullet passing through it.  The term

23   "bullet" and "projectile" can be used

24   interchangeably.

25             When we talk about debris, there are

1    chances for a bullet to pass through an intervening
2    object and then separate, meaning the lead core can
3    separate from the jacket material, and so it could
4    potentially take two different paths.
5            But in this case, Hole 1 and Hole 2 were
6    treated independently based on the type of
7    characteristics that were displayed on the surface.
8    Q.    Let me ask you about that color chromographic
9    test.  Do I have it correct, color chromographic
10   test?
11   A.    Color chromophoric test.
12   Q.    I'm sorry.  Chromophoric.  Is that something
13   where you kind of get a rubbing from the H1 and H2
14   and you test it to see if it has lead residue or
15   copper residue?
16   A.    So when I mentioned color chromophoric, it is a
17   visual test, meaning that when you apply the paper
18   onto the surface using some acid, it will appear
19   purple for lead and sort of an orange color for
20   copper -- excuse me, not orange -- but forest green,
21   if you will.
22           And so it's a color chromophoric test that
23   is done.  And by the positive control being done
24   using known lead, known copper, comparing those two
25   together, further supports.  They're not independent,

1    so you're using the characteristics of the hole

2    itself to also conduct that test.

3    Q.    Did you -- did the -- let's talk about H1.

4          You did that test on H1.  What was the

5    results of H1?

6    A.    If I could refer back to my notes, if that's

7    possible?

8    Q.    Your notes or your report?  You want your field

9    notes?

10   A.    Yes, the field notes.

11         MR. ELSENHEIMER:  Your Honor, if I could

12   have just a moment to get those?

13         THE COURT:  You may.

14   BY MR. ELSENHEIMER:

15   Q.    Are those the notes that you're referring to,

16   sir?

17   A.    Yes.

18         And may you repeat your question?

19   Q.    Sure.  I'm just wondering, with regard to H1,

20   did you do that color chromo- -- did you do that BTK

21   test?

22   A.    Yes, I did.

23   Q.    And what were the results of that test from H1?

24   A.    For H1, it was positive for lead and positive

25   for copper.

1    Q.    What does the fact that it's positive for

2    copper tell you?

3    A.    Well, again, it doesn't stand alone.  But in

4    this case, it will say that there is copper and lead

5    embedded within that damaged area around Hole 1.

6    Q.    I see.  And then for H2, did you do the BTK

7    test for H2 as well?

8    A.    No, I did not.

9    Q.    You didn't do it -- for the hole in the

10   corrugated shed, you did not do a color chromophoric

11   test?

12   A.    No, I did not.

13   Q.    Did you do one on the television set that you

14   located inside the corrugated shed?

15   A.    Yes, I did.

16   Q.    What were the results of that?

17   A.    The results were a positive copper -- excuse

18   me -- a positive lead and a negative copper.

19   Q.    Did you look -- when you visited 825 Riverside

20   Drive on August 22 of 2019, did you look in the

21   woodpile for any impact sites or any holes?

22   A.    Yes, we did.  That was part of the -- again,

23   working clockwise.  That sort of would have been the

24   second area that we would have reviewed for any

25   potential damage.

1          However, I do recall there being a lot of

2    debris and tall weeds.  So there was a -- a review

3    done of that -- that area, and it would have included

4    the wood that would have been piled up.

5    Q.    And did you also look at any of the trees or

6    limbs from the trees to see if there were any bullet

7    holes in those?

8    A.    We did.  And in fact, I do recall several

9    instances where individuals had thought they had seen

10   a hole.  But in fact, it was just a knot in the wood.

11          So again, that's just -- they're doing

12   their job by surveying the area, just trying to find

13   any damage or hole.  And then it is up to me to go

14   back and review that and determine whether or not it

15   meets the requirements or has any characteristics for

16   being the result of a projectile or bullet.

17   Q.    The knot, or the hole, is that something

18   that -- so this was in August of 2019.

19          If the incident took place a year and a

20   couple of months prior, is that knot or hole

21   something that you may have missed because of the age

22   that elapsed between the date of the incident and the

23   date that you did your investigation at the property?

