IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>**DOUGLAS D. SMITH**, )<br>)<br>Defendant. ) | Cr. No. 18-3495 JCH |

<u>UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR STATEWIDE JURY POOL AND SUPPLEMENTAL JURY QUESTIONNAIRE (DOC. 136)</u>

The United States hereby responds in opposition to Defendant's Motion for Statewide Jury Pool and Supplemental Jury Questionnaire. Defendant argues for use of a statewide jury pool based on the pretrial media attention he has received and states there is a risk of prejudice from a non-diverse jury pool as well as a risk of not obtaining a jury pool that represents a fair cross-section of the community. Doc. 136 at 2. Defendant additionally argues for use of a twelve-page supplemental jury questionnaire. *Id*. at 6. Defendant's motion should be denied.

I. <u>DEFENDANT IS NOT ENTITLED TO A STATEWIDE JURY POOL</u>

Defendant generally states there is a risk of prejudice from a non-diverse jury pool and a risk of not obtaining a jury pool that represents a fair cross-section of the community, Defendant does not appear to argue that he is being deprived of his Sixth Amendment right to a fair cross-section of the community based on anything other than pretrial media coverage and the COVID-19 pandemic infection rates in several northern counties. Doc. 136 at 2-6.

A. **Defendant's Request is Contrary to the Jury Selection Plan.**

In accordance with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, *et seq.*, the United States District Court for the District of New Mexico proposed a Jury Selection Plan

(the Jury Plan) and adopted that plan following its approval by the Judicial Council of the Tenth Circuit on October 27, 2015. *See* NM R USDCT Jury Plan filed as Case 1:15-mc-00004, Doc. 42-1. The Jury Plan establishes two petit jury divisions designated as the Northern and Southern Divisions and comprises the various counties in the respective areas of New Mexico. *See id.* at § 2. Critically, the Jury Plan specifies that the jurors "will be drawn for each place of *holding court*." *Id.*

In his request, Defendant is asking for a statewide jury pool, which would include potential jurors from the Southern Division in addition to jurors from the Northern Division. The Northern Division, which includes Bernalillo County, is the only division authorized under the Jury Plan from which the jury shall be drawn since this case is assigned to the Albuquerque Court. Defendant, therefore, requests jurors to be drawn from a division other than the place of holding court, which is the clear mandate of the Jury Plan. *Id*. Notably, the Jury Plan contains no provision for deviations from its clear policy. Moreover, "[o]nce adopted, the plan is intended to provide a uniform procedure for assembling jurors in that district court binding upon each district judge." *In re United States*, 426 F.3d 1, 6 (1st Cir. 2005). A violation of a jury selection plan is treated as a violation of the Act. *See United States v. Schmidt*, 711 F.2d 595, 600 (5th Cir. 1983) ("Violation of a local plan is analyzed in the same manner as the Act.").

### B. Defendant Has Not Complied with the Statutory Procedure for Challenging Jury Selection.

There is a process for challenging the selection of a jury pool. Title 28 U.S.C. § 1867(a) provides:

> In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of

substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. § 1867(a).

Moreover, § 1867(e) provides, "The procedures prescribed by this section shall be the *exclusive* means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." 28 U.S.C. § 1867(e) (emphasis added). Defendant ignores this exclusive challenge process entirely.

### C. Defendant Has No Substantive Right to the Relief He Requests.

To justify the inconvenience and expense of the deviation of bringing additional jurors from the Southern Division to travel to the Albuquerque courthouse, Defendant merely cites pretrial media coverage of Defendant's arrest and COVID-19 outbreaks in several Northern Division counties. Defendant cannot show how the Jury Plan, on its face or in its application to this case, excludes a distinctive group in the community in a manner that creates an unfair and unreasonable underrepresentation because of systematic exclusion from the jury selection process. *See United States v. Kamahele*, 748 F.3d 984, 1023 (10th Cir. 2014).

To successfully challenge the community composition of a jury pool, a defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri*, 439 U.S. 357, 364 (1979). The Tenth Circuit has explained that a group is only distinctive if: 1) the group is defined by a limiting quality (i.e. the group has a definite composition such as race or sex); 2) a common thread or basic similarity in attitude, idea, or experience runs through the group; and 3) a community of interests exists among members of the

3

group such that the group's interest cannot be adequately represented if the group is excluded from the jury selection process. *United States v. Green*, 435 F.3d 1265, 1271 (10th Cir. 2006) (adopting test previously used by the 7th, 8th and 9th Circuits). Defendant has not fully articulated why he considers the members of the Southern Division jury pool to be distinctive. He only explains that some individuals in the Northern Division may have seen newspaper articles related to Defendant's arrest some twenty-months ago.

