IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

vs.                              No. 1:CV-18-03495-JCH

DOUGLAS D. SMITH


TRANSCRIPT OF PROCEEDINGS

TRIAL ON THE MERITS

June 14, 2021

Volume 1

Pages 1 - 168


BEFORE:   HONORABLE JUDGE JUDITH HERRERA
          UNITED STATES DISTRICT JUDGE




    Proceedings reported by stenotype.

    Transcript produced by computer-aided

transcription.

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:

 3            OFFICE OF THE U.S. ATTORNEY
              P.O. Box 607
 4            Albuquerque, New Mexico  87103
              505-346-7274
 5            BY:  NOVALENE D. WILSON
              novalene.wilson@usdoj.gov
 6                KYLE T. NAYBACK
              kyle.nayback@usdoj.gov
 7
     FOR THE DEFENDANT:
 8
              OFFICE OF THE FEDERAL PUBLIC DEFENDER
 9            111 Lomas, Northwest, Suite 501
              Albuquerque, New Mexico  87102
10            505-346-2489
              BY:  ARIC ELSENHEIMER
11            aric_elsenheimer@fd.org
                  AMANDA LAVIN
12            amand_lavin@fd.org

13

14                    I N D E X

15                                      PAGE:

16   Certificate of Reporter                184

17

18

19

20

21

22

23

24

25
```

```
 1            THE COURT:  Please be seated.  All right.
 2    We are on the record in USA versus Smith.  Case
 3    Number is CR-18-3495.  We are here today to begin
 4    our jury trial.  Let me ask if everyone is ready to
 5    proceed.
 6            MS. WILSON:  Good morning, Your Honor.
 7    Novalene Wilson on behalf of the United States along
 8    with at counsel table Mr. Nayback and FBI Special
 9    Agent Travis Taylor.
10            We are ready to proceed.
11            THE COURT:  All right.
12            MR. ELSENHEIMER:  Good morning, Your
13    Honor.  Aric Elsenheimer on behalf of Mr. Douglas
14    Smith.  I am joined by my colleague Amanda Lavin and
15    Dan Berg from the Federal Public Defender's Office,
16    and we are ready to proceed.
17            THE COURT:  All right.  Good morning to
18    all of you.
19            Before we bring in the jury panel, I know
20    there was a pending Lafler-Frye issue that the Court
21    needs to take up.  So what I am going to do,
22    Mr. Smith, is -- the purpose of what I am about to
23    do is make sure that your attorney discussed with
24    you any settlement offers that the Government
25    extended and make sure you had a chance to discuss
```

1    that.  So because I need to ask you a few questions,

2    I am going to ask that you be placed under oath

3    simply to answer these questions.

4              (Whereupon, the defendant was sworn.)

5              THE COURT:  Mr. Smith, you are the

6    defendant in this case, correct?

7              THE DEFENDANT:  Yes.

8              THE COURT:  All right.  So I have been

9    told that the Government made a plea offer to you

10   that you rejected.

11             And so, first of all, let me explain to

12   you that I need to ask you a couple of questions

13   about that, but I do not want to know any of the

14   specifics of any discussion between you and your

15   counsel.  I don't want to know anything about your

16   conversations with counsel.  I don't want to know

17   anything about any plea offer.  I don't want to know

18   the details of any plea offer.  I don't want to know

19   the terms of any offer that was made by the

20   Government.  I don't want to know what the reasons

21   are that you didn't accept the plea offer.  I don't

22   want to get into any of those details.

23             And I also want to tell you that the Court

24   does not get involved in any of the details of plea

25   negotiations.  So the Court has no knowledge of

1    that, the Court has no opinion as to whether or

2    not -- as to your decision, the Court has no opinion

3    about your decision to proceed to trial.

4            So having said all of that, I want you to

5    understand that really I just want to know a simple

6    yes or no answer to my questions.

7            First of all, did you discuss with your

8    attorney the plea offer that was made by the

9    Government?

10            THE DEFENDANT:  Yes.

11            THE COURT:  All right.  And, second, did

12    you have a full and complete opportunity to discuss

13    the plea offer with your counsel?

14            THE DEFENDANT:  Yes.

15            THE COURT:  And are you satisfied that

16    before you rejected the plea offer that you

17    completely understood the terms of the plea offer?

18            THE DEFENDANT:  Yes.

19            THE COURT:  All right.  So the Court is

20    satisfied, then, that the defendant understands the

21    plea that was offered and he has rejected it.

22            So having gone through that, let me just

23    tell you, I have no opinions about whether, about

24    the terms of your plea offer, the rejection, but I

25    am always willing for you-all to continue to

1  converse with each other if you feel that that would

2  be fruitful.

3          So just because we start trial doesn't

4  mean that the Court is closed to the idea of some

5  resolution.  And if it doesn't happen, it doesn't

6  happen, but I do like people to keep an open mind of

7  communication.

8          All right.  So with that, is everybody

9  ready for the jury panel to come into the courtroom?

10          MR. NAYBACK:  Yes.  Just a couple of

11  questions, Your Honor.  Mr. Elsenheimer and I had

12  some pending motions on voir dire itself.

13          THE COURT:  All right.  Let me just tell

14  you that what I am going to do is I am going to ask

15  a number of questions.  And I don't think I have had

16  you in a jury trial before.  Ms. Wilson, have I had

17  you in a jury trial?

18          MS. WILSON:  Yes, Your Honor.

19          THE COURT:  So let me just explain to you

20  that I do cover a number of topics.  What I have

21  found in the past is that when I turn it over to the

22  attorneys, usually the attorneys don't have lengthy

23  questions.  I mean, because we are doing this in

24  phases, I am hoping that people can move along

25  fairly quickly.  When I say people, I mean the panel

1  because there are only 22 or whatever the number is.

2  So I am, I will give attorneys, you know, 15,

3  20 minutes.  Usually they conclude their questions

4  before the 15 minutes, but I will have an

5  opportunity to talk with you privately, very briefly

6  about the areas that you want to get into.

7           Quite frankly, there may be things that I

8  cover that you may have objected to.  Now, I am not

9  going to use the terms self-defense, but I am going

10  to talk about what people's, if they have ever

11  experienced a trespasser on their property and I am

12  going to ask questions based on the facts that have

13  been presented.  I am not going to present them as

14  though they are proven facts, I am just going to say

15  there may be evidence, there may not be evidence.

16  So I am going to do my best to explain to the jury

17  panel that it is important that we understand their

18  views on various issues.

19           I am going to ask them if any of them own

20  guns, for example.  So I do not intend to play

21  shrink on any of these issues.  I am not going to

22  assess what people think about this or that.  I am

23  going to ask questions, I am going to get the

24  information.

25           I am not crazy about the idea of counsel

1  playing shrink and trying to analyze people's -- I

2  think it is important that you know the facts.  If

3  they answer, yeah, I have a gun and, yeah, I have

4  had to defend myself or, no, I don't have a gun and

5  I hate guns.  I mean, it is important for you-all to

6  know that, but I don't know that we need to analyze

7  the root cause of these opinions.

8          And maybe it is because I am not a

9  psychologist, so I tend to just focus on whatever

10  the facts are.

11          So having said that, we will have a brief

12  conversation after I conclude my portion of the voir

13  dire, and to the extent you have issues that you

14  want to bring to the Court's attention about your

15  own voir dire, fine.

16          MR. NAYBACK:  There was just one.  Thank

17  you, that is super helpful.  I don't think we are

18  going to have questions.

19          I think Mr. Elsenheimer argued that they

20  ought to be able to get into some other stuff based

21  on my objections, so we have this, we worked really

22  hard on this recording.  It is only about 30 minutes

23  long.  It is Mr. Smith's statement to

24  Detective Abeyta.  If we had to change it, if the

25  Court made us change it in any way, Mr. Elsenheimer

1   has it.  That would be really cumbersome and maybe
2   impossible to do under 12 hours in time.
3           So that is the only reason I brought up
4   our voir dire objections this morning was I thought
5   Mr. Elsenheimer was arguing that maybe the jury
6   should hear more of Mr. Smith's self-serving
7   statements.  That is the only reason I raised it.
8           THE COURT:  We don't need to deal with
9   that during voir dire.
10          MS. WILSON:  No, we don't.  You're right.
11          MR. ELSENHEIMER:  We can deal with that
12   after voir dire.  The only other question I had,
13   Your Honor, with regard to -- just because this is
14   my first COVID trial, my understanding was that we
15   do the cause challenges after each of these
16   22-person panel --
17          THE COURT:  I am glad you mentioned that.
18   Go ahead, I'm sorry.
19          MR. ELSENHEIMER:  And I just wanted to
20   find out, that was my understanding when we spoke
21   with your courtroom deputy last week.  That was my
22   understanding and there was an e-mail about do we
23   also have peremptories and I just wanted to find out
24   what the Court is planning to do.
25          THE COURT:  Well, what I was trying to do

1    was challenges for cause after each session.  I was

2    hoping that maybe we could have a jury seated after

3    the second wave, and so I was hoping, well, not

4    hoping, so that is why I asked Yvonne to ask you-all

5    whether you wanted to exercise peremptories after

6    each wave.  I am not telling you that I have a

7    preference to do that.

8          MR. ELSENHEIMER:  My preference would be

9    to exercise peremptories after all three or two,

10   after all two has been brought in.  We think there

11   is enough after the second, but not to exercise

12   peremptories after each of the 22-person panel.

13         THE COURT:  That is fine.

14         MR. ELSENHEIMER:  Thank you.  This is

15   COVID related.  What would the Court like us to do

16   with regard to masks?

17         THE COURT:  So my preference is if you are

18   vaccinated you don't have to wear a mask.  If you

19   are not vaccinated, you probably want to wear a

20   mask, but I will leave it up to all of you.

21         I don't want to wear a mask if I don't

22   have to.  I have had, you name it, I have had it.  I

23   have had vaccines, I have had COVID.  I have had it

24   all, so I feel like I don't need to wear a mask, you

25   know.

1          MR. ELSENHEIMER:  Our table is all
2    vaccinated.  I am sure probably everybody in this
3    room is vaccinated.
4          THE COURT:  I am fine with that, then.
5          MR. ELSENHEIMER:  I just don't want the
6    jury to think we are being cavalier.
7          THE COURT:  I am going to tell them.  I
8    understand that Judge Vazquez's trial a couple of
9    weeks ago, she went into the third phrase of jury
10   selection and basically got one alternate out of it.
11   I am hoping that we don't have to go through a third
12   wave and all the time that that would consume unless
13   we really need to do it.
14          What is our magic number?  We need a jury
15   of -- how many alternates do you want?
16          MR. NAYBACK:  Fourteen, 13.
17          THE COURT: So we need 30.  When it looks
18   like we have 30, I mean, you-all, you tell me and I
19   will be happy not to go to a third wave if it looks
20   like we are there.
21          I am going to step out while the panel
22   comes in.  Let me look at one thing here.
23          (Whereupon, the jury panel enters the
24   courtroom.)
25          THE COURT:  Good morning to everyone.

1          If you have any trouble hearing me, just
2   let me know.  I want to welcome you to the
3   courthouse today.  We are here in the case of
4   United States of America versus Douglas Smith.  The
5   Case Number is CR-18-3495.
6          So first of all I will welcome all of you
7   to the courthouse.  My name is Judith Herrera.  I
8   will be presiding over this case.  It should take
9   this week, I believe, for us to select a jury, try
10  the case and hopefully have deliberations, so one
11  week.
12         Let me just tell you a little bit about
13  this jury trial process.  First of all, as you all
14  know, the Constitution guarantees a right to a jury
15  trial in matters of law, and our justice system
16  depends on the willingness of people like you-all to
17  serve as jurors, so all of us appreciate that.
18         Oftentimes people do not have the
19  opportunity to serve in the Executive Branch of
20  Government or the Legislative Branch of Government,
21  so here when you serve on a jury, you are actually
22  serving as a judge, judges of the facts in the
23  judicial system.  So you are a part of the judiciary
24  while you are serving on this jury.
25         So I am, as you know, I am the Judge on

1    this case and a lot of Judges think of this as much

2    like a traffic officer who keeps the roads moving

3    and keeps things safe, every now and then, if an

4    officer has to write a citation.  And here in the

5    courtroom while I don't write citations, I rule on

6    legal issues, Rules of Evidence, things like that.

7    The idea being, keep things moving smoothly.

8            So let me introduce my court staff to

9    you-all, and then I am going to ask you if anybody

10   here knows any of us, me, my court staff.  So in

11   front of me here is my court reporter.  His name is

12   Paul Baca.  He has been a court reporter with the

13   Federal courts since before I was a Judge, and I

14   have been here 17 years, so he has been here quite

15   awhile.

16           His job is to take down everything that is

17   said in the courtroom.  And he if he can't hear

18   someone, he will be sure to let you know that he

19   couldn't hear you and he will ask you, he will scare

20   me.  I will jump when he says, "I couldn't hear

21   you."  But you know, we get used to Paul.

22           Also in front of me is my law clerk.  Her

23   name is Virginia Loman.  Virginia is a lawyer who

24   helps me research legal issues and keep on top of

25   the issues as they come before the Court.  So she's

been a lawyer awhile. She has worked for me for several years now and she is, I know she will be embarrassed for me to say this. She graduated at the top of her class in law school. I am happy to have her as well, obviously.

My courtroom deputy is seated at the side table here. Her name is Yvonne Romero. She is the one who handles all my scheduling, makes sure that cases get before me and get decided in a timely fashion. So she is the one who is responsible for all of us being here today because she put this case on my calendar.

And then we have a visitor who is a law student observing the proceedings today, so he will be with us for at least some of the trial. So that is the Court staff.

So I have made some introductions. Is there anybody here who knows either me or any member of my Court staff? Who do you know? First of all tell me your name.

POTENTIAL JUROR: My name is Adam Baker, I am a lawyer. I know you, Judge, professionally. I have tried a case in front of you. I have known Paul Baca for probably 20-plus years in his capacity as a court reporter.

1           THE COURT:  As I recall, when I was a
2   lawyer I think we had a case together.
3           POTENTIAL JUROR:  Against each other, we
4   did, but, yes.
5           THE COURT:  If you are selected in this
6   case, anything about your knowledge of me,
7   friendship with Paul, that would affect your
8   decisions?
9           POTENTIAL JUROR:  Certainly not.
10          THE COURT:  All right.  Thank you.
11          Is there anybody else?
12          In the back of the courtroom.
13          POTENTIAL JUROR:  My name is Perla Aranda
14  and of course I know the Judge.
15          THE COURT:  Perla Aranda and I were in
16  school together.  She was ahead of me, I will say,
17  but gosh, grade school, high school.  Our kids went
18  to the same high school, so I have known Perla for a
19  very long time.
20          So the same question to you, Ms. Aranda.
21  I'm sorry I called you Perla, I shouldn't do that in
22  the courtroom.
23          Is there anything about your knowledge of
24  me that you think would affect any decisions you
25  make in this case if you are selected?

```
 1              POTENTIAL JUROR:  It may, yes.
 2              THE COURT:  All right.  Well, thank you
 3    for letting us know that.
 4              Anybody else know any of the Court staff?
 5              All right.  Now I understand the panel was
 6    sworn downstairs so I don't need to swear the panel.
 7    Let me explain a little bit about this voir dire, we
 8    call.  I am going to be asking you a lot of
 9    questions.  This portion of the proceeding is called
10    voir dire.  And the purpose of me asking these
11    questions is to enable the Court and the attorneys
12    to match the jurors with the cases.  And I will say
13    that after I finish asking questions, I will give
14    the attorneys an opportunity to ask questions, too.
15              But it is important to try to match jurors
16    with the cases that they may be better suited for
17    because all of us go through life with different
18    experiences and all of our experiences shape our
19    opinions.  Everybody develops likes and dislikes and
20    we all have biases about something or another.  I
21    mean, we all do, it is normal.  But that just means
22    that if we have certain experiences that might
23    prevent us from being completely impartial, then
24    maybe it is not the case for us.
25              For example, just to totally make an
```

1    example up.  If this were a case about, say, a bank

2    robbery.  If any of you were a bank teller during a

3    bank robbery or if any of you were a customer in a

4    bank during a bank robbery or if any of you had

5    family members or close friends who experienced

6    something like that, then it might have an impact on

7    how you would view a bank robbery case, and it

8    probably would not be a good case for you.

9         So that is what this process is about, we

10   are trying to learn how you might view what your

11   feelings are on certain things.  So, and again, I

12   really depend on you-all to share your views with

13   us, all of us because it really is important in

14   trying to put a jury in the jury box who can be fair

15   and impartial to both sides and come to this process

16   with a completely open mind and decide the case

17   based solely on the facts, the evidence that is

18   presented here in this courtroom.

19        So as I ask you questions, if anybody has

20   an answer to my question, I mean, obviously it is

21   quicker if we can hear you from your place, but the

22   court reporter needs to take everything down, all of

23   us need to hear your answers.  So if we have any

24   difficulty hearing you, then you will have to come

25   to the microphone that is just in front of the bar,

1    so I would need you to come up to the microphone to

2    answer questions.

3            Now, if there is an answer that you

4    consider to be maybe private or embarrassing or for

5    whatever reason you don't want to share it with the

6    whole, in front of the whole group, let me know

7    that.  And what I will do is after we finish with

8    the group at the end of all the questioning, I would

9    give you an opportunity to meet with the attorneys.

10   So it wouldn't be just me, it would be the attorneys

11   and it would be the court reporter taking the

12   answers on the record so that we all know everything

13   that you need to tell us.

14           So that is the preliminary information.

15   Now, let me begin by telling you that this is a

16   criminal case.  The defendant in this case, his name

17   is Douglas Smith.  And, Mr. Smith, could you stand

18   for just a moment.

19           Thank you, Mr. Smith.  I am going to --

20   and you may be seated now, Mr. Smith.

21           In a moment I will ask you whether any of

22   you know Mr. Smith.  But first, I am just going to

23   let you know a little bit about the case.

24           The defendant has been charged by an

25   Indictment that states on or about May 5, 2018, in

1    Indian Country in Rio Arriba County in the District

2    of New Mexico, the defendant, Douglas D. Smith, a

3    non-Indian unlawfully killed Jane Doe, an Indian,

4    with malice aforethought in violation of a Federal

5    statute.

6              So the defendant denies committing

7    second-degree murder, and it will be you, the jury,

8    who hears the case and decides the facts to

9    determine whether or not the defendant is guilty or

10   not guilty.

11             Now, the Indictment is not evidence.  The

12   Indictment is what the Government has charged.  So

13   none of you should assume that the defendant is

14   guilty simply by virtue of having been indicted.

15             So next, I am going to ask if any of you

16   have heard anything about this case.  So what I can

17   tell you is that this occurred in or near the City

18   of Espanola at the Western Winds Motel on Riverside

19   Drive, which is where the defendant resided.  And so

20   just based on what you heard so far, does anybody

21   know anything about this case?  I know you haven't

22   heard any evidence, you have heard just very little,

23   but does this ring a bell for any of you?

24             All right.  I see no hands.  Next, I would

25   like to introduce the parties.  Well, the attorneys.

1    So we will begin with the Government.  Now, the

2    acting United States Attorney is Fred Federici, and

3    it is his office that brings this charge against the

4    defendant.

5              The prosecutors on this case are Assistant

6    United States Attorney Novalene Wilson.  Could you

7    stand, please?  And Kyle Nayback.  They are the two

8    prosecutors.  Does anybody here know either Novalene

9    Wilson or Kyle Nayback?

10             And I see no hands.

11             Now, seated with them at counsel table is

12   Travis Taylor.  I'm sorry, which agency is that?

13             MR. NAYBACK:  FBI.

14             THE COURT:  With the FBI.  Does anybody

15   know Agent Travis Taylor?

16             All right.  Thank you, I see no hands.

17             Now, I have introduced the defendant to

18   you, Mr. Smith, and he stood a moment ago.  Does

19   anybody know Douglas Smith?

20             And I see no hands.

21             All right.  So his attorneys are Aric

22   Elsenheimer and Amanda Lavin.

23             Does anybody know either Mr. Elsenheimer

24   or Ms. Lavin?

25             And also seated at counsel table is Dan

1    Berg, who is with their office as well.

2            Does anybody know Mr. Berg?

3            And I see no hands.

4            What I would like to do next is ask

5    counsel to give us the list of potential witnesses

6    that may be called in your cases.  And go slowly as

7    you go through the names on the list because what I

8    would like to do is see if any of the members of the

9    jury panel know any of the potential witnesses.  We

10   will start with Ms. Wilson.

11           MS. WILSON:  Thank you, Your Honor.

12   Espanola Police Department Detective Byron Abeyta.

13           THE COURT:  No hands have gone up.

14           MS. WILSON:  OMI Field Investigator Lynne

15   Gudes, G-U-D-E-S.

16           THE COURT:  I see no hands.

17           MS. WILSON:  Dr. Matthew Cain.

18           THE COURT:  No hands.

19           MS. WILSON:  FBI Photographer Tammy Peter.

20           FBI Special Agent Bryan Acee.

21           THE COURT:  Mr. Baker?

22           POTENTIAL JUROR:  I represented a

23   defendant in a criminal case in which he was the

24   agent.

25           THE COURT:  All right.

1            MS. WILSON:  FBI Physical Scientist

2   Forensic Examiner Theodore Chavez; FBI Photographer

3   Nathan Schwabedissen; Geraldine Gutierrez; Derrick

4   De La Cruz; and Daniel Smith.

5            THE COURT:  Mr. Elsenheimer, if there are

6   any additional witnesses that you are aware of, if

7   you could let us know.

8            MR. ELSENHEIMER:  Thank you, Your Honor.

9   Good morning everyone.

10            We may call a few witnesses.  Does anybody

11   know Ercilia Trujillo who lives in Espanola, New

12   Mexico.

13            Corina Titus, who lives here in

14   Albuquerque.  Judy Wheat; Billie Wheat; and lastly

15   Officer Albert Rael with the Espanola Police

16   Department.

17            Thank you, Your Honor.

18            THE COURT:  All right.  Next I am just

19   going to ask some general questions.  And, again, if

20   you have an answer to a question, stand and we will

21   see if we can hear you, otherwise you will have to

22   come to the microphone.

23            Now, let me just tell you a little bit of

24   the basis for the questions.  So I told you that the

25   defendant denies committing second-degree murder.

```
 1              There may be evidence presented that the

 2    defendant was awakened at 1:00 in the morning

 3    believing that there were trespassers or intruders

 4    on his property and shot his gun to scare away the

 5    intruders or trespassers.  So my question to you is

 6    do any of you, and this question is a show of hands

 7    at this point.  Do any of you own guns?

 8              All right.  So I see just a few hands.

 9              And my next question is do any of you, I

10    know some people have hunting guns and things like

11    that.  Do any of you own guns for protection?

12              I do see several hands.

13              I am going to come back to that in a

14    moment.  Let me ask you if any of you or any member

15    of your family, anybody close to you, a friend, have

16    any of them ever been employed by a law enforcement

17    agency?

18              All right.  I see several hands.

19              All right.  So what I would like to do is

20    start on this side of the courtroom, my left, and

21    the front row, is that Alicia.

22              Could you stand, please, and tell us your

23    name.

24              POTENTIAL JUROR:  My name is Anita

25    Roberts.
```

1           THE COURT:  And tell me who in your family

2  was in law enforcement.

3           POTENTIAL JUROR:  I have an uncle who is

4  in law enforcement in New York State.

5           THE COURT:  All right.  And still in law

6  enforcement you said?

7           POTENTIAL JUROR:  Yes.

8           THE COURT:  So if you were selected as a

9  juror in this case, do you think you would be

10  influenced one way or the other pro-Law enforcement,

11  anti-law enforcement because of your relative's work

12  in law enforcement?

13           POTENTIAL JUROR:  No, I don't believe I

14  would be influenced.

15           THE COURT:  All right.  Thank you.  I did

16  see another hand on that side of the courtroom.  Is

17  that Ms. Roberts.

18           POTENTIAL JUROR:  Yes.  I had a cousin

19  that was a law enforcement in Iowa but he is no

20  longer irrelevant part of any agency.

21           THE COURT:  All right.  Is there anything

22  about your relative's work in law enforcement that

23  you think would affect you one way or the other pro

24  or con law enforcement?

25           POTENTIAL JUROR:  No.

