1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA

5    vs.                           No. 1:CV-18-03495-JCH

6    DOUGLAS D. SMITH

7

8

9                 TRANSCRIPT OF PROCEEDINGS

10                  TRIAL ON THE MERITS

11                    June 16, 2021

12                      Volume 3

13                  Pages 400 - 638

14

15   BEFORE:   HONORABLE JUDGE JUDITH HERRERA
                     UNITED STATES DISTRICT JUDGE
16

17

18

19          Proceedings reported by stenotype.

20          Transcript produced by computer-aided

21   transcription.

22

23

24

25

```
1   A P P E A R A N C E S:

2   FOR THE PLAINTIFF:

3          OFFICE OF THE U.S. ATTORNEY
           P.O. Box 607
4          Albuquerque, New Mexico  87103
           505-346-7274
5          BY:  NOVALENE D. WILSON
           novalene.wilson@usdoj.gov
6              KYLE T. NAYBACK
           kyle.nayback@usdoj.gov
7
    FOR THE DEFENDANT:
8
           OFFICE OF THE FEDERAL PUBLIC DEFENDER
9          111 Lomas, Northwest, Suite 501
           Albuquerque, New Mexico  87102
10         505-346-2489
           BY:  ARIC ELSENHEIMER
11         aric_elsenheimer@fd.org
               AMANDA LAVIN
12         amand_lavin@fd.org

13

14                    I N D E X

15  WITNESS                              PAGE:

16  BYRON ABEYTA

17         Direct Examination by Mr. Nayback   415
           Cross-Examination by Mr. Elsenheimer 442
18
    TRAVIS TAYLOR
19
           Direct Examination by Mr. Nayback   489
20         Direct Exam Cont'd by Mr. Nayback   510
           Cross-Examination by Mr. Elsenheimer 514
21         Redirect Examination by Mr. Nayback 536

22  THEODORE CHAVEZ

23         Direct Examination by Ms. Wilson    540
           Cross-Examination by Mr. Elsenheimer 558
24

25
```

I N D E X (Continued)

WITNESS                                                      PAGE:

BRYAN ACEE

        Direct Examination by Mr. Nayback     570
        Cross-Examination by Mr. Elsenheimer  578

ERCILIA TRUJILLO

        Direct Examination by Ms. Lavin       589
        Cross-Examination by Ms. Wilson       596
        Redirect Examination by Ms. Lavin     604

BILLIE WHEAT

        Direct Exam by Mr. Elsenheimer        606
        Cross-Examination by Mr. Nayback      617
        Redirect Exam by Mr. Elsenheimer      620

JUDY WHEAT

        Direct Examination by Ms. Lavin       622
        Cross-Examination by Mr. Nayback      629


Certificate of Reporter                                      638

1          (Open court, outside the presence of the
2    jury.)
3          THE COURT:  Please be seated.  We are on
4    the record in USA versus Smith.
5          And I understand there's a preliminary
6    matter; is that right?
7          MR. ELSENHEIMER:  Yes, Your Honor.  Two
8    preliminary matters.
9          First of all, with regard to Dr. Cain's
10   testimony, we would request that we be allowed to
11   call Dr. Cain, if we call Dr. Cain by Zoom.
12         The reason for that, first of all, is that
13   what we would be proposing is his testimony is very
14   limited.  It would probably consist of, on the high
15   side, less than ten questions, given what we talked
16   about yesterday.
17         I don't think there's any need to have him
18   fly back here.  It would be a significant expense.  I
19   don't think there's anything that could not be
20   accomplished over Zoom.
21         THE COURT:  Right.  Hold on.
22         Is there objection?
23         MS. WILSON:  No objection, Your Honor.
24         THE COURT:  All right.
25         MR. ELSENHEIMER:  Thank you.

1              Second, Your Honor, given the Government

2       asking Dr. Cain yesterday something for which there

3       was no evidentiary foundation or basis to believe

4       about diabetes -- not Dr. Cain, Investigator Gudes.

5       We're concerned there were some other investigations

6       that the FBI did in the case regarding kind of

7       spurious scurrilous accusations about Mr. Smith and

8       prostitutes.  We want to make sure that that is not

9       brought in directly or indirectly in any way.  I

10      think that there's no evidentiary basis for it, it is

11      irrelevant, and it is highly prejudicial.

12             I just want to make sure that we have that

13      out and seek an order barring any evidence on that.

14             THE COURT:  Do you plan on bringing this

15      issue up?

16             MR. NAYBACK:  Your Honor, I'm sorry.  I am

17      unaware of Mr. Elsenheimer's -- he didn't raise this

18      with me before.  I'm unaware of any investigation

19      into Mr. Smith and soliciting prostitution

20      prosecution or anything like that.  There's no

21      witness that would ever discuss that.  It wouldn't

22      be relevant.  And it's a nonissue, from my

23      perspective.

24             THE COURT:  All right.  So if anything

25      changes -- I normally don't feel like I have to say

1  this.  But if -- I don't want to learn about

2  something that's just blurted out for the first

3  time.  So I want -- I don't want any surprises.  I

4  don't know if there's any evidence of diabetes.

5  But -- but that was somewhat of a surprise, and so I

6  don't want any more surprises.

7          MR. ELSENHEIMER:  Just to be clear, it

8  wasn't an investigation.  It was an interview that

9  Agent Taylor had with somebody in Espanola.  It was

10  just a reference in there.  That's the only -- I

11  appreciate Mr. Nayback representing that.  And --

12          THE COURT:  All right.  And all I'm saying

13  beyond that is, no surprises, please.  So we've been

14  alerted to the issue.  If there's any reason for

15  that to come up, please don't ask it before we talk

16  about it again.

17          MS. WILSON:  Okay.  Just to that end,

18  Your Honor, with the Court's concern, there is, I

19  think, some irrelevant questioning that might be

20  going on with the law enforcement officers related

21  to other incidents that occurred on the property

22  involving other people at unknown times.

23  Specifically the bus, where we're going to say that

24  that's irrelevant.  It doesn't go to anything in the

25  case.  I am just bringing that up as an issue.

```
1                THE COURT:  Well, you'll have to bring it
2    to my attention if something is going to be said.
3    Because right now I don't have any way of knowing
4    what the information would be.  I have no way of
5    knowing how it would be relevant at this moment.
6                So you're letting us know that you have
7    that concern.  You're aware of the concern.  Let's
8    just talk about it before it surfaces.
9                MR. ELSENHEIMER:  Certainly.  And I don't
10   intend to go into that.
11               THE COURT:  Well, that makes it easy.  But
12   again, I don't want any surprises.
13               MR. ELSENHEIMER:  I certainly won't
14   surprise you.
15               THE COURT:  Yeah.  I don't surprise
16   easily.  So if I get surprised, it's not a good
17   thing.
18               MS. WILSON:  Thank you, Your Honor.  That
19   was it.
20               THE COURT:  All right.  Are we ready for
21   the jury, everyone?
22               MR. ELSENHEIMER:  Yes.
23               (Discussion off the record.)
24               THE COURT:  We are back on the record.
25               Ready for the jury?
```

```
 1              MR. ELSENHEIMER:  May we address one

 2    thing?

 3              THE COURT:  Yes.

 4              MR. ELSENHEIMER:  Sorry.  We had filed an

 5    objection to some of the Government's exhibits.

 6    Particularly, I believe 51 -- 50 and 51.  And the

 7    particular objection is, Your Honor, that while we

 8    have seen those through the OMI doctor, Dr. Cain,

 9    these additional photographs are cumulative.  They

10    run the risk of being prejudicial, because it's

11    additional photographs of the alleged victim,

12    Ms. Gallegos, laying on the pavement.  I don't think

13    the Court has ruled on our objection, and I just

14    wanted to bring that up.

15              THE COURT:  Uh-huh.  Is this coming up

16    with the next witness?

17              MS. WILSON:  Yes, Your Honor.

18              THE COURT:  What do we -- what is the

19    evidentiary value of these two exhibits that we

20    don't already have in evidence?

21              MS. WILSON:  Detective Abeyta is the first

22    responder.  He took these photographs as part of his

23    investigation.  He's not allowed to touch the body.

24    So during the course of that time he was trying to

25    ascertain what the injuries were to Ms. Gallegos.
```

1                    So he takes different pictures at different

2         angles, and he's prepared to discuss why he does that

3         as part of his investigation.  It relates to what he

4         thought was going on with her injuries at that time.

5                    It's relevant.  We're prepared to lay

6         foundation.  The examination on those questions will

7         be brief.  I don't expect it to take a long time.  He

8         just needs to explain why he was interested in those

9         injuries, which I think is relevant, and why her body

10        is --

11                   THE COURT:  What does it -- what does it

12        add to the specific charge against the defendant,

13        that you can't get at by looking -- directing the

14        officer's attention to other photographs?

15                   What's he going to tell us that he was

16        looking for that was so unique to these pictures?

17                   MS. WILSON:  So we got into a little bit

18        with Investigator Gudes, how the blood is pooling

19        the way it is.  It looks like her body was turned

20        over.

21                   THE COURT:  Is that in dispute?

22                   MS. WILSON:  No, it's not, and it's going

23        to come in as evidence.

24                   But at the same time, it goes to the

25        completeness of the investigation.  I mean, they

1  tried to figure out exactly why her body is in this

2  position and why it's -- why it's --

3          THE COURT:  So why does this -- well, not

4  "this," but these two exhibits, why -- why do they

5  add something to that analysis that we can't see in

6  other photographs, or just the officer's testimony?

7          Because these are pretty disturbing

8  photographs.  And, you know, it's a murder case, so I

9  understand that there is graphic and disturbing

10 photographs.

11         But if you can get what you need to -- to

12 get with other photographs that are already in

13 evidence, I don't --

14         MS. WILSON:  Your Honor, I'm going to

15 respectfully disagree with that.  He needs to talk

16 about what he did to look at those -- he's not able

17 to touch the body as part of his investigation, so

18 he needs to see exactly what her injuries are.

19         His understanding was it was an injury to

20 her face.  It goes to the completeness of his

21 investigation, what he knew at that time, and it goes

22 to why he took the pictures of the pooling of the

23 blood.

24         It -- you know, I think there was some

25 testimony with Investigator Gudes that came out that

1   perhaps EMT moved the body.

2           That's not the case.  We need to clarify

3   that for the jury.

4           THE COURT:  And I understand clarifying

5   all of that.  But why do these particular

6   photographs -- why are they necessary to clarify

7   that?

8           I mean, Exhibit Number 1 shows that there

9   were injuries, and I'm sure there will be testimony

10  that this is a cleaned up version of those injuries.

11          I mean, I'm not -- I'm not telling you -- I

12  haven't said yet that you can't use these exhibits.

13          I'm asking you to tell me what these

14  exhibits provide to your case that we don't have

15  already.  And so far, I'm not real clear on that.

16          MS. WILSON:  Sure.  It shows blunt force

17  trauma to her head in detail, to show that she was

18  running at the time, you know, she hit the pavement.

19          It shows the amount of trauma she sustained

20  to her head and her forehead.

21          It shows the version that is not cleaned

22  up, in a manner that is up close and meaningful.

23          It just goes to show what Dr. Cain was

24  describing with the bridging tissue on the nose.

25  That sort of information is important for the jury to

411

1   determine that she was running away at the time he

2   shot at her.

3           I think that's still in dispute.

4           I think they're arguing that there was a

5   pause and she maybe had gone.

6           So this goes to that issue directly.

7           THE COURT:  All right.  It doesn't sound

8   like there's a dispute as to whether or not she hit

9   the ground face first.

10          Is there a dispute as to whether she was

11  running when she fell?

12          MR. ELSENHEIMER:  No.  That's what

13  Dr. Cain said that was consistent with what he saw

14  with that blunt force trauma.

15          THE COURT:  Uh-huh.

16          MR. ELSENHEIMER:  That it was -- that it

17  was on the pavement and stones.

18          THE COURT:  Do you have a picture that

19  shows these injuries that's not quite so close up?

20          MS. WILSON:  These are the photographs

21  that he took.

22          THE COURT:  I understand.  I'm just asking

23  if there's another one that he took that is not

24  quite so -- just quite as graphic.

25          MR. ELSENHEIMER:  If I may, Your Honor?

1              THE COURT:  Yes.

2              MR. ELSENHEIMER:  I believe 47

3    accomplishes that.  That's why we didn't object to

4    47.  It is a farther away shot.  It's not as --

5              THE COURT:  47 shows the pooling on the

6    ground.  It shows the injuries.  It's -- it's not

7    enlarged -- an enlarged version.

8              I am not saying the photograph has been

9    enlarged, I just mean the -- the angle is much close

10   up is what I guess I am trying to say.

11             MS. WILSON:  I can see that that's the

12   case, Your Honor.  But it doesn't show the amount of

13   trauma to her forehead that she sustained.

14             I mean, we think that goes to how fast she

15   was running, which is an issue.

16             He's saying he likely did not fire quickly.

17   He waited for her to leave.  I mean, they need to see

18   the level of trauma she sustained when she hit that

19   pavement.

20             And I'm -- I'm fine with the Gov- -- taking

21   either Exhibit 48 or 50 to defendant's objection that

22   this might be cumulative.

23             But I think they do need to see some of

24   that blunt force trauma, what it looked like at the

25   scene, because she was running and she hit that

1    pavement hard as she ran.

2            THE COURT:  Well, I don't see the need for

3    50 and 51.  I will let you briefly display one of

4    those to the jury.

5            But I -- I do think that 50 and 51 --

6    honestly, I think you could get what you needed from

7    some of the other photographs, but I haven't heard

8    the testimony yet.  So I will allow 50 or 51, but I

9    don't think both are necessary.

10            MS. WILSON:  We'll go with 50, Your Honor.

11    Thank you.

12            THE COURT:  All right.  So I'll admit 50,

13    but not 51.

14            And I'll admit it once the proper

15    foundation has been laid, so you'll still have to

16    move its admission.

17            MS. WILSON:  Yes, Your Honor.  Thank you.

18            THE COURT:  Uh-huh.

19            Anything else?

20            Are we ready for the jury?

21            MR. ELSENHEIMER:  Yes, Your Honor.

22            MS. WILSON:  Yes, Your Honor.  Thank you.

23            THE COURT:  All right.  Thank you.

24            (Whereupon the jury entered the

25    courtroom.)

1              (Whereupon the following proceedings were
2    held in Open Court.)
3              THE COURT:  Good morning, ladies and
4    gentlemen of the jury.  I hope you had a pleasant
5    evening.
6              We are ready to take the -- continue with
7    the testimony.  So the Government may call its next
8    witness.
9              MS. WILSON:  Thank you, Your Honor.  The
10   United States calls Detective Byron Abeyta.
11             THE COURT:  Before you take your seat,
12   Detective Abeyta, the oath will be administered to
13   you.
14             (Whereupon, the witness was sworn.)
15             THE COURT:  Detective Abeyta, if you would
16   give us your full name and spell your first and last
17   names for the record, please.
18             THE WITNESS:  Byron Abeyta.  B-Y-R-O-N.
19   Last name, A-B-E-Y-T-A.
20             THE COURT:  Thank you.
21
22
23
24
25

```
 1                    BYRON ABEYTA,
 2   after having been first duly sworn under oath,
 3        was questioned and testified as follows:
 4                  DIRECT EXAMINATION
 5      BY MS. WILSON:
 6      Q.    After you get comfortable there, sir, how
 7   long have you -- I'm sorry.
 8            What do you do for a living?
 9      A.    I work for Espanola Police Department.
10      Q.    And how long have you been working for the
11   Espanola Police Department?
12      A.    Since 2015.
13      Q.    And do you have any other law enforcement
14   experience?
15      A.    Yes.  Prior to working for Espanola Police
16   Department, I also worked for Rio Arriba Sheriff's
17   Office as well as Ohkay Owingeh Tribal Police.
18      Q.    And as far as this law enforcement
19   experience, do you have firearms training?
20      A.    Yes.  I am a firearms instructor.
21      Q.    When did you become involved in the case
22   involving -- the investigation involving Douglas
23   Smith?
24      A.    I was on call for the criminal
25   investigations division of the Espanola Police
```

PAUL BACA, OFFICIAL COURT REPORTER
(505)508-6694

1    Department on May 5, 2018.

2        Q.    And, sir, what was the nature of that

3    call?

4        A.    The call was in reference to an unknown

5    female who had died from a gunshot wound.

6        Q.    Was that unknown female later identified?

7        A.    Yes.

8        Q.    Who was she?

9        A.    She was identified as Maria Gallegos.

10       Q.    And, Detective Abeyta, do you see the

11   defendant, Douglas Smith, in the courtroom today?

12       A.    Yes.

13       Q.    And could you please point out

14   specifically what he is wearing and where he is

15   seated?

16       A.    Mr. Douglas Smith has glasses.  He's

17   wearing a tan suit with an orange undershirt, and

18   he's sitting -- seated to your left.

19            MS. WILSON:  I would ask the record

20   reflect proper identification of the defendant.

21            THE COURT:  The defendant was identified

22   by his clothing, so the Court will accept the

23   identification.

24            MS. WILSON:  Thank you, Your Honor.

25            THE COURT:  Uh-huh.

1    Q.    (By Ms. Wilson) And what address were you

2    called out to?

3    A.    I was called out to 826 North Riverside

4    Drive, to the Western Winds Motel.

5    Q.    And for the jury, could you describe that

6    area generally?

7    A.    Yes.  The Western Winds Motel is located

8    on North Riverside Drive, which is one of the two

9    main roads that passes through Espanola.  It is

10   surrounded -- it's surrounded by businesses, to

11   include KFC, Pizza 9.  And on the back side of it

12   there is housing.

13   Q.    And when you arrived that night, did you

14   see any gates up anywhere?

15   A.    No.

16   Q.    Tell the jury:  What were your

17   responsibilities at the scene?

18   A.    My responsibilities were to take over the

19   investigation from the patrol officers, to

20   photograph the scene, process the evidence, and

21   facilitate Ms. Gallegos getting picked up.

22   Q.    And what physical evidence did you

23   collect?

24   A.    I collected a Luger .22 semiautomatic

25   handgun with a magazine.  In the magazine there were

1    three live rounds of .22 ammo.

2            I also located four spent .22 shell

3    casings, and a clear bag containing four live rounds

4    of .22 ammo.

5        Q.    And besides the defendant's gun and

6    ammunition, did you find any other weapons at the

7    scene?

8        A.    No.

9        Q.    Did you find a knife?

10       A.    No.

11       Q.    What did you do after you left the scene?

12       A.    After I left the scene, I went to the

13   Espanola Police Department to interview Mr. Douglas

14   Smith.

15           MS. WILSON:  May I approach?

16           THE COURT:  You may.

17       Q.  (By Ms. Wilson) I'm handing you what's been

18   marked, only for identification purposes at this

19   point, as Government's Exhibits 33, 34, 35, and 36.

20           Would you please take a look at those for

21   me?

22       A.    (Witness complies.) Yes.

23       Q.    Do you recognize those?

24       A.    I do.

25       Q.    Let's start with 33.

419

1              What is that?

2      A.    33 is the Miranda warning form that I went

3   over with Mr. Douglas Smith.

4      Q.    And 34?

5      A.    34 is a recording of the interview with

6   Mr. Smith.

7      Q.    And how are you able to recognize that

8   recording?

9      A.    I previously reviewed the recording and

10  placed my initials on the recording.

11     Q.    And you recognize those voices on the

12  recording?

13     A.    Yes.

14     Q.    Whose voices?

15     A.    My voice, as well as Mr. Douglas Smith.

16     Q.    And everyone can speak and understand the

17  English language?

18     A.    Yes.

19     Q.    What is 35?

20     A.    35 is a transcript of the recording.

21     Q.    And do you also recognize that?

22     A.    Yes.

23     Q.    How so?

24     A.    I compared Exhibit 35 with 34, and also

25  initialed that I reviewed it.

1    Q.    And that transcript you have, was it

2    substantially verbatim?

3    A.    Yes.

4    Q.    What is 36?

5    A.    36 is a drawing which Mr. Smith created

6    during the interview.

7    Q.    And, Detective, are those fair and

8    accurate depictions of the subject matter therein?

9    A.    Yes.

10         MS. WILSON:  Your Honor, at this time the

11   United States would move for admission of

12   Government's 33, 34, 35, 36, and permission to

13   publish?

14         THE COURT:  Is there objection?

15         MR. ELSENHEIMER:  No, Your Honor.

16         THE COURT:  33, 34, 35, and 36 are

17   admitted.

18         (Exhibits admitted, Government's 33

19   through 36 and published to the jury.)

20         MS. WILSON:  Thank you, Your Honor.

21   Q.    (By Ms. Wilson) Let's start with

22   Exhibit 33.

23         Can you explain to the jury, what is this?

24   A.    Yes.  This is the Miranda warning form

25   that I went over with Mr. Douglas Smith prior to

1    conducting my interview.

2        Q.    And how do you go over this form?

3        A.    So I go over the form in its entirety,

4    starting with his name, getting his personal

5    information.

6              I read each one of those lines to

7    Mr. Smith.  And if he agrees to talk to me, I have

8    him sign it.

9        Q.    And he agreed to talk to you?

10       A.    Yes.

11       Q.    Did he sign the form?

12             Yes, he signed the form?

13       A.    Yes, he signed the form here (indicating).

14       Q.    Thank you.

15             MS. WILSON:  And at this time, Your Honor,

16    we would ask that we play the recording of

17    defendant's statement and that we be permitted to

18    pass out transcripts for the jury to follow along.

19             THE COURT:  All right.  So you want to

20    play Exhibit 34, which has been admitted.  And you

21    want to distribute Exhibit 35, which has been

22    admitted?

23             MS. WILSON:  Yes, Your Honor.

24             THE COURT:  All right.  You may do so.

25             MS. WILSON:  Thank you.

1              (Whereupon a portion of an audio was

2    played.)

3              MR. NAYBACK:  May I collect the

4    transcripts from the jurors, Your Honor?

5              THE COURT:  Yes, you may.

6      Q.    (By Ms. Wilson) Just briefly, I'd like to

7    go over a few things, Detective Abeyta.

8              Did the defendant tell you whether he saw a

9    man or a woman?

10     A.    Mr. Smith stated that he saw somebody,

11   identified a shadow, but he didn't specify whether

12   it was male or female.

13     Q.    And did the defendant say anything to the

14   person before he started shooting?

15     A.    No.

16     Q.    Did he tell you if the person ever got

17   into the trailer?

18     A.    Mr. Smith stated that the trailer was

19   locked.

20     Q.    Let me show you Government's Exhibit 36.

21             What is that, Detective Abeyta?

22     A.    This is the drawing that Mr. Smith created

23   in our interview.

24     Q.    And when you're going over this diagram

25   with him, where does he describe where he's at and

1    where he's shooting?

2        A.    Yes.  So this area here (indicating) would

3    be Mr. Smith's residence.

4            North Riverside Drive would be here

5    (indicating).

6            Mr. Smith stated that he was on the back of

7    his porch, here (indicating).

8            And Mr. Smith stated that this would be the

9    camper trailer (indicating) and the door to the

10   camper trailer would be here (indicating).

11           There is also a fence around Mr. Smith's

12   residence.

13           Here (indicating), you would have the shed

14   that I am asking Mr. Smith about.

15           And this (indicating) would be the rest of

16   the motel rooms where Ercilia lives.

17           Mr. Smith stated that he was shooting in

18   this direction (indicating) angle-wise, and he draws

19   four -- four lines to describe the angle of which he

20   was shooting.

21       Q.    What did the defendant tell you about

22   shooting in the air?

23       A.    Mr. Smith stated that to shoot -- that --

24   to shoot in the ground, because in the air you

25   don't -- you don't know where the bullets go.

1    Q.    And he didn't shoot in the ground in this

2  case?

3    A.    No.

4    Q.    During your interview, did defendant ever

5  tell you that he used a flashlight to see who was

6  outside?

7    A.    The only time Mr. Smith mentioned a

8  flashlight was when he was checking the surrounding

9  area, and Ercilia was shining the flashlight on the

10  body.

11    Q.    And what did defendant say about the

12  mechanisms, including the safety, on his firearm?

13    A.    Mr. Smith stated that he doesn't keep a

14  round chambered in his handgun because the safety

15  was a namesake only, meaning that he would have to

16  chamber a round into -- into the barrel prior to

17  actually firing.

18    Q.    And at some point he mentioned he couldn't

19  reload the gun.

20          What did he do at that point?

21    A.    At that point Mr. Smith stated that he put

22  the magazine back in.  And he said, "Whatever

23  happens, happens."

24    Q.    What did he tell you about how fast he

25  shot?

425

1       A.    Mr. Smith stated that he shot faster than

2  he's ever done before.  And he described it as bang,

3  bang, bang, bang, and that he shot three or four

4  times.

5       Q.    And had he told you he had shot at

6  somebody else who was on the property?

7            MR. ELSENHEIMER:  Objection, leading.

8            THE COURT:  I'm sorry?

9            MR. ELSENHEIMER:  Objection, leading.

10           THE COURT:  Can you rephrase, please?

11           MS. WILSON:  Yes, Your Honor.

12      Q.    (By Ms. Wilson) During his interview, did

13  he mention that he had a prior incident with a

14  specific person?

15      A.    Yes.  Mr. Smith stated a month prior, a

16  guy was at the -- at the same camper.  And that he

17  shot to miss him, pow, pow, pow, just like he did

18  this time.

19      Q.    And he mentioned that person also took off

20  running?

21      A.    Yes.

22      Q.    The defendant told you he had additional

23  firearms?

24           MR. ELSENHEIMER:  Objection, leading.

25           THE COURT:  Overruled.

426

```
 1                You can answer that question.
 2        A.    Yes.
 3        Q.    (By Ms. Wilson) Did the defendant ever tell
 4   you he was shooting at a pile of wood?
 5        A.    No.
 6              MS. WILSON:  May I approach, Your Honor?
 7              THE COURT:  You may.
 8        Q.    (By Ms. Wilson) I am handing you what's
 9   been marked for identification purposes as
10   Government's Exhibit 37, 38, up through 49.
11              And then I'm also handing you Government's
12   Exhibits 52 through 57.
13              If you could please take a look at each one
14   of these and let me know when you're done.
15        A.    (Witness complies.) Okay.
16        Q.    Do you recognize these photographs?
17        A.    Yes.
18        Q.    How so?
19        A.    Those are the photographs that I took
20   while processing the scene, as well as after I
21   returned from the interview with Mr. Smith.
22        Q.    Fair and accurate depictions?
23        A.    Yes.
24              MS. WILSON:  Your Honor, at this time we
25   would move for admission of Government's Exhibits
```

1    Number 37 through 49.

2             THE COURT:  Is there objection?

3             MR. ELSENHEIMER:  No, Your Honor.

4             THE COURT:  All right.

5             37 through 49 are admitted.

6             (Exhibits admitted, Government's 37

7    through 49.)

8             MS. WILSON:  And also, Your Honor, if I

9    could ask for 51 through 57.

10            MR. ELSENHEIMER:  Subject to the same

11   objection.

12            THE COURT:  All right.  And maybe I

13   misheard you, but I thought when you handed the

14   packet to the witness, you handed him 52 through 57.

15            MS. WILSON:  That could be correct.  I

16   could clarify that with the witness.

17            THE COURT:  If you could just lay the

18   proper foundation.

19            MS. WILSON:  Yes, Your Honor.

20            THE COURT:  Thank you.

21            MS. WILSON:  I need to clarify,

22   Your Honor, for the record.

23            Rather than admitting Government's

24   Exhibit 51, Your Honor, we seek to admit Government's

25   Exhibit 50.  I'll have the witness authenticate.

1              THE COURT:  All right.  So not 51, but 50?

2              MS. WILSON:  Yes, Your Honor.  Thank you.

3              THE COURT:  Okay.  Thank you.

4       Q.   (By Ms. Wilson) Let me show you what's been

5  marked for identification as Government's

6  Exhibit 50.

7              Do you recognize that photo?

8       A.   Yes.

9       Q.   How so?

10      A.   That's a photograph I took of the scene.

11      Q.   A fair and accurate depiction?

12      A.   Yes.

13             MS. WILSON:  At this time, Your Honor, the

14  Government would move for Exhibit 50 and 52 through

15  57.

16             THE COURT:  Is there objection?

17             MR. ELSENHEIMER:  Only as to 50, as stated

18  before.

19             THE COURT:  All right.

20             Exhibits 50 and 52 through 57 will be

21  admitted.

22             (Exhibits admitted, Government's 50 and 52

23  through 57.)

24             MS. WILSON:  Thank you, Your Honor.

25             Permission to publish?

 1          THE COURT:  You may.

 2          (Whereupon Government's Exhibits 50 and 52

 3   through 57 were published to the jury.)

 4     Q.   (By Ms. Wilson) Detective Abeyta, what is

 5   this a photograph of?

 6     A.   This is a photograph of the crime scene

 7   when I arrived.

 8          Here (indicating), to the right -- to the

 9   right, you could see Mr. Smith's residence.

10          Ercilia lives here (indicating) on this

11   side.

