1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3

4    UNITED STATES OF AMERICA

5    vs.                        No. 1:CV-18-03495-JCH

6    DOUGLAS D. SMITH

7

8

9              TRANSCRIPT OF PROCEEDINGS

10               TRIAL ON THE MERITS

11                 June 17, 2022

12                   Volume 4

13                 Pages 639 - 812

14

15   BEFORE:   HONORABLE JUDGE JUDITH HERRERA
                UNITED STATES DISTRICT JUDGE

16

17

18

19       Proceedings reported by stenotype.

20       Transcript produced by computer-aided

21   transcription.

22

23

24

25

PAUL BACA, OFFICIAL COURT REPORTER
(505)508-6604

```
1   A P P E A R A N C E S:

2   FOR THE PLAINTIFF:

3           OFFICE OF THE U.S. ATTORNEY
            P.O. Box 607
4           Albuquerque, New Mexico  87103
            505-346-7274
5           BY:  NOVALENE D. WILSON
            novalene.wilson@usdoj.gov
6               KYLE T. NAYBACK
            kyle.nayback@usdoj.gov
7
    FOR THE DEFENDANT:
8
            OFFICE OF THE FEDERAL PUBLIC DEFENDER
9           111 Lomas, Northwest, Suite 501
            Albuquerque, New Mexico  87102
10          505-346-2489
            BY:  ARIC ELSENHEIMER
11          aric_elsenheimer@fd.org
                AMANDA LAVIN
12          amand_lavin@fd.org

13

14                      I N D E X

15  WITNESS                              PAGE:

16  DOUGLAS SMITH

17      Direct Examination by Mr. Elsenheimer    645
        Cross-Examination by Mr. Nayback         708
18      Redirect Examination by Mr. Elsenheimer  726

19
    Opening Closing Statement on behalf of the   772
20      Government

21  Closing Statement on behalf of the Defendant 781

22  Closing Statement on behalf of the Government 801

23

24  Certificate of Reporter                      812

25
```

1          (Open court, outside the presence of the

2     jury.)

3          THE COURT:  All right.  We will go on the

4     record now in USA versus Smith.

5          And so the defense wanted to make a record

6     on an issue, so you may do so at this time.

7          MS. LAVIN:  Thank you, Your Honor.

8          During the defense's cross-examination of

9     some of the Government's witnesses, questions were

10    asked of those witnesses about other people involved

11    in the investigation, such as Officer Rael,

12    Officer Trujillo.  And the prosecution made comments

13    that the jury heard about how those individuals are

14    on our witness list, so we need to call them if we

15    wanted to get that testimony out.

16         And it's our opinion, it's our position,

17    that those sorts of comments might make the jury

18    infer that somehow it's our responsibility to bring

19    in witnesses and to establish certain facts.

20         And so we think that that is burden

21    shifting.  And we need to make a record of that and

22    also ask the Court to ask the prosecutors not to make

23    comments such as -- of that nature in front of the

24    jury.

25         THE COURT:  All right.  Can you be a little

```
 1    more specific?  Other people involved in the
 2    investigation, such as Rael and Trujillo.  But remind
 3    me exactly what the question was.
 4            MS. LAVIN:  Mr. Elsenheimer was
 5    questioning, I think, both Agent Taylor and
 6    Detective Abeyta about their investigation of the
 7    case, which included review of Officer Rael's lapel
 8    cam, his interview of the defendant, as well as
 9    conversations that various law enforcement had with
10    Ercilia Trujillo.
11            And the Government objected to those
12    questions and implied that it's our job to bring in
13    those witnesses to say what they said in this case.
14            THE COURT:  All right.  Understood.
15    Honestly, I don't remember.  I'd have to refresh my
16    memory with the transcript.
17            But I understand what you're saying.
18            Do you have any comment?
19            MS. WILSON:  I do believe during voir dire
20    and with all three jury panels, the name of
21    Officer Rael was mentioned as a potential witness on
22    the defendant's witness list, so it's not somebody
23    that's just pulled out of the air.  You know, there
24    was, I think, information -- the jury had notice that
25    that person could testify.
```

1          So we disagree with the characterization

2     that it's burden shifting.  We were just simply

3     trying to address hearsay and making sure that the

4     appropriate witness -- the right questions were asked

5     of the appropriate witness.

6               THE COURT:  All right.  Thank you.

7               You've made your record.  If anyone feels

8     the need to file any motion, at some point we can

9     take the matter up more fully.  But at this point

10    your record is made.

11              MS. LAVIN:  And I would just comment, I

12    think the problem is not so much the record as to the

13    witnesses, it's the inference that it's somehow our

14    job to put on evidence in order to establish a

15    certain fact.

16              And I would just request, respectfully,

17    that the Court ask the Government not to make those

18    sorts of comments for the remainder of the trial.

19              THE COURT:  Well, I will ask the Government

20    not to make any comments that would suggest a

21    shifting of the burden of proof.

22              So anything else?

23              MS. WILSON:  Just to -- also for the

24    record, the jury was well-informed by Your Honor and

25    defense that the burden is solely on the

1  United States to prove the charges beyond a

2  reasonable doubt.  So that also was made clear

3  numerous times.

4          And we are cognizant of defense's

5  objection, and we will comply.  Thank you.

6          THE COURT:  And they will be instructed yet

7  again, when we go through the Court's final

8  instructions, about the burden of proof.  And so they

9  will be adequately instructed.

10         MS. LAVIN:  Nothing further.  Thank you.

11         THE COURT:  Are you ready for the jury to

12 come in?

13         MR. ELSENHEIMER:  We are.

14         (Whereupon the jury entered the courtroom.)

15         (Whereupon the following proceedings were

16 held in Open Court.)

17         THE COURT:  Please be seated.  Good

18 morning, ladies and gentlemen of the jury.

19         We're ready to proceed with the testimony

20 in this case.  My hope is that we will finish up the

21 testimony today.  And my hope is I will be able to

22 give you the instructions, and you'll be able to

23 begin your deliberations before the end of the day.

24         So always, in a trial, things are subject

25 to change.  But it certainly is looking like that is

1    how we will proceed today.

2            So at this time, the defense may call its

3    next witness.

4            MR. ELSENHEIMER:  The defense calls Douglas

5    Smith.

6            THE COURT:  All right.  Mr. Smith, if you

7    could please raise your right hand and take the oath.

8            (Whereupon, the witness was sworn.)

9            THE COURT:  Please give us your full name

10   and spell your last name for the record.

11           THE WITNESS:  My name is Douglas Dunn

12   Smith.  D-O-U-G-L-A-S, S-M-I-T-H.

13           THE COURT:  Thank you.

14                   DOUGLAS SMITH,

15   **after having been first duly sworn under oath,**

16       **was questioned and testified as follows:**

17                   **DIRECT EXAMINATION**

18   BY MR. ELSENHEIMER:

19   Q.    Good morning, Mr. Smith.

20   A.    Good morning.

21   Q.    How are you today?

22   A.    Fine.

23   Q.    Mr. Smith, how old are you?

24   A.    I'm 71.

25   Q.    And why don't you just start off by telling

1    the jury a little bit about yourself.

2        A.    I was born in Santa Fe in 1950.  I've lived

3    in Espanola since the third grade.

4            I have lived at the property of the Western

5    Winds Motel since I was 15, 1965.

6            I went to Espanola High School, graduated.

7            I went to NMSU to study electronics

8    engineering.  But I found that the four-year course

9    was too much, too long, so I switched over to a

10   two-year tech course.  And I -- even at that, I

11   didn't complete that.

12       Q.    Mr. Smith, you've mentioned that you moved

13   to Espanola, I think you said in the third grade.

14           Did you move there with your family?

15       A.    Yes.

16       Q.    Tell us about your family.

17       A.    My mom and dad were both in the military

18   during World War II.  My dad was a master mechanic

19   and my mom is a daughter of John Dunn, from Taos.

20       Q.    Do you have any siblings?

21       A.    I have -- I had one older brother, but he's

22   since passed away, and two younger brothers, Daniel

23   and Derrick.

24       Q.    And where do your brothers live?

25       A.    Daniel lives on the property that I live.

1    And Derrick lives at Santa Clara Pueblo.

2        Q.    That property where you live, tell us about

3    that.  I think you mentioned that you moved there

4    when you were 15?

5        A.    I moved there when I was 15, yes.

6        Q.    And tell us about when your family moved

7    there.

8              What was it, and why did they move there?

9        A.    We were living out in Corral De Piedra, on

10   the northwest side of Espanola.  And they had a

11   chance to buy this place and have the people backing

12   them to be able to purchase it.

13       Q.    What kind of property was it?

14       A.    Just a motel.  And in the back of the motel

15   was a big empty lot.

16       Q.    And when your parents bought it, was it an

17   operating motel?

18       A.    Yes.

19       Q.    Do you remember what year that was?

20       A.    '65, 1965.

21       Q.    1965.  And tell me about your parents

22   running the motel as a business and about your life

23   there when you were younger.

24       A.    It was interesting.  I helped my mom clean

25   rooms.  My mom and dad ran the place.  My dad also

1    still worked here in Santa Fe at the Chevy -- I

2    forget the name of it, the Chevy dealers.  I think it

3    was Mr. Goodwrench qualified.

4            And between the two of them they ran the

5    place, and it was a decent place to live.

6        Q.    What road is it on there in Espanola?

7        A.    It's the road to Taos, State Road 68.

8        Q.    Is that Riverside Drive?

9        A.    Riverside Drive.

10       Q.    You said that's the road, that's the main

11   road to Taos?

12       A.    The main road to Taos.

13       Q.    You mentioned that you helped your parents.

14           Did you help them clean rooms and -- with

15   the motel?

16       A.    Yes.  I've been cleaning rooms since I was

17   15.  So --

18       Q.    Did your brothers help out as well?

19       A.    They didn't like it.  So they -- since I

20   was doing it they said, Oh, let him do it.  So they

21   went off and did whatever they were doing.

22       Q.    And was it -- the hotel, when your parents

23   were running it, was it basically a mom-and-pop

24   business?

25       A.    A mom-and-pop operation.  When they started

1    they were renting single rooms for $7 a night.

2            Imagine that these days.

3        Q.    Was it tough to keep that hotel running,

4    with competition?

5        A.    In the beginning there were four or five

6    motels in Espanola, small operations like this one,

7    so it wasn't too difficult.  Plus, there were a lot

8    of people traveling.  I remember traveling salesmen

9    that don't exist anymore.

10       Q.    How long did your parents operate that

11   business as a motel?

12       A.    My mom died in January of 2008, so that's

13   basically when she quit running it.

14            I started running it then.  My dad had left

15   and had gone to live in Truth or Consequences.

16       Q.    When did your dad leave?

17       A.    I'm not sure.  2005 or '06.

18       Q.    Is it still an operating motel?

19       A.    No.

20       Q.    When did you close it?

21       A.    About the same time Ercilia Trujillo needed

22   a place to stay, I quit renting rooms to anybody

23   else.  That was 2014, in April.

24       Q.    Did you say -- you mentioned Ercilia

25   Trujillo.

```
 1              Can you tell us who she is?

 2      A.    She is -- let's see.

 3              Before my mom died, about three months, her

 4   son Patrick Martinez moved in.  He was a veteran.

 5   And I found out what kind of strait -- financial

 6   straits he was in.

 7              So I asked my mom if we could just rent him

 8   a room for 250 a month.

 9              And she said, Okay.

10              So he has been there since 2007, September.

11              And when my mom died, he was -- he was the

12   only one I could trust being there.  He helped me

13   deal with the place.  So I let him -- if he didn't

14   have the money to pay, I let him stay.

15      Q.    Let me just ask you to clarify.

16              So Patrick moved in before your mother

17   passed away?

18      A.    Just about three months before.

19      Q.    And what year was that?

20      A.    He moved in on -- in September of 2007.

21      Q.    I see.  And when did Ercilia Trujillo move

22   in?

23      A.    She moved in when her house burned, and to

24   a point where it couldn't be lived in, on April 17,

25   2014.
```

PAUL BACA, OFFICIAL COURT REPORTER
(505)508-6604

1          So when she moved in, I pretty much quit

2     renting to anyone else.

3          Q.    Mr. Smith, let me show you Defendant's

4     Exhibits A1 and A2.

5               MR. ELSENHEIMER:  Permission to approach,

6     Your Honor?

7               THE COURT:  You may.

8          Q.    (By Mr. Elsenheimer) Mr. Smith, can you take

9     a look at those two photographs?

10         A.    Yes.

11         Q.    Do you recognize what is in those

12    photographs?

13         A.    Yes, I do.

14         Q.    What is it that you see?

15         A.    It's an aerial view, looking down on my

16    property.

17         Q.    And is the property, as you see it, does it

18    fairly and accurately depict the property where you

19    live, your home and your brother's home on Riverside

20    Drive in Espanola?

21         A.    Yes.

22              MR. ELSENHEIMER:  I move Defendant's

23    Exhibit A1 and A2.

24              THE COURT:  Is there objection?

25              MR. NAYBACK:  Yeah.  We're going to object.

1              It's a Google Earth Map.  The defendant

2     didn't take the photograph, and we haven't seen it

3     previously.  It was never tendered to the

4     United States.  And for that reason we would object

5     to its inclusion.

6              THE COURT:  Can you lay a foundation?

7              MR. ELSENHEIMER:  Mr. Smith accurately

8     identified it as his property.

9              THE COURT:  All right.  The Court will

10    admit Exhibits A1 and A2.

11             MR. ELSENHEIMER:  Thank you, Your Honor.

12             (Exhibits admitted, Defendant's A1 and A2.)

13    Q.    (By Mr. Elsenheimer) Mr. Smith, let me just

14    show you the farther-away picture.  It is Defendant's

15    Exhibit A2.

16             Are you able to see your property there?

17    A.    Yes.

18    Q.    And could you just draw a line around where

19    your property is?

20    A.    (Witness complies.)

21    Q.    I just want to ask you a couple of very

22    quick questions about this.

23             To the left of the property, can you

24    describe what that is and what's beyond that?

25    A.    That's the radio station.  And then behind

1    that is the Bosque.  There's a swamp.  And then

2    farther back is the river, the Rio Grande River.

3         Q.    Thank you, Mr. Smith.

4              Let me show you Defendant's Exhibit A1.

5              And can you see this?

6         A.    Yes, sir.

7         Q.    And do you see your property on that

8    picture?

9         A.    Yes, sir.

10        Q.    So on this, again, let me ask you, can you

11   draw a line around the outside of your property?

12        A.    (Witness complies.)

13        Q.    And can you tell me, Mr. Smith, is there a

14   fence around any part of that property?

15        A.    There's a fence around the entire property

16   except where the street is.

17        Q.    And was there a fence around your property,

18   as you just described it, in May of 2018?

19        A.    Yes.

20        Q.    Let me ask you, could you please just point

21   out to the jury where your house is on the property?

22        A.    Okay.  My house is right in here

23   (indicating).

24        Q.    Would you mind pointing out to the jury

25   where Ercilia Trujillo resides?

1      A.    She resides in this room right here
2   (indicating).
3      Q.    And if you can, do you see a location where
4   there is a -- where the trailer is that we've been
5   discussing in this trial?
6      A.    It's this little square right here
7   (indicating).
8      Q.    And you mentioned your brother Dan lives on
9   the property.
10         Can you point out where Dan's residence is?
11      A.    This trailer right here (indicating).
12      Q.    Thank you, Mr. Smith.
13         Mr. Smith, did you know your house is
14   within the historic boundaries of the Santa Clara
15   Pueblo?
16      A.    I had no idea.
17      Q.    Do you pay County real estate tax?
18      A.    Yes.
19      Q.    Is it your understanding that your house is
20   within the City limits of Espanola, the City of
21   Espanola?
22      A.    It is within the City limits.
23      Q.    One thing I wanted to ask you, when you
24   were pointing out where people live on the property.
25         Was Patrick living on your property in May

1    of 2018?

2         A.    When Ercilia came to the property, her son

3    Patrick was staying somewhere else, because I didn't

4    have a bathtub, and he needed a bathtub, because he's

5    a diabetic and has to sit in -- soak in a tub.

6         Q.    So in May of 2018, was he living on the

7    property?

8         A.    No.

9         Q.    Is he living there now?

10        A.    Yes.

11        Q.    When Patrick and Ercilia Trujillo were

12   living on the property, did you charge them rent?

13        A.    In the beginning, yes.  And when Ercelia

14   came, she had her other son Henry, Memo.  And he

15   was -- he had cancer, so he was not feeling too well,

16   and she wanted one room.

17             So I just let her have two rooms for the

18   price of one and charged her 600 a month.

19        Q.    Do you still charge her rent?

20        A.    No.  I found out that -- later on, that she

21   was getting only 600 a month for her Social Security.

22   And with the amount of money that she needed to pay

23   for Memo's medication, I let her pay whenever she

24   wanted, whatever she wanted.

25        Q.    So do you get rent from Patrick currently?

1        A.     Currently, no.  He doesn't have any funds.
2    The VA cut him off for some reason or other, and he's
3    staying to help me just take care of the place.
4        Q.     Where does your other income come from?
5        A.     I'm getting a little less than 600 from
6    Social Security, and I use that to pay the bills.
7        Q.     Is that your only income?
8        A.     That's my only income.
9        Q.     Who takes care of Ms. Trujillo?
10       A.     Patrick and I both take care of her.
11       Q.     Mr. Smith, I want to show you Defendant's
12   Exhibit B1 through B17.
13              MR. ELSENHEIMER:  May I approach the
14   witness, Your Honor?
15              THE COURT:  You may.
16       Q.     (By Mr. Elsenheimer) Mr. Smith, can you take
17   a look at those exhibits, please?
18       A.     Yes, sir.
19       Q.     Thank you, Mr. Smith.
20              Let me retrieve those exhibits from you.
21              Mr. Smith, the pictures that I just gave
22   you, what do they depict?
23       A.     The area around my property.
24       Q.     And do you recognize the property that is
25   in those pictures?

1      A.    Yes, sir.

2      Q.    Whose property is it?

3      A.    Mine.

4      Q.    And do these pictures fairly and accurately

5  depict your property on or around the dates of

6  May 5th, 2018 and thereafter?

7      A.    Yes.

8            MR. ELSENHEIMER:  I move Defendant's

9  Exhibits B1 through B17.

10           THE COURT:  Is there objection?

11           MR. NAYBACK:  No objection.

12           THE COURT:  B1 through B17 are admitted.

13           (Exhibits admitted, Defendant's B1 through

14  B17.)

15     Q.    (By Mr. Elsenheimer) Mr. Smith, I want to ask

16  you about your hotel -- I want to ask you about the

17  property that you live on and the sign in front.

18  A lot of people in this trial refer to it as the

19  Western Winds Motel.

20           Why did you close the motel in 2014?

21     A.    I had been cleaning rooms since I was 15,

22  and I was kind of tired.  And now that Ercilia moved

23  in, she cleaned her own room.  So I just got tired of

24  cleaning rooms.

25     Q.    Did you have anyone else who was helping

1  you clean rooms and --

2      A.    No.

3      Q.    Did you have anybody helping you with

4  maintenance and general upkeep?

5      A.    Just me.

6      Q.    Were your brothers helping you at that

7  point?

8      A.    No.

9      Q.    In May of 2018, can you tell us, in the

10  number of years, how long it had been closed?

11      A.    Since Ercilia arrived.  About four years.

12      Q.    For four years?

13      A.    Yes.

14      Q.    Thank you.

15            I want to show you Defendant's Exhibit B1.

16            Do you see this picture here, Mr. Smith?

17      A.    Yes, sir.

18      Q.    Do you see a sign in that picture?

19      A.    Yes, sir.

20      Q.    Is that a sign in the front of your

21  property?

22      A.    Yes.

23      Q.    Since you closed the motel in 2014, has

24  that sign ever been it up at night?

25      A.    No.

1      Q.    Since you closed the motel in 2014, were
2  there any "Vacancy" or "No vacancy" signs?
3      A.    No, sir.
4      Q.    Were there any lights in the reception
5  area?
6      A.    No.
7      Q.    So let me show you that exhibit again.
8            Can you point out where, when the motel was
9  operating, the reception would have been?
10     A.    The office is this big window, this
11  building right here (indicating).
12     Q.    So since 2014, was that ever lit up at
13  night or the day, as a reception area?
14     A.    No.
15     Q.    Was there anyone ever there as a
16  receptionist or a desk clerk?
17     A.    No, there wasn't.  It was just me.
18     Q.    In May of 2018, was there a sign on your
19  property that said, "Closed"?
20     A.    A small one in the front door, which you
21  can't see here, a small "Closed" sign.
22            And I had taken down the "Office" sign, so
23  there was no indication of there being any office
24  there at all.
25     Q.    Okay.  And with the mark right there

1    (indicating), are you indicating that there's a door

2    around that corner?

3        A.    There's a door around that corner into the

4    main office.  There's three doors there.  One door to

5    the office, a door to my front -- to my living room,

6    and a door to the cleaning room.

7        Q.    Is this area -- if you were to walk in this

8    area, does that have access to your house?

9        A.    Yes.

10        Q.    Have you been living back at your house on

11    Riverside Drive -- well, since May of 2018, how long

12    have you been back at your house at Riverside Drive?

13        A.    I don't understand the question.

14        Q.    After this happened, when did you return to

15    your house at Riverside Drive?

16            MR. NAYBACK:  Objection, relevance,

17    Your Honor.

18            THE COURT:  I'm not sure what you're

19    asking.

20            MR. ELSENHEIMER:  The Government has

21    pointed out that there are now no trespassing signs

22    and fences.

