1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW MEXICO

3

4  UNITED STATES OF AMERICA

5  vs.                  No. 1:18-CR-3495-JCH

6  DOUGLAS SMITH

7

8

9             TRANSCRIPT OF PROCEEDINGS

10              EVIDENTIARY HEARING

11              March 16, 2021

12

13  BEFORE:  HONORABLE JUDGE JUDITH C. HERRERA

14          UNITED STATES DISTRICT JUDGE

15

16

17     Proceedings reported by stenotype.

18     Transcript produced by computer-aided

19  transcription.

20

21

22

23

24

25

```
 1   A P P E A R A N C E S:

 2   FOR THE PLAINTIFF:

 3           OFFICE OF THE U.S. ATTORNEY
             P.O. Box 607
 4           Albuquerque, New Mexico   87103
             505-346-7274
 5           BY:  KYLE NAYBACK
             kyle.nayback@usdoj.gov
 6               NOVALINE WILSON
             novaline.wilson@usdoj.gov
 7
     FOR THE DEFENDANT:
 8
             OFFICE OF THE PUBLIC DEFENDER
 9           111 Lomas Boulevard NW, Suite 501
             Albuquerque, New Mexico  87102-2373
10           505-346-2489
             BY:  ARIC GRANT ELSENHEIMER
11           aric_elsenheimer@fd.org

12   Also Present

13           Dan Burk

14

15                  I N D E X

16                                      PAGE:

17   Certificate of Reporter               82

18

19

20

21

22

23

24

25
```

1                    THE COURT:  Good morning everyone.

2                    We are on the record in USA versus Smith,

3       Case Number CR-18-3495.

4                    Can I have appearances, please, for the

5       record.

6                    MR. NAYBACK:  Thank you, Your Honor.

7                    The United States by Kyle Nayback and

8       Novaline Wilson.

9                    Ms. Wilson is in the same room with me and

10      will be arguing the 911 issue and I will be handling

11      the rest of the matter.

12                   Thank you.

13                   MR. ELSENHEIMER:  Good morning, Your

14      Honor.  Aric Elsenheimer on behalf of Mr. Douglas

15      Smith.  Mr. Smith is in the room with us here.  We

16      are at the Federal Public Defender's Office.  I am

17      joined by my colleague, Dan Burt.

18                   Your Honor, if it is all right with you,

19      Mr. Smith is just going to kind of sit over in the

20      corner just so we can be a little bit distant.  He

21      will be off screen, but I just wanted to let you

22      know that.

23                   THE COURT:  All right.  That is fine.  As

24      long as he is able to see and hear the proceedings,

25      that is fine.

1          We are here today to take up some of the

2    evidentiary issues.

3          Mr. Nayback, are you ready to proceed with

4    the Government's exhibits?  So basically the

5    United States filed the motion in limine regarding

6    certain exhibits and the Government has moved to

7    exclude certain self-serving inadmissible hearsay

8    and irrelevant prejudicial statements.  And also

9    filed its notice of intent to offer recorded

10   statements in its case-in-chief.

11         So are you ready to proceed on that?

12         MR. NAYBACK:  Yes, Your Honor.

13         Thank you so much.

14         MR. ELSENHEIMER:  Your Honor, may I first

15   just clarify something that Your Honor pointed out

16   in the memorandum opinion and order?

17         THE COURT:  Sure.

18         MR. ELSENHEIMER:  You had highlighted that

19   there was a discrepancy between what we highlighted

20   and our prior objections and you are absolutely

21   correct.  I apologize for that.

22         I don't know if there was a coding issue

23   or if we just missed it, but with regard to Items 4,

24   5, and 6, and this is on Page 16 and 17 of

25   Document 141, that is the memorandum opinion and

1    order.  Those four items, we do not withdraw

2    objections to those.  And again, I apologize that

3    our highlighting was unclear on that point but we do

4    not withdraw our objections.

5             THE COURT:  All right.  Understood.  Thank

6    you.

7             Mr. Nayback, you may proceed.

8             MR. NAYBACK:  I really have an interest in

9    streamlining this for the Court.

10            THE COURT:  Yes.

11            MR. NAYBACK:  I appreciated defense's

12   response and I was going to go off that this

13   morning, if the Court intends to follow along.

14   Because I think he does a good job of highlighting

15   where the disputes are and I just wanted to address

16   those with the Court.

17            And so, however, obviously we will take

18   the Court's direction on what you would like

19   information on but I was going to go to the first

20   blue, highlighted in blue statement, which is --

21            THE COURT:  I have no colors, so you will

22   have to be a little bit more precise.

23            MR. NAYBACK:  Thank you, Your Honor.

24            I am looking at the interview first,

25   Your Honor, if you have the statements in front of

```
1   you, the May 5th statement in the arrest of Douglas

2   Smith, Defendant's Exhibit A.

3              THE COURT:  I have that.

4              MS. WILSON:  Okay.  So I am going to go,

5   so let's see, I will give you a page number and a

6   line number.  The first blue highlighted portion --

7   I'm sorry, I won't reference the colors anymore but

8   the statement that's in dispute on Page 8.

9              There is a bunch of page numbers.  Page 8,

10  Line 6 through 9.  Now the statement that the

11  United States wants to admit is simply that

12  Mr. Smith stated that he came out back here with a

13  pistol.  We believe that it is an exculpatory

14  statement.  And this is raised several times where

15  he claims that, "I thought it was raccoons and I was

16  going to chase them off."

17             And then says without a transition,

18  "Someone trying to break into the little trailer

19  there."

20             This comes up a number of times and I

21  don't want to repeat myself each time, but we think

22  both the fact that he says he thought it was

23  raccoons and that someone was trying to break into

24  the trailer they are exculpatory statements that

25  ought to be deemed inadmissible by the Court.  The
```

1  reason we say that is because there is no evidence,

2  as the Court probably knows, the victim was found

3  with no burglary tools on her whatsoever and it is

4  not corroborated by anyone that she was trying to

5  break into the little trailer nor does the

6  United States believe that there is any damage to

7  the trailer handle.

8          And it is also contradictory to

9  Mr. Smith's other statement that she was facing his

10  direction.

11          So for those reasons we think lines --

12  other than the word "pistol," Line 7 through 9

13  should be inadmissible.

14          THE COURT:  All right.  It probably would

15  be most useful to hear from you, then,

16  Mr. Elsenheimer, that way we don't have to come back

17  to several issues all at the same time.  Let's just

18  take them one at a time.

19          MR. ELSENHEIMER:  Absolutely, that makes

20  perfect sense.

21          Our response is, as we set out on Page 8

22  in the margin, we believe that under the Rule of

23  Completeness, Lines 7 through 9, obviously not

24  including the word "pistol," but Lines 7 through 9

25  should be included under the Rule of Completeness.

1          First of all, the most important salient

2     factor is that without those three lines Mr. Smith's

3     subsequent reference to the shadow in Line 16 is --

4     it just kind of jumps out of nowhere, whereas if it

5     is taken in the context of those three lines added,

6     it is that he sees somebody breaking into the

7     trailer, that shadow then turns around towards him.

8          So, Mr. Nayback, I respectfully disagree

9     with his characterization of what Mr. Smith has

10    consistently said that he saw which is he saw

11    someone breaking into the tailer.  Maybe not having

12    burglary tools, that is something they can certainly

13    bring out in their case-in-chief.  But Mr. Smith

14    believed he saw somebody breaking into the tailer

15    and then that shadow turned around towards him.

16          Without those three lines, Lines 7 through

17    9 it is disjointed to then have Mr. Smith reference

18    a shadow because that shadow comes out of nowhere.

19    We don't know where the shadow turned around from,

20    but he says specifically in what the Government is

21    trying to introduce is that the shadow turns around.

22    Well, the prior Lines 7 through 9 provide context

23    for that.  And without those lines, it is left, it

24    is unfair to Mr. Smith to just incorp- -- to include

25    Lines 6 and 7 and then 16, 17, and 18 without the

1    contextural framing of Lines 7 through 9.

2             I also, just for the record, want to state

3    that we also believe that it is an excited

4    utterance.  I understand that Your Honor has ruled

5    against us on that point, but I just want to state

6    that for the record.

7             THE COURT:  Thank you, Mr. Elsenheimer.

8             Anything further on that issue?

9             MR. ELSENHEIMER:  Not on those issues.

10            THE COURT:  All right.  Mr. Nayback?

11            MR. NAYBACK:  Just briefly, Your Honor.

12   On the statements we are talking about now, it seems

13   to me that the jury is going to be absolutely clear

14   that this case is about someone who was killed,

15   someone who was on Mr. Smith's property.

16            I don't think it matters and I think it's

17   exculpatory still that Mr. Smith thought it was

18   raccoons and that someone was trying to break into

19   the little trailer.

20            We also understand the Court's ruling that

21   it does not appear to the Court that there is going

22   to be defense of a violent felony here, so we think

23   that Mr. Smith is laying this as a defense that

24   someone was on his property committing crimes.  We

25   think that is exculpatory and therefore

1    inadmissible.

2              Thank you.  That is all.

3              THE COURT:  All right.  Thank you.  I will

4    turn next to the next issue, Mr. Nayback.

5              MR. NAYBACK:  Thank you, Your Honor.

6              So I am going to turn to Page 11 and this

7    is down towards the bottom, Lines 23 through 25.  It

8    is the same issue, Your Honor, that Mr. Smith claims

9    that Jane Doe was trying to break into the trailer.

10              And I have to say I appreciated

11    Mr. Elsenheimer's response, especially the

12    annotations along the side, and the United States is

13    prepared to concede this issue.  We are going to do

14    it in a number of circumstances, both for you and

15    your law clerk.

16              We do think that when two officers are

17    talking to each other about what Mr. Smith said,

18    that that is most likely hearsay and inadmissible,

19    as Mr. Elsenheimer pointed out.  Mr. Elsenheimer has

20    convinced me of his ways in the past, so we would

21    agree that we do not intend to introduce two

22    officers talking to each other, only when they are

23    talking to Mr. Smith.

24              Thank you.

25              THE COURT:  All right.  So, then 23,

1    Lines 23 through 25 on Page 11 will not be offered.

2              Next?

3              MR. NAYBACK:  Yes, Your Honor.  Page 12,

4    just the next page, Your Honor.  The part that

5    defense is arguing, and he is talking to Mr. Smith

6    here.  "So you didn't run after her, because I

7    thought that is what I heard you said, I just want

8    to confirm that."

9              And we didn't, the United States didn't

10   believe that was admissible.  It is somewhat

11   exculpatory, we think, and we don't actually know

12   what happened.  It is simply Mr. Smith saying that

13   he didn't run after her and we think those should be

14   excluded as being admissible.