24   A.    That is something we considered.  However, we

25   were evaluating the property as we were on site.  So

1    there wasn't any reason to cut into any material.

2    Q.    Let me ask you about the trajectories.

3              There's something that you've labeled as

4    T1.

5              What does that stand for?

6    A.    There is one single trajectory, so T stands for

7    Trajectory 1.

8    Q.    I'm going to bring up your diagram, because I

9    want to ask you about that.  It might be helpful for

10   you to refer to it.

11             Now, that is the only trajectory that you

12   were able to ascertain.

13             Is that correct?

14   A.    Those two points creating that trajectory, yes.

15   Q.    And by the two points, are you talking about H2

16   and I1?

17   A.    Hole 2 and Impact 1, yes.

18   Q.    Okay.  Now, you -- I believe, and tell me if I

19   am wrong.  But I believe that you said that that

20   originated from a northeast direction.

21             Is that correct?

22   A.    I believe I stated north, northeast direction,

23   correct.

24   Q.    You didn't have a point of origin for where the

25   bullet originated that you believed caused H2.

```
 1                  Is that correct?
 2    A.    Correct.  That's one of the limitations for
 3    trajectory analysis, that we don't utilize any
 4    information, nor do we put a shooter back at a
 5    specific point.
 6                  Rather, we provide just sort of an
 7    objective perspective of where that shot originated
 8    from.  So that way it provides some context of where
 9    it originated, and also where additional evidence may
10    be collected along that line.
11    Q.    Is there any way to date the age of H2?
12                  And by that, I mean are you able to
13    determine when it was caused or -- yeah.  Are you
14    able to determine when it was caused?
15    A.    No, I'm not able to.
16    Q.    So let's say, for example, that someone had
17    fired a shot on Day 1, and then six months later
18    fired another shot, and then a year later you go and
19    find H2.
20                  Is there any way for you to determine that
21    it was fired on Day 1 or six months later on Day 2?
22    A.    Aside from the hole being subjected to the
23    elements, there may be some rusting or other features
24    that are a result of just the metal being broken.
25                  But no, not being able to decipher if a
```

1   shot was, as you mentioned, sort of a year ago versus

2   present day.

3   Q.    You wouldn't be able to make that

4   determination, aside from maybe having rusting or

5   something like that.

6           Is that right?

7           MS. WILSON:  Your Honor, I'm going to

8   object; asked and answered.

9   BY MR. ELSENHEIMER:

10  Q.    Well, did you see rusting anywhere on the H2?

11  A.    I don't recall rusting being present.  However,

12  I believe there was a hornet nest kind of in the

13  vicinity of that hole.

14  Q.    And similarly for H1, is there -- I want to ask

15  you about that.

16          Is there any way to date the age of H1?

17  Would you be able to say if bullets were fired in

18  January of 2018 and again in May of 2018?  Is there

19  any way to say that the bullets -- the bullet that

20  caused H1 came from January or May?

21  A.    No way to determine that, no.

22  Q.    Did you determine a point of origin for H1?

23  A.    I'm sorry, the audio cut out.

24          Will you repeat the question?

25  Q.    Certainly.  Were you able to determine a point

1  of origin for H1?

2  A.    Yes.  So there were some characteristics of

3  Hole 1 that allowed for me to determine that it

4  originated from the north, northeast direction.

5  Q.    But again, you were unable to decipher a

6  particular point of origin for the bullet that caused

7  H1?

8  A.    Not a particular point of origin.  That's

9  correct.

10  Q.    Your report says that H1 cannot be associated

11  with a trajectory.

12         Is that right?

13  A.    That is correct.

14  Q.    So without knowing the point of origin of

15  either H1 or H2, wouldn't it be possible for a bullet

16  to be fired and hit at H1, to ricochet and become the

17  bullet that caused H2?

18  A.    There may be instances where that can occur,

19  just to -- just because of the close proximity.

20         However, the flip side of it is that we

21  also have to treat them independently.

22         So by looking at the characteristics that

23  are displayed by Hole 1, significant damage was noted

24  that would indicate the bullet likely became

25  unstable, when compared to Hole 2, which had a

1  material going through the corrugated metal and

2  significant damage into the television screen.