To the extent that Defendant feels that New Mexicans living in either of the two Divisions comprise a distinctive group, that theory is foreclosed by Tenth Circuit precedent. Geographic location does not define a distinctive group. *Id*. at 1272 (holding that persons who live in rural counties and do not vote do not constitute a distinctive group for Sixth Amendment purposes). *See also United States v. Test*, 550 F.2d 577, 582 n.4 (10th Cir. 1976) ("Mere geographical imbalance, absent evidence that an identifiable and cognizable segment of the community has been systematically excluded or underrepresented by reason of such imbalance, does not violate the statutory and constitutional requirement that the jury panel represent a fair cross section of the community." (internal quotations omitted)). Defendant has not articulated a sufficient basis for objecting to exclusive use of a Northern Division jury panel. The Sixth Amendment only guarantees a fair cross-section of the community, not the entire state or district. *See, e.g., Ruthenberg v. United States*, 245 U.S. 480, 482 (1918).

### D. Defendant Cannot Show that Pretrial Publicity Prejudiced Him Enough to Warrant a Statewide Jury Pool.

Defendant argues the District Court ordered a statewide panel in *United States v. Robert Vigil* due to extensive pretrial publicity (Doc. 136 at 3). Defendant also states that this Court, in *United States v. McCluskey*, mailed out statewide questionnaires. *Id*. at 4. Defendant cannot show through the several newspaper articles attached to his motion that the reporting of the

murder in this case rises to the level of publicity in either of the *Vigil* or *McCluskey* cases, nor can Defendant show the pretrial publicity in this case "created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial." *Hale v. Gibson,* 227 F.3d 1298, 1332 (10th Cir. 2000). To establish prejudice, Defendant must "establish that an irrepressibly hostile attitude pervaded the community".... "Simply showing that all the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." This presumed prejudice is "rarely invoked and only in extreme circumstances." *Id.* (quoting *Stafford v. Saffle,* 34 F.3d 1557, 1567 (10th Cir.1994)).

Prejudice will be presumed when pretrial publicity "is so pervasive and prejudicial that [the Court] cannot expect to find an unbiased jury pool in the community." *Goss v. Nelson*, 439 F.3d 621, 628 (10th Cir. 2006). Actual prejudice exists when, as a result of pretrial publicity, members of the particular jury panel are unable to be impartial. *See United States v. McVeigh*, 153 F.3d 1166, 1183 (10th Cir. 1998). The presumption of prejudice is an extraordinary remedy, "rarely invoked[,] and only in extreme situations." *United States v. Abello-Silva*, 948 F.2d 1168, 1177 (10th Cir. 1991). Simple publicity related to the trial is insufficient. Courts recognize that "[p]re-trial publicity in topical criminal cases is inevitable." *Id.* at 1176. Only when a "trial atmosphere [has] been utterly corrupted by press coverage" can prejudice be presumed. *Goss*, 439 F.3d at 631.

In examining the presumption of prejudice from pretrial publicity, the Tenth Circuit considered: "(a) the nature of the publicity and its temporal nexus to the trial, and (b) the effect of the publicity on the potential jury pool." *Id.* With respect to the first consideration, the Tenth Circuit examined the magnitude of media coverage, the geographic distribution of the coverage,

5

the frequency with which media accounts were published or distributed, and the editorial disposition of those accounts, i.e., whether the coverage was predominantly factual or sensational and inflammatory. *See id*. at 631-33. In consideration of the second factor, the Tenth Circuit examined the size of the community from which the jurors were to be drawn, the amount of time between the publicity and the commencement of trial, and statements made by prospective jurors. *See id*. at 633. In determining whether actual prejudice exists, "[t]he trial court has broad discretion in gauging the effects of allegedly prejudicial publicity and in taking measures to insure a fair trial." *See Stafford*, 34 F.3d at 1567 (quoting *Abello-Silva*, 948 F.2d at 1177 (internal quotation omitted)).

The Tenth Circuit in *Hale* found no pretrial prejudice since the bulk of the press coverage occurred seven months prior to trial, even though thirty-four of thirty-seven potential jurors had prior knowledge of the case. *Hale,* 227 F.3d at 1332. Similarly, the Circuit also found that thirty-four newspaper articles which predated the trial by seven months to a year were insufficient to show prejudice. *Goss*, 439 F.3d at 632.