```
 1              THE COURT:  All right.  Thank you.

 2              Now, let me ask, was everybody able to

 3    hear these panel members without the microphone?  I

 4    want all of you on the panel to be able to hear each

 5    other, too.  So it is important that you-all be able

 6    to hear each other.  If anybody has any difficulty,

 7    let me know so we can make sure that everybody can

 8    hear.

 9              Let me ask, was there anybody else on that

10    side of the courtroom to my left that raised their

11    hand about knowing or being related to people in law

12    enforcement?

13              Let me go across the aisle, then, and I

14    did see a hand or two.  So across the aisle, any of

15    you, any members of your family, close friends in

16    law enforcement.  And so the front row, is that

17    Ms. Archuleta?

18              POTENTIAL JUROR:  My name is Pearl

19    Archuleta and my son-in-law started as a police

20    officer in Espanola Department and then he retired

21    from the Santa Fe County.  And then I have a nephew

22    that --

23              THE COURT:  Before you tell me about your

24    nephew, what is his name?

25              POTENTIAL JUROR:  Christopher Archuleta.
```

1    He just retired now.

2              THE COURT:  All right.  And then you were

3    going to mention somebody else?

4              POTENTIAL JUROR:  My nephew works for the

5    police department in Texas, Austin, Texas.

6              THE COURT:  All right.  And his name is?

7              POTENTIAL JUROR:  Jay Derby.

8              POTENTIAL JUROR:  Yes.

9              THE COURT:  All right.  He never worked in

10   New Mexico in law enforcement?

11             POTENTIAL JUROR:  No.

12             THE COURT:  All right.  So is there

13   anything about the fact that you are related to

14   people who were in law enforcement that you think

15   would have an impact on you?

16             POTENTIAL JUROR:  Yes, I think it would.

17             THE COURT:  Do you think it would?  I'm

18   sorry?

19             POTENTIAL JUROR:  I think it would.

20             THE COURT:  Do you think that would make

21   you be more in favor of law enforcement or against

22   law enforcement?

23             POTENTIAL JUROR:  It could go either way.

24             THE COURT:  All right.  Now, I know you

25   haven't heard any of the evidence in this case yet,

so do you think -- so what I am asking you is, I
guess, a bit of speculation, but do you think you
could put your relatives aside and listen to the
evidence in the case and make a decision based
solely on the evidence in this case and the law as
the Court instructs you at the end of the case?

POTENTIAL JUROR:  I don't think I could.

THE COURT:  All right.  Thank you,
Ms. Archuleta.

All right.  And there was another hand in
the first row, is that Ms. Shaw.

POTENTIAL JUROR:  Yes.

THE COURT:  And who do you have in law
enforcement?

POTENTIAL JUROR:  I had an aunt that was a
APD officer from 1985 to 1990, but it would not
influence me in any way.

THE COURT:  All right.  Behind you I think
I saw a hand.  Is that Mr. McBrayer?

POTENTIAL JUROR:  Yes, ma'am.  I was a
police dispatcher from 2017 to 2014 back in
California and I still have occasional
communications with my prior co-workers.

THE COURT:  All right.  Do you feel that
your experience as a dispatcher would cause you to

1    favor one side over the other?

2            POTENTIAL JUROR:  None whatsoever, no,

3    ma'am.

4            THE COURT:  All right.  So if you hear a

5    law enforcement officer testify, you don't feel that

6    you would be more inclined to believe because of

7    your work as a dispatcher?

8            POTENTIAL JUROR:  Not at all.

9            THE COURT:  All right.  Thank you,

10   Mr. McBrayer.

11           Is there anybody else?

12           So then we go to Ms. Aranda.

13           POTENTIAL JUROR:  I have a cousin that was

14   with the Santa Fe Police Department.  He is retired.

15           THE COURT:  And what is his name?

16           POTENTIAL JUROR:  Mark Clayton.

17           THE COURT:  I know Mark Clayton, too.  He

18   was my neighbor.

19           All right.  Ms. Aranda, is there anything

20   about your relationship with Mark Clayton that you

21   think would cause you to favor one side over the

22   other if you were selected in this case?

23           POTENTIAL JUROR:  No.

24           THE COURT:  All right.  Thank you.

25           Anybody else related to anybody in law

1  enforcement?

2          All right.  Have any of you ever been the

3  victim of a crime?  I know that is a very general

4  statement, but anybody, or anybody in your family

5  been the victim of a crime?  I see one hand, so that

6  would be Mr. Stevenson.

7          POTENTIAL JUROR:  Yes, ma'am.  When I was

8  living in Clovis, New Mexico, my house got broke

9  into.

10          THE COURT:  Your house got broken into?

11          POTENTIAL JUROR:  House got broken into.

12          THE COURT:  Okay.  So did that case go to

13  court?  Were charges filed against --

14          POTENTIAL JUROR:  Well, no.  I called the

15  police.  I was gone for the weekend taking my

16  daughter back to her mother.  And when I was gone my

17  house got broke into, and so I called the police and

18  they did an investigation and I looked and nothing

19  was stolen.  It looked to me like they got spooked.

20  And they said they were planning on coming back, but

21  I was there and nobody ever came back.

22          THE COURT:  All right.  But before you sit

23  down, let me ask you, if you were selected in this

24  case as a juror, is there anything about your

25  experience that you think would cause you to look

1    more favorably to one side over the other?

2              POTENTIAL JUROR:  No, Your Honor.

3              THE COURT:  Thank you, Mr. Stevenson.

4              Is there anyone else?  I do see another

5    hand on the same side of the courtroom, Alicia.

6    Tell me again how you pronounce your last name.

7              POTENTIAL JUROR:  Broadhurst.

8              THE COURT:  Thank you.  So you or someone

9    close to you has been the victim of a crime?

10             POTENTIAL JUROR:  Yes.  My parents' house

11   was broken into and electronics and other valuables

12   and other stuff were stolen.

13             THE COURT:  All right.  Were any charges

14   ever filed against anyone on that?

15             POTENTIAL JUROR:  No, there were not.

16             THE COURT:  It sounds like no one was home

17   when that happened; is that right?

18             POTENTIAL JUROR:  That's correct.  My

19   parents were away at the time.

20             THE COURT:  All right.  So would that

21   experience have any impact on you if you were

22   selected as a juror in this case?

23             POTENTIAL JUROR:  No, it would not.

24             THE COURT:  Thank you, Ms. Broadhurst.

25             Is there anyone else on that same side of

```
1   the courtroom to my left, your right?
2           I don't see any other hands, so let's move
3   across the aisle.  Several hands.  Let's start in
4   the front row.
5           Ms. Shaw.
6           POTENTIAL JUROR:  My uncle and I guess it
7   helps to say was an Isleta tribal member was
8   murdered in Albuquerque in 2005, and I think it
9   would absolutely influence me.
10          THE COURT:  All right.  Thank you,
11  Ms. Shaw.
12          Ms. Sanchez.
13          POTENTIAL JUROR:  Yeah, my brother-in-law
14  was shot and killed in 2011 while he was hunting.
15  He was shot in the back, and the guy that shot him
16  got sentenced for two years.  And I think it was
17  very unfair with that and everything would have an
18  impact on me.
19          THE COURT:  You think it would have an
20  impact on you?
21          POTENTIAL JUROR:  Yes.
22          THE COURT:  All right.  Thank you,
23  Ms. Sanchez.
24          Anybody else in the front row?
25          Moving then to, let's see, I see one other
```

1  hand in the back row.  Ms. Thomas.

2         POTENTIAL JUROR:  Many years ago my

3  apartment got broken into.  I was not there that

4  evening.  I returned the next day and I could tell

5  someone had been there.  A bunch of my jewelry was

6  on my couch.  My cat was unharmed.  Many things that

7  were important to me were stolen.

8         The person that entered my apartment came

9  in through my back door.  Had taken a knife that

10 belonged to me and brought it into my bedroom.  So I

11 was really fortunate not to be there.

12        And another incident that happened, when I

13 was a little girl my brother was driving a cab and

14 he was shot by his customer.  And he survived but he

15 had a pretty serious injury.  When he was in college

16 his lung collapsed twice due to the injury.

17        I do have to say that this defendant, I

18 mean, I think that we live in a community full of

19 crime and many people are being victimized and they

20 are being ripped off.  And I totally feel for people

21 that feel that somebody might be entering their home

22 and they are doing what they need to do to protect

23 themselves and their family.  So I do have a feeling

24 about that, thank you.

25        THE COURT:  All right.  And just to state

1  the obvious, do you, it sounds to me like you would

2  be impacted by your experiences if you were selected

3  as a juror in this case?

4          POTENTIAL JUROR:  Yes, Your Honor.

5          THE COURT:  Thank you, Ms. Thomas.

6          And Ms. Aranda you raised your hand as

7  well?

8          POTENTIAL JUROR:  Yes.  I experienced ten

9  break-ins into my home.  During one of them they

10 were scared off and the other one, they could not

11 get through the door.  I do not believe that that

12 would affect anything in this case, however, a few

13 years back my nephew was run over by a motorcycle.

14 And he was run over by an individual who was texting

15 and driving.  She didn't stop, she didn't put on the

16 brakes or anything.  And because she was not brought

17 to trial because of anything, I believe it was

18 because of the DA's office, but that definitely

19 would have a bearing on me.

20          THE COURT:  All right.  Thank you,

21 Ms. Aranda.

22          Anybody else on that side of courtroom?

23          Let me turn then to the jury box.  Any of

24 you or anyone close to you been the victim of a

25 crime?

1              I don't see any hands.

2              Slightly different question.  Have any of

3    you been involved in any kind of a criminal matter

4    in court, whether it involved you or you were a

5    witness or do you have any close family members who

6    were involved in any kind of a criminal court

7    proceeding?

8              Okay, I see one hand.  And if you could

9    let us know, Mr. McBrayer, was that -- tell us about

10   that.

11             POTENTIAL JUROR:  As a dispatcher and

12   occasional PSO back in California, on occasion I

13   would be called as a witness to various types of

14   trials.

15             THE COURT:  And so do you think that would

16   have any impact on you at all, your own

17   experience --

18             POTENTIAL JUROR:  No, ma'am.

19             THE COURT:  -- as a witness in court?

20             All right.  Thank you.

21             POTENTIAL JUROR:  Thank you.

22             THE COURT:  And, Mr. Baker, your hand was

23   up.

24             POTENTIAL JUROR:  You know, I started my

25   career as an Assistant Public Defender in

```
 1   Albuquerque.  I have been doing criminal defense
 2   work for close to 25 years.  I also have two close
 3   family members who have been in and out of jail
 4   quite a bit in New York.
 5              THE COURT:  All right.  Thank you,
 6   Mr. Baker.
 7              Anyone else?  Is there anybody I skipped
 8   over?
 9              POTENTIAL JUROR:  I had an uncle that
10   was --
11              THE COURT:  Actually, you are wearing a
12   mask, which reminds me that I should have told
13   you-all at the beginning, if you are vaccinated, we
14   don't require masks.  If you are not vaccinated it
15   is probably up to you whether you want to wear a
16   mask or not.  But I will say whether or not you are
17   vaccinated, if people feel more comfortable wearing
18   a mask that is certainly fine.  But I couldn't
19   understand what you were saying.  First of all, can
20   you give us your name.
21              POTENTIAL JUROR:  Melverna Aguilar.  I did
22   have a relative, an uncle, that was tried here in
23   the Pecos Courtroom maybe about two years ago.  It
24   was, I guess it was a criminal case from him against
25   the Tribe of Santo Domingo.
```

```
 1                THE COURT:  And what is his name?
 2                POTENTIAL JUROR:  Kenneth Aguilar and
 3    Daniel Coriz.
 4                THE COURT:  Now do you know what kind of
 5    case that was?
 6                POTENTIAL JUROR:  I am not sure.
 7                THE COURT:  And do you know what the
 8    outcome was, were they guilty, not guilty?
 9                POTENTIAL JUROR:  I believe they were each
10    some sort of plea bargain, I guess.
11                THE COURT:  Okay.  So is there anything
12    about that, your cousin's experience that you
13    think --
14                POTENTIAL JUROR:  Uncle, sorry.
15                THE COURT:  Your uncle, sorry, my mistake.
16    Is there anything about your uncle's experience that
17    would have an impact on you if you were selected in
18    this case?
19                POTENTIAL JUROR:  I don't believe so, no.
20                THE COURT:  You think it wouldn't cause
21    you to favor one side over the other?
22                POTENTIAL JUROR:  No.
23                THE COURT:  All right.  You could be fair
24    and impartial to both sides?
25                POTENTIAL JUROR:  Yes.
```

```
 1              THE COURT:  All right.  Thank you,
 2   Ms. Aguilar.
 3              Anybody else?  I don't see any other
 4   hands.
 5              Have any of you ever worked for an
 6   attorney or worked in a legal office?
 7              Mr. Baker, we already know about you.
 8   Anybody else in the back?  Ms. Thomas.
 9              POTENTIAL JUROR:  I worked for a personal
10   injury attorney for about six months.
11              THE COURT:  And who was that?  Was that
12   here in Albuquerque.
13              POTENTIAL JUROR:  Yes.  Patrick Fogel.
14              THE COURT:  All right.  So is there
15   anything about your work at that office that would
16   have an impact on your view of -- well, you have
17   already told us about your views on this case so,
18   but I will ask you anyway.
19              Is there anything about your work at that
20   law office that would have any bearing at all on
21   your view of the facts in this case?
22              POTENTIAL JUROR:  No, Your Honor.
23              THE COURT:  All right.  Thank you,
24   Ms. Thomas.
25              Anybody else ever work at a law, for a
```

1  lawyer or at a law office?

2          THE COURT:  Now, I asked earlier if

3  anybody had owned guns, so I am going to ask you a

4  few questions that you may or may not have answers

5  to.

6          Have any of you or anybody close to you,

7  to your knowledge, ever fired a shot to scare off a

8  trespasser or even an animal?  I think I see a hand.

9  Can you tell us a little bit about that,

10 Ms. Aguilar?

11         POTENTIAL JUROR:  Once when we were

12 camping it sounded like an animal, so my uncle shot

13 off one shot, and that was it.

14         And once when I used to live with my

15 grandma, she lives in the outskirts of the Tribe and

16 it sounded like someone was trying to -- we don't

17 know if it was an animal or person, but they just

18 shot off one shot and nothing happened.

19         THE COURT:  All right.  If you were

20 selected in this case do you think you could put

21 that situation aside and decide this case without

22 thinking about the experiences you just told us

23 about?

24         POTENTIAL JUROR:  Yes.

25         THE COURT:  Okay.  All right.

1          Is there anybody else?  One more hand in

2     the back, Ms. Martin.

3          POTENTIAL JUROR:  Yes.  My name is Andrea

4     Martin.  I have experienced as living on the

5     Reservation that my parents do own guns and every

6     once in awhile there is always an animal or you hear

7     something in the dark and they always shot off a

8     warning shot, just thinking suspicious.

9          THE COURT:  All right.  And as far as you

10    know, did they ever hit an animal or a person or --

11         POTENTIAL JUROR:  No.  My father always

12    believed that he would shoot a warning shot if you

13    are unsure someone was there.

14         THE COURT:  All right.  Let me ask you the

15    same question.  Would you be able to put your

16    experience aside, your family experience aside and

17    decide this case based solely on the facts and the

18    evidence that is presented here in court?

19         POTENTIAL JUROR:  I guess, it kind of

20    would.

21         THE COURT:  It kind of would impact you,

22    you mean?

23         POTENTIAL JUROR:  I guess it would impact

24    my decision a little bit.

25         THE COURT:  All right.  When you say, "I

```
 1   guess it would," I just need to tell you that we
 2   need to be sure about what you think.  I mean, it
 3   would or it wouldn't.
 4              POTENTIAL JUROR:  I was taught in owning a
 5   gun you never point it at someone.
 6              THE COURT:  All right.  Thank you,
 7   Ms. Martin.
 8              All right.  Anybody else?  The question is
 9   whether any of you or anyone close to you has shot a
10   gun as a warning if you believe there was an
11   intruder.
12              I don't see any other hands.
13              Now some of you have already generally
14   answered this question, but my next question is,
15   have any of you had any experience, whether it was
16   you or a member of your family or someone close to
17   you, who had an intruder on your property or a
18   trespasser on your property.
19              Now I am not asking if you shot at
20   anybody, I am just asking if you ever had a
21   situation where there was an intruder or a
22   trespasser.  Some of you have already told us about
23   situations.  You don't have to repeat that here.
24   Anybody else?  Mr. Baker.
25              POTENTIAL JUROR:  I had somebody in the
```

```
 1   middle of the night on my roof who I confronted and
 2   told him that I had a gun even though I didn't, and
 3   he took off running.
 4            THE COURT:  So if you were selected in
 5   this case do you think you could just disregard your
 6   personal experience?
 7            POTENTIAL JUROR:  Yeah.  That would have
 8   no bearing.
 9            THE COURT:  Thank you, Mr. Baker.
10            Anyone else have an intruder or a
11   trespasser?  I see two hands in the back.  We will
12   start with, I'm sorry, you will have to tell me your
13   name.
14            POTENTIAL JUROR:  John Schroeder.
15            THE COURT:  Mr. Schroeder.
16            POTENTIAL JUROR:  I had a few people come
17   around my backyard and stuff.  Let's see, most of
18   the time I usually try to go out there and sound
19   scary, but more recently I had somebody in my
20   backyard and he started breaking in my shed, and I
21   ran him off.
22            And I kind of -- I had a little BB gun.  I
23   was like you get out of here and I never heard from
24   him again.  I could have shot his eye out, at least.
25            THE COURT:  I saw that in a movie.
```

```
 1              Mr. Schroeder, if you were selected to be
 2    a juror in this case, I am going to ask you the same
 3    question.  Can you just put your personal experience
 4    aside and decide the case not based on what happened
 5    to you, but -- and when I say not based on what
 6    happened to you, I mean I don't want you to favor
 7    either side.  It is not, you know, I sympathize with
 8    side or I would have done X, Y or Z.  I want you to
 9    put your personal experience aside and decide based
10    on --
11              POTENTIAL JUROR:  I would sympathize.
12              THE COURT:  All right.  You think you
13    would not be able to be fair and impartial to both
14    sides?
15              POTENTIAL JUROR:  I would probably be
16    biased.
17              THE COURT:  All right.  Thank you.
18              Anybody else?
19              Ms. Aguilar.
20              POTENTIAL JUROR:  When I used to stay down
21    here at my boyfriend, we used to live down here and
22    there is always homeless people just crashing
23    outside your house.  And a couple of times we caught
24    a couple of people trying to sleep behind our house.
25              And, yeah, just go out there and see what
```

1  they want and if they are aggressive, then you

2  either leave them alone, call the police and that is

3  pretty much what we did.

4           THE COURT:  Have you done that, call the

5  police?

6           POTENTIAL JUROR:  No, I have not called

7  the police but my boyfriend would go out and tell

8  them to leave.

9           THE COURT:  All right.  Did anything ever

10  come of it?

11           POTENTIAL JUROR:  No, nothing.

12           THE COURT:  No confrontations?

13           POTENTIAL JUROR:  No, usually they just

14  want to sleep and they go away.

15           THE COURT:  All right.  If you were

16  selected in this case could you put that experience

17  completely aside and decide this case based solely

18  on the facts and the evidence in this case?

19           POTENTIAL JUROR:  I guess, like I said, I

20  would be biased.

21           THE COURT:  You did say that.  Fair

22  enough.  Thank you.

23           All right.  Anybody else experience

24  intruders or trespassers?

25           All right.  Why don't we move on to a

1  different subject.

2          Now, because this is a criminal case, the

3  Government bears the burden of proof beyond a

4  reasonable doubt.  Now, let me explain to you that

5  beyond a reasonable doubt simply means a doubt based

6  on reason.  It does not mean beyond all doubt.  It

7  does not mean beyond a shadow of a doubt which

8  sometimes we hear on TV shows.

9          Does everybody understand that it is the

10 Government who bears the burden of proof that the

11 defendant is guilty beyond a reasonable doubt?  Does

12 everybody understand that and agree with that?

13         Does anybody disagree with that?  Do you

14 think the defendant should be held to prove his

15 innocence?  Does anybody think that?

16         I see no hands.

17         Now, I will tell you that the defendant is

18 not required to prove his innocence.  So if anybody

19 feels that the defendant bears any burden, I would

20 like to know that.  So if any of you feel that, let

21 me know, please.

22         Let me also tell you that under the

23 Constitution we all have the right, the Fifth

24 Amendment right not to testify.  And if any of us

25 were on trial and chose not to testify, there could

1    be no inference of guilt, no suspicion of guilt.

2            So my question to you is, if the defendant

3    were to choose to exercise his Fifth Amendment right

4    not to testify, would any of you hold that against

5    the defendant?  Would any of you think that the

6    defendant must be guilty if he decides not to

7    testify?

8            All right.  I don't see any hands, so

9    everybody agrees the defendant has the right not to

10   testify.

11           I already told you that this case involves

12   a charge of second-degree murder.  There may be

13   evidence presented here that is graphic.  Do any of

14   you feel that you could not sit as a juror in this

15   case and view graphic visual evidence and hear

16   graphic testimony?  Is there anybody here who feels

17   that you could not do that?  I do see a hand.

18           Just for the record could you tell us what

19   your name is.

20           POTENTIAL JUROR:  Jerrina Sanchez.

21           When they did the trial for my

22   brother-in-law, they showed all the nasty stuff that

23   happened there and I don't think I could go through

24   that again.

25           THE COURT:  All right.  Thank you,

1  Ms. Sanchez.

2          Anybody else?  Let's see, is that

3  Ms. Cortez.

4          POTENTIAL JUROR:  Yes, Delfina Cortez.

5          THE COURT:  All right.  You don't think

6  you could sit through that?  Is there some

7  experience in your life that leads you to that?

8          POTENTIAL JUROR:  Yes.  A year ago my

9  younger sister was in a car accident, she got ran

10 over.  She had severe head trauma.  Going through

11 that experience and seeing graphic stuff is tough.

12         THE COURT:  Thank you.  Anybody else?  I

13 see another hand.  Ms. Archuleta.

14         POTENTIAL JUROR:  Yes, I have a very weak

15 stomach when it comes to stuff like that.  I had a

16 niece that was ran over, her head, and I just lost

17 it.  I can't handle graphic stuff like that.

18         THE COURT:  All right.  Anybody else?

19         Have any of you ever served as a juror in

20 either a criminal or a civil case before?  I do see

21 Ms. Sanchez.

22         POTENTIAL JUROR:  I have served in the

23 Taos County court a couple of times.  One was for a

24 doctor, what do you call it, he was guilty or that

25 they were charging him.  They had charged, the

1   patient was charging the doctor for malpractice.

2           And then another case was a guy had gotten

3   into a fight out in Red River and he was being

4   charged for that crime, too, on those two cases.

5   But that was it, other than that, those two.

6           THE COURT:  All right.  But before you sit

7   down, let me ask you, on those two cases you were on

8   the jury and --

9           POTENTIAL JUROR:  I was on the jury in

10  those two cases.

11          THE COURT:  And do you remember on the

12  civil malpractice case, was that --

13          POTENTIAL JUROR:  They lost.  The doctor

14  won the case and the other one the guy that

15  committed the crime as far as vandalizing property,

16  he paid for the property.  He was indicted on the

17  other one.

18          THE COURT:  All right.  Was he found

19  guilty?

20          POTENTIAL JUROR:  He was found guilty,

21  yes.

22          THE COURT:  Okay.  All right.

23          Now, having served as a juror before, is

24  there anything about your prior jury experience that

25  you think would have any kind of an impact on you if

1    you were a juror in this case?

2              POTENTIAL JUROR:  Yeah, I think so.  The

3    one with malpractice, I was very against it.  There

4    was two of us that didn't agree to it.  And the

5    other one they didn't, they kind of pushed to the

6    other side.  I kind of know that sometimes somebody

7    might mislead the other ones, so I really don't feel

8    comfortable on that.

9              THE COURT:  If you were a juror on this

10   case do you feel like you would stand your ground,

11   so to speak.

12             POTENTIAL JUROR:  No, I don't.  I am not

13   one to out speak.

14             THE COURT:  All right.  Thank you,

15   Ms. Sanchez.

16             Anybody else have prior jury service?

17   Ms. Aranda.

18             POTENTIAL JUROR:  It's been awhile but I

19   was on a couple of cases.  One was a DUI that ended

20   in a mistrial and the other one a lemon law trial,

21   and the person that filed against the person won.

22             THE COURT:  The company won?

23             POTENTIAL JUROR:  No, no, the person who

24   filed.

25             THE COURT:  On the lemon law case?

1          POTENTIAL JUROR:  Yes.

2          THE COURT:  And the DUI, you said that one

3    was a mistrial.

4          POTENTIAL JUROR:  Right.

5          THE COURT:  All right.  So anything about

6    that experience, was it an experience that you think

7    would have an affect on you if you were here as a

8    juror?

9          POTENTIAL JUROR:  No.

10          THE COURT:  All right.  Thank you.  Anyone

11   else with prior jury experience?

12          All right.  Let me talk a little bit about

13   scheduling here.  I told you that this case should

14   take four, five days to try.  I am expecting that we

15   will have a jury seated, hopefully, tomorrow

16   morning.

17          So what we are doing is because of the

18   COVID protocols we have to break up our jury

19   selection into sections, and so you are the first

20   group that we are speaking with.  We will have a

21   second group this afternoon.  And if necessary we

22   will have a third group tomorrow morning.

23          So my expectation is we will have a jury

24   seated either tomorrow morning or tomorrow early

25   afternoon and we will begin, once the jury is seated

1    we will begin with the opening statements and the

2    presentation of the evidence.

3              My expectation is that we will be done

4    with this trial Thursday or Friday.  So my question

5    to you is, does that schedule present any problem

6    with you?

7              Four hands.  And they are all in the same

8    area.  Let's start with the front row.

9              POTENTIAL JUROR:  My name is Jerrina

10   Sanchez.  My mom is 93 years old and she needs taken

11   care of, so I really need to be there to help her

12   out with her care.  I just lost my dad in October.

13             THE COURT:  All right.  So is there anyone

14   else who could help take care of her if you were

15   selected?

16             POTENTIAL JUROR:  I do have my sisters but

17   they also work we kind of rotate, take turns, but,

18   yeah.

19             THE COURT:  But yeah, they could help.

20             POTENTIAL JUROR:  They could help but it

21   would put a burden on them, too, because we all kind

22   of fluctuate to kind of not put a burden on just one

23   person.

24             THE COURT:  Okay.  Thank you, Ms. Sanchez.

25             Let's see, was there anyone else in the

1    first row?

2              So then go to behind Ms. Sanchez, then,

3    Mr. Wilhite.

4              POTENTIAL JUROR:  Yeah.  I have got a

5    medical procedure scheduled for in the morning at

6    6:00 that I have been scheduled for, for about

7    three months.  So I would just let you know.  I

8    could not reschedule that because I waited

9    three months for it already, maybe four.  I would

10   just let you know.

11             THE COURT:  All right.  Thank you.

12   Anybody else in that middle row?  And then we will

13   go to the back row.  Mr. Phillips.

14             POTENTIAL JUROR:  Yes.  I don't live

15   around here, I live in Espanola.  And we only have

16   one car and I used that car to bring it up today, so

17   there is that burden on everybody so, yeah.

18             THE COURT:  All right.  Are there any

19   arrangements at all that you could make?

20             POTENTIAL JUROR:  No, I can't.

21             THE COURT:  Okay.  Thank you,

22   Mr. Phillips.  And Ms. Aranda.

23             POTENTIAL JUROR:  If I might be allowed to

24   speak with you, Your Honor, and the attorneys in

25   private.

1          THE COURT:  Yes, we will do that in a bit.
2     We will wait on that, then.
3          POTENTIAL JUROR:  Thank you.
4          THE COURT:  Anybody else have scheduling
5     conflicts this week?
6          All right.  Let me ask, is there anyone
7     who has any kind of a personal situation that might
8     prevent you from concentrating or remembering the
9     evidence?  Sometimes people are on medication and
10    that makes them drowsy or has an impact on them, or
11    sometimes people work night shifts and maybe are
12    tired.  Is there anything you can think of, the
13    examples I gave, or anything else that might prevent
14    you from concentrating or remembering, paying
15    attention to the evidence?  I see one hand.
16         Mr. Schroeder.
17         POTENTIAL JUROR:  I work a swing shift.  I
18    got out of work at midnight last night and woke up
19    at 5:30.  I am already tired.
20         THE COURT:  If you were selected as a
21    juror in this case would you be able to change your
22    schedule?
23         POTENTIAL JUROR:  I would not probably be
24    able to change my schedule, I am not sure.  I would
25    need to talk to my boss to see how it would be done.