12          And you can't really see with the lighting

13   here, but --

14     Q.   Does that help?

15     A.   Yes.  Here (indicating) is where

16   Ms. Gallegos is laying.

17     Q.   Let me show you Government's Exhibit 38.

18          What is that a picture of?

19     A.   38 is another angle of where Ms. Gallegos

20   is lying.

21          On this, you could also see the camper

22   trailer.

23     Q.   And that's where her body was located?

24     A.   Yes.

25     Q.   I'm showing you Government's Exhibit 39.

1              What is that?

2      A.    Number 39 is the camper trailer.  Here

3  (indicating), you could see where the door is to the

4  camper trailer.

5      Q.    And can you -- can you see the fence in

6  this photograph?

7              Where would that be?

8      A.    So the fence would be on the other side of

9  this vegetation here (indicating) to the right.

10     Q.    I'm showing you Government's Exhibit 40.

11             What is this a picture of?

12     A.    Number 40, you can see the gun down here

13  (indicating), where it was located.

14             Here (indicating), you could also see the

15  back door to Mr. Smith's residence.

16             On this picture you could see the -- the

17  fence to residence.

18     Q.    Did defendant tell you whether or not

19  Ms. Gallegos got into the yard?

20             MR. ELSENHEIMER:  Object.  Objection,

21  leading.

22             THE COURT:  Overruled.

23     A.    The -- the defendant just stated that

24  Ms. Gal- -- that a shadow was near the -- near the

25  door to the camper.

1      Q.    (By Ms. Wilson) And you've been at the

2  scene.  And approximately how far is it from where

3  he said she was to where he was?

4      A.    I would say that is approximately -- over

5  30 feet.

6      Q.    And just to clarify, where did he say he

7  was standing?

8      A.    He was standing on the other side of the

9  fence, on the porch of his backyard.

10      Q.    And the approximate distance to where she

11  was standing?

12      A.    Over 30 feet.

13      Q.    Let me show you Government's Exhibit 41.

14            What does that depict?

15      A.    41 shows you a closer view of the fence to

16  the residence.

17            It also shows you a closer view of the back

18  porch, where Mr. Smith stated he was standing.

19      Q.    And you had your flash on when you are

20  taking these photographs, correct?

21      A.    Correct.

22      Q.    Let me show you Government's Exhibit 42.

23            What is that?

24      A.    Number 42 is a picture of the back door to

25  Mr. Smith's residence.  Here (indicating) is the

1    porch where Mr. Smith stated he was standing.

2             These yellow tags were from the responding

3    officers, where there are two spent shell casings in

4    that area.

5        Q.    Let me show you Government's Exhibit 43.

6             What is that?

7        A.    43 is the Luger semiautomatic handgun

8    .22 caliber that was recovered from the scene, and

9    also my Evidence Tag Number 1.

10       Q.    Government's Exhibit 44?

11       A.    44 shows my Evidence Tag Number 2, which

12   is a spent shell casing of a .22 caliber.

13            Also my Evidence Tag Number 3 which is also

14   another --

15       Q.    I'm sorry.

16       A.    -- .22 spent casing, as well as a ruler,

17   to show approximate length.

18       Q.    What is Government's Exhibit 44?

19       A.    Exhibit Number 45?

20       Q.    Yes, 45.  Thank you.

21       A.    45 is my Evidence Tag Number 4.  And it is

22   a spent .22 casing.

23       Q.    Government's Exhibit 46?

24       A.    Number 46 is my Evidence Tag Number 5.

25   And it is another .22 caliber spent casing.

1      Q.      So there's a total of four shell casings?

2      A.      Correct.

3      Q.      Let me show you Government's Exhibit 47.

4              What is that a picture of?

5      A.      47 is a picture of Maria Gallegos in the

6  state that I encountered her in.

7              Here (indicating), you could see the

8  pooling of blood.

9              Also, you could see, I guess, how she's

10  laying and the damage and blood to her face.

11      Q.      Did the defendant tell you whether or not

12  he rendered aid?

13      A.      Mr. Smith stated that he turned over

14  Ms. Gallegos.  And after he turned her over, he

15  realized that she was deceased and checked the rest

16  of the -- checked the front of the yard before

17  Ercilia came out shining the flashlight at Maria

18  Gallegos, and told him to call 911.

19      Q.      Let me show you Government's Exhibit 48.

20              What is that?

21      A.      48 is a closeup of the blood which is next

22  to Maria Gallegos.  Yes.

23      Q.      And why did you take a picture of this?

24      A.      So I took a picture of this because the

25  blood was away from where she was, where her body

```
 1   was, which would indicate that she was moved prior

 2   to me taking the photographs.

 3       Q.    Did the defendant tell you he moved the

 4   body?

 5       A.    Yes.  He said he turned her over.

 6       Q.    Let me show you Government's Exhibit 49.

 7             What does that depict?

 8       A.    Number 49 is a closeup of Maria Gallegos'

 9   face.  It shows blood coming from her mouth, nose,

10   and forehead.

11             Also, it captures her neck tattoo, as she

12   was still unidentified.

13       Q.    Why did you take this picture?

14       A.    So when I -- when I got briefed on the

15   incident, other officers stated that she had a

16   gunshot wound to her forehead, so I photographed --

17   photographed the wound.

18       Q.    And during the course of your

19   investigation, are you permitted to move the body?

20       A.    No.

21       Q.    Let me show you Government's Exhibit 52.

22             What is that a picture of?

23       A.    After I got done with my interview with

24   Mr. Smith, I returned to -- to the motel.

25             On the motel property you could still see
```

1  the -- the pool of blood.  So this is where

2  Ms. Gallegos would have been laying.  And it just

3  gives you a better visual of the surroundings, to

4  include the camper trailer.

5      Q.    And why was it important for you to go

6  back to the scene and take additional photos?

7      A.    Because I got Mr. Smith's accounts of what

8  had happened, as well as details that were not known

9  prior.

10     Q.    What is in Government's Exhibit 53?

11     A.    Number 53 shows another angle of the back

12  of Mr. Smith's residence and the hotel property.  So

13  here's (indicating) where the fence would be.  You

14  could see the camper -- camper trailer here, and

15  Ms. Gallegos would be laying off to the side, over

16  here (indicating).

17     Q.    And why are you interested in this angle?

18     A.    I took this picture because Mr. Smith

19  stated and drew for me that he was firing in this

20  (indication) this direction, angle-wise.

21     Q.    I'm showing you Government's Exhibit 54.

22           What is that?

23     A.    54 is a -- shows a bullet mark on the

24  camper.

25     Q.    And you were looking at this specific

1    area?

2        A.    Yes.  Once again, this was in -- in the

3    area where Mr. Smith stated he was firing.

4        Q.    Let me show you Government's Exhibit 55.

5              What is that?

6        A.    55 shows you the camper trailer.  Here

7    it's zoomed out a little bit, so you can see where

8    the bullet hole would be.  So it's about midway on

9    the camper.

10       Q.    Government's Exhibit 56.

11             Can you describe what that is and why you

12   took that picture?

13       A.    Yes.  So once again, this is going with --

14   with Mr. Smith's accounts of the event, to show the

15   angle that he stated he was firing at.

16             So that first .22 round -- impact round

17   would be here (indicating).  And I took it from this

18   angle because there is actually another impact round

19   on this metal shed near the lock.

20       Q.    I'm showing you Government's Exhibit 57.

21             What is that?

22       A.    It is the -- the impact round that I was

23   saying that was next to the lock on the metal shed.

24       Q.    Did you learn that the shooting took place

25   in Indian Country?

1       A.      Yes.

2       Q.      Let me backtrack a minute, just to

3   clarify.

4               These photos that are in the daylight of

5   the trailer and the shed, the gray shed, when did you

6   take those?

7       A.      I took those after I had got done

8   interviewing Mr. Smith.

9       Q.      What was the date?

10      A.      On May 5, 2018.

11      Q.      All right.  You mentioned that you learned

12  the shooting took place in Indian Country.

13              Did you also learn that Maria Gallegos was

14  an enrolled member of an Indian tribe?

15      A.      Yes, I did.

16      Q.      And what did you do upon learning that

17  information?

18      A.      Upon learning that information the case

19  was briefed to the FBI, and the FBI took over the

20  investigation.

21              MS. WILSON:  May I have a moment,

22  Your Honor?

23              THE COURT:  You may.

24              MS. WILSON:  Thank you.

25      Q.      (By Ms. Wilson) At the time you had gone to

1    defendant's property on May 5, did you see any --

2    you mentioned -- did you see any gates?

3        A.    No, there were no gates or no trespassing

4    signs.

5        Q.    Let me show you what's been previously

6    admitted as Government's Exhibit 27.

7              Do you see that there?

8        A.    Yes.

9        Q.    So --

10       A.    21.

11       Q.    21.  Thank you.

12             So just for the record, can you point out

13   to the jury what was not on the scene May 5th?

14       A.    Yes.  So on May 5th, this (indicating) was

15   not on the scene or the no trespassing sign.

16       Q.    And just to show you Government's

17   Exhibit 23, was that on the scene on May 5th, 2018?

18       A.    I do not believe that was on the scene.

19   I -- I did not check that side, though.

20             MS. WILSON:  I pass the witness,

21   Your Honor.

22             THE COURT:  All right.  It's 10:22, so we

23   will take our morning break at this time.

24             We'll -- we'll break, let's try to get back

25   in the courtroom in about 15 minutes.

439

1              Please rise while our jury leaves the
2    courtroom.
3              (Whereupon the jury exits the courtroom.)
4              THE COURT:  All right.  15 minutes.
5              (A recess was taken.)
6              (Open court, outside the presence of the
7    jury.)
8              THE COURT:  Please be seated.
9              We're back on the record, but I understand
10   there's another matter we need to take up before the
11   jury enters.
12             MS. WILSON:  Yes, Your Honor.
13             It appears that defense is pulling a video,
14   to play it.
15             Our concern is the issue as to what has
16   been redacted and not redacted has already been
17   litigated.  I am sure not what portion they're going
18   to play.  But they do run the risk, if they haven't
19   redacted the video, of going afoul of the Court's
20   order of what should not go before the jury.
21             THE COURT:  So is it properly edited?  Can
22   you assure me that it is properly edited?
23             MR. ELSENHEIMER:  Yes, Your Honor.
24             THE COURT:  All right.  If it's not, then
25   we will probably have other things to talk about.

1    So I'm -- I'm really relying on you to have it

2    properly edited.

3              So this is a -- a video of what we've

4    heard?

5              MS. WILSON:  Yes.  We -- there is a video

6    that went along with it.  We disclosed it to

7    defense.  I had no idea they intended to play parts

8    of it.

9              THE COURT:  I just wondered what it was.

10              MS. WILSON:  Yes.  So it's the actual

11    video that goes along with the audio.

12              THE COURT:  Okay.  And just for the

13    record, Mr. Elsenheimer, has that been admitted into

14    evidence?

15              MR. ELSENHEIMER:  No, but it would be for

16    impeachment.

17              THE COURT:  Okay.

18              MS. WILSON:  And just to clarify, if it's

19    admitted for impeachment only, it doesn't go to the

20    jury?

21              THE COURT:  The video, if it's not

22    admitted into evidence, it does not go in to the

23    jury.

24              MS. WILSON:  Or the screens back here?

25              THE COURT:  Well, I think they would be

1   allowed to view it, but they would not be allowed to

2   take it into the jury room, if it's not an exhibit.

3           MR. ELSENHEIMER:  Unless we move for its

4   admission.

5           THE COURT:  Well, if you move for its

6   admission and it's admitted, then it's an exhibit.

7           But you said it wasn't an exhibit, and it

8   was going to be used for impeachment.  So --

9           MS. WILSON:  I think the issue is, Judge,

10  you know, if we're -- we are going to be using it as

11  impeachment, I think they should be required to,

12  ahead of time, let the Government know.

13          THE COURT:  I don't -- I'm not asking

14  that.  I just want to know whether it's going to be

15  offered into evidence.  We don't know the answer to

16  that yet.

17          Are we ready for the jury?

18          MR. ELSENHEIMER:  Yes.

19          MS. WILSON:  Yes, Your Honor.

20          THE COURT:  Okay.  Great.  Thank you.

21          Please rise for our jury.

22          (Whereupon the jury enters the courtroom.)

23          (Whereupon the following proceedings were

24  held in Open Court.)

25          THE COURT:  Please be seated.

1          When we broke, the Government had passed

2     the witness.  So we will turn now to the

3     cross-examination of the witness.

4          Let me explain to the jury.  I wanted to

5     take about a 15-minute break and then, of course, you

6     can see that it was a little longer than that.

7          But I -- I just want to remind you that

8     there are things that we take up during the breaks,

9     so I don't want you to feel like we are needlessly

10    leaving you waiting.  We're usually -- we're usually

11    accomplishing something whenever we have an

12    opportunity.

13         So again, thank you for your patience.

14         Mr. Elsenheimer, you may conduct your

15    cross-examination.

16         MR. ELSENHEIMER:  Thank you, Your Honor.

17                    **CROSS-EXAMINATION**

18    BY MR. ELSENHEIMER:

19    Q.    Good morning, Detective Abeyta.

20    A.    Good morning.

21    Q.    How are you today?

22    A.    Pretty good.  Yourself?

23    Q.    Detective Abeyta, you currently work for

24    the City of Espanola Police Department?

25    A.    Correct.

1     Q.    And you've worked there since 2015?

2     A.    Correct.

3     Q.    And prior to that did you work for the Rio

4  Arriba Sheriff's Office?

5     A.    Yes.

6     Q.    And also for Ohkay Owingeh?

7     A.    Yes.

8     Q.    And just to be clear, Ohkay Owingeh, that

9  is a Pueblo just to the north of Espanola; is that

10  correct?

11     A.    Correct.

12     Q.    And I just want to make sure that we all

13  understand.  Espanola is within the County of Rio

14  Arriba; is that right?

15     A.    Espanola is within Rio Arriba County as

16  well as Santa Fe County.

17     Q.    Okay.  Mr. Smith's house at 826 Riverside

18  Drive, is that in Rio Arriba County?

19     A.    Correct.

20     Q.    And so you're familiar with the City of

21  Espanola, having been on the Rio Arriba Sheriff's

22  Office and on the Espanola Police Department?

23     A.    Yes.

24     Q.    And how long have you been a detective

25  with the Espanola Police Department?

```
 1        A.    I would guess about four years.

 2        Q.    About four years?  So since 2017?

 3        A.    Yes.

 4        Q.    Now, the City -- I want to ask you about

 5   May 5th.

 6              You went out, you were called out to

 7   Mr. Smith's house at 826 Riverside Drive at around

 8   1:40 in the morning?

 9        A.    Yes.

10        Q.    And you were called out on May 5th in

11   reference to someone who had been shot and killed

12   during an attempted burglary?

13        A.    I was called out about a female who was

14   shot and killed, yes.

15        Q.    And in your police report, it says in

16   reference to an attempted burglary, correct?

17              MS. WILSON:  I am going to object,

18   Your Honor.

19              THE COURT:  Can you tell me the basis for

20   your objection?

21              MS. WILSON:  Asked and answered.

22              THE COURT:  Overruled.

23        Q.    (By Mr. Elsenheimer) If you want to look at

24   your police report, I would be glad to give you a

25   copy.
```

1       A.      Sure.

2               MR. ELSENHEIMER:  May I approach,

3    Your Honor?

4               THE COURT:  Yes.

5       Q.   (By Mr. Elsenheimer) Did that refresh your

6    recollection?

7       A.      Yes.

8       Q.      And it was -- you were called out in

9    reference to a female who had been shot and killed

10   in -- during an attempted burglary?

11      A.      That's what I was briefed by the officer,

12   yes.

13      Q.      And when you arrived there, there was

14   already an Espanola Police Officer at Mr. Smith's

15   house, right?

16      A.      There were two.

17      Q.      There were two; one of whom is

18   Officer Rael?

19      A.      Correct.

20      Q.      And were there also New Mexico State

21   Police officers there?

22      A.      Yes.

23      Q.      And just to be clear, Mr. Smith's house, I

24   understand it is within the historic Santa Clara

25   Pueblo, but it's not on the -- within the current

```
 1   Santa Clara Pueblo, correct?
 2        A.    It is within the exterior boundaries.
 3        Q.    Of the historic Santa Clara Pueblo?
 4        A.    It is within the exterior boundaries of
 5   Santa Clara Pueblo.
 6        Q.    Okay.  And it's in the City of Espanola,
 7   though, correct?
 8        A.    Yes.
 9        Q.    Okay.  Thank you.
10             And when you were called out on May 5th,
11   you were the lead detective, right?
12        A.    Correct.
13        Q.    And when you arrived there at
14   approximately 1:40 in the morning, the first thing
15   you did was spoke to Officer Rael?
16        A.    Correct.
17        Q.    And at that point, Officer Rael had been
18   there for about 20 minutes; is that right?
19        A.    I don't know how long Officer Rael was
20   there.
21        Q.    Would it help you refresh your
22   recollection to look at your police report?
23        A.    Sure.
24        Q.    Would you mind taking a look at it?
25             It's the third line down from where you
```

1    just looked.

2        A.    A little over 20 minutes.

3        Q.    Officer Rael was there for over

4    20 minutes?

5        A.    Yes.

6        Q.    And you learned from Officer Rael that he

7    had already spoken with Mr. Smith?

8            MS. WILSON:  I'm going to object,

9    Your Honor.

10            THE COURT:  What's the basis of your

11    objection?

12            MS. WILSON:  I do believe Officer Rael is

13    on his intended witness list, and he can call him if

14    he's got questions specific to Officer Rael's

15    testimony.

16            THE COURT:  So this particular question I

17    will allow, so I'm going to overrule the objection.

18        Q.    (By Mr. Elsenheimer) And I don't want to

19    ask you what Mr. Smith told Officer Rael.

20            But you learned, as a part of your

21    investigation, that Mr. Smith spoke with Officer Rael

22    and told him what had happened?

23        A.    Correct.

24        Q.    And in response to that, Officer Rael

25    walked through Mr. Smith's property and through

1    Mr. Smith's house, along with another officer?

2        A.    Correct.

3        Q.    After you spoke with Officer Rael, did you

4    go and walk through Mr. Smith's backyard and his

5    house?

6        A.    I don't recall walking through his house.

7        Q.    Did you -- okay.  You don't recall going

8    into his house?

9        A.    No.

10       Q.    Did you walk through his backyard and

11   around by the trailer?

12       A.    Yes.

13       Q.    At that point, did you have your camera

14   with you to take photographs?

15       A.    I believe I would have conducted an

16   initial walk through and then I would photograph.

17       Q.    So the photographs -- you did take

18   photographs that night, though, right?

19       A.    Yes.

20       Q.    Did you take -- I'm showing you

21   Government's Exhibit 39.

22             Did you take that photograph?

23       A.    Yes.

24       Q.    And did you take any measurements on

25   Mr. Smith's property that night?

1      A.    I did not.

2      Q.    You took this measurement, right?

3      A.    I placed a ruler in between, correct.

4      Q.    And you placed a ruler; that's taking a

5   measurement?

6      A.    If that's considered taking a measurement,

7   then, yes, I did do that.

8      Q.    But you didn't take a measurement from

9   where Mr. Smith said he was standing on his patio to

10  the door on his trailer, where he said he saw an

11  intruder?

12     A.    No.

13     Q.    I'm sure, as the lead detective, you have

14  measuring tape, you have a way to take measurements

15  as part of your investigation?

16     A.    My job is to process the scene, correct.

17     Q.    So you did -- and you have a measuring

18  tape, so you can take measurements if you need to?

19     A.    I did not have a measuring tape.

20     Q.    But other officers on the scene had

21  measuring tapes, certainly?

22     A.    They have diagram wheels used for accident

23  reconstruction.

24     Q.    Okay.  And let's just clarify for the jury

25  what a diagram wheel is.

1              That's a wheel that has a measuring tape on
2    it.  And you can walk it like this (indicating), so
3    that you can take a measurement, correct?
4        A.    That would be correct.  But that would not
5    work in this scenario because of the fence and as
6    well as all the vegetation.
7        Q.    So you couldn't walk it.  But you could
8    extend that measuring tape out.  You could have one
9    officer stand on one side and you could stand on the
10   patio and measure it that way, couldn't you?
11       A.    No, because it tracks off of the wheel.
12       Q.    So you didn't take a measurement from the
13   patio to the trailer?
14       A.    No, I did not.
15       Q.    Later that morning, as part of your
16   investigation, you went to the Espanola dispatch and
17   listened to the 911 call that Mr. Smith made to the
18   Espanola dispatch, correct?
19       A.    Yes.
20       Q.    And I assume, as the lead investigator on
21   the case, the lead detective, you also listened to
22   the lapel video of Officer Rael, where he
23   interviewed Mr. Smith?
24       A.    I did not listen to that, that morning.
25       Q.    Have you ever listened to that?

1      A.    I believe I have.

2      Q.    You're not sure?

3      A.    No.

4      Q.    You're the lead -- you were the lead

5 detective on this case, and you're not sure if you

6 watched the first recording of Mr. Smith's

7 conversation with Officer Rael?

8      A.    I'm not sure.  And I was the lead

9 detective.  It got turned over to the FBI.

10      Q.    But you were the lead detective?

11      A.    I was, correct.

12      Q.    Let me ask you, Officer -- or I'm sorry,

13 Detective Abeyta.

14           I'm showing you Government's Exhibit 39

15 again.

16           Did you, as part of your investigation,

17 look for fingerprints on the door handle of that

18 trailer?

19      A.    No.

20      Q.    Did you dust that for fingerprints?

21      A.    No.

22      Q.    Did you have any evidence technicians dust

23 that doorhandle or door for fingerprints?

24      A.    We did not have any evidence technicians.

25      Q.    Does anybody in the Espanola Police

1    Department have the capability of dusting for

2    fingerprints?

3         A.    Yes.

4         Q.    And was that done on this door?

5         A.    I answered that.

6         Q.    And the answer is?

7         A.    No.

8         Q.    You also, that evening, met with the

9    investigator with OMI, with the Office of Medical

10   Investigations, Lynne Gudes; is that right?

11        A.    No.  I met with her in the morning.

12        Q.    What time in the morning did you meet with

13   her?

14        A.    The initial call came out after 1:00 a.m.

15   I believe I met with her -- she responded to the

16   scene that same morning, so it would have followed

17   the 1:00 a.m. call-out.

18        Q.    Fair enough.  So if -- was it

19   approximately 2:15, or -- that she was called out,

20   and then she arrived on the scene around 3:15 in the

21   morning?

22        A.    That sounds right.

23        Q.    And did you coordinate her, in terms of

24   taking photographs and looking for footprints?

25        A.    Can you restate that?

1    Q.    Did you and she look for footprints and

2    take photographs of Mr. Smith's house and property?

3    A.    Did she do that, is that -- was that the

4    question?

5    Q.    Did Ms. Gudes take photographs?

6    A.    Yes.

7    Q.    And did she look for footprints?

8    A.    I don't know what Ms. Gudes did.

9    Q.    Did you look for footprints?

10    A.    I don't believe I looked for footprints.

11    Q.    You never looked for footprints on

12    Mr. Smith's property?

13    A.    I don't recall.

14    Q.    You, as the lead detective, prepared and

15    filed a criminal complaint in this case.

16    Do you remember preparing that criminal

17    complaint?

18    A.    I don't remember preparing it.  But yes, I

19    did.

20    Q.    If you want to refresh your recollection,

21    I'll be glad to give you a copy of it.

22    A.    No.  I -- that is my criminal complaint.

23    That's correct.

24    Q.    And you filed that in Magistrate Court in

25    Rio Arriba County on May 7 of 2018, correct?

1    A.    I did not file it.  Our records filed it
2    on May 7.
3    Q.    When did you give it to your records
4    office?
5    A.    So as soon as Mr. Smith is arrested, a
6    criminal complaint will go with Mr. Smith to the
7    detention center, our case being the Espanola jail.
8        From the jail, he will be transported to
9    Tierra Amarilla and their detention center, and they
10   will hand a copy to the detention center.
11       I also placed a copy of the criminal
12   complaint in our records custodian's box, for them to
13   file when they return.
14   Q.    When did you place it in the custodian's
15   box?
16   A.    As soon as I completed it.
17   Q.    And when was that, in this case?
18   A.    That would have been the morning of May 5.
19   Q.    You were at Mr. Smith's house until 4:30
20   in the morning?
21   A.    I believe so.
22   Q.    And after that you returned to the police
23   department?
24   A.    Correct.
25   Q.    And you spoke with Mr. Smith?

```
 1        A.    Correct.

 2        Q.    You spoke with him for about 55 minutes?

 3        A.    Yes.

 4        Q.    And when you spoke to Mr. Smith, that was

 5   both audio recorded and video recorded, correct?

 6        A.    That is correct.

 7        Q.    So just to be clear, there's a camera in

 8   the room where you're sitting with Mr. Smith, and

 9   that is running live.  It's recording video and

10   audio?

11        A.    Correct.

12        Q.    On May 6, so the next day, the day after

13   May 5, on May 6 you drove to Albuquerque to the

14   Office of Medical Investigator, correct?

15        A.    Correct.

16        Q.    And as the lead detective, you attended

17   the autopsy of Maria Gallegos?

18        A.    I did.

19        Q.    Were any other law enforcement officers

20   present for that autopsy?

21        A.    I don't recall.

22        Q.    And as the lead -- do you remember the

23   autopsy?

24        A.    I -- I know that I attended.  But

25   specifics, no, I do not remember.  I've attended
```

1    several autopsies throughout my career.

2         Q.    Would you like to take a moment to review

3    your investigative report to help refresh your

4    recollection?

5         A.    No.  As I stated, I -- yes, I attended the

6    autopsy.

7         Q.    Do you recall speaking with Dr. Cain, the

8    OMI doctor?

9         A.    Yes.

10        Q.    And you learned, from attending the

11   autopsy, that there was only one small gunshot wound

12   to Maria Gallegos' left temple?

13        A.    Correct.

14        Q.    You learned that the wounds on

15   Ms. Gallegos' forehead were not gunshot wounds?

16        A.    No.  Dr. Cain stated they were likely from

17   the fall after the gunshot wound.

18        Q.    Falling on the pavement, correct?

19        A.    Yes.

20        Q.    And you and Ms. Gudes, as you've mentioned

21   in direct examination -- or let me just ask.

22             You and Ms. Gudes, the OMI Investigator,

23   had mistakenly assumed that those wounds on

24   Ms. Gallegos' forehead were gunshot wounds?

25        A.    As stated earlier, I do not move the body.

1    And there was blood coming from her forehead.  And

2    at the time, yes, I did believe that was a gunshot

3    wound.

4        Q.    And it was dark, and it was difficult to

5    see that, right?  That's kind of why you made that

6    mistake?

7        A.    What -- was that a question?

8        Q.    I'm just saying it was dark, and it was

9    difficult to see, so that's why you and Ms. Gudes,

10   without being able to move the body, made a mistake

11   about the wounds on the forehead?

12       A.    No.  I -- I just explained why I made that

13   mistake.

14       Q.    Fair enough.

15             Here's the problem, Detective Abeyta.  In

16   the criminal complaint that you wrote out, and it was

17   filed on May 7, the day after you knew that there was

18   only one gunshot wound, you stated in that criminal

19   complaint that there were two gunshot wounds to

20   Ms. Gallegos' forehead, correct?

21       A.    I believe I did.

22       Q.    Did you ever go back and amend that

23   criminal complaint?

24       A.    No.

25       Q.    Did you ever make changes to that criminal

1    complaint?

2        A.    No.  At that point it got turned over to

3    the FBI.

4        Q.    Just to be clear, that criminal complaint

5    was signed by you under the penalty of perjury?

6        A.    Yes.

7        Q.    And you knew that that criminal complaint

8    had incorrect information about the number and

9    location of the gunshot wounds?

10       A.    The criminal complaint was dated from the

11   5th.  And at that time, I did not know that.

12       Q.    But let me ask the question again.

13            The criminal complaint contained incorrect

14   information about the number and the location of the

15   gunshot wounds?

16       A.    The criminal complaint was dated from the

17   5th.

18       Q.    I'm not asking when it was dated.

19            I'm asking if the information contained in

20   it was correct or incorrect.

21       A.    It was correct at the time it was written.

22       Q.    But you later learned that was incorrect?

23       A.    Later learned, yes.

24       Q.    Thank you.

25            I want to go back to May 5th.

1          You returned to Mr. Smith's house and
2  property on May 5th, again later in the day; is that
3  right?
4      A.    That is right.
5      Q.    Do you remember what time you went back to
6  his home?
7      A.    After my interview with him.
8      Q.    Do you remember approximately what time
9  that was?
10     A.    I do not.
11     Q.    So sometime in the day of May 5th you
12  returned to Mr. Smith's property?
13     A.    Sometime in the morning.
14     Q.    And to be -- I want to ask you about
15  Mr. Smith's property there.
16         As we discussed, you work for the Espanola
17  Police Department, and you previously worked for the
18  Rio Arriba Sheriff's Office, so you're familiar with
19  Espanola?
20     A.    Correct.
21     Q.    And when you went back to Mr. Smith's
22  property later in the day on May 5th, was there
23  any -- were there any "No vacancy" signs or
24  "Vacancy" signs in any location on his property
25  indicating that there were rooms available

1  for overnight stay at a motel?