23            THE COURT:  If you can ask that question,

24    I'll allow it.

25            MR. ELSENHEIMER:  Certainly.

```
 1      Q.    (By Mr. Elsenheimer) When did you move back
 2 to your house after --
 3      A.    I was held in probation for two months
 4 after -- I mean, I was held at the halfway house in
 5 Albuquerque for two months.
 6            And after I got out from there on
 7 probation, I moved back into my house.
 8      Q.    Okay.  So you've been back at your house
 9 since -- is it approximately July of 2018?
10      A.    July, yes.
11      Q.    Okay.  And since you've been back there,
12 have you put up signs and fences and no trespassing
13 signs?
14      A.    Yes.
15      Q.    Who put those up?
16      A.    I did.
17      Q.    And why did you put those up?
18      A.    People were still showing up.  They were
19 driving back in here late at night and doing
20 whatever.  They didn't belong there, so I put up a
21 couple of fences.
22      Q.    Did they -- were they -- did they -- have
23 you continued to have problems with people on your
24 property?
25      A.    Yes.
```

1      Q.    Even with those signs?

2      A.    Yes.

3      Q.    Even with the fence?

4      A.    Yes.

5      Q.    I want to ask you about a couple of things

6  that you said to the FBI.

7            Why did you tell them that you were a hotel

8  manager?

9      A.    That's what I've been for years.  And then

10  after my mom died, I was running the place by myself.

11  So --

12     Q.    And since you closed the property in 2014

13  and Ms. Trujillo moved in, do you still maintain her

14  apartment and help her out?

15     A.    Yes.

16     Q.    If she has a plumbing problem, who's

17  responsible for fixing that plumbing problem?

18     A.    I am.

19     Q.    And is that why you referred to yourself as

20  the hotel manager?

21     A.    Yes.

22     Q.    You also mentioned that the rooms were

23  under construction.

24            What did you mean by that?

25     A.    Well, they need construction.  They need to

1   be refurbished and put back in working order.  The --

2   especially the roof along this whole area here

3   (indicating), it leaks in places, depending on which

4   way the wind is blowing.  So I need a new roof.

5       Q.    I'm glad you pointed out that section of

6   your property.

7            Is that where, when the hotel was an

8   operating hotel, when your house -- when it was an

9   operating hotel, folks could stay?

10      A.    They would stay.  There are six units along

11  the front and then six units along the side over here

12  (indicating).

13      Q.    In May of 2018, or at any time after 2014,

14  were these rooms furnished?

15      A.    No.

16      Q.    Did they have towels or soap or anything

17  that somebody would need if they were going to stay?

18      A.    No.

19      Q.    Thank you, Mr. Smith.

20            I want to ask you a question about your

21  property a little bit.  And I want to just go through

22  some of these pictures quickly, so we can move on.

23            But can you tell us what we're looking at

24  right here?

25      A.    We're looking at the Units Number 7 through

```
 1   Number 12 on the end.
 2              This is Ercilia's car, parked in front of
 3   her room.  She is in Number 9.
 4        Q.    And we saw her yesterday testify by Zoom.
 5              Was she sitting right here (indicating)?
 6        A.    She was sitting on the porch in front of
 7   her room.
 8        Q.    The red car, whose car is that?
 9        A.    That's Ercilia's car.
10        Q.    Thank you, Mr. Smith.
11              And this picture here, can you just briefly
12   describe this?
13        A.    That's the main parking lot for the Units 7
14   through 12.
15              This is my apartment over here
16   (indicating), my house.
17              There's a little shed here (indicating).
18              And Ercilia's car is right there
19   (indicating).
20        Q.    And Defendant's Exhibit B5, can you
21   describe briefly what we're looking at?
22        A.    We're standing approximately -- just off
23   from Number 12.  This (indicating) is my mom's camper
24   trailer, my car in the back.
25              This (indicating) is a little shed behind
```

1  the -- behind my house.

2          And then this is my house back here

3  (indicating) and another shed attached to the

4  building.

5      Q.    Thank you, Mr. Smith.

6          And I want to show you Defendant's

7  Exhibit B7.

8          What are we looking at right there?

9      A.    We're standing approximately in front of

10  Number 12.  This is looking west toward my woodpile.

11      Q.    And Defendant's Exhibit B8.

12          Is this a closer view of your backyard?

13      A.    Yes, it is.

14      Q.    And from this can you point out where,

15  approximately, your back patio is outside your back

16  door?

17      A.    Back patio.  The fence line runs from --

18  along behind this shed up to about the corner here

19  and then over this way (indicating).

20      Q.    And where is the step right behind your

21  back door?

22      A.    My back porch is -- can barely be seen, but

23  it is back in here (indicating).

24      Q.    Thank you, Mr. Smith.

25          This is a nighttime view, but can you

1    describe what we're looking at here?

2        A.    We're standing approximately in front of

3    the tongue of my mom's camper trailer.

4              This is the gate here (indicating).  The

5    fence runs along that, that way (indicating).

6              Here's the shed right in here (indicating),

7    and my back door here (indicating).  And the back

8    porch is right in here (indicating).

9        Q.    Thank you, Mr. Smith.

10             There are some stone blocks here with --

11   with objects on top of those.

12             What are those stone blocks and what are

13   the objects?

14       A.    These are carvings that I have done.  And

15   these are blocks of marble that are awaiting for me

16   get around to carving them.

17       Q.    Are you a sculptor?

18       A.    I hope so.  I try to be.

19       Q.    Is it something that you enjoy doing?

20       A.    Yes.

21       Q.    I want to ask you about Espanola.

22             What part of Espanola is your house in?

23       A.    It's on the east side of the river on the

24   way toward Taos, about halfway between -- I don't

25   know.  I can't -- it's in the middle of the business

```
 1    district along that street on the main road to Taos.
 2         Q.    So it's on Riverside Drive.
 3               Is that a residential area?
 4         A.    Where I live it's businesses surrounding my
 5    house.  And at night it's fairly nice and quiet,
 6    usually.  And I am essentially the only one there at
 7    night.
 8               And I have called the cops on things
 9    happening at Kentucky Fried Chicken.
10               I called the cops on the north section when
11    people were breaking in there.
12               So at night, I'm the only one around.
13         Q.    What's that part of Espanola like?
14         A.    I call the road the river during the
15    daytime, because it flows just continuously.
16         Q.    Flows with what?
17         A.    Traffic.  Cars.
18         Q.    Is it a busy road during the day?
19         A.    It is busy.
20         Q.    What is Espanola like?  You've lived there
21    since you were in third grade.
22               Tell us about what Espanola is like now,
23    compared to what it was like when you moved there.
24         A.    Well, when we moved there it was like Leave
25    it to Beaver and Barney Fife.
```

1           But lately, it's sort of become like

2    Nightmare on Elm Street.

3       Q.    Why so?

4       A.    If I went out with a rake right now today

5    and raked along the front of the street and along the

6    edge of my property, I could rake up five or six used

7    syringes.

8       Q.    Have you personally -- in your home and on

9    your property, have you personally had problems with

10   trespassers and intruders?

11      A.    Yes.

12      Q.    I want to ask you about those problems.

13           Can you tell me when those problems began?

14      A.    They began the last week of October.  And

15   before this, during the summer I was leaving my back

16   door open and the screen door even sometimes

17   unlocked.  I was living in still 1950.

18           So after the first break-in, I started

19   closing my door.

20      Q.    Let me ask you.  You said November.  What

21   year?

22      A.    The last week of October 2017 was the first

23   break-in.

24      Q.    So October 2017.  Before then, what was it

25   like with your house and your property?

```
 1              Describe that for us.
 2      A.      When you get away from the street it's like
 3   a nice, pleasant oasis in the back.
 4      Q.      Did you lock your doors at night?
 5      A.      No.
 6      Q.      Would you -- so during the night you
 7   wouldn't have to lock your door?
 8      A.      I didn't think so.
 9      Q.      And what happened in October of 2017?  Why
10   don't you tell us the first thing that happened.
11      A.      The first break-in I didn't even notice,
12   until I went to start my car and the battery was
13   dead.
14              Somebody had -- and I was leaving my car
15   unlocked.  They had gone in, they had put the visor
16   down.  I had no idea why.  They had opened the glove
17   box.  The change, about -- maybe $3 in change in the
18   console.  They had opened the little door for the
19   center console thing and taken the change.
20              And when I went to start my car I found
21   that the battery was dead, because they left the door
22   just open, so they wouldn't have to slam it shut.
23              I went and called Dan and said, Hey,
24   somebody got in my car.  So we looked around all over
25   the place.
```

670

1          And they had broken into the shop in the
2   back.  They had -- well, we used to even leave the
3   window slid open, so it wasn't too difficult to rip
4   the bug screen off, and they crawled in through the
5   window and got in.
6          We looked, then, into the -- and so tried
7   to figure out if anything was stolen.  But the only
8   thing that was missing, again, was just 2 or $3 of
9   change that Daniel had in there.
10       Q.    Did you call the police?
11       A.    No.  We figured it was just a kid.  Because
12  the window is -- it's 2-foot by 2-foot window with a
13  fixed side and then a sliding side.  So to get in,
14  they had to slide open the -- like a 12-inch by
15  24-inch space to get in.
16          And the only thing that we did any
17  different was, we had two back windows that were the
18  same.  We just put a little stick in between the --
19  where the slide, so that it couldn't slide open.  And
20  that's pretty much all we did.
21       Q.    Did anything happen after that?
22       A.    The first week of November somebody went
23  into the same -- through the same window.  They
24  smashed open the permanent window, they took the
25  stick out and they slid open the sliding window.

```
 1            They went inside and took three tote bags
 2    that were -- that contained battery-powered drills
 3    and a saw and accessories.
 4            And Daniel told me that was worth about
 5    600 bucks.
 6            And that -- at that point I had some metal
 7    plates that were exactly 24-by-24 inches, and they
 8    fit in perfectly.  We put those in and bolted those
 9    in, so we closed off those windows completely.
10            And Daniel bought three lights that would
11    come on when someone was around.  We put one behind
12    the shop at the door, and we put one over on Dan's --
13    David's trailer on the back and on the front porch,
14    for Dave's trailer.
15            And at that point all I did was, I started
16    wandering around at night.
17       Q.    What do you mean, you started wandering
18    around at night?
19       A.    At all different times I would get up and
20    wander around the whole property, look at things and
21    check out the place and be sure that there was nobody
22    breaking in.
23       Q.    Would you carry anything like a flashlight
24    or --
25       A.    At that time I was -- I started off just
```

1    wandering around carrying nothing.

2        Q.    And I don't know if I asked you, did you

3    call the police after that?

4        A.    At that incident, no.

5        Q.    Were there any other incidents after that?

6        A.    Yes.  A couple of weeks later, the third

7    week of November, I went out to wander around at

8    about 11:00.  And I saw a car parked on the lower end

9    of the KFC parking lot, just on the other side of my

10   fence.  And there were three guys milling around,

11   which isn't unusual.  It's the KFC parking lot.  I

12   had no control over it.

13            And as I started walking towards them, I

14   heard them pick up some heavy stuff and dump it into

15   the back of their car.

16            And before I could get close enough to say

17   anything to them they took off.  And I didn't think

18   too much of it.

19            So I was already going to wander around

20   anyway, so I went and wandered around, and the -- I

21   saw the shed door to Dan's -- one of Dan's little

22   sheds was completely open, and the other door was

23   partially torn and bent, so it was like a triangle,

24   where it was open.

25            And I went and told Dan that somebody broke

1    into his shed.

2            And he came out and he called the cops.

3    And at about midnight the cops showed up, and the

4    four of us wandered around the entire property.  The

5    cops were taking -- writing down a list of stuff that

6    Dan said was missing.

7        Q.    After that incident, did you ever hear back

8    from the police?

9        A.    I never heard back.

10        Q.    Did you receive a police report or anything

11    like that?

12        A.    No.

13        Q.    Did you or Dan ever receive your belongings

14    back?

15        A.    No.  And some of the tools that they took

16    were antique Volkswagen, one-of-a-kind just for

17    Volkswagens, so special tools.  I have no idea what

18    they're worth.

19        Q.    Is somebody a car collector or --

20        A.    Dan is a Volkswagen person.

21        Q.    Were you -- after that incident, did you

22    continue to walk around at night?

23        A.    After that incident, yes.  At that point in

24    time I started carrying binoculars with me so I could

25    see better at night.

1        Q.    Why did you carry binoculars to see at

2   night?  Can you describe that, or tell the jury

3   why that is?

4        A.    Well, I have trouble seeing anyway.  So

5   with binoculars, it brings in more light and you can

6   see people farther, better than having to walk right

7   up on somebody.

8              And also at the incident with the three

9   guys, Daniel bought three more lights that motion on

10  and put them in various spots.

11             And he bought two sets of motion detectors

12  that have, like, little balls that you can stick out

13  somewhere, and then you plug in the transmitter,

14  where you can hear it, and it sounds like little

15  doorbells.

16             Each of the three balls has a different

17  ring.  One has just one ring, one has three rings,

18  and one has five rings.  So that when you put it

19  somewhere, you know how many rings, where that

20  somebody is walking through.

21             But you have to be awake to hear them go

22  off.  Because once they go off, that's -- they don't

23  stay on dinging, or their ringing isn't loud enough

24  to wake me up.

25       Q.    So let me ask you about those.

1          I think you said motion detectors or
2    motion-on lights?
3        A.    Both motion detectors and motion-on lights.
4        Q.    Okay.  Tell us about the motion-on lights.
5              What do they do?
6        A.    Whenever someone is around they go on.
7        Q.    Can you point out -- I'm showing you
8    Defendant's Exhibit A1.
9              Can you point out approximately where you
10   and Dan placed the motion-on lights?
11       A.    All right.  The first three was -- one here
12   on Dave's porch (indicating) and one here on the back
13   (indicating) and then one here (indicating) at the
14   back of the shop.
15       Q.    So -- and you mentioned -- so there's three
16   motion-on lights that you placed there.
17             And you mentioned motion detectors.  Does
18   that make a sound?
19       A.    Yeah, like a little doorbell.
20       Q.    Okay.  And where did you place those?
21       A.    I have no idea where Dan put his.  But I
22   put mine -- one over here (indicating) and one on
23   this corner (indicating) of the -- of my mom's
24   trailer and then one underneath this car here, aimed
25   out that way (indicating).

1      Q.    And whose -- so you put a -- you mentioned

2  a car, and I'm pointing to it right here

3  (indicating).

4            Whose car is that?

5      A.    That one is an old Jeep that's waiting to

6  be --

7      Q.    Why did you put a motion detector there?

8      A.    Because it seemed like a good place to hide

9  it.

10      Q.    Would it detect if somebody is coming onto

11  your property?

12      A.    It would defect if someone is driving along

13  this road here (indicating).

14      Q.    After you set up those motion-on lights and

15  the motion detectors, did anything else happen on

16  your property?

17      A.    Yes.  Let me say that there was one

18  motion-on light over here (indicating) and one over

19  here (indicating).  And where was the other one?  I

20  think it was down here (indicating) at this garage.

21      Q.    Thank you, Mr. Smith.

22      A.    Okay.

23      Q.    Before I ask that -- I asked you a

24  question.  Let me back up.

25            I'm going to point to a section of the

1    property.  There's been some discussion -- there's

2    been some discussion about this area right here

3    (indicating).

4         A.    Yes.

5         Q.    Can you tell me, in 2018, was there a fence

6    there?

7         A.    There was a gate there.

8         Q.    There was a gate?  Okay.

9         A.    A gate and a fence.

10        Q.    All right.

11        A.    A metal --

12        Q.    Thank you.

13              So let me go back and ask the question that

14    I just asked.

15              After you set up the motion-on lights and

16    the motion detectors, did anything else happen on

17    your property?

18        A.    About a week later, after the three guys

19    had ransacked the place, in the afternoon I was

20    wandering around in, I don't know, 4:00 in the

21    afternoon, and I was walking through this area here

22    (indicating) between my brother's -- my brother

23    Dave's trailer.  And he had a white bus, that you

24    can't see underneath that tree.  And I noticed that

25    the driver's side window was slid open.

1          And I thought to myself, I don't remember

2     seeing that the other day when we walked around with

3     the police.

4          So I climbed up onto a Ski-Doo that was

5     next to it, and I looked inside the window.  And

6     there was some guy laying down inside the bus on the

7     floor.

8          And I said, Hi there, what are you doing?

9     Because I realized that he was laying down because I

10    was wandering around.  He saw me and was laying down

11    to hide.

12         Q.    What kind of bus was it?

13         A.    An old school bus that had all the seats

14    taken out and a few bunk beds put in, sort of a

15    camper kind of thing.

16         Q.    Can we see it on this photograph?

17         A.    No.

18         Q.    Can you just -- I think you pointed to it.

19    Can you just draw a line where it is?

20         A.    It's right underneath this tree right about

21    there (indicating).

22         Q.    And what happened next?

23         A.    He got up and was coming towards the open

24    window.

25              And I jumped down off of that.  And I kind

1    of wanted to keep him inside the bus.  I was

2    hollering and yelling to get Dan's attention.  I

3    thought he was in his home, so I was yelling for him.

4              And the guy started to squeeze out the

5    window.

6              And I saw on the ground there was a stick

7    about 6 feet long, a ratty piece of 2-by-4.  Well, it

8    wasn't a 2-by-4 anymore.  It was, like, a one and a

9    half by three-quarter.

10             And I picked that up, and I jammed the guy

11   back into the bus, and he fell backwards.  And then

12   he got up and he -- I tried to poke at him to keep

13   him in the bus.

14             But he grabbed ahold of the stick and we

15   were, like, tug of war with the stick.  And I grabbed

16   ahold of it.

17             And he said, Now it's my turn.

18             And I pulled the stick up against the

19   window that was there and tried to lever it away from

20   him, and it broke in two.

21             And I stepped back and I thought, Well, he

22   has got to come out that window, I thought.  But the

23   bus doors -- we had cement blocks, pumice blocks, and

24   some chunks of wood, square chunks of wood, piled in

25   front in the little stairway where the door is, to

1    keep the door from being opened from the outside.

2    But I forgot that all he had to do was move those and

3    he could get out from inside.

4              And he was squeezing out the door, and I

5    went over.  And the only thing I could find at the

6    time was a piece of firewood, and I smacked him in

7    the shoulder to try and get him to go back inside.

8    But he squeezed on through.

9              And then he took off running and I took off

10   running after him.  And we were both kind of huffing

11   and puffing.  And I thought, Well, for as young as he

12   is, he's huffing and puffing and I was huffing and

13   puffing.  So I thought, He's out of shape, so am I.

14             But he ran over here (indicating) to this

15   place right here, went across the fence.  And there

16   is a big long sidewalk behind this building.  And he

17   went up to about here (indicating) and went out.  And

18   I went up to the street and was trying to follow him.

19             I was staying -- trying to stay out of

20   sight on the corners.  And as he went behind the

21   buildings, I went from building to building to each

22   corner.

23             And then he saw me.  And the next building

24   he went behind he took off his black T-shirt.  And

25   the next time I saw him he had a white T-shirt on, so

1    I knew he was -- he knew I was following him.

2            So I gave up, and I went back and told Dan

3    what had happened.

4            And Dan called the cops.  And I went -- one

5    policemen drove up, and we were both standing next to

6    the car talking to the cop.  And he -- I told him the

7    story I just told you guys.

8            And he asked me, Did he take anything?

9            And I said, No, his hands were empty.  And

10    I told the cop the only thing that he did was, when

11    he was over here crossing on this sidewalk, he turned

12    around and looked at me and said, I'll be back.

13            So I told the cop that.

14            And he said, Well, if he didn't take

15    anything, the cop said, there's nothing we can do.

16    He said, You should have kept him in the bus.  I

17    could have gotten him for unlawful entry.

18            And I told him, Well, I kind of was trying

19    to keep him in there, but I couldn't.

20    Q.    Tell me again -- tell me what that man

21    looked like.

22    A.    He was about my height, kind of young,

23    maybe 30-ish, black hair.  He had on a black T-shirt

24    at first and black pants, and a little bit Hispanic

25    coloring.

1        Q.      Was he thin?

2        A.      Kind of thin.

3        Q.      Okay.  What did he tell you?  Again, what

4    did he say to you?

5        A.      When he was over here (indicating), just

6    the last -- the last -- before he kind of disappeared

7    from view he turned around and said, I'll be back.

8        Q.      What did you think about that?

9        A.      I took it as a threat that he was going to

10   come back.  So I realized not only am I going to have

11   to wander around the property at night, I'm going to

12   have to wander around more often in the daytime, too.

13       Q.      And you told this to the police?

14       A.      The complete story, yes.

15       Q.      And did the police get out of their car

16   and --

17       A.      No, he didn't get out of the car.

18       Q.      Did they look for fingerprints on the bus?

19       A.      They did not.

20       Q.      Did they -- but do you know if they ever

21   wrote a report about that?

22       A.      This policemen didn't.  He didn't even pick

23   up a piece of paper.  He didn't write anything down.

24       Q.      Do you feel that the police took that

25   situation seriously?

1    A.    Seriously, yes.  But I got the impression

2  that there wasn't a whole lot he could do.

3    Q.    Did that --

4    A.    That he was basically telling me to do his

5  job, by holding him in the bus.

6    I'm not a fighter.  I don't know how to do

7  that sort of thing, but I was trying.

8    Q.    You said after that you started to walk

9  around your property --

10    A.    Wander around more often.

11    Q.    And how often would you walk around your

12  property?

13    A.    Five or six times a day and twice at night

14  at first.  And sometimes, if I was able to be

15  awake -- if I was awake, I'd get up, put some clothes

16  on and go outside and take the binoculars with me at

17  night, more than during the day, and just stand

18  somewhere, anywhere, where I would not be likely

19  standing out where I could be seen.

20    Q.    Did you just look for people on your

21  property or did you do anything else while you were

22  out there?