15             I do want to -- so that's all I have.  It

16   is from lines -- what is in front of the Court is

17   Line 25 on Page 12 to Line 10 on Page 13.

18             THE COURT:  All right.

19             Mr. Elsenheimer?

20             MR. ELSENHEIMER:  Your Honor, I don't have

21   anything to significantly add in addition to what is

22   already in the margins.  And just to summarize that,

23   essentially our concern is that under the Rule of

24   Completeness that should be essentially Lines 25 on

25   Page 12 through Line 10 on Page 13 should be

1   introduced because without it, it makes it, it

2   doesn't appear as though Mr. Smith fully answered

3   Officer Rael's questions, and that could be

4   construed as evasiveness.

5         He did answer the question and answer the

6   follow-up question Officer Rael had for him and

7   clarified exactly what happened.

8         Cutting Mr. Smith's statement off at

9   Line 24 doesn't give his full response to

10  Officer Rael's question and runs, and I think

11  significantly risks that the jury will think that

12  Mr. Smith was being evasive and that will prejudice

13  Mr. Smith in this defense.  I think there are

14  significant due process problems with that, excising

15  the statement at Line 24 and it also deprives

16  Mr. Smith of his right to a jury trial.

17        THE COURT:  Anything further, Mr. Nayback?

18        MR. NAYBACK:  Yes, Your Honor.  The

19  United States does not intend to introduce

20  Officer Rael's question and answer in Lines 16

21  through 19, and that is what the jury should be left

22  with, where Officer Rael says -- well, I guess --

23  yeah.  "Douglas, okay.  One last thing I forgot to

24  ask you.  Where exactly were you standing when you

25  were shooting on the back porch."

1          That is what the United States intends to

2    introduce.  We do not intend to introduce Lines 20

3    through 25 and on Page 13, Lines 1 through 10.

4          THE COURT:  Anything else,

5    Mr. Elsenheimer?

6          MR. ELSENHEIMER:  No, Your Honor.

7          THE COURT:  Hold on one second.

8          Next?

9          MR. NAYBACK:  Page 15, Your Honor, of the

10   same interview.

11         THE COURT:  You said Page 15?

12         MR. NAYBACK:  I did.  Line 11 through

13   Line 15 is in dispute as to whether it is

14   admissible.

15         And without reading it off, I want to,

16   again, concede that statements between Officer Rael

17   and Officer Saucedo and an unknown officer is not

18   something that -- well, we do think it is hearsay

19   and not something that the United States intends to

20   introduce.

21         There is another area on that same page,

22   Your Honor, I want to highlight for the Court.  That

23   is the same page, Page 15, Lines 23 and 24 where

24   Officer Rael is talking to Officer Harwell and he is

25   just reiterating what the defendant said, which was,

1    "He said that she was trying to break in."

2              We think that is inadmissible as well.  We

3    do not intend to introduce that.

4              THE COURT:  All right.

5              Next?

6              MR. NAYBACK:  Page 18, Line 23 through 25.

7              THE COURT:  All right.

8              MR. NAYBACK:  We are going to concede that

9    these are hearsay, two officers talking between each

10   other and we do not intend to introduce those.

11             THE COURT:  Okay.

12             Next?

13             MR. NAYBACK:  Page 23, Your Honor,

14   Lines 12 through 14 are at issue along with Line 19.

15   The statement is, "They installed motion sensors

16   since they have been having issues with burglaries."

17             And 19 it says, "But he thought he was

18   missing."

19             Again, we think those statements are

20   exculpatory statements brought up by the defendant

21   himself and we do not intend to introduce those.

22   And we would concede the defendant's objection that

23   statements by Officer Rael are hearsay.

24             THE COURT:  Okay.

25             Next?

 1          MR. NAYBACK:  Page 26, Your Honor,

 2   Lines 15 and 16.  The specific phrase is, "And he

 3   didn't think he was actually hitting the shadow."

 4          We would concede the objection that they

 5   are hearsay and the United States does not intend to

 6   introduce that phrase.

 7          THE COURT:  Okay.

 8          Next?

 9          MR. NAYBACK:  Your Honor, that completes

10   just for the record, the arrest of Douglas Smith

11   May 5th, 2018 interview.

12          Now I am going to turn to

13   Defendant's Exhibit B.

14          MR. ELSENHEIMER:  Can I ask a clarifying

15   question, Your Honor?

16          THE COURT:  Yes.

17          MR. ELSENHEIMER:  Did the Government

18   address the highlighted section on Page 24?

19          THE COURT:  I don't think we heard

20   anything about Page 24.

21          MR. NAYBACK:  My apologies.

22          MR. ELSENHEIMER:  It is Page 24, Line 19

23   and then on to Page 25, Line 2.  I assume --

24          MR. NAYBACK:  My apologies.  Page 24,

25   Your Honor, had a different color of highlighting.

1    I know you don't have colors on yours, but I didn't

2    see it as an issue.  But there is a statement by

3    Officer Rael, once again on Line 19 through 25 and

4    then continuing over on to Page 25, Lines 1 and 2.

5             And the line is, "Yeah, so it looks like

6    just a single shot to the head.  The only thing I

7    found kind of odd is there was no blood trail or

8    anything from the trailer to where she is now.  That

9    is like the sum total of all the blood I could find

10   so far.  But he said he fired off his back porch and

11   we found a few casings there.  There is like two or

12   three and there is also an earring.  We don't know

13   if it was hers or not."

14            We don't intend to introduce that

15   statement, Your Honor.  That is again two officers

16   talking to each other.

17            THE COURT:  All right.

18            MR. NAYBACK:  And then that, I think, I'll

19   stand corrected if Mr. Elsenheimer has something

20   else, but that completes the May 5th, 2018 arrest of

21   Douglas Smith interview.

22            THE COURT:  All right.

23            MR. NAYBACK:  The next document is, let me

24   make sure this is not the same.

25            Defense Exhibit B, also an May 5th

1    interview of Doug Smith.  And the first issue in

2    dispute is on Page 8, Line 16 through 25.

3              THE COURT:  I'm sorry, one more time.

4              MR. NAYBACK:  Yes, Your Honor.  Page 8, 16

5    through 25.  So this long sentence is again talking

6    about break-ins.  The United States, you know, we

7    are not sure how a jury might take any of these

8    statements, but we view these as exculpatory

9    statements, Mr. Smith trying to lay a defense that

10   there was other break-ins, he was scared, that type

11   of thing.

12             And we don't think these are admissible as

13   statements by the defendant because they are

14   exculpatory.

15             Thank you.

16             THE COURT:  Thank you.

17             Mr. Elsenheimer?

18             MR. ELSENHEIMER:  Your Honor, just to

19   reiterate, I believe that this statement provides,

20   under the Rule of Completeness, provides context for

21   the subsequent statements that the Government is

22   seeking to introduce through Mr. Smith.

23             Simply cutting Mr. Smith's statements in a

24   piecemeal fashion significantly prejudices him and

25   leaves the jury with an inaccurate view of what he

actually said.  And more than just an inaccurate

view, it risks mischaracter- -- allowing the

statements that the Government is seeking to

introduce, allows those statements to be

mischaracterized by the absence of the surrounding

discussion and explanation and answer to

Detective Abeyta's questions.

So we believe that the -- with regard to

the statement on Page 8, going on to Page 9, that

should be introduced under the Rule of Completeness.

Again, for the record, I also believe that it falls

within the excited utterance exception to the

hearsay rule, but I know Your Honor has ruled on

that.

But we believe that under the Rule of

Completeness that should come in because it, without

it, the jury is left with an inaccurate view of what

Mr. Smith said.  And under the Rule of Completeness

it is really looking at what statements provide

context for the statements the Government is seeking

to introduce.

We are not, again, trying to get the

entire statement in but we believe that it is those

statements that provide context and explanatory

parameters for Mr. Smith's subsequent statements

1    should be introduced.  And this statement going from

2    Line 16 on Page 8 to Line 1 on Page 9 is one of

3    those statements.

4              THE COURT:  All right.  Got it.

5              Anything further, Mr. Nayback?

6              MR. NAYBACK:  Only that we just don't

7    think the fact that he has had break-ins in the past

8    that he, in fact, has, that those don't put his

9    statement into any greater context than it might be

10   without that statement.

11             And then, secondly, I don't think the fact

12   that the defendant had to put in motion detectors

13   gives his statement any more context for the jury.

14             Recall that the defendant claims he

15   thought they were raccoons.  The story, as presented

16   by the United States, can start with Mr. Smith on

17   the back porch seeing, seeing a shadow, as he put

18   it.  It doesn't matter how he got outside or what

19   his motion sensors picked up or whether he had

20   break-ins in the past.  We think the -- and those

21   haven't been proven up, Your Honor, by -- the

22   United States doesn't intend to introduce the

23   break-ins, but that clearly is Mr. Smith trying to

24   give his motivation for going out armed and then

25   firing was because he had break-ins in the past.  We

1  think those are exculpatory statements and

2  excludable.

3          Thank you.

4          THE COURT:  Next?

5          MR. NAYBACK:  Is on Page 9, Your Honor,

6  just the following page.  And what is at issue are

7  portions of Line 21 through 25.  And I will read the

8  defense objections to the relevant portion.

9          "So I thought, well, there is like three,

10 or four raccoons out there.  So I just -- I used to

11 wander around and then I ran into a couple of guys

12 in the middle of the night and all I had" -- I'm

13 sorry, I'm going on to the next page, Your Honor, so

14 it is going on to Page 9 now.

15         "And all I had on were these floppy tennis

16 shoes and just this jacket.  I was sleeping with

17 nothing on at the time, and it kind of scared the

18 crap out of me.  So I have been kind of panicky

19 about anybody."

20         We don't think these are statements

21 against interest, rather, we think those are

22 exculpatory evidence and ought to be excluded by the

23 Court.

24         Thank you.

25         THE COURT:  Mr. Elsenheimer?

1          MR. ELSENHEIMER:  Your Honor, so as with

2     the -- so just to be clear, so Mr. Nayback with

3     regard to the prior statement on Page 8 going on to

4     Page 9 and even with regard to that, those kind of

5     set the statements, Page 24.  So let me just, I'm

6     sorry, let me back up.

7          With regard to the statements on Page 8

8     going on to Page 9, Mr. Nayback may be correct and

9     that is not the hill I want to have this fight on.

10          Those statements in terms of the Rule of

11    Completeness are, I think they should be brought in

12    under the Rule of Completeness, they are not

13    critical.

14          I believe once we get into the statements

15    where the Government is parsing sentences and then

16    even down to the -- not just sentences, clauses that

17    Mr. Smith is stating, I think that is where we get

18    into the critical analysis under the Rule of

19    Completeness.  I just can't see how the jury can be

20    introduced into Sentence 1 and then we -- so like

21    Sentence 1 being Lines 20 through 21, while half of

22    that sentence is excised and then moving on and we

23    excise the sentence that starts on Line 24 going

24    into the next page and then the following sentence.