3  Q.    Let me ask you about Hole 1.  You said there's

4  significant damage associated with that.

5        What was the significant damage that you

6  observed?

7  A.    "Significant damage" meaning the -- if you look

8  at the detail of a hole, certain features -- that may

9  be the pulling back of the material, the damage of

10  the surface that it's encountering, as well as any

11  type of characteristic of that hole that isn't just a

12  matter of a bullet basically grazing it.

13        So it caused enough damage for it to be

14  unstable, the bullet to be unstable.

15  Q.    Did you conduct a test to determine that it was

16  the type of hole that would indicate that the bullet

17  became unstable?

18  A.    No, I did not.  But that is just a matter of

19  training and experience, having looked at other types

20  of material similar to metal.

21  Q.    So you're saying that you just kind of base

22  that on just observing this particular impact site.

23        Is that right?

24  A.    Yeah.  Correct.  Observations of those holes

25  independently.

1  Q.    So you didn't do any type of testing of that

2  particular hole at H1, on the side of the camper

3  trailer, to find out if the impact could have

4  resulted in a ricochet.

5           It's just based on your observation of it

6  and kind of your hunch based on that observation.

7           Is that right?

8  A.    So based on the hole itself and the testing

9  that was done, would have indicated that this was a

10 result of a bullet encountering that hole.

11          Separate from that, I'm not using any

12 information such as prior statements or reports that

13 would try and connect the two.

14          Rather, if a hole or an impact is being

15 observed, it's treated independently and reported out

16 as such.

17 Q.    Well, let me ask you a little bit about the

18 camper trailer itself.

19          Did you do any tests of the metal of the

20 camper trailer to find out if it was the type of

21 metal that would have caused a bullet to become

22 unstable?

23          Because I'm sure that different metals

24 would have different effects on the trajectories of

25 certain bullets and on whether or not they become

1    unstable.

2    A.    I did not conduct any separate tests.  However,

3    in this case, it hit the corner of the metal versus

4    actually passing through the metal.

5              So if it were to have passed through the

6    metal, that bullet likely would have lost some of its

7    velocity.

8              However, hitting the corner metal, it does

9    ultimately become unstable and is no longer in a

10   straight path.

11   Q.    Just because a bullet is on -- not on a

12   straight path doesn't mean it's not going to

13   ultimately travel to a certain place and make an

14   impact.

15             Is that not right?

16   A.    Correct.  So it may continue on, but it has

17   lost some velocity and has also become unstable;

18   therefore, the path is sort of unknown on where that

19   projectile will go or end up.

20   Q.    My point is, it could have been the bullet that

21   caused H2.  You just don't know, because there's no

22   way to say?

23   A.    The observations of the damage, we're treating

24   them two -- as two separate shots.  Again, just based

25   on their location and the type of damage that was a

1    result of the bullet passing through Hole 1 and into

2    Impact 1.

3              Excuse me.  Hole 2 and into Impact 1.

4    Q.    And what is it about Hole 2?  Did you conduct

5    any studies of the metal of Hole 2 to find out if

6    that's the type of metal that would have reacted in a

7    certain way to an unstable bullet or a stable bullet?

8    A.    So the way that the corrugated metal was

9    positioned, the bullet would have actually come into

10   contact in a relatively 90-degree angle.  So it would

11   have impacted any metal behind it, simply just the

12   thickness of the material, which then would have

13   allowed for it to pass into and ultimately impact the

14   TV screen.

15             So these, again, are all observations just

16   based on the features of a hole and any type of

17   object that is within its path.

18   Q.    Right.  But you didn't conduct any test of the

19   metal of the corrugated shed, did you?

20   A.    No specific tests of the metal.

21   Q.    You mentioned in the tree -- or the limbs that

22   you saw, there were knots that someone pointed out.