Simply put, Defendant cannot show the pretrial publicity in this case was pervasive enough to warrant a statewide jury pool. In support of his argument, Defendant provided nine news articles to the Court. Docs. 136-2-10. Two of the articles, specifically Defendant's Exhibit 2 (Doc. 136-2) and Defendant's Exhibit 4 (Doc. 136-4), are duplicates of the same May 5, 2018 article from the Santa Fe New Mexican newspaper. The eight news articles Defendant produced were all published in May of 2018. These articles primarily focus on circumstances related to Defendant's arrest. Most of these news articles are short and cite information in the criminal complaint. This pretrial media coverage is limited to articles published from May 5th through

6

May 10th. This five-day press coverage some twenty months ago cannot be described as recent or pervasive whatsoever.

Defendant also bears the burden of demonstrating the geographic distribution of the news coverage by showing how extensively the newspapers were read or made available in the Northern Division jury pool. Defendant merely states there was widespread media coverage (Doc. 136 at 4) without examining the frequency and duration of the coverage. Eight news articles printed during a five-day period some twenty months ago is not sufficient to claim widespread media coverage. Defendant additionally cites a factual inaccuracy in two of the articles (*id*.), which likely resulted from the state criminal complaint. Although this information may have been incorrect, this news coverage "does not reveal the barrage of inflammatory publicity immediately prior to trial" that the Supreme Court found crucial to a finding of prejudice. *Patton v. Yount,* 467 U.S. 1025, 1033 (1984) (internal quotations omitted). Defendant's scant pretrial media coverage does not rise to the level required to show any type of prejudice.

With regard to Defendant's comparison to the *Vigil* and *McCluskey* cases, this case has garnered nowhere near the pretrial publicity of those cases. In *United States v. Vigil*, Robert Vigil was the acting New Mexico State Treasurer. The district court noted "there is no question that media coverage of this criminal case has been extensive… [and] the most publicized and controversial matters in the District's history." *United States v. Vigil*, No. CR 05-2051 JB, 2006 WL 8443824, at *1 (D.N.M. Aug. 16, 2006). Notwithstanding this pretrial publicity, the district court declined to move the case but ordered the use of a statewide jury pool. *United States v. Vigil*, No. CR 05-2051 JP (Doc. 156) (Parker, J.). In its order permitting use of a statewide jury pool, the district court called the pretrial publicity, "extraordinary." *Id.* According to the trial

documents, there were approximately 659 articles in the Albuquerque Journal alone making reference to Vigil from the time of his arrest. *United States v. Vigil*, No. CR 05-2051 JP (Doc. 71 at 5) (Parker, J.). The Las Cruces Sun-News published twenty-seven news articles and the Roswell Daily Record published sixteen news articles. *Id.* In comparison, the eight news articles in this case demonstrates only scant pretrial publicity. Defendant does not have a sufficient basis to argue that these few news articles have prejudiced him.

As this Court is aware, *McCluskey* was a death penalty murder case that received significant pretrial publicity. The United States understands that the government did not oppose a statewide jury pool in the *McCluskey* case. These are not the circumstances at play in this case. The United States is opposing Defendant's request for a statewide pool because it is unnecessary. Defendant's comparisons and use of *Vigil* and *McCluskey* to justify use of both jury divisions is unwarranted. Not only did both the *Vigil* and *McCluskey* cases receive significantly more pretrial publicity than his case, but in one of those cases the government did not oppose use of a statewide jury pool at trial. As such, Defendant's requests for a statewide jury pool should be denied.

> **E.   The COVID-19 Pandemic is Affecting Most Counties in New Mexico and Bringing Individuals from All Over the State Would Only Increase Exposure Potential.**

Defendant additionally asserts the importance of a statewide panel given the ongoing COVID-19 pandemic, citing the outbreaks in Bernalillo, Santa Fe, and Rio Arriba Counties. *Id.* at 5-6. Unfortunately, most of the counties in the state are experiencing high rates of COVID-19 infection. Bernalillo, Santa Fe, and Rio Arriba Counties are not unique. Moreover, during the pandemic, travel is generally discouraged. Asking individuals to travel to Albuquerque from all over the state only increases the potential for widespread infection, since jurors would travel

8

back to their homes all throughout New Mexico after the trial. Defendant's reasoning that the COVID-19 outbreak in Bernalillo, Santa Fe, and Rio Arriba Counties supports use of the Southern Division is flawed and does not justify employing a statewide jury pool. Defendant's request on this basis should also be denied.