```
1              THE COURT:  I'm sorry, I didn't hear the
2    last part.
3              POTENTIAL JUROR:  I would have to talk to
4    my work and find out what the procedure is.
5              But from what I was told from old
6    information that if I was picked as a juror they
7    would let me off for the hours that I was here.
8              THE COURT:  So would you have to work?
9    Excuse me, where are you going?
10             POTENTIAL JUROR:  Can I use the restroom?
11             THE COURT:  No, not yet.  I am going to
12   let you go to the restroom, yes, but we can't do
13   this while you are gone.  Everybody has to be here.
14             POTENTIAL JUROR:  Okay.
15             THE COURT:  Let me just finish this answer
16   and then I will take a short break so you can go to
17   the restroom.  Sorry.
18             Were you finished?
19             POTENTIAL JUROR:  Yes.
20             THE COURT:  Let me ask you, if you were
21   allowed to be here in the courtroom during the day,
22   would they still expect you to work nights?
23             POTENTIAL JUROR:  I believe so, for some
24   hours.
25             THE COURT:  Okay.  Is that something that
```

```
 1  is realistic?  I mean, can you do that physically,
 2  do that and then pay attention here?
 3              POTENTIAL JUROR:  It would be challenging.
 4              THE COURT:  Okay.  Understood.
 5              We will take a very, very short break and
 6  we will return in just a few minutes.  Please don't
 7  go far, but I know one member of our panel needs to
 8  go to the bathroom, a couple do.  Any of you who
 9  need to go to bathroom, go now.  We will take a
10  short break.
11              (Whereupon the jury panel exited the
12  courtroom.)
13              (A recess was taken.)
14              (Whereupon the jury panel entered the
15  courtroom.)
16              THE COURT:  Please be seated.  Back on the
17  record in USA versus Smith.  It looks like everybody
18  is back.
19              So when we broke I was asking if anybody
20  had any kind of personal situation that would
21  prevent you from concentrating or remembering the
22  evidence in this case.
23              And is there anybody else?
24              Mr. Johnson.
25              POTENTIAL JUROR:  I am currently living
```

1  out of my vehicle.  My well-being is more concerned

2  to me than what is going on in the courtroom.

3          THE COURT:  So you feel that you would,

4  then, correct, have difficulty concentrating on this

5  case?

6          POTENTIAL JUROR:  Yes, I would.

7          THE COURT:  Thank you, Mr. Johnson.

8          Anybody else?  Ms. Archuleta.

9          POTENTIAL JUROR:  Yes, I have a medical

10 condition called temporal arthritis, and I have

11 severe headaches where I have to stop what I am

12 doing and take medication.  I have been on

13 prednisone for over a year.

14         THE COURT:  Is that something that occurs

15 regularly?

16         POTENTIAL JUROR:  Well, it occurred very

17 often and since I have been on the prednisone, it

18 kind of tapers off a little bit.  I never know if it

19 is going to come, the headaches, but sometimes I

20 can't concentrate.

21         THE COURT:  Okay.  Has that happened

22 today, for example?

23         POTENTIAL JUROR:  I am starting to feel a

24 little pain but, you know, it has subsided now.

25         THE COURT:  All right.  When was the last

1    time you experienced it?

2              POTENTIAL JUROR:  Day before yesterday.

3              THE COURT:  Okay.  Thank you,

4    Ms. Archuleta.

5              Is there anybody else who has any personal

6    issue that could affect your ability to concentrate

7    or focus on the evidence, any kind of personal

8    situation at all, anything.

9              This is Ms. Roberts.

10             POTENTIAL JUROR:  I do work nights from

11   11:00 p.m. to 11:00 a.m. but not Sunday nights, so

12   that is why I'm here.  But because it is summertime,

13   they don't usually have coverage.  It is a lot less

14   time for them to have coverage, so what they might

15   do is change my hours so I can get here at the time

16   in the morning, but I pretty much will have to do

17   some sort of block of time at work at night.

18             THE COURT:  All right.  What would your

19   night hours be, do you have any idea?

20             POTENTIAL JUROR:  If I need to be, if I

21   need to leave here by 5:00 or 6:00, they will

22   probably try to move me from 8:00 to 7:00 kind of

23   situation.

24             THE COURT:  All right.  Now, you tell me,

25   are you going to be able to listen and concentrate

1   and focus on this evidence if you are working at

2   night?

3          POTENTIAL JUROR:  It would be difficult,

4   probably, after a couple of days of not getting much

5   sleep.

6          THE COURT:  Anybody else?  Well, I think

7   one of you might have brought to my staff's

8   attention that you neglected to advise me of some

9   plans; is that right, some plans this week that

10  might prevent you from serving as a juror, anybody?

11         Now we did hear about a medical

12  condition --

13         POTENTIAL JUROR:  Yes, ma'am, that was me.

14         Is there something going on in your

15  schedule that might prevent you from being here this

16  week?  And just for the record, you are Mr. Wilhite.

17         POTENTIAL JUROR:  Yes.  I have got a

18  medical appointment scheduled for tomorrow at 6:30

19  in the morning.

20         THE COURT:  You did mention that.

21         POTENTIAL JUROR:  I was just reconfirming

22  if that is what you needed.

23         THE COURT:  Thank you for letting me know

24  that.

25         POTENTIAL JUROR:  You're welcome.

1          THE COURT:  So let me ask, is there

2     anybody here who has any difficulty hearing what is

3     going on here in the courtroom?

4          Nobody has a hearing issue.

5          Is there anyone who has any trouble seeing

6     what is going on here in the courtroom?  There may

7     be exhibits and things of that nature that you would

8     have to see.  Nobody has any trouble?

9          All right.  Does everybody understand the

10    English?  I see one hand.

11         POTENTIAL JUROR:  Good morning.  My name

12    is Amanda Torres and English is my second language.

13    So I miss some of the things or in between some

14    words, so I could not understand 100 percent in this

15    case.

16         THE COURT:  All right.  Let me ask you,

17    this morning while you have been in the courtroom

18    here have you understood everything or have there

19    been things that you have missed?

20         POTENTIAL JUROR:  Some things I miss, like

21    I cannot mention right now, but a few, yes.

22         THE COURT:  All right.  Okay.  Thank you,

23    Ms. Torres-Vasquez.

24         You know, I did mention that obviously a

25    gun was involved here.  Let me ask you, was there

1   anything about the use of a gun that causes anybody

2   any problem, in other words, is it such that because

3   a gun was involved you do not, you do or you do not

4   think you can be a fair and impartial juror.  Is

5   there anybody who has an opinion of guns, a feeling

6   of guns that you feel that this may not be the case

7   for you?

8           THE COURT:  I see Mr. Wilhite.

9           POTENTIAL JUROR:  Yes, ma'am.  I just feel

10  owning a gun you need to be responsible enough to

11  handle the gun, fire the gun or own a gun.  So I

12  think it is basically the responsibility of any gun

13  owner to be responsible enough to, you know, handle

14  a gun.  That is it.

15          THE COURT:  Okay.  Thank you.

16          Now you have not heard any evidence in

17  this case at all.  I have asked you a number of

18  general questions but you haven't heard any

19  evidence.

20          So I have told you already what the

21  Indictment, what the charge is in the Indictment,

22  but the Indictment is not evidence of anything, so

23  you have not heard any evidence yet.  But

24  nevertheless, I am going to ask you this question:

25  Based on what you have heard so far this morning do

any of you have any feelings that are either for or
against the Government's side of the case, the
prosecution, based solely on the things you have
heard this morning?  Do any of you think that you
feel negatively towards the Government based on what
you have heard here today?

All right.  I see no hands.  The same
question about the defense side, do any of you feel
negatively towards the defense based on what you
have heard thus far today?

And, Ms. Sanchez, you would feel like you
would?

POTENTIAL JUROR:  I do because I said that
I own a gun and, yeah, but I think what you should
have done, you shoot a gun, you should know what you
are shooting at.  You should just shoot randomly
into the air.  I am really against that.  Not only
did I have my brother-in-law shot, but I also had my
nephew at three years old shot because my
brother-in-law was cleaning a gun and the bullet
went through the wall, and I really feel very
strongly about the responsibility of owning a gun
and what you're going to shoot at.

THE COURT:  Thank you, Ms. Sanchez.

Ms. Aguilar.

1          POTENTIAL JUROR:  Negatively for this

2     side.  I feel angered based on, I don't know if it

3     was a woman that was indigenous, it being in Indian

4     Country, and being Native myself, I don't

5     necessarily believe he is guilty.  But I do feel,

6     have a negative anger feelings and I do want to know

7     more to make sure that it is like a fair trial,

8     yeah, that's all I have.

9          THE COURT:  Thank you, Ms. Aguilar.

10         Anybody else?

11         Now at the end of the case I am going

12    to -- another one.  I'm sorry, I didn't see you.

13         POTENTIAL JUROR:  I agree with what she

14    said.  I follow like the whole gun thing.  I own

15    hunting guns, but I would never point them at a

16    person.  That is what I was always taught.  I am

17    also Native American, so I also feel biased towards

18    that, especially with the missing murder indigenous

19    women.  I follow that very closely, too, so I do

20    feel like I have a negative feeling.

21         THE COURT:  All right.  Thank you.

22    Anybody else?  Ms. Archuleta.

23         POTENTIAL JUROR:  I personally don't like

24    guns, I never have.  On the other hand I feel like

25    in this case being that the FBI is involved, I have

1    a niece that does work with the FBI and I feel that

2    I would probably side with the FBI case.

3                THE COURT:  All right.  Your niece

4    currently works with the FBI?

5                POTENTIAL JUROR:  Yes.

6                THE COURT:  What is her name?

7                POTENTIAL JUROR:  Alexandra Ramirez.

8                THE COURT:  Thank you.  Anybody else?

9                And in the back, Juror Bowen.

10               POTENTIAL JUROR:  I am not even sure, the

11   gun freaked me out something.

12               THE COURT:  I can't hear you.

13               POTENTIAL JUROR:  I don't own a gun and

14   they kind of scare me, and I really related to

15   something the gentleman here said that if you are a

16   gun owner that you have to take responsibility.  I

17   cannot imagine just shooting at a noise because that

18   could potentially be a human life that you were

19   taking, and it just seems reckless.

20               And I also agree with what she just said.

21   I have a friend that works for the FBI and her name

22   is Tara Lochinko (phonetic).  She is an analyst, and

23   I tend to think that I am holding on to our

24   Government is still a good entity and these are the

25   smartest people in investigations.  And she reads 3,

1    400 pages a day and puts together threats of threats

2    to our country.  And I just, knowing her for

3    15 years, I tend to think that the FBI has got a

4    legitimate case.

5            THE COURT:  All right.  So you haven't

6    heard any evidence but just based on your friendship

7    with someone who is an FBI analyst you feel that the

8    FBI, you feel more favorable to the Government side?

9            POTENTIAL JUROR:  Yes.

10           THE COURT:  Well, thank you for telling us

11   that.  But my next question for you is, and only you

12   can answer this question.  Do you feel that you can

13   put that feeling completely aside, disregard it and

14   make a decision based on the facts and the evidence

15   that you hear in this case?

16           POTENTIAL JUROR:  Well, it would really

17   depend on what the case is.

18           THE COURT:  You haven't heard any facts,

19   yet but just based on your feeling.

20           POTENTIAL JUROR:  Honestly, I would do the

21   best I can.  I don't want to be prejudiced against

22   the defense side, if they make no case whatsoever.

23   If I am not totally convinced, you know, beyond a

24   reasonable doubt that he did it, then I would have

25   to side with the defense.

1              So not knowing what the case is and how
2     they are going to present it, I would just have to
3     say I will do the best I can with it.
4              THE COURT:  But only you know how you feel
5     about what your friend has told you about FBI work
6     and things of that nature, so that is why I asked.
7     Do you really feel like you can just disregard the
8     FBI's involvement in this case and approach this
9     case with be an open mind, clean slate?
10             POTENTIAL JUROR:  That is a good question.
11             You started out by saying that we all have
12    biases and experiences in life that taint how we
13    process information.  And I tend to look at the
14    Government as an honest, good entity.  I am
15    desperate that we do have that still in our country.
16             So I would do the best I can not to be
17    biased and saying, oh, every witness, every person
18    they brought forward is telling the absolute truth,
19    but, you know, I mean if we don't have an
20    organization in our country that we can depend on
21    for truth, we are kind of lost.
22             THE COURT:  All right.  Thank you,
23    Mr. Bowen.
24             Anybody else?
25             I don't see any other hands?  Oh, one more

1    hand.

2            Mr. Phillips.

3            POTENTIAL JUROR:  Well, I heard it was

4    about Native American.  I am Native American and

5    basically anything to do with Natives just gets me

6    angry.  And, yeah, I mean there is just completely

7    over the edge.  It would affect me on their part.

8    So, yes, I would have a hard time.

9            THE COURT:  You would have a hard time.

10            POTENTIAL JUROR:  With this case just

11    because it is Native.

12            THE COURT:  All right.  Thank you.

13            Anybody else have any feelings for or

14    against the defendant based on what you have heard

15    so far?

16            Ms. Thomas.

17            POTENTIAL JUROR:  Yes.  I have already

18    told the courtroom about my experience when my

19    apartment was broken into.  And we hear all the time

20    about people getting their homes vandalized and

21    their property taken or damaged and we hear about

22    people that had someone come into your home and they

23    use their firearm to protect themselves.  So in this

24    case, I think I am more in favor and empathetic to

25    the defendant.

1          THE COURT:  All right.  Well, I understand
2   what you are saying.  Thank you.
3          POTENTIAL JUROR:  Thank you.
4          THE COURT:  Anybody else have anything
5   that they want to bring to my attention?
6          I don't see any other hands.
7          So at the end of the case I am going to
8   instruct you on the law.  And basically the facts
9   are what the jury resolves, in other words, you
10  decide what the facts are that support what happened
11  in this case, whatever your decision may be.
12          But the Court will give you at the end of
13  the trial the law that you have to apply.  And so my
14  question is, generally speaking, and again you
15  haven't heard the evidence, you don't have the
16  instructions yet, but if you were to find that I
17  give you the law and there is something about the
18  law that you disagree with or you don't like, and I
19  know this isn't a drug case, but, for example, there
20  are people who think that certain drugs should be
21  legal.
22          So if we are in a drug case, I always ask
23  people whether or not they could convict someone
24  even if they disagree that certain drugs are
25  illegal.  And so is there anything that you can tell

1    me that makes you think you would have a difficult

2    time following the law as the Court instructs you?

3    You know, I told you already, for example, that the

4    Government bears the burden of proof.  Can you

5    follow the law as I give it to you, whether you

6    agree with it or not?  And it looks to me like

7    everybody can follow the Court's instructions.

8         So I am about to turn it over to the

9    attorneys, but I want to just ask you, is there

10   anything that comes to any of your minds, anything

11   at all that would suggest to you that you could not

12   sit on this jury and render a fair verdict based

13   only on the evidence that is presented in this case

14   and follow the law as the Court instructs you.  Just

15   one little catchall question.

16        I don't see any hands.

17        Before I turn it over to the attorneys,

18   let me take a moment and talk to the attorneys

19   privately here.

20        I should tell you, members of the panel,

21   that we are not wearing masks because we have all

22   been vaccinated.  So I told you that you didn't have

23   to wear them if you were vaccinated, but I will tell

24   you that I didn't tell you that we were not wearing

25   them because we are vaccinated.