2      A.    When I went back to the motel property, I

3  did not see any signs.

4      Q.    And there was no one in the reception

5  area, or any reception area.  There was no place for

6  somebody to check in as a guest, correct?

7      A.    No.

8      Q.    And that's because it was a closed motel,

9  right?

10      A.    I do not know that it was closed.

11      Q.    When you went back to Mr. Smith's property

12  on May 5th, you spoke with Ercilia Trujillo,

13  Mr. Smith's neighbor, and one of his -- somebody who

14  has an apartment on his property.

15          Did you speak with her?

16      A.    Yes, I spoke to his tenant.

17      Q.    And when you spoke with her, you were

18  wearing a lapel video, correct?

19      A.    That's correct.

20      Q.    And the lapel video was recording during

21  your conversation with Ms. Trujillo?

22      A.    That's correct.

23      Q.    You spoke with Ms. Trujillo about what she

24  heard and witnessed earlier in the day on May 5th,

25  around 12:30 or 1:00 in the morning, correct?

1      A.      Correct.

2      Q.      And based on her conversation with you,

3   you knew that she heard someone outside, a woman's

4   voice, yelling approximately 30 minutes before she

5   heard a gunshot, correct?

6               MS. WILSON:  Objection, hearsay.

7               MR. ELSENHEIMER:  It goes to what he did

8   as part of his investigation.

9               THE COURT:  So I will allow the testimony,

10  not for the truth, but for what the investigation

11  consisted of.

12     A.      So I asked Ercilia what had happened.  And

13  she stated that Doug said, "I did it.  I did it."

14     Q.      (By Mr. Elsenheimer) She also told you that

15  she heard a woman's voice outside about 30 minutes

16  prior to hearing gunshots?

17     A.      She did mention hearing someone's voice.

18  She was speaking Spanish and English, and I don't

19  speak Spanish.  So partially I was just nodding to

20  what she was saying without getting the actual

21  content.

22     Q.      You heard enough to know that she heard,

23  that she heard a woman outside yelling, "Come on,

24  come on, come on."

25              And if you -- and you might not remember.

1    And if you want to, I'll give you a transcript of

2    that interview.

3        A.    No, I -- I recall her saying that.

4        Q.    So she heard a woman's voice saying, "Come

5    on, come on, come on"?

6        A.    I recall her saying that, yes.

7        Q.    Based on that, you knew that there was a

8    possibility that there were multiple people on

9    Mr. Smith's property earlier on May 5th, around

10    12:30 or 1:00 in the morning?

11        A.    I'm sorry.  Can you repeat that?

12        Q.    Based on what you spoke with Ms. Trujillo

13    about, you knew that based on what Ms. Trujillo

14    heard, that there was a possibility that there were

15    multiple people on Mr. Smith's property, more than

16    one person on Mr. Smith's property, outside of her

17    house in the early morning hours of May 5th?

18        A.    Based on Ms. Trujillo's account, yes.  She

19    says there was a possibility.

20              Mr. Smith stated that he only saw one

21    shadow.

22        Q.    And I want to ask you about Riverside

23    Drive right there.

24              That area of Riverside Drive is a business

25    area of Espanola, right?

1       A.      Correct.

2       Q.      And there are a number of businesses

3  around or near Mr. Smith's property?

4       A.      There's the Western Winds Motel business.

5  There is KFC.  There is Pizza 9.  There's also

6  businesses to the north, correct.

7       Q.      Let me ask you, there's a KFC right next

8  door, correct?

9       A.      To the south.

10      Q.      To the south.  And directly across the

11  street from Mr. Smith's house is a Pizza 9?

12      A.      Across from the Western Winds Motel is

13  Pizza 9.

14      Q.      And that Pizza 9 faces Mr. Smith's

15  property, right?

16      A.      What do you mean by "faces"?

17      Q.      Well, the front of the Pizza 9 faces

18  Mr. Smith's, it's directly across the street from

19  Mr. Smith's property?

20      A.      No.  One of the doors is angled in a

21  southwest direction, and the other doors are to the

22  south.

23      Q.      Okay.  Fair enough.  One of the doors is

24  angled in a southwest direction.

25              And then adjacent to the Pizza 9 there's

1    also a liquor store, right?

2         A.    Yes.

3         Q.    And that's called El Rey Liquors; is that

4    right?

5         A.    Correct.

6         Q.    Did you go to any of those businesses to

7    get surveillance footage, to find out who was on

8    Mr. Smith's property?

9         A.    I did not.

10         Q.    Did any of the officers in the Espanola

11    Police Department?

12         A.    No.

13         Q.    And I want to ask you about your

14    investigation report.

15              You prepared this investigation report,

16    correct?

17         A.    Correct.

18         Q.    And it contains a progress note section

19    and then it contains the report itself; is that

20    right?

21         A.    Yes.

22         Q.    Did you mention anywhere in here your

23    conversation with Ms. Ercilia Trujillo?

24         A.    No, I did not.

25         Q.    Did you mention anywhere in here the

1  possibility that there were multiple people on

2  Mr. Smith's property in the early morning hours of

3  May 5th?

4      A.    No, I did not.

5      Q.    Did you mention in your report the lapel

6  video that you had of your conversation with

7  Ms. Trujillo?

8      A.    No, I did not.

9      Q.    And you -- fast forward just a little bit.

10         Eventually, this case was turned over to

11  the FBI, right?

12     A.    Yes.

13     Q.    And you turned the case over to

14  Agent Taylor, who's sitting right here, right?

15     A.    Correct.

16     Q.    And that was on the 18th of May?

17     A.    Correct.

18     Q.    You gave him, presumably, your

19  investigative report.  And then you gave him

20  Officer Rael's lapel video.  And you gave him the

21  911 dispatch call.

22         And I assume you gave him the interview

23  that you had with Mr. Smith, right?

24     A.    Correct.

25     Q.    And on May 18th, you did not give him your

```
 1    lapel video of your conversation with Ercilia
 2    Trujillo, did you?
 3         A.    No.
 4         Q.    How long -- I want to back up a little
 5    bit.
 6               When you arrived at -- from when you
 7    arrived at Mr. Smith's home on May 5th, at
 8    approximately 1:40 in the morning until when you
 9    left, how long were you on his property?
10         A.    I don't recall.
11         Q.    Is it safe to say you were there about
12    three hours?
13         A.    Yes.
14         Q.    Does that sound about right?
15         A.    At least three hours, yes.
16         Q.    Detective Abeyta, we just listened to your
17    interview with Mr. Smith.  We listened to
18    approximately 23 minutes of that interview, correct?
19         A.    We did listen to the interview.
20         Q.    And you said that your interview with
21    Mr. Smith was 55 minutes long?
22               MS. WILSON:  Objection, Your Honor.
23               May we approach?
24               THE COURT:  Yes.
25               (Whereupon a Bench discussion was held
```

1    outside the hearing of the jury.)

2              MS. WILSON:  Your Honor, the inference

3    that the recording is -- obviously, there are

4    redactions in it.  We litigated that issue

5    extensively.  If we leave the jury with the idea

6    that the Government is hiding something is

7    problematic, especially for the jury instruction.  I

8    believe it's Jury Instruction 11 in this case says

9    the evidence is the recording itself, not

10    necessarily the transcript.  It's an aid.

11              But also, you know, the fact that those

12    redactions are there, that is not problematic, and

13    they will be instructed to ignore those redactions.

14    So the inference that, you know, these redactions are

15    going to be ignored and him bringing that up as an

16    issue in this case, when the Court ordered these

17    redactions, is problematic.

18              THE COURT:  Were you addressing to include

19    the redactions?

20              Well, let me just ask you:  What is your

21    response?

22              MR. ELSENHEIMER:  The Government can

23    present whatever they want to present.  But I think

24    it's only fair for us to be able to point out that

25    what the jury heard was not the entire conversation.

1    A lot of that conversation was redacted, and that is

2    all I want to ask of this officer.

3            THE COURT:  So would you disagree that

4    there were a lot of things that were redacted that

5    the Court didn't permit for one reason or another?

6            MR. ELSENHEIMER:  Certainly.

7            THE COURT:  So are you going to give the

8    jury the impression that the Government is trying to

9    hide something?

10           MR. ELSENHEIMER:  I think it's only fair

11   for the jury to know that there is a longer

12   recording.

13           Again, the Government moved to exclude a

14   number of Mr. Smith's statements, and we wanted to

15   bring some in.

16           I think it's imperative for the jury to

17   know that there is a longer statement.

18           Again, it's -- the Government can select

19   whatever evidence.  But I think it's fair to point

20   out that there's missing parts of Mr. Smith's

21   statement in there.

22           THE COURT:  Well, if I allow that, I will

23   allow the Government to react.  I don't know what

24   your response would be on redirect, but I would

25   certainly allow the Government to explain whatever

1    the impression is that they feel needs to be

2    explained.

3              In other words, I feel like there are some

4    things that were included in the statement that would

5    not be admissible or relevant.  And so to the extent

6    the jury is left with the impression that there were

7    favorable things that Mr. Smith said that the jury

8    isn't allowed to hear, I think it may leave the jury

9    with a misrepresented impression, or an unfair

10   impression.

11             So I get that you want the jury to know

12   that the -- Mr. Smith cooperated with the interview

13   and -- but I think that if you do try to leave them

14   with the impression --

15             MR. ELSENHEIMER:  I will move on.

16             THE COURT:  All right.

17             MS. WILSON:  For the record, Your Honor,

18   we would ask that the jury be instructed, as per

19   what the transcript instruction application note

20   says before the statement is heard, that the -- the

21   evidence is the recording itself, not necessarily

22   the transcript, to rehabilitate that.

23             So if we would go any further, that is what

24   we would consider the Court would --

25             THE COURT:  You will have to raise it, if

1    you think it is in order.  And you will have to give

2    me in the instruction that you are referring to.

3                MR. ELSENHEIMER:  Thank you.

4                (Whereupon the following proceedings were

5    held in Open Court.)

6        Q.    (By Mr. Elsenheimer) Detective Abeyta, we

7    heard the audio recording of part of your

8    conversation with Mr. Smith.

9                That was also video recorded, correct?

10   There is an actual video of that interview, right?

11       A.    Yes.

12       Q.    Okay.  And Mr. Smith was cooperative with

13   you when you met with him?

14       A.    Yes.

15       Q.    You offered him a cup of coffee?

16       A.    I did.

17       Q.    He sat in your office with you, or I'm

18   sorry, he sat in a room at the police department

19   with you?

20       A.    I sat in the interview room, yes.

21       Q.    Okay.  And you even went through the

22   Miranda warnings with Mr. Smith, the document, and

23   advised him of his rights.  And he was cooperative

24   and forthcoming and answered all of your questions,

25   didn't he?

1      A.    Yes.

2      Q.    I want to ask you about -- you had

3  mentioned something about the firearm, the .22 Luger

4  that Mr. Smith had.

5            And you said that there was something about

6  the safety on that, that didn't function properly or

7  didn't work?

8      A.    Mr. Smith stated that.

9      Q.    I see.  And so just -- I want to make sure

10  that we understand.  The safety is something that

11  is -- prevents the trigger from being pulled on a

12  gun, correct?

13     A.    The safety prevents a bullet from coming

14  out of the gun.

15     Q.    Okay.  And you mentioned the term

16  "chambered a round."

17           And Mr. Smith explained to you that when he

18  carried the gun it was -- there was not a round in

19  the chamber, correct?

20     A.    Correct.

21     Q.    And he just carried it like that because

22  if there's not a round in the chamber, you're not

23  able to fire a gun, correct?

24     A.    You can fire the gun.  A projectile would

25  not come out.

```
1        Q.    Fair enough.  So you could pull the

2    trigger, but no bullet would come out, because

3    there's no bullet in the chamber?

4        A.    Yes.

5        Q.    Okay.  And that serves as a safety

6    mechanism, correct?  So if you don't have a

7    chambered round, that gun is the equivalent of

8    having a safety?

9        A.    Do you mean not chambering a round serves

10   as a safety mechanism?

11       Q.    Yes.

12       A.    It could.

13       Q.    Okay.  Thank you.

14             You mentioned that Mr. Smith had shot --

15   told you that he shot faster than he had ever shot

16   before, right?

17       A.    Yes.

18       Q.    He told you he shot that way because he

19   was scared witless, didn't he?

20       A.    Yes.

21       Q.    When he stepped out and saw somebody on

22   his property trying to break into his trailer he was

23   scared witless.

24             That's what he told you, right?

25       A.    He did say he was scared witless.
```

1      Q.    Thank you.

2            I want to ask you about something that

3   you've mentioned that's on Page 13 of the transcript

4   that we just listened to, if you want to take a look

5   at it.

6      A.    (Witness complies.)

7      Q.    Let me know when you have the page open.

8      A.    Okay.

9      Q.    And that is where Mr. Smith is discussing

10  how prior to May 5th, at some point earlier that

11  year, he had encountered another intruder on his

12  property, correct?

13     A.    He said that he encountered someone near

14  the camper trailer.

15     Q.    And he explained to you -- he explained to

16  you, at that -- just like with this situation, he

17  fired to the left to miss the person, and then the

18  person ran off.  He thought the person was gone and

19  he fired again, correct?

20     A.    He said that he shot to miss, again, to --

21  they took off running and he went pow, pow, pow,

22  just like he did with this girl.

23     Q.    And he only went pow -- he explained to

24  you that he went pow, pow, pow.  He fired again,

25  only after the person had left the property.  He

1  thought the person had left the property, correct?

2      A.    After they took off running.

3      Q.    Right.

4      A.    Running from the first shot.

5      Q.    This came out in the transcript.  I wanted

6  to clarify.

7          There is a reference to somebody named

8  Melanie.

9          Did you find out who Melanie was?

10      A.    Melanie was Ercilia's granddaughter.

11      Q.    So it's the -- a granddaughter of

12  Mr. Smith's neighbor and tenant, Ercilia Trujillo?

13      A.    Yes, the tenant.

14      Q.    I want to turn your attention to Page 25.

15          At the bottom of Page 25, if you can look

16  at that.

17      A.    Okay.

18      Q.    You asked Mr. Smith if he knew who the

19  person was, who we now know is Maria Gallegos.  You

20  asked him if he knew who that person was.

21          You said, "You have never seen this girl

22  before?"

23          Is that what you asked him?

24      A.    Yes.  I said, "You've never seen this girl

25  before."

1    Q.    And it says, "No audible response" in the
2  transcript.
3         But Mr. Smith actually told you he didn't
4  know who that person was, correct?
5    A.    I believe that's correct.
6    Q.    That he didn't know who that person was.
7  Okay.
8         Thank you.
9         MR. ELSENHEIMER:  May I have just a
10  moment, Your Honor?
11        THE COURT:  You may.
12   Q.    (By Mr. Elsenheimer) You mentioned that
13  Mr. Smith didn't mention a woodpile in your direct
14  examination.
15   A.    Yes.
16   Q.    But you actually asked him in a different
17  portion -- part of that interview.  It's not in the
18  transcripts.
19        You asked him if he was shooting towards
20  the woods, didn't you?
21        MS. WILSON:  Objection, Your Honor.
22        THE COURT:  What's the basis of your
23  objection?
24        MS. WILSON:  It's unclear what he's
25  referencing.  The entirety -- may we approach?

1          MR. ELSENHEIMER:  I can clarify,
2    Your Honor.  I'll clarify.  I have the page.
3          THE COURT:  All right.  Thank you.
4      Q.  (By Mr. Elsenheimer) Do you want to turn
5    your -- to the transcript Page 15, and Line 12 of
6    that transcript.
7      A.    Page 15 is redacted.
8      Q.    I'm sorry.  Let me show you a different
9    transcript.
10          MR. ELSENHEIMER:  May I approach,
11   Your Honor?
12          MS. WILSON:  I'm going to object,
13   Your Honor.
14          May we approach?
15          THE COURT:  Yes.
16          (Whereupon a Bench discussion was held
17   outside the hearing of the jury.)
18          MS. WILSON:  Again, he's going to elicit
19   things that have been redacted.  We all agreed to
20   these redactions.  Asking him a question on lines
21   that have been redacted is improper.  I think he is
22   opening the door to us asking the Court to instruct
23   the jury to ignore these redactions.
24          THE COURT:  Your response?
25          MR. ELSENHEIMER:  By asking about the

1    woodpile, they opened the door about the fact that
2    he asked about the woods, and Mr. Smith responded.
3    So that's what --
4              THE COURT:  Remind me what that page says
5    that you are going to ask him about.
6              MR. ELSENHEIMER:  I'm going to ask him
7    about 15, 12.  Mr. Smith says, "Yeah, I shot to miss
8    the trailer.  It was over to the side."
9              DETECTIVE ABEYTA:  "Towards, like, the
10   woods and stuff?"
11             "Just over the woodpile and the trees."
12             THE COURT:  But he doesn't mention the
13   woodpile.
14             MR. ELSENHEIMER:  He mentions the wood.
15             THE COURT:  Right.  But woods and
16   woodpile -- are you saying that's the same thing?
17             MR. ELSENHEIMER:  They were asking
18   Detective Abeyta where Mr. Smith shot, and then they
19   asked if he said anything about the woodpile.
20             THE COURT:  I remember the woodpile, but I
21   don't see the woodpile in your --
22             MR. ELSENHEIMER:  No, it's not.  It says
23   woods and stuff.  It's woods.  He's referring to the
24   woodpile.
25             THE COURT:  Well, I agree that they asked

1   him about a woodpile, if Mr. Smith ever said

2   anything about a woodpile.

3           So they did ask something that I think you

4   would be able to clarify or rebut, but I don't know

5   that woods and woodpile are the same thing.

6           Is there something you can --

7           MR. ELSENHEIMER:  I mean, I could ask him.

8   I just think it's fair, because he's referencing the

9   woods and stuff.  And so leaving the jury with the

10  impression that he didn't mention woodpile is a

11  little bit disingenuous, if he's mentioning the

12  woods and stuff.

13          THE COURT:  I understand what you want to

14  do, and I would allow you to do it.  But I'm just

15  not clear where the woodpile comes in on that.  So

16  that's my concern.

17          But if you have a reference to a

18  woodpile -- you asked about a woodpile.

19          MS. WILSON:  He doesn't.  And it's related

20  to the opening argument and things that they are

21  going to present in their case.  And I mean, you're

22  right, Your Honor, woods and woodpile are different.

23          THE COURT:  Well, they are different, to

24  me.  I don't know if they are different to the

25  witness.

1          MS. WILSON:  I agree.  And that fence
2   there that has the trees, talking about woods, could
3   be something like a forest, for example.  And I
4   believe that's what he's referencing.  And I think
5   you are correct.  They are not the same.
6          THE COURT:  Forget my feeling on this.
7   What I'm saying is, you did ask if he, Mr. Smith,
8   mentioned the woodpile, and he said no.
9          So if there is something that the defense
10  has that says otherwise, then it's impeachment, and I
11  would allow them to get at it.
12         I don't believe it's running afoul of the
13  redactions.  But --
14         MR. ELSENHEIMER:  It's just that he says
15  woods and stuff.  There is no forest on Mr.- --
16         THE COURT:  There are a lot of trees.  We
17  have seen a lot of greenery.
18         MR. ELSENHEIMER:  And stuff opens --
19  they're asking, What were you shooting towards?
20         I just think that it's --
21         THE COURT:  What was he shooting towards?
22  Did you ask him what was there?
23         MR. ELSENHEIMER:  I will ask him.
24         THE COURT:  If you can get him to tell you
25  that there is a woodpile there, then I would allow

1    that.

2              MR. ELSENHEIMER:  Okay.  Fair enough.

3              THE COURT:  If he doesn't, you're stuck

4    with it.

5              (Whereupon the following proceedings were

6    held in Open Court.)

7         Q.   (By Mr. Elsenheimer) Detective Abeyta, I

8    want to ask you about Government's Exhibit 36, so

9    let me go back over to the screen over here.

10             This is, again, a diagram that Mr. Smith

11   drew for you, correct?

12        A.   Correct.

13        Q.   And it's a diagram of his house and yard

14   and property, correct?

15        A.   Correct.

16        Q.   When Mr. Smith drew this diagram, did you

17   label it to identify the first line that he drew?

18        A.   I'm sorry?

19        Q.   Did you label it to identify -- did you

20   label this exhibit in any way?  Did you put any

21   markings on this exhibit?

22        A.   I don't believe so.

23        Q.   Okay.  And Mr. Smith explained -- used

24   this exhibit to further explain to you what happened

25   earlier on May 5th, right?

1    A.    Yes.

2    Q.    So he -- he said that he was standing here

3    (indicating) where I've just circled in red?

4    A.    Yes.  He stated he was standing on the

5    back porch.

6    Q.    And he said that the intruder he saw

7    trying to break into his trailer was standing here

8    (indicating); is that right?

9    A.    I believe so.

10    Q.    Okay.  So the intruder is there

11    (indicating).  And he used this diagram to show for

12    you where he fired that night, correct?

13    A.    He stated that this is the -- where he

14    fired angle-wise.

15    Q.    Okay.  And he used the term "angle-wise,"

16    correct?

17    A.    He did.

18    Q.    To show the -- he used these lines to show

19    where it was that he fired.

20         So this line right here (indicating), this

21    line right here (indicating), and this line right

22    here (indicating), were the -- that's the angle-wise

23    in the direction where he fired, correct?

24    A.    That is in the general direction, yes.

25    Q.    Okay.  These weren't the specific lines

1    that he fired, correct?

2        A.    I do not know.

3        Q.    He was just using these lines to show you

4    the general direction of where he was firing, right?

5        A.    Yes.  He stated angle-wise.

6        Q.    And you went back to Mr. Smith's property

7    later on May 5th.  And what is -- what is over here

8    on Mr. Smith's property?  Do you remember?

9        A.    I do not.

10       Q.    There's a woodpile over there, isn't

11   there?

12             MS. WILSON:  Objection, Your Honor.

13             THE COURT:  Overruled.

14       A.    I don't recall.

15       Q.    (By Mr. Elsenheimer) You don't recall.  You

16   went to Mr. Smith's property and you took

17   photographs the next day, and you don't recall if

18   there was a woodpile or not?

19       A.    That's correct.

20             MR. ELSENHEIMER:  Well, may I approach the

21   witness, Your Honor?

22             THE COURT:  To show him --

23             MR. ELSENHEIMER:  I'm going to show him --

24             THE COURT:  Is it to -- is it an exhibit?

25             MR. ELSENHEIMER:  It's to refresh his

1    recollection of the property.

2              THE COURT:  All right.

3              MR. ELSENHEIMER:  May I approach the

4    witness?

5              THE COURT:  If you show it to counsel

6    first, yes.

7              MR. ELSENHEIMER:  May I approach?

8              THE COURT:  You may.

9        Q.    (By Mr. Elsenheimer) Detective Abeyta, does

10   that -- can you take a look at that?

11       A.    Yes, I am looking at it.

12       Q.    And does that refresh your recollection of

13   what Mr. Smith's property looked like when you went

14   back on May 5th?

15       A.    I see a woodpile here, yes.

16       Q.    And does that help you remember what

17   Mr. Smith's property looked like?

18       A.    Not -- not really from -- from this.

19       Q.    So you see a woodpile there.  That doesn't

20   help you remember Mr. Smith's property?

21       A.     No, because I can't -- I can't identify

22   any of the other surrounding things around it to

23   place it.

24             MR. ELSENHEIMER:  May I approach the

25   witness?

1              THE COURT:  You may.

2       Q.   (By Mr. Elsenheimer) And just to go back to

3  this diagram.

4              When Mr. Smith drew these lines, he said

5  his -- where he fired, like he said:

6              "So my bullets are in this little area here

7  angle-wise."

8              Correct?

9       A.   Yes, he said angle-wise and drew the

10 lines.

11      Q.   And by "lines," he's referring to this

12 area in here (indicating), correct?

13      A.   Yes.

14      Q.   All right.

15             Detective Abeyta, I want to show you

16 Government's Exhibit 56 that I believe was just

17 introduced.

18             On this exhibit can you point out where the

19 tin shed was?

20      A.   The metal shed was here (indicating).

21      Q.   Okay.  And I want to ask you.

22             There's a shadow area right here

23 (indicating).  Do you see what's in that shadow area

24 right there (indicating)?

25      A.   I cannot tell based on this picture.

```
 1              But based on the one you showed earlier, I
 2    can identify the pole there.
 3         Q.    Okay.  The pole.  And do you see something
 4    behind that pole?
 5         A.    Yes.
 6         Q.    And what is that behind the pole?
 7         A.    As I stated, I can't identify it in this
 8    photo.  But I -- I believe I can identify it from
 9    that other photo.
10         Q.    Okay.  What is that, then?
11         A.    That would be the woodpile.
12         Q.    That's the woodpile on Mr. Smith's
13    property.
14              And just to be clear, angle-wise, that is
15    on this diagram right over here (indicating),
16    correct, angle-wise?
17         A.    No.  It would be a little further down.
18         Q.    Okay.  So, Detective Abeyta, Mr. Smith
19    explained to you, in that interview that you had
20    with him early in the morning on May 5th, that he
21    saw an intruder on his property trying to break into
22    the trailer, correct?
23         A.    He stated that he saw someone -- somebody
24    by his mother's camper.
25         Q.    And he explained to you that they were
```

1    trying to open the door, turn the doorhandle?

2        A.    He -- he didn't -- I don't recall

3    specifics.

4        Q.    But he explained to you that he thought

5    they were trying to get into the trailer?

6        A.    He stated that the trailer was locked.

7    But yeah, he --

8        Q.    Sure.  I mean, they couldn't -- it was

9    locked.  But he explained they were trying to get

10   into the trailer?

11       A.    That's what he believed.

12       Q.    And he fired to the left, on the other

13   side of the trailer, to scare the person off?

14       A.    Correct.

15       Q.    Because he was scared witless when he saw

16   them on his property?

17       A.    That's what he stated.

18       Q.    And then that person ran.  And he believed

19   that they had left his property, correct?

20       A.    He -- yes.

21       Q.    But when he believed that they had left

22   his property, he fired three more warning shots

23   because he was scared witless, correct?

24       A.    Not -- not exactly in that -- I guess, as

25   stated.

1      Q.     So yes, that's what he told you?

2      A.     Not exactly as stated.

3      Q.     So let me ask you about Page 16, Line 4.

4   I believe that this is part of the exhibit that you

5   have with the redactions.

6             Mr. Smith explained to you:

7             "But I thought whoever it was had already

8   taken off running, so I was just making noise."

9             So let me ask you again.

10            Mr. Smith explained to you that he thought

11  the person had already taken off running and that he

12  was just firing to make noise, right?

13     A.     Running from the camper trailer, correct.

14     Q.     And around his property and down the

15  street?

16     A.     Running from his property.

17     Q.     Thank you.

18            MR. ELSENHEIMER:  May I have just a

19  moment, Your Honor?

20            THE COURT:  Yes, you may.

21            MR. ELSENHEIMER:  Nothing further,

22  Your Honor.

23            THE COURT:  Redirect?

24            MS. WILSON:  No, Your Honor.  Thank you.

25            THE COURT:  All right.

```
 1              May this witness be permanently excused?
 2              MS. WILSON:  Yes, Your Honor.
 3              MR. ELSENHEIMER:  We would like him to
 4  remain subject to re-call.
 5              THE COURT:  So thank you for your
 6  testimony today, Detective.  I won't release you
 7  yet.  You are subject to re-call.
 8              THE WITNESS:  Thank you.
 9              THE COURT:  Thank you.
10              (Whereupon the witness was excused from
11  the courtroom subject to re-call.)
12              THE COURT:  The Government may call its
13  next witness.
14              MR. NAYBACK:  The United States calls a
15  special agent from the FBI, Travis Taylor.
16              (Whereupon, the witness was sworn.)
17              THE COURT:  You've been sitting here
18  during the trial, so you know I'm going to ask you
19  to give us your full name and spell your first and
20  last names, please, for the record.
21              THE WITNESS:  Sure.  My name is Travis
22  Taylor.  T-R-A-V-I-S, T-A-Y-L-O-R.
23              THE COURT:  Thank you.
24              You may proceed, Counsel.
25              MR. NAYBACK:  Thank you.
```

1                    **DIRECT EXAMINATION**

2      BY MR. NAYBACK:

3      Q.     Sir, where do you work?

4      A.     I work for the FBI.

5      Q.     What's your title there?

6      A.     I'm a special agent.

7      Q.     How long have you been with the FBI?

8      A.     I've been with the FBI for approximately

9  seven years.

10     Q.     Can you describe for the jury your

11 educational background?

12     A.     Prior to the FBI?

13     Q.     Yes.

14     A.     I'm a graduate from the University of

15 Texas.

16     Q.     And before becoming a special agent, do

17 you have to go through training by the FBI?

18     A.     Yes, sir.

19     Q.     How long?

20     A.     Approximately 21 weeks, when I went

21 through.

22     Q.     Where?

23     A.     At Quantico, Virginia.

24     Q.     Do you go through firearm safety training?

25     A.     I do.

1    Q.    And what agency of the FBI are you in

2    currently?