23    A.    I enjoyed watching the raccoons and the

24  skunks as they were wandering around.

25    Q.    Did you watch them through the binoculars?

1    A.    Yes.

2    Q.    Did you have any other incidents, after

3    that on the bus, with any intruders on your property?

4    A.    Let's see.  The first week of December.

5    Wait, the guy with the bus was the first week of

6    December.

7            The day after Christmas another guy was --

8    this was late at night, after 11:00.  I heard the

9    motion detectors go off over here (indicating) by my

10   mom's trailer.  There's one there.  I heard it going

11   off, and I got up and I went outside and I stood

12   on my back porch, and I stood there and listened, to

13   see if I could hear anything.

14           And usually if I'd see the raccoons I'd

15   say, Okay, there's nobody else around, and I'd go

16   back in.

17           But as I was standing there, I heard leaves

18   crunching on the opposite side of my mom's trailer

19   over here (indicating).  And I -- I thought it would

20   have to be a pretty big raccoon.

21           So as I went out the back gate, I grabbed

22   ahold of a ski pole.  And just as soon as I got to

23   the front of my mom's trailer, where the tongue is,

24   this guy stepped out from behind the trailer.

25           And he saw me, and right away he grabbed

1  something that he had put on top of the propane

2  tanks.  And then he stepped back and he put his hands

3  up right away.

4          And I thought, That's kind of weird.  Why

5  is he doing that?

6          And he stood there and he said, Please

7  don't hurt me.  I'm cold.  I'm just trying to find a

8  place to get warm.

9          But I didn't believe him, because he had

10  something over my head.  And I thought, If I lower my

11  guard, because he's telling me these nice things,

12  that he's a nice guy, I'm going to get clobbered with

13  whatever he's holding.

14          So I take the ski pole and I jab him right

15  here (indicating) in the side.  And then he grabs

16  ahold of that and we kind of tug of a war with the

17  ski pole until he gets his balance, and then he took

18  off running.

19      Q.    Did you --

20      A.    This was in the middle of the night.  I

21  could not see his face, I could not see what he had

22  in his hand.

23          All I could see was that he was well

24  dressed.  He had on heavy boots and jeans and a

25  decent jacket.

1          Q.    What time at night was it?

2          A.    After 11:00.  I don't know if it was after

3     midnight or close to 1:00.

4          Q.    Was it dark?

5          A.    Yes, very.

6          Q.    Are there any lights in that part of your

7     property?

8          A.    At that time, no.

9          Q.    You had mentioned earlier that after the

10    time -- the incident that occurred on the bus, I

11    think you mentioned you put some poles on.

12              What did you mean by that?  Were you

13    referring to ski poles?  Would you carry ski poles

14    when you were out?

15         A.    I had some old ski poles.  I used to ski

16    when I was in high school, and I used them for --

17    whenever there's ice all over the place, I'd use them

18    to walk with, a walking stick.

19              And I keep them stacked right next to the

20    gate.  And usually, whenever I would go out, I'd kind

21    of take one of those.  Because if there's a raccoon

22    around, they can come at you if they feel like it,

23    and a ski pole would kind of deter them from chomping

24    on me.

25         Q.    Thank you, Mr. Smith.

1          So after that, the time where you
2    encountered someone who is behind your mother's
3    trailer, how did that make you feel about your
4    property and about people coming onto your property?
5         A.    That they were coming close to my backyard,
6    coming close to my back door.
7              And from the time, after the ski pole guy,
8    I would almost always go outside carrying a pistol.
9         Q.    And what kind of pistol would you carry?
10        A.    A .22 Luger.
11        Q.    Why did you carry it?
12        A.    Just in case there would be someone there,
13    I could scare them off.
14        Q.    How would you scare them off?
15        A.    Cock the pistol and shoot it down to the
16    ground.
17        Q.    So your intention was to make noise to
18    scare them off?
19        A.    To make noise.
20              And unfortunately, that pistol can't handle
21    bird shot, or I would have used bird shot, because
22    it's way louder.
23        Q.    Do you have other firearms at your house?
24        A.    Yes, I do.
25        Q.    Could you tell us what those firearms are?

1       A.      Two .22 rifles and an SKS.

2       Q.      How long have you owned the pistol, the

3  Luger pistol?

4       A.      Years ago I used to go hiking, and I would

5  carry one of the .22 rifles.

6               And after awhile I thought, Well, this is

7  getting kind of heavy for just a .22.  So I went and

8  bought a Luger.

9       Q.      And why would you carry a pistol or a rifle

10 while you were hiking?

11      A.      In case of a bear or a mountain lion, make

12 noise and hopefully scare them away, because a .22 it

13 wouldn't stop a bear or a cat.

14      Q.      Do you ever target practice?

15      A.      I used to, years ago.

16      Q.      How long ago?

17      A.      Back before the -- before they started

18 closing the dumps, I used to go real early, bright

19 and early before the sun came up, before anybody was

20 around, and set up some bottles and shoot with a

21 rifle.

22      Q.      Did you ever target practice with a pistol?

23      A.      Not as much.  Once I realized that the

24 pistol's rear sight was part of the ejection

25 mechanism, that every time it fired it changed the

1    sight.  So using it to sight with seemed kind of

2    pointless.

3        Q.    When was the last time that you went target

4    shooting?

5        A.    Oh, that?  Jeez, at least ten years before

6    this.  So 15 years ago.

7        Q.    Tell us again, why did you start carrying

8    the .22 Luger when you would walk around your

9    property?

10       A.    To make noise.  If I had encountered the

11   guy that I hit with the ski pole, I would have fired

12   a round right in front of him and he would have taken

13   off, without having to feel the fear of being whacked

14   on the head with whatever he was holding, and the

15   fear of having a fight with him.

16            Because I was -- I sort of gave it up at

17   that point.  I had to fight or be hit.

18       Q.    Before May 5th of 2018, did anyone -- did

19   you ever see anybody else near your mother's trailer?

20       A.    Yes.  On the 20th of January, real early

21   Saturday morning, when it was still dark, the -- I

22   usually get up -- well, I get up -- now I have no

23   sleep.  I sleep a couple of hours and get up and

24   wander around.

25            And I heard the motion detectors going off

1    around 4:30, 5:00.  And I grabbed the pistol and went

2    out and stood on the back porch, like I usually do,

3    just stand there and wait and listen and look around.

4              And hopefully I will see a raccoon and say,

5    Okay, there's nobody around.  I use the raccoons as

6    kind of little watchdogs.

7              And as I was standing there, I noticed that

8    there was someone kneeling down just behind the

9    rear -- well, there's only one tire -- behind the

10   tire of my mom's trailer, just behind it.

11             And he was kneeling down doing something.

12   I don't know what he was doing.  I thought he was --

13   my first impression was, the way he was kneeling, he

14   was trying to set fire to my mom's trailer.

15             So I thought, That's awfully strange.  So I

16   cocked the pistol and fired a shot behind the

17   trailer, about 8 feet, 8 to 10 feet to the side of

18   where the guy was kneeling, to scare him off.

19        Q.    You mentioned -- what happened after that?

20        A.    He got up and took off running.  And he ran

21   up this way (indicating).  And then after he was past

22   the area, I fired two more rounds into the woodpile,

23   so that he would know, Don't come back.

24        Q.    And why did you fire your gun on that

25   occasion?

1        A.     To scare him away.

2        Q.     From where he was kneeling next to your

3   mother's trailer, to where you fired the first shot,

4   how far was that?

5        A.     Where he was kneeling was about 25 feet

6   from where I was standing.  And the angle that I shot

7   was from the back end of the trailer over -- pretty

8   much over in this direction (indicating).

9        Q.     And so approximately how many feet was

10  that?

11              That's a bad question.  Let me reask it.

12              From where the individual was kneeling next

13  to your mom's trailer, to where you shot to the side

14  of the trailer, how far was that?

15       A.     About 10 feet.

16       Q.     About 10 feet.

17              And after you fired that first shot, what

18  did that person do?

19       A.     He stood up and ran off.

20       Q.     And after he had run off, what did you do?

21       A.     After he was out of the way, I fired three

22  more while he was still within hearing range.  I

23  fired two more rounds into the woodpile that's in

24  that area.

25       Q.     And the woodpile you're referring to, is

1    that Defendant's Exhibit B7?  Is that Defendant's

2    Exhibit B7?

3         A.    Yes, that's the woodpile.

4         Q.    Why did you shoot into that woodpile?

5         A.    Because there's a lot of wood there.  It

6    extends from here (indicating) all the way back here

7    (indicating).  There's a three-layer of wood cut,

8    three layers here (indicating), three layers back

9    here (indicating).

10              And then on the other side of this little

11   coyote fence there's another three layers of wood

12   behind that, extending all the way back to here

13   (indicating).

14        Q.    Can you tell us what a coyote fence is?

15        A.    It's a pole fence with them jammed as close

16   together as you can get them, so that nothing can get

17   through.

18        Q.    If you fire a bullet into that woodpile, is

19   there any chance it's going to go through that

20   woodpile?

21        A.    No.

22        Q.    How did that incident with the individual

23   kneeling next to your mother's trailer make you feel?

24        A.    That I was justified in walking outside the

25   back door carrying a pistol.  That the only way I'm

1    going to defend myself is to defend myself by scaring

2    people away.

3            And the next time -- this was early

4    morning.  Ercilia heard me shooting and she came out

5    and said, Doug, what is going on?

6            And I told her about the guitar.  I went

7    back and found that there was a guitar stashed

8    underneath the back end of my mom's trailer.  And I

9    pointed it out to her.  And she said, Well, okay.

10           So the next day was Sunday, and I got a

11   call from Ercilia that one of the musicians at her

12   church the night before had had his guitar stolen.

13   So they knew to come and get it, and they came and

14   picked it up, and it was his guitar, an expensive

15   acoustic guitar.

16      Q.    Mr. Smith, let me ask you about May 5th.

17   Let's talk about May 4th and May 5th.

18           Tell us about the evening of May 4th and

19   what you were doing.

20      A.    The evening I was watching TV.  And about

21   9:00, 9:30, the motion detectors went off.  So I went

22   outside.

23           I grabbed my pistol and went and stood on

24   the back porch, and just stood there and listened for

25   a while.

```
1                  And then I walked around the area and
2       didn't see anybody.  I didn't see any raccoons, so I
3       figured there was maybe a cat.  It would go off when
4       there's cats around.
5            Q.    Approximately what time was that?
6            A.    That was at about 9:30.
7            Q.    And was it dark by that point?
8            A.    It was dark.
9            Q.    Were there any lights outside of your
10      house?
11           A.    No.  The only lights were along this porch
12      here (indicating), the porch lights.
13           Q.    What happened next?
14           A.    I went in and started watching TV again.
15      And then about 10:00 -- between 10:00 and 10:30 the
16      motion detectors went off again.
17                 So I did the same thing again, and there
18      was nobody out there.
19                 So about 10:30 or so I said, Okay.  And I
20      set the -- set my pistol on top of the kitchen
21      counter and closed the door and went to bed.  And I
22      turned on my radio and listened to Coast to Coast AM.
23      It comes on at 11:00.
24                 And when it's on, I can't really hear the
25      motion detectors go off.  So if anything happened
```

1   between about 11:00 to a little after 12:00, when I

2   turned the radio off to get some sleep -- the person

3   that I was listening to was talking about pets having

4   souls, and that was interesting.

5           And then she went off the air, off the

6   program, about 11:00 -- I mean, 12:00.  So I listened

7   for a little while, and there was nobody else that I

8   wanted to listen to, so I shut the radio off and was

9   laying there to go to sleep.

10          And I was laying there for about a half an

11  hour, and the motion detectors went off again.

12          So I went, put on some floppy shoes, my

13  get-them-on-quick tennis shoes, and put on my jacket,

14  grabbed the pistol, and went out the back door.

15          And I stood there like I had been, stood on

16  my back porch, and stood there listening and

17  watching.

18          And then I saw a shadow with his back -- I

19  thought it was a guy.  His back was toward me and he

20  was jiggling the doorknob on the -- on the trailer.

21          And then he turned around and suddenly

22  crouched down.  I didn't -- I tried to get out the

23  back door as quietly as possible.  In case it's

24  raccoons, I'll just stand there and watch them.

25          But this guy turned around and crouched

1    down.  And the way he crouched down, I thought I was

2    about to be shot.  I thought he was going to start

3    blasting away at me.

4             And there wasn't time.  I was, like, a

5    sitting duck.  Back behind me was white.  He could

6    see me more than I could see him.

7             So I cocked the pistol and I fired behind

8    the trailer, above the -- tried to get above the wire

9    fence.  It's a hog wire fence with a little square,

10   thin enough that if a bullet hits it, it could go

11   anywhere.  So I wanted it to go off behind the

12   trailer in that area there, where it wouldn't hit him

13   and it wouldn't hit anybody else.

14   Q.    What did that person do after you fired

15   that first shot?

16   A.    That person rose and took off running in a

17   sprint, as fast as they could go.

18            And at that time my heart was pumping, and

19   I was shaky as the dickens.  And I thought that the

20   person had run off and run towards the street, so I

21   wanted to warn them again, warn this person who I --

22   it might have been the same guy.  I had no idea.

23            And I fired, but I was shaky, just pointing

24   toward the woodpile.

25            And because I was firing faster than I had

1    ever fired before, I swear, when I pulled one time I

2    heard two shots.  I don't know if my pistol is

3    capable of being a little machine gun.  It had never

4    done that before.

5           And because I heard two rounds in quick

6    succession, I figured they had a gun, and that's why

7    I went to reload mine, because I had fired -- I

8    usually keep seven rounds in it.  It will hold 14,

9    but if you leave them there over a long period of

10   time, the clip spring just sort of gets tired and it

11   will jam.  So I keep it only about half -- halfway

12   full.

13          And I had fired, I had no idea how many,

14   four, or five, I thought.  And when my -- I went out

15   my back -- I went out the gate, and my pickup truck

16   was there.  So I used it as a table.

17          I ejected the clip and ejected the shell

18   and left it on top of the truck.

19          And I was trying to -- I had a bucket with

20   a plastic bag with five or six more shells in it.

21   And I tried to reload, but there was no way.  And I

22   just thought, Well, there's -- if they're still there

23   waiting to shoot me.

24          I put the clip back in.  I did not put a

25   bullet in the chamber.  And I walked between -- in

1    front of my mom's trailer.  And as I got to the
2    corner, I saw someone laying there and they weren't
3    moving.  And I just went in complete -- from absolute
4    total terror to absolute total emptiness, that
5    someone -- that I had shot somebody.

6            And when I got closer, I saw that it was a
7    girl.  And I thought, Oh, my God.  I might have shot
8    Melanie.  She was staying in Number 9 with Ercilia.
9    But why she would be out there, I didn't even think
10   of that.  I just saw a girl.  And I -- the only girl
11   that was possibly going to be there was Melanie.

12           So I went, and I lifted up her shoulder and
13   saw that -- saw her face, and saw that it wasn't
14   Melanie.

15           But I -- I had never dealt with anyone dead
16   before.  And she was, like, really stiff.  So I
17   didn't -- I didn't know if she had life or not.

18           But I still worried that there were other
19   people, because I swear I heard another shot.

20           So I went up to -- I left her and I went up
21   to the street to look both ways down the street.  I
22   couldn't see anybody.

23           So as I was coming back, Ercilia was out.
24   And I'm pretty sure she was shining a flashlight at
25   the person laying there.

1            And I went and I told her that I had shot
2    somebody.
3            And she said, Go call the police.
4            And I said, Yes, I'm going.
5            And she went back in.  She had just opened
6    her door and stuck her head out.  She went back in,
7    and I went in to use the phone.  I don't have a cell
8    phone -- or I didn't at that time.
9            And I called 911.  I said, My name is
10   Douglas Smith.  I'm at 826 North Riverside Drive, and
11   I have shot an intruder.  Someone was trying to break
12   in.  And I said -- because I could not bring myself
13   to say "dead," I was kind of hoping maybe not.
14           But I said that this person is 10/7.
15           My mom, when she was alive, she used to sit
16   in the kitchen late at night and read books and look
17   at catalogs.  And she'd have on the cop radio.  So I
18   learned some of their codes, and 10/7 was out of
19   service.  So I was kind of hoping she was just
20   unconscious.
21           And the rest is -- the cops have reports.
22           I went out the back gate.  I set the gun
23   down and waited for the police to show up.
24           And when they arrived, they said to step
25   towards them backwards, which I did, and they put

1    cuffs on me.

2              They said, We're not arresting you at this

3    time, we're just making sure that you're secure.

4              And they put me in one of their -- in the

5    backseat of one of their cars, and they did what they

6    were going to do.

7         Q.    Mr. Smith, let me ask you -- let me --

8              THE COURT:  We'll need to take a break at

9    some point, so when you get to a stopping point.

10             MR. ELSENHEIMER:  Okay.  Thank you.

11   Perhaps five minutes?

12             THE COURT:  Five minutes?

13             Anybody need a break, yet?

14             All right.  Five more minutes.

15             MR. ELSENHEIMER:  We can take a break now.

16             THE COURT:  All right.  15 minutes, and

17   Yvonne will let the jury know where to go.

18             (Whereupon the jury exited the courtroom.)

19             (A recess was taken.)

20             THE COURT:  We are back on the record.

21             The jury will be in momentarily.

22             (Whereupon the jury entered the courtroom.)

23             (Whereupon the following proceedings were

24   held in Open Court.)

25             THE COURT:  Please be seated.

1          Mr. Elsenheimer, you may continue.

2          MR. ELSENHEIMER:  Thank you, Your Honor.

3     Q.    (By Mr. Elsenheimer) Mr. Smith, I'm going to

4  show Defendant's Exhibit A1, and just back up for the

5  jury.

6          Can you please point out, in this picture,

7  approximately where the woodpile is that we've been

8  talking about?

9     A.    It's underneath this tree that goes from

10  about right here (indicating) to right here

11  (indicating).

12          There's one woodpile there, and then

13  there's another woodpile in this area (indicating)

14  underneath this, and behind that fence.

15          So that whole area is pretty much woodpile,

16  the yellow marked area.

17     Q.    Thank you, Mr. Smith.

18          Let me ask you, when you stepped out on

19  your back patio and you saw someone at your trailer,

20  can you please describe for the jury, where is this

21  picture taken from?

22     A.    It looks like from my back porch.

23     Q.    Is this approximately where you were

24  standing when you stepped out?

25     A.    Yes, pretty much.

```
 1      Q.    At approximately what time of night was
 2   that?
 3      A.    After midnight, before 1:00.
 4      Q.    And this is a picture that's taken in
 5   daylight, obviously.
 6            Was it -- describe the conditions when you
 7   stepped out there after midnight, before 1:00, on
 8   May 5th.
 9      A.    I don't know how to describe.  What do you
10   mean?
11      Q.    Was it dark?
12      A.    It was dark, like it usually is.  I used to
13   like it dark, because I would come out on the back
14   porch and just take my little refractor telescope and
15   look at the moon.  So I didn't have any lights back
16   there at all for that reason.
17      Q.    And where was the person standing when you
18   stepped out on your back patio?
19      A.    The person was standing right here
20   (indicating) by this door.
21      Q.    And tell us again what happened when you --
22   what did you see that they were doing?
23      A.    The person's back was to me.  They were
24   facing the door and they were -- their hands were on
25   doorknob.
```

1    Q.    And what happened next?  The person -- I

2  thought I had got out the door as quietly as

3  possible.  But apparently the person heard me and

4  turned around and ducked down, so that the person was

5  just a head and shoulders right about like that

6  (indicating).  All I could see was a shadow of the

7  head and shoulders crouched down and eye --

8  eyeballing me and just looking at me as intensely as

9  possible.

10        And because of that, the way they crouched

11  down, I figured they were going to start blasting at

12  me.

13    Q.    And what did you do?

14    A.    There wasn't time to do anything.  There

15  wasn't time to yell at them.  There wasn't time to do

16  anything, just cock the pistol and shoot.

17    Q.    Where did you fire that first shot?

18    A.    Back behind here (indicating), behind my

19  mom's trailer.  I tried to get it over this fence so

20  it wouldn't ricochet, and in this area right in here

21  (indicating).

22    Q.    Were you aiming at the person?

23    A.    No.

24    Q.    Were you trying to hit the person?

25    A.    No.

1      Q.    How far away from the person was it where
2  you shot?
3      A.    I'd say 12 feet.
4      Q.    And after you fired that first shot, what
5  did that person do?
6      A.    The person stood up right away and sprinted
7  out.
8      Q.    In what direction?  Draw -- please draw on
9  this.  What direction did they run?
10     A.    They ran over here (indicating) and then
11  out this way (indicating).
12     Q.    Can you make an arrow to show the
13  direction?
14     A.    (Witness complies.)
15     Q.    How long did you wait between the first
16  shot that you fired and the second shot that you
17  fired?
18     A.    I thought about 15 seconds.
19     Q.    And did you think the person was gone?
20     A.    I thought they were gone and totally way
21  over here (indicating) somewhere.
22     Q.    And where did you fire the second, third,
23  and fourth shot?
24     A.    I was pointing in this direction right here
25  (indicating).

1      Q.    And what is behind -- so we see a tree

2   right there.  What's on the other side of that tree?

3      A.    On the other side of that tree is the big

4   woodpile.

5      Q.    When you shot the second time, did you

6   think the person was still on your property?

7      A.    No.  If they were, they were way out toward

8   the street.

9      Q.    Did you think that there was any chance

10  that you could hit somebody?

11     A.    No.

12     Q.    Did you think anybody was on your property?

13     A.    No.

14     Q.    Why did you fire your shots that night?

15     A.    To scare them away.

16           After you fired the first shot and they

17  ran, and you believed they ran out by the front of

18  your driveway by the street, why did you fire the

19  second shot?