25          I think once we get down to that type of

1  glandular editing of Mr. Smith's statements, it is

2  impossible for the jury to have an accurate

3  impression and an accurate sense of what he is

4  saying and an accurate context of how he is

5  explaining to Detective Abeyta what happened on that

6  evening.  I think those, that is the critical

7  analysis under the Rule of Completeness.

8         Mr. Nayback might be right with regard to

9  the four prior burglaries that Mr. Smith said on

10  Page 8.  Again, that is not the hill that I think

11  the fight about the Rule of Completeness that I want

12  to have that argument on.  But when we get to the

13  glandular editing of Mr. Smith's statements, that is

14  critical because it deprives the jury of an accurate

15  sense of what Mr. Smith was explaining to

16  Detective Abeyta.

17         And I think, again, I want to incorporate

18  by reference my analysis in the margins, the

19  reference to *Rainey v. Beech Aircraft*, I think,

20  explains how the Rule of Completeness operates in

21  this context.  I think that *Rainey* is an excellent

22  case to show that context is critical.

23         So if we are excising clauses in a

24  sentence and sentences within larger explanatory

25  paragraphs, the jury cannot possibly have an

1    accurate assessment of what Mr. Smith says.

2            The idea that these are, some statements

3    are exculpatory and some are somehow not, I don't

4    know that that even has any analytical relevance at

5    this point because how does somebody in Mr. Smith's

6    shoes, as he is interviewing with Detective Abeyta,

7    kind of make some exculpatory statements and some

8    not?  I just don't think that it is, just psychology

9    doesn't allow that type of glandular parsing of

10   one's defenses from one's explanation of what

11   happened.  And if that can't happen in realtime, I

12   don't think that we should deprive the jury of the

13   ability to see what Mr. Smith was saying in response

14   to Detective Abeyta's questions so that the jury

15   gets an accurate sense of what Mr. Smith said.

16           The big problem is that without those,

17   those isolated sentences or clauses that the

18   Government wants to exclude and, Your Honor,

19   particularly Mr. Nayback hasn't gotten to this, but

20   I may as well just mention it now because I don't

21   want to repeat myself.  When we get down to things

22   like, "I got scared witless in Line 12," and I am

23   sure Mr. Nayback will address this.  I don't want to

24   jump ahead, but then we get a real problem where the

25   jury is not given an accurate, not given the

1    accurate statement of what Mr. Smith experienced at

2    the time this incident occurred.

3            And that is critical particularly in a

4    case like this where the facts really are not

5    largely in dispute.  What we are really talking

6    about is what was Mr. Smith's mental state at the

7    time and was it a culpable mental state or was it a

8    non-culpable.  That is the real critical question

9    here.

10           And if the jury is left with an edited

11   version of what Mr. Smith said, he is going to be

12   deprived of his right to a fair jury trial because

13   they won't have an adequate explanation or an

14   adequate picture into what he actually said to

15   Detective Abeyta in the hours following this

16   incident.  And that's a significant depravation of

17   Mr. Smith's right to a jury trial and a significant

18   depravation of his right to due process.

19           THE COURT:  I understand your point.  Tell

20   me if you are -- if you are still asking for the

21   inclusion of specific phrases here.

22           MR. ELSENHEIMER:  Yes.

23           THE COURT:  So the bottom of Page 9, for

24   example, Mr. Nayback argues that certain things are

25   exculpatory and I wasn't real sure whether you were

1    saying he might be right or whether you were saying

2    he may be right, but they should come in anyway.

3             MR. ELSENHEIMER:  I was referring to

4    Page 8 with regard to the four prior burglaries and

5    the motion detectors, putting up the motion

6    detectors.

7             THE COURT:  Right, right.

8             MR. ELSENHEIMER:  I do not think that with

9    regard to the statements starting at Line 20.

10            THE COURT:  Okay.

11            MR. ELSENHEIMER:  So Lines 21 through 22,

12   that certainly should come in and then likewise,

13   Line 24 through Line 5 on Page 10.  Those should all

14   come in.

15            Again, I want to be clear that I was

16   talking about Page 8.  I'm sorry for the confusion,

17   Your Honor.

18            THE COURT:  Well, I just wanted to make

19   sure I understood which ones you were -- I

20   understand your argument about parsing out phrases

21   and altering what might be the defendant's mental

22   state.  I understand your argument, I just want to

23   make sure I am following exactly which phrases or

24   which parsing you are referring to.  So that is what

25   I am trying to accomplish.

1          MR. ELSENHEIMER:  Thank you.

2          THE COURT:  Okay.  So 9 you say that all

3     should come in.  The Page 10, same?

4          MR. ELSENHEIMER:  The same, Your Honor,

5     yes.

6          THE COURT:  Okay.  Understood.  Thank you

7     for helping me clarify that.

8          Mr. Nayback anything further on Pages 9

9     and 10?

10          MR. NAYBACK:  Well, just a point of

11     clarification, Your Honor, if you'll indulge me.

12          After the Court rules on admissibility or

13     inadmissibility of certain statements, the U.S.

14     obviously intends to evaluate the Court's order and

15     may choose not to play certain statements that the

16     Court ruled were admissible.

17          I want to make clear on the record that it

18     is the United States' prerogative to admit or not to

19     admit certain statements by the defendant.

20          The defendant cannot introduce these

21     statements or cross witnesses on statements that the

22     Court ruled were admissible if the U.S. decides not

23     to introduce them.  I hope that question was clear,

24     but what I am saying is the Court might rule

25     something --

1          THE COURT:  I was just going to say what

2     you're saying if I rule something is admissible that

3     you may still decide not to offer it?

4          MR. NAYBACK:  Yes.

5          THE COURT:  And if you decide not to offer

6     it, even though the Court may have ruled that it was

7     admissible, I think I heard you say that the

8     defendant should not offer those statements.

9          Did I hear your correctly?

10         MR. NAYBACK:  I think under 801(b)(2), it

11    has to be admission by a party opponent and I just

12    wanted to make clear, this seems like axiomatic for

13    me and Ms. Wilson, but I just wanted to be clear

14    that even if a Court ruled that something were

15    admissible, the United States can decline to

16    introduce it in its case-in-chief.

17         THE COURT:  Right.  I think that's an

18    accurate statement.  You don't have to introduce

19    evidence even if it may be admissible.

20         MR. NAYBACK:  Thank you, Your Honor.

21         The next issue that was raised by the

22    defense was Page 15 of the same interview, the

23    May 5th, 2018 interview of Mr. Smith.

24         It is at the bottom of the page, 15, and

25    it starts on Line 21.  The statement that is in

1 dispute is where Mr. Smith says, "I thought she was

2 already gone, but I was scared witless and I just --

3 I don't know how many rounds I shot, four, five,

4 altogether, I don't know."

5         We think those are exculpatory statements

6 that should not be admissible.  I apologize, Your

7 Honor, for completeness, it goes on to Page 16,

8 Lines 1 through 8.  Those are something that the

9 United States and the defense dispute.  And the

10 United States would ask for a ruling that those are

11 inadmissible as exculpatory statements.

12         Thank you.

13     MR. ELSENHEIMER:  Your Honor, I can't make

14 an argument about Rule of Completeness with regard

15 to those statements.  You've already ruled on the

16 excited utterance.  We would reassert that it is an

17 excited utterance, but I understand your ruling.

18         Just to be clear, we are talking Page 14,

19 Line 22 through Page 15, Line 7; is that right?

20         THE COURT:  I had us at Page 15, Line 21

21 to Page 16, Lines 1 through 8.

22     MR. ELSENHEIMER:  I'm sorry.

23     MR. NAYBACK:  That is what I was arguing.

24     THE COURT:  Page 15, Line 21 through

25 Line 25 and it is Line 21 beginning with, "I

1  thought," and then on to the next page, 16, Lines 1

2  through 8.

3            MR. ELSENHEIMER:  Okay.  Let me withdraw

4  what I just said.  I apologize for that.  I was

5  referring to the prior statement on the prior page.

6            With regard to Page 15 starting at

7  Line 20, again, first I think that that falls under

8  the excited utterance exception and the residual

9  exception, but the Court has already ruled on that

10 and I just state it for the record.

11           And I believe the Government is seeking,

12 "She started running and ran behind the bushes and

13 then I couldn't see."

14           I think the next statement should come in

15 because it provides Mr. Smith's full response to

16 Detective Abeyta's question, "And then what happened

17 after?"

18           I don't think that we can cut off the

19 statement after the first sentence.  I think under

20 the Rule of Completeness that second -- that second

21 sentence has to come in, the second and third

22 sentence.

23           And further the lines starting Line 25 on

24 Page 15 going on to Line 8 on Page 16 also comes in

25 under the Rule of Completeness for the reasons that

1    I set out in the margin.  And again it is a

2    reference to *Rainey v. Beech Aircraft*.  I believe

3    that fundamental fairness demands that that entire

4    statement come in, particularly if we are then

5    seeking to introduce the Government is seeking to

6    introduce Line 9, which I believe they are going on

7    to Line 25 of Page 16.

8            I think the Government is seeking

9    basically, they are essentially trying to cut off a

10   section of Mr. Smith's statement and that is

11   fundamentally unfair to him.  It deprives him of his

12   right to due process and right to a jury trial.

13           THE COURT:  All right.  Anything further

14   on that issue, Mr. Nayback?

15           MR. NAYBACK:  No, Your Honor.

16           Thank you.

17           THE COURT:  All right.

18           Next.

19           MR. NAYBACK:  It is on Page 17, Line 1

20   through Line 14.  This is Mr. Smith talking about

21   having some spare bullets, and the United States

22   believes they are exculpatory statements that are

23   inadmissible.

24           Thank you.

25           THE COURT:  Mr. Elsenheimer?

1          MR. ELSENHEIMER:  Your Honor, my
2    explanation is essentially the same as with regard
3    to Page 16, the first eight lines on Page 16.  But
4    just to parse that out a little bit, from my copy
5    and maybe I am wrong on this, but it seems as though
6    the Government is seeking to introduce Lines 9
7    through Line 25 of Page 16 and then it seems to cut
8    off with Line 1 of Page 17.  So it is almost like
9    they are -- as if they are kind of severing
10   Detective Abeyta's question almost mid-sentence.
11          I believe that the entire sentence should
12   be introduced and Mr. Smith's, at least Mr. Smith's
13   response, "I didn't see her anymore and I didn't
14   even know that I hit anybody," should be introduced
15   because if we look at -- he is talking about on
16   Page 16, Line 17 through 21 -- I'm sorry, 19, for
17   example -- well, 16 through 22, let's say.
18          It is the discussion of the shooting, so
19   Mr. Smith says, "When I was shooting, no" and
20   Detective Abeyta says, "Okay.  And you saw her near
21   the camper and started shooting this way," and he is
22   pointing in a particular direction if you are
23   looking in the video, "and then she took off
24   running."
25          And Mr. Smith says, "Took off for the" --

1          Detective Abeyta says, "In the direction

2     you started shooting?"