23             Is that right?

24   A.    I recall the knots being on the fencepost that

25   may have been close to where the lumber was piled up.

```
 1   Q.     You didn't notice -- did you notice -- you or
 2   anybody on your team -- notice anything in any of the
 3   trees that could have been bullet impacts?
 4   A.     The trees were searched, but no bullet impacts
 5   were located.
 6   Q.     You mentioned that when -- and you did look at
 7   the woodpile that was on the property.  And you
 8   mentioned other debris.  Let me ask you about that.
 9          Why was it that you weren't able to find
10   any holes or bullet impact sites?  Was it because of
11   the debris that was around the woodpile?
12   A.     No.  The debris did not prevent us from
13   observing any potential impacts; rather, it was just
14   that we would have had to have moved equipment to try
15   and look at or make additional observation.
16          So it was a matter of the, I believe, weeds
17   or other trash that was in that location that
18   prevented us from doing any sort of detailed search.
19          But nothing -- once we were able to get
20   past that point and look on the opposite side, we
21   were able to observe some of those areas for any
22   potential damage.
23          THE COURT:  Mr. Elsenheimer, how are you
24   doing on time?
25          MR. ELSENHEIMER:  Your Honor, I have -- I
```

1 definitely have a few more questions. I know
2 Your Honor wanted to finish early today, so I will
3 wrap up my examination.
4          Could I at least, for right now, have ten
5 more minutes --
6          THE COURT: Yes.
7          MR. ELSENHEIMER: -- and then maybe a
8 little bit longer? Okay. And again, I might go a
9 little longer. I don't exactly know.
10 BY MR. ELSENHEIMER:
11 Q.    Mr. Chavez, let me go back to your report.
12          In your report you say that the direction
13 of travel can be determined by the nature of the
14 damage around the holes, the direction of transport
15 of additional material, and the lack of an exit hole
16 on one end of the trajectory, or the recovery of a
17 bullet or bullet fragment from one end of the
18 trajectory.
19          So we've been talking about H1 and H2 and
20 your conclusion that these are two separate shots.
21          That -- the test -- and I want to ask you
22 about the tests that you used to reach that
23 conclusion.
24          My understanding is that the test that you
25 used really was the bullet testing kit, which is to

1    find out if there is lead or copper associated with

2    H1 or H2, and then the rest of that was your own

3    observations, and that's it.

4            Am I wrong in that assessment?

5    A.    You are not.  So the field notes, along with

6    the bullet testing kit and the photographs and the

7    on-site observations all support the results of those

8    two holes being independent.

9    Q.    But that's really just observation.  It's just

10   your kind of observational conclusion.  You didn't

11   conduct any type of laser examination, you didn't

12   conduct any type of additional tests that would

13   support or that would verify or -- or not verify that

14   particular observation.

15           Isn't that right?

16   A.    And to clarify, lasers -- when lasers are used,

17   that is just a visual representation of the

18   observations that are made, so connecting two points

19   with a manner of lasers and fog.

20           But no additional procedures were -- were

21   done in this investigation.

22   Q.    Can you say that last part again, because you

23   cut off right as you were saying that.  I'm sorry

24   about that.

25   A.    Yes.  So all observations were made as part of

1    this examination, meaning that lasers were not used.

2    There was no requirement for it.

3           But all field notes, photography, and data

4    being collected by the scan and survey data, was done

5    in this case.

6    Q.    Okay.  So let me just ask you again, because I

7    want to understand this.

8           A bullet, when it becomes unstable, that

9    bullet can still cause a hole and result in an impact

10   site, correct?

11   A.    That's correct.

12   Q.    And it exclusively depends on how that unstable

13   bullet enters or hits whatever it ultimately hits?

14   A.    To include the ground, correct.

15   Q.    Absolutely.  And so let's say, for example,

16   that a bullet hits the side of a shed -- of a -- the

17   side of anything, and it becomes unstable and it

18   begins to wobble, right?

19          So when that bullet makes the next hole in

20   whatever it hits, it depends on where it hits in the

21   course of its unstable wobbling, for lack of a better

22   term.

23          Isn't that right?

24          So if it hits at the right angle, it's

25   going to cause the same type of hole that a bullet

1    that didn't hit anything, an unobstructed bullet,

2    correct?

3    A.     May you repeat that?  I'm sorry.

4              Just when it does impact something and

5    its -- I'm sorry -- its shape.