II. THE CIRCUMSTANCES IN THIS CASE DO NOT NECESSITATE A SUPPLEMENTAL JURY QUESTIONNAIRE

Defendant's motion fails to justify the additional burden he asks the Court to take on in administration of the supplemental jury questionnaire. Although he asserts use of the supplemental questionnaire would allegedly help the Court, the parties, and the jurors themselves, nothing in Defendant's motion explains why the Court's standard practices would not be adequate in the present case. Additionally, several of Defendant's proposed questions are highly problematic and should not be included.

   A. **Defendant's Proposed Questions 36 and 37 Misstate the Applicable Law in this Case.**

Defendant's Proposed Question 36 states (without any legal authority in his motion), "Do you know that New Mexico is a stand your ground state?" Doc. 136-1 at 10. Defendant goes on further to ask on Proposed Question 37, "If a homeowner is allowed to use deadly force to defend themselves or their property would you honor that law when you are deliberating in this matter?" These questions are wholly improper. Defendant cannot argue application of New Mexico state law in this case nor should he be permitted to characterize New Mexico as a "stand your ground" state. This improper characterization of state law in a federal case would undoubtedly create bias and unnecessary confusion among potential jurors.

Moreover, Defendant cannot show that defense of self or defense of property is applicable in this case. Although posed as a hypothetical, allowing Defendant to pose such a

9

question to a potential juror would circumvent Defendant's prima facie obligation to establish that a *federal* self-defense jury instruction is applicable in this case. As the Court is aware, the United States filed a Motion *in Limine* to Exclude Self-Defense, Defense of Another, or Justification by Preventing Commission of a Felony (Doc. 68), which is pending before the Court.

Nothing in this case shows that Defendant was under active attack. Defendant never told law enforcement that Jane Doe advanced towards him, nor did he see any weapons in her hands. Doc. 68 at 2. It is only after the investigating detective posed the question as to whether Jane Doe was "crouching" (Doc. 66-2 at 18:7) that Defendant has latched onto that term to describe his alleged fear of being fired upon by Jane Doe. Even if Jane Doe were standing in a position that he thought was aggressive, *she ran away from Defendant after he fired the first shot*. Defendant saw her running away. Rather than ceasing fire at her immediate flight, he responded by continuing to shoot. Defendant tracked Jane Doe with his gunfire while shooting over and over until he finally killed her. Defendant does not have an absolute right to the self-defense instruction. *United States v. Toledo*, 739 F.3d 562, 568 (10th Cir. 2014). Defendant has not yet shown that he used force to prevent Jane Doe from causing him death or great bodily harm and should not be permitted to pose a theory of self-defense or defense of property in his supplemental juror questionnaire.

### B. Administration of Defendant's Twelve-Page Proposed Supplemental Questionnaire is Impractical, Unduly Burdensome, and Unnecessary Given the Court's Current Voir Dire Procedure.

The Court's standard jury questionnaire and voir dire will provide the parties with sufficient information to exercise challenges. The standard questionnaire responses of venire members are provided to counsel in the normal course of trial preparation. The Court's

10

questionnaire asks for basic personal information such as educational and employment background, criminal history and prior jury service. The Court additionally invites voir dire questions from the parties and conducts voir dire of the venire members. The information provided by potential jurors in response to the Court's basic questionnaire and in the course of voir dire is normally sufficient to permit the parties to exercise their challenges in informed fashion. Although the practice of trial judges differs as to whether counsel is permitted to participate, "[t]he scope of [juror] examination is a matter within the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of a discretion." *United States v. Espinosa*, 771 F.2d 1382, 1405 (10th Cir. 1985).

Many of the matters addressed in the Defendant's supplemental jury questionnaire, including occupation, marital status, and prior jury service, are already covered it the Court's standard questionnaire. Some of Defendant's proposed questions elicit some of this same information, but many of Defendant's questions go even further and ask for more detailed information about the potential jurors' relatives and friends. For example, Defendant poses questions related to children and grandchildren, including their gender, age, education level and occupation in Proposed Questions 5 and 6. Doc. 136-1 at 3-4. Proposed Question 7 asks about proposed jurors' or close relatives' military experience, including specialized training and combat experience. *Id.* at 4. Proposed Questions 10 and 22 asks about friends', relatives', and even acquaintances' experiences with law enforcement and detention facilities. *Id*. at 5. These questions are unduly burdensome. Having potential jurors list all of their children and grandchildren along with their ages, gender and occupations is unnecessary. Asking for a relative's specialized military training and combat experience is obtrusive. Moreover, asking for information about friends and acquaintances who served in a law enforcement or detention

11

facility is unduly burdensome. These questions are generally addressed in the standard questionnaire and Defendant can choose to elicit more specific information during the voir dire process.