```
 1              (Whereupon a Bench discussion was held
 2      outside the hearing of the jury.)
 3              THE COURT:  Okay.  So are you okay with
 4      15 minutes?
 5              MR. ELSENHEIMER:  Certainly.
 6              MR. NAYBACK:  Yes.
 7              THE COURT:  So is there anything that you
 8      need to bring to my attention that you want to cover
 9      beyond what I have covered?
10              MR. ELSENHEIMER:  I was only going to ask
11      a little bit more about the burden of proof.  I was
12      going to ask about masks if anybody will be
13      concerned if we don't wear masks.  I think some
14      people still have that.
15              MR. NAYBACK:  We were just going to ask a
16      little bit more about gun safety.  You touched on
17      it, just the rules of gun safety and that was about
18      it, but probably ten minutes.  We are not going to
19      take that long.
20              MR. ELSENHEIMER:  I might ask a couple
21      more gun questions.
22              THE COURT:  My thoughts about all of this
23      is that I told you before I am not looking into
24      delving into the inner-workings of someone's
25      opinions, but I think that these issues you need to
```

1  know them.  Whatever I have covered I would

2  certainly, you know, not -- I wouldn't say no to

3  following up on gun safety things that we really got

4  going on.  So and my personal preference is to leave

5  it to you-all to maybe flesh out things that we

6  raised and I didn't cover fully because I leave it

7  to you guys.

8             Anything else?

9             MR. ELSENHEIMER:  No.  I might ask some

10 follow-up questions in line with that.

11            THE COURT:  Stuff that I have asked,

12 things that I have covered, but I want you to try to

13 keep it as short of possible.

14            MR. ELSENHEIMER:  Just a couple of

15 follow-ups.

16            THE COURT:  What I will do after you-all

17 finish with your questions, I will excuse the panel,

18 and then we will have one or two people that

19 mentioned they want to talk to me privately.

20            Just one, okay.  Thank you.

21            (Whereupon the following proceedings were

22 held in Open Court.)

23            THE COURT:  All right.  At this time we

24 will turn it over, then, to the attorneys.  We will

25 hear first from the Government, Ms. Wilson, and as I

said before, we are all asking questions not to

embarrass anybody, not to cause any distress for

anyone, simply to make sure we all understand how

you view some of the issues that may be involved in

this case.

Ms. Wilson, you may proceed.

MS. WILSON:  Thank you, Your Honor.

Good morning again.  My name is Novalene

Wilson, and I am responsible, along with my

colleague Kyle Nayback, for presenting the evidence

for the charges against the defendant, Mr. Douglas

Smith.

I just want to follow-up briefly on a few

things that we discussed this morning.  And I think

we have had a pretty good discussion, already.

Of those that own guns and have shotguns,

how many know about gun safety rules?

Okay.  Quite a few hands here.  Let me go

ahead, whoever is comfortable, if you want to stand

up and kind of tell us what you know about those

basic gun safety rules.

POTENTIAL JUROR:  I have taken gun safety

rules in Taos.  It has been a long time.  I always

know that you always carry a safety on your gun.

You don't take the safety off and you don't point

1   the gun at nobody unless you have the intentions of

2   shooting that gun.  And then you have to know about

3   having the gun in a safe location where nobody, kids

4   can get ahold of high up.

5           MS. WILSON:  Anything else, any other gun

6   safety rules that you-all know about?  Those of you

7   who raised your hands.  I would hate to call on you

8   but --

9           POTENTIAL JUROR:  I own guns and stuff,

10  but I have always heard not to point them at

11  anything that you are not willing on destroying.

12  And when you point a gun, you don't have your finger

13  on the trigger unless you are ready to fire.

14          I don't know about the rest of you-all,

15  but common sense goes a long ways.  When you own a

16  gun, you never store one loaded with one in the

17  chamber, just for safety purposes of you and your

18  family, your loved ones, your friends that may be

19  around.  You never know when a gun, most guns I hear

20  that kill are ones that are assumed empty.

21          In fact, my friend a long time ago he had

22  a shotgun and he pointed that gunshot right at my

23  head.  I said, no, put that shotgun down now.  I was

24  3 feet away from him.  He pointed it down to the

25  floor, pulled the trigger and it went off.

1          So gun safety is real big.  I understand

2     he didn't meant to, but if he would have meant to,

3     he would have killed me right away.  I didn't press

4     any charges or anything else, but that opened my

5     eyes to how serious guns are.  And even little BB

6     gun, they hit you in an area, they can do damage.  I

7     am not saying they can kill, but they can do damage.

8          MS. WILSON:  Just for the record, what was

9     your name and your number.

10          POTENTIAL JUROR:  Cody Stevenson,

11     Number 5.

12          MS. WILSON:  Thank you, Mr. Stevenson.

13          Anybody else?  Yes.

14          POTENTIAL JUROR:  The first rule of owning

15     any kind of handgun or hunting rifle or anything

16     else is to always have a trigger lock on each gun,

17     that way somebody can just pick it up and pull the

18     trigger because it won't go off.  That is the

19     Number 1 rule.

20          MS. WILSON:  And just for the record, your

21     name and --

22          POTENTIAL JUROR:  My name is Cory Wilhite,

23     and I am Juror Number 15.

24          MS. WILSON:  Juror 15.  Thank you.

25          And if I could ask you a follow-up

1  question on that.  Have you heard of the rule,

2  Always be sure of your target and what is behind it.

3         POTENTIAL JUROR:  I have heard of it but

4  it is a little deceiving, especially if you are

5  hunting for sport with a rifle.  Handgun is a little

6  different.

7         MS. WILSON:  Why is it different with the

8  handgun?

9         POTENTIAL JUROR:  Because handguns were

10 more made for self-protection and not so much target

11 shooting.  So, you know, handguns, they pretty much

12 were made for protection.  I mean, that's what they

13 are.

14        MS. WILSON:  And the distinction is it is

15 good to know what your target is and what is behind

16 that target if you are looking at protection?

17        POTENTIAL JUROR:  If you are shooting a

18 handgun, yes.  Not for sporting, hunting for sport

19 with a rifle.  It is a little different.

20        MS. WILSON:  Okay.  Anybody have any other

21 thoughts on that?

22        You have heard the rule, Always be sure of

23 your target and know what is behind it.  You have

24 heard that rule before.

25        POTENTIAL JUROR:  Absolutely.

1          MS. WILSON:  What does that mean to you?

2          POTENTIAL JUROR:  Well, anytime you ever

3   decide you are going to own a gun you should go to

4   gun safety, you should go to hunters education.

5   When my stepdad brought them around me, I was like

6   eight years old and he took me to gun safety

7   immediately.  So, I mean, that is something you do

8   right away and they tell you, don't even point it in

9   any direction.  The way you carry a gun even if you

10  are walking and a hunting rifle, you hold it up or

11  point it at the ground just to make sure you are not

12  pointing it at anybody.

13          You put the safety on.  If you go to point

14  the gun at something, you better make sure what you

15  are looking at before you pull the trigger.  That

16  goes for hunting, whether it is a hunting rifle, a

17  shotgun, whether you are hunting for food or you are

18  just target practice.

19          It doesn't matter what kind of gun, any

20  gun, you don't point it at anything you are not

21  going to shoot.  But even though targets, they can

22  go through targets, depending on the gun, depending

23  on what is behind it.

24          MS. WILSON:  Just for the record, could I

25  get your Juror Number?

 1              POTENTIAL JUROR:  Ten.

 2              MS. WILSON:  Number 10, thank you.

 3              Anybody else familiar with that rule, have

 4    any thoughts on that rule?

 5              MS. WILSON:  So the concern about shooting

 6    at night, does anybody have any, and thinking of the

 7    gun safety rules, does anyone have any thoughts on

 8    that, that we already haven't covered?

 9              Yes, sir.

10              POTENTIAL JUROR:  You can't see what you

11    are actually shooting.  You want to make sure the

12    reason they say that in the rule as far as knowing

13    what your target is because guns have an issue where

14    they shoot.  If that ricochets or go and hit a child

15    or any human being, there is a potential for death

16    there.

17              MS. WILSON:  And just for the record, your

18    Juror Number?

19              POTENTIAL JUROR:  5.

20              MS. WILSON:  Thank you, sir.

21              Thank you for your time.

22              THE COURT:  Thank you, Ms. Wilson.

23              Next we will hear from Mr. Elsenheimer for

24    the defendant.

25              MR. ELSENHEIMER:  Thank you, Your Honor.

 1          Good morning again.  My name is Aric

 2     Elsenheimer and I represent Douglas Smith.

 3          Thank you so much for participating this

 4     morning and for taking your time to be here.  I want

 5     to ask you a couple of questions and I don't want to

 6     take too much more of your time.  First I want to

 7     ask you, we are in the middle of, not in the middle

 8     of, thank goodness, but we are kind of still a

 9     little bit in the COVID pandemic.  And you see that

10     us here, we don't have masks on and people have, you

11     know, a lot of different views about masks and some

12     people have very -- there is a real concern about

13     whether somebody has a mask or doesn't have a mask.

14          Is anybody seeing that we up here don't

15     have masks on, does anybody feel like they might

16     hold it against us as the lawyers for Mr. Smith or

17     the Government that we aren't wearing masks?  Does

18     anybody have a concern about that?

19          Is it Ms. Cortez?

20          POTENTIAL JUROR:  Yes.  I have very strong

21     emotions my mom passed away of the COVID, so it is

22     still very fresh.

23          MR. ELSENHEIMER:  Certainly.  Thank you,

24     Ms. Cortez.  Anyone else?

25          POTENTIAL JUROR:  Just to clarify your

1   question you mean negative emotions?

2   MR. ELSENHEIMER:  Yes, negative like you

3   might hold it against us.

4   POTENTIAL JUROR:  No, I am fully

5   vaccinated, I just choose to wear a mask for

6   everybody else.

7   MR. ELSENHEIMER:  All right.  It is

8   Ms. Aguilar, right?

9   POTENTIAL JUROR:  Yes.

10   MR. ELSENHEIMER:  Thank you.

11   The other question I want to ask,

12   Judge Herrera asked a question similar to this, but

13   let me ask more broadly.  Does anyone have anything

14   going on in their life, maybe, it could be anything,

15   something that is causing you anxiety or a difficult

16   time at work or maybe a difficult time in your

17   family life, having trouble with your kids, your

18   parents, something like that, that might distract

19   your attention away from the evidence that you hear

20   in this trial.

21   That you have a little bit of a concern

22   that you might not focus on what you hear in the

23   trial because you have something else that you are

24   worried about or that you are anxious about.

25   Anybody have anything like that, that is going on in

1    their lives?

2            Great.  Let me ask you about,

3    Judge Herrera spoke about this, the burden of proof.

4    In our criminal justice system Mr. Smith is

5    innocent.  He sits there innocent and he remains

6    innocent unless and only unless the Government is

7    able to prove their case beyond a reasonable doubt.

8            And it is the Government's burden,

9    entirely the Government.  Does anybody have any

10   concerns that they would want to hear from Mr. Smith

11   or that they would want Mr. Smith and his lawyers to

12   put on evidence or to fill in blanks that the

13   Government hasn't filled in, that they wouldn't hold

14   the Government to their burden of proof.

15           Is anybody concerned or have feelings

16   about that?  How do you-all feel about that or think

17   about that?  Let me ask, Ms. Sanchez,

18   Juror Number 1, what do you think about the burden

19   of proof?

20           POTENTIAL JUROR:  He is innocent until

21   proven guilty.

22           MR. ELSENHEIMER:  And would you, if you

23   were a juror in that case, would you follow that and

24   require the Government to prove every element beyond

25   a reasonable doubt?

 1              POTENTIAL JUROR:  Absolutely.

 2              MR. ELSENHEIMER:  Thank, you Ms. Sanchez.

 3              Anybody else?

 4              Mr. Bowen, let me ask you a question.  You

 5     had a conversation with Judge Herrera --

 6              Thank you, sir.  And again you are Juror

 7     Number 14.

 8              You had an extensive conversation with

 9     Judge Herrera and I just want to follow-up on that a

10     little bit.  You said something about you think it

11     is important in society, and correct me if I am

12     misphrasing how you said it.  I don't have what you

13     said in front of me, but my understanding is that

14     you believe it is important that we as a society

15     have a Governmental structure and part of that

16     structure is the FBI and that you might be more

17     favorable to the Government's side given that view

18     of our government.

19              Does that kind of adequately summarize

20     what you said?

21              POTENTIAL JUROR:  Yes.

22              MR. ELSENHEIMER:  So let me ask you about

23     that.  If you were a juror and you heard evidence

24     and you thought, well, I don't know if -- you were

25     on the fence.  Would you be concerned that you might

```
 1   lean towards the Government's side because you have
 2   that view?
 3             POTENTIAL JUROR:  Well, I would be
 4   concerned that I would lean on that.  Let me ask a
 5   certain question that is in my mind.  So the
 6   defendant is innocent until proven guilty?
 7             MR. ELSENHEIMER:  Absolutely.
 8             POTENTIAL JUROR:  Has the defendant spent
 9   any time in jail?
10             MR. ELSENHEIMER:  I am not at liberty to
11   answer that.
12             POTENTIAL JUROR:  Well, I mean, regarding
13   this case.  Because the follow-up question would be
14   if he has spent any time in jail and we are to
15   assume he is innocent, why would you have an
16   innocent man spend any time in jail?
17             MR. ELSENHEIMER:  Mr. Smith is not in jail
18   right now.  If you were to hear that he did spend
19   time in jail would that influence how you view
20   evidence in the case?
21             POTENTIAL JUROR:  Well, I go back to that.
22   For me trying to understand innocent until proven
23   guilty, if he did spend time in jail why would an
24   innocent man be put in jail?
25             THE COURT:  Let me ask you, Mr. Bowen.
```

There are things that we can -- well, let me put it this way.  As a juror, I am glad you are telling us these things that are on your mind, but there may be a number of things that we can't really answer.

Sometimes that happens in the course of a trial where people who served on juries tell me after the case, you know, I wondered about this or I wondered about that.  I can tell you that the information that you are allowed to consider in making a decision of guilt or innocence will be presented to you in the course of the trial.

And so my biggest concern would be would you be able to put aside whatever questions you may have that maybe aren't answered, can you put them aside and decide the case solely on the evidence that is presented in the court?  And if you can't, feel free to tell us that, but I am just telling you that there may be questions that we can't answer in the course of the proceeding.  So do you feel like you can put some of your personal questions aside?

POTENTIAL JUROR:  Like I said earlier, I can do the best I can with it.  I need to hear the case before I can make a decision, but I do think that I am a fair-minded person.  And, you know, if the case doesn't seem to convince me beyond a

1    reasonable doubt that he did it, then I would have

2    to say he is innocent.

3            THE COURT:  But if the issue of is he in

4    jail, has he been in jail, if that is not presented

5    in this case, can you put that question aside and

6    just decide the case based on the evidence that is

7    presented here?

8            POTENTIAL JUROR:  Yes, Your Honor, I

9    believe I can.  It is one of those things that, you

10   know, if you are innocent until proven guilty then

11   if you have spent time in jail because an

12   organization has done an investigation and they said

13   let's arrest him, he is a dangerous person.  Like I

14   said, I try to look at the government as an entity

15   that we can trust that they are trying to do things

16   the right way.  Just like the police, I think they

17   are trying to do things the right way.  They mess it

18   up sometimes, but --

19           THE COURT:  Mr. Elsenheimer, I interrupted

20   your questioning.  You may proceed.

21           MR. ELSENHEIMER:  If the Government didn't

22   do a sufficient investigation or if you have looked

23   at the facts and were deliberating on the case and

24   had a question, it was a tie.  In a criminal case,

25   it was a tie for you, which side would you go for?

1    In a tie does the Government, have they met their

2    burden of proof?

3                POTENTIAL JUROR:  I don't know if I can

4    answer that, really.

5                MR. ELSENHEIMER:  You know about baseball,

6    right?  And in baseball the rule is the tie goes to

7    the runner.  You have heard that expression.  Who is

8    the runner in the criminal case?

9                POTENTIAL JUROR:  Probably the defendant.

10               MR. ELSENHEIMER:  If you were a juror in

11   this case, would you promise to follow that rule and

12   give the benefit to Mr. Smith and hold the

13   Government to their burden of proof beyond a

14   reasonable doubt?

15               POTENTIAL JUROR:  Boy, it really depends

16   on the case.  All I can honestly say I will do the

17   best I can with the information that they give me.

18               THE COURT:  Thank you, Mr. Bowen.

19               MR. ELSENHEIMER:  Does anybody else after

20   that discussion, does anybody else have any feelings

21   or thoughts about holding the Government to their

22   burden of proof, might be concerned in this case

23   that you would have a tough time doing that?

24               What about over here in the jury box, does

25   anybody have anything that they want to say that we

1    haven't heard yet?

2           Is it Mr. Renner, Juror Number 12?

3           POTENTIAL JUROR:  Yes.

4           MR. ELSENHEIMER:  What do you think about

5    the burden of proof beyond a reasonable doubt in a

6    criminal case?

7           THE COURT:  I couldn't hear a word you

8    said.

9           MR. ELSENHEIMER:  I want to ask you about

10   the burden of proof in a criminal case.  If you were

11   a juror, do you have any concerns about that, if you

12   were a juror in this case?

13          POTENTIAL JUROR:  No.

14          MR. ELSENHEIMER:  About holding the

15   Government to their burden of proof?

16          POTENTIAL JUROR:  No.

17          MR. ELSENHEIMER:  Thank you, Your Honor.

18          THE COURT:  All right.  Thank you.

19          What I am going to do now is get together

20   with the attorneys for a movement.  I am going to

21   ask Yvonne, it would be the -- so I am going excuse

22   all of you except the one or two who wanted to talk

23   to the Court and the attorneys privately.

24          Ms. Aranda, I know you did and I don't

25   remember if there was another one.  But anybody who

1   wanted to raise an issue in a smaller setting, stay

2   behind.  The others, follow Yvonne to the Pecos

3   courtroom and she will give you further

4   instructions.

5               (Whereupon the jury panel exited the

6   courtroom.)

7               (Whereupon Juror Number 8 entered the

8   courtroom.)

9               THE COURT:  We have two jurors who wanted

10  to express some views in a smaller setting.

11              Ms. Archuleta.

12              POTENTIAL JUROR:  It was regarding my

13  statement earlier to the FBI.  I don't know if you

14  know her, and I wasn't sure if I was supposed to say

15  her name.  I don't know if you know her or not.

16              THE COURT:  We are on the record and I

17  need to hear you.  I am talking about the exchange

18  that was just going on.  I did not hear

19  Ms. Archuleta.

20              POTENTIAL JUROR:  I don't know what she

21  does.  I know she works for the FBI.  She lives here

22  in Albuquerque.  I was not sure whether I needed to

23  say her name.

24              THE COURT:  I don't remember if I asked

25  you her name or not, I may have.  But I wanted to

1    know so that people would know who we are talking

2    about since we do have someone here from the FBI.

3    And I did ask about the person who had a relative

4    with the Espanola Police since the Espanola Police

5    were involved here.  Was that you, too?

6              POTENTIAL JUROR:  Yes.

7              THE COURT:  Okay.  So that's why.

8              POTENTIAL JUROR:  I just wanted to make it

9    clear that I would probably side with the FBI

10   because she works for them and I am just trying to

11   be as honest as I possibly can.

12             THE COURT:  Well, that's important.  We

13   all need that.  Before I let you go, let me ask if

14   the attorneys have any questions as a result of what

15   you just told us.

16             MS. WILSON:  No.  Thank you, Your Honor.

17             MR. ELSENHEIMER:  No, Your Honor.

18             THE COURT:  Thank you.  So follow Yvonne.

19             (Whereupon Juror Number 8 exited the

20   courtroom.)

21             (Whereupon Juror Number 21 entered the

22   courtroom.)

23             THE COURT:  Ms. Aranda.

24             POTENTIAL JUROR:  Well, I am more than

25   glad to serve as a juror, but this is the most

1    inopportune time.  I am doing major construction at

2    my house.  I am the only one there, and the reason I

3    asked for a private audience is because it is

4    unfortunate nowadays that you don't really want to

5    let a lot of people know that you are away from your

6    home for a certain period of time, right?  I am the

7    only one there who would be able to supervise the

8    project that is going on and it is really not a good

9    time for me to be away from that project for so many

10   days.

11          THE COURT:  Let me ask you, do you have --

12   I know you said that you are the only one there.  Do

13   you have any other family members that could cover

14   for you if you were selected in this case?

15          POTENTIAL JUROR:  Well, I have a ton of

16   family members, but there is no plan in writing that

17   they can say, yes, this is the way she wants it or,

18   no, that is not where she wants this.  So, no, they

19   don't know my plans nor is it really written.  That

20   is why, you know, my excavator or something will

21   come to me and say, Is this exactly where you wasn't

22   this or whatever.  Yes, so --

23          THE COURT:  So then my next question is,

24   is there any way to reschedule your project?

25          POTENTIAL JUROR:  No.  My front yard is

1   just, it is completely right now the pavement is

2   torn up, they have done the footings for a wall and

3   to tell you the truth during this pandemic you

4   postpone something, you don't know when you are

5   going to be able to get it rescheduled then on time.

6              THE COURT:  All right.  And then I am just

7   going to ask you because I am curious, you know me

8   and what about you knowing me might affect the way

9   you view this case?

10             POTENTIAL JUROR:  Well, because I know

11  you, because how I feel about you and how I admire

12  you, anything that you may or may not say or

13  anything that I see, I am going to basically go with

14  how you, you know, I would lean towards you,

15  whatever.  It is just the way it is and the way I

16  feel about you.

17             THE COURT:  Well, you have known me a long

18  time.  You might see a reaction or something in me

19  that might mean something to you that maybe somebody

20  else wouldn't.  But, all right, not that that is

21  important, I was just curious.

22             All right.  Thanks.

23             (Whereupon Juror Number 21 exited the

24  courtroom.)

25             (Whereupon Juror Number 2 entered the

```
 1   courtroom.)
 2            THE COURT:  If you would give us your
 3   name, please.
 4            POTENTIAL JUROR:  My name is Rose
 5   Prentice.
 6            THE COURT:  And, Ms. Prentice, I
 7   understand you had something you wanted to share
 8   with us.
 9            POTENTIAL JUROR:  Well, I recently hurt my
10   foot and I forgot my doctor's note.  And my doctor
11   wants me to be off my foot for about a month, and so
12   I have been using my crutches and stuff like that,
13   but I don't want to be really tired and all of that,
14   so I just wanted to bring it up.
15            THE COURT:  All right.  Let me ask you how
16   have you felt today?
17            POTENTIAL JUROR:  I feel kind of tired.
18   My mom had to drive me because I didn't feel
19   comfortable driving by myself and stuff like that.
20            I fractured my foot on Monday and I went
21   to the urgent care and stuff like that, but had to
22   go to orthopedics and they gave me a boot.  I can
23   take it off and everything like that, but I have to
24   treat it like a cast, so --
25            THE COURT:  Are you in pain?
```

```
 1              POTENTIAL JUROR:  No.  It is
 2   uncomfortable.  Like I get really tired especially
 3   since, you know, I am going up from like the stand
 4   and stuff like that, so --
 5              THE COURT:  All right.  Are you on any
 6   kind of pain medication?
 7              POTENTIAL JUROR:  I am not.
 8              THE COURT:  Okay.  So are you saying that
 9   you don't think you can handle this for a week.
10              POTENTIAL JUROR:  I want to kind of get
11   myself, I want to heal and stuff like that.  I don't
12   want to, you know, I don't want to cause any
13   complications to my foot and stuff like that, so --
14              THE COURT:  Okay.  Let me ask the lawyers,
15   do you have any questions for Ms. Prentice based on
16   her comments?  Ms. Wilson?
17              MS. WILSON:  No, Your Honor.
18              MR. ELSENHEIMER:  No, Your Honor.
19              THE COURT:  All right.  Thank you.
20              (Whereupon Juror Number 2 exited the
21   courtroom.)
22              THE COURT:  What I would like to do is
23   take five minutes and then I will return to the
24   courtroom and we will take up challenges for cause
25   and we will see how many people we have.
```

1              (A recess was taken.)

2              (Open court, outside the presence of the

3     jury panel.)

4              THE COURT:  Please be seated.  We are back

5     on the record.  At this time we will take up the

6     challenges for cause.

7              Now, in the interest of time, what I would

8     like to do, and those of you who have tried cases

9     with me before, probably you will remember.  It

10    seems to me that there are going to be a number of

11    challenges for cause that both sides will agree

12    with.  So what I would like to do is begin by not

13    arguing challenges for cause.  I will start with the

14    Government and if the Government tells me who their

15    challenges for cause are, once they give us the

16    juror's name if the defense doesn't object, just let

17    us know, and then we can move on to the next person.

18             So we will get through the list of the

19    people that we all agree on and if there are any

20    that require arguing, then we will go back to those.

21             Does that make sense?

22             MR. NAYBACK:  It does.

23             MR. ELSENHEIMER:  Yes.

24             THE COURT:  All right.  We will begin,

25    then, with the Government's challenges for cause.

1              MR. NAYBACK:  Number 2, Rose Regina
2    Lopez-Prentice.
3              THE COURT:  Is there objection?
4              MR. ELSENHEIMER:  No, Your Honor, we
5    agree.
6              THE COURT:  All right.  So we will excuse
7    her for cause.
8              MR. NAYBACK:  Number 4, Delfina M. Cortez.
9              MR. ELSENHEIMER:  No objection, we agree.
10             THE COURT:  Next, Mr. Nayback?
11             MR. NAYBACK:  Number 8, Pearl J.
12   Archuleta.
13             MR. ELSENHEIMER:  No objection, we agree.
14             THE COURT:  Next.
15             MR. NAYBACK:  Number 9, Maryellen B.
16   Sanchez.
17             MR. ELSENHEIMER:  No objection, we agree.
18             MR. NAYBACK:  Number 10, Rebecca D.
19   Schall.
20             THE COURT:  Mr. Elsenheimer?
21             MR. ELSENHEIMER:  No objection.
22             MR. NAYBACK:  Number 11, John R.
23   Schroeder.
24             MR. ELSENHEIMER:  We disagree.
25             THE COURT:  So we will come back to that

1    one.

2            Next, Mr. Nayback.

3            MR. NAYBACK:  Number 13, Amanda G.

4    Torres-Vazquez.

5            MR. ELSENHEIMER:  No objection.

6            MR. NAYBACK:  Number 15, Cory W. Wilhite.

7            MR. ELSENHEIMER:  No objection.

8            MR. NAYBACK:  Number 18, Garreth Johnson.

9            MR. ELSENHEIMER:  No objection.

10           MR. NAYBACK:  Number 20, Rebecca L.

11   Thomas.

12           MR. ELSENHEIMER:  No objection. (CHECK)

13           MR. NAYBACK:  And finally, Number 21,

14   Perla Aranda.

15           MR. ELSENHEIMER:  No objection.

16           THE COURT:  All right.  We will come back

17   to Mr. Schroeder in a moment.  Let me ask for the

18   defense challenges for cause, do you have any

19   additional, Mr. Elsenheimer?

20           MR. ELSENHEIMER:  Yes, Your Honor.  Let me

21   just start off here.  We have Alicia -- Number 6,

22   Number 7, Anita Roberts.

23           MR. NAYBACK:  Oppose.

24           THE COURT:  We will come back to her.

25           MR. ELSENHEIMER:  We have Michael Bowen,

1    Number 14.

2              MR. NAYBACK:  Oppose.

3              THE COURT:  Next.

4              MR. ELSENHEIMER:  Number 17, Andrea

5    Martin.

6              MR. NAYBACK:  Oppose.

7              THE COURT:  Next.

8              MR. ELSENHEIMER:  Number 19, Melverna

9    Aguilar.

10             MR. NAYBACK:  Oppose.

11             MR. ELSENHEIMER:  Number 22, Darren Jacob

12   Phillips.

13             MR. NAYBACK:  Oppose.

14             THE COURT:  Any others?

15             MR. ELSENHEIMER:  I don't believe so.

16             THE COURT:  All right.  So let's begin,

17   then, with the Government's motion regarding

18   Mr. Schroeder, Juror Number 11.

19             MR. NAYBACK:  Mr. Schroeder said that he

20   works shift work, that it would be very difficult

21   for him to pay attention and sleep.  And the Court

22   pressed him on whether he could get the schedule

23   changed.  He said, "I think they will still make me

24   work when I am not here."

25             For those reasons we don't think he that

1   could be a fair and impartial and give us his

2   attention.  He also experienced a trespasser on his

3   property and said he would be biased against the

4   Government.

5        THE COURT:  All right.  Your response?

6        MR. ELSENHEIMER:  Well, with regard to the

7   work issue, I think he said he could get his hours

8   covered.  He was going to look into that.  He

9   thought, he has heard that that is possible.

10        THE COURT:  Okay.  And with respect to the

11   bias issue?

12        MR. ELSENHEIMER:  He said he would

13   sympathize.  That is probably not for cause.

14        THE COURT:  Right.  He did say he was

15   probably, or had used a BB gun or not used it, but

16   possessed one and he said enough that I am going to

17   grant the Government's challenge for causes as to

18   Mr. Schroeder, Juror Number 11.  So he will be

19   excused for cause.

20        And then that was your only one that was

21   challenged as I recall, right, Mr. Nayback?

22        MR. NAYBACK:  Yes, Your Honor.

23        THE COURT:  Let's turn then to the

24   defendant's challenges for cause.

25        MR. ELSENHEIMER:  Starting with Number 7,