3    A.    I work for the Santa Fe Resident Agency of

4    the Albuquerque division.

5    Q.    Does that mean you handle cases in

6    Northern New Mexico, mostly?

7    A.    Yes, sir.

8    Q.    Are you familiar with how the FBI gets

9    involved in crimes, felony crimes, that happen on

10   our 22 Native American Reservations in New Mexico?

11   A.    I am, sir.

12   Q.    And how many do we have here in

13   New Mexico?

14   A.    22.

15   Q.    How many in the United States?

16   A.    I believe it's 754.

17   Q.    How do you go about determining whether a

18   crime has happened in Indian Country?

19   A.    Well, the most definitive way is to go to

20   the Tribal Enrollment Office, or Tribal Land

21   Property Office of the Reservation or Pueblo that

22   the crime may have been committed near, and you

23   request a land status record for either the geo

24   coordinate that we give to that realty office or the

25   address.

1       Q.      When you say geo coordinates, what do you
2   mean?
3       A.      Longitude and latitude.
4       Q.      How do you obtain those, if you're an
5   agent?
6       A.      I stand on the property or I go to Google
7   maps and put a pin on the property where the
8   crime -- or the area of which the crime was
9   committed.
10      Q.      Once you decide a crime is happening in
11  Indian Country, what else do you need to know before
12  the FBI has jurisdiction to investigate?
13      A.      If the victim was Indian, or if the
14  defendant was an Indian, and it was -- the crime
15  also took place on Indian Country.
16      Q.      So if two non-Indians get into a fight and
17  one commits an assault against the other, and it's
18  on the, let's say, Sandia Indian Reservation at the
19  casino, where does that case go?
20      A.      Most likely a State case.  It would not be
21  a Federal case.
22      Q.      As lead case agent, what are your
23  responsibilities in any given case?
24      A.      I manage and run cases.  I investigate.  I
25  interview witnesses, subjects, gather more

1    information.

2        Q.    And when there are multiple agencies

3    involved, how do you track down evidence or reports?

4        A.    That is -- that actually occurs quite

5    often.  And sometimes I'll go to the lead officer or

6    detective on the scene and ask for them -- ask for

7    their investigative reports.

8            In addition, some policy requires that I go

9    to the custodian of records for the agency.  And so

10   then I'll go to the custodian of records and ask for

11   any reports related to their investigation.

12       Q.    Other than reports, what else might you be

13   asking for?

14       A.    Diagrams, videos, audio recordings,

15   anything in possession that would be related to

16   their investigation.

17       Q.    Are you always successful in getting all

18   the evidence the first time you ask, or sometimes

19   does it take multiple requests?

20       A.    It has taken multiple at times.  I mean, I

21   trust that that law enforcement agency gives me the

22   information that they have.  I trust that they also

23   follow-up with me if they gather more information.

24           I do not go back to them weekly and ask

25   them if something new has come up.

1       Q.    Are you familiar with the tribal

2   boundaries of the Santa Clara and Ohkay Owingeh

3   Pueblo Reservations?

4       A.    I am, sir.

5       Q.    What town do they border?

6       A.    Espanola.

7       Q.    So is it always clear, when you're working

8   in the Espanola area, Special Agent Taylor, when

9   something happens in Indian Country or not?

10      A.    No.  Many cases that we have in Espanola,

11  and cases that I've worked, it's oftentimes unclear.

12  And we work them side-by-side with locals until it's

13  determined whether it is on tribal land or on City

14  property or State property.

15      Q.    Is it problematic in any way, if you're

16  working with a State agency as a Federal agency, or

17  is that something that's common?

18      A.    No.  We try really hard to establish

19  relationships with local agencies, so that when

20  things like this come up we can work hand-in-hand

21  together.

22      Q.    The homicide in this case occurred on

23  May 5th, 2018, correct?

24      A.    Yes, sir.

25      Q.    When did you get a call to assist?

1        A.      It was about 2:30 a.m. on May 6, 2018.

2        Q.      Okay.  Not the first night?

3        A.      No, sir.

4        Q.      Why is that?

5        A.      From what I understand from conversations

6    with Detective Abeyta and that they did not, they

7    did not know on May 5th that this happened on tribal

8    land.

9        Q.      And just a minute ago you said you were

10   familiar with some of the tribal boundaries.  Are

11   they always demarcated by a straight line such as

12   Riverside Drive or do they vary?

13       A.      In my experience they do vary.  They are

14   often commingled -- well, in Espanola, Santa Clara

15   particularly is commingled with City limits.

16       Q.      You mentioned your role as the

17   investigator is to track down all the evidence that

18   has already been collected, but then do you go ahead

19   and interview witnesses as a special agent yourself?

20       A.      I do.

21       Q.      In this case how many witnesses were there

22   to this homicide?

23       A.      Two, but one is deceased.

24       Q.      Did you interview the defendant in this

25   case?

495

```
1        A.    I did.

2        Q.    What is his name?

3        A.    Douglas Smith.

4        Q.    Is the defendant in the courtroom and if

5   so, please point to him and describe his clothing.

6        A.    Yes, sir.  Douglas Smith is over there

7   (indicating).  He is wearing a sand-colored

8   button-up and a gray/beige suit.

9        Q.    What color is his hair?

10       A.    White.

11             MR. NAYBACK:  Your Honor, would the Court

12  record reflect proper ID of the defendant?

13             THE COURT:  Yes, the record will so

14  reflect.

15       Q    (By Mr. Nayback) Special Agent Taylor, how

16  much agencies were involved in this case, if you

17  know?

18       A.    FBI, OMI, EMS, Fire, State and EPD or

19  Espanola Police Department.

20       Q.    When you got alerted about the case, how

21  did you first go about learning what happened and

22  what the case is about?

23       A.    So around 2:38 on May 6 I got an e-mail

24  that a crime was committed on Indian Country land

25  and that the subject had been arrested prior by
```

1    Espanola Police Department.  So we had two agents go

2    up on Monday early in the morning to bring the

3    subject to the Santa Fe RA, Resident Agency, so that

4    I could interview him with a colleague.

5        Q.    And in any case would you always at least

6    attempt to talk to the subject?

7        A.    Always.

8        Q.    Were you able to speak with the defendant

9    in this case?

10       A.    I was.

11            MR. NAYBACK:  Approach the witness,

12   Your Honor?

13            THE COURT:  You may.

14       Q    (By Mr. Nayback) I am showing what you has

15   been marked for identification as Government's 63.

16   Would you take a moment to take a look at that and

17   tell me when you are done.

18       A.    (Witness complies.) Thank you.

19       Q.    What is that?

20       A.    That is a diagram that Douglas Smith drew

21   while he was being interviewed by myself and a

22   colleague.

23       Q.    Fair and accurate depiction of the actual

24   diagram?

25       A.    Yes.

```
 1              MR. NAYBACK:  I move Government's 63.

 2              THE COURT:  Is there objection?

 3              MR. ELSENHEIMER:  No.

 4              THE COURT:  63 is admitted.

 5              (Exhibit admitted, Government's 63.)

 6      Q    (By Mr. Nayback) And before that you talked

 7   to the defendant, what do you usually do to advise

 8   him of his rights?

 9      A.    Well, in this case I have given his advice

10   of rights with a Miranda warning.  They have a form

11   for that in the FBI that we allow someone to read

12   and understand.

13              MR. NAYBACK:  Approach the witness?

14              THE COURT:  Yes.

15      Q    (By Mr. Nayback) Government's 62, take a

16   moment to look at it and tell me when you're done

17   and hand it back.

18      A.    (Witness complies.) Thank you, sir.

19      Q.    What is it?

20      A.    It is our Miranda warning, our advice of

21   rights.

22      Q.    Fair and accurate depiction of the

23   original?

24      A.    Yes, sir.

25              MR. NAYBACK:  I move Government's 62.
```

```
1              THE COURT:  Is there objection?

2              MR. ELSENHEIMER:  No, Your Honor.

3              THE COURT:  62 is admitted.

4              (Exhibit admitted, Government's 62.)

5              MR. NAYBACK:  Permission to publish?

6              THE COURT:  You may.

7              (Whereupon Government's 62 was published

8    to the jury.)

9         Q.   (By Mr. Nayback) Can you explain to the

10   jury what portions of this that you filled out and

11   what portions Mr. Smith filled out?

12        A.   Mr. Smith filled out the signature that he

13   consented, that he understood his rights and I read

14   out all of his rights and I asked him to sign here

15   to understand that he understood his rights and then

16   I signed as a witness and my other colleague signed

17   as the other witness.

18        Q.   Did he appear to be lucid that day?

19        A.   Yes.

20        Q.   What date and time is on there?

21        A.   11:28 or the time that we signed it as a

22   witness was 11:28 a.m. May 6.

23        Q.   Who else was with you?

24        A.   Special Agent Michelle Cobb.

25        Q.   Is her signature on here?
```

1        A.      Yes.

2        Q.      Would you circle it.

3        A.      (Witness complies.)

4        Q.      Why do you interview subjects with two

5   agents?

6        A.      For safety, for rapport building, and for

7   accuracy when it comes to writing reports

8   afterwards.

9        Q.      Before you talked to the defendant were

10  you able to review the recorded interview done by

11  Detective Abeyta who just testified a minute ago?

12       A.      No.  I read his affidavit.  I read --

13  well, at the same time I received his affidavit I

14  also had a text file of Albert Rael's.  I don't

15  believe it was his official report, maybe his draft

16  report.  But I do recall using his affidavit as far

17  as knowing what happened that night.

18       Q.      Did you talk to Mr. Smith about what he

19  does for a living?

20       A.      Yes, I did.  He referenced himself as a

21  hotel manager.

22       Q.      And did you ask him about the rooms that

23  he rented out?

24       A.      He said he had 12 rooms under construction

25  and that he had three tenants that he charged.

1      Q.    Did Mr. Smith ever mention that the hotel
2  was closed since 2014?
3      A.    I don't recall that ever happening in my
4  interview.
5      Q.    Where is the hotel located?
6      A.    On North Riverside Drive at 826 or
7  826 North Riverside Drive.
8      Q.    Have you worked in that area before this
9  case, before have you, day or night have you worked
10 in that area?
11     A.    I have.
12     Q.    Can you describe it for the jury?
13     A.    It is a business area.  There is
14 restaurant, KFC to the south.  There is a Pizza 9 to
15 the east.  An El Rey Liquors as well to the east,
16 southeast and that El Rey Liquors is part of a small
17 strip mall that is there.
18          There are some residents directly to the
19 west, some other residents in the southwest of the
20 property as well as it appears to be a radio station
21 directly west past the residential buildings.
22     Q.    Can you tell me about the level of either
23 foot traffic or vehicle traffic in that area in the
24 daytime and then in the nighttime?
25     A.    In Espanola often for different various

1   reasons and I would say that it is heavily

2   trafficked vehicular-wise and pedestrian-wise.

3        Q.    You just mentioned some rural residences

4   to the west of the property.  Can you tell me, was

5   it clear to you where the Mr. Smith's hotel property

6   stopped and started on the west side?

7        A.    There are two, I believe, residential

8   structures to the west that don't have fences in

9   between them and the motel.  And then there appears

10  to be a larger fenced area that encompasses those

11  residential buildings as well as the motel.

12       Q.    So if you had to say for certain where the

13  hotel property starts and starts or Mr. Smith's

14  property stops and starts, would you be able to say

15  for certain?

16       A.    I couldn't say for certain where the motel

17  property stops and where those residential

18  properties begin.

19       Q.    When was the first time you went on to the

20  property?

21       A.    I believe it was May 18 to interview

22  Ercilia Trujillo.

23       Q.    And when you went there, did you notice

24  any gates or private property signs up, Special

25  Agent?

```
 1        A.    From what I recall there was no gates on

 2   the driveway that we have seen previously with the

 3   red vehicle, nor did I notice any trespassing signs.

 4   And per my conversations with Espanola Police

 5   Department and their pictures, I did not see any

 6   trespassing signs.

 7        Q.    And with regard to those rural homes or

 8   the homes to the west of the motel property, what

 9   would be the most direct route to Riverside Drive?

10        A.    For the homes to the west or southwest?

11        Q.    Yes, sir.

12        A.    From the west the two resident, what

13   appeared to be residential buildings on the property

14   there is a road that goes to the north of the motel

15   where I believe there is a gate.  And if you are on

16   the southwest as the crow flies it would be the

17   property, but I couldn't say if they use that

18   pathway or not.

19        Q.    Is Ms. Gallegos a tribal member?

20        A.    She is.

21        Q.    Mr. Smith?

22        A.    No.

23              MR. ELSENHEIMER:  Objection, foundation.

24              THE COURT:  If the witness knows I would

25   allow the answer.
```

1      Q.    (By Mr. Nayback) How do you know that

2    Mr. Smith is a non-Indian?

3      A.    I interviewed his brother, Daniel Smith,

4    who stated that neither his brothers David

5    De La Cruz or Doug Smith were tribal members nor no

6    one in his family.

7      Q.    Maria Gallegos, was she a member of the

8    Santa Clara Pueblo?

9      A.    Yes, she was.

10      Q.    Okay.  How tall was she?

11      A.    Approximately 5'3".

12      Q.    Weight?

13      A.    Approximately 140.

14      Q.    Describe her hair at this time of death.

15      A.    For pictures that I have seen it looks

16    curly, thick, and dark hair.

17      Q.    I am going to ask you some questions about

18    what you learned from Mr. Smith's interview just

19    briefly.  Was the defendant working that night as

20    the hotel manager, to your knowledge?

21      A.    He in my interview only indicated he was

22    the hotel manager.  He never indicated that he was

23    or was not working.

24      Q.    And on May 5th of 2018 did he explain to

25    you why he was awakened?

1        A.    Yes.

2        Q.    What was that?

3        A.    So he had motion sensors in his backyard.

4  Two times before the incident in question here he

5  went out, the motion sensors went off and he went

6  out.  And he has had problem with raccoons setting

7  off his motion sensors because they would, I think

8  in his words, raid the KFC garbage to the south.

9              And so on the third time he went out and he

10 saw a shadow right there by his trailer door or by

11 the camper trailer door.

12       Q.    Before he went outside what did he grab?

13       A.    His firearm.

14       Q.    Do you know what kind of firearm that is?

15       A.    .22 Luger.

16       Q.    You mentioned earlier that you go through

17 some firearms training at Quantico, correct?

18       A.    Yes, sir.

19       Q.    Is that extensive?

20       A.    Yes.

21       Q.    How many rounds would you say you fired in

22 your lifetime?

23       A.    Well, from my service pistol we fire 4,400

24 rounds while in Quantico and I probably shot a few

25 thousand rounds since then.

```
 1       Q.    What are you taught at Quantico about
 2   shooting at nighttime?
 3               MR. ELSENHEIMER:  Objection.  May we
 4   approach?
 5               THE COURT:  Yes.
 6               (Whereupon a Bench discussion was held
 7   outside the hearing of the jury.)
 8               MR. ELSENHEIMER:  Objection under 702.  I
 9   believe they are trying to bring in Agent Taylor as
10   an expert in firearms safety protocols and he is not
11   noticed under Rule 702.
12               MR. NAYBACK:  Just based on his training.
13   We are calling Bryan Acee later in the day.  I would
14   be happy to move on.  I don't think that would draw
15   an objection.  I think based on his training and
16   experience he can discuss the protocols for shooting
17   at night, the rules of engagement and what he
18   considers a threat.
19               THE COURT:  But you are talking about FBI
20   training?
21               MR. NAYBACK:  Yes, ma'am.
22               THE COURT:  Pursuant to FBI training that
23   is what they are trained to do as far as shooting at
24   night.
25               MR. NAYBACK:  Yes.
```

1          THE COURT:  That is relevant to Mr. Smith?
2     Did he go to the Quantico FBI Academy?
3          MR. NAYBACK:  Gun safety rules apply
4     across the board, I think, and Mr. Elsenheimer can
5     certainly cross-examine him.
6          THE COURT:  But you said you would move
7     on, so move on.  It is almost time to break for
8     lunch.
9          (Whereupon the following proceedings were
10    held in Open Court.)
11    Q    (By Mr. Elsenheimer) Special Agent Taylor,
12    where did Mr. Smith tell you that Ms. Gallegos was
13    standing?
14    A    I believe the first statement he made in
15    my interview is that when he came out he saw a
16    shadow breaking into the camper trailer door.  And
17    then the second follow-up, the second question
18    regarding what had happened, where was she standing
19    that night, he said that she was standing inside the
20    trailer, camper trailer door.
21    Q    Did you take that to be inconsistent
22    statements within the same interview?
23    A    Well, in the first statement he said
24    breaking in and in the second statement he said
25    standing by the camper trailer door.

1    Q.    Did he say that he could discern whether
2  it was a man or a woman or a juvenile?
3    A.    He said it was a shadow and then he
4  referenced her later in the interview and then
5  corrected himself and said, "At the time I didn't
6  know she was a she."
7    Q.    How did he say that he knew the person was
8  breaking into the trailer?
9    A.    He didn't elaborate.
10    Q.    And then the second time you asked him he
11  said the person was just standing there?
12    A.    I believe it was the second time that he
13  said the person was just standing there, to the best
14  of my recollection of the transcripts.
15    Q.    How did he describe the person?
16    A.    He didn't.  He just described the person
17  as a shadow, to the best of my knowledge.
18    Q.    Do you know whether he had the back patio
19  lights on?
20    A.    He just said that there is barely any
21  lighting and that just enough not to trip on
22  something, I think is what the wording was.
23    Q.    Did Mr. Smith tell you that -- did he
24  engage the shadow in any way?
25    A.    Other than using a firearm, no.

1      Q.    Did he announce that he had a gun?

2      A.    No.

3      Q.    Did the defendant say that the silhouette

4   ran at him?

5      A.    I specifically asked him that question, he

6   said no.

7      Q.    What is between the defendant and the

8   shadow, given your knowledge of the property?

9      A.    From photos that I have seen from EPD, as

10   well as photos that we took, as well as being on the

11   property, it's a chain link fence with trees and

12   bushes covering it.

13      Q.    How many times did he say he shot?

14      A.    He didn't give a specific number in my

15   interview.  He said he was shooting.  Per EPD's

16   photos there was four shell casings located on the

17   property and there was three rounds left in the

18   magazine.

19      Q.    Did he indicate to you what the shadow did

20   after his first shot?

21      A.    He did say that the shadow was running

22   away and then later on in the interview he

23   referenced that the shadow was fleeing.

24      Q.    Did the FBI or the Espanola Police

25   Department locate the bullet holes which show which

direction he was shooting in?

A.    There were two impact points that Espanola PD had found.  Later on the FBI went back to take more comprehensive photos as well as some additional analysis of the property, and we identified those two impact points that would be consistent with Douglas Smith, in the direction that Douglas Smith said he was shooting.

THE COURT:  We will take our lunch break at this time.  It is 12:00.  I would like to return at 1:30 but before I confirm that, let me just ask, are we making progress here?  And the reason I am asking is because if it would help us to start a few minutes earlier, I would be willing to do that.

MR. NAYBACK:  It always depends on the defense cross-examinations and their length, but we are making progress.  The United States after Special Agent Taylor has just two more witnesses after that.  We anticipate resting this afternoon, if that is what you are asking.

THE COURT:  That is exactly what I am asking.  So it sounds like you are okay.  You will be ready to proceed after that?

MR. ELSENHEIMER:  Yes.

THE COURT:  All right.  So we will return

1   at 1:30.  So let me remind you-all that while we are

2   on our lunch break you should not discuss this case

3   with each other nor with anyone else, and so enjoy

4   your lunch break.

5            (Whereupon the jury exited the courtroom.)

6            (A recess was taken.)

7            THE COURT:  Back on the record.  Ready for

8   the jury?

9            (Whereupon the jury entered the courtroom.)

10           (Whereupon the following proceedings were

11  held in Open Court.)

12           THE COURT:  Please be seated.

13           All right.  We are ready to resume the

14  direct testimony of the witness.

15           So, Mr. Nayback, you may continue.

16           **DIRECT EXAMINATION** (Continued)

17      BY MR. NAYBACK:

18      Q.   Special Agent Taylor, what did the

19  defendant tell you about how fast he shot?

20      A.   In my interview with Douglas Smith he did

21  not mention the cadence in which he shot.

22      Q.   He did or did not?

23      A.   Did not.

24      Q.   Did he mention pausing after the first

25  shot?

```
 1        A.    He said he shot his first shot to miss and
 2   then he thought that the shadow was gone and
 3   continued to fire.  So that in one instance he
 4   mentioned continued to fire so they felt as scared
 5   as he felt.
 6        Q.    What you just said was he thought the
 7   shadow had left.  Why did he tell you, or what did
 8   he say about why he thought the shadow was gone?
 9        A.    I don't know why he thought the shadow was
10   gone.
11        Q.    Can you see Government's Exhibit 63?
12        A.    I can.
13        Q.    Is this a diagram that the defendant drew?
14        A.    Yes, sir.
15        Q.    Was it during your interview?
16        A.    Yes, sir.
17        Q.    Did you observe him draw it?
18        A.    Yes, sir.
19        Q.    Can you circle the area where he said he
20   was standing?
21        A.    (Witness complies.)
22        Q.    And can you circle the trailer where he
23   said the shadow was standing by?
24        A.    He indicated by that circle right there
25   (indicating), that that is where the shadow was
```

1  standing.

2      Q.    Where did he indicate was his first shot?

3      A.    To the left of the trailer to miss the

4  trailer and by his lines, approximately right there

5  (indicating.)

6      Q.    Did he miss the trailer?

7      A.    We did find an impact of a bullet on the

8  very edge, left edge of the trailer.

9      Q.    And then what direction did he say he

10  continued to shoot in?

11      A.    While drawing this diagram he said that he

12  shot between the trailer and a tree.  I am going to

13  draw where I -- he is pointing as the tree, I

14  believe it is this area right here is the tree

15  (indicating), and then this corner is the trailer.

16  And then he circled right here (indicating), where

17  Mrs. Gallegos' body was found.

18      Q.    Did he draw a woodpile on the diagram?

19      A.    He did not in my interview.

20      Q.    Did he mention shooting at a woodpile to

21  you?

22      A.    As far as I can recall, I had not -- I do

23  not remember him ever saying that he shot at a

24  woodpile.

25      Q.    Did you know, can bullets travel through

1    leaves and shrubs?

2        A.    Yes.  In the FBI we consider that

3    concealment but not cover as a bullet can go through

4    bushes and leaves.

5        Q.    If you know, Special Agent Taylor, of the

6    four bullets that were discharged, how many are

7    accounted for by either an impact, by impact points?

8        A.    Well, there are two impact points found in

9    the direction that Douglas Smith indicated that he

10   was shooting and then there is a third impact point

11   in Ms. Gallegos' temple.

12       Q.    So is it fair to say that the FBI or the

13   Espanola Police Department could not locate where

14   the fourth bullet or the third bullet landed?

15       A.    Can you repeat the beginning of that

16   question, sir?

17       Q.    Is it fair to say that the FBI or the

18   Espanola Police Department did not locate all of the

19   impact points?

20       A.    I think that is fair to say.  To my

21   knowledge, a third or fourth round has never been

22   identified.

23       Q.    And so if I have -- can you explain to the

24   jury with each successive shot which direction was

25   he moving his gun?

1              MR. ELSENHEIMER:  Objection, leading.

2              THE COURT:  Overruled.

3              Go ahead.

4       A.     The lines that he drew, he didn't label

5  them from one to four, but he said that the first

6  shot was to the left of the trailer and presumably,

7  or one of the shots was in Maria Gallegos' temple

8  which is further counterclockwise of the first shot.

9  So moving in what happened to be moving in a

10 counterclockwise direction if the first shot was

11 directly to the left of the trailer and

12 Mrs. Gallegos' body was found further away from the

13 trailer.

14             MR. NAYBACK:  The Court's indulgence.

15             I pass the witness.

16             THE COURT:  Cross-examination,

17 Mr. Elsenheimer.

18             MR. ELSENHEIMER:  Yes, Your Honor.

19                    **CROSS-EXAMINATION**

20    BY MR. ELSENHEIMER:

21    Q.    Good afternoon, Agent Taylor.

22    A.    Good afternoon, sir.

23    Q.    You met with Mr. Smith for the first time

24 on May 7th, right?

25    A.    That is correct.

1    Q.    You interviewed him along with your

2    colleague Michelle Cobb?

3    A.    Yes, sir.  That is correct.

4    Q.    And Mr. Smith, you gave him that Miranda

5    warning that we saw earlier?

6    A.    Advice of rights, yes.

7    Q.    And he signed that form?

8    A.    Yes, sir.

9    Q.    And he was cooperative with you and he

10   told you what happened, correct?

11   A.    Absolutely.

12   Q.    And before you interviewed Mr. Smith had

13   you visited his home at 826 Riverside Drive?

14   A.    No, sir.

15   Q.    Had Agent Cobb visited 826 Riverside

16   drive?

17   A.    No, sir.

18   Q.    At that point had you interviewed any

19   other witnesses?

20   A.    No, sir.

21   Q.    So prior to interviewing Mr. Smith and

22   charging him with the crime, you did no other

23   investigation?

24   A.    I didn't charge him with a crime until

25   after I interviewed him.

1      Q.    At that point you had done no other
2    investigation other than interview Mr. Smith?
3      A.    Correct.
4      Q.    I believe you mentioned earlier, and
5    correct me if I am wrong, the first time you went to
6    Mr. Smith's house at Riverside Drive was on the 18th
7    of May; is that correct?
8      A.    That is correct.
9      Q.    When you went to Mr. Smith's house on the
10   18th of May of 2018 did you take any photographs?
11     A.    No, sir, I did not.
12     Q.    Did you take any measurements of
13   Mr. Smith's house at all?
14     A.    No, sir, I did not.
15     Q.    You saw the back patio that you referred
16   to that he was standing on when he saw somebody
17   trying to break into his trailer?
18     A.    On that day I did not go into his
19   backyard.
20     Q.    You did not go into his backyard at all?
21     A.    On a future date, yes, I was in his
22   backyard.  On May 18th, I was not.
23     Q.    So let me ask you, in May or June or July
24   of 2018 did you take any measurements of Mr. Smith's
25   house?

```
1       A.      No, sir.

2       Q.      Did you take any photographs of

3   Mr. Smith's house?

4       A.      No, sir.

5       Q.      Did you try to find any fingerprints on

6   Mr. Smith's, on the trailer door that Mr. Smith said

7   he saw somebody breaking into?

8       A.      No, sir.

9       Q.      Did you have any FBI evidence technicians

10  go out and take fingerprints off that door or see if

11  there were any fingerprints on that door?

12      A.      No, sir.

13      Q.      Did you look for footprints around that

14  trailer or behind the trailer?

15      A.      That would have been several days after

16  the incident.  No, I did not.

17      Q.      Because law enforcement had already been

18  there?

19      A.      That is correct.

20      Q.      The early morning hours of May 5th, based

21  on your understanding, there were a lot of law

22  enforcement present?

23      A.      That is correct.

24      Q.      As the case agent in this case, you are

25  the case agent, correct?
```

1      A.    That is correct, sir.

2      Q.    As the case agent, I assume that you have

3  reviewed Mr. Smith's 911 call, the dispatch call

4  that he made to 911 in the early morning hours on

5  May 5th?

6      A.    I did a long time ago, I haven't recently.

7      Q.    And I am sure you also reviewed

8  Officer Rael's, Espanola Police Department

9  Officer Rael's lapel interview with Mr. Smith?

10     A.    It was several months ago but, yes, I do

11 remember.

12     Q.    You have reviewed it?

13     A.    Yes.

14     Q.    Okay.  And similarly, I assume you

15 reviewed Detective Abeyta's interview with

16 Mr. Smith?

17     A.    I believe I saw the video in which the

18 audio was coming from, but I also, you know, read

19 the transcripts post, yes.

20     Q.    Thank you.

21           When you went back to Mr. Smith's house on

22 May 18th, you interviewed his neighbor and tenant

23 Ercilia Trujillo; is that right?

24     A.    That is correct.

25     Q.    Was that the first time you met

1    Ms. Trujillo?

2         A.    That was the first time I met

3    Mrs. Trujillo, yes.

4         Q.    Did Agent Cobb meet Ms. Trujillo before?

5         A.    Agent Cobb and another special agent were

6    heading north for another investigation and I think

7    they walked on to the property and Mrs. Trujillo

8    began speaking to them.  They left soon after and

9    she called, she gave some prophesies about them.  It

10   was an odd encounter.

11        Q.    Do you remember the date of that?

12        A.    I don't know the date, no, sir.

13        Q.    On the 18th you went back and spoke with

14   Ms. Trujillo, correct?

15        A.    That is correct, yes.

16        Q.    And you were with Agent Cobb?

17        A.    That is correct.

18        Q.    Did you record that conversation?

19        A.    I believe it was recorded, yes, it was.

20        Q.    And I don't want to ask you specifically

21   what she told you, but in terms of your

22   investigation, you learned from Ms. Trujillo what

23   she heard in the early morning of May 5th outside of

24   her apartment in the early morning around 12:30 or

25   1:00, correct?