20     A.    Because I thought they were going to start

21  shooting at me.  I wanted to make sure they were

22  gone.

23     Q.    Were you scared?

24     A.    Yes, very.

25     Q.    Tell us what you felt.

1          A.    The only other time I've ever been scared

2    to that extent -- I used to go hiking, and I was

3    hiking one day up in Abiquiu, lots of rattlesnakes.

4    And I was looking around trying to make sure I wasn't

5    going to see any rattlesnakes.  And because I was

6    looking so hard, I didn't see that I was getting

7    ready to come right -- step right down on top of a

8    rattlesnake.

9          And he started rattling, and I backed up

10   and I heard myself going, Uh, uh, uh, as I was

11   backing up.  And as I got far enough away I realized

12   who was yelling, who was screaming, and that was me.

13   Without any control over yelling, I was yelling.

14         So when you're scared you do stuff you

15   don't even know you're doing until it's over.

16         And that night I was that scared.

17         Q.    Is that why you fired your gun?

18         A.    Yes.

19         Q.    And again, Mr. Smith, did you have any

20   intention of hitting anyone?

21         A.    No.

22         Q.    Did you think anyone was on your property

23   between you and the woodpile when you fired?

24         A.    No.

25               MR. ELSENHEIMER:  May I have a moment,

1    Your Honor.

2            THE COURT:  You may.

3            MR. ELSENHEIMER:  I'll pass the witness,

4    Your Honor.

5            THE COURT:  Cross examination, Mr. Nayback?

6            MR. NAYBACK:  May we approach first,

7    Your Honor?

8            THE COURT:  Yes.

9            (Whereupon a Bench discussion was held

10   outside the hearing of the jury.)

11           MR. NAYBACK:  Your Honor, I wanted to seek

12   permission from the Court to get into something that

13   was previously excluded, that was in Mr. Smith's

14   May 7th, 2018, when he told the FBI that he was --

15   the hardest job was being a motel cop.

16           The evidence that we have from his direct

17   testimony is that -- well, it was yesterday -- was

18   laid out that he was a peaceful cop that wasn't

19   looking for trouble.  Now we have testimony that he's

20   engaged two people in non-shooting fights on his

21   property, one with a ski pole and one with a stick,

22   and that he shot at another person.

23           We think -- and I think you have ruled that

24   the hotel cop was overly prejudicial, improper 404B.

25           He has testified now, and I think it's only

1    proper that we be allowed to get into his statement

2    to the FBI Special Agent Taylor that the hardest job

3    is being a motel cop.

4            THE COURT:  Your response?

5            MR. ELSENHEIMER:  I think it's still -- we

6    didn't ask him about it.  It's irrelevant.

7            THE COURT:  I will allow it.  I think this

8    is cross-examination and impeachment.

9            (Whereupon the following proceedings were

10    held in Open Court.)

11                    **CROSS-EXAMINATION**

12    BY MR. NAYBACK:

13    Q.    Mr. Smith, is it okay if I ask you some

14    questions?

15    A.    Certainly.

16    Q.    You told -- you gave two statements to --

17    at least two statements to law enforcement, correct?

18    A.    Once to the Espanola police and once to the

19    FBI.

20    Q.    And you told the detectives, in both of

21    those interviews, that you were the hotel manager,

22    right?

23    A.    Yes.

24    Q.    You told them that you were co-owner of

25    your motel with your brothers?

1      A.    Yes, sir.

2      Q.    You never mentioned, to either Special

3 Agent Taylor or Byron Abeyta that your motel had been

4 closed since 2014?

5      A.    They didn't ask.

6      Q.    And then you went on to mention that you

7 rented out three rooms, and that 12 rooms were under

8 construction, correct?

9            Do you remember that?

10     A.    Yes.

11     Q.    Okay.  On May 5, 2018, you had no "Private

12 Property" or "No Trespassing" signs anywhere on your

13 property, did you?

14     A.    No, I did not.

15     Q.    And you have about 3 acres there, don't

16 you?

17           Do you know how many acres you have?

18     A.    3 acres.

19     Q.    Hard to patrol on your own, isn't it?

20     A.    Yes, sir.

21     Q.    The door to your home has a functioning

22 lock on it, doesn't it?

23     A.    Yes, sir.

24     Q.    On direct examination you just said that

25 you thought it was a man?

1      A.    Yes.

2      Q.    And when you talked to Special Agent Abeyta

3 and Special Agent Taylor, you said you didn't know if

4 it was a man or a woman?

5      A.    I assumed it was a man.

6      Q.    And you said they were eyeballing you,

7 right?

8      A.    Yes, sir.

9      Q.    How can you see their eyes, if you can't

10 tell if it's a man or a woman, Mr. Smith?

11     A.    I couldn't see their eyes.  I saw someone

12 crouching and looking intently in my direction.

13           I used the phrase "eyeballing me" as that.

14     Q.    And then you just testified to the jury

15 that the person initially had their back to you,

16 right?

17     A.    Yes, sir.

18     Q.    And then you said their hands were on the

19 doorknob.

20     A.    Yes, sir.

21     Q.    And if their back is to you, how can you

22 see their hands on the doorknob?

23     A.    Their hands are to the side.

24     Q.    You've engaged at least three people --

25 prior to killing Ms. Gallegos, you've engaged with

1    three people on your property, right?

2              The first one is the person in the bus,

3    right?  You just talked about that on direct

4    examination?

5         A.    Yes.

6         Q.    Okay.  Why were you trying to keep them in

7    the bus?  What was your plan?

8         A.    I had no plan to keep him in the bus.

9    That's where he was.

10        Q.    You weren't thinking, right?

11        A.    I was thinking to keep him in the bus.

12        Q.    And you were engaging him physically?

13        A.    I poked him with a stick.

14        Q.    What was he taking?  Do you know?

15        A.    I have no idea.  My brother Dave has -- he

16   was -- he has a bunch of stuff.  Dave's -- I can't

17   describe what it is, personal belongings and glass --

18   stained glass making --

19        Q.    Okay.  Did he make off with anything?  Did

20   he steal anything?

21        A.    No.

22        Q.    Okay.  And you were telling the jury that

23   you were running after him?

24        A.    Yes.

25        Q.    And he was a younger guy?

```
 1        A.    Yes.

 2        Q.    And then you said you were panting, right?

 3        A.    Puffing and huffing, yes.

 4        Q.    And you said that he was huffing and

 5   puffing?

 6        A.    Yes.

 7        Q.    How did you know that, Mr. Smith?

 8        A.    I could hear him.

 9        Q.    You weren't concerned for your safety that

10   day?

11        A.    Yes, I was.

12        Q.    Yet you didn't walk away from the bus.  You

13   engaged with the person, right?

14        A.    It's my property.

15        Q.    That is right.  And you want to defend your

16   property, don't you?

17        A.    Yes, sir.

18        Q.    And it's frustrating when you can't defend

19   3 acres of property, isn't it?

20        A.    Frustrating?  I suppose, if that's the

21   word.

22        Q.    I think you testified that you were

23   frustrated with all the crime on your property,

24   didn't you?

25        A.    I don't remember using that word.
```

1    Q.    Okay.  How does people walking onto your

2    property make you feel, Mr. Smith?

3    A.    Well, it depends on who it is.

4    Q.    And if you don't know who it is, you shoot

5    at them?

6    A.    No, sir.

7    Q.    Well, that's what you did with

8    Ms. Gallegos, wasn't it?

9    A.    The way they were looking at me, the way

10   that person was looking at me, I thought I was about

11   to be shot.

12   Q.    You said it was so dark -- you told law

13   enforcement it was so dark you could barely avoid

14   stumbling, right?

15   A.    I'm not sure exactly if those were my

16   words.

17   Q.    Okay.  Were you here in the courtroom when

18   your recorded interview was played?

19   A.    Yes, I was.

20   Q.    Okay.

21   A.    Did I say --

22   Q.    I'm sorry?

23         The way this works, Mr. Smith, is I get to

24   ask the questions and you answer them.  Okay?

25         So it's so dark you can't tell if it's a

1    man or a woman, right?

2        A.    I assume it to be a man.

3        Q.    You assumed it to be a man.  And you

4    assumed they had a gun, right?

5        A.    The way they were eyeballing me, I thought

6    I was about to be shot, yes.

7        Q.    You can't see their face.  What do you

8    mean, the way they were eyeballing you?

9        A.    Looking intently at me, bent over, looking

10   at me.

11       Q.    And after the first shot, you told Special

12   Agent Taylor they were fleeing, right?

13       A.    Yes.

14       Q.    Running away from you?

15       A.    Yes.

16       Q.    Running to the motel parking lot to

17   Riverside Drive, correct?

18       A.    Yes.

19       Q.    You were just estimating distances a little

20   while ago.

21           Mr. Smith, I'm showing you what's been

22   marked for identification as Government's B17 --

23   Defense Exhibit B17.

24           Do you see that photo?

25       A.    Yes, sir.

1     Q.     How many strides was Ms. Gallegos able to

2 take?

3     A.     I have no idea.

4     Q.     Is that more than 10 feet from the trailer?

5     A.     It looks like about 20.

6     Q.     All right.  It's pretty dark out, isn't it?

7     A.     Yes, sir.

8     Q.     And that's -- the lighting that you can see

9 is from the police lights, isn't it?

10     A.     Yes, sir.

11     Q.     And you're telling the jury that you could

12 see to the woodpile, and that's where you were

13 shooting?

14     A.     I could not see to the woodpile, but I knew

15 it was there.

16     Q.     Shooting blindly?

17     A.     I could not see in the dark --

18     Q.     You told --

19     A.     -- but I knew the woodpile was there.

20     Q.     You told law enforcement you shot to miss

21 your mom's trailer, right?

22     A.     Yes.

23     Q.     And you didn't miss it, did you?

24           Well, let me ask another question.

25           You listened to Theo Chavez testify

1  yesterday, the forensic expert that talked about

2  trajectory?

3       A.    Yes, sir.

4       Q.    Did you see the photographs of the holes in

5  your mom's trailer?

6       A.    Yes, I did.

7       Q.    Those weren't old holes, were they,

8  Mr. Smith?

9       A.    Not that I know of.

10      Q.    Do you remember the questions that your

11 lawyer was asking some of the detectives?  They

12 didn't know whether that was from May 5th of 2018, or

13 some other occasion?

14      A.    Yes, sir.

15      Q.    Do you have any sharpshooter training?

16      A.    No.

17      Q.    Are you familiar with the rules of gun

18 safety?

19      A.    Yes.

20      Q.    What do you know about shooting in the

21 dark, Mr. Smith?

22            Do you think it's advised?

23      A.    No.

24      Q.    When law enforcement said, Why didn't you

25 shoot into the ground, or why didn't you shoot into

1    the air, and you said, Well, if you shoot into the

2    air, you never know where the bullet's going to come

3    down.

4            Do you remember saying that?

5        A.    Yes, sir.

6        Q.    You think it's more safe to shoot head high

7    at a person in the dark?

8        A.    A person I assumed to be out of the way.  I

9    was shooting towards the woodpile.

10       Q.    Mr. Smith, you wrote two diagrams to law

11   enforcement.

12           Have you seen those diagrams?

13       A.    Yes, sir.

14       Q.    And each line you drew, the first one was

15   at the trailer, the second one was in Ms. Gallegos'

16   direction, the third one was in Ms. Gallegos'

17   direction.  You said you were not --

18           MR. ELSENHEIMER:  Objection.  That

19   mischaracterizes the evidence.

20           THE COURT:  Overruled.

21           You can conduct your redirect.

22           You may proceed.

23       Q.    (By Mr. Nayback) And the fourth shot was in

24   Ms. Gallegos' direction?

25       A.    It was in the direction of the woodpile.

 1          Q.    And she wasn't gone, was she, Mr. Smith?
 2    She wasn't gone.  You know that now?
 3          A.    I know that now.
 4          Q.    Yeah.  You shot her in the temple, didn't
 5    you?
 6          A.    (No verbal response.)
 7          Q.    Did you hear the testimony of the
 8    pathologist?
 9          A.    Yes.
10          Q.    When you shot at the guy a month before,
11    you missed him completely, right?
12          A.    (No verbal response.)
13          Q.    Do you remember your testimony on direct
14    ten minutes ago, Mr. Smith?
15          A.    Yes, sir.
16          Q.    You were talking about shooting at someone
17    else.
18                Did you shoot at someone else?
19          A.    No, sir.  I shot into the woodpile.  I shot
20    away from the person.
21          Q.    Right.  You didn't shoot into the ground,
22    did you?
23          A.    If I had shot towards the ground, like
24    you're pointing, it would have ricocheted off of the
25    flagstone that was in my backyard, and it would have

1  gone anywhere.

2      Q.    You told law enforcement that you've never

3  shot that fast before.

4            Do you remember that?

5      A.    Yes, sir.

6      Q.    And you heard Special Agent Acee say that

7  your firearm operated normally, right?

8      A.    He said.

9      Q.    Did you hear that he was an expert in

10  firearm testing?

11      A.    (No verbal response.)

12      Q.    I'm just asking you whether you heard that.

13      A.    Yes.

14      Q.    Okay.  And then today, you're telling the

15  jury for the first time that you thought the person

16  had a gun, right?

17      A.    I thought I was about to be shot.

18      Q.    You thought you were about to be shot,

19  because you saw a person on your property, right?

20      A.    And I believe I mentioned that in one of

21  the police reports.

22      Q.    I'm sure your lawyer will bring it up.

23            And then next, you said, for the first

24  time, you thought your firearm -- you were shooting

25  so fast you thought your firearm shot two rounds at

1    once.

2             Can you explain that a little bit further?

3        A.    That's what I meant when I told the police

4    that I was pulling the trigger faster than I ever had

5    before.  I never experienced my pistol firing two

6    rounds with one trigger pull.

7        Q.    Yeah.

8        A.    If it did that.

9        Q.    Yeah.  Special Agent Acee said it operated

10   normally, right?

11       A.    He said -- was he trying to make it run

12   like a machine gun?

13       Q.    And that's an important part of your

14   testimony.  Because right after that you said, When I

15   thought I heard a second shot, you thought someone

16   was firing at you, right?

17       A.    I thought someone else was firing a weapon.

18       Q.    Yeah.

19       A.    Whether at me, I do not know.  I didn't.

20       Q.    And you never told that to the FBI.  You

21   never told that to Byron Abeyta.  It's brand-new

22   information for the first time today, correct,

23   Mr. Smith?

24       A.    I did tell it to them when I said I was --

25   I pulled -- was firing the pistol faster than I ever

1    had before.

2        Q.    You never told them that you thought the

3    person -- that you were being fired at or that the

4    person had a gun, did you?

5        A.    No.

6        Q.    That's new information for the first time

7    today, Mr. Smith, isn't it?

8        A.    Yes.

9        Q.    And that's important so could you make a

10   claim of self-defense.

11           That's what you're claiming, right?

12       A.    No.

13       Q.    You're not claiming self-defense?

14       A.    No.

15       Q.    Oh.  All right.

16           When you went to pick up -- well, when you

17   approached Maria Gallegos in your hotel parking lot,

18   you said it looked like a girl's butt?

19       A.    Yes.

20       Q.    Do you remember that?

21       A.    Yes.

22       Q.    And that you thought you had shot Melanie,

23   one of your tenants.

24       A.    Yes.

25       Q.    And you said, Oh, no.  Oh, no.  Oh, no.

1    And you got scared witless.

2        A.    I was scared witless.

3        Q.    If you were scared witless, Mr. Smith, and

4    you saw someone by your mom's trailer that you hadn't

5    been into in, what, ten years?  You hadn't been in

6    the trailer?

7        A.    I wouldn't say that exactly.  I would have

8    gone in for something.

9        Q.    Can you tell me what's inside the trailer?

10       A.    Camping stuff, blankets, food.

11       Q.    And you told Byron Abeyta -- and the jury

12   heard the transcript.  You were here for the

13   recording.

14            You said it was locked so there was no way

15   she could get in, right?

16       A.    It was locked.

17       Q.    Right.  So when you or your attorneys say

18   there's an intruder forcing their way into the

19   trailer, all you mean is they had their hands on the

20   handle?

21       A.    Forcing it back and forth.

22       Q.    Yeah.  But you knew it was locked.

23            And you had time to think about your call

24   to 911, right?  That didn't even occur to you at

25   first.  It was Ms. Trujillo that told you to call

1    911, and then you responded, Yeah, I should.  Right?

2         A.    That's where I was headed when I met her.

3         Q.    Mr. Smith, there's no way to get out of the

4    problem that you had, right, other than to call 911?

5         A.    That's what I was going to do.

6         Q.    But you didn't do it right away.  You went

7    out to the front of the hotel property.

8         A.    Yes.

9         Q.    For what?

10        A.    To find out if there was anyone else.

11        Q.    Why were you so paranoid?

12        A.    Because I had been broken into.  The area

13   had been broken into several times.

14        Q.    For $3 and change and for some -- some of

15   your brother's property, right?

16        A.    Altogether, over $10,000 worth has been

17   stolen.

18        Q.    Okay.  This is the first time you've told

19   anything -- anyone about that, right?

20        A.    Am I under oath?

21             MR. NAYBACK:  I don't know what to do with

22   that question, Your Honor.

23             THE COURT:  You're under oath.

24             THE WITNESS:  Was I ever under oath?

25             THE COURT:  But that's -- this is not an

1    exchange.  Counsel will ask you questions and you

2    answer the questions.

3        Q.    (By Mr. Nayback) Do you understand the rules,

4    Mr. Smith?

5        A.    Pardon?

6        Q.    Do you understand the rules here in the

7    courtroom?

8        A.    Apparently not.  I'm learning as I go

9    along.

10        Q.    You understand that you have to tell the

11    truth, right?

12        A.    Oh, yes, sir.

13        Q.    And that you gave a different story today

14    than you gave to Special Agent Taylor and to Special

15    Agent Abeyta, didn't you?

16        A.    I was not under oath with them.

17        Q.    Okay.  So you were lying to law enforcement

18    when you had initially talked to them?

19        A.    No, sir.

20        Q.    Okay.

21            You told Special Agent Taylor, not only you

22    were a hotel manager and you're co-owners with your

23    brother.  You never mentioned it was closed in 2014.

24            And then you said, The hardest part of the

25    job, of the job, is being a motel cop.

1             Do you remember saying that?

2       A.    Yes, sir.

3       Q.    And that's what you consider yourself?

4       A.    No, sir.  I consider it -- I'm also a

5  toilet cop.  I take care of the toilets.  The sewers.

6  I'm a sewer cop.  I take care of everything that's

7  there, building maintenance.  Motel cop is just a way

8  of saying security of the area.

9       Q.    And you just giggled a minute ago.

10            Can you tell me what's so funny about this?

11      A.    Nothing is funny.

12      Q.    Did you ever ask law enforcement the name

13  of the woman you killed?

14      A.    I was kept in the dark for the two months

15  that I was locked up.  I did not know who.

16      Q.    Did you ever ask how you can reach out to

17  the family?  No?

18      A.    No.

19      Q.    And, Mr. Smith, you know now that guns are

20  deadly, don't you?

21      A.    Yes, sir.

22      Q.    And they can go through corrugated metal

23  and through TVs and through temples.

24            You know that now?

25      A.    Yes, sir.

1          MR. NAYBACK:  Court's indulgence.

2          Pass the witness, Your Honor.

3          THE COURT:  Do you have any redirect,

4    Mr. Elsenheimer?

**REDIRECT EXAMINATION**

6    BY MR. ELSENHEIMER:

7    Q.    Mr. Smith, Mr. Nayback just asked you about

8    what you told Detective Abeyta and Special Agent

9    Travis Taylor here.

10          You remember those conversations, right?

11   A.    It would be nice to have them read over.

12   Q.    If you need to look at them, I'll let you

13   have -- you can have a copy.  I have a couple of

14   copies here.

15          Let me ask you a specific question.

16          Mr. Nayback said that you never said

17   anything about thinking that the shadow that you saw

18   next to your trailer had a gun.

19          But that's -- that wasn't true, was it?

20          You actually did say something to both

21   Detective Abeyta and Special Agent Taylor about that.

22          Do you remember saying that?

23   A.    I said I was afraid I was about to be

24   blasted.

25   Q.    Do you want to look at the transcript, and

1    you can tell us what you told them?

2            MR. NAYBACK:  He didn't ask to --

3    objection.  He didn't ask to look at the transcript.

4        Q.   (By Mr. Elsenheimer) Do you want to -- do you

5    want to look at the transcript?

6        A.    I do.

7            THE COURT:  Hold on one second.

8            MR. ELSENHEIMER:  Sure.

9            THE COURT:  Now the witness has not

10   indicated that he needs to have his recollection

11   refreshed, so no transcript at the moment.

12           THE WITNESS:  Didn't I say that I would

13   like to see them?

14           THE COURT:  So you may continue,

15   Mr. Elsenheimer.

16       Q.   (By Mr. Elsenheimer) Mr. Smith, do you

17   remember what you told Detective Abeyta about that?

18       A.    Not completely.

19       Q.    Would it help you remember what you told

20   Detective Abeyta if you look at the transcript?

21       A.    Yes, sir.

22           MR. ELSENHEIMER:  May I approach the

23   witness, Your Honor?

24           THE COURT:  You may.

25           MR. ELSENHEIMER:  Page 14 and 15 of the

1    Abeyta transcript.

2        Q.    (By Mr. Elsenheimer) Mr. Smith, does that

3    help you refresh your memory about --

4        A.    Yes.

5        Q.    -- what you told Detective Abeyta?

6        A.    Yes.

7        Q.    And what did you tell Detective Abeyta?

8        A.    That I was afraid I was -- that the

9    person -- that they were going to start blasting

10   away.

11       Q.    And did you tell Detective Abeyta why you

12   fired your gun?