3          Mr. Smith clarifies, "toward the road.

4     She was headed out."

5          That is why it is important for us to have

6     the explanation Mr. Smith gives when he says, "I

7     didn't see her anymore and I didn't even know I hit

8     anybody," because it is -- to cut it off where the

9     Government proposes ending that statement leaves it

10    up in the air.  It is not the full explanation.  It

11    is a conversation between Mr. Smith and

12    Detective Abeyta and if you cut it off where the

13    Government proposes to cut off, you are essentially

14    terminating the conversation before Mr. Smith has

15    had time to even fully answer the question that

16    Detective Abeyta is answering and that is just

17    fundamentally unfair because anybody knows that in

18    the course of a conversation like that, there are

19    questions and answers and additional questions for

20    clarification and an additional answer for

21    clarification.

22          Cutting it off where the Government

23    proposes, deprives the jury of seeing what Mr. Smith

24    actually said to Detective Abeyta and what

25    Detective Abeyta asked Mr. Smith.

1          THE COURT:  All right.  Thank you.

2          Anything further on this, Mr. Nayback?

3          MR. NAYBACK:  Nothing further, Your Honor.

4          Thank you.

5          THE COURT:  All right.

6          Next.

7          MR. NAYBACK:  Is at the bottom of Page 17,

8    Line 22 through 24.  The statement that the

9    United States seeks to exclude is, "When you are

10   scared shitless, you are not really thinking."

11          We think this is part and parcel of the

12   entire defense that Mr. Smith was scared.  We think

13   this is self-serving, and exculpatory and wherever

14   it arises in these statements we think it ought to

15   be excluded.

16          Thank you.

17          THE COURT:  All right.

18          Mr. Elsenheimer?

19          MR. ELSENHEIMER:  Your Honor, my reasoning

20   for this, this is a critical statement.  I

21   understand that Your Honor excluded Mr. Smith's

22   statement with regard to his being scared witless

23   regarding the prior -- there had been a prior

24   burglary attempt or a prior intruder on his property

25   and Mr. Smith fired to scare that intruder away and

1    Mr. Smith said in that context that he was scared
2    witless.  Your Honor ruled that that should not come
3    in because it wasn't relevant.  That may well be the
4    case under a 404B analysis because we are really
5    talking about something different.
6            If we are talking 404B, then Mr. Smith's
7    state of mind at the time isn't necessarily, the
8    Court has perhaps less relevance.  When we are
9    talking about this, obviously it has tremendous
10   relevance.  So the relevance analysis doesn't,
11   doesn't apply here as it would for the 404B because
12   this is a relevant statement in the context of this
13   type of trial.
14           It is critical under the Rule of
15   Completeness because it is Mr. Smith's -- again, I
16   keep going over this, but it is Mr. Smith's
17   explanation to Detective Abeyta following up on
18   Detective Abeyta's questions about what was taking
19   place at the time Mr. Smith was on his back porch
20   and saw an intruder on his property.
21           It is, I think that without that statement
22   we don't understand why Mr. Smith walked out to get
23   more bullets, why he said what he did in the
24   statements, let's say, Line 6 through 14, I'm sorry,
25   yes, Line 6 through 14, but moreover what the

1    Government is seeking to introduce through Lines 14

2    through 22.

3            For example, Mr. Smith -- this is the part

4    the Government is trying to get in.  Mr. Smith says,

5    "Well, so I just said well whatever happens,

6    happens.  And I saw the fence line and somebody

7    lying there.  There is no rely on this.  There is no

8    going back and doing something different."

9            That makes Mr. Smith seem -- the jury

10   could see that and think that Mr. Smith is being

11   crass and what is the word I am looking for, kind of

12   callus about what happened.  And he is not at all.

13   He is saying this is kind of resigned, he is -- and

14   he says, "But you're not really thinking."

15           The reason he is saying that is because he

16   was scared, he was scared witless and he wasn't

17   really thinking.  It provides critical context for

18   those prior statements.  Without that last line,

19   "When you're scared witless you are not really

20   thinking," that prior, the prior essentially seven

21   or eight lines could -- the jury could see that and

22   think that Mr. Smith is callus and that is far from

23   the truth.

24           And that would significantly deprive him

25   of his right to a jury trial and his right to due

1    process by excising that particular statement that

2    he was scared because that provides -- it is

3    critically relevant because this case is all about

4    Mr. Smith's state of mind.  And it is critical under

5    the Rule of Completeness because without it, it is

6    like the situation in *Rainey v. Beech Aircraft* and a

7    lot of the other cases that discuss the importance

8    of context with regard to Rule of Completeness.

9              THE COURT:  All right.  Thank you,

10   Mr. Elsenheimer.

11             Anything further on this particular point,

12   Mr. Nayback?

13             MR. NAYBACK:  Just briefly, Your Honor.

14   One of the things that was not highlighted by

15   Mr. Elsenheimer that I wanted to was Mr. Smith's

16   statement contained within Line 1 through 14, which

17   is Line 7 through 9, "I thought I better put some

18   more in just in case I go over and they start

19   shooting at me."

20             Now, I think the Court has already hinted

21   or maybe finally ruled that Mr. Smith wasn't trying

22   to prevent a violent felony.  And I think it leaves

23   the jury with the impression that Mr. Smith had some

24   information that this person pointed a gun or was

25   armed.

1              And as the Court, I think knows by now,

2     that the victim was found without any weapon on her,

3     no other shots were fired.  And so we think it is,

4     you know, again, Mr. Smith thinking about what he

5     should say to law enforcement and putting in this

6     exculpatory statement about, Oh, what if they start

7     shooting at me I better arm myself with more

8     bullets.

9              So we think that is pretty clearly an

10    exculpatory statement.  It is not really taken out

11    of any context of the other statements that he has

12    given.

13             One final point just in response to

14    Mr. Elsenheimer's argument that this is about

15    Mr. Smith's state of mind.  As the Court well knows

16    we are not charging him with first-degree murder.

17    This is a reckless homicide.  The United States is

18    arguing that his reckless conduct resulted in the

19    death of Jane Doe.  And fear is not going, in our

20    minds not going to be a defense to that.  In any

21    event, we think that the statement that, "I thought

22    I better put some more in, in case I go over and

23    they start shooting at me."

24             Mr. Smith was asked by agents if he has

25    ever encountered burglars with weapons before, he

1    said no.  There is no evidence in this case Jane Doe

2    had a weapon and so we think this is a very clear

3    attempt at Mr. Smith to parse in an exculpatory

4    statement that we think ought not to be admissible.

5              Thank you.

6              THE COURT:  Mr. Elsenheimer, any comment?

7              MR. ELSENHEIMER:  The only comment I have

8    for that is that I don't think it -- to me in my

9    mind, it doesn't really make sense.  I mean,

10   Mr. Smith is merely explaining why he went over and

11   put bullets back into the gun, which I don't think

12   is terribly unreasonable in those circumstances.

13             It is the middle of the night and somebody

14   had just, an intruder had just been on his property.

15   I don't think it is unreasonable and it is certainly

16   not necessarily a self-defense claim, but it is

17   certainly unreasonable that one would go over and

18   reload a gun just in case the intruder who is on

19   one's property returned or still there or was, in

20   fact, armed.

21             We live in a society where guns are

22   relatively prevalent.  Probably that is an

23   understatement.  Guns are widespread in our society.

24   Virtually, I mean, so many people have guns and a

25   lot of people who shouldn't have guns, have guns.

 1    We see it every day.  Literally every day we have,

 2    the Government charges individuals with possession

 3    of firearms and they should not under the law have

 4    firearms.

 5            We live in a society where guns are as

 6    prevalent, practically, or more prevalent as water.

 7            And thinking that somebody who is just on

 8    one's property, I certainly would probably think

 9    that if I was in Mr. Smith's shoes, that they might

10    still be there and they might have a gun.  Just, I

11    may not have seen a gun but there is a very real

12    possibility that they could have a gun.  It is not

13    unreasonable to go and reload.

14            Now in and of itself -- I am just pointing

15    that out because I think that it does -- Mr. Smith

16    is not a monster because he goes over and reloads

17    his gun.  He is certainly not irrational by thinking

18    that somebody might still be on his property with a

19    gun.

20            In the context of this statement it

21    explains why he went to get -- why he put bullets in

22    his clip because the Government is seeking to

23    introduce Lines 14, 15, and 16 and it discusses him

24    going to go put bullets in his clip.  Well, the jury

25    is going to hear that he is putting bullets in his

1   clip and it is only fair that they hear why he was

2   putting bullets in his clip.  Most jurors are going

3   to be reasonably -- most jurors are homeowners or

4   rent their own homes and realize if they have a gun

5   for self-defense that if they were in Mr. Smith's

6   shoes they would probably go reload, too, just in

7   case that person was still on their property.

8           I don't think it is -- I mean, the jury is

9   going to figure it out, but it is only fair to

10  Mr. Smith to introduce that statement of why he was

11  going over to the truck to reload his gun and why he

12  was reloading.  Without that, the statement that he

13  was putting bullets back in the clip is kind of --

14  kind of left, it just doesn't have any, doesn't have

15  anything that explains where it comes from or why it

16  would just suddenly appear out of the blue.

17          THE COURT:  All right.  Thank you.

18          Anything else on that issue?

19          MR. NAYBACK:  No, thank you.

20          THE COURT:  Okay.  All right.

21          Next.

22          MR. NAYBACK:  Your Honor, I think the last

23  two statements in dispute on this interview are on

24  Page 20, Lines 23 and 24.

25          Mr. Smith saying, "I just figured

1  raccoons" and then finally, Your Honor, on Page 39,

2  Line 19 Mr. Smith indicating that fear took over.

3  The United States submits those are both exculpatory

4  statements that ought not to be admissible.

5          And then I will move on to the next

6  interview.

7          THE COURT:  Mr. Elsenheimer?

8          MR. ELSENHEIMER:  Yes, Your Honor.  So

9  with regard to line, Page 18, Lines 9 through

10  Page 19, Line 21, that is the -- that is the

11  beginning of the conversation Mr. Smith is having

12  with Detective Abeyta that the Government is seeking

13  to introduce on Page 19, Line 22.  That is a -- that

14  is important because it provides the -- what they

15  are talking about when Detective Abeyta asks

16  Mr. Smith about, "Well, why didn't you shoot into

17  the air," and Mr. Smith explains, "Well, you don't

18  know where it is going to land."

19          It provides an explanation that Mr. Smith

20  didn't know, had just shot to scare the individual

21  off and that that is why he was firing where he did.