6    Q.     So if an unstable bullet is traveling through

7    the air and it hits the side of a metal building, the

8    hole that it creates, when it hits the side of that

9    metal building, depends on how it entered that metal

10   building, correct?

11   A.     That is correct.

12   Q.     And that hole could look like -- could look

13   identical to the hole created by a bullet that was

14   not unstable?

15   A.     Correct.  The term we commonly use is a

16   keyhole.

17   Q.     So the keyhole could be the same for an

18   unstable bullet or a stable bullet?

19   A.     The keyhole will depend on the type of material

20   that it's passing through.

21              Where we typically see a keyhole is when

22   a -- it's in a drywall material.  So when a bullet

23   becomes unstable, it will pass through, potentially

24   the shape, the overall shape of that bullet, and

25   appear as if it is a keyhole.

```
1    Q.    Right.  So just-- so there's no way to

2    determine conclusively, based on a keyhole, whether

3    the bullet that caused it was stable or unstable?

4    A.    Dependent on -- it's dependent on the material.

5    So in some cases, we can determine that a bullet was

6    unstable based on the profile or shape of that hole.

7             There are features or characteristics that

8    would indicate a bullet having passed through without

9    any type of intervening object versus a bullet that

10   is unstable.  All dependent, though, on the type of

11   material.

12   Q.    So there's nothing about Hole H2 in the

13   corrugated shed that you can conclusively say was

14   caused by a stable bullet, correct?

15   A.    That's incorrect.  So I cannot state that

16   Hole 2 is taking the shape of an unstable bullet.

17   Q.    But it could be?

18   A.    That is also possible.  However, Hole 2 has

19   additional information behind it, that being

20   Impact 1.

21             So collectively using all the information

22   about that hole and its proximity, Hole 2 connects to

23   Impact 1.  Therefore, that bullet is still in stable

24   condition when it passed through the material.

25             MR. ELSENHEIMER:  May I have a moment,
```

```
 1    Your Honor?

 2              THE COURT:  You may.

 3    BY MR. ELSENHEIMER:

 4    Q.    Does the weather on a particular occasion or

 5    the wind on a particular occasion affect your

 6    analysis, trajectory analysis?

 7    A.    No, it does not.

 8    Q.    So you did this -- your field tests in

 9    August -- on August 22, 2019, and the incident in

10    this case was a year and, I believe, three months

11    prior to that.

12              So over a year and three months later,

13    small changes in the location of the TV or the

14    location of the trailer, that could affect your

15    trajectory analysis.

16              Isn't that right?

17    A.    That information -- again, any type of prior

18    location isn't reflected in the work or examination

19    that was conducted on August 22.

20              So the report, as well as the supplemental

21    graphic, speaks to the examination conducted on

22    August 22.

23    Q.    Okay.  And there's nothing about -- and I

24    understand that, because you want to be objective.

25              But what you're not able to do, through
```

```
 1  that attempted objectivity, is you're not able to

 2  have a baseline comparison to the state of the

 3  property or the state of the objects at the time of

 4  the actual incident.

 5          Isn't that correct?

 6  A.    Correct.  That would introduce any type of bias

 7  into the report or the graphic.

 8  Q.    So ideally for you, you would get out to the

 9  scene of an incident, or alleged crime, almost

10  immediately after the alleged incident.

11          Isn't that right?

12  A.    No.  There are some cases where we will respond

13  out several years after the incident occurred.

14          The laboratory also will take a position to

15  provide an unbiased -- if there, for instance, is an

16  instance of a color of law shooting, where the

17  laboratory will go in and conduct an examination to

18  provide, again, an unbiased approach based on the

19  scene or based, maybe, on a vehicle that was secured.

20  Q.    Okay.  Let me ask you this.

21          You were discussing H2, and I believe it's

22  I1, which is the impact site on the television.

23          Your conclusion about the trajectory would

24  change if the -- if the position of the television

25  was moved.
```

1    Isn't that right?

2    So if the television was in a different

3    place, that would affect your analysis of the

4    trajectory, wouldn't it?