Questions related to how jurors get their news, broad questions about internet usage, blogging, and firearm ownership can be better addressed in voir dire without the necessity of a supplemental questionnaire. Other areas of proposed inquiry, such as religious affiliations, beliefs, and political party affiliation in Proposed Questions 12, 13, and 14, are not appropriate for juror examination, and the Court should not authorize them to be asked, whether in voir dire or elsewhere. Proposed Questions 19-24 are categorized under the title of "Crime and Gangs." *Id.* at 7. None of Defendant's proposed questions relate specifically to gang violence and Defendant has not proposed a theory involving gang violence. The United States has also moved *in limine* to prohibit Defendant from admitting self-serving statements that Jane Doe was attempting to break into a camper trailer (Doc. 66), and to preclude Defendant from admitting anything related to Jane Doe's criminal history (Doc. 112). Defendant's proposed questions related to property crime, the cause of the problem, as well as questions for solutions imply that Defendant has a right to use deadly force to defend his property. As previously stated, Defendant cannot interject this unsubstantiated legal theory in this case for the reasons articulated in the government's motion *in limine* to preclude defense of property (Doc. 68). Defendant's proposed juror questions related to criminal justice experience, the criminal justice system, and jury service, are of the type that are normally addressed through the voir dire process. With regard to Defendant's COVID-19 questions (Proposed Questions 43-68), undersigned counsel recalled the District Court made such inquiries to potential jurors. The District Court is cognizant of the COVID-19 pandemic and is fully capable of making these inquires independently. Defendant is

asking potential jurors to complete twelve pages of questions. Defendant's proposed questions are extensive and unduly burdensome.

Courts within this District do not routinely allow supplemental juror questionnaires. *Equal Emp't Opportunity Comm'n v. BOK Fin. Corp.*, No. CIV-11-1132-RB/LAM, 2014 WL 12628594, at *1 (D.N.M. Mar. 20, 2014). The costs of implementing a questionnaire do not outweigh the benefits. Court staff will be tasked with copying, mailing, sorting, and scanning the supplemental questionnaires. *Id.* After the prospective jurors complete and return the questionnaires, all parties will have to go through each set of questionnaires and catalog the responses provided. The court will likely bear the costs of implementing the supplemental questionnaire.

On top of these difficult logistical issues, an important function of voir dire is observing the reactions of the jurors and their demeanor as part of the venire. *BOK Fin. Corp.* at *1. The appellate courts give deference to District Court findings based on these additional observations. *United States v. Chanthadara*, 230 F.3d 1237, 1269-70 (10th Cir. 2000). "Petitioner says that the questioning can be accomplished by juror questionnaires submitted in advance at trial, but such written answers would not give counsel or the court any exposure to the demeanor of the juror in the course of answering the content questions." *Mu'Min v. Virginia*, 500 U.S. 415, 425 (1991). "The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). Additionally, observing the prospective jurors interact amongst one another is crucial in determining which jurors are best suited to serve on a trial jury.

Defendant additionally states that a juror questionnaire is appropriate because it gives prospective jurors the option to answer sensitive questions in private. Doc. 136 at 9. A juror questionnaire is not necessary to combat this. If a juror feels they are incapable of being impartial, they are free to ask for a private conference with the judge and counsel to explain any misgivings they may have regarding their ability to be impartial. In counsel's experience, this is a common occurrence for child sexual assault trials when jurors report sexual abuse to them or a family member. Nothing about the circumstances of this case suggests that the proposed supplemental jury questionnaire is necessary. As such, the Court should deny Defendant's request to use the proposed supplemental jury questionnaire.

## CONCLUSION

WHEREFORE, based on the foregoing, the United States respectfully requests Defendant's Motion be denied.

Respectfully submitted,

FRED J. FEDERICI
Acting United States Attorney

*Electronically filed on 1/15/2021*
NOVALINE D. WILSON
KYLE T. NAYBACK
Assistant United States Attorneys
Post Office Box 607
Albuquerque, New Mexico  87102
(505) 224-1419

I HEREBY CERTIFY that I electronically filed
the foregoing with the Clerk of the Court using
the CM/ECF system, which will cause a copy of
this filing to be sent to counsel for Defendant.

*/s/*
NOVALINE D. WILSON
Assistant United States Attorney