```
1   Ms. Roberts.  She said that she works the night
2   shift and she is concerned that given the change in
3   her schedule she would be tired and sleepy.  She
4   also said that, I believe, that her brother-in-law
5   was shot and as a result it would be difficult to be
6   fair and impartial.
7               THE COURT:  Your response, Mr. Nayback.
8               MR. NAYBACK:  Your Honor, I don't recall
9   her brother being shot, but it sounded like she
10  could balance her work and for those reasons,
11  especially given all the other for cause, in this
12  panel, we would ask that she be allowed to stay on.
13              THE COURT:  All right.  I don't have a
14  note about her brother and she did make it sound
15  like she might be able to get some relief at work,
16  so I am going to deny the challenge for cause.
17              MR. ELSENHEIMER:  Did you say you are
18  denying?
19              THE COURT:  I will deny the challenge as
20  to Juror Number 7, Anita Roberts.
21              Next.
22              MR. ELSENHEIMER:  I want to make clear
23  with regards to that, my notes may be wrong, I
24  believe she said did her brother-in-law was shot and
25  fair and impartial would be difficult.
```

```
 1              MR. NAYBACK:  Your Honor, I just want to
 2   point out --
 3              THE COURT:  I thought she had a
 4   brother-in-law that was in law enforcement.
 5              (Discussion off the record.)
 6              THE COURT:  We don't have that in our
 7   notes.  We only have the relative who was in law
 8   enforcement.  And the brother-in-law shot was the
 9   brother-in-law of Number 9, Ms. Sanchez.
10              That request is denied.
11              MR. ELSENHEIMER:  Sorry about that.
12              Next is Number 14.  This is Michael Bowen.
13   He could not say that he was going to be -- he could
14   not commit to being fair and impartial.  He said he
15   would try but it would be difficult.  He just
16   couldn't get to yes as, I think, a prerequisite to
17   being a fair and impartial juror and having the
18   ability to say, yes, I can be fair and impartial.
19   He couldn't commit to that.
20              THE COURT:  Your response, Mr. Nayback?
21              MR. NAYBACK:  I thought Mr. Bowen said
22   that he would try his best to be fair and impartial.
23   I think that is tantamount to saying yes, he could
24   be fair and impartial.
25              The Court talked with him for a bit.
```

1    Mr. Elsenheimer and Ms. Wilson talked with him.  I
2    don't think it disqualifies a juror to say that they
3    have a relative or believes in Government.  And I
4    think he should be allowed to stay on the jury.
5          THE COURT:  I am going to grant the
6    challenge for cause as to Mr. Bowen.  He was very
7    forthright and basically starts with the premise
8    that the FBI and the United States Government are
9    institutions that we have to believe in.  While that
10   is all great, he just couldn't say that he could put
11   aside some of these feelings that he has, and so I
12   will grant the challenge for cause as to Juror
13   Number 14, Mr. Bowen.
14          Next, Mr. Elsenheimer?
15          MR. ELSENHEIMER:  Number 17, Andrea
16   Martin.  She said that, I believe it was because she
17   is Native American and that would impact her ability
18   to be fair and impartial.  I'm sorry, the nature of
19   the case would impact her ability to be fair and
20   impartial.
21          THE COURT:  Your response, Mr. Nayback?
22          MR. NAYBACK:  I do not recall Ms. Martin
23   saying that she could not be fair and impartial.  I
24   believe she would be a juror -- she didn't say a lot
25   today, but I didn't hear anything that should give

1   the Court concern that she can't be fair and

2   impartial.

3           THE COURT:  Well, I am going to grant the

4   request as to Ms. Martin she did speak somewhat

5   about her parents teaching her about the use of guns

6   and she did say it would have an impact on her.  So

7   because she said that, I will grant the defendant's

8   request or motion for challenge.

9           Next.

10          MR. ELSENHEIMER:  Your Honor, our next one

11  is Number 18, Melverna Aguilar.  I actually stopped

12  writing down the reasons for the basis for cause.

13  She said she would be biased.

14          THE COURT:  Mr. Nayback?

15          MR. NAYBACK:  I never heard Ms. Aguilar

16  say she could not be fair and impartial.  I think

17  that is the standard.  And while she had some

18  familiarity with homeless people in her backyard and

19  didn't shoot at them, I don't think that she has met

20  the standard that she could be excused for cause.

21          MR. ELSENHEIMER:  Just to elaborate,

22  Your Honor, I believe she said she couldn't be fair

23  and impartial because the alleged victim in the case

24  is a Native woman and that I think she said it would

25  make her mad.  I don't know if she said angry, but

1    it was something like that.

2              THE COURT:  She said she felt negative and

3    anger as a Native American woman about an Indian

4    woman being the victim in this case.

5              I will grant the defendant's challenge for

6    cause and Ms. Aguilar, Juror Number 19, will be

7    excused.

8              Next.

9              MR. ELSENHEIMER:  Your Honor, Number 22,

10   it is the same thing with regard to the Native

11   American aspect of the case, in addition to the fact

12   that he has no or difficult transportation from

13   Espanola.  And I think he said he doesn't have

14   family that can help him out.

15             THE COURT:  Mr. Nayback?

16             MR. NAYBACK:  It is ironic that

17   continually try to gat more Native Americans on our

18   jury, but as soon as they identify with Native

19   American issues we get them stricken for cause.  I

20   sympathize that Mr. Phillips doesn't have a vehicle.

21   I think he would make a good juror.  I was hoping

22   that the Court would consider or having one of your

23   staff consider explaining that he could be put up in

24   a hotel here in town as long as he could get a ride

25   back and forth from Espanola, but the other things

```
 1   that he said I don't think disqualifies him as a
 2   juror.
 3            MR. ELSENHEIMER:  It is not just that he
 4   said he is Native American or that aspect, he said
 5   specifically in response to your question, your
 6   question who is going to be biased for the defense
 7   and that is the question he answered and he said
 8   there was a concern that he would be biased for the
 9   defense.
10            THE COURT:  And he did.  And I agree we
11   want more Native Americans serving as jurors, but
12   the expression of anger is one that maybe tips the
13   balance more on the side of bias.  And if they come
14   in here in jury selection and tell me that they are
15   angry about Native American being a victim in this
16   case, I don't know that I have much choice, really.
17            And he did say he has transportation
18   issues.  I tried to see if he could get some help on
19   that he said, no.  And I note also he is the one who
20   left the courtroom because he had to go to the
21   bathroom.  And did say on the record that he would
22   have a hard time with this case.
23            For all of those reasons, I will grant the
24   defendant's request for challenge for cause as to
25   Mr. Phillips.
```

1              Is that everything?

2              MR. NAYBACK:  From the United States, yes.

3              MR. ELSENHEIMER:  From the defense, yes.

4              THE COURT:  All right.  Let's just compare

5    notes for a moment here.  The jurors that I show

6    that are yet available are Juror Number 1,

7    Ms. Sanchez.

8              Juror Number 3, Adam Baker.

9              Let's see Juror Number 5, Cody Gene

10   Stevenson.

11             Juror Number 6, Alicia Broadhurst.

12             Number 12, Drew Bryant Renner; is that

13   right?  We didn't talk about Number 7.  So we have

14   number, all right, I overlooked one.  We do have

15   Juror Number 7, Ms. Roberts.

16             Let me start again, Number 1; Number 3;

17   Number 5.  We have Number 6.  We have Number 7.  We

18   have Number 12, Mr. Renner.  We have Number 16,

19   Mr. McBrayer, and that is it.

20             Is that what you-all show, too?

21             MR. NAYBACK:  Yes.

22             MR. ELSENHEIMER:  Is there a way we could

23   bring Number 7 in just to do follow-up questions

24   about her work and her ability to --

25             THE COURT:  We already covered that.

```
 1              So 1, 3, 5, 6, 7, 12, 16.

 2              So what we will come is we will bring

 3    everybody into the courtroom, I will excuse all but

 4    the seven that are still alive, I guess.

 5              (Whereupon the jury panel enters the

 6    courtroom.)

 7              (Whereupon the following proceedings were

 8    held in Open Court.)

 9              THE COURT:  All right.  Everyone is here.

10    We are back on the record.  What I am going to do is

11    I am going to excuse a number of you.  The ones who

12    are not excused, remain in the courtroom, Yvonne

13    will give you further instructions.

14              Those of you who are excused, if you would

15    sit tight until I finish reading the list of names

16    of people who are excused.  Once I excuse you then

17    you are free to leave and the ones who are going to

18    stick with us for a while, you're not necessarily on

19    the jury yet because I have another two sections of

20    people like this section that I need to go through,

21    but you are still in the mix, so to speak.

22              So the ones who are excused will be Juror

23    Number 2, Ms. Prentice; Juror Number 4, Ms. Cortez;

24    Juror Number 8, Ms. Archuleta; Juror Number 9,

25    Ms. Sanchez; Juror Number 10, Ms. Schall;
```

1    Juror Number 11, Mr. Schroeder; Juror Number 13,

2    Ms. Torres-Vazquez, you're also excused.  Juror

3    Number 14, Mr. Bowen; Juror Number, or Panel Member

4    Number 15, Mr. Wilhite; Number 17, Ms. Martin;

5    Number 18, Mr. Johnson; Number 19, Ms. Aguilar;

6    number 20, Ms. Thomas; Number 21, Ms. Aranda;

7    Number 22, Mr. Phillips.

8             So the ones who shall remain are Number 1;

9    Number 3; Number 5; Number 6; Number 7; Number 12;

10   and Number 16.

11            Okay.  So those of you who I have excused,

12   you may leave the courtroom.  I thank you very much

13   for your participation today.

14            (Whereupon excused jury panel members

15   exited the courtroom.)

16            THE COURT:  Please be seated for just a

17   moment.  Yvonne is in the process of handing out the

18   instructions.  Let me just say to you that what we

19   will do is we will have you come here tomorrow

20   morning at 9:00.  You will wait in the courtroom

21   across the hall where you were a moment ago.

22            And I am going to -- so I am going to meet

23   with another group at 1:30, much like you-all.  If

24   necessary, then I will meet with another group

25   tomorrow morning at 9:00.

1          Now, my, if we don't have to use all of

2   the -- if we don't need any additional jurors after

3   we're done this afternoon, which would mean we don't

4   have to meet with a third group tomorrow morning, my

5   plan would be to begin the opening statements

6   tomorrow morning at 9:00.  Of course, we don't know

7   that yet because we don't have a jury assembled at

8   this point.

9          So tomorrow morning we will require some

10  patience on your part because if we do have to have

11  another session like this, chances are it could be

12  several hours before we know whether you are on the

13  jury or not.  So be patient with us.  Bring

14  something to keep yourselves busy, and thank you for

15  your participation so far in this selection process.

16          We will see you tomorrow.

17          We'll be in recess.

18          (A recess was taken.)

19          (Whereupon the following proceedings were

20  held in Open Court.)

21          (Whereupon the jury panel enters the

22  courtroom.)

23          THE COURT:  Please be seated.  Good

24  afternoon to everyone.  We are on the record in the

25  case of United States of America versus Douglas D.

1    Smith.   Case Number is 18-CR-3495.

2            Good afternoon to all of you.  Welcome to

3    the courthouse today.  We are here today to select a

4    jury in a criminal case.  This is a criminal case.

5    The case is expected to take four to five days,

6    conclude Thursday or Friday of this week, and so we

7    are going to go through the jury selection process.

8            This part of the proceeding is called voir

9    dire.  What we do here is we, I, the Court and the

10   attorneys will ask you-all a number of questions.

11   The idea being that we will assemble a jury to hear

12   the case and I will tell you a little bit more about

13   the case in just a moment.

14           But the Constitution, as you all know,

15   guarantees a right to a jury in matters of law, a

16   jury trial, and our system of justice depends on the

17   willingness of people like you, citizens, to come in

18   and participate in the jury process.

19           So I want you to know, first of all, that

20   we all appreciate you being here.  We all know that

21   you have other things going on in your lives, so the

22   fact that you are here today participating in this

23   process, it means a lot to all of us.

24           I know that most of you will not have a

25   chance to serve in the judiciary, but if you were

1    selected as jurors in this case, you will be judges.

2    You will be judges of the facts in the case.  So I

3    am hoping if you are selected, even if you are not

4    selected to participate in this process today, I am

5    hopeful that you find it to be educational and

6    interesting.  If you are selected for the case, I do

7    hope you find it to be a meaningful experience.

8          So my role is the Judge, I've heard other

9    Judges at times refer to, I guess I would say make a

10   comparison to a role of a Judge in a trial much like

11   a traffic officer who tries to keep the traffic

12   flowing.  My job is to try to keep the trial flowing

13   smoothly.  And so while I don't issue citations for

14   traffic violations, I can certainly make sure that

15   the Rules of Evidence are followed in this case much

16   as an officer might follow the, make sure the rules

17   of the road are followed.

18         So what I will do first is again introduce

19   myself.  My name is Judith Herrera.  I have been a

20   Judge here in the District of New Mexico for about

21   17 years, and I will be presiding over this trial.

22         I am going to introduce my other court

23   staff and then I am going to ask you-all if you know

24   any of us, me or the court staff.  So I will start

25   at my right.

1              My court reporter, his name is Paul Baca.

2     He has been a court reporter in the Federal system

3     for a number of years, longer than I have been a

4     Judge, so he is very good at his job.  He takes down

5     everything that is said in the courtroom and he

6     makes the official record of any proceedings in my

7     courtroom but he will do the same in this case.

8              Next is my law clerk.  Her name is

9     Virginia Loman.  Virginia is a lawyer who helps me

10    research legal issues.  She, if you are selected for

11    the jury, you will be seeing jury instructions,

12    instructions on the law that the Court will give at

13    the end of the case, and Virginia is the lawyer who

14    helps me put together the final instructions to the

15    jury.

16             Next on my far left is my courtroom

17    deputy.  Her name is Yvonne Romero.  She is the

18    person who manages my court schedule, so she manages

19    my cases.  In this case, it is a criminal case and

20    so she is the one who makes sure you-all are

21    summoned here and she makes sure everything runs

22    smoothly.

23             So if you are selected as a juror in this

24    case, you will see a lot of Yvonne.  She is the one

25    who takes roll and answers everybody's questions and

1    so she will be very helpful to anybody who is

2    selected as a juror in this case.

3            So what we are going to do this afternoon

4    is I am going to ask you-all a series of questions

5    and then I am going to give the lawyers an

6    opportunity to ask questions.  As I said before,

7    this part is called voir dire.  And the purpose of

8    voir dire is to enable the Court and the attorneys

9    to match jurors to cases that they maybe well-suited

10   for.

11           We all go through life experiencing

12   things.  We all have different experiences, and so

13   all of our experiences shape our opinions.  So all

14   of us develop likes and dislikes.  We all develop

15   things that we may feel we have a bias in favor of

16   something or a bias against something.  So this is

17   human nature.  Everybody develops likes and dislikes

18   so if it may turn out that a juror would be

19   well-suited for a particular case, you know, we need

20   to know that or if there is some life experience or

21   some relationship or relationship, you know a police

22   officer or anything, anything that might make it

23   more difficult for you to be a juror in a particular

24   case, then these are the things that we need to

25   know.  So that is the purpose of this.

         1              It doesn't mean anybody is a bad person if
         2    they are not suited for a particular case, it just
         3    means that given your life experience maybe this
         4    isn't the case for you.  So an example I can give
         5    you, this is just a sheer example.  Let's say, for
         6    example, that this was a bank robbery case.  And
         7    let's just say that you worked as a bank teller and
         8    you happened to be at work when your bank was
         9    robbed.  Well, you might not be the best juror for a
        10    bank robbery case because your personal experience
        11    might come to play if you were selected as a juror
        12    in the case.  So that is the reason we need to ask
        13    questions.  It is not to pry, it is not to embarrass
        14    anybody, it is just that there are issues that are
        15    involved in any case and so we just need to know
        16    that jurors are well-suited for the case.
        17              So I will be asking a number of questions.
        18    I am trying to avoid the microphones only because it
        19    moves things along a little bit quicker.  You will
        20    notice that there are microphones at the front of
        21    your area.  And if I have a hard time hearing any of
        22    you, I might ask you to go to the microphone.  But
        23    the way I do it is I will ask a number of questions.
        24    Typically people will raise their hand if they have
        25    an answer to my question and then when I call on

1    you, I would ask you to stand and give us your name

2    and then answer the question.

3            Again, if we can do it without having to

4    go to the microphone, we will give it a try.  But

5    try to remember to speak loudly so we can hear

6    everyone.

7            Now, if any of you have an answer to my

8    question that concerns a matter that you consider to

9    be private or embarrassing, then ask if you can talk

10   to us in a more private setting.  Now private

11   doesn't mean completely private, it means that what

12   I would do is I would wait until the end of all the

13   questioning and then I would have, I would bring the

14   juror who has something to say into the courtroom

15   one at a time, but all the rest of us will still be

16   here.  So you would still be speaking to the

17   attorneys, the court reporter would be taking

18   everything down.  So it is a more private setting

19   but not really private.  I want to alert you to

20   that.  But if you need to say something that you

21   think is a little more private, we are happy to

22   accommodate you.

23           I should say that it is important that

24   everybody in the panel remain in the courtroom while

25   we are doing these questions.  If anybody needs a

 1    break for any reason, raise your hand and let me

 2    know that you need a break.  I will be happy to give

 3    you a break, but don't just get up and leave the

 4    room, because it is important that everybody be here

 5    to hear every question and every answer.  So I want

 6    all of you to hear each other's answers as well.

 7            Now, I understand everybody was sworn in

 8    before you came into the courtroom, so you-all are

 9    sworn and we don't need to swear you in again.

10            So let me tell you just a little bit about

11    the case.  Well, first of all, I did say that this

12    case was going to take four to five days, basically

13    the rest of this week.  I expect that we will start

14    the case tomorrow.  Because of this pandemic, as you

15    can see, you are seated, you're spaced apart.  Well,

16    that means that I can't pick a jury the way I

17    normally would, which normally would be 60 people

18    seated in the gallery and we would go through the

19    jury selection process in that manner.

20            But because of all the pandemic

21    precautions that we are required to take, you have

22    to be socially distanced and so I can't do it the

23    way I normally do.  So I had to break it up into

24    three groups.  So if by some chance after I finish

25    with you-all if by some chance I have enough people

1    to impanel the jury then we can start the trial

2    first thing in the morning.  But if I don't have

3    enough I will be doing another session like this

4    with another group of people tomorrow morning, which

5    means we wouldn't begin the trial probably until

6    after lunch together.  So it will be tomorrow, I

7    just don't know whether we will start the case in

8    the morning or in the afternoon.  But in any event I

9    believe we should be done with the case this week.

10            So does that schedule present a problem to

11   anybody?

12           All right.  So scheduling I don't see

13   anybody in the jury box.  We will go to the back.

14   Let's start with the front row.  Is that Ms. Nieto?

15           POTENTIAL JUROR:  Yes.  My name is Teresa

16   Nieto, and the reason why I am not able to attend or

17   be selected for a jury, my place of employment, I

18   work for the Albuquerque Public Schools.  I am a

19   night custodian, and I need to lock up the facility.

20           THE COURT:  Ms. Nieto, is there anybody

21   who could cover for you if you were selected to

22   serve?

23           POTENTIAL JUROR:  No, ma'am.  There is

24   only two of us in the facility.  I have a head

25   custodian and I, and I am the one that locks up the

1  facility.

2         THE COURT:  I saw another hand in the

3  front row.  Is it Mr. Mardo.

4         POTENTIAL JUROR:  Yes, Your Honor, David

5  Mardo.  I have been asked to accompany some youth on

6  a church camp that begins Wednesday and will not be

7  over until Saturday.

8         THE COURT:  And what is your role in the

9  church camp?

10        POTENTIAL JUROR:  I will be chaperoning

11  some youth.

12        THE COURT:  Now if you were selected in

13  this case, is there someone who could step in for

14  you?

15        POTENTIAL JUROR:  If I am selected I

16  imagine they could find someone.

17        THE COURT:  Thank you, Mr. Mardo.  Right

18  behind Mr. Mardo.

19        POTENTIAL JUROR:  My name is Victoria

20  Bautista, and I am not able to attend because I will

21  be attending a funeral tomorrow.

22        THE COURT:  A funeral.

23        POTENTIAL JUROR:  Yes.

24        THE COURT:  Thank you.  That is fine.

25  Anybody else in that section to my right that has a

1    scheduling issue this week?

2            All right.  Let's go across the aisle.

3    Anybody on your right side, my left side that has a

4    conflict, in the way back?

5            POTENTIAL JUROR:  My name is Anthony

6    Montes and my son has a doctor's appointment on

7    Wednesday.

8            THE COURT:  Now is there anyone else who

9    can --

10           POTENTIAL JUROR:  No, ma'am.  I am a

11   single dad.  I ain't got nobody at home.

12           THE COURT:  One more question.  Is there

13   any way that the appointment could be rescheduled?

14           POTENTIAL JUROR:  No, ma'am.  I have been

15   waiting for a while with COVID and stuff.

16           THE COURT:  Thank you, Mr. Montes.

17           Anybody else with scheduling issues?

18           THE COURT:  All right.  I don't see

19   anybody else with issues.

20           So this is a criminal case and the

21   Government has charged the defendant, Mr. Douglas

22   Smith, as follows:  The Grand Jury charges on or

23   about May 5, 2018 in Indian Country in Rio Arriba

24   County, in the District of New Mexico, the defendant

25   Douglas D. Smith, a non-Indian unlawfully killed

1    Jane Doe, an Indian, with malice aforethought.

2             Now, that is the Indictment.  I want to

3    let you know that an Indictment is not a conviction.

4    An Indictment is not evidence.  The Indictment is

5    the charge, the charge brought by the Government.

6    So my question to you, is there anybody here who

7    just by virtue of the Indictment believes that the

8    defendant must be guilty?  And there are no hands

9    raised, okay.

10            Next, I will introduce the defendant to

11   you, the defendant, Douglas Smith.  If you would

12   stand, please, Mr. Smith.

13            Is there anybody on the jury panel who

14   knows Mr. Smith?

15            I see no hands.

16            You may take your seat, Mr. Smith.

17            I will introduce the others at the table

18   in just a moment.  But let me ask you, I am going to

19   want to know whether any of you have heard anything

20   about this case.  So you heard the Indictment.  What

21   I will tell you, to just help jog your memory in

22   case you might have heard something about this case,

23   this is something that occurred in or near the City

24   of Espanola.  It was at a motel the defendant

25   resided at called the Western Winds Motel on

1    Riverside Drive in Espanola, New Mexico.

2         So having heard all of this, does anybody

3    recall hearing anything about this case?  And,

4    again, it was on or about May 5, 2018.

5         I see no hands.

6         So next I will introduce the people at

7    counsel table.  The Government is represented by

8    prosecutors, and the acting United States Attorney,

9    his name a Fred Federici.  He is not present in the

10   courtroom, but he is in charge of the office.  And

11   the case is actually being prosecuted by two

12   Assistant United States Attorneys.  One is Novalene

13   Wilson.  Does anybody know Novalene Wilson?

14        And next to her is Kyle Nayback.  Does

15   anybody know Kyle Nayback?

16        I did mention Fred Federici as the acting

17   U.S. Attorney.  Does anybody know Mr. Federici?

18        No hands.

19        Also with the prosecutors at the table is

20   FBI Agent Travis Taylor.  Does anybody know

21   Mr. Taylor?

22        Let's turn to the defense side of the

23   room.  Mr. Smith is represented by attorney Aric

24   Elsenheimer.  Does anybody know Mr. Elsenheimer?

25        All right.  Also helping him is Attorney

1    Amanda Lavin.  Anybody know Ms. Lavin?  No?

2              And Mr. Dan Berg.  Anybody know Mr. Berg?

3              All right.  Thank you.  Next, I want to

4    know whether any of you know any of the potential

5    witnesses in this case.  So what I will do next is

6    ask the attorneys to tell you-all who their

7    potential witnesses may be.

8              And, Ms. Wilson, if you could go slowly so

9    that if anybody recognizes a name, they will have

10   time to raise their hand before you move on to the

11   next name.

12             MS. WILSON:  First Espanola Police

13   Department Detective Byron Abeyta; FBI Photographer,

14   Tammy Peter; OMI Field Deputy Medical Investigator

15   Lynne Gudes, gudes with a G; Dr. Matthew Cain; FBI

16   Special Agent Bryan Acee; FBI Physical Scientist and

17   Forensic Examiner Theodore Chavez; FBI Photographer

18   Nathan Schwabedissen; Geraldine Gutierrez; Derrick

19   De La Cruz; and Daniel Smith.

20             THE COURT:  There were no hands raised.

21   Thank you.

22             Mr. Elsenheimer, can you let the jury know

23   who your potential witnesses may be.

24             MR. ELSENHEIMER:  Certainly, Your Honor.

25             Good afternoon.  Does anyone know Ercilia

1    Trujillo?

2              Does anyone know Corina Titus?

3              Judy Wheat, Billie Wheat, and lastly

4    Espanola Police Officer Albert Rael.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.  Again, I saw no

7    hands go up.

8              Now, next I want to ask you a number of

9    questions that bear on some of the facts that may or

10   may not come out in this case.  It is important that

11   I know and the attorneys know how you feel about

12   certain things.

13             So I told you what the charge is.  Now

14   there may be evidence that the defendant was

15   awakened at 1:00 in the morning and believed there

16   was a trespasser on his property and fired his gun

17   to scare the trespasser away.

18             So with all of those facts and, again, you

19   have not heard any evidence.  So you are not to make

20   any decisions about guilt or innocence at this

21   point.  You have heard no evidence because my

22   question for you, and I am just going to ask for a

23   show of hands at this point.  Do any of you own

24   guns?  Just a show of hands if you own guns.  So I

25   see a few hands, all right.

1           Now, again you have not heard any
2   evidence.  You have not heard any testimony at all,
3   but just based on what you have heard so far, do any
4   of you have any strong feelings yet that you want to
5   bring to the Court's attention, whether it is
6   pro-Government, anti-Government, pro-defendant,
7   anti-defendant?  I may ask you that question again
8   later, but just based on what you have heard so far.
9   It looks like nothing has raised any flags that you
10  want to bring to our are attention.
11          Now, have any of you or any member of your
12  family or close friends ever been employed by a law
13  enforcement agency?  And when I say law enforcement
14  agency, I mean anything, police, sheriff, FBI, any
15  kind of agency.  And if you have any question at all
16  in your mind, let us know and we will let you know
17  whether or not this is what I am considering to be a
18  law enforcement agency.  I saw several hands.
19          Ms. Romero.
20          POTENTIAL JUROR:  My husband is a police
21  officer for 20 years.  He is Chief of Police in
22  Bernalillo and SID and Academy.
23          THE COURT:  All right.  So you, did you
24  say he is retired?
25          POTENTIAL JUROR:  Just now, yeah.

1          THE COURT:  Okay.  All right.  So is it

2   fair to say that you know a number of other people

3   who are also involved in law enforcement?

4          POTENTIAL JUROR:  Yes.

5          THE COURT:  Let me ask you, Ms. Romero, if

6   you were selected as a juror in this case, do you

7   think you would tend to favor the law enforcement

8   side of the case over the defense side or do you

9   think you can be completely neutral and fair and

10  impartial?

11         POTENTIAL JUROR:  I think I can be

12  impartial.

13         THE COURT:  Well, you say, "I think."

14         POTENTIAL JUROR:  I don't know, you know,

15  circumstances, how do you know?  It is like I can't

16  make a decision now because I haven't heard the

17  case.  I was with a law enforcement person for

18  40 years.

19         THE COURT:  Let me ask you this:  If you

20  listened to the case and you decided that the

21  Government had not met its burden of proof beyond a

22  reasonable doubt, do you think you would have any

23  difficulty finding in favor of the defendant,

24  finding the defendant not guilty?

25         POTENTIAL JUROR:  No, I don't think I

1  would have a problem.

2          THE COURT:  All right.  Would you have any

3  concern about facing your husband and his friends?

4          POTENTIAL JUROR:  No.

5          THE COURT:  All right, okay.  Thank you,

6  Ms. Romero.  And I saw another hand.  Is that

7  Ms. Nieto?

8          POTENTIAL JUROR:  Yes, Your Honor.  My

9  cousin, she was with the Sheriff's Department, but

10 she is no longer with us.

11         THE COURT:  Okay.  So is there anything

12 about her experience in law enforcement that you

13 think might affect you or impact your decisions?

14         POTENTIAL JUROR:  No.  No, ma'am.

15         THE COURT:  All right.  Thank you,

16 Ms. Nieto.

17         And next I will hear from, is it

18 Mr. Trujillo?

19         POTENTIAL JUROR:  Yes.  My girlfriend and

20 friend for a long time, for about ten years.

21         THE COURT:  I am having a little trouble

22 hearing you.

23         POTENTIAL JUROR:  Girlfriend and a friend

24 who was a police officer for ten years.

25         THE COURT:  Okay.  Which agency?

1          POTENTIAL JUROR:  UNM PD.

2          THE COURT:  And so you heard my previous

3     questions.  Is there anything about your friendship

4     with these people that you think could have any

5     impact at all on your decision-making in this case?

6          POTENTIAL JUROR:  Impartial.  The same,

7     impartial.

8          THE COURT:  Impartial.  Okay.  Thank you.

9     And in the back, Mr. Kistler.

10         POTENTIAL JUROR:  Jesse Kistler.  I have a

11    very close friend, he is with Scottsdale Sheriff's

12    Department out of Nebraska, so not even anywhere

13    close to this area.  And, no, I will be completely

14    impartial.

15         THE COURT:  All right.  You could be fair

16    to both sides?

17         POTENTIAL JUROR:  Yes.

18         THE COURT:  Thank you, Mr. Kistler.

19         Anybody else in that section of the

20    courtroom?

21         Let me go across the hall.  I will start

22    on the far end is, it Mr. Blue-Sky.

23         POTENTIAL JUROR:  Yeah, that is me.  My

24    dad was a State Police Officer for 25-plus years.

25    He just retired last year.