520

```
 1        A.    She did reference -- do you have my 302,
 2   sir, regarding that interview?
 3        Q.    I don't, but I think I have the interview.
 4              Would you like to review the interview?
 5        A.    Sure, absolutely.
 6              Thank you very much.
 7              THE WITNESS:  And for the Court, the 302
 8   is a report that I write after the interview.
 9              MR. ELSENHEIMER:  May I approach the
10   witness?
11              THE COURT:  Yes.
12        Q     (By Mr. Elsenheimer) Does that help refresh
13   your recollection?
14        A.    Yes, sir, thank you.
15        Q.    May I retrieve that from you?
16        A.    Sure.  Let me just make sure.
17        Q.    Can you tell me what page you are looking
18   at?
19        A.    I am currently on Page 21.
20        Q.    Does that help refresh your recollection?
21        A.    Yes, sir.
22        Q.    And she, Ms. Trujillo, overheard a woman's
23   voice outside of her house yelling to someone else;
24   is that correct?
25              MR. NAYBACK:  Objection, Your Honor.  That
```

1    calls for hearsay and I don't know if Ms. Trujillo

2    is going to testify or not, but this witness would

3    be testifying to hearsay.

4             THE COURT:  All right.  So you'll

5    rephrase?

6        Q    (By Mr. Elsenheimer) So let me ask you

7    this:  You spoke with Ms. Trujillo about what she

8    witnessed or what she heard in the early morning

9    hours of May 5th?

10       A.    That was the point of the interview, yes.

11       Q.    Certainly.

12             And you learned from her that she heard

13   individuals outside of her house, one a woman's voice

14   yelling to someone else?

15       A.    That is what she said, yes.

16       Q.    Okay.  And you also learned from

17   Ms. Trujillo and you may need to refer to other

18   parts of that transcript of the conversation.  You

19   also learned from her that someone approached her

20   the next day looking for a knife that the person had

21   dropped the night before, so the early morning hours

22   of May 5th?

23             MR. NAYBACK:  Objection, Your Honor.

24   Again, it calls for hearsay.  It doesn't go to what

25   the Agent did next and I don't know if Ms. Trujillo

1    is going to testify, but that is the appropriate

2    witness to ask that of, it seems to me.

3              MR. ELSENHEIMER:  I am asking only about

4    what he did in terms of investigation.

5              THE COURT:  If you could rephrase your

6    question without referring to what was said.

7              MR. ELSENHEIMER:  Certainly.

8        Q.   (By Mr. Elsenheimer) Did you learn from

9    Ms. Trujillo that she also encountered someone the

10   next day who came out to the property?

11       A.    That is what she said.

12       Q.    And that would have been later in the day

13   on May 5th?

14       A.    Yes, that would sound right because the

15   shooting happened at 1:00 a.m. on May 5th, so

16   presumably that morning.  I was there on May 18th,

17   so I don't know if she was referring to the next

18   morning but --

19       Q.    You know that there are a lot of

20   businesses nearby Mr. Smith's house?

21       A.    Yes.

22       Q.    There is a Pizza 9 across the street?

23       A.    Yes.

24       Q.    You were here today, there is a KFC next

25   door and an El Rey Liquors across the road?

1      A.    Yes, sir.

2      Q.    Did you ever obtain surveillance footage

3  from any of those businesses?

4      A.    No, I did not.

5      Q.    As the case agent, I assume you have read

6  the OMI report in this case, the report that

7  Dr. Cain prepared?

8      A.    Yes.

9      Q.    And I assume you also reviewed doctor, I'm

10  sorry, Ms. Gudes' report?

11      A.    Not very recently but, yes, I did, of

12  course.

13      Q.    And you also, I assume, reviewed the

14  toxicology report, correct?

15      A.    That is correct.

16      Q.    You have been here throughout this case

17  and you sat right here and you have listened to all

18  of the testimony?

19      A.    Yes, sir.

20      Q.    You heard the prosecutor ask Ms. Gudes if

21  she knew that Ms. Gallegos was a diabetic?

22      A.    Yes, sir.

23      Q.    Did you gather any evidence suggesting

24  that Ms. Gallegos was a diabetic?

25      A.    No, sir.

1    Q.    Did you know that OMI found morphine in
2    Ms. Gallegos' system based on your review of the
3    toxicology report?
4    A.    The toxicology report, I believe, listed
5    morphine at 32MG which is under the therapeutic
6    level of 75.
7    Q.    But it is above the --
8    A.    Reporting requirement, yes.
9    Q.    So was there morphine in Ms. Gallegos'
10   system based on the toxicology report?
11   A.    Yes.
12   Q.    Thank you.
13   A.    I think it also might be worth noting that
14   methadone is a synthetic version of morphine.
15   Q.    I want to ask you about something you said
16   in your direct examination with Mr. Nayback.  Again,
17   you interviewed Mr. Smith on, was it, May 7th again?
18   A.    Yes.  The morning, late morning of
19   May 7th.
20   Q.    And that interview that you had with
21   Mr. Smith, that was in a room with both Mr. Smith
22   there, you and Agent Cobb, correct?
23   A.    That is correct.
24   Q.    That interview was recorded by video and
25   audio, right?

1      A.    Yes, sir.

2      Q.    There is a videotape recording of that

3  interview?

4      A.    Sure is.

5      Q.    And we have a transcript of that interview

6  as well, right?

7      A.    Yes, sir.

8      Q.    Have you reviewed that transcript

9  recently?

10     A.    I have.

11     Q.    Okay.  And you mentioned in your direct

12 examination that Mr. Smith told you that he saw

13 someone breaking into his trailer?

14     A.    During the first questioning about what

15 exactly happened the moment that he walked out, that

16 is the first thing he said regarding the time that

17 he saw the shadow, yes.

18     Q.    So regarding the time he saw a shadow he

19 walked out and saw the person trying to break into

20 his trailer and he told you that he just panicked,

21 correct?

22     A.    If you had the transcript I would like to

23 see it because we asked about more details of that

24 situation several times and so there are different

25 words, of course.

1    Q.    Certainly.  I would be glad to give you a

2    transcript.

3    A.    Thank you.

4          I believe it is around Page 44 I believe

5    where his first statements begin regarding that.

6          MR. ELSENHEIMER:  May I approach the

7    witness, Your Honor?

8          THE COURT:  Yes, you may.

9    A.    I believe it is on Page 37 is where it

10    begins.

11    Q    (By Mr. Elsenheimer) And you are referring

12    to Line 8 through 11, approximately, correct?

13    A.    The one I am looking at shows me asking

14    him what happened that night, and around Line 5 is

15    when he begins telling me what happened that night,

16    and then it ends around Line 18 or --

17    Q.    Right there he said, "I saw the shadow

18    over by the trailer again somebody trying to break

19    in," correct?

20    A.    Yes, sir.  He mentioned that when he sees

21    the shadow it is, "The first thing my trailer trying

22    to break in."

23    Q.    And you told the prosecutor that he said

24    something inconsistent later on in that interview;

25    is that right?

1     A.    That is correct.

2     Q.    What you are referring to is on Page 39 or

3     40, correct?

4     A.    Let me find it.  Okay, I think I know the

5     statement that you are referring to.

6     Q.    You asked Mr. Smith to explain what

7     happened, correct?

8     A.    To tell me more about what happened.  Tell

9     me more about what happened when he came to the

10    porch.

11    Q.    What page are you referring to?

12    A.    On 39.

13    Q.    So you said to him, "Can you tell me more

14    about when you came out on the porch and you saw the

15    shadow," correct?

16    A.    Yes, sir.

17    Q.    And Mr. Smith said to you, "At first I saw

18    the shadow facing the door of the trailer and then

19    the shadow turned around and bent down to see

20    through the bushes to look at me."

21          That is what he responded to you, right?

22    A.    That is correct.

23    Q.    You say that is inconsistent, yet two

24    pages earlier, two pages earlier Mr. Smith had just

25    told you that he saw the shadow trying to break into

1    the door, didn't he?

2        A.    The first statement, yes, he did say break

3    in, yes.

4        Q.    He didn't need to mention it again because

5    he had just told you less than what a minute before?

6        A.    The transcript doesn't have a time on it.

7        Q.    So two pages, so a minute, two minutes?

8        A.    I don't know, sir.

9        Q.    Two pages?

10       A.    I understand what you are saying.  I don't

11   know the time that it took place between those two

12   pages.

13       Q.    Not even in the same conversation, the

14   same exchange of questions he told you he saw

15   somebody breaking in and then you asked him to

16   explain it again and he explained the person was

17   towards the door, the person turned, crouched down,

18   right?  That is what he told you?

19       A.    He said bent over.

20       Q.    There is nothing inconsistent about that,

21   is there?

22       A.    That is your interpretation.

23       Q.    You're exactly right, and I think it is

24   anybody's interpretation.  And let me ask you this:

25   You reviewed the 911 call in this case, didn't you?

```
1       A.    A long time ago, yes.
2              MR. NAYBACK:  Objection.  That has been
3   kept out by the Court, Your Honor.
4              MR. ELSENHEIMER:  Your Honor, this is
5   rehabilitation.
6              THE COURT:  He hasn't asked the question
7   yet.
8       Q.  (By Mr. Elsenheimer) You know from
9   reviewing that 911 call the first thing Mr. Smith
10  said --
11             MR. ELSENHEIMER:  Objection, Your Honor,
12  hearsay.
13             THE COURT:  Let's come to the corner here.
14             (Whereupon a Bench discussion was held
15  outside the hearing of the jury.)
16             THE COURT:  How is this consistent with my
17  ruling on the 911 call?
18             MR. ELSENHEIMER:  They said that Mr. Smith
19  gave inconsistent statements to detective,
20  Agent Taylor, and this is a prior consistent
21  statement.  And it is for rehabilitative because
22  they brought Mr. Smith's statement in.  He is a
23  witness he can be rehabilitated.  It is an exception
24  to the hearsay rule.  It is perfectly proper for me
25  to inquire about prior inconsistent statements that
```

1    Mr. Smith has made.

2              THE COURT:  Your response?

3              MR. NAYBACK:  It is not a prior consistent

4    statement.  It has already been kept out by the

5    Court and what Mr. Elsenheimer is trying to do is

6    elicit inadmissible hearsay.  It is a self-serving

7    statement and it should not be permitted at this

8    point.

9              THE COURT:  All right.  So the Court kept

10   it out as hearsay.  It was self-serving.  It was not

11   an excited utterance, so that was the basis on which

12   the Court excluded it previously.

13             But in a different situation now, because

14   of the testimony of the witness.

15             MR. NAYBACK:  I will withdraw the

16   objection.  I will withdraw.

17             THE COURT:  All right.

18             (Whereupon the following proceedings were

19   held in Open Court.)

20       Q.   (By Mr. Elsenheimer) Agent Taylor, did you

21   review the 911 call?

22       A.   I don't know that I did.

23       Q.   Do you want to look at it again to refresh

24   your recollection?  I would be glad to give you a

25   copy, but the first thing that Mr. Smith said when

1   he called 911 is that, "There was someone breaking

2   into the building back there and I shot somebody."

3            Isn't that what he said?

4       A.    I don't think that is in dispute.  It is

5   also in my warrant affidavit.

6       Q.    I am just asking you what he said to 911.

7       A.    Yes.

8       Q.    And you also reviewed the lapel video of

9   Mr. Smith's conversation with Officer Rael

10  immediately upon law enforcement arriving at

11  Mr. Smith's house on 826 Riverside Drive, you

12  reviewed that?

13      A.    I reviewed it several months afterwards,

14  yes.

15      Q.    Mr. Smith when asked by Officer Rael said

16  that he thought it was raccoons and I was going to

17  chase them off and saw someone trying to break into

18  the little trailer there.  He said that, didn't he?

19      A.    If it is on the transcript, then, yes.

20      Q.    Do you want me to look at it?

21      A.    If you want me to look at it, sure.

22            MR. ELSENHEIMER:  May I approach the

23  witness?

24            THE COURT:  You may.

25      A.    That is what this Line 17 through 18 of

1    Page 2, yes, it's there.

2        Q.    (By Mr. Elsenheimer) That is what Mr. Smith

3    said, that he saw somebody breaking into the

4    trailer?

5        A.    That is what he told this police officer.

6        Q.    Thank you.

7              MR. ELSENHEIMER:  May I approach the

8    witness, Your Honor?

9              THE COURT:  Yes.

10       Q     (By Mr. Elsenheimer) Mr. Smith has

11   consistently told law enforcement on every occasion

12   that he saw somebody trying to break into the

13   trailer behind his house, correct?

14       A.    I believe he has mentioned it to, I think

15   it was Officer Rael on there and in Abeyta's

16   interview and mine as well.

17       Q.    Okay.  So 911, Officer Rael,

18   Detective Abeyta and you, every law enforcement

19   officer that he met with?

20       A.    Sure.

21       Q.    Okay.  I want to ask you about the diagram

22   that we have here.

23       A.    This is the diagram that he drew during my

24   interview?

25       Q.    Exhibit 63.  I will show it to you right

1    here.

2         A.    Thank you.

3         Q.    I want to clarify something that you said

4    in your direct examination.  There was a little bit

5    of question about, Mr. Nayback questioned you about

6    when Mr. Smith fired these shots that I am pointing

7    at right here.  And let's just clarify that and make

8    sure we're very clear on it.

9              Mr. Smith said to you the first shot he

10   fired was to the left of the trailer, correct?

11        A.    I believe he has it labeled right here

12   (indicating).

13        Q.    First and that is to the left of the

14   trailer?

15        A.    That is what he said, yes.

16        Q.    And when he fired that first shot the

17   intruder on his property was approximately where I

18   just put a red X, correct?

19        A.    That is where you put it, yes.

20        Q.    And then Mr. Smith explained that after

21   that first shot the intruder that he saw ran this

22   way (indicating), and that is what that line is

23   there and there is an arrow going that way, correct?

24        A.    That is what he drew, yes.

25        Q.    Okay.  There is actually an arrow out

1    here, correct?

2        A.    Yes.  I don't recall what that arrow is

3    indicating, if it is the street or it is the path in

4    which he thought she was running.

5        Q.    Well, we have got two arrows, one going

6    right here, and then the other right here

7    (indicating), correct?

8        A.    Yes.

9        Q.    Okay.  And Mr. Smith explained to you that

10   he believed that the person was already gone and

11   then he fired some more?

12       A.    Yes, that is what he said in my interview.

13       Q.    And he explained to you that he was

14   shooting in this general direction where he drew

15   these lines to show the area where he was firing,

16   correct?

17       A.    He said that he was shooting between a

18   tree in the backyard and the left of the trailer,

19   yes.

20       Q.    So that would be this tree right here

21   (indicating)?

22       A.    That is how I interpreted how his drawing

23   is.

24       Q.    And the trailer right here?

25       A.    Correct.  And then obviously this isn't to

1    scale.

2         Q.    Certainly.  This is a -- thank you for

3    clarifying that.

4              Just to be clear, between the tree where

5    the bottom red mark is and the trailer at the top red

6    mark between those two points is where he fired?

7         A.    From what he said, yes.

8         Q.    That is what he said.  After he believed

9    the person had already run from his property?

10         A.    He used different words but, yes, running,

11   fleeing.

12         Q.    You're right.  Thank you.  He said that he

13   believed they were already gone?

14         A.    Yes, he also says that as well.

15              MR. ELSENHEIMER:  Thank you.

16              May I have a moment, Your Honor?

17              THE COURT:  You may.

18         Q.    (By Mr. Elsenheimer) Agent Taylor, you keep

19   saying that is what Mr. Smith said.  You have no

20   other evidence to contradict anything about what

21   Mr. Smith told you, told Detective Abeyta, told

22   Officer Rael or told 911, do you?

23         A.    Are we saying that there is anything that

24   is contradicting these statements?

25         Q.    You keep saying, "That is what Mr. Smith

1    said."

2           I am just asking you, that is all the

3    evidence you have.  You have the evidence of

4    Mr. Smith's statement, correct?

5        A.    I have his statement, we have impact

6    points and where Ms. Gallegos' body was found, yes

7    as evidence.

8           MR. ELSENHEIMER:  Thank you.

9    One moment.

10       Q    (By Mr. Elsenheimer) I want to ask you

11   about the impact points.  We are referring to the

12   impact point on the corner of the trailer?

13       A.    That one and then there is one in the shed

14   farther back, yes.

15       Q.    There is no way for you to date those,

16   correct?

17       A.    Of course not, no.

18           MR. ELSENHEIMER:  Nothing further.

19           THE COURT:  You're done?

20           MR. ELSENHEIMER:  Nothing further.

21           THE COURT:  All right.  Mr. Nayback, if

22   you have redirect, you may proceed.

23                  **REDIRECT EXAMINATION**

24   BY MR. NAYBACK:

25       Q.    Was Mr. Smith able to tell you that the

1    person standing by the trailer was a man or a woman

2    or a juvenile?

3        A.    No.

4        Q.    Why is that?

5            MR. ELSENHEIMER:  Objection, calls for

6    speculation.

7            THE COURT:  If he knows, I will allow him

8    to answer, but don't guess.

9        Q    (By Mr. Nayback) Let me rephrase.  How did

10   he describe the lighting that night?

11       A.    The lighting he said was there was barely

12   enough light, just enough not to trip on something,

13   something along those lines.

14       Q.    What did he say about how he could tell

15   the person was trying to break into the trailer?

16       A.    He didn't give any details as to why he

17   thought she was breaking in.

18       Q.    Were there any burglary tools located on

19   Ms. Gallegos?

20       A.    No, sir.

21       Q.    Did she have a weapon?

22       A.    No, sir.

23       Q.    Do you know when the last time the

24   defendant had been in that travel trailer?

25       A.    If I can recall from the interview with

1    Douglas Smith, he said he hadn't been in, in a long

2    time.  It was the mother's travel trailer.  He

3    couldn't get himself to go in there after her

4    passing.

5        Q.    It was locked, right?

6        A.    Yes.

7        Q.    What did he say was inside of it?

8        A.    I think just her belongings, if I recall.

9        Q.    Do you know when Mr. Smith called 911?

10       A.    Per my interview with Douglas Smith, he --

11   after firing those shots, he -- and after attempting

12   to reload, he walked towards the body, pulled on her

13   shoulder to identify who it was.  He thought it was

14   Melanie and it was not Melanie.

15            And then he went to the front of the motel

16   to check to see if there was anybody else and at that

17   point he returned to Mrs. Gallegos' body and that is

18   when Ercilia Trujillo told him that he should call

19   911.

20       Q.    So before he called 911, so he didn't call

21   right away.  Is that what you're saying?

22       A.    From my interview with him, no.

23       Q.    And when he called 911 he knew he had

24   killed a person on the hotel property, right?

25       A.    I believe somewhere in my interview he

1    indicated that she was -- that he knew that she was

2    dead or something along those lines.

3        Q.    He had time to think about what he was

4    going to say to 911?

5            MR. ELSENHEIMER:  Objection, no

6    foundation.

7            THE COURT:  Overruled.

8        A.    He did walk to the front of the property

9    and then however long it takes to come back and

10    being told by Mrs. Trujillo to call 911, he had that

11    amount of time.

12        Q    (By Mr. Nayback) Did he tell you that he

13    checked her pulse?

14        A.    He never mentioned that he did.

15        Q.    Did he provide CPR?

16        A.    He never mentioned that he did.

17        Q.    He didn't give you any detail about how he

18    knew in the dark that a person was trying to break

19    in to the travel trailer?

20            MR. ELSENHEIMER:  Asked and answered.

21    Objection, asked and answered.

22            THE COURT:  This has been covered, as I

23    recall.

24            MR. NAYBACK:  Thank you, Your Honor.

25            THE COURT:  All right.  Thank you for your

1    testimony.  You may return to your seat.

2              (Whereupon the witness was excused from

3    the witness stand and returned to Counsel table.)

4              THE COURT:  The Government may call its

5    next witness.

6              MS. WILSON:  Thank you, Your Honor.  The

7    United States calls Theodore Chavez.

8              (Whereupon, the witness was sworn.)

9              THE COURT:  And please begin by giving us

10   your full name and spell your first and last names

11   for the record, please.

12             THE WITNESS:  Sure.  My name is Theodore

13   J. Chavez.  My last name is spelled, C-H-A-V-E-Z.

14             THE COURT:  Thank you.

15                   THEODORE CHAVEZ,

16   **after having been first duly sworn under oath,**

17        **was questioned and testified as follows:**

18                   **DIRECT EXAMINATION**

19     BY MS. WILSON:

20     Q.    Sir, what do you do for a living?

21     A.    I am a physical scientist forensic

22   examiner for the FBI laboratory, which is located in

23   Quantico, Virginia.  I am qualified in the

24   discipline of firearms and toolmarks.

25     Q.    How long have you been employed by the

1    FBI?

2        A.    Yesterday was 12 years.

3        Q.    And could you describe for the jurors what

4    are your responsibilities?

5        A.    My primary responsibility as an examiner

6    is to receive and analyze evidence that is sent to

7    our laboratory, conduct examination on those items

8    of evidence, document my examination results in a

9    laboratory report, and be able to testify to those

10   results in a court of law.

11       Q.    And as part of your position you also work

12   in the area, in the toolmarks unit in the area of

13   firearm trajectory analysis?

14       A.    Correct.  So within the firearms and

15   toolmarks discipline are a series of sort of

16   subdisciplines.  I am qualified in firearms

17   examination, so that would be just a routine gun or

18   cartridge case gets submitted or conducting that

19   analysis toolmarks, you may think of some bolt

20   cutter, different toolmarks, different tools for

21   handling that evidence.

22            Gunshot residue distance determination.  So

23   the victim gets shot, we are trying to approximate a

24   distance at which that shot was fired from based on

25   the analysis of the victim's clothing.

1          And then shooting incident reconstruction,

2     which involves trajectory analysis looking at holes,

3     or impacts, to determine any type of information such

4     as where the shots originated from, the number of

5     shots, or the approximate sequence of shots.

6          Q.    And what training have you received

7     specifically in firearm trajectory?

8          A.    So starting in 2009, I entered a forensic

9     examiner training program that was approximately

10    three years.  Upon entering the lab there I signed

11    and started an examiner training program.

12          I received a training manual that outlined

13    a series of different sections that would include

14    competency tests, working with another qualified

15    examiner, so mentorship, working alongside them on

16    casework.  I also had to pass a series of moot

17    courts, three moot courts and three oral boards in

18    preparation for testimony.

19          And upon that successful completion of the

20    training program and all the required sign-offs in

21    the training manual, I then was qualified as an

22    examiner for the FBI lab within the firearms and

23    toolmarks discipline.

24          Q.    And approximately how many cases have you

25    conducted sort of a trajectory analysis?

1      A.    Approximately 30 times I think I have been

2      out on scene either as a lead or an assistant.  But

3      also within that 30 count is, I also do technical as

4      well.  So anytime my colleagues go out and conduct a

5      similar type of examination it goes through a

6      thorough technical and administrative review, which

7      is often by another qualified examiner in the

8      discipline.

9      Q.    How many times have you testified in court

10     as an expert in this area?

11     A.    I have testified 12 times as a combination

12     of a State as well as Federal court throughout

13     through the Continental U.S.  And, again, different

14     areas of firearms and gunshot residue, as well as

15     trajectory analysis.

16          MS. WILSON:  Your Honor, at this time the

17     United States would proffer Mr. Chavez as an expert

18     in firearm trajectory with the ability to testify as

19     to his opinions and his analysis.

20          THE COURT:  Is there objection?

21          MR. ELSENHEIMER:  No, Your Honor.

22          THE COURT:  All right.  Mr. Chavez is

23     recognized as an expert in firearm trajectory.

24          You may proceed.

25          MS. WILSON:  Thank you, Your Honor.

1      Q      (By Ms. Wilson) Were you asked to conduct a

2   firearm trajectory analysis in this case?

3      A.      Yes, I was.

4      Q.      And as part of this request were you

5   deployed to Espanola, New Mexico?

6      A.      Yes, I was.

7      Q.      And was that part of a team?

8      A.      It was.  The team's name is the Laboratory

9   Shooting Reconstruction Team or the acronym LSRT.

10   That is the laboratory division's mechanism for any

11   time a shooting occurs, it is sending out resources

12   or assets, not only from Quantico but any field

13   office that has those capabilities from their ERT,

14   or Evidence Response Team.

15      Q.      And what did you do when you arrived on

16   scene?

17      A.      So when I arrived on scene I actually met

18   with the Albuquerque Evidence Response Team, or ERT,

19   as well as with the case agent, Travis Taylor.  And

20   out of the Santa Fe office as well as the

21   Albuquerque office, we met there near Espanola to

22   then arrive at the scene where it was being

23   requested that a trajectory analysis be conducted as

24   a result of a shooting investigation.

25      Q.      And you're on the scene with the team,

1    what are you doing?

2        A.    So we kind of handle each scene the same

3    way.  It can be overwhelming at times, depending on

4    the number of shots.  But what typically happens is

5    we do an initial line search.  So that could kind

6    of -- so in looking at this room do a

7    counterclockwise or clockwise position where you are

8    lining people up and you are looking for any suspect

9    holes or impact points now.

10            Those are on different types of material,

11    so it could be a wall, it could be a tree, it could

12    be a fencepost, it could be a metal shed, it could be

13    a tire, a vehicle.

14            And so as we are doing that line search,

15    these trained personnel who are with me are also

16    marking any indications of suspected holes, or

17    impacts.  As a subject matter there on scene, I go

18    back and review those holes, or impacts, do an

19    analysis of those areas and then we proceed on with

20    the documentation.

21            So that process of revealing, labeling, and

22    collecting data takes place for each one of those

23    suspected holes or impact points.  That will continue

24    through the entire area in which the investigation

25    was taking place.

1    Q.    And based on the line search, what

2    observations did you make?

3    A.    So based on that line search I observed

4    two holes and one impact point.  In that same

5    process, labeling those holes and that one impact

6    and then requesting that the team from the

7    Albuquerque ERT start collecting data, not only as a

8    photographer, but also a surveyor and a total

9    station operator.  So they can think of data as

10   being a photograph, scan, as well as survey data.  I

11   was directing the team to begin documenting those

12   two, two holes and one impact.

13   Q.    I am going to show you what has been

14   admitted previously as Government's Exhibit 25 here.

15         Can you describe what this is for the jury?

16   A.    Sure.

17         So this is a photo of a trailer there on

18   the property where we were conducting the

19   investigation.

20   Q.    Okay.  And did you label an impact point

21   on this?

22   A.    I did.  And may I draw on this?

23   Q.    Yes.

24   A.    It may be difficult to see what I circled

25   there in yellow, that may not be clear.  What I have

1    I circled there is the area at which a hole is
2    located.  And what I am going to mark in fuchsia is
3    the edge of that label that I can see there in the
4    photo.  So it is a hole with a label.
5        Q.    I show you Government's Exhibit 26, which
6    has been previously admitted.  Can you describe, is
7    this what you have done with your labeling?
8        A.    Yes.  So this is the label that I applied
9    myself and indicated as being Hole 1, H1.  And that
10   same previous photo this is now a close-up with
11   scale as well as with the label and indicating
12   Hole 1.
13            What I will circle again, if I may?
14       Q.    Yes.
15       A.    It is in green.  That is the area that I
16   am analyzing as being the Hole 1.  And this is --
17   the label also serves a purpose, too.  It gives some
18   reference to the photographer as well as the person
19   who is doing the total station or scan data to
20   understand that this is the point of interest, that
21   being Hole 1.
22       Q.    I am showing you Government's Exhibit 27.
23   Can you tell us what that is?
24       A.    Sure.
25            May I clear the previous marking?

```
 1      Q.    Yes.

 2      A.    This is some corrugated metal that is

 3  attached to an adjacent shed.  And what I will

 4  circle in blue this time is what has been labeled as

 5  Hole 2, or H2.  And that is along, again, the

 6  corrugated metal of a shed adjacent to the main

 7  property.

 8      Q.    I am showing you what has been previously

 9  admitted as Government's Exhibit 28.  Can you

10  describe that for the jury?

11      A.    Sure.  Similar to the previous photo where

12  we had H1, this is now a close-up photograph of H2.

13  And, again, this is in a corrugated metal in a shed

14  adjacent to the main property.

15      Q.    And just so the jury understands, what do

16  you notice about this hole different from the other

17  hole?

18      A.    So one indication here and, again, as we

19  are doing that initial line search is we are looking

20  for, and this is part of trajectory analysis, is we

21  understand that a bullet will have a path that it

22  travels through, and obviously intervening objects

23  such as glass, metal, any other material may

24  potentially impact the path of that bullet.

25            In this case the bullet had passed through
```

1    the corrugated metal, so it showed a nice hole there.
2    And something else that I wanted to mention, too, is
3    that these are adhesive stickers.  So as we are going
4    through, you know, we are also mindful that, you
5    know, this doesn't get blown away or anything like
6    that.  The hole itself is what we consider both it
7    had an entrance and an exit.  It passed through the
8    material.
9         Q.    And just so the jury is clear, that is
10   different from what you observed in Hole 1?
11        A.    Right.  Let me provide some context,
12   though, with Hole 1.
13             Unlike Hole 2, which you just saw, which is
14   corrugated metal and it is a relatively thin
15   material.  And I could see the path of that bullet
16   traveling through.
17             Hole 2 occurred on a piece of trim there on
18   the side of a trailer also adjacent to the property.
19   Some characteristics that we also observed as part of
20   a trajectory analysis is to see how the metal is
21   either being pulled back or is there any indication
22   of directionality.  In some cases an impact point, or
23   a hole like Hole 1 will provide some just information
24   of what direction did it come from.
25             You can tell here based on the marking that

1   I am going to put in gray, that are right there

2   (indicating), metal has actually pulled back.  It

3   appears it is being pulled back, but, in fact, based

4   on our analysis, my analysis, you know, a bullet is

5   traveling in that direction.  You can see that aerial

6   marked in red, and so that is an indication that the

7   bullet has traveled from the direction where it is

8   listed as FTU coming out of that direction.