13       A.    Because I was scared witless.

14       Q.    And you fired your gun to do what?

15       A.    To scare them away.

16       Q.    You used the phrase "eyeballing."

17             Can you tell the jury what you mean by that

18   phrase, if somebody is eyeballing you?

19       A.    When you're looking at somebody intently,

20   they are eyeballing you.  Whether you see their eyes

21   or not, if they're bent over and they're looking at

22   you, you know they are looking at you.

23       Q.    I want to ask you about a couple of other

24   things Mr. Nayback asked you.

25             MR. ELSENHEIMER:  May I have the Elmo?

1     Q.    (By Mr. Elsenheimer) Mr. Smith, Mr. Nayback

2   asked you about whether you had "No Trespassing" signs

3   up or fences up on your property.

4          Was there a fence around three sides of

5   your property?

6     A.    Yes, sir.

7     Q.    You don't need to draw it here, because

8   you've already drawn it for the jury.

9          But that fence was up in May of 2018?

10    A.    Yes, sir.

11    Q.    Mr. Nayback asked you if you told

12  Detective Abeyta or Agent Taylor that you had closed

13  the motel in 2014.

14         Did they ever ask you if you -- when you

15  closed the motel?

16    A.    They never asked.

17    Q.    I'm going to ask you about the incident

18  where an intruder was in your bus on your property.

19         Do you remember we just discussed that?

20    A.    Yes.

21    Q.    Mr. Nayback asked you about that, and asked

22  you about you trying to keep that person on the bus.

23         When the police came by your house, what

24  did they tell you, you should have done?

25    A.    They told me that I should have kept him in

1    the bus.

2        Q.    And when you -- and when that person left,

3    did you run after that person?

4        A.    Yes, I did.

5        Q.    And what did they say to you?

6        A.    After he climbed out through the fence and

7    onto the sidewalk behind the other property, as he

8    was walking away, he turned around and looked at me

9    and he said, "I'll be back."

10       Q.    Was this in the middle of the day?

11       A.    It was about 4:00 p.m.

12       Q.    Was it light outside?

13       A.    Yes, sir.

14       Q.    Mr. Smith, tell us where you have your

15   phone in your house.

16           Well, you know, that's a bad question.

17       A.    It's in my kitchen.

18       Q.    Is it a landline?

19       A.    Yes.

20       Q.    Did you have a cell phone in May of 2018?

21       A.    No.

22       Q.    When you saw a woman laying in your

23   driveway, why did you go out to the front of the

24   property?

25       A.    To see if there was anyone else there.

1      Q.    How long did it take you to get from --
2      A.    Less than a minute.
3      Q.    -- the back of the driveway to the front of
4    the property and back?
5      A.    Less than a minute.
6      Q.    And when you spoke with Ercilia Trujillo,
7    how long did it take for you to get from there, where
8    you spoke with Ercilia Trujillo, into your house and
9    make the call to 911?
10     A.    A little over a minute and 15 seconds or
11   so, give or take.
12     Q.    Did you call 911?
13     A.    Yes, sir.
14     Q.    When you got into the house, did you call
15   911 immediately?
16     A.    Yes.
17           MR. ELSENHEIMER:  May I have a moment,
18   Your Honor?
19           THE COURT:  You may.
20     Q.    (By Mr. Elsenheimer) Mr. Smith, I want to
21   show you the Government's Exhibit 36.
22           This is a diagram that you drew along --
23   for Detective Abeyta.
24           Do you remember drawing this?
25     A.    Yes, sir.

1      Q.      -- diagram?

2              And do you see the lines that are there

3      that describe -- I'm pointing to -- let me point to a

4      couple of lines right here (indicating).

5              There's a line here (indicating) and a line

6      here (indicating).

7              Tell us why you drew those lines for

8      Detective Abeyta.

9      A.      To indicate the general direction that I

10     was shooting.

11     Q.      And were these lines drawn in a sequential

12     order, so that you were showing where you fired the

13     first shot, the second shot, the third shot, the

14     fourth shot?

15     A.      No.

16     Q.      Why did you draw the lines like this?

17     A.      Because that's roughly the angle that I had

18     from the edge of my mom's trailer out.

19     Q.      And was that to describe the general

20     direction of where you were firing?

21     A.      The general direction.

22     Q.      Was it to describe the individual shots

23     that you fired?

24     A.      No.  Because if it was, we would have some

25     that go into the shed over here (indicating) and into

1    the tree there (indicating).

2        Q.    And the same with Government's Exhibit 63.

3              Do you see a similar diagram?

4        A.    Yes, sir.

5        Q.    And do you see lines where you describe the

6    shots that you fired?

7        A.    Yes.

8        Q.    And is one labeled "The First Shot"?

9        A.    Yes.

10       Q.    And can you describe that in relationship

11   to the trailer?

12       A.    Just behind the trailer.

13       Q.    The other lines, were those drawn in a

14   sequential order, in terms of the second shot and the

15   third shot?

16       A.    No, just to kind of sketch.

17       Q.    And what are those lines designed -- or

18   what did you intend them to depict for Agent Taylor?

19       A.    The general area that I was firing.

20       Q.    And what is in that general direction?

21       A.    The woodpile is behind there and the big

22   tin shed.

23       Q.    Mr. Smith, when you stepped out of your --

24   on your back porch and you saw somebody at your

25   mother's trailer, what did you see that person trying

1    to do?

2                MR. NAYBACK:  Objection, asked and

3    answered.  This has been gone over in direct

4    examination.  We're rehashing old ground.

5                THE COURT:  Overruled.

6                Go ahead.

7        A.    The person's back was to me.  They were --

8    I could see their hands to the side, and they were

9    jiggling the doorknob.

10       Q.    (By Mr. Elsenheimer) Thank you.

11              And then after that, what did they do?

12   I know you described this for Mr. Nayback, but I'd

13   like you to describe it one more time.

14       A.    The person turned around and crouched down

15   and was intently looking at me.

16       Q.    And what did you feel in that moment right

17   there?

18       A.    In that moment I thought I was about to be

19   shot.

20       Q.    And you did what?

21       A.    I cocked the gun and fired to the side,

22   fired a warning shot, to scare the person away.

23       Q.    And then the person did what?

24       A.    Ran off.

25       Q.    And where did you think they ran to?

```
 1        A.    They ran past the area where I was

 2   shooting.  They ran up the parking lot and out.

 3        Q.    Did you think they had left your property?

 4        A.    Yes, I did.

 5        Q.    And what did you -- what were you still

 6   feeling in that moment?

 7        A.    Absolute terror.

 8        Q.    And what did you do then?

 9              MR. NAYBACK:  Objection, Your Honor.  This

10   has all been testified to by direct examination.

11   He's simply telling the story a second time.

12              MR. ELSENHEIMER:  It was brought out on

13   cross.

14              MR. NAYBACK:  Yes.  This is redirect,

15   though.

16              THE COURT:  So I don't think you're

17   addressing specific points that were made on cross.

18   I have given you some leeway, but you -- if you could

19   be more specific, if there's something that you're

20   trying to deal with that was mentioned on cross.

21        Q.    (By Mr. Elsenheimer) Mr. Smith, did you think

22   there was anyone between where you were standing on

23   your back patio and the woodpile?

24              Did you think there was anyone between

25   there?
```

1      A.    No.

2      Q.    Did you think that you could hit anyone?

3      A.    No.

4            MR. ELSENHEIMER:  May I have a moment,

5      Your Honor?

6            THE COURT:  You may.

7            MR. ELSENHEIMER:  Nothing further,

8      Your Honor.

9            THE COURT:  All right.

10           Mr. Smith, you may return to your seat, and

11     the defense may call its next witness.

12           MR. ELSENHEIMER:  The defense rests.

13           THE COURT:  All right.

14           Does the Government have any rebuttal

15     testimony?

16           MS. WILSON:  No, Your Honor.  Thank you.

17           THE COURT:  All right.

18           So, ladies and gentlemen of the jury, the

19     evidence in this case is now closed.  It is 11:39.

20     So I will take a little longer lunch break than we

21     normally take, because I will need to get together

22     with the attorneys to put some issues on the record,

23     as they relate to some of the instructions that the

24     Court will give to the jury.

25           When we return after lunch, at about 1:30,

1    we will proceed with the Court's instructions to the

2    jury.  And then after that, the attorneys will be

3    given an opportunity to make their closing arguments.

4            And the way that works is the Government

5    goes first, to make their closing argument.  The

6    defense will then have the opportunity to make a

7    closing argument.  And then the Government, because

8    the Government has the burden of proof, will have an

9    opportunity to make a rebuttal argument.

10           After that the case will be submitted to

11   you for your deliberations.

12           So we will plan on reconvening -- I'm going

13   to say, let's -- let's try to come back maybe around

14   1:15.  If we need to take a little bit longer, again

15   please have patience, bear with us.

16           But if we start a little bit earlier, then

17   I feel like it just gives us more time to get as much

18   done as possible this afternoon.

19           So let's plan on reconvening at about 1:15.

20           Again, I remind you during your lunch break

21   do not discuss this case with anyone, including each

22   other.

23           And enjoy your lunch break.

24           See you around 1:15.

25           (Whereupon the jury exited the courtroom.)

1           (A recess was taken.)

2           (Open court, outside the presence of the

3     jury.)

4           THE COURT:  Please be seated.  All right.

5     We are back on the record.

6           And at this time I'll take objections to

7     the Court's instructions.

8           I'll start with the Government.

9           Do you have any objections?

10          MS. WILSON:  No objections, Your Honor.

11          THE COURT:  All right.

12          The defense, are there objections?

13          MS. LAVIN:  Your Honor, we have objections

14    to Instruction 14.  There were no stipulations, or do

15    you want me to go through them one-by-one?

16          THE COURT:  Yes, please.

17          MS. LAVIN:  Okay.  So we have an objection

18    to Instruction Number 6, which instructs the jury on

19    the elements of involuntary manslaughter.

20          THE COURT:  All right.  And the basis for

21    your objection?

22          MS. LAVIN:  The basis for the objection,

23    Your Honor, is that from the beginning, the

24    Government has proceeded on a theory of second-degree

25    murder.  That's the single count in the indictment in

1    this case.

2              The opening statements, all the evidence

3    presented on both sides, has been designed to elicit

4    testimony either in support of or in defense of a

5    second-degree murder charge, not involuntary

6    manslaughter, which has different elements.

7              And so I think to present the jury with

8    this Instruction Number 6 would be confusing, and we

9    don't think there is any basis for it.

10             THE COURT:  All right.

11             Do you have a response, Ms. Wilson?

12             MS. WILSON:  Again, Your Honor, the

13   United States believes it's a lesser-included offense

14   of second-degree murder.  There was evidence

15   presented to the jury related to recklessness and

16   wanton disregard for human life, which is a part of

17   involuntary manslaughter.

18             But the instruction for the difference

19   between the two, and second-degree murder being an

20   extreme -- of extreme nature of wanton and careless

21   disregard, we feel that that's for the jury to

22   decide, if they have evidence.

23             There is evidence to support a

24   lesser-included, and we oppose the objection.

25             THE COURT:  All right.  And the Court will

1    overrule the objection.

2            Next objection?

3            MS. LAVIN:  The next objection is to

4    Instruction Number 15.

5            This instruction instructs the jury to

6    consider certain statements as impeachment evidence

7    only, and not substantive.  And I don't know that

8    there have been any statements introduced that are

9    not substantive evidence.

10           The Government's case is basically what

11   Mr. Smith told law enforcement.  So his statements to

12   law enforcement were brought in as substantive

13   evidence, and he testified.  And I don't think that

14   this instruction has any application.

15           THE COURT:  All right.

16           Do you have a response, Ms. Wilson?

17           MS. WILSON:  Some of the witnesses were

18   impeached with their transcripts.  And, you know, I

19   think the nature of Instruction 15, how it's based on

20   a number of witnesses in general, I believe that's

21   broad enough.

22           And I believe it's consistent with what the

23   jury can do, decide on their own whether or not they

24   can believe somebody's testimony.

25           THE COURT:  All right.

1              Anything else on that issue?

2              MS. LAVIN:  I just think the problem is

3    with -- the jury is going to be weighing heavily in

4    this case the testimony of the defendant.  We don't

5    want there to be any confusion about all the

6    different statements he made and which ones are

7    evidence and which ones are not.

8              THE COURT:  All right.  I'm going to

9    overrule the objection.  My recollection is that

10   there were very -- just a few discrete situations

11   that involved impeachment by a prior statement.  And

12   there was some reference along those lines with

13   Ms. Trujillo yesterday about whether or not she told

14   the -- I forgot how she described the female FBI

15   agent.  But the good-looking FBI agent, no offense.

16   But something about whether or not she had left the

17   room and -- or that she had left the room.

18              And her testimony yesterday was that she

19   never left the room.  And then, of course, a couple

20   of examples that I could give you from the testimony

21   we heard this morning.  And there may have been

22   others that I'm forgetting at the moment.

23              But I do think that the instruction would

24   be helpful to the jury, so I'll overrule the

25   objection.

1          Next?

2          MS. LAVIN:  Our next objection is to

3   Instruction Number 17.  This instruction has to do

4   with whether or not the defendant's statement that

5   was made after the commission of the crime, but not

6   made in court, is reliable.  And I think this really

7   has to do with whether or not it was a voluntary

8   statement.

9          Ordinarily, my experience of instructions

10  is that it's often requested by the defendant when

11  there's a challenge as to some sort of -- you know,

12  the conditions under which the statement was made,

13  and that's not the case here.

14         Mr. Smith voluntarily cooperated with law

15  enforcement on several occasions.  There were no

16  challenges to his out-of-court statements from the

17  defense.

18         And it's -- these things are just not an

19  issue.  And so I think if the jury were to be looking

20  at this instruction, considering things like his age

21  and his gender and his training and education and

22  occupation, and thinking about whether or not that is

23  reliable or credible, I think they're being asked to

24  consider the defendant's testimony in a way that's

25  different than all the other witnesses.  And I just

1    don't think there's any application of this either.

2    And I think it runs the risk of confusing the jury.

3              THE COURT:  All right.

4              Do you have a response, Ms. Wilson?

5              MS. WILSON:  As defense has stated, I think

6    this is something the defense typically asks for.

7    And I think, you know, given the context of this, he

8    did make two voluntary statements.  He did have

9    Miranda forms.

10             But there was also a little bit of a

11   colloquy on cross-examination about his statements to

12   those law enforcement officers, whether or not being

13   under oath.

14             And I think this language, Instruction

15   Number 17, would be helpful to the jury and we would

16   oppose the objection.

17             THE COURT:  I will overrule the objection

18   and will give Instruction Number 17.

19             Any other objections?

20             MS. LAVIN:  We would object to Instruction

21   Number 18, Your Honor.  This has to do with evidence

22   of other acts engaged in by the defendant.

23             The jury will be instructed to consider

24   that evidence as it bears on the opportunity, motive,

25   intent, preparation, plan or absence of mistake in

1    this case.

2            And we just think that all of the other

3    acts that were testified to in court were not bad

4    acts, and so they fall outside the scope of what this

5    instruction contemplates.

6            THE COURT:  Do you have a response,

7    Ms. Wilson?

8            MS. WILSON:  Yes, Your Honor.  As the 404B

9    instruction, this Court has admitted by order some of

10   defendant's 404B, as it relates to prior bad acts,

11   shooting at another person who was on his property.

12           But in addition to that, the United States

13   did notice in its 404B motion the phrase "motel cop."

14   Defense has opened the door to that.  The Court did

15   rule that the United States was able to get into

16   that.

17           And with those two pieces of 404B evidence,

18   we believe this instruction is appropriate.

19           THE COURT:  Okay.  Again, I'll overrule the

20   objection.  I do think that there was evidence that

21   was presented that meets -- meets the language that

22   I've included in Instruction Number 18.  The prior

23   incident where the defendant shot is one example, and

24   that was the primary example I had in mind when I

25   included this.  So I'll overrule the objection.

1          Other objections?

2          MS. LAVIN:  No other objections.  Thank

3    you.

4          THE COURT:  No other?  All right.

5          So we will bring the jury in.

6          MS. LAVIN:  Your Honor, I apologize.  We

7    have one other objection, and that is the Court's

8    admission of the proposed instruction of the

9    incident.  It's a New Mexico State Jury Instruction,

10   NM UJI 14-5140.

11         This is an instruction to the jury that

12   would ask them to consider whether or not, as it's

13   presented, that the killing of Jane Doe was an

14   accidental or excusable homicide, and that was

15   submitted to the Court.

16         And so there's a Ninth Circuit case that we

17   cited in that proposed instruction, *United States*

18   *versus Lesina*.  It's 833 F.2d 156.

19         And I think that that -- there's precedent

20   for this instruction, in that when evidence has been

21   presented that the defendant accidentally killed

22   someone, while acting otherwise in a lawful manner,

23   that this type of instruction is imperative.

24         And so for that reason, we would ask that

25   the Court instruct the jury on accidental homicide.

 1    And I think that there is support in the law for

 2    using a New Mexico State Jury Instruction, because

 3    Mr. Smith is a non-Indian.  He resides in the City of

 4    Espanola.  This case was originally charged in State

 5    Court.  He had no way of knowing that the person he

 6    accidentally shot was an Indian, and he had no way of

 7    knowing that his land was former -- former Santa

 8    Clara Pueblo land, and that federal laws and

 9    jurisdiction would apply.

10           So this is an instruction that would

11    otherwise be available to him, were it not for those

12    things that are completely out of his control.

13           So I think he does have a Fifth Amendment

14    due process right to this instruction.

15           THE COURT:  Do you have a response,

16    Ms. Wilson?

17           MS. WILSON:  Yes, Your Honor.

18           The defense's continual effort to state

19    that things that he should be entitled to in State

20    Court are not appropriate.  This is a Federal case.

21    We've established Federal jurisdiction.  This Court

22    has an order determining that the location where Jane

23    Doe was killed was, in fact, Indian Country.

24           We've met the -- evidence was presented

25    that the defendant is a non-Indian, she's an Indian.

1    As a preliminary matter, jurisdiction is appropriate

2    in this Court.

3            As a secondary matter, there's no evidence

4    to show excusable homicide.  No evidence has been

5    presented that the gun was accidentally discharged.

6    We would oppose this instruction.  It's a State

7    instruction.  Again, we're in Federal court.

8            THE COURT:  Anything further?

9            MR. ELSENHEIMER:  One last thing,

10   Your Honor.  We would -- well, we would move again

11   for our Rule 29 motion for directed verdict.

12           THE COURT:  Can I finish jury instructions?

13           MR. ELSENHEIMER:  Sure.  Sorry.

14           THE COURT:  Anything else on this

15   instruction?

16           MS. LAVIN:  Well, I think, again, it's just

17   a due process issue.  I mean, these are things that,

18   you know, Mr. Smith shouldn't be required to evaluate

19   what instructions, what defenses he's entitled to,

20   based on things that are completely out of his

21   control.

22           And so he's not on notice that, you know,

23   what kind of -- how he's supposed to lawfully act,

24   essentially.  So that's the due process issue.

25           THE COURT:  Well, I will deny the

1   defendant's request for jury -- requested Jury

2   Instruction Number 7A, excusable homicide.  This is a

3   case that is in the Federal jurisdiction.

4          The Court has included Instruction

5   Number 8, which is not exactly an accident, but it is

6   an instruction regarding non-premeditated killing,

7   and describes that it may be second-degree,

8   manslaughter, or no crime at all.

9          So if you feel that the Government has

10  failed to meet its burden on any of the elements, you

11  can argue that to the jury.  So --

12         MS. LAVIN:  Thank you.

13         THE COURT:  And now, Mr. Elsenheimer, you

14  had something else?

15         MR. ELSENHEIMER:  Yes, Your Honor.  Sorry.

16  I just wanted to move again for a directed verdict,

17  Rule 29.

18         And I don't need to argue that.  We would

19  just reference what we argued at the original Rule 29

20  motion, but I want to raise that for purposes of the

21  record.

22         THE COURT:  All right.  And I don't know if

23  you want to say anything for the record, Mr. Nayback,

24  Ms. Wilson?

25         MR. NAYBACK:  I don't.

```
 1              THE COURT:  All right.  And the Court
 2   denies the motion for the same reasons previously.
 3              Are we ready for the jury?
 4              MR. NAYBACK:  We are.
 5              THE COURT:  So I will instruct the jury,
 6   and then we will go straight to closing arguments.
 7              How much time would you like on closing?
 8              MS. WILSON:  I believe 20 for closing, and
 9   up to maybe 20, probably less, for redirect.
10              THE COURT:  For rebuttal?
11              MS. WILSON:  Rebuttal.  Thank you,
12   Your Honor.
13              THE COURT:  And how much time do you need?
14              MR. ELSENHEIMER:  20 minutes, but I don't
15   think I will take that long.
16              THE COURT:  All right.  And do either of
17   you want any kind of a warning, two-minute warning or
18   anything?
19              You don't have to, but if you get to your
20   time allotment, I will.
21              MR. ELSENHEIMER:  Maybe I should ask for
22   25, just to make sure I don't get long winded.
23              (Whereupon the jury entered the courtroom.)
24              (Whereupon the following proceedings were
25   held in Open Court.)
```

```
 1              THE COURT:  Ladies and gentlemen of the
 2    jury, I will read to you the Court's instructions.
 3    Of course you're free to take notes if you'd like,
 4    but rest assured, each of you will be getting a copy
 5    of these instructions when you go to deliberate, so
 6    each of you will have your own version that you can
 7    refer to if you need to.
 8              So I will read these instructions.  It may
 9    take 30 minutes or so.
10              After I finish reading the instructions, I
11    will call on the Government for their closing
12    argument.
13              Next, I will -- I'll give the Government
14    20 minutes or so.  I'll give the defense 20,
15    25 minutes, to make their closing argument.  I'll
16    give the Government another 20 or so to make their
17    rebuttal argument.
18              And so we will probably have to take some
19    kind of a short break, depending on how quickly
20    these things go.
21              So if anybody needs a break, just raise
22    your hand and we'll do what we can to accommodate
23    you.
24              My preference would be not to take a break
25    during an argument.  So if everyone can -- can hold
```

1    on for the instructions and then another 20 minutes

2    or so beyond that, it's just my preference not to

3    break up an argument.