22  And that provides the context for Officer Abeyta's

23  question about firing into the air.

24          If I can move over to page -- I have

25  something on Page 20 if I can just look at this

1   really quick.

2          Oh, I know the Government is seeking to

3   introduce paragraph -- Page 20, Line 18 through

4   Line 22.  They are seeking to introduce that which

5   includes Detective Abeyta's question, "When you went

6   out twice before what did you see?"

7          They didn't include and maybe this was an

8   oversight, I am not sure, but Mr. Smith's response.

9   I think that is important because without it, it

10  seems as though Mr. Smith didn't answer the question

11  and is therefore being evasive.  I think we have to

12  include Mr. Smith's answer to Detective Abeyta's

13  question.

14          MR. NAYBACK:  Your Honor, I agree with

15  that.  We would concede that that is an oversight on

16  my part.

17          THE COURT:  All right.

18          MR. ELSENHEIMER:  Again, on Page 22,

19  Line 21, the Government is seeking Line 21 through

20  Page 23, Line 1 but they are seeking to excise the

21  clause, "and went into total absolute scared witless

22  at the time."

23          For the same reasons as I have discussed,

24  that is a critical part of Mr. Smith's answer.

25          Cut editing his response to exclude that

```
 1  is fundamentally unfair and deprives him of his

 2  right to a jury trial and his right to due process.

 3          THE COURT:  One more time.  What was the

 4  page and line you are referring to?

 5          MR. ELSENHEIMER:  Sure.  It is Page 22 and

 6  we are looking at Line 22 and 23.

 7          THE COURT:  Okay.  Got it.

 8          MR. ELSENHEIMER:  So the Government is

 9  seeking to introduce 21 through the next page

10  Line 1.

11          But they are seeking to edit out that

12  statement that I just quoted.  Do you want me to say

13  that again?

14          THE COURT:  No, I just wondered, I just

15  wanted to know which page and lines you were

16  referring to.

17          MR. ELSENHEIMER:  Can I just have a moment

18  because I want to make sure there is not something

19  else that I wanted to address here.

20          THE COURT:  Yes.

21          MR. ELSENHEIMER:  I just want to make sure

22  that we are clear on this.  Page 26, Line 18 through

23  Line 24, we are objecting to that.  I can't recall

24  if Your Honor already excluded that, if that was

25  covered, but I just want to make sure that we are
```

1    objecting to that.  That is with regard to a

2    different incident with someone else on Mr. Smith's

3    property.

4            Let me just make the record clear that we

5    are still objecting Page 26, Line 18 through 24 of

6    Document 138-2.

7            Moving on, Your Honor, if I can just

8    address this.

9            THE COURT:  Hold on one second.

10           MR. ELSENHEIMER:  Sure.

11           THE COURT:  All right.  What were you

12   going to say, Mr. Elsenheimer?

13           MR. ELSENHEIMER:  Your Honor, Page 30,

14   Line 2.

15           THE COURT:  All right.

16           MR. ELSENHEIMER:  There is the first five

17   words, "I was scared shitless, so."

18           So, again, for the same reasons I have

19   discussed before with this very similar statement.

20   That should be included because it is part of

21   Mr. Smith's answer to Detective Abeyta's questions

22   and his conversation with Detective Abeyta.  It

23   should come in under the Rule of Completeness.

24           THE COURT:  All right.

25           MR. ELSENHEIMER:  I don't know, can I just

1  address Page 38, Lines 5 through 6?

2          I don't believe -- we object to that on

3  the basis it is not relevant.  I don't know that the

4  Government is still seeking to get that into

5  evidence, but if they are, we object on the basis

6  that it is not relevant.

7          THE COURT:  All right.  Are you keeping

8  track of all of these, Mr. Nayback, so you can

9  respond to each?

10          MR. NAYBACK:  I am, Your Honor.  Thank you

11  so much.

12          I am going to start on Page 26, Line 18

13  through 24.  This is something that happened to

14  Mr. Smith and it gives the jury a full impression of

15  the nature of his property and those who he

16  encounters there.

17          And particularly the Government has always

18  sought to admit Lines 18 through 24.  And this is a

19  person he encounters and Mr. Smith says, "And then

20  he raises his hands and he says -- what did he

21  say -- 'I am cold.  I am only looking for a place to

22  get warm'."

23          We think this is a relevant and admissible

24  statement.  It is a statement by the defendant and

25  we think it goes to -- gives the jury a complete

1    picture of how big his property is, how many out
2    trailers he has and that he does encounter people
3    there who are looking for a place to get warm.  That
4    is our argument on that.
5         The next, I believe, I will just highlight
6    it for the Court, Page 30, Line 2.  Again, he says
7    this throughout his statements that he was scared
8    shitless and we think those are inadmissible.
9         And then finally I am going to go to
10   Page 38, Lines 5 and 6.  Those are statements by
11   Mr. Smith that we believe are admissible.  He says
12   or a statement, "But I didn't know who this was and
13   I thought, well, it is not Melanie."
14        And we think this is an admissible
15   statement.  It goes to show that Mr. Smith did not
16   know who was outside his house, that he had
17   residents at his house, one of which was a small
18   child and we think that is relevant for the jury to
19   hear.
20        Mr. Smith, we allege, was acting
21   recklessly that night shooting into the dark not
22   knowing who was there or what the purpose of that
23   person was there.  And each of these statements that
24   Mr. Elsenheimer seeks to keep out goes to show how
25   reckless he actually was.

1          So for those reasons we ask the Court

2     allow the United States to introduce those in its

3     case-in-chief.

4          Thank you.

5          THE COURT:  Mr. Elsenheimer, anything

6     else?

7          MR. ELSENHEIMER:  Only Page 39.  The

8     Government is seeking to introduce a statement at

9     Line 21 through 22.  If the Government is seeking to

10    introduce that, Mr. Smith's statement prior to that,

11    that fear took over is part of that statement.  It

12    is in response to Detective Abeyta's questions.  It

13    is essentially one thought that he is saying, "fear

14    took over and I stopped thinking."

15         And the transcript it looks like it is

16    interspersed with Detective Abeyta essentially kind

17    of in conversation saying, "Uh-huh, uh-huh."

18         This happens a lot in the conversation as

19    it does in most conversations, but it is one thought

20    Mr. Smith saying, "Fear took over and I stopped

21    thinking and just started pulling the trigger."

22         Without "fear took over," that statement

23    is incomplete, inaccurate on its own because it

24    doesn't convey exactly what Mr. Smith said and it

25    unfairly prejudices Mr. Smith in front of the jury.

1          That is all that I have on this particular

2   transcript.

3          THE COURT:  All right.  Anything else,

4   Mr. Nayback?

5          MS. WILSON:  Yes, Your Honor.  The

6   United States does seek to admit Mr. Smith's

7   statement that he stopped thinking or -- "And I

8   stopped thinking and I just started pulling the

9   trigger."

10          That goes to the heart of the

11   United States' theory of this homicide, and we think

12   it should be admissible.  And I would resubmit the

13   same arguments that Mr. Smith was -- Mr. Smith's

14   exculpatory statements that he was scared witless or

15   that fear took over, are inadmissible.

16          Thank you.

17          THE COURT:  Got it, thank you.

18          Moving on, then, Mr. Nayback.

19          MR. NAYBACK:  And I'm sorry this is so

20   cumbersome, Your Honor.  We don't often have cases

21   where there is a defendant interviewed several

22   times, but I think we are getting very close to the

23   end of this motion.

24          And I am going to start on page, let me

25   make sure here.  Page 33 of the May 7th interview by

1    the FBI of Mr. Smith two days after the homicide.

2              And on Page 33, lines, a portion of

3    Line 14 through 17.  I am going to read this

4    statement.

5              "And this incident was the guy, I saw a

6    shadow at the back end of the trailer bent down

7    doing something.  And I cocked the pistol and went

8    pow."

9              And this is in regards to another

10   statement, you know, and again it is hard to say

11   what a jury might do with a statement where again

12   Mr. Smith is shooting in the dark at a human.  But

13   we don't think it is relevant and it is clearly

14   exculpatory and we would ask that lines on this

15   page, Page 33 that Lines 14 starting with, "and"

16   through 17 ending in pow, P-O-W, and then on the

17   same page, Your Honor, Lines 19 through 21, and on

18   21 ending with, "gone" should be excluded as

19   inadmissible.

20              Thank you.

21              MR. ELSENHEIMER:  May I have just a

22   moment, Your Honor?

23              THE COURT:  You may, yes.

24              MR. ELSENHEIMER:  My understanding was the

25   Government was seeking to introduce those

1    statements.  At least it is highlighted in green in

2    their, in their Document 132 and I thought green was

3    what they were seeking to introduce.

4              MR. NAYBACK:  Your Honor, I apologize.  I

5    have as you can probably tell, a number of

6    transcripts in front of me.  I was going off

7    Mr. Elsenheimer's transcript here and we are seeking

8    to introduce those statements.  I apologize, working

9    with a number of things here.  And those statements

10   ought to be admissible and I didn't, I didn't

11   realize that Mr. Elsenheimer was not agreeing to

12   those.

13             Thank you.

14             THE COURT:  All right.  So the Government

15   intends to admit those statements, the defendant

16   objects.

17             MR. NAYBACK:  We think this has already

18   been ruled on by the Court, Your Honor.

19             MR. ELSENHEIMER:  Right, I believe it was.

20             THE COURT:  I believe it was in the

21   Court's memorandum opinion and order, so then moving

22   on.

23             MR. NAYBACK:  Thank you, Your Honor.

24             There weren't many in this transcript that

25   I think were in dispute, and I think that is the sum

1    total.  I don't believe -- so on Page 37,

2    Your Honor, Lines 9 and 10, starting on Line 9,

3    "Somebody trying to break in and I just panicked,

4    panicked.  I lost any -- again fear took over."

5          And then the same argument applies to

6    Lines 14 through 16.  And it's portions of it, "Just

7    scared, scared them off."

8          We think those should be excluded.

9          MR. ELSENHEIMER:  Your Honor, may I have

10   just a moment?  I want to find a ruling with regard

11   to the last statement.

12         Your Honor, with regard to -- I want to

13   make the argument with regard to Page 37, and I am

14   referring to the statements at Lines 9 through 11

15   and then again Lines 14 through, essentially,

16   Line 16.

17         I think that the Court's reasoning with

18   regard to the statement on Page 33, this is in

19   regard to the 404B evidence and the Government had

20   sought to keep out the statement, "Definitely

21   missing both him and the trailer, just to scare him

22   off."