5    A.    If the TV was located in a different area, not

6    within the path of that bullet, yes.  That would

7    cause some question of, Well, could it have been

8    moved?

9    Q.    You have no way of knowing if the TV was in the

10   same place on August 22, 2019, as it was on May 5,

11   2018, when the incident took place, do you?

12   A.    I have no information about that.

13   Q.    And you have no way of saying that the trailer

14   that you observed on August 22, 2019, was in the same

15   place as it was on May 5, 2018, at the time of the

16   alleged incident, do you?

17   A.    No information about that as well.

18        MR. ELSENHEIMER:  Nothing further,

19   Your Honor.  I'll pass the witness.

20        THE COURT:  All right.  Thank you.

21        Ms. Wilson, do you have any redirect?

22        MS. WILSON:  No, Your Honor.

23        THE COURT:  All right.  May this witness be

24   excused from this hearing?

25        MS. WILSON:  Yes, Your Honor.

1           THE COURT:  All right.

2           Thank you for your testimony today,

3    Mr. Chavez.

4           THE WITNESS:  Thank you.

5           THE COURT:  So that concludes the testimony

6    we'll be hearing today.

7           I don't really require any additional

8    argument.

9           One of the things that I wanted to ask you

10   about today -- I guess we won't really have time to

11   get to -- to respond, at least verbally today, so I'm

12   going to ask you to respond in writing.

13          And what I was a little bit curious about,

14   because the government had supplemented its -- what

15   was the issue of the statements that the government

16   wanted to submit, you did -- you confused me a little

17   bit.  I wasn't quite sure exactly what, in the

18   transcript, you intend to at least try to admit.

19          So what I'd like you to do is, I'd like the

20   government to submit a transcript that is highlighted

21   with the statements that they want to ask the Court

22   to admit.

23          And then I would like the defense to

24   respond with its own highlighting, so that I can look

25   at that and make a decision without having to take

```
 1   any more of your time in -- in a hearing.

 2            That's the -- that was the crux of my

 3   question.  I just wanted to make sure I know what

 4   statements exactly the government seeks to admit, and

 5   then what the defense feels needs to be added for

 6   completion.

 7            So can you do that, Ms. Wilson, say, in

 8   ten days?

 9            MS. WILSON:  Yes, Your Honor.  Ten days

10   would be fine.  Thank you.

11            THE COURT:  All right.

12            And then, Mr. Elsenheimer, you can respond

13   with your highlighting -- and, what should -- five

14   additional days, ten days?  What do you think?

15            MR. ELSENHEIMER:  I think five would be

16   fine.  If I need more time for some reason I'll

17   submit a request.  But I'll do my best to get it in

18   five.

19            THE COURT:  All right.  So let me see.

20            The government's in ten days, and then the

21   defense has five days to respond unless a request

22   comes for additional time.

23            Mr. Elsenheimer, you look like you have

24   something you want to say.

25            MR. ELSENHEIMER:  No.
```

```
 1              THE COURT:  No?  Okay.
 2              MR. ELSENHEIMER:  I think it's because of
 3  the way that the camera is positioned that makes me
 4  look like I'm --
 5              THE COURT:  You're itching to say things.
 6              MR. ELSENHEIMER:  Well, I usually am.
 7              THE COURT:  Yeah.  Right.  It all makes
 8  sense.
 9              I don't have anything else that I need to
10  ask you to clarify today.  So unless there's
11  something that you all want to bring to the Court's
12  attention, I will work diligently on getting this
13  finalized and get my ruling to you all, of course,
14  once I see what the transcript looks like.
15              So -- all right?
16              MR. ELSENHEIMER:  Could I ask,
17  Your Honor --
18              THE COURT:  Yes.
19              MR. ELSENHEIMER:  Just in terms of a trial
20  setting, just so we can kind of gauge for ourselves,
21  are we thinking -- I know that everything is up in
22  the air, so everything is with the caveat that things
23  could get shut down again because of the pandemic.
24              But is Your Honor thinking January,
25  February, later into the spring?
```