```
 1              THE COURT:  All right.  And so tell me
 2    what you think if you were selected in this case, do
 3    you think you would be influenced at all by the fact
 4    that your father was a State Police Officer for so
 5    many years?
 6              POTENTIAL JUROR:  No, not at all.
 7              THE COURT:  All right.  If you thought the
 8    Government had not met its burden of proof, you
 9    could go visit your dad and tell him you voted not
10    guilty on a criminal case?
11              POTENTIAL JUROR:  Yeah.
12              THE COURT:  You would be able to do that?
13              POTENTIAL JUROR:  Yeah.
14              THE COURT:  Very good.  Thank you,
15    Mr. Blue-Sky.
16              And then going to Mr. Rivera.
17              POTENTIAL JUROR:  Yes, Your Honor.  I
18    represented police officers in the past as a lawyer,
19    so --
20              THE COURT:  All right.  You are an
21    attorney here in Albuquerque?
22              POTENTIAL JUROR:  Very recently, yes.
23              THE COURT:  Congratulations.  So you
24    represented law enforcement?
25              POTENTIAL JUROR:  Yes, State Police
```

1   Officers.

2           THE COURT:  I got to ask you the same

3   questions.  If you were selected as a juror in this

4   case having represented police officers do you think

5   your sympathies would lie with police officers?

6           POTENTIAL JUROR:  No.

7           THE COURT:  All right.  You could evaluate

8   both sides of the case fairly?

9           POTENTIAL JUROR:  Yes, Your Honor.

10          THE COURT:  And render a decision even if

11  you felt the evidence supported it in favor of the

12  defendant?

13          POTENTIAL JUROR:  Yes, Your Honor.

14          THE COURT:  Thank you, Mr. Rivera.

15          Anybody else in the far back?

16          Hold on.  I am having difficulty hearing

17  you.  I know you have your mask on, so maybe you

18  should go to the microphone or try it without, go

19  ahead.

20          POTENTIAL JUROR:  My name is Lisa Finch

21  and my sister and her husband are both New York City

22  Police Officers.

23          THE COURT:  All right.  So the same

24  questions, do you think you would be influenced at

25  all by the fact that you have family members who are

1   in law enforcement?

2          POTENTIAL JUROR:  No, ma'am.

3          THE COURT:  All right.  And again you

4   could be fair to both sides?

5          POTENTIAL JUROR:  Yes, ma'am.

6          THE COURT:  Thank you, Ms. Finch.

7          Is there anyone else who either yourselves

8   or your family members or close friends have worked

9   in law enforcement?

10         Have any of you ever been involved in a

11  criminal matter in any court that concerned either

12  yourself or members of your family or a close friend

13  as a defendant or a witness or a victim?

14         So have any of you had any involvement in

15  any criminal case?  And let's go to, is it

16  Ms. Black?

17         POTENTIAL JUROR:  Yes, Your Honor,

18  Ms. Black.  My homeless daughter was charged with a

19  Federal in the state of Arizona.

20         THE COURT:  Charged, did you say Federal?

21         POTENTIAL JUROR:  Yes.

22         THE COURT:  And how far along in the

23  process is your daughter's case?

24         POTENTIAL JUROR:  It was -- she did her

25  time.  She did 30 days.  It was back in March, April

1    of 2020.

2              THE COURT:  Okay.  What was she charged

3    with?

4              POTENTIAL JUROR:  I believe it was with

5    the Border Patrol.  She helped bring immigrants

6    over.

7              THE COURT:  I see.  Okay.  Was there

8    anything about your daughter's situation that struck

9    you as unfair, wrong, anything at all about that

10   process that bothered you?

11             POTENTIAL JUROR:  Just, I guess when she

12   was profiled.

13             THE COURT:  Profiled.  All right.  Let me

14   ask you this:  Now this case has nothing to do with

15   border-type issues.  Do you think if you were

16   selected as a juror in this case that your

17   daughter's situation would play any role in your

18   thinking?

19             POTENTIAL JUROR:  No.

20             THE COURT:  You think you could put all of

21   that aside and evaluate this case based on the

22   evidence that is presented here?

23             POTENTIAL JUROR:  Yes.

24             THE COURT:  Okay.  And be fair to both

25   sides of the case?

1          POTENTIAL JUROR:  Yes.

2          THE COURT:  Okay.  Thank you, Ms. Black.

3          Anybody else in the back corner?

4          POTENTIAL JUROR:  Kara Komula.

5          THE COURT:  All right.  Thank you.  And

6     what happened here?

7          POTENTIAL JUROR:  So the case never went

8     to trial, but an individual struck my car, so I was

9     a victim in this case.  And that is all that

10    happened.  We didn't end up going to trial because

11    we settled out of court.

12         THE COURT:  Do you think that there is

13    anything about that experience that would weigh on

14    your mind if you were selected in this case?

15         POTENTIAL JUROR:  No.

16         THE COURT:  All right.  Thank you.

17         Anybody else?

18         I will ask next a question -- I just asked

19    about a criminal matter, a proceeding.  I am going

20    to ask you a little more general question.

21         Have any of you ever been a victim of a

22    crime?  Anybody been a victim of a crime?  One hand,

23    Ms. Reinhard.

24         POTENTIAL JUROR:  Yes.  Bridget Reinhard.

25    I was a victim of rape and sexual assault.

1          THE COURT:  Okay.  Sorry to hear that.

2     How long ago was this?

3          POTENTIAL JUROR:  About three years ago.

4          THE COURT:  And did, was there a criminal

5     charge filed against anybody, any prosecution?

6          POTENTIAL JUROR:  Unfortunately not.

7          THE COURT:  Was law enforcement called?

8          POTENTIAL JUROR:  It was after some time,

9     then I let the police know, but it took awhile

10    because it took awhile to process what had happened.

11         THE COURT:  So was there anything about

12    the way your case was handled that you disagreed

13    with or was it handled in a way that left you maybe

14    unhappy with law enforcement?

15         POTENTIAL JUROR:  No, Your Honor.

16         THE COURT:  Is there anything about your

17    situation that you think would weigh on you or have

18    any impact on you if you were selected in this case?

19         POTENTIAL JUROR:  I have since worked

20    through it, so I don't believe it would affect this

21    case.

22         THE COURT:  All right.  Thank you,

23    Ms. Reinhard.

24         Is there anyone else who has been a victim

25    of a crime?

1          Ms. Komula.

2          POTENTIAL JUROR:  So it was the same case

3    that I previously spoke of.

4          THE COURT:  Okay.  Thank you.

5          Ms. Romero.

6          POTENTIAL JUROR:  Katherine Romero.  I was

7    held up at gunpoint.  Nothing was ever done with it,

8    they never found the person.  I have no problem.

9          THE COURT:  No problem.

10          POTENTIAL JUROR:  With law enforcement or

11    the way they handled it.

12          THE COURT:  Okay.  So is there anything

13    about your personal situation, as you say, being

14    held up at gunpoint, is there anything about that,

15    that you think might weigh on you if you were a

16    juror in this case and this case involved the use of

17    a gun and someone shot?

18          POTENTIAL JUROR:  No, I don't believe I

19    would have a problem.

20          THE COURT:  All right.  Okay.  Thank you,

21    Ms. Romero.

22          Anybody else who has been the victim of a

23    crime?

24          Have any of you ever worked for an

25    attorney or a legal office, and I know we have an

1   attorney.

2           Ms. Finch, did you raise your hand and I

3   missed it?

4           POTENTIAL JUROR:  I wasn't sure about

5   residential burglary if that counts.

6           THE COURT:  It does.

7           So residential burglary and theft?

8           POTENTIAL JUROR:  Yes.

9           THE COURT:  Again, I have trouble hearing

10  you.  If you want to keep your mask on, you're

11  welcome to do so, but go to the microphone.

12          POTENTIAL JUROR:  Residential burglary and

13  theft from my home.

14          THE COURT:  All right.  Now were charges

15  ever filed in that case?

16          POTENTIAL JUROR:  I believe so but we were

17  kind of held back because the suspects had been in a

18  foot chase with the officers was what I heard later

19  on and they were charged for that more than they

20  were charged from my burglary because that is

21  obviously more important.

22          THE COURT:  Was there anything about the

23  way your case was handled that you were unhappy

24  about?

25          POTENTIAL JUROR:  No, the officers did

1    what they could do.

2              THE COURT:  All right.  It sounded to me

3    like you were not home when this happened.

4              POTENTIAL JUROR:  I wasn't home for the

5    beginning of it.  I did walk in on them and they got

6    away.

7              THE COURT:  So is there anything about

8    your situation that you think might have any impact

9    on you if you are listening to the evidence in this

10   case?

11             POTENTIAL JUROR:  No.

12             THE COURT:  Okay.  Thank you, Ms. Finch.

13             POTENTIAL JUROR:  My name is Joanne LeFrak

14   and I have also been burglarized.

15             THE COURT:  All right.  And were you home

16   during the burglary?

17             POTENTIAL JUROR:  No, I was not home.

18             THE COURT:  And were charges filed against

19   anybody?

20             POTENTIAL JUROR:  No, I just filed a

21   police report.

22             THE COURT:  All right.  Anything about

23   your situation that you think could have any impact

24   on you in this case?

25             POTENTIAL JUROR:  No.

```
 1                THE COURT:  You could be fair to both

 2    sides?

 3                POTENTIAL JUROR:  Yes.

 4                THE COURT:  Anybody else is the victim of

 5    any kind of crime?

 6                Have any of you ever worked for an

 7    attorney or in a legal office?  Now, I know you are

 8    an attorney, Mr. Rivera, so I know about you, but I

 9    see another hand.

10                Ms. Black.

11                POTENTIAL JUROR:  I worked for the child

12    support office.

13                THE COURT:  Okay.  Have you worked in

14    your -- does your job at child support lead to you

15    having any interactions with any kind of law

16    enforcement agencies?

17                POTENTIAL JUROR:  Just the person that

18    serves the service.

19                THE COURT:  Process servers?

20                Okay.  Again, I am assuming, you tell me

21    if I am wrong, that there is not anything about your

22    job working in a legal department that would cause

23    you to favor one side over the other?

24                POTENTIAL JUROR:  No.

25                THE COURT:  Okay.  Thank you, Ms. Black.
```

1          Have any of you or anyone close to you,

2     family member, friend, ever fired a shot to scare

3     off an intruder or an animal?  Any of you or any of

4     your friends, family members, anybody close to you.

5          One hand.

6          Ms. Nieto.

7          POTENTIAL JUROR:  Yes, my son-in-law he

8     does carry guns and that is his hobby.  But there

9     was a bunch of ground hogs at my mom's house so he

10    was trying to get rid of the ground hogs.

11         THE COURT:  Was any, as far as you know,

12    did he actually shoot any animals?

13         POTENTIAL JUROR:  No, not that I know of.

14    I know he goes hunting and stuff like that for like

15    turkeys and stuff like that.

16         THE COURT:  Thank you, Ms. Nieto.

17         Anyone else?  I see one more hand

18    Mr. Blue-Sky.

19         POTENTIAL JUROR:  My uncle back at the

20    Pueblo almost got attacked by a cougar, and I had to

21    fire a couple of rounds to scare him.  And he is

22    doing fine, though.

23         THE COURT:  Thank you, Mr. Blue-Sky.

24         Anybody else?  I don't see any other

25    hands.

1              Now a slightly different question.  Have

2    any of you or anyone close to you ever been shot at?

3              I do see one hand.

4              Mr. Trujillo.

5              POTENTIAL JUROR:  Yes, I got shot in the

6    face in a random shooting.

7              THE COURT:  A random shooting?

8              POTENTIAL JUROR:  Yeah, kids.

9              THE COURT:  Did you require medical

10   attention, I would assume.

11             POTENTIAL JUROR:  Yeah, absolutely.

12             THE COURT:  And were the shooters ever

13   caught?

14             POTENTIAL JUROR:  No.

15             THE COURT:  All right.  Now, having been

16   shot do you feel like your personal situation might

17   come into play somehow in this case if you were

18   selected as a juror?

19             POTENTIAL JUROR:  I don't think there was

20   any reason for them to shoot me.

21             THE COURT:  So it sounds like you are

22   saying that the --

23             POTENTIAL JUROR:  Yeah, possibly because I

24   don't feel like I should have been shot in that

25   scenario.

1          THE COURT:  Okay.  All right.  Thank you,

2     Mr. Trujillo.

3          Anybody else who has been shot at?

4          Now a couple of you have already answered

5     this question, at least in part, but the question

6     is, have any of you had any experience involving

7     either yourself or a family member or close friend

8     that relates to having a trespasser or an intruder

9     on your property.

10          Now some of you have already talked about

11     burglaries, so you don't have to tell me about that,

12     again.

13          I see one hand.  Ms. LeFrak.

14          POTENTIAL JUROR:  Joanne LeFrak.  There

15     have been trespassers on my property and I called

16     the police.  The trespassers left before the police

17     arrived.

18          THE COURT:  Are these trespassers that you

19     saw?

20          POTENTIAL JUROR:  No.  Somebody was

21     ringing by doorbell in a violent way in the middle

22     of the night.  I live alone and I called the police.

23          THE COURT:  Now is there anything, again,

24     the same question.  Anything about that experience

25     that you think might weigh into your decision-making

1    in this case if you were a juror?

2                POTENTIAL JUROR:  No.

3                THE COURT:  Okay.  Thank you, Ms. LeFrak.

4                Anyone else?

5                Ms. Reinhard.

6                POTENTIAL JUROR:  Yes, recently about a

7    month ago someone took my paper mail from my mailbox

8    and I saw it when I was far away.

9                THE COURT:  Did you have any reaction?

10               POTENTIAL JUROR:  First I thought it was

11   my neighbor's friend and then after that I realized

12   it was my mail and I just filed a report.

13               THE COURT:  Did anything come of it?

14               POTENTIAL JUROR:  Nothing came of it.

15               THE COURT:  All right.  Again, would that

16   weigh on you at all if you were selected here?

17               POTENTIAL JUROR:  It wouldn't weigh on me.

18               THE COURT:  All right.  Again, be fair to

19   both sides?

20               POTENTIAL JUROR:  Yes.

21               THE COURT:  Very good.  Thank you,

22   Ms. Reinhard.

23               Anyone else?

24               That reminds me actually, between the

25   Kleenex and the face mask.  I want to just say that