9           So this indicates that a bullet has

10  impacted this material but is not deflected again,

11  not having passed through this material.  It is at

12  the corner, so there's now some additional material

13  that it hasn't passed through or that it does

14  encounter, which does change the path of that bullet.

15  Q.    I am showing you what has been previously

16  admitted as Government's Exhibit 29.  Can you

17  describe what this is for the jury?

18  A.    Sure.

19          So inside of the shed this is an interior

20  shot of that shed with the corrugated metal which you

21  can also see there on the left-hand side.

22          This photo is showing a television set

23  inside of the shed.  And if you were to be standing

24  at the shed door, it would be on your left-hand side.

25          Similar to the other areas of interest,

 1   this is labeled I1 and that stands for Impact 1.  The
 2   reason why it is an impact is because it did not pass
 3   through that material.  So if you can think of a
 4   bullet as having passed through something versus just
 5   graze something or the surface that it encountered is
 6   a harder material, it will show a stopping point.
 7               So in this case I1 was marked on the front
 8   of the television set there on the glass.
 9        Q.    And let me show you what's been previously
10   admitted as Government's Exhibit 30.  Can you tell
11   the jury, what is that?
12        A.    This is Impact 1 and this is a closeup
13   shot of that impact.  Something to note is, and what
14   I will circle here, is that this entire area
15   obviously has, it's as a result of that bullet
16   impacting the surface, creating sort of these radial
17   cracks that you see coming off the side.  So this
18   indicates that a bullet has impacted that television
19   set.
20        Q.    In addition to the photographs, what
21   additional information was collected?
22        A.    So the team collects a lot of information.
23   And not only photographs but there is scan data that
24   is collected from a scanner and there is also
25   serving data, which I don't know if you guys are

1    familiar with, obviously sometimes he is seen on the

2    side of the road doing road survey with a tripod

3    looking into a glass and someone holding a pole.

4    That same type of instrumentation is used to collect

5    fixed points such as the corners of buildings,

6    trees, anything that could then be related back to

7    the scene at which we were conducting the analysis.

8        Q.    And in addition to that type of data did

9    you look at any chemistry?

10        A.    Yes.  So in some cases where, for

11   instance, we are trying to rule out or the

12   characteristics of an impact point or a hole aren't

13   as transparent or visible, we will use what is

14   referred to as a BTK, and that is Bullet Hole

15   Testing Kit.

16            It is a presumptive test looking for lead

17   residues as well as copper residues.  If I were to

18   have a kit here it just requires that I break two

19   vials and I'm using a piece of filter paper and

20   applying the first solution, adhering that to a

21   suspected hole or impact, removing that maybe after

22   ten seconds, applying the second solution.

23            So we are also doing positive controls, so

24   if I were to do a positive control for lead, it comes

25   up and appears as violet or purple.  And if it was

1    copper it would be more of an Army green or a forest

2    green, dark green.

3              And so the Bullet Hole Testing Kit, or BTK,

4    is often used as a complement to all physical

5    characteristics that are observed of those holes, or

6    impacts.

7         Q.    And you did that?

8         A.    Yes, I did.

9         Q.    What specifically did you look at?

10        A.    I looked at lead residues as well as

11   copper residues, but I also did background checks,

12   meaning if there was potentially paint or anything

13   that would have added particulate to lead residues.

14   I was testing a surface that was not impacted but on

15   the same type of material around that hole, or

16   impact, point.

17        Q.    Did you examine any additional evidence in

18   this case?

19        A.    I did not and that's our standard

20   operating procedure is that in order to keep an

21   unbiased process for the laboratory, any examiner

22   who is conducting the forensic exams, the physical

23   items, is completely separated from the person who

24   is out on scene.

25              That just helps to create an unbiased

1    perspective and well as procedure for not having any

2    other additional information to glean from.

3              MS. WILSON:  May I approach, Your Honor?

4              THE COURT:  You may.

5        Q.    (By Ms. Wilson) I am handing you what has

6    been marked for identification purposes as

7    Government's Exhibit 75.  Could you please take a

8    look at that and let me know if you recognize it?

9        A.    I do recognize it.  One indication is on

10   the bottom right here, it's a laboratory number.

11   The laboratory number is 20192378.  That's the same

12   lab number that I issued the report on.

13             MS. WILSON:  I move Government's

14   Exhibit 75 with permission to publish.

15             THE COURT:  Is there objection?

16             MR. ELSENHEIMER:  No, Your Honor.

17             THE COURT:  75 is admitted and, yes, you

18   may publish.

19             (Exhibit admitted, Government's 75 and

20   published to the jury.)

21       Q.    (By Ms. Wilson) And just so we are clear,

22   how are trajectory results analyzed?

23       A.    In two ways.  It is a narrative as well as

24   a graphic.  The narrative describes what are those

25   holes or what are those impacts, and it then comes

1    with an enclosure or a graphic that is a

2    demonstrative describing where those holes, or

3    impact, points are located.  And in this case it is

4    a top-down view of the scene and the area that was

5    analyzed.

6        Q.    And can you explain to the jury how your

7    findings translate to this graphic?

8        A.    Yes.  At the top right there is a key and

9    what you will see is the impact bullet as well as

10   trajectory.  Those correspond then to the impact

11   point as well as the two holes.

12          This also serves, again, to provide some

13   context of where these holes are located.  So when I

14   mention the scan data, as well as the survey data,

15   those were all used to create this graphic.

16          When the information is collected on scene,

17   it goes back to the laboratory and specifically the

18   operational projects unit.  And it is up to the

19   Visual Information Specialist, the VIS.  And the VIS

20   who has, is familiar with CAD, is familiar with

21   dealing with that data, will generate this graphic.

22          It is then up to me to authenticate those

23   holes and impact points were put in the correct

24   positions.  As well as along with my report, we will

25   go through a technical review.  So this actually is a

1    supplement to the laboratory report, again,

2    highlighting what I will circle now is Hole 1,

3    Hole 2, and Impact 1.

4        Q.    Were you able to approximate the distance

5    from the trailer here to the porch door?

6        A.      There is a way to do that.  If you could

7    delete the markings.  Focusing down on this area

8    here (indicating), there is a scale.  And it may be

9    difficult to see, but it is a scale in feet.  So it

10   is listed as zero, five, and ten.

11            So using that same scale and approximating

12   may draw the areas that you want that are in question

13   of distance.

14       Q.    Approximately here to the porch door.

15       A.    So using that same scale it is

16   approximately 30 to 40 feet.

17       Q.    And, Mr. Chavez, in your opinion based on

18   your observations, the data collected, your report

19   and the graphic, were multiple bullets fired by a

20   gun?

21       A.    Yes.  So the analysis of Hole 1, Hole 2

22   and Impact 1, does support there being at least

23   minimum two shots fired.

24       Q.    Were you able to determine some

25   directionality?

1      A.     Yes.  Both had a directionality.

2      Q.     And could you explain what directionality

3  you were able to look at.

4      A.     Sure.

5             So also on this graphic this will be in

6  yellow.  You will see a compass up in the key there

7  of the graphic.

8             And so in this case, we are looking at,

9  again, the combination of the photograph, on-scene

10 documentation and the analysis of that hole using the

11 chemical for Bullet Hole Testing Kit.  Hole 1 did

12 support that the shot originated from the

13 north/northeast direction.

14            So the scale, excuse me, the compass has

15 north in this direction up here (indicating), and so

16 the shot from Hole 1, again, is anywhere between

17 north and northeast, so in that quadrant.  Not that

18 specific area, I was just drawing on the graphic to

19 indicate north/northeast.

20            And the same for Hole 2 and Impact 1,

21 unlike Hole 1 those two points do create a line.  And

22 so when I connected Impact 1 to Hole 2, that allowed

23 for a line, a trajectory to be generated, and that,

24 too, also is from a north/northeast direction.

25            That's common how we refer a common

1    description for directionality, is that sometimes it

2    is an approximation just based on the information

3    collected on the scene is what we commonly will refer

4    to it by a compass direction.

5            MS. WILSON:  May I have a moment,

6    Your Honor?

7            THE COURT:  You may.

8            MS. WILSON:  I pass the witness,

9    Your Honor.

10           THE COURT:  Cross-examination,

11   Mr. Elsenheimer.

12           MR. ELSENHEIMER:  Thank you, Your Honor.

13                   **CROSS-EXAMINATION**

14   BY MR. ELSENHEIMER:

15   Q.    Good afternoon, Mr. Chavez.

16   A.    Good afternoon.

17   Q.    What is your proper title?  I want to make

18   sure I have your proper title.

19   A.    I am a physical scientist forensic

20   examiner.

21   Q.    Can I just call you Mr. Chavez?

22   A.    Please do, yes.

23   Q.    Mr. Chavez, you went to Espanola on

24   August 22nd of 2019, Espanola, New Mexico?

25   A.    That is correct.

 1      Q.    And that was in, should we say, the late

 2  summer or midsummer of 2019?

 3      A.    August 2019 I would probably consider that

 4  late summer.

 5      Q.    And the incident we are talking about in

 6  this case took place in early May.

 7            Are you aware of that?

 8      A.    I am actually not aware of when the

 9  incident took place, and that is just based on when

10  the case was transferred as a Federal case and when

11  it was requested that the lab provide our resources.

12      Q.    That is fair.  So let me ask you this

13  question:  Do you know if the scene at Mr. Smith's

14  house at 826 Riverside Drive in Espanola looked

15  different in late summer when you visited than it

16  did in May -- than it would have looked in May when

17  this all took place?

18      A.    It is possible, however, that doesn't have

19  an impact on my examination.  I am processing the

20  scene as I am there on scene, so it would have been

21  my analysis in August of 2019.

22      Q.    And if the incident in this case took

23  place on May 5th of 2018, you would have visited

24  there over 15 months after; is that right?

25      A.    This is not uncommon.  The Bureau will --

1    Q.    That is a yes or no.  Yes, you --

2    A.    I'm sorry, would you repeat the question?

3    Q.    It was 15 months afterwards, right?

4          MS. WILSON:  Objection, Your Honor.  I

5    think he was trying to answer the question but he

6    was interrupted.

7          THE COURT:  I think he was explaining his

8    answer but he hadn't actually given the answer yet.

9    So answer first and then you can explain.

10    A.    One more time, can you repeat the

11    question?

12    Q.    (By Mr. Elsenheimer) Sure.

13          If the incident took place on May 5th of

14    2018 and you were there in August, late August,

15    August 22nd of 2019, that was approximately 15 months

16    after, between the times?

17    A.    Yeah, not authenticating when the incident

18    occurred, but approximately 15 months.

19    Q.    Okay.  Thank you.

20          Now, I want to ask you about this diagram.

21    First I am going to clear what has been on there.

22          We are talking about two different holes,

23    H1 and H2, correct?

24    A.    Two different areas where, yes, they are

25    labeled Hole 1 and Hole 2.

1      Q.     And Hole 1, H1 is where my pen is right

2    there (indicating), correct?

3      A.     That is correct.

4      Q.     And H2 is over here on that metal shed?

5      A.     That is also correct.

6      Q.     And you were not able to ascertain a

7    trajectory regarding H1; is that right?

8      A.     That is correct.  May I explain?

9      Q.     Certainly.

10     A.     So in some cases we may label something as

11   a hole that does pass through some material.  And

12   what we traditionally use as a trajectory rod and

13   sometimes, and I will use this back area.  Sometimes

14   there may be a hole and when we are applying a

15   trajectory rod there isn't enough area to support

16   the rod actually staying upright.

17            So again, in order to create a line, we

18   need two points.  That second point, although, can

19   touch the rod there is a lot of play in that rod.  So

20   oftentimes a hole will just provide directionality

21   and not support an actual trajectory rod extending

22   out just based on that short amount of distance

23   between the two.

24     Q.     Thank you, Mr. Chavez.

25            So that bullet hole, H1, is where a bullet

1    hit the side of that trailer, correct?

2        A.    That is correct.

3        Q.    And H2, Bullet Hole 2, is where a bullet

4    pierced the side of that metal shed right there

5    (indicating)?

6        A.    Yes.  The bullet passed through that

7    metal, corrugated metal.

8        Q.    Okay.  Now, I want to ask you, let me show

9    you Government's Exhibit 26, and this is H1,

10   correct?

11       A.    Yes, it is.

12       Q.    There is no rust around that bullet hole

13   there?

14       A.    I didn't observe any type of rusting

15   around Hole 1.

16       Q.    Nor did you observe any type of rusting

17   around Hole 2, correct?

18       A.    I didn't observe any rusting on Hole 2,

19   however, is there a photo of the inside of Hole 2?

20       Q.    I don't believe so.

21            Now I want to ask you, there is no way for

22   you to determine the age of H1, is there?

23       A.    No.  That goes beyond the analysis for

24   trajectory examinations.

25       Q.    Certainly.

1          And similarly there is no way for you to

2    determine the age of Hole 2.  And by that I mean

3    there is no way for you to say when it was, when a

4    bullet pierced that shed, correct?

5         A.    The reason I asked for the photo of Hole 2

6    is that there was a beehive that was built on the

7    inside of Hole 2.  To me that indicated that it had

8    been there for some time.  But again, that had no

9    impact on the analysis for that trajectory.

10        Q.    Again, we are talking 15 months after

11   May 5th of 2018.  So, again, there is really no way

12   for you to ascertain if that beehive was built that

13   summer or the summer before, right?

14        A.    Correct.

15        Q.    And so just, I want to ask you, one of

16   those holes could have been from a bullet that was

17   shot in January of 2018, for example?

18        A.    Right.  So the results of the trajectory

19   analysis don't ascertain to when the shooting

20   occurred.  It was a matter of this hole is

21   consistent with having been fired by a bullet or

22   that a bullet had traveled through that area.

23        Q.    Similarly there is no way for you to

24   determine whether one of those holes was from a

25   bullet shot in May of 2018?

1       A.    Again, no way to authenticate when the

2   shooting actually occurred, but, in fact, that a

3   bullet did pass through the material.

4       Q.    They could have both been from January,

5   possibly?

6       A.    I am not -- I have no way of indicating or

7   responding to that just based on my analysis of when

8   it occurred.

9       Q.    That is fair, thank you.

10          My real question is there is just no way

11  for you to date when these holes were created?

12      A.    Yeah, that goes beyond the limitations of

13  the exam.

14          MR. ELSENHEIMER:  Nothing further,

15  Your Honor.

16          THE COURT:  Do you have any redirect

17  Mr. Nayback or Ms. Wilson?

18          MS. WILSON:  No, Your Honor.

19          Thank you.

20          THE COURT:  May this witness be

21  permanently excused?

22          MS. WILSON:  Yes, Your Honor.

23          MR. ELSENHEIMER:  Yes, Your Honor.

24          THE COURT:  All right.  Thank you for your

25  testimony today, Mr. Chavez, you are excused.

1              (Whereupon the witness was excused from

2       the courtroom.)

3              THE COURT:  The Government may call its

4       next witness.

5              MR. NAYBACK:  Thank you, Your Honor.

6              The United States calls FBI Special

7       Agent Bryan Acee.

8              MR. ELSENHEIMER:  Your Honor, may we

9       approach really quick?  I'm sorry.

10             THE COURT:  Yes.

11             (Whereupon a Bench discussion was held

12      outside the hearing of the jury.)

13             MR. ELSENHEIMER:  So, Your Honor, we would

14      object to some testimony by FBI Agent Acee about his

15      testimony about experience with firearms.  And

16      Mr. Nayback had indicated that they were going to

17      bring that up through this witness who they are

18      about to call.  And so our objection to any line of

19      questioning of that nature is that he was not

20      properly noticed as an expert under 702.

21             So I think that that goes outside of the

22      scope of the work that he provided in this case,

23      which is basically he tested the functioning of the

24      weapon that was found in Mr. Smith's property.

25             So any questions about gun safety, anything

1    of that like, of that nature, I think, is expert

2    testimony and he should be prohibited because they

3    didn't notice him as an expert.

4              THE COURT:  What is this witness going to

5    testify?

6              MR. NAYBACK:  We did notice him up.  There

7    was no *Daubert*, there was no challenge four months

8    ago.  We did notice him up as someone who examined

9    the firearm in this case and who is also familiar

10   with the gun safety rules and a fact witness.  He

11   examined the firearm and he may provide expert

12   testimony regarding the functionality of the

13   firearm, examining the cartridges.

14             So in his CV on Line 7, "As part of my

15   employment with the FBI, I have attended several

16   firearms courses," and this is the report for this

17   case.

18             "I have attended several firearms courses

19   and schools that pertain to safe handling, firing,

20   and cleaning of different types of weapons and brands

21   of firearms."

22             That is in the CV that was never objected

23   to that was filed in April.

24             THE COURT:  Tell me how that relates to

25   what the area of testimony that you noticed him on

1    you had?

2             MR. NAYBACK:  Can you ask me again.

3             THE COURT:  That is his CV, but what is

4    the content of his projected expert testimony?

5             MR. NAYBACK:  The content is he can

6    testify including his expertise and specialized

7    derived from his education, training, and

8    professional --

9             THE COURT:  But on what topics?  You

10   listed your topics.  Did you list gun safety?

11            MR. NAYBACK:  It is in the CV.

12            THE COURT:  Understood.  I am sure a lot

13   of things are in his CV.  My question is, what did

14   you say about the content of his opinions?

15            MR. NAYBACK:  You know, the notice is

16   pretty general, but Special Agent Acee's testimony

17   may include his expertise especially in guns

18   regarding this matter, derived from his education,

19   training and professional experience and then --

20            THE COURT:  On what, though?

21            MR. NAYBACK:  On gun safety.

22            THE COURT:  Show me where it says gun

23   safety.

24            MR. NAYBACK:  It doesn't in here, it has

25   it in the CV.

1              THE COURT:  That is my problem where in

2    the notice?

3              MR. NAYBACK:  It doesn't.

4              THE COURT:  Can I look at the notice?

5              MR. NAYBACK:  Yes.

6              THE COURT:  It is anticipated that Special

7    Agent Acee will testify at trial primarily as a fact

8    witness as he examined the firearm and multiple

9    cartridges.  He has been in defendant's property,

10   and may provide expert opinion testimony regarding

11   functionality of firearm as well as his examination

12   of the cartridges.

13             Further may provide opinion testimony about

14   the consistency of the bullets fired from certain

15   firearms and inconsistency with other firearms.

16             May include his expert opinions or

17   specialized knowledge regarding this matter derived

18   from his education, training and professional

19   experience.

20             MR. NAYBACK:  It goes on with Theodore

21   Chavez and other experts.  That is the paragraph

22   that you are seeing on Special Agent Acee.

23             So this is notice pleading.  It has as part

24   of his CV, safety and I get the defendant's objection

25   if the Court rules against us.  I just want to move

1    it along.  They brought up warning shots, firing in

2    the dark and we feel like we tried to get it in

3    through another expert and we think the jury should

4    hear about gun safety.

5              But I think it is common knowledge, but I

6    think this expert is the most qualified to talk about

7    gun safety.  And if the Government is going to get

8    dinged for not including it specifically in here,

9    again, there was never a *Daubert* notice, that he

10   testifies in other trials on gun safety.  It says

11   specialized knowledge, education and training, and it

12   is in his CV.  That is it.

13             So if it is not specific enough, we get it.

14             MS. LAVIN:  We are not challenging, you

15   know, his expertise as far as what is indicated in

16   this notice that he tested the firearm.  I mean,

17   Mr. Smith said he fired warning shots three years

18   ago when he was arrested, so it is not new

19   information.  I think if they wanted to get that in,

20   it should have been done in a timely way.  We could

21   have voir dired him, filed equivalent motions.  I

22   think his testimony should be limited as to the

23   notice as far as expert testimony.

24             THE COURT:  I will agree that his

25   testimony should be what you noticed.  I don't

1    disagree that it's been mentioned that he fired

2    warning shots fired in the dark.  I get it, but this

3    witness has not been noticed as an expert to discuss

4    those things, so limit it to the notice.

5              MR. NAYBACK:  It will be short.

6              THE COURT:  Thank you.

7              (Whereupon the following proceedings were

8    held in Open Court.)

9              (Whereupon, the witness was sworn.)

10             THE COURT:  If you would please give us

11   your full name and spell your first and last names

12   for the record.

13             THE WITNESS:  Good afternoon.  My name is

14   Bryan Acee, B-R-Y-A-N, A-C-E-E.

15             THE COURT:  Thank you.

16             MR. NAYBACK:  May I proceed?

17             THE COURT:  You may.

18                   BRYAN ACEE,

19   **after having been first duly sworn under oath,**

20      **was questioned and testified as follows:**

21                **DIRECT EXAMINATION**

22     BY MR. NAYBACK:

23     Q.    Sir, what do you do for a living?

24     A.    I am a special agent with the FBI here in

25   Albuquerque.

1    Q.    How long have you been with the FBI?

2    A.    A little over 12 years.

3    Q.    What are your responsibilities?

4    A.    I have a short list.  I am primarily a

5    field agent, that is what I do on a daily basis.  I

6    have some collateral duties which include I am one

7    of the team leaders for our SWAT team, our Special

8    Weapons and Tactics Teams for this region.

9         I also serve as a firearms instructor and a

10   tactical instructor, a training agent for new agents

11   coming out of the academy, they will be assigned to

12   me for approximately two years as a mentor agent.

13        And then I work within our division's

14   firearms program doing firearms examinations and test

15   fires.

16   Q.    Do you have any certifications?

17   A.    I do.

18   Q.    What are those?

19   A.    In addition to having graduated, I will

20   spare you the details of basic academies, I have

21   been a law enforcement officer for 21 years.

22        But in terms of more advanced

23   certifications, I mentioned earlier that I am a SWAT

24   team leader and there is a number of protocols there

25   to go through for tactical and firearms training with

1    the FBI.

2              I have been through the basic, intermediate

3    and advanced courses to become a SWAT team leader.  I

4    am a graduate of the FBI's firearms instructor

5    school.

6              I am a graduate of ATF's certified firearms

7    specialist school, which pertains to examining

8    firearms and ammunition, explosives.

9              I hope I am not leaving anything out, but I

10   am trying to narrow it just to the area of firearms.

11   I think that is the majority of the courses.

12        Q.    That is fine.

13              Have you spent time with ongoing training

14   in firearms?

15        A.    I do.  In addition to the ongoing

16   training, because sometimes I encounter firearms or

17   ammunition that I am not familiar with and so I have

18   to reach out to the cadre of instructors who worked

19   with me to certify me.  But I examine hundreds of

20   firearms a year just here in Albuquerque.

21        Q.    It sounds like you do training for both

22   agents and for members of the public?

23        A.    I do, yeah.  So I guess I talked about the

24   FBI training but on -- outside of the FBI, I conduct

25   training for a number of organizations, the Boy

1  Scouts, different area church security teams where

2  there are volunteers that are armed in their

3  churches as a security response.

4          I have worked with, I forget the name of

5  the group, but it is mothers and women self-defense

6  who want to learn firearms safety and shooting and

7  some basic tactics with firearms.

8          I have worked with some NRA groups up at

9  the West Side Range.  Off the top of my head,

10  that's -- I will stop there.

11      Q.    Thank you, sir.

12          And in your, if you know, in your career

13  how many firearms have you examined?

14      A.    Easily more than 10,000 over the last

15  again 20-plus years.

16      Q.    Have you testified in court as an expert

17  previously?

18      A.    I have.  In fact just this year, I think

19  this will be my fourth or fifth time.

20      Q.    Which courts?

21      A.    Here, Federal courts in this building.

22          MR. NAYBACK:  Your Honor, the United

23  States will proffer Special Agent Acee as an expert

24  in firearms and firearms safety with the ability to

25  testify to his opinions and analysis just to the

1    firearm in this case.

2                    MR. ELSENHEIMER:  No objection.

3                    THE COURT:  All right.  Special Agent Acee

4    will be recognized as an expert.

5        Q.    (By Mr. Nayback) Were you asked to examine

6    a firearm in this case.

7        A.    Yes, sir.

8        Q.    What type was it?

9        A.    It was a Stoeger Luger .22 caliber pistol.

10       Q.    Are you familiar with that pistol?

11       A.    I am.  I think that was the second or

12   third that I had examined of that caliber.

13       Q.    And how do you go about examining it?

14       A.    I start by -- I get a request from an

15   agent in a case that I am normally not involved in

16   to do an examination, usually for your office and

17   for purposes of court.

18                   Simply stated, I go down to the evidence

19   room and I check the firearm out.  I start by making

20   sure that it is properly identified so that all

21   firearms manufactured after 1968 will have the name

22   of the manufacturer, the City and State where it was

23   manufactured.  If it was imported, it will have the

24   location of where it was imported.  Serial number, a

25   make, model and caliber.

1              So that is the general information, of

2    course, first I make sure the gun is unloaded.  I

3    have actually found them loaded before, sadly in our

4    evidence, which is a -- I will stop there.  That is a

5    terrible thing.  But in any case --

6        Q.    I was going to ask you about that.  What

7    is chambering?  Is that a term you are familiar

8    with?

9        A.    Yes.

10       Q.    What is that?

11       A.    So chambering, I am going use my hands a

12   little bit.  I will try to describe for the court

13   reporter.  But picture my right hand as a

14   semiautomatic pistol, and the magazine is inserted

15   into the bottom of the pistol.  The magazine is full

16   of cartridges, sometimes referred to as, bullets,

17   but I will say cartridges.

18             As the slide on the semiautomatic is pulled

19   to the rear and then a spring action sends that

20   forward, one of the cartridges from the magazine is

21   chambered up into the barrel of the pistol.  And that

22   is, that is how I would define chambering, chambering

23   a round.

24       Q.    We are talking about kind of how to

25   operate the .22 pistol in this case.

```
 1            Do you happen to know as a matter of course
 2   do weapons when they are purchased, usually come with
 3   instructions and safety rules along with them?
 4        A.    Yes.
 5            MR. ELSENHEIMER:  Objection.  No
 6   foundation as it pertains to this gun.
 7            THE COURT:  Well, if you could lay a
 8   foundation, please.
 9            MR. NAYBACK:  I will move along,
10   Your Honor.
11            THE COURT:  Thank you.
12        Q    (By Mr. Nayback) And so can you further
13   explain how you go about testing the firearm?
14        A.    After I make that initial identification I
15   just explained, I then will take the firearm to one
16   of the area shooting ranges and I will put
17   ammunition in it.  Usually it is at least two
18   rounds, if it is a semiautomatic.  If I suspect the
19   weapon is a fully automatic or a machine gun, I will
20   use more ammunition.
21            In this case I only used two rounds and
22   simply stated, I load it and I fire it.  And that way
23   that meets two objectives.  One, it is a successful
24   test fire and then we submit the casings that are
25   expelled from the weapon to the area lab through an
```

1  ATF Albuquerque police program where we try to match

2  up shell casings to crime scenes.  So those are the

3  two reasons that I test fire it.

4          I will note whether or not it functioned as

5  designed, and then I will head back to the office,

6  return the weapon to evidence and write a report

7  about the test fire and my examination.

8      Q.    Did this specific gun have a safety device

9  on it?

10     A.    I would need to look at the instruction

11 manual.  Off the top of my head, I don't recall.  I

12 printed the instruction manual, I have it with me

13 but --

14     Q.    Tell me this, if you have that pistol when

15 it is empty, what do you have to do before you pull

16 the trigger and discharge a bullet?  What has to be

17 done to the gun?

18     A.    So I would say four things.

19     Q.    Okay.  Let's hear them.

20     A.    First is I need to load the magazine.

21 Second thing is I need to insert the magazine into

22 the pistol and then I need to chamber a round or

23 activate the slide to load that first chamber into

24 the bore.  The fourth thing is I need to press the

25 trigger.

1    Q.    In your opinion in this case did the

2    firearm function as designed?

3    A.    Yes.

4    Q.    Any problems with it at all?

5    A.    No.

6         MR. NAYBACK:  I pass the witness,

7    Your Honor.

8         THE COURT:  Cross-examination,

9    Mr. Elsenheimer.

10                  **CROSS-EXAMINATION**

11   BY MR. ELSENHEIMER:

12   Q.    It is nice to see you, Agent Acee.

13   A.    Nice to see you again, sir.

14   Q.    I know you are a busy man.  I just have a

15   very couple quick questions.  I want to ask you

16   about chambering a round.