4              So -- all right.

5              So, members of the jury, in any jury trial

6    there are, in effect, two judges.  I am one of the

7    judges.  You are the other.  I am the judge of the

8    law.  You, as jurors, are the judges of the facts.

9              I presided over the trial and decided what

10   evidence was proper for your consideration.  It is

11   also my duty at the end of the trial to explain to

12   you the rules of law that you must follow and apply

13   in arriving at your verdict.

14             In explaining the rules of law that you

15   must follow, first I will give you some general

16   instructions which apply in every criminal case.  For

17   example, instructions about burden of proof and

18   insights that may help you to judge the believability

19   of witnesses.

20             Then I will give you some specific rules of

21   law that apply to this particular case.

22             And finally, I will explain the procedures

23   you should follow in your deliberations and the

24   possible verdicts you may return.

25             These instructions, as I said a moment ago,

1    will be given to you for your use in the jury room,

2    so you need not take notes, but you certainly may if

3    you choose to.

4              You, as jurors, are judges of the facts.

5    But in determining what actually happened; that is,

6    in reaching your decision as to the facts, it is your

7    sworn duty to follow all of the rules of law as I

8    explain them to you.

9              You have no right to disregard or give

10   special attention to any one instruction or to

11   question the wisdom or correctness of any rule I may

12   state to you.

13             You must not substitute or follow your own

14   notion or opinion as to what the law is or ought to

15   be.

16             It is your duty to apply the law as I

17   explain it to you, regardless of the consequences.

18   However, you should not read into these instructions

19   or anything else I may have said or done, any

20   suggestion as to what your verdict should be.  That

21   is entirely up to you.

22             It is also your duty to base your verdict

23   solely upon the evidence without prejudice or

24   sympathy.  That was the promise you made and the oath

25   you took.

1          The defendant is charged by the Indictment

2     as follows.

3          On or about May 5, 2018, in Indian Country,

4     in Rio Arriba County, in the District of New Mexico,

5     the defendant, Douglas D. Smith, a non-Indian,

6     unlawfully killed Jane Doe, an Indian, with malice

7     aforethought, in violation of 18 United States Code

8     Sections 1152 and 1111.

9          The Government has the burden of proving

10    the defendant guilty beyond a reasonable doubt.  The

11    law does not require a defendant to prove his

12    innocence or produce any evidence at all.

13         The Government has the burden of proving

14    the defendant guilty beyond a reasonable doubt.  And

15    if it fails to do so, you must find the defendant not

16    guilty.

17         Proof beyond a reasonable doubt is proof

18    that leaves you firmly convinced of the defendant's

19    guilt.

20         There are few things in this world that we

21    know with absolute certainty.  And in criminal cases,

22    the law does not require proof that overcomes every

23    possible doubt.  It is only required that the

24    Government's proof exclude any reasonable doubt

25    concerning the defendant's guilt.

1          A reasonable doubt is a doubt based on

2    reason and common sense after careful and impartial

3    consideration of all the evidence in the case.

4          If, based on your consideration of the

5    evidence, you are firmly convinced that the defendant

6    is guilty of the crime charged, you must find him

7    guilty.

8          If, on the other hand, you think there is a

9    real possibility that he is not guilty, you must give

10   him the benefit of the doubt and find him not guilty.

11         The defendant is charged with second-degree

12   murder in violation of 18 United States Code

13   Sections 1152 and 1111.

14         This law makes it a crime to unlawfully

15   kill a human being with malice aforethought.

16         To find the defendant guilty of this crime

17   you must be convinced that the Government has proved

18   beyond a reasonable doubt:

19         First, the defendant caused the death of

20   Jane Doe.

21         Second, the defendant killed Jane Doe with

22   malice aforethought.

23         Third, the defendant is a non-Indian.

24         Fourth, Jane Doe is an Indian.

25         And fifth, the killing took place within

1    Indian Country.

2            To kill with malice aforethought means

3    either to kill a person deliberately and

4    intentionally, or to act with callous and wanton

5    disregard for human life.

6            Malice aforethought is an element that may

7    be established by evidence of conduct that is

8    reckless and wanton and a gross deviation from a

9    reasonable standard of care, and of such a nature

10    that it may be inferred the defendant was aware of a

11    serious risk of death or serious bodily harm.

12            To find malice aforethought you need not be

13    convinced that the defendant hated the person killed

14    or felt ill will toward the victim at the time.

15            In determining whether the killing was with

16    malice aforethought, you may consider the use of a

17    weapon or instrument and the manner in which death

18    was caused.

19            It is not necessary for the Government to

20    prove that the defendant acted with premeditated

21    intent to kill.  Premeditation is typically

22    associated with killing in cold blood and requires a

23    period of time in which the accused deliberates or

24    thinks the matter over before acting.

25            You are instructed that the alleged murder

1    occurred in Indian Country, if you find beyond a

2    reasonable doubt that such -- let me start that

3    again.

4           You are instructed that the alleged murder

5    occurred in Indian Country, if you find beyond a

6    reasonable doubt that such offense occurred in the

7    location described in the Indictment.

8           If you unanimously find the defendant not

9    guilty of the offense charged, or if, after all

10   reasonable efforts you are unable to agree on a

11   verdict as to that offense, then you must determine

12   whether the defendant is guilty or not guilty of

13   involuntary manslaughter.

14          The difference between these two offenses

15   is that to convict the defendant of involuntary

16   manslaughter, the Government does not have to prove

17   malice aforethought.

18          Malice aforethought is an element of the

19   greater offense of second-degree murder, but not of

20   the lesser-included offense of involuntary

21   manslaughter.

22          The law regarding involuntary manslaughter

23   makes it a crime to unlawfully kill a human being

24   without malice.

25          The difference between these two offenses

1    is that to convict the defendant of involuntary

2    manslaughter, the Government does not have to prove

3    malice aforethought.

4            Malice aforethought is an element of the

5    greater offense of second-degree murder, but not of

6    the lesser-included offense of involuntary

7    manslaughter.

8            The law regarding involuntary manslaughter

9    makes it a crime to unlawfully kill a human being

10   without malice:

11           One, while committing an unlawful act not

12   amounting to a felony.

13           Or, two, while committing a lawful act in

14   an unlawful manner or without due caution and

15   circumspection, which act might produce death.

16           For you to find the defendant guilty of

17   involuntary manslaughter the Government must prove

18   each of the following elements beyond a reasonable

19   doubt:

20           First, the defendant caused the death of

21   Jane Doe.

22           Second, Jane Doe was killed while the

23   defendant was committing a lawful act in an unlawful

24   manner or without due caution and circumspection

25   which act might produce death.

1            Third, the defendant is a non-Indian.

2            Fourth, Jane Doe is an Indian.

3            And fifth, the killing took place within

4    Indian Country.

5            In order to prove this offense the

6    Government need not prove that the defendant

7    specifically intended to cause the death of the

8    victim, but it must prove more than the defendant was

9    merely negligent or that he failed to use reasonable

10   care.

11           To prove that defendant committed

12   involuntary manslaughter, the Government must show

13   that his conduct was grossly negligent and that he

14   had actual knowledge that his conduct was a threat to

15   the lives of others, or he had knowledge of such

16   circumstances as could reasonably be said to have

17   made foreseeable to him the peril to which his acts

18   might subject others.

19           The Government must prove gross negligence

20   amounting to wanton and reckless disregard for human

21   life.

22           The substantive distinction between

23   second-degree murder and involuntary manslaughter is

24   the severity of the risk -- excuse me -- the severity

25   of the reckless and wanton behavior.

1          Second-degree murder involves reckless and

2     wanton disregard for human life that is extreme in

3     nature, while involuntary manslaughter involves

4     reckless and wanton disregard that is not extreme in

5     nature.

6          If you are convinced that the Government

7     has proved all of these elements beyond a reasonable

8     doubt, you may find the defendant guilty of the

9     lesser-included offense.

10          If you have a reasonable doubt about any of

11     these elements, then you must find the defendant not

12     guilty of the lesser-included offense.

13          You are instructed that the alleged murder

14     occurred in Indian Country, if you find beyond a

15     reasonable doubt that such offense occurred in the

16     location described in the Indictment.

17          Wanton is defined as unreasonably or

18     maliciously risking harm while being utterly

19     indifferent to the consequences.

20          A non-premeditated killing may be

21     second-degree murder, manslaughter, or no crime at

22     all.

23          The distinction between second-degree

24     murder, involuntary manslaughter, or finding the

25     defendant not guilty, is whether the defendant had

1    the requisite mental state for the charged crime,

2    second-degree murder, or the lesser-included offense,

3    involuntary manslaughter.

4         If you have a reasonable doubt about the

5    elements of second-degree murder, and you have a

6    reasonable doubt about any of the elements of

7    involuntary manslaughter, then you must find the

8    defendant not guilty of both offenses.

9         You will note that the indictment charges

10   that the crimes were committed on or about May 5th,

11   2018.  The Government must prove beyond a reasonable

12   doubt that the defendant committed the crimes

13   reasonably near May 15 -- May 5th of 2018.

14        You are instructed, as a matter of law,

15   that 826 North Riverside Drive, Espanola, New Mexico,

16   in Rio Arriba County, in the District of New Mexico,

17   is Indian Country, which is the territorial

18   jurisdiction of the United States.

19        As used in these instructions, the term

20   "Indian" means a person who:

21        One, has some Indian blood.

22        And, two, is recognized as an Indian by a

23   tribe or the Federal Government.

24        You are instructed as a matter of law, that

25   the Santa Clara Pueblo is a federally recognized

1    Indian tribe.

2            You must make your decision based only on

3    the evidence that you saw and heard here in court.

4            Do not let rumors, suspicions, or anything

5    else that you may have seen or heard outside of court

6    influence your decision in any way.

7            The evidence in this case includes only

8    what the witnesses said while they were testifying

9    under oath, the exhibits that I allowed into

10   evidence, any stipulations that the lawyers agreed

11   to, and the facts that I have judicially noticed.

12   Nothing else is evidence.

13           The lawyers' statements and arguments are

14   not evidence.  Their questions and objections are not

15   evidence.

16           My legal rulings are not evidence, and my

17   comments and questions are not evidence.

18           During the trial, I did not let you hear

19   the answers to some of the questions that the lawyers

20   asked.  I also ruled that you could not see some of

21   the exhibits that the lawyers wanted you to see, and

22   sometimes I ordered you to disregard things that you

23   saw or heard, or I struck things from the record.

24           You must completely ignore all of these

25   things.  Do not even think about them.  Do not

1    speculate about what a witness might have said or

2    what an exhibit might have shown.  These things are

3    not evidence, and you are bound by your oath not to

4    let them influence your decision in any way.

5            There are, generally speaking, two types of

6    evidence from which a jury may properly determine the

7    facts of the case.

8            One is direct evidence, such as the

9    testimony of an eyewitness.  The other is indirect,

10   or circumstantial evidence; that is, the proof of a

11   chain of facts which point to the existence or

12   nonexistence of certain facts.

13           As a general rule, the law makes no

14   distinction between direct and circumstantial

15   evidence.

16           The law simply requires that you find the

17   facts in accord with all of the evidence in the case,

18   both direct and circumstantial.

19           While you must consider only the evidence

20   in this case, you are permitted to draw reasonable

21   inferences from the testimony and the exhibits;

22   inferences you feel are justified in the light of

23   common experience.

24           An inference is a conclusion that reason

25   and common sense may lead you to draw from the facts

1    which have been proved.

2           By permitting such reasonable inferences,

3    you may make deductions and reach conclusions that

4    reason and common sense lead you to draw from the

5    facts which have been established by the testimony

6    and the evidence in the case.

7           I remind you that it is your job to decide

8    whether the Government has proved the guilt of the

9    defendant beyond a reasonable doubt.

10          In doing so, you must consider all of the

11   evidence.  This does not mean, however, that you must

12   accept all of the evidence as true or accurate.  You

13   are the sole judges of the credibility or

14   believability of each witness and the weight to be

15   given to the witnesses' testimony.

16          An important part of your job will be

17   making judgments about the testimony of the

18   witnesses, including the defendant, who testified in

19   this case.

20          You should think about the testimony of

21   each witness you have heard and decide whether you

22   believe all or any part of what each witness has

23   said, how important that testimony -- and how

24   important that testimony was.

25          In making that decision, I suggest that you

1    ask yourself a few questions.

2              Did the witness impress you as honest?

3              Did the witness have any particular reason

4    not to tell the truth?

5              Did the witness have a personal interest in

6    the outcome of the case?

7              Did the witness have any relationship with

8    either the Government or the defense?

9              Did the witness seem to have a good memory?

10             Did the witness clearly see or hear the

11   things about which he or she testified.

12             Did the witness have the opportunity and

13   ability to understand the questions clearly and

14   answer them directly?

15             Did the witness' testimony differ from the

16   testimony of other witnesses?

17             When weighing the conflicting testimony,

18   you should consider whether the discrepancy has to do

19   with a material fact or with an unimportant detail.

20             And you should keep in mind that innocent

21   misrecollection, like failures of recollection, is

22   not uncommon.

23             The testimony of the defendant should be

24   weighed and his credibility evaluated in the same way

25   as any other witness.

         In reaching a conclusion on a particular

point, or ultimately in reaching a verdict in this

case, do not make any decisions simply because there

were more witnesses on one side than on the other.

         You have heard the testimony of a number of

witnesses.  You have heard that before this trial he

or she may have made a statement that may be

different from his or her testimony here in court.

         These earlier statements were brought to

your attention to help you decide how believable his

or her testimony in this trial was.

         You cannot use it as proof of anything

else.  You can use it as one way of evaluating his or

her testimony here in court.

         During the trial, you heard the testimony

of Dr. Matthew Cain, M.D., who expressed opinions

concerning the nature of Jane Doe's injuries and the

cause of her death.

         You also heard the testimony of Bryan Acee,

who expressed opinions concerning the firearm, and

the testimony of Theodore Chavez, who expressed

opinions concerning firearm trajectory.

         In some cases, such as this one,

scientific, technical, or other specialized knowledge

may assist the jury in understanding the evidence or

1    in determining a fact in issue.

2             A witness who has knowledge, skill,

3    experience, training, or education may testify and

4    state an opinion concerning such matters.

5             You are not required to accept such an

6    opinion.  You should consider opinion testimony just

7    as you consider other testimony in this trial.  Give

8    opinion testimony as much weight as you think it

9    deserves, considering the education and experience of

10   the witness, the soundness of the reasons given for

11   the opinion, and other evidence in the trial.

12            Evidence has been presented about a

13   statement attributed to the defendant alleged to have

14   been made after the commission of the crime charged

15   in this case, but not made in court.

16            Such evidence should always be considered

17   by you with caution and weighed with care.  You

18   should give any such statements the weight you think

19   it deserves after considering all the circumstances

20   under which the statement was made in determining

21   whether any such statement is reliable and credible,

22   consider factors bearing on the voluntariness of the

23   statement.  For example, consider the age, gender,

24   training, education, occupation and physical and

25   mental condition of the defendant and any evidence

1    concerning his treatment while under interrogation,

2    if the statement was made in questioning by

3    Government officials and all the other circumstances

4    in evidence surrounding the making of the statement.

5              After considering all this evidence, you

6    may give such weight to the statement as you feel it

7    deserves under all of the circumstances.  If you

8    determine that the statement is unreliable or not

9    credible, you may disregard the statement entirely.

10             You have heard evidence of other acts

11   engaged in by the defendant.  You may consider that

12   evidence only as it bears on the defendant's

13   opportunity, motive, intent, preparation, plan,

14   absence of mistake or accident and for no other

15   purpose.

16             Of course, the fact that the defendant may

17   have previously committed an act similar to the one

18   charged in this case does not mean that the defendant

19   necessarily committed the act charged in this case.

20             During this trial you have heard sound

21   recordings of certain conversations.  Some portion of

22   these recordings have been redacted.  The Court has

23   required that certain comments made in the recording

24   should be redacted.  These conversations were legally

25   recorded.  They are a proper form of evidence and may

1  be considered by you as you would any other evidence.

2  You were also given transcripts of those recorded

3  conversation which also includes redacted portions.

4          Keep in mind that the transcripts are not

5  evidence.  They were given to you only as a guide to

6  help you follow what was being said.

7          The recordings themselves are the evidence.

8  If you noticed any difference between what you heard

9  on the recordings and what you read in the

10  transcripts, you must rely on what you have heard,

11  not on what you read.  If you could not hear or

12  understand certain parts of the recording, you must

13  ignore the transcript as far as those parts are

14  concerned.

15          Additionally do not speculate about the

16  statements that have been redacted.  These redactions

17  are not evidence and you must ignore them.  Again,

18  only the recordings themselves are the evidence.

19          You are here to decide whether the

20  Government has proved beyond a reasonable doubt that

21  the defendant is guilty of the crime charged.

22          The defendant is not on trial for any act,

23  conduct, or crime not charged in the Indictment.  It

24  is not up to you to decide whether anyone who is not

25  on trial in this case should be prosecuted for the

1   crime charged.  The fact that another person also may

2   be guilty is no offense to a criminal charge.  The

3   question of the possible guilt of others should not

4   enter into your thinking as you decide whether this

5   defendant has been proven guilty of the crime

6   charged.

7              If you find the defendant guilty, it will

8   be my duty to decide what the punishment will be.

9   You should not discuss or consider the possible

10  punishment in any way while deciding your verdict.

11             In a moment the Court Security Officer will

12  escort you to the jury room and provide each of you

13  with a copy of the instructions that I have just

14  read.  Any exhibits admitted into evidence will also

15  be placed in the jury room for your review.

16             When you go to the jury room you should

17  first select a foreperson who will help to guide your

18  deliberations and will speak for you here in the

19  courtroom.

20             The second thing you should do is review

21  the instructions.  Not only will your deliberations

22  be more productive if you understand the legal

23  principles upon which your verdict must be based, but

24  for your verdict to be valid.  You must follow the

25  instructions throughout your deliberations.

1          Remember you are the judges of the facts
2  but you are bound by your oath to follow the law
3  stated in the instructions.
4          To reach a verdict, whether it is guilty or
5  not guilty, all of you must agree.  Your verdict must
6  be unanimous on each count in the Indictment and your
7  deliberations will be secret.  You will never have to
8  explain your verdict to anyone, you must consult with
9  one another and deliberate in an effort to reach
10 agreement, if you can do so.  Each of you must decide
11 the case for yourself, but only after an impartial
12 consideration of the evidence with your fellow
13 jurors.
14         During your deliberations do not hesitate
15 to reexamine your own opinion and change your mind if
16 convinced that you were wrong.  But do not give up
17 your honest belief solely because of the opinion of
18 your fellow jurors or for the mere purpose of
19 returning a verdict.
20         Remember at all times you are judges,
21 judges of the facts.  You must decide whether the
22 Government has proved the defendant guilty beyond a
23 reasonable doubt.
24         A form of verdict has been prepared for
25 you.  You will get an envelope that has a verdict

1    form in the envelope.  The verdict form states:  We,

2    the jury, find the defendant, Douglas Smith, and then

3    there is a line for you to fill in with the words

4    guilt or not guilty, of second-degree murder as

5    charged in the Indictment.

6           And then there are a couple of paragraphs

7    with some instructions which I will read to you.  If

8    you unanimously find the defendant guilty of

9    second-degree murder as charged in the Indictment,

10   then you are instructed to stop your deliberations

11   and the foreperson should sign and date this verdict

12   form and return it to the Court.

13          The second instruction paragraph says:  If

14   you unanimously find the defendant not guilty of

15   second-degree murder or you cannot unanimously agree

16   on a verdict for second-degree murder, go on to

17   consider the lesser-included offense of involuntary

18   manslaughter.  And then it goes to say:  We, the

19   jury, find the defendant, Douglas Smith, and then the

20   blank line for you to fill in with either guilty or

21   not guilty, of involuntary manslaughter, a

22   lesser-included offense of the charge in the

23   Indictment.  And then dated this blank day of June

24   2021, and then a signature line for the foreperson.

25          That concludes the Court's reading of the

1    instructions.  If everybody is comfortable I would

2    like to proceed with closing arguments.  I don't see

3    anybody looking for a break.

4            Ms. Wilson.

5            MS. WILSON:  Thank you, Your Honor.

6            May it please the Court.

7            THE COURT:  Counsel, you may proceed.

8    **OPENING CLOSING STATEMENT ON BEHALF OF THE GOVERNMENT**

9            MS. WILSON:  Counsel.  Defendant didn't

10   even know if he was shooting at a man or a woman.

11   Initially he thought he had killed Melanie, his

12   tenant's granddaughter.  But he did know that he

13   pulled the trigger faster than he has ever done

14   before when he is shooting in the direction he sees

15   the shadow run.

16           And with each pull of the trigger the

17   defendant is taking an unreasonable risk while

18   utterly indifferent to the consequences of his

19   actions.  And after it is all said and done, the

20   defendant says, Well, it is not Melanie.

21           It may not have been Melanie, but the

22   defendant did shoot and kill Maria Gallegos.  When

23   this trial began we explained to you what the

24   evidence would be and now we detail what the evidence

25   is and how it shows beyond a reasonable doubt that

1    defendant is guilty of second-degree murder.