23         I believe the Court introduced that

24   statement and allowed that statement to come in on

25   the grounds that it provided, there was a danger of

1    misleading the jury by excluding the middle of that

2    passage.  I think the same analysis applies to this

3    particular statement on Page 9, I'm sorry, Page 37,

4    Line 9 through 11 and again Page 37, Lines 14 and

5    then Line 15 through 16.  I think the same analysis

6    applies that brings in Lines 17 through 18 on

7    Page 33, that the same analysis applies to those

8    disputed portions of Page 37.

9            I hope that makes sense.  I am referring

10   to the Court's order with regard to the 404B

11   statement and the same reasoning applies.  In fact,

12   I think given the fact that we are talking about the

13   instant case, the case for which Mr. Smith is

14   charged, it is even more danger of misleading and

15   danger of unfair prejudice by misleading the jury

16   with regard to these statements on Page 37.

17           THE COURT:  Yes, I follow your argument.

18           Anything further, Mr. Nayback?

19           MR. NAYBACK:  No.  Thank you, Your Honor.

20           THE COURT:  Any others in this transcript,

21   Mr. Nayback?

22           MR. NAYBACK:  Yes.  We are almost done, at

23   least from our perspective.

24           On Page 55 Special Agent Cobb is asking

25   Mr. Smith at Line 7, "What was the feeling inside

1    you?  I know you were scared but what was the

2    purpose of shooting the gun?"

3              And on Line 10 Mr. Smith indicates, "to

4    scare them away," and we believe this is

5    inadmissible being an exculpatory statement.

6              THE COURT:  Mr. Elsenheimer?

7              MR. ELSENHEIMER:  I believe that it's

8    prior conversations introduced.  Prior conversations

9    being my understanding the Government is seeking

10   essentially virtually the entire conversation

11   beginning on Page 53, Line 11, going all the way

12   through to Page 55 Line 6.

13             My understanding from my transcript is

14   that that is what the Government is seeking to

15   introduce.  I think that the Rule of Completeness

16   demands that that, at the very least, Special

17   Agent Cobb's question of Mr. Smith, "What was the

18   feeling inside of you?  I know you were scared, but

19   what was the purpose of shooting the gun?"

20             That, the Rule of Completeness demands

21   that that, those four lines be introduced as well,

22   Line 7 through 10 of Page 55 because it is an entire

23   conversation about what Mr. Smith was doing, where

24   he was, what was happening and a discussion about

25   the use of a firearm.  And I think that statement

1    has to be introduced if the prior conversation is

2    introduced.

3                THE COURT:  All right.  Understood.

4                Mr. Nayback?

5                MR. NAYBACK:  The last final couple,

6    Your Honor, is on Page 38 and 39.  The first one the

7    Government seeks to exclude is Line 2 of Page 38,

8    which is in the middle of the line and it just says,

9    "I was too nervous."

10               We think that is exculpatory and

11   inadmissible.

12               And then secondly, Your Honor --

13               THE COURT:  Hold on.  Page 38 line?

14               MR. NAYBACK:  Two.

15               THE COURT:  Line 2, okay.

16               MR. NAYBACK:  And then on Page 39, the

17   next page, 19 through 24.  Mr. Smith indicates on

18   Line 19 starting with, "And when this person bent

19   down I thought I was going to get shot right there

20   on the spot.  Total panic.  Fear just took over."

21               We believe that is an exculpatory

22   statement that should be excluded.

23               And then similarly that same paragraph

24   Line 23 and 24, "And then after that I was scared.

25   I couldn't say."

1          That those should be excluded, Your Honor.

2    And I have one final one on the next page.

3          THE COURT:  Mr. Elsenheimer?

4          MR. ELSENHEIMER:  With regards to Page 38

5    taking those four words out at Line 2, "I was too

6    nervous," I think that has to come in under the Rule

7    of Completeness.

8          Moving on to Page 39, again what the

9    Government is doing is kind of piecemeal parsing out

10   and cutting and pasting Mr. Smith's statements to

11   kind of take away the full -- the full body of what

12   he is explaining to the detectives.

13         The Government wants to introduce

14   statements that Mr. Smith made to the detectives.

15   They have to introduce at least the portions of that

16   statement that don't mischaracterize what Mr. Smith

17   said.  Taking these lines out, so Page 39, Line 19

18   through 21 and again Line 23 through 24, risk --

19   doesn't just risk, it would lead to a

20   mischaracterization of what Mr. Smith said, and that

21   is fundamentally unfair.  And it will mislead the

22   jury.

23         I believe that Mr. Nayback didn't move on

24   to Page 40; is that right?

25         MR. NAYBACK:  That is correct.

1          THE COURT:  He has not yet moved on to

2     Page 40.

3          MR. ELSENHEIMER:  I wanted to make sure.

4          THE COURT:  Let me just ask Mr. Nayback,

5     anything on 38, Pages 38 or 39?

6          MR. NAYBACK:  I think the argument on 38

7     is the same one we have maintained throughout this

8     morning, Your Honor.

9          And then in particular on Page 39 we do

10    think that the defense is trying to get into an area

11    that the Court believes, indicated in their pretrial

12    ruling that was inadmissible.  So what you see is

13    Mr. Smith on Page 39, again this is after he has had

14    two days to think about what his statement should be

15    like, that, "When this person bent down, I thought I

16    was going to get shot right there on the spot.

17    Total panic fear just took over."

18          Again, Jane Doe was not found with a

19    weapon.  There is nothing to corroborate that she

20    bent down except to maybe get out of the way of

21    Mr. Smith's gunshots, and we think this is

22    exculpatory and ought not to be admissible.  The

23    Government ought not to be forced to introduce it.

24    And for those reasons we would ask that the Court

25    not allow defense to get into that with

1    cross-examining the witness.  We certainly don't

2    intend to introduce it.

3                THE COURT:  Anything else on Page 39

4    before we move on to Mr. Nayback's comment on

5    Page 40?

6                MR. ELSENHEIMER:  Not at this time,

7    Your Honor.

8                THE COURT:  Mr. Nayback.

9                MR. NAYBACK:  Again, the same arguments,

10   Your Honor, apply on Page 40 to Line 7 and 8,

11   particularly after the first shot which is behind

12   the, "I just went, I went total fear," and then the

13   exculpatory at Lines 11 and 13.  "I thought whoever

14   it was had already run off so I was just shooting to

15   make sure they were scared."

16               I missed just a couple of others,

17   Your Honor, I promise will just be brief.  I am sure

18   Mr. Elsenheimer will take them up with you.

19               Page 45 of this same statement, Lines 3

20   through 5 you have Special Agent Michelle Cobb

21   asking the defendant, "During all of these incidents

22   did anyone ever have a weapon?"

23               MR. SMITH:  "Not that I know of."

24               That is, should be an admissible statement

25   and I think that defense is objecting to it.

1          I will move on unless you are going to
2   hear from Mr. Elsenheimer.
3          THE COURT:  Let me hear from
4   Mr. Elsenheimer on this.
5          MR. ELSENHEIMER:  On Page 40, I believe
6   the same analysis under the Rule of Completeness
7   demands that those statements, Page 40, Lines 7 and
8   8 and then again Lines 11 through 13 should come
9   into evidence.
10          Under the Rule of Completeness, "What was
11   the person doing?"
12          "Running."
13          And then it just stops there the jury is
14   left with a misapprehension of what actually
15   happened or what Mr. Smith was describing as
16   happening.  What he really said was, "Running.  I
17   thought whoever it was had already run off so I was
18   just shooting to make sure they were scared."
19          Leaving it with just "running" could give
20   the implication, the inaccurate implication
21   Mr. Smith was following them as he was firing or
22   something like that.  I mean, the jury could be left
23   with a misunderstanding of what happened.
24          What Mr. Smith said was, "I thought
25   whoever it was already ran off, so I was just

59

1    shooting to make sure that they were scared."

2            That has to come in under the Rule of

3    Completeness particularly considering what the

4    Government is proposing to introduce is essentially

5    a very large swath of Mr. Smith's conversation with

6    the FBI.

7            With regard to Page 45, I believe the

8    Government is just trying to introduce Line 3

9    through Line 5.  I don't think they are trying to

10   introduce anything else.  And our highlighting of

11   that is to point out this:  The Government wants to

12   get in the fact that Mr. Smith never saw anyone,

13   never -- not that he, he did not know of anybody on

14   his property who had a weapon.

15           Now, of course the person with the 404B

16   incident from a month or so prior may have had a

17   weapon, we don't know.  What the Government is

18   trying to do and it shows the unfairness.  As I

19   explained in the margin, it shows the fundamental

20   unfairness of parsing Mr. Smith's prior statements

21   that we have been discussing.  Statements on

22   Page 40, statements on Page 39, 38, that he was

23   nervous, that the person bent down.

24           Mr. Smith never saw a weapon but again

25   that doesn't mean, merely the absence of evidence,

1    the absence of something doesn't mean that somebody

2    doesn't have a weapon.  The absence of seeing

3    somebody with a gun doesn't mean they don't have a

4    gun.  That still could give rise in the middle of

5    the night in the backyard of one's house with an

6    intruder, that still is a scary frightening

7    situation.

8           The Government wants to get in the

9    statement that Mr. Smith, "did anyone ever have a

10   weapon?"

11          "Not that I know of."

12          On its own the Government would love to

13   have that statement and not size out these other

14   statements.  The fact that the Government wants to

15   see, get that statement in highlights the unfairness

16   of excluding these other statements that we believe

17   should be introduced under the Rule of Completeness.

18          What the Government is doing is

19   essentially cutting and pasting Mr. Smith's

20   statements to paint as negative a picture as

21   possible and as -- to the jury of Mr. Smith's

22   statements.  That will lead to, it's fundamentally

23   unfair to Mr. Smith.  It misleads the jury about

24   what Mr. Smith actually said and I think that the

25   Government's effort to introduce Lines 3 through 5

1   on Page 45 highlight that because that just -- it

2   will leave the jury with a misapprehension, a

3   misunderstanding and a prejudicial misunderstanding

4   about what Mr. Smith said in response to the full

5   questioning with the FBI.

6           THE COURT:  All right.

7           Anything else, Mr. Nayback?

8           MR. NAYBACK:  Thank you, Your Honor.  We

9   are simply trying to operate within the rules here,

10  Your Honor, and that was Mr. Smith's statements that

11  he doesn't know if anyone else ever had a weapon.

12  And then on page, I think this will take care of

13  most of the arguments altogether.

14          On Page 48 we again have the same

15  statement by Mr. Smith that he was -- this is at

16  Lines 6 and 7, Your Honor.  "I was just shooting to

17  make sure they were as afraid of being there as I

18  was."

19          And we don't believe that is -- we believe

20  that is an exculpatory statement that could be

21  excluded.