1          THE COURT:  Well, I don't have a specific
2    time frame just yet.  Clearly, it's not going to be
3    this year.
4          And then the reality is that right now we
5    have one jury courtroom that all of us are sharing in
6    the Northern District.  We -- we may try to come up
7    with a second courtroom, but we're not there yet.  So
8    that, of course, affects everything.  And that's one
9    of the reasons why I say it's not going to be this
10   year.
11         And then of course as you pointed out,
12   Mr. Elsenheimer, the way this virus is -- is -- you
13   know, it just seems to be that we're getting more and
14   more people that are testing positive.
15         So I -- I don't know what to tell you
16   exactly.  I will tell you that there are cases that
17   probably have priority over this one, because your
18   defendant is not in custody.
19         So once we are able to start getting cases
20   tried, I think we're all going to be pretty backed
21   up, and I think we're going to be interested in
22   getting cases tried where defendants are in custody.
23         But as -- so I'm just basically telling you
24   the various considerations that go into it.  And it
25   won't be this -- this year.  But I -- it might be

1    spring of next year.  That might happen.

2              And I'm looking at Yvonne to see if she's

3    going to shake her head and tell me that I'm out of

4    my mind, but she's not.  So...

5              But here -- but here is my plan.  You know,

6    once I -- once I have a ruling on these motions, and

7    once it looks like things are maybe -- not calming

8    down, but once I feel like I'm in a position where

9    maybe we all need to seriously plan, I will have a

10   status conference so that we can try to figure out

11   dates and availability of witnesses and things of

12   that nature.

13             So I promise I won't spring it on you, but

14   I don't think it's going to be in the next few

15   months.

16             MR. ELSENHEIMER:  Thank you, Your Honor.

17             THE COURT:  Sorry I can't --

18             MR. ELSENHEIMER:  No, no problem at all.  I

19   completely understand.  I'm just curious.

20             THE COURT:  Yeah.  And ask any time.  I

21   mean, I don't mind questions like that.  It's fine.

22             All right.  Well, thank you all for your

23   appearances today.  Thank you for your presentations.

24             I'll take the matter under advisement, and

25   we'll be in recess.

1           (Proceedings concluded at 12:06 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                          CERTIFICATION

2

3    I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled

5    matter.  I further certify that the transcript fees

6    and format comply with those prescribed by the Court

7    and the Judicial Conference of the United States.

8

9    Date:  November 13, 2020

10

11                    _____
                      PAUL BACA, RPR, CCR
12                    Certified Court Reporter #112
                      License Expires:  12-31-20
13

14

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2                    GOVERNMENT'S EVIDENCE

3   WITNESSES:

4   SAIGE LIBERTORE:

5      Direct Examination by Mr. Nayback  ...............9
       Cross-Examination by Mr. Elsenheimer ............19
6
    THEODORE CHAVEZ:
7
       Direct Examination by Ms. Wilson  ...............70
8      Voir Dire Examination by Mr. Elsenheimer ........76
       Direct Examination (Continued) by Ms. Wilson ....79
9      Cross-Examination by Mr. Elsenheimer ..........100

10  Certificate of Court Reporter ...................140

11                   GOVERNMENT'S EXHIBITS

12  NO.    DESCRIPTION                          ADMITTED

13  Chavez 1  Chavez CV                               72

14  Chavez 2  Slides                                  80

15  Chavez 3  Slides                                  80

16  Chavez 4  Slides                                  80

17  Chavez 5  Report                                  96

18  Chavez 6  Graphic                                 96

19  Libertore 1  Photograph                           13

20  Libertore 2  Photograph                           14

21  Libertore 3  Photograph                           15

22

23

24

25

|  | DEFENSE EXHIBITS | |
|---|---|---|
| NO. | DESCRIPTION | ADMITTED |
| A | Photograph | 24 |
| B | Photograph | 26 |
| C | Photograph | 29 |
| E | Photograph | 30 |
| H | Photograph | 34 |
| J | Photograph | 45 |
| K | Photograph | 47 |
| L | Photograph | 52 |
| M | Photograph | 52 |
| N | Photograph | 56 |
| P | Photograph | 58 |
| Q | Photograph | 61 |
| R | Photograph | 61 |