```
 1    our policy here is if you-all have been vaccinated
 2    and we all have been vaccinated, so if you have been
 3    vaccinated then, of course, I don't require you to
 4    wear a face mask.
 5              If you choose to, that is perfectly fine,
 6    but I want you to know that as long as you are
 7    vaccinated you don't need to wear a face mask.  And
 8    so when you see us without a face mask that is
 9    because we all have been vaccinated.
10              I want to mention a couple of things here.
11              Now, in any criminal case the Government
12    bears the burden of proof.  And the Government needs
13    to prove a defendant guilty beyond a reasonable
14    doubt.  And so I want to make sure that you-all
15    agree that it is the Government who bears the burden
16    of proof in a criminal case and not the defendant.
17              Does anybody here think that the defendant
18    needs to prove his innocence?
19              Okay, I see no hands.  So, again, the
20    Government bears the burden of proof beyond a
21    reasonable doubt.  And reasonable doubt does not
22    mean beyond all doubt.  It does not mean beyond a
23    shadow of a doubt.  It means beyond a reasonable
24    doubt, which basically means a doubt based on
25    reason, common sense, essentially.
```

1          So can everyone agree that the Government

2    has the burden of proof beyond a reasonable doubt

3    and not beyond all doubt or not beyond a shadow of a

4    doubt?  Does everybody agree with that?

5          I see no hands, so it looks like everybody

6    agrees.

7          Another important Constitutional right

8    that we all have is the Fifth Amendment right not to

9    testify at trial.  And if someone chooses to

10   exercise their right not to testify, there can be no

11   inference of guilt.  In other words, if a defendant

12   decides to exercise the Constitutional right not to

13   testify, we should not make any kind of assumption

14   or inference that that person must be guilty,

15   otherwise they would testify.

16         Does anybody disagree that the defendant

17   has the right not to testify?  Does anybody disagree

18   with that?

19         Does everyone agree that if a defendant

20   chooses not to testify that there should be no

21   thought that the defendant must be guilty?  Does

22   everybody agree with that?

23         All right.  I don't see any hands so let

24   me make sure everybody understands the question.  If

25   you agree that the defendant has the right not to

1   testify and that we do not assume or infer that he

2   must be guilty, if you agree with that, raise your

3   hand.

4           I can tell that I didn't ask a very good

5   question.  I am going to clarify.

6           POTENTIAL JUROR:  Can I clarify?

7           THE COURT:  Yes.

8           POTENTIAL JUROR:  You are saying if he

9   doesn't talk it doesn't mean that you get to lay the

10  blame on him, is that what you're saying?

11          THE COURT:  That is pretty much, yeah.

12          POTENTIAL JUROR:  So I agree with that.

13          THE COURT:  So do you agree that if

14  somebody chooses not to testify, do you agree that

15  we should not assume that he must be guilty?

16  Anybody?  Does anybody disagree with that raise your

17  hand if you think that somebody must be guilty if

18  they don't testify.

19          All right.  So got it.  All of you agree,

20  then, that a person who does not testify is not

21  assumed guilty.

22          I told you already that this case involves

23  a charge of second-degree murder, so some of the

24  evidence that is presented in this case maybe a bit

25  graphic.  Do any of you feel like you would have a

1  problem sitting as a juror in this case if it
2  involves viewing graphic visual evidence and hearing
3  graphic testimony?  Do any of you feel that you
4  couldn't do that?
5          All right.  I see no hands.
6          All right.  Let me ask if anybody needs a
7  break yet.  Anybody need a break?
8          I see two hands, so we will take a break.
9  Don't go too far, but feel free to stand up and
10 stretch your legs, walk outside a little bit, if you
11 feel you need to.  I mean outside the courtroom, not
12 outside the building.  Just a few minutes.  We will
13 be back soon.  Thank you.
14         (Whereupon the jury panel exits the
15 courtroom.)
16         (A recess was taken.)
17         (Whereupon the jury panel enters the
18 courtroom.)
19         THE COURT:  Please be seated.
20         I believe when we broke I was asking if
21 anybody would have any trouble with viewing graphic
22 evidence or listening to graphic testimony and
23 nobody raised their hand, but I want to make sure I
24 didn't overlook anybody.
25         I don't see any hands.

1          Have any of you ever served as a juror in

2    either a criminal or civil case, any jury

3    experience?

4          Mr. Rodriguez.

5          POTENTIAL JUROR:  Steve Rodriguez.  It was

6    a DUI case.

7          THE COURT:  And did the jury deliberate to

8    a decision?

9          POTENTIAL JUROR:  Yes.

10          THE COURT:  What was the result?

11          POTENTIAL JUROR:  Not guilty.

12          THE COURT:  Okay.  Which court was that

13    in?  Was that in Albuquerque?

14          POTENTIAL JUROR:  It was here.  I think it

15    was in metropolitan.

16          THE COURT:  Was there anything about your

17    experience as a juror, whether it was unpleasant or

18    fantastic, I mean, anything that you think would

19    spill over into this case and affect you one way or

20    the other if you were selected as a juror?

21          POTENTIAL JUROR:  No, ma'am.

22          THE COURT:  All right.  Thank you.

23          Anybody else have any prior jury service?

24          POTENTIAL JUROR:  Iliana Velasquez.  I

25    attended Metro Court for a DUI.

1          THE COURT:  And what was the result of
2    that trial?
3          POTENTIAL JUROR:  Guilty.
4          THE COURT:  And how long ago was your jury
5    duty?
6          POTENTIAL JUROR:  Maybe 2015.
7          THE COURT:  All right.  Was there anything
8    about your jury service in that case that bothered
9    you or affected you in any way that you think might
10    affect you here?
11          POTENTIAL JUROR:  No.
12          THE COURT:  All right.  Thank you,
13    Ms. Velasquez.
14          Anybody else have prior jury service?
15          Mr. Blue-Sky.
16          POTENTIAL JUROR:  I don't know if this
17    counts, I was here about a month ago but I wasn't
18    selected for the case.
19          THE COURT:  You were here in front of
20    another Judge?
21          POTENTIAL JUROR:  Yeah, it was a different
22    Judge.
23          THE COURT:  Was it also a criminal case?
24          POTENTIAL JUROR:  No, it wasn't.
25          THE COURT:  All right.  Thank you,

1    Mr. Blue-Sky.

2              Is it Mr. Mardo?

3              POTENTIAL JUROR:  Yes, a couple of times

4    locally in Tucumcari I have served on juries.  It's

5    been a few years, maybe a decade or two now, so I

6    don't remember particulars.  But one was a civil

7    case for a young man who had been killed riding his

8    motorcycle.  And that wasn't the case, but following

9    the family sued some of the local bars for damages

10   and we, as a jury, voted affirmative that they

11   needed to compensate the family.

12             And I thought I was the voice of reason in

13   that jury because they were asking for an insane

14   amount of money.  I didn't feel -- so there was a

15   little bit, it left a little bit of a sour feeling.

16             THE COURT:  Did you come away from that

17   experience feeling that the system had been fair?

18   How did you feel about it?  How would you describe

19   the reason for the sour taste in your mouth?

20             POTENTIAL JUROR:  Well, I was one alone

21   that felt that the jury as a group was deciding to

22   allot a whole bunch of money, millions of dollars to

23   this family.  I didn't feel that, though the parties

24   were guilty, that that was too much to suggest and

25   so I argued that quite a bit and it didn't make a

```
 1   difference.
 2           THE COURT:  Did you come away from that
 3   thinking, "I don't want to be on a jury anymore"?
 4           POTENTIAL JUROR:  No.
 5           THE COURT:  All right.  If you were
 6   selected here would that service --
 7           POTENTIAL JUROR:  Probably not, no.
 8           THE COURT:  It would not weigh on you at
 9   all?
10           POTENTIAL JUROR:  No.
11           THE COURT:  Anybody else with prior jury
12   service?
13           Do any of you have any kind of a personal
14   situation that would prevent you from concentrating
15   on what is going on in this case or remembering
16   testimony that you have heard?  When I say anything
17   going on in your personal lives, it could be
18   anything.  It could be work, for example, working
19   the night shift which we heard about.  It could be
20   taking medications that might affect your memory or
21   your ability to focus.  It could be some sort of a
22   worry, stressful situation in part of your life that
23   is going on that might interfere with your ability
24   to focus on this case.  Anything, is there anything
25   going on that you think would interfere with your
```

1    ability to focus on this case if you were selected

2    as a juror?

3              I see one hand.  Is it, Mr. Hayes?

4              POTENTIAL JUROR:  Yes.  I had a stroke

5    about three years ago and blood clots.  It has

6    messed up my shoulder and my brain, and I have a

7    hard time focusing a lot of times.

8              THE COURT:  All right.  So you have

9    trouble focusing and you have short term memory

10    issues?

11             POTENTIAL JUROR:  Yes, I remember stuff

12    50 years ago and I can't remember stuff yesterday.

13             THE COURT:  I have the same problem.

14             POTENTIAL JUROR:  I don't know if it is

15    age or the stroke.

16             THE COURT:  I am glad you have a good

17    attitude about it all.  Before you sit down, let me

18    ask you, I mean, you know your situation.  Is it

19    such that you think it could have an impact on your

20    ability to serve in this case?

21             POTENTIAL JUROR:  Yes.

22             THE COURT:  All right.  Thank you,

23    Mr. Hayes.

24             Anybody else?

25             Ms. Black.

1           POTENTIAL JUROR:  I don't have a condition

2    or anything, I just don't have a great memory.  I

3    will write notes that may be able to help, but I

4    can't recall a lot of things.

5           THE COURT:  Well, I don't know you, so I

6    am relying on you to tell me.  Is it the type of

7    situation where you think you can serve as a juror

8    if you are allowed to take notes?  You tell me.

9           POTENTIAL JUROR:  If I am allowed to take

10   notes, yeah, I am sure I can.

11          THE COURT:  All right.  Thank you,

12   Ms. Black.

13          And Ms. Reinhard.

14          POTENTIAL JUROR:  Yes, I am diagnosed with

15   ADHD, but I take the medication for it.  I was just

16   on that note and if I could take some notes because

17   that helps with my ability to be as present as I can

18   possibly be.

19          THE COURT:  I will allow anybody on the

20   jury who cares, who wishes, who wants to, to take

21   notes.

22          All right.  Thank you.  Anybody else?

23          Mr. Blue-Sky.

24          POTENTIAL JUROR:  Yes.  I am just worried

25   about work.  I am trying to put on as many hours as

1    I can.  I am going to be moving from Santa Fe to

2    Albuquerque in the next month.  I am worrying about

3    money right now.

4              THE COURT:  Where do you work?

5              POTENTIAL JUROR:  Over at Santa Fe in

6    Target.

7              THE COURT:  I should have guessed.

8              All right.  So you are putting in a lot of

9    hours?

10             POTENTIAL JUROR:  Yeah, trying to put as

11   much as I can so I could have as much money so I can

12   move down here.

13             THE COURT:  And when is it that you are

14   moving?

15             POTENTIAL JUROR:  It would be next month,

16   the end of July.

17             THE COURT:  All right.  Thank you,

18   Mr. Blue-Sky.

19             Anybody else?

20             At the end of the case, at the end of the

21   trial, I instruct the jury on the law that the jury

22   must follow.  You-all listen, the jury listens to

23   the testimony, reviews the exhibits and the jury

24   decides what the facts are.  You know, anytime there

25   are two sides in disputes, the jury decides what the

facts in the case are.  So as the judge of the

facts, you make that decision based on the law that

I, as the Judge on the case, will instruct you.  So

I give you instructions on the law that you need to

follow in your analysis of the facts.

So my question to you is, do you all feel

you can follow the law and the Court's instructions

to you even if you disagree with the law?  Can you

follow the law as the Court instructs you?  I am not

seeing anybody raise their hand in disagreement, so

everyone can follow the Court's instructions.

So having heard the questions that I have

asked you, does anything else come to mind, even if

it is something I did not ask you about, is there

anything that comes to your mind that would suggest

that you should, you could not sit as a juror on

this case and render a fair verdict based on the

evidence presented to you and follow the Court's

instructions?  Anything at all that comes to mind

that you might not be a fair and impartial juror in

this case?

I don't see any hands.  Let me doublecheck

my notes, I think I am about done.

So I am done with my questions.  What I am

going to do is I am going to give the attorneys a

1    little bit of time to ask you any follow-up

2    questions that they may have for you or ask you a

3    few other questions.

4            Before I turn the podium over to the

5    attorneys, let me talk to counsel for just a moment,

6    please, in our little corner over there.

7            (Whereupon a Bench discussion was held

8    outside the hearing of the jury.)

9            THE COURT:  So 15 minutes works?

10           MS. WILSON:  Yes.

11           THE COURT:  Anything, any new stuff that

12   we need to talk about?

13           MR. ELSENHEIMER:  There was one question

14   that you asked of the last panel that you didn't ask

15   of this panel.  I can't remember exactly how you

16   phrased it, given the facts that you discussed, is

17   there anybody who would be biased against the

18   prosecution.  And you also asked --

19           THE COURT:  I did ask that, didn't I, the

20   first time.

21           MR. ELSENHEIMER:  Yeah.

22           THE COURT:  Yes, I can do that.

23           MR. ELSENHEIMER:  And then maybe you asked

24   this, but maybe a question about medical background

25   and any medical issues that people might have.

```
 1            MS. LAVIN:  There are a few people that
 2   have not spoken up that indicate on their
 3   questionnaire indicating they didn't have the
 4   vaccines.
 5            THE COURT:  Are you saying that you want
 6   me to ask about the COVID issue specifically?
 7            MS. LAVIN:  If there is any medical issue
 8   that you can't participate.
 9            THE COURT:  I mean, I thought I basically
10   gave them an opportunity.
11            MR. NAYBACK:  You did a catchall.
12            MS. WILSON:  I don't think so.  I just
13   have a little bit of follow-up very similar to the
14   last time, so --
15            MR. ELSENHEIMER:  Are you going to ask the
16   question about bias?
17            THE COURT:  Yes, I will.
18            (Whereupon the following proceedings were
19   held in Open Court.)
20            THE COURT:  So before I turn it over to
21   the attorneys, let me make sure I am clear on one
22   thing.  You-all have heard, again, what I said to
23   you so far is not evidence.  I am doing my best to
24   try to just touch on some issues that may come up in
25   the case, so I want to get a read on how you feel
```

1    about some of these issues.

2         So even though what I have said today is

3    not evidence, based on what I have said, do any of

4    you feel like you have any feeling for or against

5    the Government because of the nature of the charge

6    and the information that I have discussed with you

7    here this afternoon?

8         Do any of you feel that you might be

9    biased against the Government?

10        I see no hands.

11        Now, I am going to ask you the flip side

12    of that question.  Again, based on what I have said

13    and the questions that I have asked you, do any of

14    you have any feeling for or against the defendant

15    based on the nature of the charge here?

16        Do any of you feel any kind of a bias

17    against the defendant based on these charges?

18        All right.  I see no hands.

19        With that, then, let me turn to the

20    Government first.

21        Ms. Wilson.

22        MS. WILSON:  Thank you, Your Honor.

23        Good afternoon.  My name is Novalene

24    Wilson, and with my colleague Mr. Kyle Nayback, we

25    will be responsible for presenting the evidence for

1    the charges against the defendant, Mr. Douglas

2    Smith.

3              And we have already talked a little bit

4    about this, but the Judge did ask who were gun

5    owners.  And just by show of hands, if I could have

6    those folks raise their hands again.  Thank you.

7              Of those folks who have owned guns,

8    presumably shotguns, are you familiar with what the

9    rules of gun safety are?  Great.  Anybody feel like

10   chiming up what you know of the rules of gun safety?

11             What is your experience with it?  Are you

12   familiar with what they are?  Do you know them?  You

13   know, never point your gun at something you are not

14   prepared to destroy, those kinds of things.  Do you

15   have any experience, feelings related to that?

16             Your juror number?

17             POTENTIAL JUROR:  I am Juror Number 30.  I

18   have taught the kids what to do, what not to do.

19   Shooting in a shooting range.  As I said before, my

20   husband has been a police officer for a long time.

21             MS. WILSON:  Thank you.  Anybody else?

22   Your juror number?

23             POTENTIAL JUROR:  29.

24             MS. WILSON:  29, yes.

25             POTENTIAL JUROR:  My husband owns a big

```
 1    amount of shotguns.  My husband owns a great amount
 2    of guns and we are fully armed in our house, but we
 3    also know at my house and he has taught me and
 4    everything that I need to know about guns not to
 5    point and everything.
 6              MS. WILSON:  Thank you.  Of those folks
 7    who are familiar with gun safety, anybody hear,
 8    Always be sure of your target and what is behind it.
 9    You have also heard that?  Anybody have any opinions
10    on that, that they would like to share with us.  Why
11    is that important?
12              Could I ask you, Mr. Mardo, I did see you
13    respond.  That rule, Always knowing your target and
14    what is behind it.  Why is that important?
15              POTENTIAL JUROR:  Because you could miss
16    the target and shoot something behind it or the
17    bullet could go through the target and hit something
18    behind it.
19              MS. WILSON:  Thank you.  If I could just
20    follow-up with you, Mr. Trujillo, Number 36.  I just
21    wanted to be sure, the Judge talked to you about
22    your experiences with being shot and I'm sorry to
23    hear that.  I just wanted to confirm that you could
24    be fair to both sides, both the defense and the
25    prosecution in this case?
```

1          POTENTIAL JUROR:  I guess knowing what you

2     guys told me so far, I kind of feel like I was shot,

3     I was in harms way, so I don't know.  I can't give

4     you a yes or a no on that.

5          MS. WILSON:  Knowing what you know, you

6     think it would be hard for you to be fair to both

7     sides or you think you could listen to the evidence

8     and then decide if you would be fair to both sides?

9          POTENTIAL JUROR:  It is a pretty traumatic

10    experience, so I don't know.

11         MS. WILSON:  One last follow-up question,

12    I know some of you talked about residential

13    burglary.  I am presuming that was in your home and

14    I believe you talked about that, Number 34,

15    Ms. LeFrak.

16         POTENTIAL JUROR:  Yes.

17         MS. WILSON:  Is that different than

18    somebody trespassing?  I am assuming that is

19    somebody that broke into your home?

20         POTENTIAL JUROR:  That has been two times

21    that they have been trespassed.  Once when my home

22    was burglarized, another time when somebody was

23    ringing my bell.  So it was different both times,

24    but I consider both a trespass.

25         MS. WILSON:  Both a trespass even though

1    in your house was a little bit different, would you

2    say that?

3              POTENTIAL JUROR:  Yeah, it is different

4    because some of my personal items were taken.

5              MS. WILSON:  With that experience, again,

6    you could be fair and impartial in this case?

7              POTENTIAL JUROR:  Not knowing the details

8    of the case, it is difficult to say, but I think if

9    there was someone like trespassing with the intent

10   to burglarize, I might not be able to be fair.  And

11   not knowing the details of this case, I don't know

12   if that is the case.

13             MS. WILSON:  But you would agree there is

14   a distinction between just trespassing and then

15   something more than that intruder based.

16             POTENTIAL JUROR:  Somebody who is just on

17   my property without an invitation that I don't know,

18   I do agree that that is different.

19             MS. WILSON:  Thank you for your time.

20             THE COURT:  Thank you, Ms. Wilson.

21             Mr. Elsenheimer.

22             MR. ELSENHEIMER:  Good afternoon, ladies

23   and gentlemen.  Again, my name is Aric Elsenheimer.

24   I represent Douglas Smith along with Amanda Lavin

25   and Daniel Berg.

1          First of all, thank you for taking the

2    time to talk with us this afternoon.  You know,

3    anytime after lunch I think the most civilized thing

4    to do is take a nap.  So I really appreciate your

5    being here and being alert and answering our

6    questions.

7          Second, thank you for your willingness to

8    serve as a juror.  Every individual in our country

9    who is charged with a crime is entitled to a jury

10   trial.  They are entitled to a presumption of

11   innocence and requiring the Government to prove

12   their case beyond a reasonable doubt.

13          I want to ask you a couple of questions

14   about that.  First I want to ask you about what voir

15   dire is itself.  We use the term voir dire.  Who

16   wants to raise a hand and tell me what voir dire

17   means?  I don't even know.  It is Latin, to be

18   perfectly honest, but what I think it means is it

19   means to tell the truth.  I think it means to tell

20   the truth.  So I first want to say anything, there

21   is no wrong answer.  So when we ask you if you used

22   the term bias, really that kind of has, sometimes

23   people have a negative feeling.  But really what we

24   are asking about is if this is the right jury, the

25   right trial for you to sit on as jurors.

 1              THE COURT:  I hate to interrupt you,

 2    Mr. Elsenheimer, but when you have your back to me I

 3    can't hear you as well, so can you speak into the

 4    microphone.

 5              MR. ELSENHEIMER:  Certainly, Your Honor.

 6    I'm sorry.  Just remind me if I stray.

 7              THE COURT:  I will.  Thank you.

 8              MR. ELSENHEIMER:  So I want to make sure

 9    you understand that.  There is no wrong answer.  So

10    if I am asking you, I don't want to ask your bias.

11    Really I want to ask you if because of your

12    experiences, what you have experienced in your life

13    or things that you have done or people that you

14    know, if there is some reason that this my not be

15    the right trial for you to sit on as a juror.

16              Mr. Blue-Sky, Juror Number 27?  Can I ask

17    you a really quick question?  You mentioned that you

18    have work commitments and you are currently working

19    in Santa Fe; is that right?

20              POTENTIAL JUROR:  Yes, that is correct.

21              MR. ELSENHEIMER:  You are trying to work a

22    lot to move to Albuquerque?

23              POTENTIAL JUROR:  Yeah.

24              MR. ELSENHEIMER:  So you are trying to put

25    in as many hours as possible.  So let me ask you, is

1  there any reason or is there anything about that

2  you're trying to work as much as you can that it

3  might not be a good time for you to serve as a

4  juror?  Like would you might not be focused as much

5  or not present or worried that the trial is going on

6  longer than you anticipated?

7  POTENTIAL JUROR:  Maybe just the trial

8  going longer than anticipated.

9  THE COURT:  I know Mr. Elsenheimer is not

10  very far away from you, so the natural inclination

11  is to not speak any louder than you need to.

12  MR. ELSENHEIMER:  Could you just repeat

13  what you told me?  I'm sorry about that.

14  POTENTIAL JUROR:  What did you ask again?

15  MR. ELSENHEIMER:  I was just wondering if

16  because of your concerns about, you're trying to

17  work as much as possible, if that might distract you

18  or you might get worried if it looked like the trial

19  was going to go longer than we had anticipated.

20  POTENTIAL JUROR:  It might be a little bit

21  distraction about how long the trial is going to be,

22  I am not sure.  I am just worried money-wise and

23  want to make sure that I have enough to support

24  myself to come down here.

25  MR. ELSENHEIMER:  Of course.  Do you think

1    if you were deliberating in the case and it looked

2    like the deliberations would take too long, might

3    you want to wrap those deliberations up so you can

4    get back to work?

5            Is that fair?

6            POTENTIAL JUROR:  No, I would weigh it

7    fairly.

8            MR. ELSENHEIMER:  That is all the

9    questions I have for you.  Thank you very much.

10            Let me ask you, several of you raised your

11    hand.  The question was whether or not you were gun

12    owners.  Let me ask a more general question.

13            A lot of people have strong opinions one

14    way or the other about gun ownership in this

15    country.  Will anyone hold it against Mr. Smith that

16    he owns firearms?  Is anybody concerned about their

17    feelings towards gun ownership or firearms that they

18    would hold that against Mr. Smith?

19            I want to apologize to the folks that are

20    over here.

21            I want to talk about the Government's

22    burden in a criminal case.  Mr. Smith is innocent

23    and he remains innocent unless and only if the

24    Government is able to prove their case beyond a

25    reasonable doubt.  And that means a number of

1    things.  One thing it means is that the defense has

2    to do nothing, it is entirely the Government's

3    burden.  It is their job to prove their case, and

4    they have to prove their case as to each element of

5    the charge against Mr. Smith.

6            Let me ask you about elements.  I am not

7    sure how many of you are familiar with criminal

8    cases, but we use the term elements.  And the way I

9    like to think of those, the term elements, every

10   criminal charge has a number of elements.  I like to

11   think of those as kind of ingredients in a recipe,

12   so I am going to be really simple.  If you are

13   making chocolate chip cookies, those chocolate chip

14   cookies have to have certain elements.  They have to

15   have, obviously, chocolate chips, right?  You will

16   have to have flour and sugar and I am going to lose

17   track of this because I don't actually know how to

18   make chocolate chip cookies.  But let say that, and

19   every element is important.  Baking soda.  Seemingly

20   insignificant, but vitally important to chocolate

21   chip cookies.

22           That is the same way with a criminal

23   charge.  The Government has to prove each and every

24   element.  And in this case you will see that there

25   are a number of elements the Government has to

1  prove.

2          I want to ask you, let's say that it is

3  seemingly an insignificant element to you.  You are

4  discussing it with the jury and you think it is not

5  the chocolate chip of the recipe, it is something

6  that is insignificant to your mind element.  You

7  think, well, I don't know, the Government hasn't

8  proven their case beyond a reasonable doubt.  In

9  that case what would your verdict be?  Let me ask

10  you, is it Ms. Christensen?

11          POTENTIAL JUROR:  Yes.

12          MR. ELSENHEIMER:  What would your verdict

13  be in that situation?

14          POTENTIAL JUROR:  If you didn't have all

15  of the ingredients, then you can't call it what you

16  are trying to make.

17          MR. ELSENHEIMER:  So what would your

18  verdict be?

19          POTENTIAL JUROR:  Can you grade it A or B,

20  or is it guilty or not guilty?  I mean, is that what

21  you're asking?

22          MR. ELSENHEIMER:  That is what I am

23  asking.  There's two options, guilty or not guilty.

24          POTENTIAL JUROR:  I don't know, I would

25  have to taste the cookie first to see.

1          MR. ELSENHEIMER:  The Judge is going to

2   instruct you that you have to find beyond a

3   reasonable doubt to each of those elements.

4          POTENTIAL JUROR:  If there is not a

5   reasonable doubt, then he can't be guilty.  So I

6   would say that, you know, if you don't have all the

7   ingredients you can't make the cookie, that means

8   you don't have the elements.  He is not guilty.

9          MR. ELSENHEIMER:  So you have a reasonable

10  doubt without one of the elements even if you think

11  it is insignificant, would you return a verdict of

12  not guilty?

13         POTENTIAL JUROR:  Probably.  If it is not

14  a clear case, you can't guess on somebody's life.

15  If it is something like that, you can't jump to

16  conclusions in that case.  It is supposed to be

17  this, but it is not, then, it is not.

18         MR. ELSENHEIMER:  Thank you,

19  Ms. Christensen.

20         Let me ask you this:  When you are

21  deliberating you will be with 11 other members of

22  the jury and you will be deliberating with them.  As

23  a juror, it is your decision as to whether or not

24  the Government has met their burden of proof beyond

25  a reasonable doubt.  What if you are in a situation

1    where you are convinced that the Government has not

2    met their burden of proof beyond a reasonable doubt

3    but all the 11 other people believe that the

4    Government has met their burden.  Would you be

5    swayed by those other 11 members of the jury?  Does

6    anybody have a concern that they would be swayed?

7    Is it Mr. Mardo?  I think you mentioned something

8    like this in a civil case, right?

9            POTENTIAL JUROR:  Right.

10           MR. ELSENHEIMER:  It seems like you were

11   kind of on one side and everybody else was on the

12   other.  What was that like for you?

13           POTENTIAL JUROR:  It was uncomfortable.  I

14   did ultimately just agree with the rest.  It was not

15   a matter of someone's life, so I didn't weigh it

16   like I would have in that situation.

17           MR. ELSENHEIMER:  So it is a different

18   type of case, so you are more flexible perhaps.

19   What if in a criminal case where the Government is

20   accusing somebody of murder, would you be more

21   committed to your position if you believed the

22   Government had not met their burden of proof beyond

23   a reasonable doubt?

24           POTENTIAL JUROR:  I believe so.

25           MR. ELSENHEIMER:  Would you have any

1   concern that you might be swayed?

2           POTENTIAL JUROR:  Yes, I believe so.

3           MR. ELSENHEIMER:  Does anybody else have a

4   concern that they might be swayed by those?

5   Ms. Herson, I saw you shaking your head.  Do you

6   mind if I call you?  What are your feelings about

7   that?

8           POTENTIAL JUROR:  I don't see that, I can

9   stand my ground.  I don't think that anybody can

10  force me to have a position at all.  That is at

11  least the way I feel.  I don't have, I can listen to

12  others what others have to say, but I can always

13  stick to what I have and stand to it.

14          MR. ELSENHEIMER:  Thank you, Ms. Herson.

15          THE COURT:  I wasn't sure if I heard you

16  correctly.  Did you say you could or could not stand

17  your ground.

18          POTENTIAL JUROR:  I could stand my ground.

19          THE COURT:  Okay.  Thank you.

20          MR. ELSENHEIMER:  Does anybody else have

21  any thoughts based on what we talked about, concerns

22  about holding the Government to their burden of

23  proof beyond a reasonable doubt?

24          Does anybody have any thoughts about that?

25  Is it Mr. Rivera?  What are your thoughts about

1    proof beyond a reasonable doubt?

2            What are your feelings about holding the

3    Government to their burden of proof beyond a

4    reasonable doubt?

5            POTENTIAL JUROR:  That is what is required

6    by law, that is what we were taught in law school.

7    So that is the standard.  A lot of times that is not

8    always the case.  In some criminal cases that is the

9    jury's job to make sure that that is the case and

10    sometimes when they fail that, that is when

11    injustice happens.

12            MR. ELSENHEIMER:  Thank you.

13            May I have just a moment, Your Honor?

14            THE COURT:  You may.

15            MR. ELSENHEIMER:  There is one other topic

16    I want to talk to you about.  In a criminal case

17    under the Constitution somebody like Mr. Smith who

18    is charged with a crime does not have to testify,

19    does not have to take the stand.  Literally does not

20    have to do anything.  I mean conceptually his

21    attorneys don't even have to do anything.  We will,

22    but Mr. Smith does not have to take the stand.

23            I know the Judge asked you this, but I

24    want to ask you a little bit more.  If you are

25    deliberating in this case and you are back in the