17         After you put a magazine into the

18   semiautomatic, right?  If you don't do anything with

19   the mechanism, what do you call that, the slide?

20   A.    The slide.

21   Q.    If you don't do anything with the slide

22   the round is not chambered, correct?

23   A.    Yes and no.  I want to be clear.  A

24   pistol, a semiautomatic pistol could already be in a

25   locked back position where if you put the magazine

1    in with enough force you could actually cause it to

2    close.

3        Q.    My question is, if a round is not

4    chambered, if there is no round in the chamber you

5    can't fire a bullet out of that gun, correct?

6        A.    Correct.

7        Q.    It is the effective equivalent of having a

8    safety on; is that right, in the sense that you

9    can't fire a bullet out of the gun?

10        A.    I agree.

11            MR. ELSENHEIMER:  Thank you, Agent.

12            THE COURT:  Is there anything further?

13            MR. NAYBACK:  No.

14            THE COURT:  May this witness be excused?

15            MR. NAYBACK:  He may.

16            THE COURT:  And for the defense also?

17            MR. ELSENHEIMER:  Yes, Your Honor.

18            THE COURT:  Thank you for your testimony

19    today, Special Agent Acee.

20            (Whereupon the witness was excused from

21    the courtroom.)

22            THE COURT:  And the Government may call

23    its next witness.

24            MS. WILSON:  The United States has no

25    additional witnesses, and we will rest.

1          THE COURT:  All right.  Government has

2    rested.

3          The defense may call its first witness.

4          MR. ELSENHEIMER:  Your Honor, may we take

5    a break?  I see it is 3:00.

6          THE COURT:  Well, it is a little bit

7    early, but we will go ahead and take one.  I am half

8    joking since I usually take it at 3:05.

9          We will take a break at this time.  We will

10   return in about 15 minutes.

11          (Whereupon the jury exited the courtroom.)

12          THE COURT:  Please be seated.

13          (Open court, outside the presence of the

14   jury.)

15          MR. ELSENHEIMER:  Your Honor, we move for

16   a Rule 29 directed verdict.  To begin with the -- in

17   order to convict Mr. Smith of second-degree murder,

18   the Government must prove malice aforethought.

19          Under the instructions that is defined and

20   I am going to read the instruction.  "To kill with

21   malice aforethought means to kill another person with

22   callus and wanton disregard for human life."

23          Callus and wanton disregard for human life.

24   I think those words are critical to an analysis of

25   second-degree murder.  There has not been one shred

1    of evidence yet in this trial that Mr. Smith was in

2    any way callus or wanton at all, not a shred of

3    evidence.

4            He encountered an intruder behind his house

5    at 1:00 in the morning and fired to scare that person

6    away.  The person ran, he believed they left his

7    property and fired three more times.  I know the

8    Court knows the facts as well as the rest of us

9    because we have been over it many times in prior

10   pleadings.  But there is simply no argument, no

11   evidence that Mr. Smith was callus or wanton in any

12   way.

13           Those terms callus and wanton under the law

14   require a level of disregard for human life that is

15   associated with murder.  That is not present here at

16   all.

17           Now, if we were facing charges for

18   involuntary manslaughter, I don't know that I would

19   have a strong argument on the difference between

20   negligence or criminal negligence, which is required

21   for involuntary manslaughter.  I am not conceding

22   anything, I am just pointing out, if we were here on

23   an involuntary manslaughter charge I don't know that

24   my argument would be the same.

25           We are here on a second-degree murder

charge.  And for second-degree murder they must prove
callous and wanton disregard for human life.  That is
simply not present in this case.  There has been not
one shred of evidence from the Government to
establish that.

         Mr. Nayback's opening statement and just
the Government's requested Instruction Number 19
defines wanton as unreasonably or maliciously risking
harm while being utterly indifferent," utterly
indifferent to the consequences.  That is critical,
utter indifference to the consequences.

         Mr. Smith wasn't utterly indifferent.
Mr. Smith said he thought the person had left and
then he fired.  That is not utter indifference to the
consequences of one's actions.

         Again, if this was involuntary
manslaughter, our argument would not -- we would not,
we would be talking about negligence versus criminal
negligence, and I think that is a finer line.  But we
have a very clear-cut line with second-degree murder,
malice aforethought and then required callus and
wanton disregard for human life.  Not one shred of
evidence.

         Thank you, Your Honor.

         THE COURT:  Thank you.

1          Mr. Nayback.

2          MR. NAYBACK:  Mr. Elsenheimer just

3    addressed one element.  I just wanted to clear up

4    the record that there doesn't seem to be a dispute

5    in this case that the crime occurred in Indian

6    Country, that Maria Gallegos is a tribal member, the

7    defendant is a non-Indian, that the defendant killed

8    Maria Gallegos.

9          You heard the defendant's statements this

10   morning and told Detective Byron Abeyta, "Whatever

11   happens, happens."

12         The Court now knows that defendant could

13   not see.  He said it was dark enough not to stumble.

14   He could not tell if the person was a man or a woman,

15   and I am going to add a juvenile.

16         The evidence will show that he actually

17   thought he killed a tenant that lived there or at

18   least Ercilia Trujillo's granddaughter, Melanie,

19   proving further he didn't know who it was.

20         The defendant has said that the person was

21   standing by the trailer and there is no evidence that

22   she was breaking in.  The defense keeps referring to

23   Maria Gallegos as an intruder and the evidence shows

24   there was no private property or trespassing signs on

25   the property whatsoever and that the shadow, as the

1    defendant referred to it, was actually standing

2    outside of his fenced-in backyard.

3          He didn't explain how he knew the person

4    was breaking in and there is no evidence that she was

5    an intruder or that she was breaking in.  The

6    evidence is clear that he shot four times.  We have

7    proven that through impact points and shell casings.

8    The defendant himself admits that she ran off after

9    the first shot and he continued shooting, moving his

10   gun in her direction.

11         He created the unreasonable risk that she

12   would die, and she did die.  He said, "I was pointing

13   not aiming."

14         He told the law enforcement officer, "Well,

15   if you shoot into the air you never know where the

16   bullet is going to come down," indicating that he is

17   familiar with rules of gun safety.  He knew how to

18   chamber a round.  He said he was, "pulling the

19   trigger faster than I have ever pulled it," and there

20   was no aiming.

21         Your Honor, he was shooting into the dark

22   at a human being and he put one -- and he was

23   shooting body height.  Both bullet holes show that he

24   was shooting body height, and he put one into her

25   temple approximately 30 feet away from where he was

1    standing.

2            Defendant talks about putting the clip in,

3    "And whatever happens, happens."

4            THE COURT:  Now, let me just ask about

5    that because if I remember the testimony of the

6    interview correctly, I thought that that, "Whatever

7    happens, happens," occurred after when he tried to

8    reload and was unable to reload, I thought.

9            MR. NAYBACK:  I think that is right.  I

10   think that is right.  He didn't ask the agent who

11   she was.  He didn't ask how to contact the family,

12   and he had time before he called 911 to think about

13   his self-serving statement that someone was breaking

14   into the trailer.

15           I think any reasonable juror could conclude

16   that shooting into the dark at a human being as they

17   are running away, as they are running away, it

18   doesn't really matter if he thought they were gone.

19   The evidence shows that she wasn't gone.  She was

20   killed on the hotel property, 15 feet from the

21   trailer, approximately, maybe ten strides from where

22   she was at.

23           And he said he wasn't, he wasn't aiming, he

24   was shooting through the trees.  And any reasonable

25   juror can conclude that that is callous and wanton

1    disregard for human life.  He created the

2    unreasonable risk and she died as a result.

3              For that reason, the United States submits

4    viewing the facts in a light most favorable to the

5    Government that any reasonable juror could conclude

6    that the defendant is guilty of second-degree murder.

7              Thank you.

8              THE COURT:  Okay.  Anything further?

9              MR. NAYBACK:  No.  Oh, sorry.

10             MR. ELSENHEIMER:  Very briefly,

11   Your Honor.

12             There is no evidence that Mr. Smith was

13   moving his gun in her direction.  We have the diagram

14   from Mr. Smith of his interview with the FBI and we

15   have the diagram from Mr. Smith.  In each occasion,

16   he said he shot, for the FBI with Agent Taylor, he

17   said between the tree, which is where my finger is,

18   to the left.  That is the general direction where he

19   shot.

20             Similarly with the Detective Abeyta we have

21   in this, in the language that Mr. Smith used with

22   Detective Abeyta was, "angle-wise in this area

23   between," again, identical to what he told the FBI

24   between the trailer and the tree.  There is no

25   evidence that he was moving his gun in the person's

1    direction.  He thought that person was gone and fired
2    the gun through the tree at the woodpile.  That is
3    the evidence.
4            Lastly, there is no evidence that he said
5    he was shooting at anyone.  Consistently he said he
6    was, he thought the person had left the property.
7            THE COURT:  Well, I will deny the motion.
8    I will acknowledge that this is a hard case.  I do
9    think that if believed, the jury could find that the
10   defendant was utterly indifferent to the
11   consequences because he was shooting in the dark.
12   He was shooting despite the fact that he said he
13   was -- he thought the victim had left the property.
14           The fact of the matter is it was dark, he
15   couldn't see.  And while I don't know precisely what
16   the height was of the bullet holes in either the
17   camper or the shed, I could see from the photographs
18   that the bullet hole on the tractor or, excuse me, on
19   the trailer was not higher than a person.
20           And the fact that he, she was hit and even
21   if he didn't intend to hit her, clearly he was firing
22   his gun in a manner where he was firing not able to
23   see where the bullet was going.  The fact that he
24   was, that he shot between the trees, where he was
25   shooting is all well and fine, but the fact is he

1    didn't know where the shadow was.

2          So I do think that it is a hard case.  I

3    mean, I could see that the jury could believe the

4    Government, the jury could not believe the

5    Government.  But I think the Government has met its

6    burden of proof for purposes of the Rule 29 motion.

7          So thank you and we will -- our break will

8    be a little bit --

9          MS. LAVIN:  Your Honor, the only thing we

10   want to address right now is our first witness,

11   Ms. Trujillo, we are going call, she is going to

12   testify via Zoom.  So logistically we just want

13   to -- where am I going stand?  Right here

14   (indicating)?

15          (A recess was taken.)

16          THE COURT:  Are you ready for the jury?

17          (Whereupon the following proceedings were

18   held in Open Court.)

19          (Whereupon the jury entered the

20   courtroom.)

21          THE COURT:  Please be seated.  The

22   defendant may call its first witness.

23          MS. LAVIN:  Thank you, Your Honor.  The

24   defense calls Ms. Ercilia Trujillo via Zoom

25   videoconference.

```
 1              THE COURT:  Ms. Trujillo, my name is

 2    Judge Herrera and I am going to ask you to raise

 3    your right hand and my clerk will administer the

 4    oath.

 5              (Whereupon, the witness was sworn.)

 6              THE COURT:  Thank you, Ms. Trujillo, you

 7    may put your hand down.  I am going to ask you to

 8    give us your full name, please, and spell your first

 9    name and your last name.

10              THE WITNESS:  E-R-C-I-L-I-A,

11    t-R-U-J-I-L-L-O.

12              THE COURT:  All right.  Thank you,

13    Ms. Trujillo.  I am going to now turn it over to the

14    attorney Ms. Lavin, and she will ask you some

15    questions.

16              THE WITNESS:  Thank you.

17                   ERCILIA TRUJILLO,

18    after having been first duly sworn under oath,

19       was questioned and testified as follows:

20                   DIRECT EXAMINATION

21    BY MS. LAVIN:

22    Q.    Good afternoon, Ms. Trujillo.

23    A.    How are you?

24    Q.    I am well, how are you?

25    A.    Okay.
```

1      Q.    Ms. Trujillo, could you please tell the
2   jury where you live?
3      A.    I live in Espanola.  I live in a motel,
4   Western Winds.
5      Q.    The Western Winds?
6      A.    Apartment 9.
7      Q.    Apartment 9, thank you.
8      A.    Yes, ma'am.
9      Q.    And who owns the apartment that you live
10  in?
11     A.    Douglas Smith.
12     Q.    Okay.  And, Ercilia, can you see the
13  gentleman seated next to me?
14     A.    Yes.
15     Q.    Who is that?
16     A.    That is Douglas Smith.
17     Q.    Okay.  He is your landlord?
18     A.    Yes, sir -- yes, ma'am.
19     Q.    Thank you.
20           How long have you lived at the apartment
21  where you live?
22     A.    Seven years.
23     Q.    Okay.  Do you recall -- do you remember
24  what you were doing on the night of May 4th, 2018?
25     A.    I was praying and I was reading my Bible.

```
 1        Q.     Okay.  And what happened that night?
 2        A.     Well, I heard voices, a lot of voices on
 3   the entrance of the motel.  They were arguing, they
 4   were fighting.  And I said to myself, what is going
 5   on, and then pretty soon, like, I would say, like,
 6   15 or 20 minutes somebody tried getting into my car.
 7           And my car was rigged by me nobody would
 8   get into it.  I was the only one who could get into
 9   my own car.
10        Q.     Okay.  So Ms. Trujillo --
11        A.     And I heard the handles of the car making
12   a noise but I didn't come out because I had been
13   very, very sick with pneumonia and I was real weak.
14        Q.     Thank you, Ms. Trujillo.
15           When you heard these things, where were
16   you?
17        A.     I was in my room in bed.
18        Q.     And your door was shut?
19        A.     Yes, it was.
20        Q.     Where was your car parked?
21        A.     Well, eight feet from the door.
22        Q.     What kind of car do you have?
23        A.     A Chevy Classic.  It is a -- it is a
24   Cavalier.
25        Q.     What color is it?
```

1    A.    Red.

2    Q.    Do you ever drive that car?

3    A.    No, honey, it is broken.

4    Q.    How long has that car been parked in front

5    of your apartment?

6    A.    Oh, my goodness, since I moved in.

7    Q.    Is it still parked there?

8    A.    It is still parked here.

9    Q.    Okay.  How many voices did you hear the

10   night of May 4th?

11   A.    There was a lot of them.  I couldn't

12   distinguish to tell you it was four, five, or six,

13   but there was a lot of them.

14   Q.    What did you think was happening?

15        MS. WILSON:  Objection, Your Honor.

16   A.    I don't know.  I knew something was not

17   good because --

18        THE COURT:  Ms. Trujillo, hold on one

19   second.

20        THE WITNESS:  Okay.

21        THE COURT:  Yes, Ms. Wilson?

22        MS. WILSON:  Calls for speculation,

23   Your Honor.

24        THE COURT:  I would ask if you could ask a

25   question that doesn't call for speculation.  You

1    asked what she thought they were doing, but I didn't

2    hear a foundation for that.

3              MS. LAVIN:  I will move on.

4        Q    (By Ms. Lavin) Ms. Trujillo, what time did

5    you hear the voices?  Do you remember the time of

6    night?

7        A.    I don't remember what time it was.

8        Q.    Was it early, was it late?

9        A.    No, it was late.

10       Q.    Was it dark outside?

11       A.    Yes.

12       Q.    What else did you hear that night?

13       A.    Well, I heard I thought it was fire

14   crackers.  And I said, What is going on, and I sat

15   back in my bed and continued listening, but it

16   wasn't fire crackers, it was something else.

17       Q.    What did you hear the voices say that you

18   heard?

19              MS. WILSON:  Objection, Your Honor.

20   Hearsay.

21              THE COURT:  Hold on one second.

22              MS. LAVIN:  Your Honor, we are not

23   eliciting the answer to this question for the truth

24   of the matter, we are just trying to set the scene

25   as to what Ms. Trujillo heard that night.

1          THE COURT:  All right.  The Court will

2    allow Ms. Trujillo to talk about what she heard, but

3    I just want to make sure everybody understands that

4    we are not hearing what she heard as for the truth,

5    only to set the stage for what was going on that

6    night.

7          For that reason I will allow Ms. Trujillo

8    to answer your question.

9          MS. LAVIN:  Thank you.

10         THE WITNESS:  Can I say it, Your Honor?

11         THE COURT:  Yes, you may, Ms. Trujillo.

12    A.    "Come on, come on, let's get it on.  Let's

13    do it now."

14         That is what I heard, ma'am, Your Honor, I

15    mean and then like I tell you, they were trying to

16    get into the car and my car was rigged by me because

17    I knew sooner or later somebody was going try to do

18    something from my car or try to remove parts from it.

19    Q.    (By Ms. Lavin) Okay.  Ms. Trujillo, what

20    made you think they were breaking into your car?

21    What did you hear?

22    A.    The noise, the door handles.

23    Q.    Okay.  Thank you.

24         What happened the next day, Ms. Trujillo?

25    A.    Okay.  Officer Abeyta, he was the last one

1    that came.  He wanted to make sure that everything

2    was okay, you know, and he spoke to me, and then he

3    left.

4              And this young man came scroungy looking.

5    You could tell that this man was up to no good.  I am

6    in my apartment and I walked and I told him, "Young

7    man, what are you doing in the yard?"

8              He said, "I am looking for the knife that I

9    dropped here last night."

10             I said, "Were you with this young lady,"

11   and he didn't answer.  I told him, I said, "Get out

12   or I will call you the cops."

13        Q.    Thank you, Ms. Trujillo.

14             Did you tell police officers what you heard

15   the night of May 4th, 2018?

16        A.    Well, Abeyta was more concerned in telling

17   me, in asking me questions, you know, that if I

18   was -- if I had came out the door.  I told him, I

19   said, I didn't come out the door.  I opened the

20   door.  I opened the door, I peeked out and I closed

21   the door immediately.

22        Q.    Ms. Trujillo, how many officers did you

23   speak with?

24        A.    Okay.  Two of them and two FBIs, that is

25   four.

```
 1        Q.    So four total?
 2        A.    Yeah.  Taylor was one of them and, I don't
 3   know, a real pretty young lady.  I don't know who
 4   she was, but they came way afterwards, after this
 5   happened to question me.
 6        Q.    Thank you, Ms. Trujillo.
 7              MS. LAVIN:  Thank you, Ms. Trujillo, those
 8   are all the questions I have, but don't go away.
 9              THE COURT:  Ms. Trujillo, next an attorney
10   representing the Government will ask you some
11   questions.
12              THE WITNESS:  Okay, thank you.
13                      CROSS-EXAMINATION
14   BY MS. WILSON:
15        Q.    Good afternoon, Ms. Trujillo.
16        A.    I can't hear you.
17        Q.    Is it okay if I ask you a few questions?
18        A.    Sure, you can.
19        Q.    Thank you.
20        A.    Sure.
21        Q.    Where is the entrance of the motel you
22   live in?
23        A.    The entrance?
24        Q.    Yes.
25        A.    It is against the highway.
```

1      Q.    Against the highway, that is that main
2  road there north --
3      A.    Yes, ma'am.
4      Q.    Is that where you heard the voices from?
5      A.    They were against the motel.
6      Q.    So when you say against the motel, is that
7  behind you or in the front?
8      A.    In the front.  On the side there is a tree
9  and that tree has created a lot of problems for us
10 because people come and they hide there and they do
11 what they want to.
12     Q.    Let me just have you answer my question.
13           Thank you.
14     A.    All right.
15     Q.    Did you tell Doug Smith to call 911?
16     A.    I sure did.
17           MS. LAVIN:  Objection, scope.
18           THE COURT:  I will allow the question.
19 She was asked about whether she spoke to police
20 officers or law enforcement, and I think it was
21 broadened, so I will allow it.
22     Q     (By Ms. Wilson) Ms. Trujillo, you said you
23 talked to Detective Abeyta and that statement was
24 recorded, did you know that?
25     A.    Of course.

1    Q.    And there were some transcripts along with

2    that recording.  Have you reviewed those?

3    A.    No.  Nothing was given to me about what I

4    told Abeyta.

5    Q.    Okay.  That is fine.

6    A.    The truth.

7    Q.    So also you were interviewed by Special

8    Agent Taylor and Michelle Cobb?

9    A.    There you go, there you go, the pretty

10    girl, yes.

11    Q.    And when you talked to Detective Abeyta

12    and both Michelle Cobb, you told them both times you

13    never left your room; is that right?

14    A.    Pardon me?

15    Q.    Did you tell them whether or not you left

16    your room?

17    A.    I did not leave my room, ma'am.  I opened

18    the room.  It is the following day when I went

19    outside.

20    Q.    Okay.  When you were talking to Ms. Cobb

21    and she asked you, "At any point did you come out

22    and talk to Doug before the police came?"

23    Do you remember that?

24    A.    The only thing, ma'am, is that I told him

25    to call the police is what I told him.

1    Q.    When you told him to call the police did
2    you go out of your room?
3    A.    I sure did not, huh-uh.
4    Q.    All right.  But you did tell Michelle Cobb
5    when she asked you, "At any point it did you come
6    out of the room to talk to Doug before the police
7    came," and you said, "I did."
8         Do you remember that?
9    A.    I opened my door, ma'am.  I opened my door
10   and I told him, "Go ahead and call the cops."
11        That is what I did.
12   Q.    But you told Michelle Cobb in that
13   interview that was transcribed, "I did," you did
14   leave the room?
15   A.    I did not leave the room, I did not leave
16   the room, ma'am.
17   Q.    You also testified on a prior occasion,
18   and that was sworn testimony, right, you were
19   supposed to tell the truth?
20   A.    Yes.
21   Q.    Have you had a chance to look at those
22   transcripts?
23   A.    I can't hear you.
24   Q.    Have you had a chance to look at the
25   transcripts of your prior sworn testimony?

600

```
 1        A.    No, because nothing was given to me.

 2        Q.    And you testified previously under oath

 3   that you did not have a flashlight; is that correct,

 4   that night?

 5        A.    I didn't have a flashlight, ma'am.

 6        Q.    So you had no flashlight and you never

 7   shown it on Ms. Gallegos' body?

 8        A.    No.

 9              MS. LAVIN:  Your Honor, I am going to

10   object to this question as outside the scope of

11   direct.

12        A.    No.

13              THE COURT:  This is outside the scope of

14   direct, Ms. Wilson.

15              MS. WILSON:  I will move on, Your Honor.

16        A.    Go ahead.

17        Q     (By Ms. Wilson) So Doug Smith is more than

18   your landlord, isn't he?

19        A.    I can't hear you.

20        Q.    So you pay rent to Mr. Smith, don't you?

21        A.    Pardon me?

22        Q.    You pay rent to him, don't you?

23        A.    I rent from him, yes.

24        Q.    And you pay $500 a month?

25        A.    Yes.
```

```
1        Q.    And you testified on direct examination he
2    is your landlord, right?
3        A.    Honey, I can't hear you.
4        Q.    You testified he was your landlord, right?
5        A.    He is my landlord.
6        Q.    But you have also previously testified
7    that you owe him a lot, don't you?
8        A.    Yes.  You know why?  Because he took care
9    of me and my son when we were very, very sick.
10        Q.    And you are just trying to help him out
11    today, aren't you?
12        A.    Pardon me?
13        Q.    You are just trying to help him out today,
14    aren't you?
15        A.    No, I am not, I am trying to say the
16    truth.
17        Q.    And let's talk about the voices you heard
18    that night.
19        A.    Yes, ma'am.
20        Q.    You testified that you never left your
21    room?
22        A.    I did not leave my room, ma'am, I opened
23    the door in my room.
24        Q.    So you didn't know who was talking, you
25    couldn't tell who those voices were.  You never saw
```

1  anybody with those voices, you only went with what

2  you heard; is that correct?

3      A.    I don't know who they were.

4      Q.    So it sounds like you might have been

5  confused that night; is that correct?

6      A.    Honey, what?

7      Q.    It sounds like you were confused that

8  night, isn't that right?

9      A.    I was not confused.

10     Q.    You didn't know, you didn't go outside of

11 your room so you didn't know who was talking; is

12 that right?

13     A.    No, I did not go out my room and I don't

14 know who they were, I have said this over and over

15 again.

16     Q.    I am just clarifying, thank you.

17           And you only heard somebody breaking into

18 your car, you didn't see anybody; is that right?

19     A.    Pardon me?

20     Q.    You only heard somebody who you think was

21 breaking into your car but you did not see anybody;

22 is that right?

23     A.    No.

24           MS. WILSON:  No further questions,

25 Your Honor.

1          THE COURT:  All right.  Thank you.

2          Ms. Lavin, do you have any more questions

3   for Ms. Trujillo?

4          MS. LAVIN:  Just a couple, Your Honor.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**REDIRECT EXAMINATION**

BY MS. LAVIN:

Q.    Ms. Trujillo, why didn't you leave your room that night?  Was it because you were scared?

A.    Because of fear.  Because I was very weak. I was down with real bad pneumonia.  I could barely stand up on my feet.

Q.    And, Ms. Trujillo, do you mind sharing with the jury and the Judge why it is that you are testifying over a computer today instead of being here in person?

MS. WILSON:  Objection, Your Honor. Relevance.

A.    I can't hear.

THE COURT:  I will overrule the objection.

Q.    (By Ms. Lavin) Ms. Trujillo, can you please tell the jury why it is that you are testifying over video instead of being here in person in the courtroom?

A.    Because I have a problem with my urinary tract.  I lose my urine at any given time.  If not, I would be in person in court.

MS. LAVIN:  Thank you, Ms. Trujillo.  I'm sorry about that.  I really appreciate you being here today.

```
 1                    That is all the questions I have for you.
 2              Thank you.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  Thank you for your testimony
 5    here today.
 6              THE WITNESS:  I want to thank you for
 7    hearing my testimony and I want to thank you for
 8    okaying the letter that the doctor gave you because
 9    if it wouldn't be for that, I would see you in
10    person.
11              THE COURT:  Thank you.  Good-bye.
12              (Whereupon the witness was released from
13    the Zoom videoconference.)
14              THE COURT:  You may call your next
15    witness, Mr. Elsenheimer.
16              MR. ELSENHEIMER:  The defense calls
17    William Wheat.
18              THE COURT:  Mr. Wheat, before you sit
19    down, we will administer the oath to you, and I will
20    have my clerk --
21              (Whereupon, the witness was sworn.)
22              THE COURT:  If you would, please, give us
23    your full name and spell your first and last names
24    for the record.
25              THE WITNESS:  My full name is Billie Mike
```

1    Wheat.  The first name is spelled B-I-L-L-I-E, last
2    name is W-H-E-A-T.
3                THE COURT:  Thank you.
4                      **DIRECT EXAMINATION**
5        BY MR. ELSENHEIMER:
6        Q.    Good afternoon, Mr. Wheat, how are you
7    today?
8        A.    Fine, thank you.
9        Q.    Mr. Wheat, I want to ask you a little bit
10   about your background, but let me first start out,
11   where do you live currently?
12       A.    Currently I live in Rio Rancho.
13       Q.    And where did you grow up?
14       A.    I grew up in the Espanola Valley.
15       Q.    Do you know Douglas Smith?
16       A.    Yes.
17       Q.    Do you see him in the courtroom today?
18       A.    Yes.
19       Q.    Would you mind describing him for us?
20       A.    Doug is sitting over there with a purple
21   shirt and a striped tie, gray coat and white hair.
22                MR. ELSENHEIMER:  May the record reflect
23   that Mr. Wheat has identified Mr. Smith?
24                THE COURT:  The record will so reflect.
25       Q.    (By Mr. Elsenheimer) How do you know

1    Mr. Smith?

2         A.    I met Doug, I think, around 1966, '67 when

3    I was in high school with a mutual friend.  I went

4    to a different high school, but I had friends from

5    the Espanola High School, which Doug went to, and

6    through my mutual friends I met Doug.

7         Q.    Are you and Mr. Smith about the same age?

8         A.    Yes.

9         Q.    Were you in approximately the same class

10   growing up or the same?

11        A.    We graduated in the same year, yes.

12        Q.    Did you both live in and around the

13   Espanola area?

14        A.    Well, he lived in Espanola, I lived about

15   three miles south in an area called Arroyo Seco.  It

16   is an incorporated portion of Espanola.

17        Q.    About how far is that from Espanola?

18        A.    About three miles.

19        Q.    Were you friends in high school?

20        A.    Yes.

21        Q.    And after a high school did you continue

22   to be friends with Mr. Smith?

23        A.    Yes, uh-huh.

24        Q.    Can you describe the nature of your

25   friendship and acquaintances with Mr. Smith?

1      A.    Well, Doug and I attended New Mexico State

2 University together.  We went down there, in fact,

3 it was his mom that convinced me to go there.  I was

4 going to go to Eastern, she asked me where I was

5 going to go, I said New Mexico State.  "Oh, honey,

6 don't go there."

7           "Okay."

8           So Doug was going to State and I had other

9 friends in my class and his class that were going

10 down there, too, so it was just fine with me.  And

11 before we went to State we had an orientation for the

12 university, which was in the summer of '68, and

13 Doug's parents let us use their brand-new 1968 Ford

14 Bronco to drive down there.

15           So he and I drove down there with

16 the Bronco to break it in.  So I was really surprised

17 they trusted us enough to take the new car down there

18 and we did, brought it back, too.

19      Q.    Did you graduate from New Mexico State?

20      A.    No, I didn't.  I went there for about a

21 year and a half and then I went out to California

22 and worked out in California for Mattel Toymakers.