2            Let's talk about the elements of this case.

3    You heard a little bit about them from Judge Herrera.

4    There are five elements that you need to pay

5    attention to and they are going to be in Jury

6    Instruction Number 5.  The first element you need to

7    consider, the defendant caused the death of Maria

8    Gallegos.  The defendant admitted to law enforcement

9    that he shot the bullets that killed Maria, that

10   entered her left temple.

11           You heard Dr. Cain testify.  You saw the

12   pictures that were extracted from her brain of the

13   two pieces of fragment that were taken out and you

14   saw the entry wound on the side of her temple.  You

15   heard Dr. Cain also testify that the cause of her

16   death, the manner of her death was homicide and that

17   that shot to her left temple caused her death.  It is

18   clear that the defendant caused Ms. Gallegos' death.

19           The second element that you need to pay

20   attention to is that the defendant killed Maria

21   Gallegos with malice aforethought.  And when you are

22   thinking about malice aforethought, it means the

23   defendant acted with callous and wanton disregard for

24   human life.  Take a look at the language in that

25   instruction and when you think of the evidence in

1    this case that shows defendant's conduct was so

2    reckless and wanton.  His conduct was a gross

3    deviation from the reasonable standard of care.  You

4    can also think about the weapon the defendant used,

5    and the manner of Mrs. Gallegos' death.  You can

6    consider the evidence that shows defendant was aware

7    of the serious risk of death or bodily harm caused.

8            You know from testimony that you have heard

9    today and yesterday, this week, that he used a loaded

10   firearm with bullets.  He is not firing blanks.  He

11   is not just trying to make noise, he is using live

12   ammunition.  He is not shooting in the air, he is not

13   shooting in the ground.

14           And when Detective Abeyta asked him, Why

15   aren't you shooting in the air?  He says, Oh, because

16   you are not sure where the bullets are going to go.

17   He is aware of the serious risk of death associated

18   with the shooting of a gun.  He is not trying to make

19   noise, no, he is shooting bullets at a height that

20   can cause death or serious bodily harm.

21           Undoubtedly there is a risk of serious

22   death when you point and pull the trigger of a loaded

23   firearm at a person.  You don't shoot a loaded

24   firearm to scare somebody away, why not, because you

25   can kill somebody.  When you think about wanton, look

at Jury Instruction Number 7.  Wanton is defined as the unreasonable risk the defendant took while being utterly indifferent to the consequences.

You also have been given the instruction for the lesser-included offense of involuntary manslaughter which requires you to consider the severity of the recklessness and wanton behavior.  So you are going to think about the severity and in thinking about that severity, you're instructed that second-degree murder involves reckless and wanton disregard for human life that is extreme in nature.

That is what you need to pay attention for. When considering this difference, think about what defendant did that night.  He knows he sees the shadow of a human being, that shadow is 5'3", Maria Gallegos, in a pink hoody.  She is not approaching the defendant.  She does not have a weapon.  She is not trying to get in the defendant's house.  She is not even in his yard.  She is behind a fence some 30 to 40 feet away.  What does the defendant do?  Does he yell out a warning, no.

Does he use a flashlight to see who is out there, no.

He is standing right there on the porch. He can take a few steps and be inside the safety of

1    his home.  What does he do instead?  He chambers his

2    gun, he points in the direction of the trailer he

3    sees the shadow and he pulls the trigger.  Not once,

4    not twice, but four times.  And he tells

5    Detective Abeyta, I was pulling that trigger faster

6    than I have ever done before.  Bam, bam, bam, bam.

7    You heard that in the recording.

8              In his interview the defendant drew out the

9    directionality of how he was shooting, you saw that.

10   You have seen the exhibits.  He was tracking her with

11   his gunfire, she was running for her life, and you

12   saw the injuries to her forehead.  She hit that

13   pavement hard.

14             And even after shooting Mrs. Gallegos did

15   he try to render aid, no.  He goes over, turns over

16   her body, starts wandering around the property,

17   doesn't call 911 immediately until he is told to by

18   his tenant.  He is standing over somebody he has shot

19   and killed and what does he do, he reports it as an

20   attempted burglary, even though there is no evidence

21   to support his allegations.

22             He knows he is in trouble.  He tells

23   Detective Abeyta in that recording, shit trip had

24   been done.  I couldn't undo it.  I can't bring people

25   back.  And he tells Detective Abeyta, I don't know

 1   who this was and I thought, Well, it is not Melanie.

 2   That is callous and wanton disregard for human life.

 3         The defendant's conduct that night was

 4   extremely reckless and his actions show extreme

 5   wanton disregard for human life.  Why is that?

 6   Because just a month prior to this incident the

 7   defendant shot at a man.  He says the same trailer.

 8   You heard him testify to this.  The same thing, I

 9   shot to miss.  And that man took off running and the

10   defendant says I went pow, pow, pow just like I did

11   with this girl.

12         Shooting in the dark, shooting to miss in

13   the dark, shooting to miss 30 to 40 feet away.  You

14   heard the defendant testify he hadn't used that gun

15   to target practice within at least 15 years and he is

16   telling you-all he is shooting to miss.  This is

17   extreme recklessness.  This demonstrates the

18   defendant's extreme disregard for human life.

19         Think about it, he is pointing and shooting

20   in the direction of human beings absolutely taking an

21   unreasonable risk while being utterly indifferent to

22   the consequences.  He knows it is best to shoot the

23   warning shots in the ground.  What does he do?  He

24   points and shoots at people outside this fenced yard

25   in the dark.  He is shooting at people in the motel

1   parking lot at night.  Again, his conduct, this is

2   extreme, this is second-degree murder.

3         The third element you-all need to pay

4   attention to in this instruction is the defendant is

5   a non-Indian.  You heard his brother testify that

6   they are not enrolled members.  He is not an Indian

7   and this element has been met.

8         The fourth element you need to pay

9   attention for, Maria Gallegos is an Indian.  You can

10  look at Jury Instruction 11 for this one.

11        You heard Geraldine Gutierrez from the

12  Pueblo of Santa Clara testify that it was her opinion

13  that Ms. Gallegos was indeed an enrolled member, you

14  have the certificate of enrollment in your exhibit

15  binder.  Clearly, Maria Gallegos is an Indian.

16        And the fifth element you need to pay

17  attention to is that this killing occurred in Indian

18  Country.  You look at Jury Instruction 10 for that,

19  and it explains as a matter of law, that is

20  important, as a matter of law that 826 North

21  Riverside Drive, Espanola, New Mexico, in Rio Arriba

22  County, in the District of New Mexico is Indian

23  Country.  All you have to think about is did this

24  killing take place at 826 North Riverside Drive and

25  you heard evidence about that.

1          The defendant in this case even admits 826.

2   The fifth element has also been met.

3          Let's move on to Jury Instruction

4   Number 14, which talks about reasonable doubt.  Now

5   as you know, the Government has the burden of proof.

6   The Government is required to present proof to you

7   and that means proof that is based on reason and

8   common sense.  We are not talking about absolute

9   certainty here.  There are very few things in life

10  that you can say are truly certain.  But if you find

11  yourself having doubts in this case, ask yourself is

12  the doubt reasonable, is it based on common sense.

13         Throughout this case the defense is trying

14  to create reasonable doubt where there is not any.

15  The defense is going to bring up arguments that don't

16  have anything to do with the elements.  These

17  arguments are made to confuse you and to get you to

18  think you have doubts when there really aren't any.

19         The defense will argue Ms. Gallegos was

20  breaking in.  Aside from defendant's opinion there is

21  no evidence to support Ms. Gallegos was trying to

22  break in.  He says his trailer was locked.  No one

23  lived in the camper trailer.  He hasn't been in that

24  camper trailer in about ten years.

25         The defendant is going to get up here and

1    call Mrs. Gallegos an intruder.  She did not have any

2    burglary tools on her.  She had no weapons on her.

3    She did not break into anything.  Evidence will

4    show -- the evidence shows she was walking on motel

5    property.  You heard testimony that this property was

6    not gated ed off.  There were no signs indicating

7    that she was trespassing or that it was private

8    property.  It was open to pedestrian traffic, and it

9    was a path to the main road.

10           The defendant tries to tell you he was not

11   looking for trouble.  Wasn't he, though?  He goes

12   outside when he hears the motion detectors go off.

13   He doesn't stay inside where it is safe.  You heard

14   him testify today, he goes on patrol numerous times

15   in the day and in the night, why, because he is the

16   motel cop.

17           The defense may also get up here to argue

18   that Ms. Gallegos had morphine in her blood which has

19   nothing to do with the elements.  The defendant had

20   no idea Ms. Gallegos had morphine in her blood when

21   he shot and killed her.  Is he going it try and

22   suggest that somehow her life is less valuable

23   because of what she had in her pockets?  Why is he

24   doing this?  He is trying to distract you from the

25   undeniable fact that she is dead now because of his

1    extreme recklessness and wanton disregard for human

2    life.

3              Ms. Gallegos did not have to die that

4    night.  The defendant did this.  No matter how you

5    look at it, the defendant took an incredibly,

6    incredibly unreasonable risk while being utterly

7    indifferent to the consequences of his conduct.

8              Ladies and gentlemen, the Government worked

9    hard to present the evidence in a coherent and

10   efficient manner.  We appreciate the time that you

11   have taken to pay attention to all the evidence.

12   After consideration of all the, evidence you should

13   be firmly convinced that the defendant is guilty.

14             We ask you to return a verdict of guilty of

15   second-degree murder.

16             Thank you.

17             THE COURT:  Thank you, Ms. Wilson.

18             Mr. Elsenheimer.

19   **CLOSING STATEMENT ON BEHALF OF THE DEFENDANT**

20             MR. ELSENHEIMER:  Your Honor, Counsel.

21   Good afternoon, ladies and gentlemen.  Thank you for

22   being here.  Thank you for taking the time, listening

23   and, writing notes.  I have seen a lot of you write

24   notes.  I want to thank you for doing that.

25             Mr. Smith is not a criminal.  He did not

1    commit a crime.  In the early morning hours on

2    May 5th, 2018 Douglas Smith was laying in his bed in

3    Espanola, New Mexico, in his house, his private

4    residence.  He was alone in his house and he heard

5    something outside.  He got up, he put on his shoes,

6    put on his jacket, walked to the door, got his .22

7    Luger.  Didn't have a chambered round, walked

8    outside, opened the door, walked outside, he stepped

9    out his back patio on his back step and he looked

10   over at the trailer.  He saw somebody at the trailer

11   door, a figure, at 1:00 in the morning.  1:00 in the

12   morning.  And that figure, that person heard that

13   door shut behind him and that person turned around

14   and crouched down and that person looked at Doug

15   Smith, and Doug Smith's heart started beating, and he

16   was scared.  He had somebody facing him at 1:00 in

17   the morning.

18           THE COURT:  Mr. Elsenheimer, I am sorry,

19   but I need to hear you with the microphone.

20           MR. ELSENHEIMER:  He chambered a round and

21   he fired.  He didn't fire at the person, he fired to

22   miss the person.  He fired on the other side of his

23   trailer and that person ran.  And Doug Smith, scared,

24   terrified that there was an intruder on his property

25   at 1:00 in the morning waited, I think he testified

1    15 seconds.  15 seconds and that person, he says,

2    ran, sprinted.  He thought that person was gone.

3         He was scared and terrified and he wanted

4    to make sure that that person was scared, so he fired

5    three more rounds.  He fired those three rounds at

6    the woodpile.  He never, he certainly never tracked

7    somebody.  He didn't think anybody was there.  He

8    didn't aim at anybody and he had no idea that he was

9    going to hit someone.

10        Doug Smith did not ask for this.  Let's

11   just step back.  He was not out on the streets of

12   Espanola patrolling for crime.  He wasn't walking

13   around on the sidewalk of Riverside or down in the

14   downtown of Espanola looking for crime.  He was

15   laying in his bed at 1:00 in the morning.  Laying in

16   his bed at 1:00 in the morning, listening to his

17   radio.

18        We are not here because he did something

19   wrong, we are here because someone was on his

20   property, on his private property at 1:00 in the

21   morning trying to break into his trailer.  That is

22   why we are here.  And let me take a moment because I

23   want -- the Government said what happened here is

24   tragic, what happened here is a tragedy and I want to

25   say something because they mentioned the morphine.

```
 1          The only reason we mentioned the morphine
 2   and we -- I felt bad about mentioning it.  The only
 3   reason we mentioned the morphine is because they
 4   tried to mislead you to make you think that
 5   Ms. Gallegos was a diabetic.  It is only fair to
 6   Mr. Smith that we point out what really happened in
 7   this case.  What happened here is a tragedy and don't
 8   think for one moment that we don't recognize it for
 9   the tragedy and the terrible, the terrible situation
10   that it is.
11          But Doug Smith is not the one to blame.  He
12   was laying in his bed, he walked out on his back
13   patio and he saw someone at his trailer.  He was
14   gripped by fear, and that is what this case is about.
15          They said I wouldn't mention the elements.
16   Well, I have news for you I can't wait to talk about
17   the elements in this case.  In fact, I want to spend
18   the next couple of minutes talking about these
19   elements because these elements are really important,
20   so I am glad they mentioned it or I am glad they -- I
21   am glad they tried to predict what I would do because
22   I can assure you this is exactly what I am going to
23   do.  I am going to talk about the elements.
24          You are going to have jury instructions.
25   You are going to have Jury Instruction Number 5, and
```

1    I want to ask you to read those instructions very,

2    very carefully.  Jury Instruction Number 5 is the

3    instruction for second-degree murder.  And one of the

4    elements is malice aforethought.  Malice aforethought

5    is defined in this instruction.  It says that that is

6    established by evidence of conduct that is reckless

7    and wanton and a gross deviation from a reasonable

8    standard of care.  Think about that, reckless and

9    wanton and a gross deviation from a reasonable

10   standard of care.

11        And then let's move forward to Jury

12   Instruction Number 7, and that defines wanton.  The

13   reason it defines wanton is because wanton is not a

14   word that is typically used in our day-to-day speech.

15   Frankly, I don't use it ever, but it is used here and

16   it is defined as unreasonably or maliciously risking

17   harm while being utterly indifferent to the

18   consequences.  Unreasonably and maliciously or

19   maliciously risking harm while being utterly

20   indifferent to the consequences.

21        This case is not about wanton conduct.  It

22   is not about conduct that is utterly indifferent to

23   the consequences.  Doug Smith was scared.  This case

24   is about fear.  It is not about malicious malice

25   aforethought.  It is not about wanton and callous

1    disregard for human life.  That is the jury

2    instruction for second-degree murder.

3              You also have a jury instruction, and this

4    is Instruction Number 6, involuntary manslaughter.

5    Involuntary manslaughter says that to prove the

6    defendant committed involuntary manslaughter, the

7    Government must show that his conduct was grossly

8    negligent and that he had actual knowledge that this

9    conduct was a threat to the lives of others or he had

10   knowledge of such circumstances as to reasonably be

11   said to have made foreseeable to him the peril to

12   which his acts might subject others.  Then it goes on

13   to say this:  The Government must prove gross

14   negligence amounting to wanton and reckless disregard

15   for human life.  Again that word wanton.

16             We do not have reckless and wanton

17   disregard for human life.  We have a man who is

18   laying in bed at 1:00 in the morning and he went on

19   to his porch and saw somebody on his property.  What

20   Mr. Smith had in his mind was fear.  What he had in

21   his heart was fear.  That is not wanton.  That is not

22   reckless.  That is not indifference to the

23   consequences of others.  That is fear and that is

24   fear that he didn't bring upon himself.  That is fear

25   that was brought there because somebody intruded on

1    his property at 1:00 in the early morning hours of

2    May 5th.

3              This case is about fear, never forget that.

4    So how do we get here?  How do we end up here?  How

5    did the Federal Government go in to Espanola and

6    prosecute Mr. Smith?  Let's back up.  First of all we

7    are here because Mr. Smith called 911.  They tried to

8    make it seem like he waited, I don't know, that he

9    waited and concocted his story.  He walked out to his

10   driveway, he walked to Riverside Drive and about one

11   minute later he was inside his house making a call.

12   If he had a cell phone, he would probably have called

13   from the driveway.  But he didn't have a cell phone,

14   he had a landline in his house.

15             First thing he called 911 and the police

16   officers arrive.  You heard from Mr. Smith, he, the

17   police officers arrived and they asked him to

18   approach with his hands up.  He did exactly what they

19   wanted him to do.  He spoke with Officer Rael, the

20   first police officer on the scene, or at least the

21   first police officer to speak with Mr. Smith.

22             Mr. Smith told him what happened.

23   Mr. Smith then went and spoke with Detective Abeyta.

24   Two days later he spoke with Agent Taylor and

25   Agent Taylor's colleague Agent Cobb.  Every time

1    Mr. Smith had an opportunity to tell what happened he

2    told the Government and law enforcement what

3    happened.  He has been an open book since Day One.

4            But there is another piece of this puzzle.

5    And I am going it ask you to kind of go back and kind

6    of remember the evidence you heard.  You heard

7    Detective Abeyta testify, you heard investigator, OMI

8    Investigator Gudes.  She is the investigator who

9    drove down from Vallecito.  It took her about an hour

10   to get to Mr. Smith's property.

11           And you heard this from Detective Abeyta.

12   When he and Investigator Gudes were at Mr. Smith's

13   house it was dark, it was late, they didn't have a

14   lot of light.  And as you heard from them they

15   couldn't, they couldn't do much.  It wasn't, they

16   didn't have a lot of light to see, so they believed

17   that Ms. Gallegos had two gunshot wounds to the front

18   of her head, that that is where the gunshot wounds

19   were.  I am not trying to criticize them.  That is an

20   honest mistake.  It was dark, it was night, I

21   completely understand it.

22           And Detective Abeyta went and he put that

23   in his criminal complaint that there were two gunshot

24   wounds to the front of Ms. Gallegos' head.  And but

25   on May 6th he attended an autopsy at the OMI, the

Office of Medical Investigator here in Albuquerque on
August 6th.

You heard Dr. Cain, he was the doctor who
performed that autopsy.  Detective Abeyta attended
that autopsy, and at that autopsy he learned that he
and Investigator Gudes were mistaken that, that there
were not two gunshot wounds to Mrs. Gallegos'
forehead, there was one gunshot wound to her left
temple.

This is what I want to point out about
that.  Not only did he not amend his criminal
complaint to correct that mistake, not only did he
not amend his criminal complaint, he didn't go back
and investigate when he learned that there was a new
fact.  When he learned that they were wrong about
where the gunshot wounds were, when we learned there
was just one gunshot wound to the temple, he did not
go back to Mr. Smith's house to investigate the case
again, to reevaluate what he had seen.

He already charged Mr. Smith.  He didn't
even amend that criminal complaint.  He had already
charged Mr. Smith.  And why didn't he go back and
investigate?  Why didn't he go back to Mr. Smith's
house?  Well, I will tell you why.  Because once they
charged Mr. Smith, once they blamed Mr. Smith, it was

1  over.  That train left the station and it wasn't

2  going back.  He had zero interest in going back to

3  investigate and to reevaluate this case.

4         Why did I say he had zero interest to go

5  back and investigate?  Well, let's look at what he

6  did in this case from Day One, from Minute One when

7  he got to Mr. Smith's house at 1:41 in the morning.

8  He knew why he was out there, that there had been an

9  attempted burglary.  Did he take fingerprints of the

10 trailer or the trailer door or the doorhandle, no.

11         Did he look for footprints, no.

12         Did he take measurements?  The

13 measurements.  I asked him if he had a tape measure

14 and he went out of his way to say that nobody on the

15 Espanola Police had a tape measure, a tape measure.

16 He could have driven down to Walmart and got a tape

17 measure.  He didn't take measurements of Mr. Smith's

18 house when he was investigating the scene for the

19 three hours that he was at Mr. Smith's house at 1:40

20 in the morning until about 3:40 or 3:45, no

21 measurements.

22         He did nothing to investigate that case.

23 Why else would I say he had zero interest in

24 investigating the case?  What did he do on May 5th?

25 So he interviewed Mr. Smith, early in the morning.

1    What did he do later that day?  We heard from

2    Detective Abeyta and we heard from Ms. Trujillo.

3    What did he do?  He went and he interviewed

4    Ms. Trujillo.  He went back to Mr. Smith's house and

5    he interviewed Mr. Smith's neighbor, Ercilia

6    Trujillo.  We know that Detective Abeyta had a little

7    helper there, that that interview was recorded and

8    there was an audio recording of it.  There was video

9    and audio.

10          What did Ercilia Trujillo tell him?  She

11    told him that she heard a woman's voice outside

12    yelling, "Come on, come on, let's go," to someone

13    else.  But why did he say he didn't follow-up on that

14    interview?  Why did he say he didn't pursue an

15    interview with Ercilia Trujillo because she spoke

16    Spanish and he doesn't speak Spanish.  He didn't go

17    and get a Spanish speaking interpreter, did he?  He

18    didn't go and get somebody to try to help him

19    interview Ercilia Trujillo.  And you know what, you

20    heard from Ercilia Trujillo.  You saw her on these

21    televisions.  You heard her.  He didn't need a

22    Spanish speaking interpreter.  Her English is fine.

23    She speaks perfect English.  He could have

24    interviewed her right there, but he didn't.

25          He talked to Ercilia Trujillo, he hears

1    from her that there is a woman's voice yelling to

2    somebody else outside yelling, "Come on, come on."

3            Does he go across the road to the Pizza 9

4    and get surveillance video?

5            Does he go to the KFC next door and get

6    surveillance video?

7            What about to the El Rey Liquors across the

8    street.  It is a liquor store, you know they have

9    surveillance video.  Does he go to the liquor store

10   to get surveillance video?  No.