22          And then if I can, just the last one is on

23  Page 49, Your Honor.  And this is a dialogue on

24  Lines 7 through 13.  It says -- Special Agent Cobb

25  is talking with Mr. Smith along with FBI Special

1    Agent Taylor.  "I struggle with stick figures.  So,
2    I mean, that is totally okay.  We are not DaVincian
3    here, just something rough if you label them.  All
4    right."
5            And she is cut off, but Special Agent Cobb
6    says, "The idea," and the defense, we don't have a
7    real, a real problem with these, Your Honor.  I
8    think this goes to Mr. Smith's drawing of his
9    property and we intend to introduce it.  And I think
10   I -- I think I read it here that Mr. Smith's drawing
11   was not to scale and we honestly don't have a
12   problem with that.
13           Once the Court sees the exhibit you will
14   see what I am saying.  It is a very rough sketch,
15   but the United States thinks it is relevant,
16   admissible.
17           If Mr. Elsenheimer wants to -- and we will
18   probably have the Agent obviously admit that it is
19   not to scale.  I think that would be the essence of
20   the argument by Mr. Elsenheimer.  We will concede
21   that.  It is pretty clear from the sketch itself.
22           And I think, Your Honor, sorry about how
23   laborious this has been this morning, but I think
24   that concludes the United States and perhaps the
25   defense arguments on these transcripts.

1          MR. ELSENHEIMER:  Your Honor, just very

2    briefly, if I may.

3          THE COURT:  Sure.

4          MR. ELSENHEIMER:  Page 48.  I don't have

5    anything to add, really, aside from what is in the

6    margin, which is that it provides a full answer to

7    Agent Cobb's question and I believe under the Rule

8    of Completeness it has to be introduced.

9          Because it doesn't, without that it seems

10   as though Mr. Smith isn't fully answering the

11   question and it could lead this jury to think that

12   he is not, by not answering the question affirming

13   the contrary and I think that is, could unfairly

14   mislead the jury.

15         With regard to Page 55, I'm sorry,

16   Page 49, I appreciate Mr. Nayback's concession on

17   that, with regard to the drawing.  I think it is

18   fair to bring in the statement if the drawing is

19   introduced because it provides an explanation of

20   that.

21         The last issue, I believe is Page 55 and

22   my only comment on that is that it completes the

23   questioning that Agent Cobb has been going through

24   for the prior, essentially from Page 53, Line 11 it

25   goes all the way through, the Government is seeking

1    to introduce it through Page 55, Line 6.  The next

2    four lines complete that.

3            And now, there is even more kind of

4    discussion of that but I think, you know, for

5    purposes of not having, not taking up the entire

6    trial with recordings and transcripts, but I don't

7    think the rest needs to be introduced.  I don't have

8    any problem if it is, but certainly the four lines

9    on Page 55, 7, 8, 9, and 10 have to be introduced to

10   finish that conversation.

11           THE COURT:  Okay.  Thank you.

12           Anything else?

13           MR. ELSENHEIMER:  No, I don't think so,

14   Your Honor.

15           THE COURT:  So there were a few things

16   that I just wanted to ask you to clarify.  So this

17   same transcript, Defendant's Exhibit C, on Page 4,

18   Lines 16 to 21, there was a defense objection but I

19   wasn't sure that I have seen the Government's

20   response to this.

21           MR. NAYBACK:  Your Honor, just so I am

22   clear, are we talking about going over Mr. Smith's

23   rights?

24           THE COURT:  So the defense objected to

25   Lines 16 through 21 on Page 4.

1          MR. ELSENHEIMER:  I'm sorry, I missed

2    that, Your Honor.

3          THE COURT:  And I didn't see, I didn't

4    hear any or see anything from the Government on that

5    objection.

6          MR. NAYBACK:  We don't intend to introduce

7    those, Your Honor.

8          THE COURT:  Okay.  All right.  And then I

9    have a similar question then on Page 10, Lines 1

10   through 4.  And again the defendant was seeking to

11   admit the full answer and I didn't see any position

12   from the Government on that.

13         MR. NAYBACK:  Your Honor, I'm sorry to

14   interrupt.  And this has been a little scattered

15   this morning.  I was -- you heard me say that it was

16   going over his rights.  I think Mr. Elsenheimer was

17   referring to a Government's Exhibit C and I was

18   looking at another one.

19         What I hear, what the Court asked about

20   was FBI Taylor saying, "All right.  Well, I'm

21   Special Agent Travis Taylor.  You know the FBI isn't

22   here because you're in bigger trouble, it is just

23   because it was on Pueblo land so that is our

24   jurisdiction.  I don't want to think that," and then

25   there is something inaudible.

1          And if I heard the Court right, am I at

2     the place where the Court was at?

3          THE COURT:  Yeah.  That was my first

4     question.  The defendant had objected to that

5     portion that you just read and I had not seen the

6     Government's response to the defendant's objection.

7          MR. NAYBACK:  I apologize, Your Honor.

8     This is basically a statement by the FBI explaining

9     why there is jurisdiction there and I think that is

10    a fair game for the jury to hear.  It is probably

11    going to come out in the Court's voir dire.  We will

12    probably have the Court explain why they are in

13    Federal Court over a homicide.  So we think it is,

14    we think it is admissible.

15          I'm sorry, I don't have the defense

16    objection in front of me.  I see it now,

17    Mr. Elsenheimer, I apologize.

18          I just disagree, Your Honor, that this is

19    a legal conclusion.  I think the jury is going to

20    understand that Indian Country status is an element

21    of the offense.  It is just the FBI explaining why

22    it is there.  We don't want the jury to think that

23    Mr. Smith is in bigger trouble than he already is,

24    but we think this statement is admissible.  And

25    thanks for highlighting that for me.  Sorry I was on

1    the wrong spot.

2              THE COURT:  All right.  Do you have any

3    further comment on that particular objection,

4    Mr. Elsenheimer?

5              MR. ELSENHEIMER:  I am sure that is going

6    to be part of the Government's case-in-chief.  I

7    just don't think that it can come in through a

8    transcript and something that Agent Taylor said to

9    Mr. Smith in the context of an interview.  It

10   strikes me as lacking foundation and having most

11   likely hearsay problems.

12              I don't know that we can assess the

13   hearsay problems given the cursory nature of the

14   statement, but I am sure it will draw from hearsay.

15   It is probably going to have hearsay problems but

16   certainly has foundational problems if it comes in

17   through this.  Obviously there are other ways the

18   Government can establish that.  I am not arguing

19   they can't make jurisdiction part of their

20   case-in-chief.

21              THE COURT:  All right.  Understood.

22              MR. ELSENHEIMER:  I would argue that, but

23   I don't think I can in this context.

24              THE COURT:  Yeah, we are just talking

25   about this statement in the transcript.

 1          All right.  Understood.  And then,

 2    Mr. Nayback, I had a similar question about Page 10

 3    of the same transcript, Lines 1 through 4 that the

 4    defendant seeks to admit and I wasn't sure that I

 5    have the Government's position on that.  So Page 10,

 6    Lines 1 through 4.

 7          MR. NAYBACK:  We have no objection that

 8    that might be admissible, Your Honor.  Whether we

 9    intend to introduce it or not, I think it is within

10    the United States' prerogative and we sought to get

11    it introduced, but we are excluding before that, "I

12    just work for her just for a place to stay."

13          I think it is probably going to be part of

14    Mr. Smith's story anyway, and there is no real fight

15    over that.

16          Thank you.

17          THE COURT:  Mr. Elsenheimer, any comment?

18          MR. ELSENHEIMER:  Just what we have in the

19    margins.  I think that the full answer should be

20    given because without anything less than the full

21    answer could leave the jury with the impression that

22    Mr. Smith was not being fully -- fully answering the

23    question or somehow being evasive because the

24    question was, "How long have you been managing?"

25          THE COURT:  Right.

1          Then there were a couple of things that I
2    wanted the defendant to clarify.  So the Court made
3    some rulings regarding the "motel cop" reference and
4    things of that nature.
5          So the Court excluded some of that and in
6    this transcript the defendant highlighted those
7    portions in green, which I guess indicated that the
8    defendant was -- well, I wanted to get the
9    defendant's position clear on the record because it
10   looked like this was material that has already been
11   ruled on.  So does the defendant continue to object
12   or what, can you just explain that for me, please.
13          MR. ELSENHEIMER:  Absolutely, Your Honor.
14   I apologize, the highlighting that we had in there
15   was inaccurate.  I don't know if it was a coding or
16   if we highlighted it in yellow and it turned into a
17   darker green, I'm not sure.
18          You're absolutely right, Your Honor, and
19   this is with regard to Pages 16 and 17 of your
20   memorandum opinion and order.  You identified three
21   areas, first Item 4, Item 5, and Item 6.  And you're
22   absolutely correct that in each of those we did
23   object to those and we continue, we persist in our
24   objection to those.  I apologize for the confusion
25   in our highlighting and in our response.

1          THE COURT:  All right.  And then that
2  carries over on to Page 21, Page 22, Page 23.  I
3  just wanted to make sure that the defendant
4  continues to object to the admission of those
5  references.
6          MR. ELSENHEIMER:  That is right.  So
7  Page 21 would be Item 5.  That is the issue of
8  confronting hotel residents in the past.  Your Honor
9  excluded that and we continue to object to that.
10          With regard to Item 6, this is in Page 22,
11  in regards to the incidents where Mr. Smith took a
12  pistol when he perceived a threat, we continue in
13  our objections to that.
14          THE COURT:  All right.  Well, you answered
15  my question, then.
16          Are we done, then, with the transcripts?
17          MR. NAYBACK:  I am hoping so, Your Honor.
18  I am.
19          MR. ELSENHEIMER:  I am as well.
20          THE COURT:  All right.  So then the 911
21  call, is that what is next?
22          MR. NAYBACK:  Your Honor, Ms. Wilson is
23  going to handle that.
24          Thank you.
25          MS. WILSON:  Good morning, Your Honor.

1   Good morning.

2          THE COURT:  Good morning.  I am ready when

3   you are.

4          MS. WILSON:  Thank you.

5          Well, with regard to the 911 calls, I know

6   they were not in the exhibit binder for the Court,

7   so I realize the Court does not have a copy of

8   those.  And I believe when we filed our exhibits in

9   September of 2020, we sought to be over inclusive

10  and we did file in our exhibit list and in our

11  witness list the 911 operator as a potential witness

12  and included the transcripts from those.

13         We at that time were not sure if we were

14  going to play them and we thought to be over

15  inclusive.  As we are reviewing things, we want to

16  streamline the evidence in the presentation for the

17  jury, we are inclined not to play them.  I just

18  wanted to let the Court know that.

19         With regard to any questions the Court may

20  have, specifically I do have the transcript in front

21  of me.  I know you don't.  There are a few

22  statements that relate to break-ins and, of course,

23  the United States would move that those are

24  exculpatory statements and that they should be

25  excluded.