```
1    jury room and you are weighing what the Government
2    put on as evidence, will anybody want to hear from
3    Mr. Smith?  Will anybody say I wish that we had
4    heard from Mr. Smith.  And it is completely fine and
5    understandable if you think that, I just want to
6    find out if anybody has that feeling or that
7    thought.
8            Is it Ms. Heath over here?  What do you
9    think about that?
10           POTENTIAL JUROR:  Yeah, I would want to
11   hear from him after awhile if the elements
12   weren't -- if the elements didn't -- I don't know
13   how to put it -- together.  I would want to hear
14   from him himself to see his side of everything to
15   see what he has to say.
16           MR. ELSENHEIMER:  So let me make sure I
17   understand what you're saying.  If you didn't think
18   that the Government, or you thought that there was
19   questions about what the Government proved, in that
20   situation you would want to hear from Mr. Smith?
21           POTENTIAL JUROR:  Yes.
22           MR. ELSENHEIMER:  Okay.  Do you understand
23   that a criminal defendant has no obligation to take
24   the stand and that it is entirely the Government's
25   burden?
```

```
 1            POTENTIAL JUROR:  Yes.
 2            MR. ELSENHEIMER:  Would you, knowing that,
 3   would you still want to hear from Mr. Smith?
 4            POTENTIAL JUROR:  Yes.  It is not guilty
 5   until proven so, yeah, I would.
 6            MR. ELSENHEIMER:  You would want to hear
 7   from him?
 8            POTENTIAL JUROR:  Yeah.
 9            MR. ELSENHEIMER:  Would that affect your
10   evaluation of how you looked at the evidence?
11            POTENTIAL JUROR:  No.
12            MR. ELSENHEIMER:  Anybody else?
13            POTENTIAL JUROR:  Just a note on that.  I
14   believe that I would have a natural tendency to want
15   to speak with Mr. Smith.  I know well that my biases
16   would be influenced and I rather not for that
17   purpose of just allowing the Court to take place as
18   an actual witness.
19            MR. ELSENHEIMER:  Okay.  Anybody else,
20   anybody else have a similar thought to Ms. Heath?
21            Is it Ms. Romero?
22            POTENTIAL JUROR:  Are you not speaking for
23   him?
24            MR. ELSENHEIMER:  Yes, we certainly are.
25            POTENTIAL JUROR:  So you would present
```

1    what he may or may not want to say.  So you are

2    representing him.

3           MR. ELSENHEIMER:  Yes, that is a great

4    question.  So we are representing him and we will do

5    everything that we can do as his lawyers, but what I

6    am specifically asking about is a person's decision

7    to testify or to not testify.  And under our

8    Constitution someone has the right not to testify

9    and that decision cannot be held against them.

10           Does that make sense?

11           POTENTIAL JUROR:  I agree.

12           MR. ELSENHEIMER:  You agree with that.

13    And you wouldn't hold it against him if you were a

14    juror?

15           POTENTIAL JUROR:  No.

16           MR. ELSENHEIMER:  Thank you very much,

17    Ms. Romero.

18           Anyone else?  Any other thoughts on that?

19           Thank you very much for your time.  Thank

20    you.

21           THE COURT:  So ladies and gentlemen, we

22    are going to take a little bit of a break.  Yvonne

23    will escort you to the other courtroom and we will,

24    I will get together with the attorneys, we will make

25    some decisions about who of you may be excused or

1    who may return.  But in any event, we will get

2    together again in the courtroom before I excuse you

3    for the day.

4            So we will take a, hopefully, ten-minute

5    break, maybe 15.

6            Please rise for our jury panel.

7            (Whereupon the jury panel exits the

8    courtroom.)

9            (A recess was taken.)

10           (Open court, outside the presence of the

11   jury.)

12           THE COURT:  All right.  We are back on the

13   record.  At this time we will take up the challenges

14   for cause.  We will do it the same as we did last

15   time.  We will start with the Government and just

16   give us the name and we will figure out if there is

17   agreement and we will move on to the next.

18           MR. NAYBACK:  Juror Number 32, Theresa A.

19   Nieto for cause.

20           MR. ELSENHEIMER:  We agree.

21           THE COURT:  Nieto for cause.  That is the

22   night custodian?

23           MR. NAYBACK:  It is.

24           THE COURT:  Next.

25           MR. NAYBACK:  Juror Number 36, Johnny

1    Edward Trujillo.

2             MR. ELSENHEIMER:  We agree.

3             THE COURT:  Okay.  Excused.

4             MR. NAYBACK:  Juror Number 37, Victoria R.

5    Bautista.

6             MR. ELSENHEIMER:  We agree.

7             MR. NAYBACK:  Juror Number 40, Adrian

8    Montes.

9             MR. ELSENHEIMER:  We agree.

10            THE COURT:  Adrian Montes, that's the one

11   whose son has a doctor's appointment.

12            MR. NAYBACK:  Juror Number 43, Mark A.

13   Haynes stroke and memory issues.

14            MR. ELSENHEIMER:  We agree.

15            MR. NAYBACK:  Those are all for the

16   Government.

17            THE COURT:  So that is five strikes that

18   you-all agree are challenges for cause.

19            MR. NAYBACK:  Challenges for cause.

20            THE COURT:  All right.

21            MR. ELSENHEIMER:  The only other cause

22   challenge we have is for Juror Number 23, Calayla

23   Heath.  She said that if the elements weren't there

24   from the Government's proof she would need to hear

25   from the defendant, she would want to hear from the

1  defendant.

2        She was also -- I think worth pointing

3  out -- she seemed like she had her eyes closed or

4  she was sleeping for a lot of the voir dire.  I

5  don't know if there was a substantial part of it,

6  but there were a number of times we looked over and

7  she was eyes closed obviously.

8        THE COURT:  Mr. Nayback, do you agree?

9        MR. NAYBACK:  No.

10       THE COURT:  Okay.  Was there anything else

11  you wanted to say on that?

12       MR. ELSENHEIMER:  That's it.

13       THE COURT:  Your response, Mr. Nayback?

14       MR. NAYBACK:  My back is to her, Judge,

15  and I didn't do a good job of constantly turning

16  around, although I did a number of times.  But

17  certainly Ms. Heath didn't say she couldn't be fair.

18  And the exchange wasn't between the Court and

19  Ms. Heath, it was between Mr. Elsenheimer and

20  Ms. Heath.  I thought it was a little clumsy, no

21  fault of Mr. Elsenheimer's.  I think she was

22  confused and I don't think -- she is 19 years old.

23  I don't know if she is familiar with -- she was

24  following everything but it doesn't mean that she

25  couldn't be a good juror.  She didn't say she could

1    not be fair and impartial.

2             MR. ELSENHEIMER:  I agree, she was

3    confused.  I think she was confused because she was

4    sleeping for a lot of it.  And also she did say,

5    though, and I think she was paying attention when I

6    questioned about the elements, so it reflected that

7    she had absorbed that, but she did say reflecting

8    kind of a conscious acknowledgment, if I didn't hear

9    about the elements, I would want to hear from the

10   defendant.

11            THE COURT:  I thought that she was

12   confused.  I thought that the way the question was

13   framed it kind of lured her to that response because

14   the way I remember the question it was not -- I

15   don't have the question in front of me, but it was

16   kind of a casual question.  Say you are all back in

17   the jury room and you are talking about the case and

18   you are thinking, gee, I wish he had said, we had

19   heard from him and it is only natural that we would

20   want to hear from him.  The way you phrased it, it

21   kind of lured her to say that.

22            And I thought, so you said if the elements

23   weren't met would you want to hear from him and I

24   just thought she was really confused.  I felt like

25   she didn't know what to say.  She was trying, I

1    thought she was trying to say that she wouldn't hold

2    it against him, but I mean she was all over the

3    place.  But I thought she was kind of lured there.

4              MR. ELSENHEIMER:  Just in my defense, I

5    didn't lure.  The reason I asked that is because I

6    heard from a number of jurors who made a commitment

7    to not holding against the defendant in voir dire

8    and then after they deliberated they say I wanted to

9    hear, we wanted to hear from the defendant.  There

10   is an about face.  I certainly don't think I lured

11   her because --

12             THE COURT:  I just thought it was

13   confusing, that is all.  I am not saying that you

14   lured her --

15             MR. ELSENHEIMER:  My only point is that

16   the next person I asked gave the opposite answer.

17             THE COURT:  She raised her hand and

18   volunteered because I think she saw some confusion.

19   Anyway, anything else?

20             MR. NAYBACK:  Only that my recollection is

21   that she didn't say she would hold it against

22   Mr. Smith if he didn't testify, was her ultimate

23   answer.

24             THE COURT:  Well, if all I had was that

25   exchange, I am not sure that she said she would hold

1    it against Mr. Smith.  But she was pretty drowsy.

2    So I don't know, I thought she looked bored.  I

3    thought she looked like she wasn't really with it,

4    so I will excuse her for cause.  And I really don't

5    want to do that, but I feel like that is what needs

6    to happen.

7            Anything else, Mr. Elsenheimer?

8            MR. ELSENHEIMER:  That's it, Your Honor.

9            THE COURT:  All right.  So I am showing

10   six that will be excused for cause.  Juror

11   Number 23, or Panel Member Ms. Heath; Number 32,

12   Ms. Nieto; Number 36, Mr. Trujillo; Number 37,

13   Ms. Bautista; Number 40, Mr. Montes; and Number 43,

14   Mr. Haynes.  So where are we now?  What is our count

15   available panel members we have seven.  Everybody

16   come up with 23?

17           So we could do one of two things.  We can

18   come back tomorrow and take up the third panel

19   tomorrow morning or we can try to see if we can come

20   up with 14.  Now, I know you get ten peremptories I

21   know you get six peremptories.  And I thought it

22   might be worth a try if we do a blind exercise of

23   peremptories.

24           In other words, the defense would write

25   their list of ten peremptory challenges, the

1   Government would write up their list of six

2   peremptory challenges and I could just look at it

3   privately and see if we have, between the two lists,

4   come up with the 14 people to sit on the jury.  And

5   if we do not have 14 people, then we would come back

6   tomorrow and I would not necessarily share the list

7   with you unless you wanted me to share the list with

8   you because then everybody is back in play.

9           MR. NAYBACK:  Tomorrow do we get all our

10   peremptories back or are we stuck with the ones we

11   use today?

12           THE COURT:  Well, my thought was if we

13   have to go to a third, I mean, I am open to what you

14   all have to say so I should ask what you think

15   before I tell you what I think.

16           MR. NAYBACK:  I really like the idea.  In

17   our last trial we used two of our six peremptories,

18   so that is why I think it is a good idea.  But since

19   you are giving us six blind, we will use six blind

20   and I like the idea of trying it.  I think if I had

21   to guess, we would come up with 13.

22           MR. ELSENHEIMER:  Your Honor, I prefer

23   that we come back tomorrow.  The reason is because a

24   lot of our decision about exercising our peremptory

25   challenge is based on the panel farther down the

1  line.  We have 23 jurors right now, so how we

2  exercise peremptories in this context could be

3  dependent on who we have tomorrow available after we

4  have the panel tomorrow.

5          THE COURT:  I understand that if we have a

6  panel tomorrow, but I am saying let's try with the

7  panel we have.

8          MR. ELSENHEIMER:  But a large part of

9  exercising peremptories, for the defense, at least,

10  hearing from the Government what their exercise is

11  and then we make a decision based on that.

12          THE COURT:  I may do blind tomorrow, too.

13          MR. NAYBACK:  I think it is fair.  I think

14  it is constitutional.  I think the Court can simply

15  do it.  My only other question was so tomorrow we

16  are picking from three panels, aren't we, and then I

17  am just wondering then so you have not decided yet,

18  we may go blind tomorrow.  It has been since Tyrone

19  Coriz, I forget.  If we go tit for tat back and

20  forth.

21          THE COURT:  I have done that.  But on the

22  blind, I just take your list and I compare it and I

23  see who we lost and who is still there.

24          MR. NAYBACK:  I think that is completely

25  fair and that gives us a better chance of not having

1    to come back tomorrow and starting in the morning.

2    So that is the Government's position.  I hear where

3    Mr. Elsenheimer is coming from but I urge the Court

4    do what it is inclined to do.

5              THE COURT:  We could come back tomorrow

6    and have, you know, five people left.  If we only

7    add five to the 23 we already have, I am going to do

8    blind.  So I cannot tell you that if we hold on

9    until tomorrow we will do the exchange that you

10   described, Mr. Elsenheimer.  It could be blind

11   tomorrow as well.

12             MR. ELSENHEIMER:  So if we do kind of just

13   a trial run tonight and if it doesn't work out,

14   would we get our peremptories back tomorrow?  Do we

15   just start over with a blind slate tomorrow?

16             THE COURT:  Mr. Nayback was suggesting

17   that we not, I believe.  I feel that what I was

18   thinking was let's see if we can get a jury today

19   and not deal with the group tomorrow.  If we are

20   going to have to deal with the group tomorrow, then

21   I don't have a problem with scrapping whatever we do

22   tonight and then just start fresh.

23             MR. ELSENHEIMER:  So we will start fresh

24   tomorrow.

25             MR. NAYBACK:  But tomorrow might also

1    still be blind.

2              THE COURT:  It may still be blind.

3              MR. ELSENHEIMER:  Sure.  I just want to be

4    sure we are able to start on a blank slate tomorrow

5    if we come back.

6              THE COURT:  So we will give it a go

7    tonight and see if we can come up with a jury; is

8    that right?

9              You are going to give me a written list of

10   ten peremptories, you are going to give me a written

11   list of six.

12             If the result is we have 14 jurors, we're

13   done.

14             If the result is we don't have 14 jurors,

15   then we come back tomorrow and I will rip up the

16   list.

17             (A recess was taken.)

18             THE COURT:  Well, we tried but it didn't

19   work.  We didn't come close to getting a jury.

20   There was the overlap of maybe one, so we weren't

21   even close.

22             We will be back tomorrow morning.  The

23   panel will come back, but I will just tell you, we

24   are going to have to come back tomorrow morning and

25   voir dire the third group.

1          So I will have the panel come in and I
2     will excuse the ones that --
3          MR. NAYBACK:  Just for -- since we are
4     putting on witnesses, hopefully, tomorrow and just
5     to try to get them lined up so there is no delay, do
6     you have a sense of when we might start, like the
7     most conservative estimate before we might start
8     with opening statements and putting on evidence?  Is
9     it 11:00, is it 1 p.m., 2:00?  I know it depends,
10    there are a lot of variables.
11         THE COURT:  I am shooting for having a
12    jury seated by noon tomorrow or 12:30, but I would
13    take a lunch break and come back at 1:30 and start
14    openings at 1:30.  We didn't talk about how much
15    time you needed, but we can --
16         MR. NAYBACK:  20 minutes for me.  Your
17    business hours are til 5:00 usually?
18         THE COURT:  In the past it is dependent on
19    a lot of things.  Right now my usual is about 4:45,
20    but 5:00 is my -- I don't go until 5:05, unless
21    there is a witness on at 5:00 that will be done, off
22    the stand, if we just go another couple of minutes.
23    So yeah, 5:00 is my, I am willing to do that.
24         MR. NAYBACK:  We will rest on Wednesday
25    midday, guaranteed.  We are shooting for before

1    lunch.  Ten witnesses maybe six hours of testimony.

2    It is hard to know with Mr. Elsenheimer and

3    Ms. Lavin's cross.

4            THE COURT:  Right.

5            MR. NAYBACK:  But we would try to estimate

6    those.  We have two photographers that are getting a

7    bunch of photos that are ten minutes.

8            (Whereupon the following proceedings were

9    held in Open Court.)

10           (Whereupon the jury panel entered the

11   courtroom.)

12           THE COURT:  All right.  Please be seated.

13   So everyone here.

14           All right.  What I am going to do is tell

15   you who has been excused.  So those of you who are

16   not excused will have to come back tomorrow.  Now,

17   when you come back tomorrow it doesn't mean you are

18   on the jury, it just means you are still in the

19   pool.

20           We have another group to hear from

21   tomorrow morning and after we hear from that panel,

22   we will make the final decisions on who will be on

23   the jury.  There are a few of you that will be

24   excused, now, and so I will announce who is being

25   excused and then you are free to leave and then the

1  rest of you just hold on for a moment because Yvonne

2  will give you information about tomorrow.

3          So those who are excused Panel Member

4  Number 23, Ms. Heath, you are excused.

5          Number 32, Ms. Nieto, you are excused.

6          Number 36, Mr. Trujillo, you are excused.

7  And thank you for coming and participating.

8          Number 37, Ms. Bautista, you are excused.

9  And the same to you, thank you for your time.  I

10 really appreciate it.

11         Number 40, Adrian Montes, and thank you as

12 well, Mr. Montes.

13         And last Mr. Haynes, Number 43, you are

14 excused as well.  So thank you, Mr. Haynes, for

15 coming and participating.

16         Now, Yvonne is handing out the sheet that

17 gives you the information to come back tomorrow, I

18 will expect that we will seat our jury before lunch,

19 that is why I would like you to come back tomorrow

20 morning.

21         My expectation is you will, the jury will

22 be seated before we break for lunch and then we will

23 return from lunch and go straight to the opening

24 statements and then to the testimony.

25         The Government will start, put on its

1  case.

2          Again, I am hopeful that we will be done

3  Thursday or Friday but it is hard to know for sure

4  because we have not started the testimony yet, but I

5  will do my best to keep you posted as the case

6  progresses.

7          So I am guessing that some of you will be

8  on the jury but we won't know until closer to the

9  noon hour tomorrow.

10         So thank you all for your attendance

11  today.  We will see you tomorrow.  Bring reading or

12  something to occupy yourselves while you are waiting

13  tomorrow, but we will get to you just as soon as we

14  can.

15         (Proceedings concluded at 4:26 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2           I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.  I further certify that the

5    transcript fees and format comply with those

6    prescribed by the Court and the Judicial Conference

7    of the United States.

8    Date:  June 14, 2021

9

10

11           _____

12           PAUL BACA, RPR, CCR
             Certified Court Reporter #112
13           License Expires:  12-31-2023

14

15

16

17

18

19

20

21

22

23

24

25