23      Q.    Okay.  When did you return to New Mexico?

24      A.    Well, I returned in '71.  Well, actually

25 late 1970 and I went out to California in '69.

PAUL BACA, OFFICIAL COURT REPORTER
(505)508-6694

1    Q.    When you came back to New Mexico from

2    California, where did you move?

3    A.    I lived for a while in my parents' house

4    and then I bought a trailer and I moved that trailer

5    behind Doug's motel.  They had a trailer park there,

6    and I moved my trailer to that trailer park.

7    Q.    Who was running the motel at that time?

8    A.    Doug's mom and dad.

9    Q.    And did you live at the motel there?

10   A.    Well, I lived at my trailer behind the

11   motel for a while briefly, very briefly.

12   Q.    So you lived in a trailer that was on the

13   Smith's property?

14   A.    Right.  They had several trailers back

15   then, quite a few that they rented.

16   Q.    Was Mr. Smith living there when you lived

17   there in the trailer?

18   A.    I can't remember if he was still in school

19   or he moved back.  No, no, he was living there,

20   yeah.

21   Q.    Did you -- what kind of things did you and

22   he do in those years?

23   A.    Well, I worked.

24   Q.    Where did you work?

25   A.    I got a job at Los Alamos National

1    Laboratory.  I was a technician out there, computer

2    operator.  And I would come down in the evenings,

3    Doug, his brothers and I would get together, play

4    games or we would -- even his mom and I would play

5    games at their house, you know, poker, Monopoly,

6    things like that, you know.

7         Q.    What did you think of Mr. Smith?

8         A.    Doug?

9         Q.    Yes.  I'm sorry, Doug Smith.

10        A.    When you said that I thought of his dad.

11   He is a nice fellow, too.  I always got along real

12   well.  Doug has an interesting sense of humor, real

13   subtle, and things were funny.  And the brothers are

14   pretty much the same way.  They are similar, I

15   should say.

16        Q.    How long did you live there in your

17   trailer on the Smith's property?

18        A.    I didn't live there very long.  My father

19   died and left my mother alone outside of Espanola,

20   you know, three miles away.  It was kind of out in

21   nowhere and so I moved my trailer out by her

22   property so she wouldn't be alone.  So it was about,

23   I don't know, five months.

24        Q.    Did you move anywhere else after that?

25        A.    After that I -- about five years later I

1    moved to La Mesilla, which is south of Espanola, a

2    little farming community, and I lived there until

3    1999.

4        Q.    Let me ask you this:  About how far away

5    is Espanola from La Mesilla?

6        A.    It is two to three miles away.

7        Q.    Did you get married at any point?

8        A.    Yes, I did.  I got married in May.  My

9    father died -- no, in April.  My father died a few

10   months later, a few weeks later and I moved to

11   Arroyo Seco.

12       Q.    I think you said April of what year?

13       A.    1971.

14       Q.    Was Mr. Smith in your wedding?

15       A.    Yes.

16       Q.    Was Doug Smith in your wedding?

17       A.    Well, he was asked to be our best man and

18   that is an interesting story.  So his mom is very

19   traditional.  She would do colcha, which is

20   stitchery, and she made Doug a beautiful colcha

21   shirt.

22       Q.    What is colcha?

23       A.    You do a stitchery to create a design,

24   flowers, or whatever.  It is, I don't know what is

25   the other word for it.  People with Hispanic

 1    background might know what I am talking about.  But,

 2    anyway, it is flowers and designs on a shirt.

 3           Well, when my mother-in-law saw Doug coming

 4    in that, she said, "No, you got to wear a suit and

 5    tie."

 6           And Doug didn't have a suit and tie and he

 7    left, so my oldest brother-in-law became my best man,

 8    not that I asked him, but that is the way it

 9    happened.

10       Q.    Did you ask Doug to be your best man?

11       A.    Yeah.  Judy and I did, my wife.

12       Q.    You mentioned that you moved to a town

13    outside of Espanola.  Can you tell me the name of

14    that again?

15       A.    It is an area called La Mesilla.

16       Q.    And after you moved to La Mesilla, were

17    you married at that point?

18       A.    Yes.  We had been married about

19    five years.

20       Q.    What is your wife's name?

21       A.    Judy.

22       Q.    You had been married for about five years

23    when you moved to La Mesilla?

24       A.    Right.

25       Q.    After you moved to La Mesilla did you

1  remain in contact with Doug Smith?

2      A.    Yes, we would, we wouldn't get together as

3  often as we liked, but we would remain in contact.

4  And for a while Doug delivered the Albuquerque

5  Journal in the area and we picked that up.

6          Throughout the year his oldest brother, we

7  used to take care of our own trash.  We would collect

8  it and take it to the dump.

9          His oldest brother set up a company where

10 they would come by and pick up our trash.  And then,

11 I mean, I would see Doug, you know, at various things

12 like that.

13         My wife liked his mom Susie pretty well and

14 they would communicate once in a while, call on the

15 phone, how are you doing, things of that nature.

16     Q.    Would Doug Smith ever visit you out in La

17 Mesilla?

18     A.    Yes, he would come out when we are

19 roasting chile or something, keep me company, and we

20 would play chess and do things at the house and help

21 me do different things.  He helped me paint the

22 house when we moved in.

23     Q.    Tell me about his helping you.

24     A.    Well, he is always there to help.  When we

25 moved into the house, it needed painting.  And Judy

1    was pregnant with my second son and he came over and

2    helped us paint the entire inside of the house,

3    helped me I should say.  And his mom came over and

4    she would help.  When the baby was born, she would

5    help.  She would iron clothes and do various things

6    for my wife.

7        Q.    When did you move -- well, let me ask you

8    this:  During, I think you mentioned you lived in La

9    Mesilla until the end of the '90s; is that right?

10       A.    Yes.

11       Q.    And did you remain friends with Mr. Smith

12   throughout those years?

13       A.    Yes.

14       Q.    Where did you move in 1999?

15       A.    In 1999 we moved here to Rio Rancho.

16       Q.    Why did you move to Rio Rancho?

17       A.    Well, we wanted to get out of Espanola.

18   My wife retired that year and I saw a plot here in

19   Rio Rancho that I liked a lot and I thought maybe we

20   should get it while we can.  We moved out here when

21   she retired I commuted another for five years to Los

22   Alamos, then I retired.

23       Q.    Why did you want to move out of Espanola?

24       A.    It is not the same place it used to be.

25   It is frankly unsafe.  We wouldn't go to the stores

1    at night.  We wouldn't go to Walmart at night.  It
2    is not safe to go Walmart at night and even during
3    the day it could be -- my wife's aunt was robbed in
4    broad daylight twice, you know, Judy coming home
5    from work stopped by the grocery store from school
6    to pick up stuff and two men were murdered in the
7    parking lot while she was in the store, things of
8    that nature.
9         Q.    Do you enjoy Rio Rancho?
10        A.    Yes.
11        Q.    Since you have lived in Rio Rancho have
12   you remained in contact and have you remained
13   friends with Doug Smith?
14        A.    Yes, uh-huh.
15        Q.    How often do you visit or speak with him
16   since you have lived in Rio Rancho?
17        A.    Since I lived in Rio Rancho, oh, I don't
18   know, maybe once every couple of months or something
19   of that nature I will call him up, things like that.
20   But we didn't go up to see him very often.  When we
21   went up, my wife's family still lived there.  Her
22   mom and dad were getting old, required care.  So
23   when we would go there, we would usually spend time
24   with the family and we didn't have much time for
25   anybody else.

```
 1              MR. ELSENHEIMER:  May I have a moment?

 2              THE COURT:  You may.

 3      Q.   (By Mr. Elsenheimer) And I just want to

 4   clarify.  You said -- do you still have family in

 5   Espanola or is it your wife that has family in

 6   Espanola?

 7      A.   My wife has family in Espanola.  I had two

 8   brothers in Espanola.  One moved to Deming in the,

 9   oh, around '96 or somewhere in that time frame and

10   my brother, they are both older than me, died in

11   February 26 of last year at my house.  Well, he

12   lived in Espanola, he was in hospice.

13      Q.   Let me ask you, do you consider Mr. Smith

14   a longtime friend of yours?

15      A.   Yes.

16      Q.   I want to ask you your opinion about

17   Mr. Smith.  In your opinion is he an honest person?

18      A.   Yes.  I have no reason to believe he is

19   not.  He has always been honest to me and Judy.

20      Q.   And, in your opinion, is he a good person?

21      A.   Yes.

22      Q.   Is he a peaceful person?

23      A.   Yeah, pretty much, you know, not that I

24   have ever seen him get angry at people.  You know,

25   when we were in high school Doug got along with
```

1    everybody, never got in any fights.  I didn't either
2    as far as that went.  I guess birds of a feather
3    flock together, but, no, he never had any trouble or
4    got trouble from anybody else, however, you know
5    there are always, you know, like any place there is
6    always people and things going on.  Back then it was
7    a different world, I think the whole country was
8    different.
9        Q.    And, in your opinion, is Mr. Smith a
10   truthful person?
11       A.    Yes.
12             MR. ELSENHEIMER:  I will pass the witness,
13   Your Honor.
14             THE COURT:  Cross-examination,
15   Mr. Nayback.
16                    **CROSS-EXAMINATION**
17       BY MR. NAYBACK:
18       Q.    Good afternoon, Mr. Wheat.
19       A.    Good afternoon.
20       Q.    We have never had a chance to meet before,
21   have we?
22       A.    No.
23       Q.    Have you met or spoken with
24   Mr. Elsenheimer before today?
25       A.    No.

1    Q.    Who contacted you about --

2    A.    Well, I have spoken with him over the

3    phone.  I haven't met with him until today.

4    Q.    So you have spoken with him?

5    A.    Yes, on the phone.

6    Q.    Do you know if he recorded that

7    conversation?

8    A.    Not to my knowledge.

9    Q.    And you talked with him on an occasion

10   before this about what your testimony would be

11   today, correct?

12   A.    Yes.

13   Q.    Okay.  And you were asked if you would

14   come to court today to talk about Mr. Smith?

15   A.    Yes.

16   Q.    Doug Smith?

17   A.    Yes.

18   Q.    You have known him for a long time, you're

19   good friends?

20   A.    Yes.

21   Q.    And you came here today to help him out,

22   right?

23   A.    Yes.

24   Q.    You told the jury that he is a good and

25   honest man?

```
1        A.    Well, from what I know, yes.

2        Q.    Have you talked with him in the last

3   couple of years?

4        A.    Oh, yeah.

5        Q.    You know he is in a bit of legal trouble?

6        A.    Yes, uh-huh.

7        Q.    Do you know what he is charged with?

8        A.    Yes.

9        Q.    Has he talked to you about the case?

10       A.    Well, he talked about what he is charged

11  with.  I was notified by our mutual friend that

12  introduced us in high school, he called me and told

13  me Doug is in trouble or something, Doug is arrested

14  for murder.  And he had heard it on TV.

15            My wife said she heard it, too.  Anyway a

16  mutual friend called me and I called Doug's brother

17  and talked to them about what is going on, you know.

18  He just said, you know, what was on the news.  So I

19  didn't talk to Doug, I can't remember, but it was

20  when he was, I think, released to the halfway house.

21       Q.    So he hasn't talked to you specifically

22  about what happened on May 5th of 2018?

23       A.    Well, he said there was a shooting there.

24  Prior to that I knew when I was talking to Doug

25  there were people that would come around the motel,
```

1    roam around and try to get in stuff, so --

2        Q.    Did he tell you that he was frustrated

3    with that?

4        A.    Oh, yeah.  I mean, Doug does not have very

5    much, and what little he has is there at the motel

6    and around the motel.  I mean, he is not as well off

7    as people at work, like, for the lab or have a

8    retirement.

9        Q.    Did he tell you that he closed his motel

10   in 2014?

11       A.    Yes.

12       Q.    And he is renting to people still there

13   though, correct?

14       A.    Well, to one person oh, maybe two, I

15   think.

16            MR. NAYBACK:  Thank you, Your Honor.

17            THE COURT:  Anything further?

18                    **REDIRECT EXAMINATION**

19   BY MR. ELSENHEIMER:

20       Q.    Mr. Wheat, the prosecutor asked if you

21   have spoken with Mr. Smith in the last couple of

22   years.  Have you spoken with Mr. Smith about

23   anything in the last couple of years?

24       A.    Oh, yeah, we have been in contact.

25       Q.    Is he staying at your house right now?

1        A.    Yes.

2        Q.    So while he is here in Albuquerque he is

3    staying at your house?

4        A.    Right, right.

5        Q.    And do you go up and help, do you pick him

6    up and drive him?

7        A.    Right.  He can't drive very well.  He

8    can't see very well, in the first place, but he does

9    drive, I guess, around Espanola.  But to come down

10   here and not being familiar with the traffic and the

11   streets, I told him I will go pick you up and bring

12   you down here.

13            MR. ELSENHEIMER:  Thank you, Mr. Wheat.

14            THE COURT:  May this witness be excused?

15            MR. NAYBACK:  Yes.

16            MR. ELSENHEIMER:  Yes, permanently.

17            THE COURT:  Thank you for your testimony

18   here today, Mr. Wheat.

19            (Whereupon the witness was excuse from the

20   courtroom.)

21            THE COURT:  The defense may call its next

22   witness.

23            MS. LAVIN:  Your Honor, the defense calls

24   Judy Wheat.

25            THE COURT:  While we are waiting, let me

1  ask, just for scheduling purposes, do you expect

2  this witness will be a brief witness?  It is 4:09.

3          MS. LAVIN:  I think she will be pretty

4  brief, yes.

5          THE COURT:  All right.  Do you anticipate

6  any other witnesses today?

7          MS. LAVIN:  Not today.

8          THE COURT:  All right.  So tomorrow?

9          MS. LAVIN:  We are not sure.

10          THE COURT:  We can talk about it later.  I

11  just wanted to get a sense of how we are doing.

12          Before you take your seat, my clerk will

13  administer the oath.

14          (Whereupon, the witness was sworn.)

15          THE COURT:  One more thing, before we

16  begin, I will ask you to give us your full name and

17  spell your last name for the record.

18          THE WITNESS:  My name is Mary Jude Wheat.

19  I am known as Judy.  W-H-E-A-T is my last name.

20          THE COURT:  Thank you.

21                    **DIRECT EXAMINATION**

22    BY MS. LAVIN:

23    Q.    Good afternoon, Ms. Wheat.  You can move

24  the microphone a little bit closer to you, I think

25  that might help.

1              Ms. Wheat, where do you live?

2      A.     I live in Rio Rancho.

3      Q.     Is that New Mexico?

4      A.     Yes.

5      Q.     Have you always lived in Rio Rancho?

6      A.     No.

7      Q.     Where did you live before?

8      A.     I grew up in Espanola, New Mexico.

9      Q.     Okay.  Were you born there?

10     A.     Yes.

11     Q.     Okay.  How long did you live in Espanola?

12     A.     Until I was 49.

13     Q.     Okay.  And do you know the defendant,

14 Douglas Smith?

15     A.     Yes, I do.

16     Q.     Okay.  Do you see him in the courtroom

17 here today?

18     A.     Yes, I do.

19     Q.     Can you describe what he is wearing and

20 what he looks like?

21     A.     He has gray hair, a wine shirt, and a gray

22 jacket and gray tie.

23     Q.     And where is he sitting?

24     A.     Right at the end of that table there

25 (indicating).

1          MS. LAVIN:  May the record reflect she has

2    identified Mr. Smith?

3          THE COURT:  Yes, the record will so

4    reflect.

5      Q    (By Ms. Lavin) When did you meet Douglas

6    Smith?

7      A.    I met him in high school.  We were

8    classmates.

9      Q.    Okay.  And where was that?

10     A.    In Espanola, New Mexico.

11     Q.    What high school?

12     A.    Espanola High School.

13     Q.    Okay.  So were you the same year?

14     A.    Yes.

15     Q.    Okay.  What was he like as a classmate?

16     A.    He was rather quiet, but a very good

17   student.  I think he was probably in the top

18   2 percent of our graduating class.  I was like the

19   top 10 percent, so he was much brighter than I was,

20   I believe.  I believe we took probably chemistry and

21   algebra together were two of the classes for sure.

22     Q.    Okay.  How old were you when you met him?

23     A.    About 15 or 16.

24     Q.    Okay.  And did you become friends in high

25   school?

1    A.    Yes.

2    Q.    Okay.  So have you been friends with

3  Mr. Smith ever since you met when you were 15?

4    A.    Yes.

5    Q.    Okay.  What was your friendship like after

6  high school?  How often did you see each other?

7    A.    Not too often, probably maybe once a year,

8  twice a year, depending on where we were at.  I went

9  to school at New Mexico State and then when we got

10  married he was supposed to be our best man at our

11  wedding and we were on honor attendance at his

12  wedding as well, my husband and I.

13    Q.    Who is your husband?

14    A.    Billie Wheat.

15    Q.    And when were you married?

16    A.    In 1971.

17    Q.    And Mr. Smith was in your wedding?

18    A.    Yes.

19    Q.    And you said something about his wedding

20  as well.  Could you tell me about your involvement

21  in his wedding?

22    A.    We were asked to be his best man and

23  matron of honor for him, but I can't remember what

24  year that was.

25    Q.    That is okay.  So why did you leave

1    Espanola?

2        A.    Espanola has changed quite a bit from when

3    I was growing up.  And Espanola at the time I was

4    growing up it was a typical all American small town.

5            And as I grew up and taught in Espanola for

6    25 years, it changed vastly from being a nice quiet

7    town where everybody knew everyone and you didn't get

8    in much trouble because by the time you got home your

9    parents would know what kind of trouble you were in

10   and you paid the consequences immediately, to a place

11   where as one of my co-workers described back in '75

12   or '76 when I started teaching, she said Espanola is

13   a small town with big City problems.

14           And she was from the Bronx, so she knew

15   about big City problems.  And it just progressively

16   got worse in terms of the drugs, especially, and

17   people not being afraid to do whatever they needed to

18   do to get their money to buy them, and it was pretty

19   scary.

20           I was -- I had a couple of relatives that

21   were killed by drug addicts, one being an 11-year-old

22   child because they were looking for stuff in their

23   house when they got home and they shot her.

24       Q.    I'm sorry to hear that.

25       A.    And another one that was, lent his truck

1   to a drug addict and when he went to collect it they

2   killed him and burned his body.

3       Q.    I'm really sorry to hear that.  So when

4   you lived in Espanola as an adult you said you

5   taught.  Are you a teacher?

6       A.    Yes.

7       Q.    In what capacity were you a teacher?

8       A.    I was an elementary schoolteacher.

9       Q.    Okay.  Are you still an elementary

10  schoolteacher?

11      A.    No.  I retired about 23 years ago.

12      Q.    Okay.  Did you teach elementary school

13  when you left Espanola?

14      A.    No.

15      Q.    Okay.  So when did you move to Rio Rancho?

16      A.    In 1999.

17      Q.    Okay.  Since then how often do you see

18  Douglas Smith?

19      A.    Probably about the same amount of time

20  except since this incident happened we have seen him

21  a lot more.

22      Q.    You have seen him more?

23      A.    Uh-huh.

24      Q.    And why is that?

25      A.    We call and see how he is doing and, you

1    know, we have given him a ride to his meetings with

2    his lawyers and also he stayed at our house.  In

3    fact, he is staying there now during the trial.

4        Q.    Okay.  Is Douglas Smith, is he someone

5    that you trust?

6        A.    I wouldn't let him in my house if I

7    didn't.

8        Q.    And you have known him since you were 15.

9    Is he the kind of person who goes looking for

10   trouble, does he get in fights?  What would you say

11   about that?

12       A.    Probably much to the contrary.  He keeps

13   pretty much to himself.  He came home after working

14   in Arizona and stayed with his mom and helped her to

15   keep the motel that they owned running and pretty

16   much, as far as I know, he wasn't involved with any,

17   any people on a regular basis that, you know, you

18   would say that he would be outgoing and stuff.

19            Usually if we called, he was happy to see

20   us, of course, but he keeps pretty much to himself.

21       Q.    Okay.  And do you know, this motel that

22   you mentioned, do you know whether or not the motel

23   that his family owned, if it is still operating as a

24   motel?

25       A.    No.

1    Q.    Okay.  Do you know when it closed?

2    A.    Probably after his mother died, which was

3    several years ago.

4    Q.    Okay.  Before 2018?

5    A.    Probably, yeah.

6    Q.    Okay.

7          MS. LAVIN:  Those are all the questions I

8    have for you.

9          Thank you, Mrs. Wheat.

10          THE COURT:  Cross-examination,

11    Mr. Nayback?

12          MR. NAYBACK:  Just briefly, Your Honor.

13          Thank you.

14                    **CROSS-EXAMINATION**

15    BY MR. NAYBACK:

16    Q.    Good afternoon, Ms. Wheat.

17    A.    Good afternoon.

18    Q.    You and I have never met before, have we?

19    A.    No.

20    Q.    Okay.  And have you spoken with Ms. Lavin

21    before today?

22    A.    Yes.  She called me to ask me if I would

23    be willing to be a witness.

24    Q.    Okay.  And what did she explain to you

25    about what you would be talking about?

```
 1        A.     Pretty much about what, how long I had
 2   known Doug and how long I had lived in Espanola.
 3        Q.     And you agreed to come here and help him
 4   out today, correct?
 5        A.     Yes.
 6        Q.     You testified earlier that Espanola has
 7   changed and there is a lot of crime?
 8        A.     Yes.
 9        Q.     When did you last live there?
10        A.     In 1999, but I was up there pretty often
11   because I have lots of family that still lives
12   there.
13        Q.     And you heard about the crime or --
14        A.     Yes.
15        Q.     But it's been 20 years?
16        A.     Like I say, I have had -- in recent years
17   the two murders that I have been, had relatives
18   involved in were not that long ago.
19        Q.     And Mr. Smith has told you that he has
20   gotten frustrated with the crime, hasn't he?
21        A.     Yes.
22        Q.     You have not talked with him about what
23   happened on May 5th of 2018, have you?
24        A.     Not really.  We know what happened but
25   mainly because of what was in the news and, you
```

1    know, what we asked him what happened and that was

2    about it, but not, I mean, not in detail.

3        Q.    But you have talked with him about what

4    happened?

5        A.    Yes.

6            MR. NAYBACK:  Okay.  Thank you, Ms. Wheat.

7            Thank you, Your Honor.

8            THE COURT:  All right.  Anything further?

9            MS. LAVIN:  No redirect, thank you.

10           THE COURT:  May this witness be

11   permanently excused?

12           MS. LAVIN:  Yes.

13           MR. NAYBACK:  Permanently.

14           THE COURT:  Thank you for your testimony,

15   Mrs. Wheat.

16           (Whereupon the witness was excused from

17   the courtroom.)

18           THE COURT:  And no other witnesses today?

19           MR. ELSENHEIMER:  May we approach,

20   Your Honor?

21           THE COURT:  Yes.

22           (Whereupon a Bench discussion was held

23   outside the hearing of the jury.)

24           MR. ELSENHEIMER:  We don't have any other

25   witnesses today.  I would propose that we break for

1    the day, perhaps we could address preliminary jury

2    instructions and let Mr. Smith decide whether he is

3    going to exercise his Fifth Amendment rights and we

4    can come back tomorrow.

5              THE COURT:  Other than Mr. Smith, any

6    other witnesses?

7              MR. ELSENHEIMER:  No.

8              THE COURT:  All right.  So we can break

9    for the day and then we can have a conversation

10   about how I will handle jury instructions.

11             (Whereupon the following proceedings were

12   held in Open Court.)

13             THE COURT:  All right.  Ladies and

14   gentlemen of the jury, we will wrap up our time with

15   you today.  The attorneys and I will continue

16   working a little bit longer today, but I am going to

17   excuse you for the evening.

18             We will plan on returning with you in the

19   courtroom tomorrow morning at 9:00.  We are getting

20   close to wrapping up the testimony and so tomorrow

21   may involve some lag times.  There may be some time

22   tomorrow that the attorneys and I are dealing with

23   some of the legal issues that we need to address.

24             I am hopeful that tomorrow will go

25   smoothly, so even if you have to wait for us a little

```
 1   bit, I am hopeful that it won't be too long a delay.

 2   And I am expecting that we will be able to get a lot

 3   of our work on this trial done tomorrow.  But I will

 4   give you a better idea of the time estimate tomorrow

 5   morning.

 6              So have a nice evening.  Again, I remind

 7   you don't discuss this case with anybody, none of

 8   your family members, friends, not even each other

 9   until the case is submitted to you for your

10   deliberations.  Don't do any kind of independent

11   research on any of the issues in this case.  No

12   Google searches, no Facebook commentary, nothing.

13   Don't even look up words in the dictionary about what

14   you might have heard in the courtroom, just nothing.

15              And enjoy your evening.  Have a nice rest.

16   See you tomorrow morning.

17              Please rise for our jury.

18              Don't listen to any media reports or read

19   any news accounts, should there be any.

20              Thank you.

21              (Whereupon the jury exited the courtroom.)

22              (Open court, outside the presence of the

23   jury.)

24              THE COURT:  Jury instructions.  I will

25   tell you how I handle the jury instruction
```

1    conference.  So I know Mr. Nayback and Ms. Wilson

2    have had trials with me in the past.  So what I do

3    is, we are not going to talk about instructions

4    right this minute because I see you frantically

5    moving your laptop, and let me tell you how I do it.

6            I do not have an informal conference where

7    we, you know, haggle about instructions.  I don't do

8    that.  What I will do is I will give you my proposed

9    set of instructions.  They are still in draft, but I

10   will give you my proposed set which we may be able to

11   do in the next few minutes.  And when we get together

12   to have our informal conference, usually it takes

13   about ten minutes.  What I do is I, you know, I take

14   the packet of instructions and I start with

15   Instruction Number 1, and I ask if anybody has any

16   comment on Instruction Number 1, and yes or no,

17   obviously usually the instructions that involve

18   comment are the substantive ones.

19           So there are many, many, many instructions

20   to which there is no comment.  And I literally start

21   at Page 1, Page 2, Page 3.  I will take any comment

22   that anybody wants to give me on any instruction and

23   I will consider your comments.  But it is -- I don't

24   argue instructions.  I am not going to hear from you

25   and then hear from you on what this word should be, I

1  don't do it that way.

2         Then I come up with my final set of

3  instructions after I consider the comments you-all

4  make and then I will give you the Court's set of

5  final instructions.  I will give you an opportunity

6  to put your objections on the record and that is how

7  I do it.

8         So Virginia and I will take just a couple

9  of minutes to make sure -- now, let me, one other

10  thing about the instructions.  These, I said this is

11  a draft set.  So what I am trying to accomplish in

12  this draft set is I just want to make sure that I am

13  stating the law accurately.  I don't, and I will just

14  tell you, I don't often -- I am not making a judgment

15  as to whether or not every instruction I give you to

16  review will be given, in other words, I haven't heard

17  all the defense testimony yet and so you submitted a

18  self-defense instruction, for example.  I may or may

19  not include in my packet a self-defense instruction.

20  If I include it, it is not to be interpreted as

21  though I am going to give that instruction, I just

22  want to have a correct statement of the law handy in

23  case I hear something that makes me think the

24  evidence supports a self-defense instruction.

25  Frankly, I am not there yet.

1            So if I include a self-defense instruction
2   I am telling you right now it doesn't mean I am going
3   to give it.  I just want to make sure I have an
4   accurate statement of the law.  So that is how I
5   usually do it.  And so Virginia and I can get
6   together and once again review the draft instructions
7   just to make sure that we are ready to give them to
8   you.  It would take us a couple of minutes probably
9   to print out.  Do you want two copies?
10           MR. NAYBACK:  That's fine.
11           THE COURT:  Do you want three?
12           MR. ELSENHEIMER:  Please.
13           THE COURT:  So we will do that.
14           It is 4:30.  I don't know whether or not,
15  you know, I will hear from you at 5:00 and tell me if
16  you want to spend ten minutes talking about
17  instructions informally off the record or if you want
18  to do it tomorrow.
19           MR. NAYBACK:  No, tomorrow.  Is that what
20  you were asking us?
21           THE COURT:  I won't leave here before
22  5:00.  So at 5:00 you can let me know if you want to
23  get together for ten minutes to informally tell me
24  what you think of Page 1, Page 2, Page 3 or whether
25  we should come back and do that tomorrow.

1          MR. ELSENHEIMER:  I have no problem doing

2    it tomorrow.

3          MR. NAYBACK:  The same.

4          THE COURT:  All right.  So then Virginia

5    and I will just review one more time.  Don't leave

6    without, don't leave without your instructions but

7    you-all are thinking, haven't you heard of e-mail.

8          (Proceedings concluded at 4:31 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.  I further certify that the

5    transcript fees and format comply with those

6    prescribed by the Court and the Judicial Conference

7    of the United States.

8    Date:  June 16, 2021

9

10

11            _____

12            PAUL BACA, RPR, CCR
             Certified Court Reporter #112
13            License Expires:  12-31-2023

14

15

16

17

18

19

20

21

22

23

24

25