11           We heard lots of testimony.  Riverside

12   Drive is a business district.  Did he go to any other

13   businesses on Riverside Drive to try to get

14   surveillance video to find out what really happened

15   on Mr. Smith's property in the early morning of

16   May 5th, find out how many people were there, find

17   out what is really going on, you know.  He had zero

18   interest in investigating this case because that

19   train already left the station.  What else didn't he

20   do?  He had lapel video of his interview of Ercilia

21   Trujillo.  Did he list that in his investigative

22   report, no.  Did he list the fact that he even

23   interviewed Ercilia Trujillo in his investigative

24   report, no.

25           You heard that he turned over the evidence

1    to Agent Taylor with the FBI on May 18.  You heard

2    from Detective Abeyta what he turned over.  He turned

3    over the 911 dispatch call, he turned over Officer

4    Rael's lapel video, and he turned over his

5    investigator report.  He didn't turn over Ercilia

6    Trujillo's interview.  He didn't turn over that lapel

7    video.  He had zero interest in investigating this

8    case.  And he turned, he turned the evidence over to

9    the FBI on May 18th.

10         FBI went out, Agent Taylor went out to

11   Mr. Smith's house on May 18th.  He hadn't been out

12   there before.  He interviewed Mr. Smith on May 7th.

13   Before he interviewed Mr. Smith, he had not been to

14   Mr. Smith's house, he hadn't been to Mr. Smith's

15   house to take measurements, take photographs, look

16   for fingerprints, look for footprints, nothing.

17         Interviewed Mr. Smith, charged him with a

18   crime.  Why?  Because that train already left the

19   station.  It wasn't going back.  They had zero

20   interest in investigating this case.

21         He goes out to Mr. Smith's house on

22   May 18th and interviews Ercilia Trujillo.  What does

23   Ercilia Trujillo tell him?  She tells him what she

24   told Detective Abeyta.  She tells him what she told

25   you.  She heard somebody outside of her house early

morning hours of May 5th.  She heard somebody, a
woman's voice yelling to somebody, "Come on, come on,
let's go.  Get it on."

They knew there was more than one person
outside Mr. Smith's house.  What else did Ercilia
Trujillo tell Agent Taylor?  She told, Ms. Trujillo
told him that the next day, so that day later in the
day on May 5th after she had spoken with
Detective Abeyta on May 5th.  So after that, later in
the day, somebody came off the street, a man came off
the street and approached her and said that he was
looking for a knife that he dropped the night before.
That is what they knew on May 18th.  Did they go
across the street to the Pizza 9 to get surveillance
video, the El Rey Liquors surveillance video?  What
about the KFC or any of the other businesses on
Riverside Drive, any surveillance video?  No
surveillance video.

Agent Taylor at Mr. Smith's house on
May 18th, did you look for fingerprints?  Did you
dust for fingerprints on the door of the trailer, on
the door handle of the trailer?  Did he look for
footprints?  He didn't because he said it was too
late, it was too long.  11 days after he interviewed
Mr. Smith.  No footprints.  Did he take measurements

1    on May 18th?  No, nothing.  He interviewed Ercilia

2    Trujillo, that was it.

3          They didn't go back to the property to take

4    measurements until 15 months later, August of 2019,

5    15 months later, they went back and they took

6    photographs, they got measurements.

7          And you heard from Mr. Chavez, the

8    trajectory analysis, the trajectory expert.  And you

9    know, Mr. Chavez he testified and I appreciate his

10   testimony.  What he -- I appreciate his testimony

11   because you know what it does, it confirms what

12   Mr. Smith said.  Mr. Smith told you that he fired

13   between the trailer and the tree.  Well, that is what

14   Agent Chavez confirmed.  There was two bullets.

15   There was a bullet hole on the side of the trailer

16   and one in the shed.  I don't need a weather man to

17   tell me which way the wind blows.  Mr. Smith told us

18   that.  We didn't need an expert.  What Mr. Chavez did

19   is confirm what Mr. Smith said.

20          But all of that, the trajectory analysis

21   and the drone or the plane that they flew above

22   Mr. Smith's residence to take pictures of it and the

23   measurements that they took in August, all of that

24   stuff, that is just a distraction.  It is smoke and

25   mirrors.  It is just to distract you from the fact

1    that they didn't do a proper investigation on Day One

2    on May 5th and May 6th and May 7th of 2018.  It is to

3    distract you from the fact that they dropped the ball

4    on the investigation.

5             And the other distraction that I want to

6    point out, they mentioned throughout this trial that

7    this was a hotel and Mr. Smith, the Western Winds was

8    a hotel and that somehow Mr. Smith should expect

9    people to be in his private property behind his

10   house.  An area that was dark, no lights, no lit

11   path.  I want to stop and think about that.  You

12   heard from Mr. Smith that that hotel had been closed

13   since 2014, and there was not one shred of evidence

14   that that hotel had any lit sign in the middle of the

15   night.  There was no vacant -- there was no "No

16   vacancy" sign or "Vacancy" sign.  There was no

17   reception area.  There was nothing about that hotel

18   that would tell anyone that it was an open operating

19   business.

20            And the other thing, we are not talking

21   about the front of the hotel, we are talking about in

22   the back, Mr. Smith's house.  We are talking about

23   part of his property, his private property that is

24   dark, there is no lit path.  There is no path

25   inviting guests to come in, in the middle of the

1    night.  We are talking about 1:00 in the morning not

2    1:00 in the afternoon or 5:00 in the afternoon, 1:00

3    in the morning.  That is a distraction.  Again, it is

4    a distraction to distract from the fact that the

5    Government didn't do a good solid investigation in

6    May of 2018.  It is smoke and mirrors.

7            And the other thing about Mr. Smith's

8    property, the Government has said, asked if he had

9    "No trespassing" signs up or if he had fences up or

10    if he had signs that say "Closed."  I want to pause

11    right there, because that -- the area we are talking

12    about is Mr. Smith's backyard and his private

13    property.  You don't need a "No trespassing" sign to

14    have a reasonable expectation of privacy in your home

15    to be able to rest assured that you won't have

16    trespassers on your property.

17            I don't need a "No trespassing" sign at my

18    house to know that people won't come on my property.

19    And if they come on, they know that they are not

20    invited.  You do not need that.  And also even if

21    Mr. Smith had a "No trespassing" sign or if he had a

22    fence up, it still wouldn't be enough for the

23    Government.  They would ask him why didn't you put up

24    a bigger fence?  Why didn't you put up a cinderblock

25    wall.  And if he had a cinderblock wall they would

```
 1    say why isn't there barbed wire across that wall?
 2    Nothing would be good enough for them because that is
 3    not what this is about.  They are trying to distract
 4    from the fact that they didn't do an investigation
 5    from Day One.  They didn't try to find out who else
 6    was on Mr. Smith's property in the early morning
 7    hours of May 5th.  That is what that is about.
 8           And one of the things we talked about
 9    throughout jury selection and voir dire, the Judge
10    read you instructions on this.  We talked about the
11    burden of proof.  That it is the Government's burden
12    to prove their case beyond a reasonable doubt.  It is
13    the Government's burden to prove their case beyond a
14    reasonable doubt.
15           And to prove their case beyond a reasonable
16    doubt they need to do solid investigation.  They need
17    to do -- they need to look in to fingerprints.  They
18    didn't try to get fingerprints in this case,
19    footprints.  They didn't take measurements on
20    May 5th.  They didn't look for surveillance video
21    after they learned the possibility from Ercilia
22    Trujillo and there were other people on Mr. Smith's
23    property that night.  That shoddy, slipshod
24    investigation, that is not enough.  Our democracy,
25    liberty is the essential principle of our democracy,
```

```
 1    our liberty.  And before the Government takes away
 2    somebody's liberty, we require the Government to
 3    prove their case beyond a reasonable doubt.  We
 4    require them, the FBI and Espanola Police Department
 5    and anyone else, we require them to do a good
 6    investigation.  To do a solid job and to look in to
 7    leads and to follow-up on those leads.  That didn't
 8    happen here.
 9             The Government has fundamentally failed to
10    prove this case beyond a reasonable doubt.
11             THE COURT:  You're at 25 minutes.
12             MR. ELSENHEIMER:  Can I have two more
13    minutes, Your Honor?
14             THE COURT:  Yes.
15             MR. ELSENHEIMER:  Mr. Smith is innocent.
16    The Government has not proven beyond a reasonable
17    doubt that he is guilty.  They have failed to meet
18    that burden.
19             And there is one last thing.  I have
20    represented Mr. Smith for years, and I want to let
21    you know, it is my pleasure to represent this man.
22    There is one thing, in the three years that I have
23    represented him, there is one thing that just keeps
24    bugging me and agitating me.  We are sitting here in
25    a Federal courthouse in Albuquerque, New Mexico.
```

```
 1    There are security guards here.  There are probably
 2    more security guards in this building than per square
 3    foot than any other place in Albuquerque.  And we are
 4    evaluating in the cold light of day what happened on
 5    May 5th at 1:00 in the morning.  And that is wrong
 6    because you can't judge this case in the clear light
 7    of day.  We can't sit here and judge this case in the
 8    clear light of day in a courtroom in Albuquerque.  We
 9    need to see this case how Doug Smith saw this case at
10    1:00 in the morning when he was awakened and got out
11    of his bed and went on to his back porch and he
12    stepped out and he saw somebody on his property.  And
13    that person turned and looked at him and he was
14    terrified.  He was scared and fired a gun to scare
15    that person off, and he thought that person left.  He
16    thought that person left and he fired three more
17    shots.
18            Ladies and gentlemen, because they didn't
19    do their job we don't know how many people were on
20    that property, we don't even know if Maria Gallegos
21    was the person standing next to this trailer.  We
22    don't know where she was.  All we know is that
23    Mr. Smith saw someone standing at his trailer.  He
24    fired his gun and that that person left.  He waited
25    15 seconds, 15 seconds enough for that person to be
```

1    off his property and back to the street and then he

2    fired three more times.

3            Doug Smith is not guilty of the crime.

4    Doug Smith was terrified.  He is not -- he is not

5    callous and wanton.  He is not indifferent to the

6    lives of others.  The Government cannot meet their

7    burden of proof and you must find Mr. Smith not

8    guilty.

9            Thank you.

10           THE COURT:  Thank you, Mr. Elsenheimer.

11           I will call on the Government for rebuttal.

12    Before I do that, does anybody need a break?

13           All right.  Mr. Nayback.

14           MR. NAYBACK:  Thank you, Your Honor.  May

15    it please the Court.

16           THE COURT:  Counsel, you may proceed.

17    **CLOSING STATEMENT ON BEHALF OF THE GOVERNMENT**

18           MR. NAYBACK:  Mr. Elsenheimer, Ms. Lavin,

19    Mr. Berg.

20           If you have never been a juror before, I

21    know some of you have juror experience, but if you

22    have never been a juror before in a murder trial and

23    have seen a defendant try to wiggle his way out of

24    indictment, this was pretty classic.  There is a

25    number of things that happened every time.  Attack

1    the Government investigation, devalue the life of the

2    victim and spin the facts.

3            Do you remember the first line in the

4    defense attorney's opening statement, that Mr. Smith

5    had an intruder trying to force her way in.  And if

6    we stop right there you would think, oh, this is

7    going to be a self-defense case.  This is going to be

8    a burglary into someone's home.  And then later you

9    hear into a trailer that no one has been into for

10   ten years, outside of his fenced-in backyard.  That

11   is classic spinning of the facts and I am sure each

12   of you can think of more examples of how they spin

13   the facts.

14           They asked the field investigator what was

15   in Ms. Gallegos' pocket and they have a syringe

16   needle and she doesn't have her license and she

17   doesn't have a credit card.  Maybe she is poor.  And

18   then why not get surveillance from across the street?

19   Well, that is not going to show Mr. Smith's backyard,

20   is it?  It wouldn't show the trailer.  And then

21   another distraction with what about these other

22   people earlier in the night that Ercilia Trujillo

23   thinks she heard?  What would that have shown?

24           As Travis Taylor said, there are two

25   witnesses to this crime, and one is dead, right?  The

1    footprints, that would have been Maria Gallegos'

2    footprints running and what if it showed her

3    fingerprints on the trailer.  He called in a burglary

4    or a break-in.  And then later when he was

5    interviewed, you have the transcript, you heard the

6    recording.  And the detective -- and he said, Well,

7    the trailer was locked so and then the detective

8    finishes his sentence, So she couldn't have gotten

9    in.  There are no burglary tools.  The reason he is

10   scared witless is because he has got a body in his

11   parking lot at his motel.

12          And I still don't understand this

13   distraction about whether it is open or not.  I don't

14   think it matters.  He has got a body, that is why he

15   is scared witless.  That is why he is telling the

16   agent he can't -- he can't bring him back.  What is

17   done, is done.  He is shooting a gun.

18          I think in voir dire some of you mentioned

19   you may have shot a gun or you are a gun owner, and

20   so you probably know the rules of gun safety.  Even

21   Mr. Smith said, you know, you don't shoot into the

22   air, you never know where the bullet might come down.

23   You heard about know your target.  You heard about

24   shooting at night.  Can you be more grossly reckless

25   than shooting at someone running away from you in the

1    dark?

2                    Is there anything more important than

3    taking someone's life with a gun?

4                    And the Judge's instruction told you, you

5    can consider if they used a weapon as to whether they

6    are grossly negligent.

7                    And he did it before.  He shot at someone

8    before, shooting to miss.  And the reason he did it

9    again because he got away with it the first time.

10                   It didn't work out this time.

11                   There was no one else there.  He said he

12   saw one person.  The voices were for some other time.

13   You heard Travis Taylor and Detective Gallegos [sic]

14   said, We interviewed a lot of people.  It was a good

15   investigation.  FBI planes flying to give you the

16   best photographs we could get.  Trajectory experts

17   showing that he was tracking her path of travel.  He

18   has to say he was scared.  But today on the witness

19   stand he said, I am not claiming self-defense.

20                   The other voices, the poor investigation

21   they claim is just something they are hoping that one

22   of you will hang your hat on to and stick with it.

23   And I suggest that is not reasonable.

24                   Callus and wanton disregard for human life.

25   Shooting in the dark at someone running away, who

1    does that to another human being?  He does, Doug

2    Smith.  I know he had a couple of friends come and

3    say he is a peaceful guy.  You heard him today say he

4    has gotten into fights on his property.  He shot at

5    other people.  He is the motel cop.  He went out with

6    his gun loaded and he has to say that he waited.  He

7    has to say, I thought she was gone.  But if you look

8    at Defendant's Exhibit B17, Maria Gallegos made it

9    ten strides from where she was at, if that.  And that

10   he shot as fast as he could.  That is consistent,

11   right, someone running, boom, boom, boom, boom.  And

12   it is in her temple and you can tell she is running

13   because her face is torn up from the pavement of the

14   hotel.  Right?

15         That is what he is charged with.  And I

16   would submit to you if some of you don't think that

17   is gross and wanton disregard for human life, maybe

18   we failed as the Government in some way.  There is no

19   doubt he is guilty of involuntary manslaughter, if

20   you want to consider that.  But I submit that is not

21   the right charge here.  He was shooting a firearm in

22   an unlawful manner.  You don't get to shoot at

23   people, Mr. Smith, who are running away.

24         He said some ridiculous stuff to law

25   enforcement that doesn't make any sense and it shows

1    that he is making a story up.  Right?  I wasn't

2    aiming, I was pointing.  What does that even mean?

3    He has to admit that he fired the gun because the

4    shell casings are on his patio.  The gun is his.  She

5    was outside of his fenced-in property.  He has got

6    three acres.  You saw in the surveillance footage

7    there is someone walking, someone walking across his

8    property and Nathan Schabedissen testified to that,

9    walking right up the driveway across to Riverside

10   Drive.  It is a rural area.  And then he confirmed,

11   yeah, there is people on the property all the time,

12   it frustrates me.  He is hitting them with 2-by-4s,

13   he is fighting them with ski poles and then he starts

14   carrying a gun and things escalate.

15          It wasn't a mistake and you can consider

16   the, what we call 404B evidence, the fact that he

17   shot at someone before and shot to miss.  You can

18   consider that as evidence that he did make a mistake

19   this time.  He is not claiming self-defense and there

20   is no other excuse for what he did.  I want you to

21   know that just because we are here at trial doesn't

22   mean this is a close case, every defendant who walks

23   into this courthouse has a right to a trial, every

24   one of them.

25          MR. ELSENHEIMER:  Objection, improper

1    argument.  Outside the scope of --

2              THE COURT:  Overruled.

3              Go ahead.

4              MR. NAYBACK:  It is not a complicated case.

5    It is not about fingerprints or footprints or

6    measurements.  You got the measurements.  You know it

7    is 30 feet away.  She didn't advance on him.  There

8    is no self-defense claim.  And I think most of you

9    know, I bet all of you know that reason and common

10   sense as a human being means you don't shoot a deadly

11   weapon at another person while they are running away

12   in the dark.

13             He has to say to law enforcement what he

14   said to get out of trouble.  And what he said on the

15   witness stand today, Am I under oath?  I don't

16   even -- I have never seen -- I don't even know where

17   that was coming from.  But you can consider whether

18   he is a truthful person.  You certainly can.

19             But he had to make that story up.  So with

20   that, Douglas Smith told law enforcement, The shit

21   trip's done.

22             He didn't ask for her name, he didn't ask

23   how to get ahold of the family.  And Ms. Gallegos has

24   left this earth and he just considers it a shit trip.

25   We are asking you to find him guilty because he is

1  guilty.

2          Thank you.

3          THE COURT:  Thank you, Mr. Nayback.

4          The jury will be excused to begin their

5  deliberations in just a moment.  Before I excuse you,

6  I am sure you noticed there are 14 of you, not 12, so

7  there are two alternates.  So I am going to excuse

8  the alternates, but I am not going to discharge the

9  alternates because if for some reason one of the 12

10  jurors who is deliberating were to become ill or have

11  some sort of an emergency, I would need to bring in

12  an alternate.  So for that reason, I am going to --

13  when I excuse you from the courtroom, and excuse you

14  from the courthouse, I want you to be on call because

15  if necessary you may need to come in and participate

16  in the deliberations.

17          So for that reason I will continue to tell

18  you not to discuss the case with anyone and not to do

19  any independent research, and keep in mind that your

20  service may be called back.  So the alternates that I

21  will excuse at this time are Daniel Rushton and Eli

22  Yazzie.  So the two of you will be excused, and the

23  rest of you I will dismiss you to the jury room so

24  that you can begin your deliberations.

25          Please rise while the jurors leave the

1   courtroom.

2           (Whereupon the jury exited the courtroom.)

3           (A recess was taken.)

4           (Whereupon the jury enters the courtroom.)

5           (Whereupon the following proceedings were

6   held in Open Court.)

7           THE COURT:  Please be seated.  Ladies and

8   gentlemen of the jury, it is 5:14 by my clock, so we

9   are at a point where we are probably going to have to

10  wrap it up for the day, but I would ask a couple of

11  questions.

12          First, let me ask your foreperson, do you

13  feel, whoever your foreperson is, do you feel that

14  you're close to a decision?  And the reason I ask is

15  because if you told me you were, you know, ten or

16  15 minutes away from concluding, I would ask you to

17  continue.  If you told me that you were not, then I

18  would tell you to come back tomorrow morning and

19  continue your deliberations so --

20          FOREPERSON:  It is Jesse Kistler,

21  Your Honor, and we are not ten or 15 minutes away

22  from a decision.

23          THE COURT:  All right.  So in that case I

24  would suggest, then, that you return tomorrow morning

25  at 9:00.  Now we all just learned about a couple of

1    hours ago that tomorrow is now a Federal holiday,

2    June 19, Juneteenth, which is on June 19.  So,

3    however, we will continue working.  I suppose if we

4    had had a little more notice we could have planned a

5    little differently.  There are many reasons why I

6    won't be able to observe the holiday tomorrow.

7            The Federal courthouse will be open, but I

8    wanted you to know that because if you go home

9    tonight and somebody tells you it is a Federal

10   holiday, things are closed, I wanted you to know that

11   we will be open.

12           So what I will ask you to do is return

13   tomorrow morning to the second floor jury assembly

14   room where you have been conducting your

15   deliberations.  You don't need to come back into the

16   courtroom before you deliberate, you can begin

17   deliberating once all of you are there.

18           And I should tell you if any of you have to

19   leave the room for any reason, go the bathroom or

20   whatever, I mean, it is important that you try to

21   stop and wait for everybody so that everyone benefits

22   from your deliberations.  If somebody needs to take a

23   walk or something, you know, stretch your legs, fine,

24   as long as you can always hear what is going on in

25   the room.

1          But if anybody needs to leave the

2    deliberations, even to go to the bathroom, you need

3    to hold on and wait until everybody is present.  So

4    tomorrow once you all are together, you can begin

5    your deliberating.  So I would ask that you get there

6    and be ready to go by 9:00 and then we will proceed

7    accordingly.

8          Let me think.  I would again remind

9    everyone that you should avoid any media reports,

10   should there be any about this case.  You should not

11   talk to anybody at all about these deliberations or

12   the case.  The whole concept of keeping your

13   deliberations private while you're deliberating is

14   all the more important at this point.

15         So with that, I will wish you all a good

16   evening, and we will see you tomorrow.  All right.

17              (Proceedings concluded at 5:18 p.m.)

18

19

20

21

22

23

24

25

PAUL BACA, OFFICIAL COURT REPORTER
(505)508-6604

1                    REPORTER'S CERTIFICATE

2              I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.  I further certify that the

5    transcript fees and format comply with those

6    prescribed by the Court and the Judicial Conference

7    of the United States.

8    Date:  June 17, 2021

9

10

11              _____

12              PAUL BACA, RPR, CCR
                Certified Court Reporter #112
13              License Expires:  12-31-2022

14

15

16

17

18

19

20

21

22

23

24

25