     1              And then there is a lot of chatter after
     2    the call is made.  There is a lot of chatter between
     3    unknown witnesses who are talking over each other.
     4    The type of thing you would expect in a 911 call.
     5    Somebody is just repeating the information they just
     6    heard just so that the EMTs and law enforcement can
     7    respond accordingly.
     8              So that would all be hearsay.  We would
     9    believe that would be excluded, them talking to each
    10    other saying what they just heard.  But, again, from
    11    our perspective, we are inclined not to admit these
    12    statements or the transcripts.
    13              Any questions, Your Honor?
    14              THE COURT:  Not at the moment.
    15              Mr. Elsenheimer, do you have any comment?
    16              MR. ELSENHEIMER:  May I have just a
    17    moment, Your Honor?
    18              THE COURT:  Yes.
    19              (A recess was taken.)
    20              THE COURT:  All right.  We are back on the
    21    record in USA versus Smith.  And when we broke I was
    22    about to hear from Mr. Elsenheimer.
    23              MR. ELSENHEIMER:  Your Honor, I don't know
    24    if you have the 911 transcript in front of you, but
    25    we can share the screen.

1          Before I do so, let me just say that I
2  agree that there is a lot of chatter in the 911 call
3  that I agree shouldn't come in.  It doesn't fall
4  within any exception.
5          Mr. Smith makes a basic call to 911 and
6  that begins on Page 2 and here is where I will share
7  the screen, if that helps.  So if we begin at
8  Page 2.  So the 911 call essentially begins at the
9  beginning of this page and it carries on through to
10 Page 4, I'm sorry, 3, Line 23.
11         I agree with Ms. Wilson that what comes
12 after that I believe it was after Mr. Smith hangs
13 up, then there is a lot of discussion between the
14 dispatch and perhaps other police officers.  I agree
15 that doesn't come in, but Mr. Smith's statement, we
16 believe, is an excited utterance and falls within
17 the excited utterance exception to the hearsay rule.
18 It is made virtually immediately after the incident
19 he calls 911 and describes where he is, what
20 happened.
21         And we believe it should, the defense
22 should be allowed to introduce this in trial in our
23 case-in-chief.  I think it sits within the hearsay,
24 I think the one question Your Honor has is whether
25 or not that you had sufficient evidence to consider

1    this or sufficient record to decide whether it fell

2    within excited utterance exception.  It seems to

3    me that the first and third prongs of the analysis

4    are set aside.  There is a startling event and a

5    nexus.

6             The one question it seems as though was

7    open was whether or not the statement was made while

8    the declarant was under the stress of the event's

9    excitement.  We would be glad to play the 911 call

10   for you if you would like, Your Honor.  I think that

11   would be the best record to clarify Mr. Smith's

12   operating under the stress of an -- of the event.

13            THE COURT:  I think that would be helpful

14   for the Court.

15            MR. ELSENHEIMER:  We would be glad to do

16   so.  We will play that right now and I will also be

17   glad to send that to Your Honor through whatever way

18   you would like me to.  And I can talk to Ms. Romero

19   about that.

20            We will play it right now and then we can

21   send you a copy as well so you have it.

22            THE COURT:  All right.  Is there anything

23   about the call that gives me a time frame how close

24   in time the 911 call was to the event?

25            MR. ELSENHEIMER:  I don't believe so, Your

1    Honor.  I mean, there is Mr. Smith's statement.

2              THE COURT:  I am ready when you are.

3              MR. ELSENHEIMER:  Thank you, Your Honor.

4              We are going to play one snippet of it to

5    make sure you can you hear it.

6              Can you hear that?

7              THE COURT:  I heard that, yes.

8              MR. ELSENHEIMER:  All right.  We will play

9    the rest of it.

10             (Whereupon a portion of a 911 audio was

11   played.)

12             MR. ELSENHEIMER:  We just stopped it

13   briefly, Your Honor.

14             (Whereupon a portion of a 911 audio was

15   played.)

16             MR. ELSENHEIMER:  Your Honor, that would

17   be the extent of what we would want to introduce.  I

18   also want to point out that there is a part of that

19   recording, and it would be lines -- it would be

20   Page 2, Lines 12 through 19, which is where the

21   dispatcher -- we are going to pull it up for you.

22   Lines 12 through 18 where the male was identified as

23   the male dispatcher is characterizing for someone

24   else what happened.  I don't think I can make a

25   plausible argument that that should come in, because

1  it is a dispatcher relating it to somebody else of

2  what he was told.  I don't think that falls within

3  the excited utterance exception, but the rest of it,

4  I believe, does fall within the excited utterance

5  exception.

6          THE COURT:  All right.  Now, I believe you

7  said you would try to get, get the audio recording

8  available to the Court; is that right?

9          MR. ELSENHEIMER:  Certainly, Your Honor.

10 I will speak with Ms. Romero, your CRD, about that.

11 Whatever form is best for us to send it to you

12 whether it is on a DVD or electronically or --

13         THE COURT:  Right.  Then if you could also

14 send me the portions of the transcript that

15 correspond to what you want admitted, that would be

16 helpful, too.

17         MR. ELSENHEIMER:  Certainly, Your Honor.

18         THE COURT:  Okay.

19         So, Ms. Wilson?

20         MS. WILSON:  Yes, Your Honor.  In response

21 to that, I would just like to point out for the

22 record that Mr. Smith did not call 911 on his own

23 volition.

24         At this point, as you can recall from his

25 statement Ercilia had come out of her home because

1    she had heard the gunshot.  So she comes out, she

2    sees a body laying there she says, "Oh, no, Doug,

3    you need to call 911.  You need to call for help."

4         To the point that this may have happened

5    in, you know, the amount of time the call made

6    shortly after the event, the United States still

7    believes that his statement in -- you will see it

8    when you look at the transcript.  His first

9    statement, "Oh, there was somebody breaking into the

10   building back here," is still exculpatory.  It is

11   self-serving.  It is something he says after he has

12   been caught over a dead body with a gun.

13        It is important to note that he says

14   "Somebody is breaking into the building back here."

15        He says building.  There is nothing in the

16   evidence to show that there is a building that was

17   being broken into.  There is the trailer, which is

18   at issue, he doesn't say trailer.  So that is

19   misleading.  It has potential to mislead the jury.

20   That is of a concern to the United States as well.

21        The fact that he also says, "We have had a

22   lot of break-ins," Your Honor has heard why we

23   believe that that is also a self-serving statement,

24   something that he is saying after the fact.  He is

25   talking to the authorities here, so of course he has

1    an incentive to mitigate some of the damage he has
2    already done.  If somebody has seen him with the
3    body, so of course he has got to call 911.  And of
4    course he has to make these statements.
5                So for those reasons if the transcript
6    does come in through the defense, the United States
7    believes that we can streamline our presentation of
8    the evidence, we can talk about this in summary, but
9    if it does come in, we would argue that those two
10   statements are inadmissible and that they should be
11   excluded.
12               THE COURT:  Anything further?
13               MR. ELSENHEIMER:  Your Honor, I don't
14   think that we can characterize Mr. Smith's statement
15   to 911 as misleading.  I am not sure what else he
16   should have said in that moment.
17               It is what he saw happening.  There was
18   somebody breaking into a building in the back.  It
19   was the exact description, it was a motor home, but
20   it is a building.  It is a structure.  That's what
21   we call it.  That's how we describe things.
22   Somebody was breaking into a building on his
23   property.  It is not misleading.  There's nothing
24   misleading about his statement.  It's exactly what
25   happened.

1          It also provides an explanation for the

2     jury for why he did what he did.  He placed the gun

3     down on the ground and when the police officers

4     arrived that is where they found the gun.  The

5     reason he did that is because that is what he was

6     instructed to do by 911.  He did exactly what he

7     should have done.  He called 911 after this

8     happened, explained what happened and did as they

9     told him to do.

10          I don't think that anything about it is

11     misleading or mischaracterizes what happened.  It is

12     certainly not misleading.

13          One other thing.  Your Honor had a

14     question about how -- if we know or, if we have

15     anything that tells us how close in time the 911

16     call was made after the incident, after Mr. Smith

17     fired his gun.

18          And I think the Government clarified that.

19     Ms. Trujillo came out on her back porch, saw

20     Mr. Smith there and he told her what happened and

21     she said, "Doug, you have got to call 911."

22          He said that -- and that is what he did.

23     I think that is the best evidence we have that this

24     is in almost immediate propinquity to the event that

25     we are talking about here.  This was, I mean within

1   seconds after Mr. Smith walked out, went to his

2   truck and then walked to the front of his property

3   and saw the decedent lying on the ground and then

4   Ms. Trujillo came out of her house, immediately

5   after that, that he called 911.

6           THE COURT:  Okay.  Anybody have any other

7   comment on the 911 call, any other?

8           MR. ELSENHEIMER:  No, Your Honor.

9           MS. WILSON:  No, Your Honor.

10          THE COURT:  Thank you.

11          Does anybody have anything else they need

12  to take up?

13          MR. ELSENHEIMER:  I don't believe so,

14  Your Honor.

15          MS. WILSON:  I think just for

16  clarification, the United States' practice in the

17  past and as Mr. Nayback was talking about, if the

18  United States elects to admit certain statements

19  that the defendant makes, either through the Agent

20  or through the transcript and playing of the

21  recording, we will make copies of those available

22  prior to trial.

23          We will file an amended exhibit list and

24  witness list so everyone will have a copy of the

25  recording and the transcripts so we know what to

1  expect.  And we hope not to be redundant in our

2  presentation.

3          So we appreciate the Court giving us the

4  parameters of what defendant's statements we can go

5  into and then from there will elect to make

6  presentation as streamlined as possible.

7          And the only other logistical issue we

8  have since we do have a number of witnesses and

9  experts that we have to sort of look into, just

10  scheduling perhaps.

11          THE COURT:  Well, what I would like to do

12  is get you a ruling on these issues and then we can

13  probably schedule a status conference or something

14  like that to try to pin down some scheduling issues.

15  So I will get a ruling out to you on today's

16  matters, and then we will proceed from there.

17          MS. WILSON:  Thank you, Your Honor.

18          MR. ELSENHEIMER:  Thank you, Your Honor.

19          THE COURT:  Thank you all for your

20  presentations today.  That concludes this matter and

21  we will stand in recess.  I will take the matter

22  under advisement and get you a ruling as soon as

23  possible.

24          Thank you.

25          (Proceedings concluded at 11:08 a.m.)

1                    REPORTER'S CERTIFICATE

2             I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.  I further certify that the

5    transcript fees and format comply with those

6    prescribed by the Court and the Judicial Conference

7    of the United States.

8    Date:  March 16, 2021

9

10

11            _____

12            PAUL BACA, RPR, CCR
              Certified Court Reporter #112
13            License Expires:  12-31-2023

14

15

16

17

18

19

20

21

22

23

24

25